1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF TEXAS

3              HOUSTON DIVISION

4  JENNIFER HARRIS,         )

                         )

5        Plaintiff,     )

                         )

6  vs.                 )  Civil Action No.

                         )  4:21-cv-1651

7  FEDEX CORPORATE SERVICES,  )

  INC.,                )

8                      )

        Defendant.     )

9

10

11

12  ********************************************

13             ORAL DEPOSITION OF

14             JENNIFER HARRIS

15             MAY 19, 2022

16  ********************************************

17   Job No. CS5236668

18     On the 19th day of May, 2022, at 9:00 a.m., the

19  videotaped oral deposition of the above-named witness

20  was taken at the instance of the Defendant, FedEx

21  Corporate Services, Inc., before Michelle L. Munroe,

22  Certified Shorthand Reporter in and for the State of

23  Texas, at The Sanford Firm, 1910 Pacific Avenue,

24  Suite 15400, Dallas, Texas, pursuant to Notice and

25  the agreement hereinafter set forth.

1  Ahern and Michelle Lamb.

2                    JENNIFER HARRIS,

3  having been first duly sworn, testified as follows:

4                    EXAMINATION

5  BY MR. BABCOCK:

6       Q.   Good morning, Ms. Harris.

7       A.   Good morning.

8       Q.   I hand you what has been marked as

9  Exhibit 1 and Exhibit 2 to the deposition.

10 Exhibit 1 is Charge of Discrimination.  It's Bates

11 FXC 675 and 676.  Exhibit 2 is an amended charge of

12 discrimination.  It's Bates Harris-1057 through

13 1062.

14            Focusing your attention on Exhibit 1,

15 Ms. Harris.  That's your signature in the bottom

16 left-hand side; is that right?

17                 (Exhibit 1 marked.)

18      A.   Yes.

19      Q.   And at the time you submitted this --

20 signed this document, you were represented by

21 counsel; is that correct?

22      A.   Yes.

23      Q.   And you reviewed Exhibit 1 before you

24 submitted it to the EEOC?

25      A.   Yes.

1    revenue.  So FedEx transitioned to a new pricing

2    program called ePRS, which caused many issues where

3    management -- both Michelle, Dave Russell, and

4    several other people -- were knowledgeable of the

5    issue because it wasn't just BJ Services who had the

6    issue.

7          But to focus on BJ Services, the pricing

8    did not load correctly.  This was escalated on

9    several occasions prior to the customer shipping so

10   that it could get corrected.  But, unfortunately,

11   the pricing team did not have the tools and

12   resources to correct it prior to the customer

13   shipping.  So when they shipped, the pricing and

14   discounts that they were supposed to receive were

15   incorrect which caused them to have inflated revenue

16   which then, in return, the next year inflated the

17   goal that was impacted by the district aligned to

18   that particular customer, BJ Services.

19        Q.   Okay.  So looking at the first sentence of

20   paragraph 2, you say, On or about July 11, 2018, I

21   first witnessed the difference in the way management

22   treated black employees and white employees.

23        Did I read that right?

24        A.   Correct.

25        Q.   So I'm trying to understand -- what do you

1      A.    Correct.  It came from Michelle Lamb.

2      Q.    Okay.  Can you explain to me briefly how

3    the report compared you to other DSMs?

4      A.    The snippet or screenshot of the report

5    that she sent in her email showed false data that my

6    district didn't have adequate FedEx One Rate and

7    Global Gold Rush opportunities in the pipeline when

8    the truth is that the details she sent in the report

9    when I went to Salesforce to verify the reports of

10   my white peers were details from 2014, 2016, and

11   2017 when none of us were in the role.

12        So the accuracy of the report was

13   incorrect, which I highlighted in my response to her

14   because, yet again, this was another example of her

15   falsely accusing me of poor performance.  And the

16   accurate details of the report confirmed by

17   Salesforce shows that those opportunities in the

18   report that she used were not correct.

19        There was no acknowledgment or apology of

20   her falsely accusing me of, you know, the incorrect

21   opportunities.  I then provided her with correct

22   opportunities from my team since the report that she

23   showed was inaccurate.  But yet there was never any

24   acknowledgment of the mistake of her accusation, but

25   yet more praise of my white peers that, oh, they're

1    against me in her allegations to make it appear that

2    I was a poor performer, so it took time.  It wasn't

3    that she, oh, magically had, you know, a report that

4    she could pull because at the time, there was no

5    details to support her allegations.  So she had to

6    create those type of reports and generate those

7    details and then issue the letter of counseling.

8         Q.   All right.  Paragraph 5, in September

9    of 2018, Ms. Lamb approved you to attend the

10   Pathways event in Memphis; is that right?

11        A.   Yes.

12        Q.   Paragraph 6, what company goals does

13   attending Pathway help you achieve?

14        A.   It helps me continue to develop my

15   leadership skills as well as develop people who

16   aspire to be leaders in the company.  That's always

17   been a part of the FedEx culture.  I was a part of

18   lead-up, but they transitioned the program to

19   Pathway, which is a direct connection of people who

20   aspire to be leaders.

21        Q.   Okay.  And you were told by Ms. Lamb in

22   January of 2019 that you could no longer attend the

23   Pathways event; is that right?

24        A.   Yes.

25        Q.   And then you eventually attended the

1  Pathways event by taking vacation time and going to

2  Memphis yourself, correct?

3      A.  Correct.  And my white peers were also

4  allowed to go to Dallas to the same event and --

5      Q.  We'll get to that.

6      A.  Okay.

7      Q.  It's in here.  Trying to go paragraph by

8  paragraph, ma'am.

9      A.  Okay.

10     Q.  Okay?

11         And you were told by Ms. Lamb that FedEx

12 was attempting to control costs in January of 2019,

13 correct?

14     A.  Correct.

15     Q.  And that was the reason she told you you

16 couldn't go to the Memphis Pathways event, right?

17     A.  Correct.

18     Q.  Am I right, ma'am, this is not the first

19 time in your FedEx career that you observed FedEx

20 going into cost control mode?  Is that fair?

21     A.  Correct.

22     Q.  Do you agree, ma'am, that it's not the

23 managing director such as Ms. Lamb's decision on

24 whether or not FedEx is going to attempt to control

25 costs at any given time?

1  anybody of the other panelists?

2      A.   I do not.

3      Q.   And ultimately, this Pathway event in

4  Memphis, you were permitted to go as long as FedEx

5  didn't have to pay for your airfare and your hotel

6  and your incidentals, correct?

7      A.   And required me to take vacation.

8      Q.   Okay.  And you were eventually reimbursed

9  for those two vacation days, correct?

10     A.   Only for the vacation, not for the hotel

11  or the rental car.

12     Q.   Correct.

13         My question was:  You were eventually

14  reimbursed for the two vacation days, correct?

15     A.   After I continued to complain about the

16  issue because originally FedEx declined to give me

17  the vacation days back.  They said that it wasn't

18  required and that Michelle stated that she didn't

19  know I was using vacation to attend the Pathway

20  event when in my vacation request, it specifically

21  says, Memphis visit.

22         And during our conversation, I told her

23  that I was going to use vacation so that I could

24  still attend the Pathways event because I was

25  committed to be able to help and develop the Pathway

1    candidates.

2         Q.   Okay.  I'm not trying to be controversial,

3    ma'am.

4              Sitting here today, you have been paid for

5    the two days of vacation, correct?

6                   MR. SANFORD:  Objection; form.

7         A.   After several complaints, yes.

8         Q.   Okay.  And you attended the Pathways

9    event, correct?

10        A.   Correct.

11        Q.   So you're able -- in your mind, were you

12   able to advance the company goals and further

13   develop your skills by attending this event?

14        A.   Yes.

15        Q.   Paragraph 7, you use the word "pretext."

16   What does "pretext" mean?

17        A.   Where are you?

18        Q.   Second line.  It says, Initially relieved

19   at the revived opportunity, I later learned that

20   Ms. Lamb's previous excuses for barring my

21   attendance at Pathway were merely pretext.

22        A.   Yeah, it was a coverup.

23        Q.   Okay.  Did you ask to attend the Dallas

24   Pathway event?

25        A.   No, but I was neither given the invitation

1    were able to work together yet had separate

2    meetings.  But yet I was singled out and had to do

3    things exactly how Michelle Lamb wanted it done.

4         Q.   Oh, I see.

5              So is it your testimony, ma'am, that

6    Michelle Lamb micromanaged how you would roll out

7    Coach2Grow with your team?

8         A.   Correct.

9         Q.   And she didn't micromanage some of your

10   white peers on their rollout to Coach2Grow with

11   their teams?

12        A.   Correct.

13        Q.   Okay.  Can you describe for me how

14   Ms. Lamb's response was aggressive or condescending?

15             What specifically do you take issue with

16   with her response?

17        A.   It was the tone and words used in her

18   email and in her communication to me.  She responded

19   that she yet again had to spend 3 hours with me on

20   the demonstration of Coach2Grow 2.0 when coaching

21   and development is part of her job.

22             If she didn't feel like I did it the right

23   way and I'm trying to be resourceful to leverage my

24   peers, but even if that's not the approach she

25   wanted to take, instead she didn't have to be

1    aggressive with her response.

2           Coaching and development is a part of what

3    we did as a leader.  And if someone didn't get it

4    the first time, it's not that they, you know, aren't

5    a good person and can't absorb the details.  So

6    having an aggressive attitude with a response that

7    she yet again had to spend more time with me was

8    very offensive.

9           Q.    Okay.  And Ms. Lamb told you in your

10   March 7, 2019, meeting that you were not a, quote,

11   strong coach; is that right?

12          A.    That is correct.

13          Q.    And you disagree with that, right?

14          A.    Yes, I disagree.

15          Q.    Okay.  What would you expect of a team

16   being led by a strong coach?  What would that team

17   exhibit, what kind of qualities?

18          A.    They would be able to develop, be able to

19   demonstrate, be able to collaborate, be able to

20   identify strengths and weaknesses of the individual

21   that they were coaching so that they could create a

22   strategy and leverage their experience and knowledge

23   to then, in return, demonstrate best practices on

24   how they could move forward and improve.

25          Q.    Okay.  Would a team being led by a strong

1    coach, would that team be able to meet their

2    objectives and metrics that FedEx expects of a sales

3    team to meet?

4         A.   Yes.

5         Q.   In paragraph 9, you say, Given the

6    severity of the Coach2Grow 2.0 incident.

7              Do you see that?

8         A.   Yes.

9         Q.   Were there -- was there anything else that

10   occurred in your actions with Michelle Lamb about

11   Coach2Grow in the spring of 2019 that occurred that

12   you haven't already testified to here this morning?

13        A.   Not about Coach2Grow.

14        Q.   Okay.  And Coach2Grow, the -- the meeting

15   took place on March 7, 2019, correct?

16        A.   Yes.

17        Q.   So it was after that incident that you had

18   your first conversation with Jim Wallace about your

19   concerns involving Michelle Lamb.  Fair?

20        A.   Yes.

21        Q.   Was that the first time you had ever

22   spoken or dealt with Mr. Wallace?

23        A.   In a complaint form, yes.

24        Q.   Okay.  Did you deal with him as your -- as

25   the HR representative or adviser that was matrixed

1    A.    Yes.

2    Q.    How did you reach out to Mr. Chonoles?

3    A.    Via email.

4    Q.    Was it the same email you sent to

5    Mr. Clark?

6    A.    Yes.

7    Q.    Okay.  So you sent an email to the two of

8    them.

9    A.    Yes.

10    Q.    Fair?

11    A.    Uh-huh.

12    Q.    All right.  Paragraph 15.  Am I correct,

13    ma'am, that the letter of counseling is the initial

14    basis of your retaliation complaint?

15    A.    Yes.

16    Q.    Did you form a belief at the time you

17    received the letter of counseling that your race had

18    something to do with receiving the letter of

19    counseling?

20    A.    Yes.  It was the only determining factor

21    Michelle Lamb used in evaluating my performance

22    compared to my white peers.

23    Q.    So is your contention, ma'am, that had you

24    been white or another race or a race that isn't

25    black, you would not have received a letter of

1  counseling?

2  A.  Right.  Because in her evaluation, I would

3  have been the same if not better than my white

4  peers.

5  Q.  Okay.  You mention in paragraph 15, My

6  recent complaints regarding Mrs. Lamb -- Ms. Lamb.

7  Excuse me.

8  Have we discussed all those complaints,

9  again, up until the time of receipt of the letter of

10  counseling so far today?

11  A.  The negative impact of BJ Services, 4G

12  Dental, the issue with Coach2Grow, her

13  aggressiveness of approaching me in email and

14  one-on-one situations, up to that point, yes.

15  Q.  Okay.  You mention in paragraph 15 that

16  the documented discussion process is missing, right?

17  A.  That is correct.  There was no documents.

18  In the 11 years that I had worked for FedEx, I had

19  never received any discipline and there was no

20  documented discussion between myself and Michelle

21  Lamb of any issues with my performance until after

22  my complaint.

23  Q.  Can you describe for me as a former

24  manager of FedEx what the documented discussion

25  process is to your understanding?

1    A.   Sure, because I have used them.  It is how
2    we are trained by human resources to identify an
3    area of opportunity, whether it's performance or
4    conduct, so that we could then develop a strategy to
5    try to develop the employee and then give them
6    details that if their performance conduct didn't
7    improve, that it could proceed to a letter of
8    counseling.
9         So the documented discussion is a part of
10   the policy that outlines a manager identifying an
11   area of opportunity to an employee, +and it was
12   skipped during my process.
13   Q.   Okay.  But you would agree, ma'am, that a
14   manager could describe an area of opportunity to an
15   employee during a one-on-one, right?
16   A.   Correct.
17   Q.   And -- or a manager could highlight an
18   area of opportunity to his or her employee through
19   the use of an email, correct?
20   A.   Correct.
21   Q.   In other words, it's your understanding,
22   isn't it, ma'am, that you don't have to have a
23   document that has the phrase "documented discussion"
24   at the top in a formal process or formal form,
25   correct?

1  Jennifer Garcia.

2      Q.   All right.  Okay.  And then after you

3  found out because you went prospecting --

4      A.   Correct.

5      Q.   -- with Abraham -- I forgot his last name.

6      A.   Velasco.

7      Q.   Velasco.  Mr.  Velasco.

8           And that's when you first learned from 4G,

9  hey, we just saw Ms. Garcia and Ms. Lamb?

10     A.   Correct.

11     Q.   Okay.  All right.  So then you raised the

12  issue with Ms. Lamb that, hey, 4G should, because

13  it's in Spring, Texas, should be in my geographic

14  area, correct?

15     A.   Correct.  And just like she adjusted the

16  negative revenue of BJ Services, she should have

17  positively adjusted the 4G Dental to my district

18  since it was improperly aligned.

19     Q.   Got it.  Thank you.

20          Did you ever have in your management

21  career a similar situation where a customer wasn't

22  properly aligned at the beginning when the customer

23  was onboarded and you raised an issue with someone

24  in management that the customer should be realigned?

25     A.   I have never had an issue where I have

1    instead of continuing to allow my white peer Brian

2    Conrey receive the positive revenue credit and

3    commission for that account, which also helped her

4    with her false accusation of poor performance.

5         Q.   Okay.  Thank you.

6              Paragraph 19?

7         A.   Yes.

8         Q.   What facts or actions by Ms. Lamb can you

9    point me to to support your contention that Ms. Lamb

10   wanted to terminate your employment at the time she

11   put you on the performance improvement plan in

12   September of 2019?

13        A.   The negative impact of BJ Services, which

14   was a 1-plus million dollar adjustment, potentially

15   every quarter on that particular customer; in

16   addition to not properly aligning the 4G Dental

17   account, which shows and demonstrates $80,313.54 of

18   positive revenue that should have been properly

19   aligned to -- to me and my district; in addition to

20   her aggressive response to the details in her

21   Coach2Grow 2.0; and all of the other details that I

22   shared.

23             So all of those things line up with the

24   response that I sent for retaliation and

25   discrimination from Michelle Lamb.

1  drafted?

2      A.    Because she used different details.  Just

3  as the example of my white peer Richard Holley being

4  given zero of six quarters and, in my letter of

5  counseling, I was given zero of four quarters, it's

6  different and inconsistent with my white peer.

7            So the details outlined in the performance

8  improvement plan actually allowed her to inflate her

9  expectation of improvement and falsely accuse me of

10  not doing well when, compared to my white peers, I

11  was doing better if not the same as them.

12      Q.    Wasn't this September 2019 PIP your second

13  PIP?

14      A.    That is correct.

15      Q.    Okay.  And wasn't the second PIP based on

16  some of the issues that were being addressed in your

17  first PIP?

18      A.    But they also aligned to her falsely

19  inflating the numbers of BJ Services and 4G Dental,

20  which should have positively impacted me.  So she

21  continued to add on those details and retaliate

22  against me due to my complaint to HR to her -- on

23  her, excuse me, for the letter of warning now with

24  the second PIP.

25            MR. BABCOCK:  I'm just going to move

1      to strike as nonresponsive.

2          Q.   Ma'am, my question was:  Wasn't the second

3      PIP in September 2019 based on some of the contents

4      of your first PIP?

5          A.   Some of the contents, yes.

6          Q.   Okay.  And you claim in here -- it's on

7      the top of the next page -- you were only provided

8      one quarter to show improvement, correct?

9          A.   Yes.

10         Q.   And a quarter at FedEx is 90 days?

11         A.   Yes.

12         Q.   Okay.  And so who are the similarly

13     situated or worse performing white employees that

14     you're referencing in this paragraph?

15         A.   Brian Hickman, Jaime Golden-McElroy,

16     Richard Holley, and Brian Golden.

17         Q.   And that's the same discussion we had

18     before the first break where you talked about their

19     attainment goals?

20         A.   And their calls on opportunities --

21         Q.   Right.

22         A.   -- and their joint calls, all of those

23     details compiled, or details she used to falsely

24     accuse me of poor performance and not consistently

25     use those same factors to evaluate my white peers.

1    Q.   I know.  Let's move to 22.

2    A.   Okay.

3    Q.   It says in here that the recent PIP --

4    that would be the September 2019 PIP, correct?

5    A.   Yes.

6    Q.   And you say, quote, which falsely accuses

7    me of managing the district with the lowest pricing

8    activity in the region, closed quote.

9         Did I read that phrase right?

10   A.   That is correct.

11   Q.   And you're saying that that's blatantly

12   false, right?

13   A.   That is correct.

14   Q.   Okay.  Were -- was there false information

15   in your first PIP as well, ma'am?

16   A.   Yes.

17   Q.   And do you recall what that false

18   information was?

19   A.   It was the negative adjustment from

20   BJ Services that was falsely aligned to me and

21   should have been aligned to my white peer Brian

22   Conrey and the adjustment of 4G Dental, which should

23   have been positively aligned to me and was not.

24   Q.   Okay.  Was there anything correct or

25   justifiable in your mind, ma'am, in your first PIP?

1     A.   No.

2     Q.   Okay.  Was there anything justified or

3  correct or true in your second PIP?

4     A.   No.

5     Q.   Okay.  In paragraph 22, you highlight that

6  you were number 4 in the region for daily

7  activations.

8         Do you see that?

9     A.   That is correct.

10    Q.   Do you recall, sitting here today, what

11  you ranked in all the other metrics that FedEx

12  tracks?

13    A.   I recall that I was number one in joint

14  call activity, but I don't recall which place I was

15  in calls on opportunities, but I know I was in the

16  top half, so in the top four of managers on her

17  team.

18    Q.   Besides daily -- average daily

19  activations, joint call activities, call on

20  opportunities, those three categories, what other

21  metrics did FedEx measure?

22    A.   Close business tracking.

23    Q.   Any other metrics?

24    A.   Pricing.

25    Q.   Any other metrics?

1   A. Yes.

2   Q. What race is Mr. Holley?

3   A. White.

4   Q. And he's a man?

5   A. That is correct.

6   Q. Okay. When you were a manager at FedEx,

7 did you have training?

8   A. Yes.

9   Q. Okay. And did you -- you're aware that

10 FedEx has policies, right?

11   A. Yes.

12   Q. Like an EEO policy? Are you aware of

13 those policies?

14   A. Yes.

15   Q. Okay. That FedEx has a progressive

16 corrective action policy, are you aware of that

17 policy?

18   A. Yes. I used it myself.

19   Q. What about that FedEx has an acceptable

20 conduct policy, are you aware of that?

21   A. Yes.

22   Q. Are you aware that FedEx has an equal

23 employment opportunity policy?

24   A. Yes.

25   Q. Are you aware that FedEx has an

1    antiharassment policy?

2         A.   Yes.

3         Q.   Are you aware that FedEx has a policy that

4    describes the EXPLORE process?

5         A.   Yes.

6         Q.   And you went through the EXPLORE process,

7    correct?

8         A.   Yes.

9         Q.   Twice, right, once for the warning letter

10   and once for your termination?

11        A.   Yes.

12        Q.   And if I remember correctly in my review

13   of the documents, you didn't attend any meetings,

14   correct?

15        A.   No.

16        Q.   Because you were represented by counsel at

17   that point, right?

18        A.   That is correct.

19        Q.   All right.  Is it your understanding that

20   your counsel communicated with FedEx while you were

21   in the EXPLORE processes?

22        A.   Yes.

23        Q.   Okay.  Are you aware that FedEx has a code

24   of conduct?

25        A.   Yes.

1     Q.   Okay.  And you had periodic training on

2  the code of conduct, correct?

3     A.   Yes.

4     Q.   And periodic, I believe -- well, I'll ask

5  you:  Was the training annual training, recurring

6  training about the code of conduct?

7     A.   Code of conduct, I don't recall at this

8  time if it was annual or periodic.

9     Q.   But you -- it was definitely periodic,

10  though, right?

11     A.   Yes.

12     Q.   All right.  You're aware that FedEx has an

13  Alert Line, correct?

14     A.   Yes.

15     Q.   Did you ever call the Alert Line?

16     A.   No.

17     Q.   And you're aware through your training at

18  FedEx as a manager, an employee can complain to an

19  HR professional if they choose to, right?

20     A.   Yes.

21     Q.   They can complain to another member of

22  management?

23     A.   Yes.

24     Q.   They can complain to FedEx security?

25     A.   Yes.

1    Q.   They can call the Alert Line?

2    A.   Yes.

3              (Exhibit 3 marked.)

4    Q.   Okay.  Hand you what has been marked as

5    Exhibit --

6              MR. BABCOCK:  Do you have a pen?

7              MR. SANFORD:  A what?  A pen?  I do.

8              MR. BABCOCK:  Okay.

9    Q.   -- Exhibit 3, which is an exempt job

10   description for a sales manager.  It's Bates FXS1780

11   through 1782.

12             Have you ever seen this -- did you ever

13   see this document, ma'am?  And let me tell you, if

14   you thumb through it, it's -- the first page is --

15   let's start -- let's go page by page.  All right?

16   A.   Okay.

17   Q.   Let me start over.

18             So I'm looking at the first page of

19   Exhibit 3, which is FSX1780.  This is a manager's of

20   sales with a run date of January of 2015.

21             Do you see that?

22   A.   Yes.

23   Q.   Do you see under General Summary?

24   A.   Yes.

25   Q.   If you could read that to yourself and let

1    me know when you're done.

2        A.    (Reviewed document.)  Okay.

3        Q.    I'm going to ask you:  Do you think that

4    describes what you believe your job duties were as a

5    manager in sales?

6        A.    Some of them yes.

7        Q.    And that goes on to talk about the

8    essential duties, correct?

9        A.    Some of the duties, yes.

10        Q.    Okay.  It lists three, correct, essential

11    duties?

12        A.    Yes.

13        Q.    All right.  And do you agree with each of

14    those three -- do you agree those are essential

15    duties of a manager at sales -- as part of the sales

16    organization?  Excuse me.

17        A.    Some of them, yes.

18        Q.    Okay.  Do you think there's more essential

19    duties?

20        A.    Yes.

21        Q.    What additional -- if you were drafting

22    the policy, what additional essential duties or

23    responsibilities would you add?

24        A.    There -- it's missing holding, you know,

25    the account executive responsible to obeying other

1      So the history of my performance

2   demonstrates that I was very successful in -- not

3   only as an individual contributor role but as a

4   manager because my first year as a district sales

5   manager in field sales, I was awarded President's

6   Club as well.

7      Q.   Would you agree, ma'am, in your history of

8   being a sales professional at FedEx, that probably

9   the most important job or the -- or the reason FedEx

10  has a sales team is to go out and find revenue for

11  the FedEx operating companies?

12     A.   That is one of them but maintaining

13  revenue is also as important.

14     Q.   Okay.  Because without customers shipping

15  packages, there's no -- they wouldn't be able to pay

16  the employees, right?

17     A.   Right.

18     Q.   Okay.  What criteria do you believe

19  indicates a successful manager?

20     A.   I think the consistency of territory

21  management, performance with maintaining, growing,

22  and finding new revenue, all of those components

23  aligned with each other, and it's an ongoing

24  evaluation.  It just doesn't stop with those steps.

25  You have to go back to see if the existing strategy

1   that you're utilizing is working or if there's

2   opportunity for change.  So those are just some of

3   the characteristics of a good sales professional.

4        Q.   All right.  Thank you.

5             Looking at paragraph 42, which is on

6   page 6.  Again, some of this is another way to see

7   if it jogs your memory of anything else.

8             You write, Many other persons have

9   complained of discrimination or retaliation at

10  FedEx.

11            You testified before about Richard Holley,

12  correct?

13       A.   Yes.

14       Q.   Is there anyone else that you're aware of

15  that complained of discrimination?  We'll start

16  there.

17       A.   Yes.

18       Q.   Who?

19       A.   Blanche Bond-Hudson.

20       Q.   Who is Blanche -- and what's her last

21  name?

22       A.   Bond-Hudson.

23       Q.   Can you attempt to spell that?

24       A.   B-o-n-d, H-u-d-s-o-n.

25       Q.   And who is -- is Ms. Hudson a female?

1    Q.   Okay.  On paragraph 74, that's when

2    Ms. Lamb asked Ms. Harris to take a demotion on

3    March 8, 2019.

4         Did I read that right?

5    A.   Yes.

6    Q.   All right.  And this was the

7    conversation -- or part of the conversation you had

8    with Ms. Lamb where you discussed the Coach2Grow 2.0

9    rollout, right?

10   A.   Yes.

11   Q.   Okay.  And it was that conversation that

12   caused you to believe Ms. Lamb was discriminating

13   against you, correct?

14   A.   Yes.  She wanted to try to bully me out of

15   my position, which I had earned.

16   Q.   In other words, up until that time period,

17   things were going fine at FedEx from your point of

18   view?

19   A.   Yes.

20   Q.   Okay.

21   A.   I had just won President's Club, and which

22   she was awarded because she is given President's

23   Club based on her managers' performance.

24   Q.   Okay.  Paragraph 75 says you reported the

25   discrimination to FedEx human resources department

1    on March 11, 2019.

2              Do you see that?

3         A.    Yes.

4         Q.    Did I read that right?

5         A.    I sent the email to Dave Russell and Dan

6    Mullally.

7         Q.    Okay.

8         A.    And the policy says as long as you

9    escalate to management and you specifically state

10   those details, it is supposed to be given to HR.

11        Q.    Have you ever heard the -- strike that.

12             When you were at FedEx, did you know about

13   the EthicsPoint process or management system?

14        A.    I am not familiar.

15             (Exhibit 5 marked.)

16        Q.    Okay.  Hand you what has been marked as

17   Exhibit 5.  That's the EthicsPoint for the 3/11/2019

18   complaint -- actually, can you hand that back to me,

19   Miss?

20        A.    (Witness complies.)

21        Q.    Thanks.

22             It's Bates FXE414 through 417.

23             MR. SANFORD:  Last page is not.

24             MR. BABCOCK:  I'm not sure how another

25   page got stapled to it, but it's no longer stapled.

1          MR. SANFORD:  Do you need it back?  It

2     says "privileged."

3          MR. BABCOCK:  I've already produced it

4     to you.

5     Q.   If you go to page 2, it says, Provide a

6     brief description of the general nature of this

7     matter.  Please limit it to one or two sentences.

8          And it says, quote, DSM Jennifer Harris

9     had alleged her director, Michelle Lamb, has shown

10    discrimination towards her, creating an

11    uncomfortable place to work.  She was recommended to

12    find other opportunities that are not leadership

13    roles within FedEx.

14         Did I read that right?

15    A.   Yes.

16    Q.   Okay.  And now your email, which we'll get

17    to, to Mr.  Mullally and Mr. Russell obviously was

18    more than two sentences, right?

19    A.   Yes.

20    Q.   Okay.  But the two sentences we just

21    looked at in Exhibit 5, do you believe that to

22    reference the meeting that you had in March with

23    Michelle Lamb where she suggested you find a

24    different role at FedEx?

25    A.   Part of it, yes.

1    Q.   Okay.  Were you aware before right now
2    that the complaints you raised to Mr. Russell and
3    Mr.  Mullally were inputted into this software
4    program?
5    A.   No.
6    Q.   Okay.  Paragraph 78, this is the
7    August 23, 2019, incident of -- I'll just read it,
8    quote, On August 23, 2019, Ms. Harris reported
9    discrimination and retaliation again by Ms. Lamb for
10   not assigning a customer in Ms. Harris's district to
11   Ms. Harris, closed quote.
12        Did I read that right?
13   A.   Yes.
14   Q.   This is the 4G --
15   A.   That is correct.
16   Q.   -- Dental?
17   A.   Yes.
18   Q.   Okay.  Paragraph 92 and 93.  This is on
19   page 11.  This talks about your quota being set too
20   high because a customer's moved out of your district
21   to another district.
22   A.   That is correct.  That reference is
23   BJ Services.
24   Q.   Okay.  And by "quota," you mean revenue
25   attainment?

1      A.   That is correct.

2      Q.   Okay. So, Ms. Harris, it's your

3 contention that if you back out -- or if you rectify

4 BJ Services by not inflating your revenue attainment

5 for that number and then you got credit for 4G

6 Dental, your performance gap to revenue goal

7 wouldn't exist, right?

8      A.   It would based on the data because I was

9 not given all of the quarters of BJ Services. Based

10 on the calculation, I would be higher and the same

11 with some of my white peers on the team.

12      Q.   Would you still be missing your goal?

13      A.   But not the same as what was identified on

14 that letter of counseling.

15      Q.   Appreciate that.

16      Would you still be missing your goal?

17      A.   Yes, but not the same as listed on the

18 letter of counseling.

19      Q.   Okay. Paragraph 95 you write -- you

20 allege, excuse me, quote, Ms. Harris's white

21 supervisor, Ms. Lamb, belittled Ms. Harris to

22 Ms. Harris's peers, closed quote.

23      Did I read that right?

24      A.   Yes.

25      Q.   I don't think we have discussed this yet

1   with Ms. Lamb where she belittled you?

2       A.    When she sent the email which falsely

3   accused me of those FedEx One Rate and Global Gold

4   Rush, we looked at -- or talked about --

5   apologize --

6       Q.    Uh-huh.

7       A.    -- those details as well.  It was --

8       Q.    Okay.

9       A.    She compared me to my white peers and that

10  I was a poor performer, and everything was a beat

11  down, but in the research in confirming the details

12  that she sent in the report, they were inaccurate.

13          So instead of acknowledging that there was

14  a mistake on her part or whoever's part in producing

15  that false information, it's that she wants to

16  continue to try to belittle me and encourage me to

17  step down from the position or leave FedEx so that

18  she could continue to discriminate and retaliate

19  against me.

20      Q.    Okay.  Did Ms. Lamb ever use a racial slur

21  towards you?

22      A.    No.

23      Q.    Are you aware of Ms. Lamb ever referring

24  to you in a racially derogatory way to another

25  person at FedEx?

1     A.   Not to my knowledge, no.

2     Q.   Okay.  Paragraph 97 of the complaint, it's

3  on page 11 of the amended complaint.

4     A.   Yes.

5     Q.   Is -- the HR adviser, is that Jim Wallace?

6     A.   Yes.

7     Q.   Okay.  Besides the conversation involving

8  the Coach2Grow in March 1 and the additional

9  conversation you had with her about the FedEx One

10 Rate and the Global Rush, was anything said to you

11 either outside of work or while you were at work by

12 Ms. Lamb that you considered offensive or demeaning

13 slanderous?

14    A.   Yes.

15    Q.   Okay.  What conversation -- where -- where

16 were you when Ms. Lamb said these things to you?

17    A.   The first instance was an email and her

18 response to me asking her about the adjustment of

19 BJ Services.  Instead of responding and

20 acknowledging that she went through a loophole to

21 negatively adjust that account to me so that it

22 would make my white peer have a higher commission,

23 she denied it.

24         And once the sales compensation

25 representative, Vicky Peterson, forwarded us the

1    this May 21, 2018, meeting that you wanted to do all

2    three of those activities under your joint rides

3    with your AEs?

4        A.   I don't recall that, but I also held

5    one-on-ones on my calendar as well.

6        Q.   Do you recall that members on your team,

7    some of your account executives complaining that

8    your coaching of them took place at the end of the

9    day and spilled over into the evening?

10       A.   Yes, one.

11       Q.   And who was the one?

12       A.   Lynne Hennessey.

13       Q.   Okay.  So you remember only one AE

14   complaining about that.  Is that fair?

15       A.   Yes, one of the eight.

16       Q.   And then the second page of this Exhibit 6

17   is the calendar invite for this meeting, correct?

18       A.   Yes.

19       Q.   All right.  And would Ms. Lamb often tell

20   you some of the topics you-all were to discuss

21   during your one-on-ones?

22       A.   Yes.

23       Q.   Okay.  Did you find that helpful?

24       A.   Not all the time because during the

25   meetings, we did not always follow the agenda of the

1     A.   I volunteered for that to be done because

2    in October of 2017, we already identified that there

3    was an issue with the pricing of BJ Services and if

4    it was correctly implemented, that we wouldn't have

5    had any inflated or rerating done to that particular

6    customer.

7     So it was well enough time for the pricing

8    to be corrected so that it would prevent the issue.

9    It wasn't that it was a one-time communication.

10    There were several people on the email to bring

11    awareness of the issue because of the ePRS system

12    not aligning discounts properly.

13     Q.   Is it your contention, ma'am, that

14    Ms. Lamb instructed or made sure the pricing

15    department didn't correct the BJ Services in a

16    timely fashion?

17     A.   She didn't escalate it either.

18     Q.   That wasn't my question.  Is it your

19    contention, ma'am, that Michelle Lamb somehow

20    influenced the pricing people to not fix the

21    BJ Services issues in a timely fashion?

22     A.   She didn't help it either, so no.

23     Q.   Okay.  If FedEx -- in the situation where

24    they don't request the revenue to be repaid, does

25    that impact the stretch goal on that account for the

1   following year?

2        A.   It does.

3        Q.   Okay.  Do you recall the amount of the

4   overpayment to you for your commission on the

5   BJ Services --

6        A.   I do not.

7        Q.   -- matter?

8             Was it around $300?

9        A.   I have no idea.  I don't even know the

10  exact number of the difference between the discounts

11  and what they should have received.  All I do know

12  is that during the evaluation of President's Club,

13  they were audited so that they could look to see if

14  we even qualified for President's Club by removing

15  the inflation of BJ Services.

16             And even once that was corrected and the

17  inflation was removed, myself and Jennifer Garcia

18  still excelled in performance and was awarded

19  President's Club.

20                  (Exhibit 10 marked.)

21        Q.   Hand you what has been marked Exhibit 10,

22  which is an email chain from January 2018 involving

23  BJ Services.  It's ESI 0040773 and 774.

24             All right.  And in January of 2018, your

25  boss, Ms. Lamb, asked you to provide her or share

1  a ZIP code is moved, an account manager is moved,

2  customers are moved, the goal is transitioned with

3  it. If you reviewed the details of the email from

4  Vicky Peterson, if that was a part of the process,

5  there would not have been a loophole requested for

6  Vicky Peterson to find a way to negatively adjust it

7  back to me.

8      Q. Okay. And is it your belief, ma'am, that

9  had you been white, the negative adjustment would

10  have been put back on you.

11      A. The determining factor that Michelle used

12  to evaluate my performance alignment to any accounts

13  all aligns with my race. When you look at all of my

14  peers on that team, I'm the only African-American,

15  so yes, that is correct.

16           MR. BABCOCK: Move to strike as

17  nonresponsive.

18      Q. Ma'am, my question was: Is it your belief

19  that if you were white, that you would not have

20  received the stretch goal related to the

21  BJ Services?

22      A. Yes, if I was white.

23           (Exhibit 12 marked.)

24      Q. Hand you Exhibit 12. Email chain

25  regarding Tom Seagraves' letter of counseling. It's

1    Q.    And you indicate to Dave Russell and Dan

2    Mullally that Mr. Wallace suggested to you that you

3    assume positive intent, correct?

4    A.    Yes.

5    Q.    You further indicate that Mr. Wallace told

6    you to consider this a miscommunication to follow up

7    with him again if you needed to, correct?

8    A.    Yes.  He did not take any complaint

9    serious.

10                   (Exhibit 28 marked.)

11   Q.    I'm going to hand you what has been marked

12   Exhibit 28.  It's an email from you to Ms. Lamb

13   dated October 9 of 2018.

14             In this email you're asking her to

15   schedule weekly one-on-ones with you, correct?

16   A.    Yes.  That was guidance from Dave Russell.

17   Q.    And you also asked to schedule something

18   on a Wednesday or Thursday for your district.  What

19   was that?

20   A.    That was in response to the one-on-ones.

21   Q.    Okay.  What's a DID every third Thursday?

22   A.    It's called a day in the district --

23   Q.    Okay.

24   A.    -- where the director is in your district

25   for that particular day.

1  convenience, right?

2       A.   Correct.

3       Q.   And who was Casey?  Casey Millner, right?

4       A.   Yes.

5       Q.   That was one of your peers?

6       A.   Yes.

7       Q.   Is that a male or a female?

8       A.   That is a male.

9       Q.   And what race is Mr. Millner?

10      A.   He is white.

11      Q.   Hand you Exhibit 31.

12           This is a copy of your letter of

13  counseling, correct?

14                (Exhibit 31 marked.)

15      A.   That is correct.

16      Q.   Did you receive this document in person?

17      A.   Yes.

18      Q.   Where were you when you received this

19  document?

20      A.   At SmartPost.

21      Q.   Okay.  Do you agree or disagree at the

22  time you received this letter you had 91.6 percent

23  adjusted year-to-date attainment for FY19?

24      A.   I disagree because that number is

25  inaccurate because it included the negative

1   adjustment of BJ Services.

2        Q.   Okay.  And what about the next phrase,

3   your district had the lowest year to date goal

4   attainment for the Longhorn region; is that true?

5        A.   That is inaccurate as well.  Because of

6   the inflated revenue added to my district, because

7   of the impact of BJ Services, that is inaccurate.

8        Q.   Okay.  And what about zero out of eight

9   AEs were at or above plan for your fourth quarter of

10  fiscal year '19; was that true?

11       A.   That would be inaccurate also just because

12  once the removal of BJ Services and the alignment of

13  4G Dental, I could have had, if not the same as my

14  white peers, I would be equal to them.

15       Q.   Okay.  But that would only affect one or

16  two AEs, right?

17       A.   Correct.  But that would put --

18       Q.   Okay.

19       A.   -- me equal if not the same --

20       Q.   So at --

21       A.   -- or higher.

22       Q.   So at best, six out of eight of your

23  AEs -- or two of eight of your AEs would be at or

24  above plan, correct?

25       A.   Correct.

1      Q.    And what about, did your district fail to

2   meet plan four out of four quarters in FY19?

3      A.    That is false also because I am impacted

4   by the negative adjustment of BJ Services.

5      Q.    Okay.  You were asked to create a PIP,

6   right, a performance improvement plan?

7      A.    Yes.

8      Q.    And she asked for you to send that to her

9   by close of business on July 3rd?

10     A.    Yes.

11     Q.    And then you would meet about it, correct?

12     A.    Yes.

13     Q.    Okay.  And that's the same process that

14   you filed with Mr.  Seagraves when you issued him a

15   letter of counseling, correct?

16     A.    The difference is --

17     Q.    No, ma'am.  My question is --

18     A.    Yes --

19     Q.    -- did you --

20     A.    -- that is correct.

21     Q.    Thank you.

22           Hand you what has been marked as

23   Exhibit 32.  This is an email exchange between you

24   and Ms. Lamb about your PIP, correct?

25                (Exhibit 32 marked.)

1     A.   Yes.

2     Q.   Do you recall how many categories were on

3  your PIP?

4     A.   Four.

5     Q.   Okay.  And while you're creating your PIP,

6  you spoke to Dave Russell to get his input and

7  views, correct?

8     A.   Yes.

9     Q.   Okay.  And you provided an updated action

10  plan to Michelle Lamb, correct?

11     A.   Yes.

12              (Exhibit 33 marked.)

13     Q.   Hand you what has been marked as

14  Exhibit 33.  Ms. Harris, this is just in color.

15  You'll notice it's the -- it's your July 9th letter

16  to Ms. Lamb.  It's basically the first couple pages

17  of Exhibit 32.  Okay.

18         So if you go to the bottom of the first

19  page, that's one of your categories, right, the

20  bullet point that's in black?

21     A.   Yes.

22     Q.   Okay.  And is the red comments that say,

23  on the top of page 2, How will this impact district

24  performance and how will it be measured, am I

25  correct that the red on this document is Ms. Lamb's

1  questions to you?

2      A.   Yes.

3      Q.   And then the yellow -- I think that's

4  yellow.

5      A.   Yes.

6      Q.   -- is your response to Ms. Lamb's question

7  in red; is that right?

8      A.   Yes.

9      Q.   Okay.  And these are all the categories

10  that you had on your first PIP; is that right?

11     A.   These are all of the strategies and

12  approaches that I was going to take that I'm not

13  100 percent sure if it outlines all the details in

14  the PIP.

15     Q.   Okay.  But do you recall there were, like,

16  seven action items that you were going to work on

17  addressing?

18     A.   Strategies, yes.

19     Q.   Okay.  And that's what you and Ms. Lamb

20  agreed to?

21     A.   We didn't agree because what I submitted

22  to her was different than what she requested.

23     Q.   Okay.  The stuff that's on Exhibit --

24  okay.

25          Based on your management experience, what

1    was your expectation on what would happen regarding

2    your first PIP?

3              Let's take it if you were successful, you

4    successfully completed it, what would have happened?

5        A.    That I wouldn't move forward to a letter

6    of warning and I wouldn't be targeted and retaliated

7    against.

8        Q.    Okay.  And if you were unsuccessful at

9    completing the PIP, what -- what is your

10   understanding as a manager would have happened to

11   you as the employee?

12       A.    That the specifics in the letter of

13   counseling and the letter of warning would be

14   consistent and used to evaluate my white peers.

15       Q.    Is your understanding that if an employee

16   doesn't successfully complete the PIP, a letter of

17   warning is typically issued?

18       A.    If it's held to the same standard, it

19   should be, but I was not.

20              (Exhibit 34 marked.)

21       Q.    Okay.  Hand you what's been marked as

22   Exhibit 34.

23              Do you recall having a meeting with

24   Ms. Lamb in September of 2019 to go over your

25   performance on your PIP?

1       A.   Yes.

2       Q.   Okay.  And is Exhibit 34, does that

3   identify the seven categories you were being tracked

4   on in your PIP?

5       A.   Yes and held to a different standard as my

6   white peers.

7       Q.   Okay.  And am I correct, ma'am, that the

8   boldface is the PIP and the unbold statement

9   underneath is what Ms. Lamb wrote to grade you on

10  your performance on the PIP?

11      A.   Yes.

12      Q.   Is that fair?

13           And Ms. Lamb informed you that she

14  believed you only met one of the objectives and that

15  your plan -- your district had now been under plan

16  for five consecutive quarters, correct?

17      A.   That isn't correct because if I did not

18  have the negative adjustment of BJ Services, I would

19  not have had only one quarter, I would have had two

20  or more.

21      Q.   Okay.  So my question is:  Ms. Lamb,

22  though, during your meeting -- I appreciate your

23  contention that the numbers aren't fair because of

24  BJ Services and 4G Dental and some of the other

25  things you talked about this morning.  Okay?

1          My question is:  During the meeting in
2    September of 2019, September 14th, did Ms. Lamb go
3    over this document with you and highlight that she
4    believed you only met one of the objectives?
5          A.    That she believed, yes.
6          Q.    Okay.  And did she tell you -- let's look
7    at the first bullet -- that the revenue gaps
8    increased from 1.19 million to 1.36 million?
9          A.    What she doesn't say is the impact of
10   BJ Services, yes.
11         Q.    Okay.  Is she -- how about for -- and all
12   these things that are identified in the first
13   bullet, the scorecard is a weekly report; is that
14   right?
15         A.    Yes.
16         Q.    What's ROA?
17         A.    We all had different ROAs.  Mine was
18   return on -- I don't recall what the A was --
19         Q.    Okay.
20         A.    -- so I can't give you an accurate answer
21   on that.
22         Q.    So were you -- is it your testimony that
23   you were the only manager in Michelle Lamb's group
24   that had a biweekly ROA?
25         A.    Yes.

1   Q.   Hand you Exhibit 37.  It's a copy of your

2   9/13/2019 warning letter.

3        You received this warning letter, correct?

4   A.   Yes.

5   Q.   And you initiated the EXPLORE process

6   after you received this warning letter, right?

7   A.   Yes.

8   Q.   And you still had an attorney at that

9   point, correct?

10  A.   Yes.

11  Q.   When did you switch from your first

12  counsel to your current counsel?

13  A.   I moved in January of 2021 so around about

14  that time frame.

15  Q.   Okay.  So it was well after your

16  termination?

17  A.   Yes.

18  Q.   Okay.  And I'm correct you wanted your

19  attorney to participate in the EXPLORE process,

20  right?

21  A.   Yes.

22  Q.   As a result of this warning letter, you

23  were told to do another PIP, correct?

24  A.   Yes.

25  Q.   And you were asked to submit that to

1    correct?

2         A.    Yes.

3         Q.    All right.  We already discussed those

4    before our last break, right?

5         A.    Yes.

6                   (Exhibit 38 marked.)

7         Q.    Handing you what's marked as Exhibit 38.

8               This is a copy of the action plan that was

9    ultimately --

10        A.    Yeah.

11        Q.    -- given to you to meet?

12        A.    Yes.

13        Q.    Okay.  And do you recall, sitting here

14   today, what parts of the action plan you disagreed

15   with?

16        A.    All of it.

17        Q.    Okay.  And so what did you suggest as your

18   action plan?  Do you recall that?

19        A.    I just asked that Michelle Lamb be

20   consistent with her evaluation of our performance

21   compared to my white peers.  The reporting showed

22   that not only did several of my white peers not have

23   people who did not have market development reps who

24   couldn't achieve $250 of closed business tracking,

25   in addition to they also had strategic development

1    account executives who didn't hit $1,000 of closed

2    business tracking, so why was I held to a different

3    standard than my white peers.  And the only

4    determining factor in her evaluation was my race.

5        Q.  And so if you look at Exhibit 33, you

6    didn't engage in a similar exercise with Ms. Lamb

7    regarding your first PIP as you did -- regarding

8    your second PIP as you did your first PIP, correct?

9        A.  Repeat the question again.

10       Q.  Do you have Exhibit 33 in front of you?

11       A.  I do.  I just got it.

12       Q.  And if you look at the second page, it

13   shows the collaboration between you and Ms. Lamb,

14   right?

15       A.  Yes.  It shows --

16       Q.  Okay.

17       A.  -- details of the -- the PIP and then --

18       Q.  So --

19       A.  -- her questions and my response.

20       Q.  And so my question to you is:  You did not

21   engage in the same back-and-forth with Ms. Lamb for

22   your second PIP; is that right?

23       A.  I don't recall.

24       Q.  Okay.  But you didn't -- is it fair to say

25   you didn't come up with these five categories on

1   Exhibit 38?

2        A.   They were from Michelle Lamb.

3        Q.   Okay.  And -- but she discussed these

4   categories with you, right?

5        A.   Yes.

6        Q.   All right.  And so she told you that each

7   of your -- for example, for the CBT, she wanted

8   100 percent of your MDs, needed to track their 250

9   average daily --

10       A.   Net revenue.

11       Q.   -- revenue in order to close territory

12  gaps in quarter 2, correct?

13       A.   That is -- yes.

14       Q.   And then for the strategic directors, she

15  wanted them to track $1,000 average daily net

16  revenue, correct?

17       A.   The strategic development, yes.

18       Q.   Did you -- I just want to make sure I

19  understand your testimony, ma'am.

20            Do you believe the numbers should have

21  been different or do you think you shouldn't have

22  had to deal with CBT at all?

23       A.   I think it should have been consistent.

24  If she was going to hold me to this standard, that

25  100 percent of my market development reps had to

1   close $250 and 100 percent of my strategic

2   development account executives had to hit $1,000, my

3   white peers should have been held to the same

4   standard.

5          It is inconsistent based on the closed

6   business tracking and gives evidence that my white

7   peers did not have or meet this expectation but yet

8   I was held to it in this Q2 action plan.

9          Q.   Okay.  Was there ever a time in your

10  relationship with Ms. Lamb that you didn't think she

11  was being racist?

12         A.   No.

13         Q.   You thought she was racist the entire time

14  you worked for her?

15         A.   Yes, because she already had a perception

16  that I wasn't qualified for leadership or the

17  manager role for field sales because she had a

18  conversation with Grant Kuhn who never thought I

19  should be in leadership and spoke in front of

20  several inside sales managers and told them if he

21  ever had an opening, he wouldn't hire me.

22         Q.   Okay.  And when did this conversation

23  occur between Ms. Lamb and Grant Kuhn?

24         A.   I don't know when they had a conversation.

25  He was the director prior to her taking over, so I'm

1   build her own relationship with me and not assume

2   that she was going to take the feedback or

3   perception from Grant Kuhn literally and actually

4   act out discrimination and retaliation against me.

5       Q.   Okay.  Going back to Exhibit 38, do you

6   agree under International that at the time this

7   action plan was made, the current attainment was

8   86.1 percent with six out of your eight AEs missing

9   international plan?

10      A.   I don't recall that exact number.

11      Q.   Okay.  And for pricing, she -- she --

12  Ms. Lamb told you that success would be measured

13  based on MD pricing submissions averaging out to one

14  per week in quarter 2.  Correct?

15      A.   That is what it says, yes.

16      Q.   And for collaborating to close, Ms. Lamb

17  informed you that each MD on the team needed to be

18  working at least one collaborate to close

19  opportunity in quarter 2, right?

20      A.   That is what it says.

21      Q.   Okay.  And that's what Ms. Lamb told you

22  was her expectation, correct?

23      A.   Yes.

24      Q.   Okay.  So Ms. Lamb told you all these -- I

25  don't know if you call them carets, little arrow,

1    those were her expectations of you for quarter 2,

2    correct?

3         A.    Yes.

4         Q.    December of 2019, do you recall having a

5    meeting with Ms. Lamb where you discussed your

6    performance on the action plan?

7         A.    I don't recall that specific date, but I

8    had several conversations with her in regards to the

9    performance.

10        Q.    Do you recall that at the beginning of

11   that meeting, you had a discussion about Laura

12   Segovia's letter of counseling update?

13        A.    I don't recall specifically when that was,

14   but we had several conversations about Laura

15   Segovia.

16        Q.    Do you recall having a conversation with

17   Michelle Lamb where you walked through Laura's PIP

18   and demonstrated that Laura had successfully

19   completed all of her objectives?

20        A.    I don't recall that meeting specifically,

21   but I did share the details of Laura's letter of

22   counseling and her performance improvement plan with

23   Michelle Lamb.

24        Q.    Do you recall that Ms. Lamb had a meeting

25   with Laura Segovia in early December of 2019?

1     A.   I don't recall.  Michelle had several

2  meetings with Laura.

3     Q.   Do you recall Ms. Lamb relaying to you

4  that Laura wished she had more support from you as

5  her manager?

6     A.   I don't recall.

7     Q.   Do you recall Ms. Lamb telling you that

8  that's why Laura was going to Brian Conrey for

9  strategy sessions?

10     A.   No, I don't recall.  I encouraged Laura to

11  collaborate with Brian Conrey and myself so that she

12  could try to get additional strategies from him on

13  winning Empower.

14     Q.   Do you recall Ms. Lamb telling you that

15  Laura wanted to apply for an open position in Jen

16  Amix (phonetic) --

17     A.   Amix.

18     Q.   -- Amix's organization?

19     A.   Yes.

20     Q.   Okay.  When you had a conversation with

21  Ms. Lamb about the action plan that's referenced in

22  Exhibit 38, did you admit to her that you failed to

23  meet three out of the five objectives?

24     A.   No, because these were false accusations.

25     Q.   Do you recall having a meeting with

1    Michelle Lamb where you went through each of these

2    five items on Exhibit 38 and you had a discussion

3    with Ms. Lamb on whether or not you met the

4    requirements?

5        A.    I had a discussion with her about the

6    requirements.  I don't recall having a discussion

7    with her about not hitting the requirements.

8        Q.    Do you -- so is it your testimony, ma'am,

9    that Ms. Lamb never closed out the second PIP?

10       A.    She did because I was terminated.

11       Q.    Okay.  And to close out a PIP, she would

12   need to talk to the employee who was on the PIP,

13   correct?

14       A.    No, she could talk to HR because she

15   doesn't have to consult with me to terminate me.

16       Q.    Okay.  Is it your -- so your testimony

17   today is you don't recall Ms. Lamb ever discussing

18   the second PIP with you?

19       A.    I never said that.  I said we discussed

20   it.  Your other question was did we close it out.

21   We discussed the PIP and reviewed those details

22   highlighted in the PIP.

23       Q.    Okay.  And do you recall discussing the

24   details highlighted in the PIP on whether or not

25   your team successfully met those objectives?

1     A.   I do not.

2     Q.   Do you recall Ms. Lamb telling you that as

3 of 12/5/2019, one -- looking at Exhibit 38, one of

4 your MDs failed to meet this requirement on the

5 close to business tracking?

6     A.   I don't recall; she could have.

7     Q.   Do you recall that she told you that as of

8 12/5/2019, two strategic directors failed to meet

9 this requirement?

10    A.   As I shared, I don't recall this

11 specifically but she could have.

12    Q.   Do you recall her telling you that your

13 team didn't meet the international requirement

14 referenced in the action plan?

15    A.   I don't recall her going through the

16 completion or conclusion of this action plan.

17    Q.   Do you recall -- but you don't deny that

18 she did, you just don't remember it?

19    A.   Correct.

20    Q.   Okay.  See if this refreshes your memory.

21 Do you recall involving pricing -- so the third

22 category on Exhibit 38.

23       Do you recall Ms. Lamb informing you that

24 the requirement was not met because four out of six

25 MDs did not meet this requirement?

1     A.   I don't recall her specifically

2  identifying those, no.

3     Q.  And do you recall on the fourth one,

4  collaborate to close, that Ms. Lamb told you the

5  requirements had been met?

6     A.   I do not recall if she gave me an update

7  on how the results of this particular collaborate to

8  close ended, no.

9     Q.  And on Exhibit 38 under Performance where

10  you have the different types of FedEx Service

11  offerings --

12     A.   Uh-huh.

13     Q.   -- listed and with a percentage, those

14  were the goals that Ms. Lamb told you you needed to

15  meet, correct?

16     A.   No.  That demonstrates what my actual

17  goals were is what she stated, but it's actually

18  inaccurate because it does not include the addition

19  of 4G Dental and the removal of BJ Services.

20     Q.  Okay.  But this is what Ms. Lamb told you

21  she expected you to meet, correct?

22     A.   That is correct.

23     Q.  Okay.  And did she go over what your

24  percentages were for those four different service

25  offerings; do you recall?

1    A.   I do not.

2    Q.   Does it refresh your memory at all, ma'am,

3  that after Ms. Lamb went through your second PIP

4  action plan December of 2019, that you asked her if

5  you will have another meeting and Ms. Lamb told you

6  that will be scheduled ad hoc and more than likely

7  follow the holidays?  Do you recall that?

8    A.   I don't, but I know I was terminated

9  shortly after that.

10   Q.   After what?

11   A.   In January so after the holiday.

12             (Exhibit 39 marked.)

13   Q.   Okay.  Handing you what has been marked as

14  Exhibit 30.

15             MR. SANFORD:  30?  We skipped over --

16  oh.

17   Q.   What does it say?

18   A.   It says 39.

19   Q.   39.  Thank you.

20             Exhibit 39 is the termination letter dated

21  1/7/2020.

22             You received a copy of this letter, right?

23   A.   Yes.

24   Q.   Okay.  And you went through the EXPLORE

25  process regarding this letter, correct?

1          A.    Yes.

2          Q.    Returning to 38, it's your belief that

3    Ms. Lamb put you on your second PIP because of your

4    race, correct?

5          A.    Yes.

6          Q.    In other words, had you been a race other

7    than black, Ms. Lamb would have not put you on the

8    PIP.  Is that your contention?

9          A.    Yes.

10         Q.    And again, at the time you were terminated

11   you were represented by a law firm, correct?

12         A.    Yes.

13         Q.    And you wanted that law firm to

14   participate in the EXPLORE process, correct?

15         A.    Yes.

16         Q.    Okay.

17              MR. BABCOCK:  Let's go off the record

18   for a minute.

19              THE VIDEOGRAPHER:  Off the record at

20   3:27.

21              (Recess 3:27 p.m. to 3:37 p.m.)

22              THE VIDEOGRAPHER:  We are back on the

23   record at 3:37 p.m.

24              (Exhibit 40 marked.)

25         Q.    All right.  Exhibit 40 is an email

1   holding the account manager, which was my white peer

2   Brian Conrey, accountable for making sure that I

3   received the positive revenue for that and holding

4   me to a different standard than my white peers.

5          After that, I believe that because of

6   Michelle's actions and responses, that the

7   determining factor in her evaluating my performance

8   was my race.

9          Q.   Regarding the BJ Services issue, you

10   identified it in 2017, right, the fall of 2017,

11   correct?

12          A.   October 2017, yes.

13          Q.   And there's email traffic between you and

14   Ms. Lamb that we went over starting in January

15   of 2018, correct?

16          A.   Correct.

17          Q.   And at the time that email traffic started

18   in January of 2018, had you formed your opinion that

19   Ms. Lamb was a racist?

20          A.   Yes.

21          Q.   Okay.  Because the 4G Dental customer

22   issue occurred after that time period, correct?

23          A.   Correct.  But BJ Services happened during

24   that time frame.

25          Q.   Okay.  And was the BJ Services the

1  earliest incident or issue that you identified that

2  caused you to believe Ms. Lamb was a racist or is a

3  racist?

4       A.   No.

5       Q.   What was the earliest issue?

6       A.   It was the comment that she made in March

7  that also identified as her being a racist.

8       Q.   Okay.

9       A.   So it's not just one; it's the

10  BJ Services, it's the 4G Dental, it's the

11  inconsistencies of evaluating my performance --

12       Q.   If we --

13       A.   -- all of those things.

14       Q.   If we look at -- I'm trying to understand

15  when the earliest date was.

16            The comment that was made to you to

17  self-demote was March of 2019?

18       A.   That is correct.

19       Q.   That's after the emails you were

20  exchanging with her about BJ Services, which were in

21  January of 2018, right?

22       A.   Correct.  So BJ Services started before

23  then.

24       Q.   Correct.

25            Is there any issue that leads you to

1      A.   Yes.

2      Q.   Did a hub tour ever take place?

3      A.   No.

4      Q.   Did the customer end up putting a Memphis

5   facility in?

6      A.   They were still thinking about it at that

7   particular time.

8      Q.   Okay.  And so Ms. Lamb was willing to help

9   you try to get a customer a hub tour in September

10   of 2018 even though you believed she was a racist,

11   right?

12      A.   Yes, that is correct.

13                (Exhibit 46 marked.)

14      Q.   Hand you what has been marked Exhibit 46.

15                MR. BABCOCK:  Hand that back to make

16   sure I don't have writing on your copy, Mr.  Sanford.

17                MR. SANFORD:  Oh --

18                MR. BABCOCK:  Just make --

19                MR. SANFORD:  -- do I have it?

20                MR. BABCOCK:  Just make sure I don't

21   have writing on the second page.

22                MR. SANFORD:  Oh, okay.

23                MR. BABCOCK:  I don't think I do.

24   Perfect.

25      Q.   This is your email that you sent to

1    Michael Clark on March 20th of 2019, correct?

2        A.    Yes.

3        Q.    And it says at the beginning, It was great

4    speaking with you today.

5              So you had -- this is when you had your

6    phone conversation with Mr. Clark?

7        A.    Yes.

8        Q.    To discuss the concerns you raised about

9    the meeting you had with Michelle Lamb where she

10   asked you to self-demote, right?

11       A.    And my other concerns with BJ Services,

12   Global Gold Rush, FedEx One Rate, and other details

13   with Pathway and the inconsistences of how she

14   treated me against my white peers.

15       Q.    Okay.  And was your goal to provide

16   Mr. Clark with examples of the unfair treatment you

17   received from Lamb up until that point in time?

18       A.    Yes.

19       Q.    Okay.  Had you visited with an attorney

20   yet about your experiences at the time you wrote

21   this email?

22       A.    Yes.

23       Q.    Did you have help writing this email?

24       A.    They evaluated but the details came from

25   me.

1    Q.   Okay.  And please when we tread around

2  topics about your attorneys, try to answer my

3  question because I'm not entitled to know about

4  conversations you had with anyone that you may have

5  visited with.  Okay?

6    A.   Okay.

7    Q.   And so if you answer my question, I'll do

8  a good job of hopefully not delving into that

9  material.

10       All right.  And so am I correct your

11  attorneys reviewed the email before you submitted it

12  to Michael Clark?

13    A.   Yes.

14            (Exhibit 47 marked.)

15    Q.   Okay.  Hand you what has been marked as

16  Exhibit 47.  This is the June 28th ethics case which

17  references a June 26th date.

18       Are you aware, ma'am, on who inputted this

19  into the EthicsPoint software?

20    A.   No.  Prior to today, I have never seen

21  this.

22    Q.   Okay.  And do you recall ever filling out

23  on a website concerns you were having at FedEx?

24    A.   Yes.

25    Q.   Okay.  If you go to page 2 of this

1  document, which is FXC 8, it says, quote, Jennifer

2  is concerned that she's being retaliated against due

3  to filing an EEO just after receiving a letter on

4  June 3, 2019, which is attached that states, quote,

5  Each issue brought forth has been thoroughly

6  investigated with the determination that corrective

7  action will be taken, close quote.

8          Do you recall raising a concern that you

9  thought you were being retaliated against in late

10 June of 2019?

11         A.   Yes.

12         Q.   Okay.  And who did you raise that concern

13 with?

14         A.   I went to Michael Clark with an email, as

15 well as Kristie Castilow.

16         Q.   Okay.  It says at the end, Jennifer states

17 that it has been 23 days since this letter and

18 things haven't improved; yet, it has gotten worse.

19         Did I read that right?

20         A.   Yes.

21         Q.   Is that part of the concern you were

22 raising at that time?

23         A.   Yes, at that time.

24         Q.   And the 23 days since the letter, that's

25 the letter of counseling, correct?

1       A.    Yes.

2       Q.    Okay.  And what happened during that 23

3    days that caused you to tell FedEx that things had

4    gotten worse?

5       A.    The timeline is I make a complaint,

6    23 days later I'm given a letter of counseling with

7    the requirement of a performance improvement plan.

8    That outlines details that could highlight

9    retaliation.  I complain; I'm given a letter of

10   counseling.  That process continued throughout my

11   complaint process with HR.

12                 (Exhibit 62 marked.)

13      Q.    Okay.  It's out of order, Ms. Harris, but

14   the record will be fine.  This is Exhibit 62.

15                 MR. BABCOCK:  62, Brian.

16      Q.    This is the June 3, 2019, letter you got

17   from Ms. Clark (sic), and that's the letter you're

18   referencing in Exhibit 47, correct?

19      A.    Yes.

20                 MR. BABCOCK:  Where did we go to?

21                 THE WITNESS:  62.

22                 MR. BABCOCK:  What was after 62?  47?

23      Q.    Okay.  And looking at Exhibit 62, that's

24   not the only closure letter you received from

25   Michael Clark, correct?

```
1    Here is Exhibit 54.

2              This is your first EXPLORE, right?

3              (Exhibit 54 marked.)

4         A.   I'm looking at the details.  One moment.

5    (Reviewed document.)

6              Yes.

7         Q.   Okay.  And you didn't receive any

8    follow-up with this because at the time, you had an

9    attorney that you wanted involved in the process,

10   right?

11        A.   Yes.

12        Q.   And FedEx wouldn't permit that?

13        A.   Correct.

14        Q.   Okay.  And then you complained again after

15   you received the warning letter, correct?

16        A.   Yes.

17        Q.   All right.  How did you raise your

18   complaint in December of 2019, do you recall, ma'am?

19        A.   I sent a message to Michael Clark.

20              (Exhibit 55 marked.)

21        Q.   Okay.  Hand you what has been marked as

22   Exhibit 55.

23              You testified earlier that you hadn't seen

24   any EthicsPoints until today, correct?

25        A.   That is correct.
```

1    Q.   If you go to page 2 of this document,
2    there's -- under "provide a brief description,"
3    someone entered in information, correct?
4    A.   Yes.
5    Q.   And looking at the information, where it
6    says, Please see the details below of my ongoing
7    complaint of retaliation, humiliation,
8    discrimination treatment by Michelle Lamb, and then
9    it goes on, is that the information you were
10   providing to Mr. Clark?
11   A.   For the follow-up complaint, yes --
12   Q.   Okay.
13   A.   -- not for the initial.
14   Q.   Correct.
15        In the first paragraph, five lines from
16   the bottom, it says, quote, While I didn't meet all
17   my goals in the action plan, I did demonstrate
18   improvement in my teams.
19        Did I read the first part of that sentence
20   correctly?
21   A.   Yes.
22   Q.   All right.  So you admitted to Mr. Clark
23   that you had not met all the goals in your action
24   plan, correct?
25   A.   That is correct.  He also knew that those

1    impact you?

2         A.   Yes.

3         Q.   And you were willing to be negatively

4    impacted?

5         A.   Yes.

6         Q.   Why?

7         A.   Because I wanted to be considered for

8    President's Club with accurate numbers.  I didn't

9    want them to be inflated and for them to give me an

10   award that I did not deserve.

11        Q.   What's the difference between agreeing to

12   be negatively impacted for the purpose of

13   President's Club or Ambassador Club or Rewards Club

14   and not agree to be negatively impacted on your

15   attainment goals?

16             MR. BABCOCK:  Object to form.

17        A.   Because the President's Club, Ambassador's

18   Club, and Rewards Club was prior.  The adjustment of

19   BJ Services was for the future.

20        Q.   So I think I heard something that you

21   would be willing to take a credit or something or --

22        A.   Yes.

23        Q.   -- discount on commissions on past?

24        A.   Yes, because I wanted to be evaluated

25   accurately.

1   declines them.

2        Q.   Right.

3             So it's one thing for FedEx to say we want

4   to lower costs, and it's another thing to say to

5   someone like Michelle Lamb, we want you to lower

6   costs by this amount, you have discretion to choose

7   how that's going to be done?

8        A.   That is correct.

9        Q.   And she chose you in reducing costs and

10  not your white peers?

11       A.   Correct.

12            MR. BABCOCK:  Object to the form.

13       Q.   And how do you know this?

14       A.   Because when originally she approved my

15  travel and trip to Memphis for the Memphis Pathway

16  program, that included for me to give the expenses

17  to FedEx for my flight, my hotel, and my rental.

18  She came back and said when it was time for me to

19  book that specific travel that now the company was

20  on cost constraints and that I was not allowed to be

21  able to attend.

22            But what she didn't share is that there's

23  a program in Dallas in which, as a team, as peers,

24  my white peers specifically could drive to and be

25  afforded the same opportunity to still attend the

1    Q.    When did you find out that they had

2    attended the event or were going to attend the

3    event, before or after?

4    A.    Before.

5    Q.    And then -- so why didn't you go?

6    A.    They laughed in my face and said that they

7    were going and that the excuse that Michelle used

8    that I couldn't go to Memphis wasn't correct because

9    they were going.  And I was never extended the same

10   invitation.

11   Q.    Why didn't you just show up?

12   A.    Because I had used vacation time so that I

13   could still honor my commitment to the director

14   Jerry Page in Memphis to come to the Pathway program

15   there in Memphis and still be able to demonstrate my

16   leadership skills and help coach and develop the

17   people who aspire to, you know, grow and develop in

18   the company.

19   Q.    So was Michelle Lamb the first time you

20   experienced discrimination at FedEx?

21   A.    No.

22   Q.    So you have been through this before --

23   A.    Yes.

24   Q.    -- right?

25         But it had a different outcome?

1   A.   No.

2   Q.   Do you know whether or not FedEx has been

3   trained on whether or not there's no token exception

4   to discrimination?

5          MR. BABCOCK:   Object to the form.

6   A.   I would hope so.

7   Q.   You're able to go to Pathway?

8   A.   At my own expense and using vacation.

9   Q.   So did Michelle Lamb give you any

10  assistance, help you at all --

11  A.   No.

12  Q.   -- in that process?

13         I think you -- I think you said that

14  Michelle Lamb wanted you to do Coach2Grow 2.0

15  different ways than you were doing it.  What do you

16  mean?

17         MR. BABCOCK:   Object to the form.

18  A.   Yes.  She rolled out the Coach2Grow 2.0

19  program, and there were specific ways that she

20  wanted it done.

21  Q.   Like what?

22  A.   There was a lengthy PowerPoint

23  presentation that instead of going to the facts of

24  what Coach2Grow 2.0 was, she wanted me to go through

25  every slide with each account executive and then

1    allow them to take an assessment based on that which

2    would identify their strengths or ways for them to

3    be focused on me to coach them with the new

4    Coach2Grow 2.0.  But the approaches of my white

5    peers, they didn't go through every slide.  They

6    highlighted slides just like I did but weren't given

7    the aggressive treatment.  And --

8         Q.   So -- so two things, so -- let me stop.

9              So what you did that was different is you

10   didn't go through every slide; you highlighted

11   certain slides?

12        A.   Yes.

13        Q.   And she wanted you to go through every

14   single slide?

15        A.   Yes.

16        Q.   And you're saying your peers, other

17   district managers, didn't go through all the slides

18   with their account executives?

19             MR. BABCOCK:   Object to the form.

20        A.   No.

21        Q.   How do you know?

22        A.   Because we talked about their process, and

23   that is why I reached out to Brian Conrey and

24   Rebecca Callahan to get best -- best practices from

25   them but was denied that opportunity because

1  Michelle wanted it to be done her way.

2      Q.   So how do you know they didn't go through

3  their slides?

4      A.   Because they told me the details they went

5  through.  They went through more slides than I did

6  but not every slide as she requested.

7      Q.   So why wouldn't you go through every slide

8  initially?

9      A.   Because I wanted to focus on the key

10  components that would really transition what we were

11  doing and coaching prior to Coach2Grow 2.0.  That

12  wasn't the first time we had Coach2Grow.  This just

13  was a transition of what Coach2Grow was.  We had

14  regular Coach2Grow and Coach2Grow 2.0.

15          So the account managers were already

16  familiar with the original Coach2Grow 2.0.  And in

17  my attempt to just reiterate what the changes were,

18  I highlighted what those were instead of going

19  through every slide that was given in that

20  presentation.

21      Q.   Because they already knew it?

22      A.   Yes.

23      Q.   So after she instructed you to go through

24  every slide, did she want you to go back and do it

25  again?

1      A.   Yes.  And I did.

2      Q.   And you did?

3      A.   Yes.

4      Q.   Every single slide?

5      A.   Yes.

6      Q.   You complied with her request?

7      A.   That is correct.

8      Q.   And she still -- I mean, we know you're

9  terminated.

10          Okay.  So let me ask you -- let's go

11  through this.  Well, let me -- before I do that, I

12  want to -- I think you talked about the team needed

13  to be led by a strong coach, meeting strong metrics.

14          Do you remember talking about that?

15     A.   Yes, that was the reference of Michelle

16  saying that I was not a strong coach.

17     Q.   Yeah.

18          And so what about your peers, were they

19  meeting their metrics?

20     A.   No.

21          MR. BABCOCK:  Object to the form.

22     Q.   Okay.  And do you dispute that you were

23  not a strong coach?

24     A.   Yes.

25     Q.   On what basis do you dispute that you are

1     A.    No.

2     Q.    Why not?

3     A.    Because on several occasions, her actions

4  demonstrated that she was intentionally trying to

5  target me because I was black.

6     Q.    How so?

7     A.    BJ Services goes against the sales

8  compensation policy which aligns a customer with

9  territories and ZIP codes.  And she overrode that

10  process to negatively impact me and make it appear

11  on the reporting that I was a poor performer.

12     Q.    She had access to see all your performance

13  records?

14     A.    Yes.

15     Q.    Performance records that showed that you

16  were a good performer?

17     A.    Yes.

18     Q.    You have seen their policies against

19  discrimination and retaliation?

20     A.    Yes.

21     Q.    So they have a written policy saying it.

22           Do you dispute that they follow that

23  policy?

24     A.    Yes, they did not follow the policy.

25     Q.    Well, they say they don't tolerate

1  discrimination.

2          Do you dispute that statement in their

3  policy?

4          A.   I experienced them tolerating

5  discrimination and retaliation.

6          Q.   Well, they have got -- I mean, how can

7  they?  They have a policy that says we do not

8  discriminate.  We do not tolerate discrimination.

9  So how can they discriminate if they -- I mean, it's

10  right there.  Their policy says we don't do it.

11          A.   Policies have to be --

12                MR. BABCOCK:  Object to form.

13          A.   -- enforced by the actual employees.  So

14  if they don't monitor or supervise if that behavior

15  is being demonstrated to an employee and investigate

16  the complaints made when they share the specifics

17  and facts, then FedEx isn't following those

18  policies.

19          Q.   Does that go the same for retaliation?

20          A.   Yes.

21          Q.   Did you take advantage of their policies

22  to try and contest what was happening to you?

23          A.   Yes.

24          Q.   What did you do?

25          A.   I escalated to Dave Russell, to Dan

1    having any FedEx One Rate and Global Gold Rush

2    opportunities compared to my white peers, and that

3    was false.  So there's several occasions that --

4         Q.   When you say it's false, you dispute --

5         A.   Yes.

6         Q.   -- her statement --

7         A.   That is correct.

8         Q.   -- that you were at the bottom?

9         A.   Yes.

10        Q.   So let's just go -- this is Plaintiff's

11   Exhibit 1.

12                  MR. BABCOCK:  Do you want to just...

13                  MR. SANFORD:  Yeah.  Oh, I can make

14   it.  Add it?

15                  MR. BABCOCK:  Yeah, why not.

16                  MR. SANFORD:  Why not.  Thanks.

17                  (Exhibit 64 marked.)

18        Q.   This is Exhibit 64.  So it says you failed

19   the meet plan throughout FY19.

20             Do you dispute that?

21        A.   Yes.

22        Q.   And you failed to meet plan FY20 quarter,

23   unadjusted.

24             Do you dispute that?

25        A.   Yes.

1    Q.   FY20 year to date, your district has the
2    lowest pricing activity in the region.
3         Do you dispute that?
4    A.   Yes.
5    Q.   Says you did not meet action plan
6    objectives which you created to improve performance.
7         Do you dispute that?
8    A.   Yes.
9    Q.   Says you did not meet the CBT expectation.
10        Do you dispute that?
11   A.   Yes.
12   Q.   You did not meet the collaborate to close
13   expectation.
14        Do you dispute that?
15   A.   Yes.
16   Q.   You did not meet pricing expectation.
17        Do you dispute that?
18   A.   Yes.
19   Q.   You did not close gaps performance gaps.
20        Do you dispute that?
21   A.   Yes.
22   Q.   You did not meet the attainment
23   expectation.
24        Do you dispute that?
25   A.   Yes.

1      Q.   Okay.  And percent of AEs above plan

2   versus below plan, you're at 50 percent?

3      A.   Right.  That contradicts her saying

4   zero --

5      Q.   Right.

6      A.   -- of eight.

7      Q.   And so where does that -- let's see.  The

8   50 percent, where does that put you in the group of

9   the eight?

10     A.   Number 4.

11     Q.   Is it number 4 out of 8 the top half or

12  the lower half?

13     A.   The top half.

14     Q.   So not only is she wrong about the zero,

15  you're -- you're in the top half?

16     A.   Correct.

17     Q.   So how about improvement?  Closing the

18  gaps on improvement, right?

19          Let's look at 145319.  Did we improve?  So

20  we have some down arrows.  What's down arrow

21  signify?

22     A.   It means that instead of improvement from

23  the previous meeting, that it went down.

24     Q.   And if it goes up, what's that?

25     A.   That you did improve.

1     Q.   So let's look at the first one, Capital of

2     Texas.  It's got two down arrows and two up arrows.

3          Do you see that?

4     A.   Yes.

5     Q.   And what do you have?

6     A.   I have three up arrows and one down arrow.

7     Q.   So you did better than Capital of Texas

8     group?

9     A.   Yes.

10    Q.   In terms of closing the gap?

11    A.   Yes.

12    Q.   And Alamo has three up arrows and one

13    down, right?

14    A.   Yes.

15    Q.   Same as you?

16    A.   Correct.

17    Q.   And Bayou Bruisers, all down?

18    A.   Correct.

19    Q.   You did better?

20    A.   Yes.

21    Q.   Summit, all down.  You did better?

22    A.   Yes.

23    Q.   Now, who is Capital of Texas?

24    A.   It's either Jaime Golden-McElroy or Brian

25    Golden.  They split Austin.

1    Q.   What -- what's their race?

2    A.   White.

3    Q.   Put on a plan --

4    A.   No.

5    Q.   -- performance improvement plan?

6         Terminated?

7    A.   No.

8    Q.   Bayou Bruisers, who is that?

9    A.   I don't recall specifically who that was,

10   but it was a white peer.

11   Q.   Okay.  Put on a plan?

12   A.   No.

13   Q.   Unless it's Richard, I guess.  Would it

14   have been Richard?

15   A.   No, Richard is Alamo.

16   Q.   Okay.  Summit, all down.  Who's that?

17   A.   Based on the percentage, that appears to

18   be Brian Conrey, but I can't 100 percent verify

19   that.

20   Q.   He's white?

21   A.   Yes.

22   Q.   Westside Warriors, three down, one up,

23   right?

24   A.   Correct.

25   Q.   Do you know who Westside Warriors is?

1     A.    No.

2          Q.    But we know this is -- each one of these

3     is the eight -- your eight peers?

4     A.    Yes.

5          Q.    You're the only nonblack -- you're the

6     only black person --

7     A.    Yes.

8          Q.    -- of the peers, right?

9     A.    Yes.

10         Q.    And so whoever it is, you're doing better

11    than them?

12    A.    Yes.

13         Q.    And we know it's not Richard Holley

14    because he's Alamo?

15    A.    That is correct.

16         Q.    So they weren't put on a plan --

17    A.    Correct.

18         Q.    -- performance improvement plan or

19    terminated, right?

20    A.    Right.

21         Q.    And then there's Central Texas, which is

22    three down and one up.

23               You did better than Central Texas?

24    A.    Yes.

25         Q.    Not put on performance improvement plan?

1      A.   No.

2      Q.   Not terminated?

3      A.   No.

4      Q.   Q4 FY20.  This shows your replacement?

5      A.   Yes.

6      Q.   Your replacement is only 87.7.

7      A.   That is correct.

8      Q.   Replacement is not doing as good as you

9 did?

10     A.   No.

11     Q.   And same thing on the next -- the last

12 page, 145340, 87.6, not doing as good as you?

13     A.   Correct.

14     Q.   And are you relying on any of this as part

15 of the reasons for your disputing that you failed

16 to -- all the things on the first page of 64?

17     A.   Yes.

18     Q.   And disputing the -- the plan that you

19 have?

20     A.   Yes.

21     Q.   And disputing your termination?

22     A.   Yes.

23     Q.   And disputing that they conducted a fair

24 investigation?

25     A.   Yes.

1   STATE OF TEXAS   )

2   COUNTY OF DALLAS )

3       I, Michelle L. Munroe, Certified Shorthand

4   Reporter in and for the State of Texas, certify that

5   the foregoing deposition of JENNIFER HARRIS was

6   reported stenographically by me at the time and place

7   indicated, said witness having been placed under oath

8   by me, and that the deposition is a true record of

9   the testimony given by the witness;

10      That the amount of time used by each party at

11   the deposition is as follows:

     Mr. Babcock  -    6 hours, 16 minutes

12      Mr. Sanford  -   11 minutes

13      I further certify that I am neither counsel for

14   nor related to any party in this cause and am not

15   financially interested in its outcome.

16      Given under my hand on this the 6th day

17   of June, 2022.

18

19

20

21   *Michelle L. Munroe* (signature)

    Michelle L. Munroe, CSR No. 6011

22     Commission expires 1-31-24

    Firm Registration #571

23     VERITEXT LEGAL SOLUTIONS

    300 Throckmorton Street, Suite 1600

24     Fort Worth, Texas  76102

    817.336.3042  telephone

25