Page 189

1    Healthcare which was a loss of 50,000.  Qualtex

2    Laboratories was 96,701.  Another account called --

3    which fell under Qualtex for 97,978.  Those five

4    accounts, Michelle declined.  Oh, and here's another

5    one, INVACARE which was 70,000, and those accounts,

6    Michelle declined to give me adjustment consideration.

7    And a year later, Matt Wheeler, which was the new hire

8    with Rebecca, all of a sudden, Michelle got involved

9    and gave them a consideration for adjustment, but she

10   wouldn't give me an adjustment.

11          So this was just a note to myself that,

12   "Note, Adding Melisa to the string in case she has

13   experience.  Michelle has experience with OptiFreight

14   brought to her attention in FY '18 due to the losses

15   of Qualtex/South Texas Blood Bank.  OptiFreight

16   solicited Qualtex to where all business shifted,

17   advised Michelle, and she didn't know how to handle.

18   I rode the revenue down for 12 months.  No help in

19   revenue adjustment due to the loss."  So I had to eat

20   it, but Michelle's new hire, he got all the

21   consideration to take an adjustment, where I didn't.

22        Q.   Right.  Let's mark Exhibit 22.

23        A.   Thank you for that.

24        Q.   Exhibit 22, I gather, is an e-mail from you

25   to Michelle Lamb where you're attempting to explain

Page 190

1    the situation involving the Mexico border accounts in

2    Laredo?

3         A.    There's another one that goes with this, I

4    think.

5         Q.    This?

6         A.    No.

7         Q.    Why don't you take the folder back and see

8    if you can identify any other documents that go

with 9   22.

10        A.    These go together, right here.

11        Q.    Why don't you put Exhibit 22 together in the

12   order you think they should belong.

13        A.    So this is the way they should go.

14        Q.    So with that adjustment that you made to

15   Exhibit 22, what is the document?

16        A.    Michelle sent me an e-mail on Thursday,

17   August 29th, 2019.  Let me take that back.  I sent

18   Michelle an e-mail on August 28th, 2019, and it was,

19   "Michelle, per our conversation yesterday, enclosed is

20   a list of Laredo accounts that are aligned to

21   Alejandra."  That's A-L-E-J-A-N-D-R-A.  "These were

22   the accounts that Alejandra had direct placed to her,

23   however two to have dropped off due to low revenue."

24   One was JR Wholesome.  Number two was Mexus.  Three

25   was Rush Box.  Four was TM Carriers, and five was

Page 191

1    Dixondale Farmers.

2          She came back and said on August 29th, "I

3    didn't realize that Alejandra has been traveling to

4    Laredo for three accounts.  This is extremely

5    inefficient.  Why haven't the accounts been moved to

6    Ricardo in the past?"

7          And I came back to her in one big response,

8    and I said, "I discussed with you in the beginning,

9    Alejandra was an SD covering San Antonio and the San

10   Antonio markets.  Due to realignments and the lack of

11   strategic accounts within San Antonio, the decision

12   was made to remove her from the SD role and place her

13   back as an MD.  In doing, we direct placed several

14   Laredo accounts within her territory being that she

15   was very familiar with the Laredo market and that she

16   has relations with Rush Box.  Not to mention that we

17   have reduced the head count of Laredo from four to

18   two.  Alejandra Ambrose relocated to San Antonio.

19   Luis Gomez relocated to Austin.  Felix Jauargui,"

20   that's J-A-U-A-R-G-U-I, "resigned.  Ricardo Ramirez,

21   Laredo AE, extended to the MSA to move Ricardo from an

22   MD versus a BD."

23          "Rush Box was Laredo's largest account prior

24   with levels surpassing 1.5 to 2.5 million.  Due to the

25   levels, we extended Rush Box an opportunity to visit

Page 192

1   the Memphis hub.  Business continued to grow until

2   Rush Box lost a contract with Hewlett-Packard.  It has

3   been a struggle with Rush Box as they are bringing on

4   new business and the loss of business due to

5   contracts."

6           "I have tried to remove Alejandra from the

7   Laredo market on multiple occasions, discussing with

8   you in the beginning Karen James and Melisa.  Here's a

9   snippet of the April 20, 2018, meet requesting a

10  discussion of adjustment consideration of Mexico

11  accounts.  Anyway, the reason why Alejandra has not

12  been removed from Laredo is strictly due to territory

13  revenue balance/Rush Box.  Outside of TMB, I have not

14  been in a position to transfer the accounts to Ricardo

15  based on territory revenue and/or decline of Rush Box.

16  As of today, with Rush Box in a declining mode, I

17  can't justify moving to Ricardo.  Currently, she is

18  handling three accounts, Rush Box, JR Wholesale, and

19  Mexus.  The other two have been removed due to revenue

20  levels."

21          And I gave her a snippet of the Rush Box of

22  the FedEx Express Primary, and the current quarter was

23  174,000, and the previous quarter was 358,000.  And

24  all this was, all this together is, she asked

25  something.  I gave it to her, and then she turned

Page 193

1    around and started accusing me that I never told her

2    about anything.  And I said, No, from the very

3    beginning of the day I met you, I outlined all the

4    people in my territory.  And this is the reason why I

5    can't realign accounts.  She wanted me to realign the

6    loss of the accounts to Ricardo, and it's not going to

7    do.  This wasn't my call.  This was Karen James under

8    Dave Russell because she's the one that balances

9    territories.  And everyone tried to balance around

10   $5 million per quarter per AE.  So if you take my AEs

11   at $5 million per quarter, give or take a mil, my

12   revenue responsibility per quarter was like 55 mil.

13   That's what I was responsible for.  And I can't move

14   this to someone that's in a loss because it's just

15   going to be detrimental to him.  And she couldn't

16   understand that.  So that's what that was about.

17        Q.   All right.  Let's mark Exhibit 23.  What's

18   Exhibit 23?

19        A.   This was a one note snippet to myself, and

20   this is just where I was just tracking Michelle's

21   activity with my district.  This is back when she

22   first came in.  This was May 17th through May 31st of

23   2018.  So it was one year.  It shows that on August

24   21st through the 23rd, she went to Laredo.  September

25   26th, she came to my meeting with the team build.

Page 194

1    December 20th, she did my one-on-one, Dave Russell

2    conference call, casual, nothing in regards to DSM

3    coaching.

4            January 25th, 2018, was a Houston meeting,

5    Mexico.  She scheduled my one-on-one, but then she

6    canceled it.  I was brought in there to talk to the

7    people in corporate about the Mexico billing issues

8    that never got rectified because she led them down a

9    rabbit hole where she told them what was wrong, but

10   when they got there, it was never what was wrong.

11   They were totally confused.  And once they heard it

12   from me, they said, We apologize.  We didn't know this

13   was going on.

14           February 28th is when she came down, and she

15   scheduled my one-on-one which was a casual

16   conversation, nothing related to nothing.  She

17   constantly complained about a neck ache.  She got

18   concerned with my AE, Adrian Moralez, entertainment

19   with Frost Bank.  She wanted to know if Adrian had a

20   drinking problem, concerned with the amount of

21   alcohol.  She told me that at that time she made the

22   decision to move Mexico out of Brian Hickman, and she

23   was going to move it to me.  And I questioned why, and

24   basically it was her decision.  And then May 10th,

25   just an outline of the meeting.  It was a note to

Page 195

1    recount my deals.  The most interesting deal was when

2    she accused my AE of having a drinking problem.  That

3    was the most comical one I could see.

4         Q.   In what sense do you think that was comical?

5         A.   That she went out with my AE and our largest

6    customer in San Antonio, Frost Bank, took three of the

7    people from the bank to the Spurs game, and all of my

8    AEs knew that it's their responsibility.  We have to

9    entertain.  We have to interact, and customers are

10   going to drink alcohol.  And if it's -- if a customer

11   drinks alcohol, it's your responsibility to make sure

12   that customer gets home safe.  That's always the

13   unspoken rule, and they knew about it, and I always

14   reminded them when they took one out.  And I had that

15   same conversation with Adrian the day before, that

16   tomorrow you're going to be with Michelle.  It's the

17   first time she's been in our market to make sales

18   calls.  Make sure everything goes accordingly.  He

19   said, no problem.  So they went to the Spurs game.

20   They entertained the customers, and everything came

21   back, not a word said.  The next morning when I met

22   for my one-on-one, she hit me right between the eyes,

23   and she wanted to know if my AE was an alcoholic

24   because he displayed signs of a drinking problem.

25        Q.   Did she explain to you --

Page 196

1      A.    And I said, What are you talking about?  She

2   goes, He was drunk to the capacity that I was in fear

3   of driving back to the hotel by myself.  Took me

4   totally off guard, and I kind of explained the deal.

5   I said, that's really uncharacter [sic] of Adrian.

6           So anyway, she accused me of all the

7   wrongdoing.  So when I was done, I called Adrian, and

8   I said, What happened?  And he goes, What are you

9   talking about?  And I said, She's accusing you of

10  being an alcoholic and being drunk that night.  He

11  goes, Richard, I had like three or four beers.  That

12  was it.  He said, Now, the Frost Bank guys, they

13  overindulged.  He said, but all of them were good.  He

14  said, Everyone got home.  Everyone's fine.  And he

15  said, As far as me driving Michelle, I was nowhere to

16  the limit of intoxication that I would get pulled over

17  and get a DUI or DWI.  That's totally off base.  And I

18  said, I'm really confused why she even brought that

19  up.  He said, I have no clue.

20          But she hit me with that that morning which

21  was totally false.  So that's why I thought it was

22  comical because she always kind of let everyone know

23  that she's always kind of drug up something that was

24  just to kind of catch me off guard.  That's why I said

25  earlier, with her, I always walked on eggshells

Page 197

1    because I never knew when she was going to -- what

2    part of the baseball field I was going to get hit with

3    a ball.

4        Q.    Okay.  What's Exhibit 24?

5        A.    Did we already discuss this one?

6        Q.    Possibly.  Let me see.

7        A.    That's the one that I sent to Mac Chonoles

8    which was Michael Clark's -- maybe not.  Maybe this is

9    a different one.  I sent it to Mac Chonoles, Michael

10   Clark's director.

11       Q.    Okay.

12       A.    This was on a follow-up.  This was June

13   28th, 2019, to where I said to Mac Chonoles,

14   C-H-O-N-O-L-E-S, "Thank you for getting back with me.

15   I truly understand the steps that you and Michael have

16   gone through to determine an outcome which I can

17   appreciate.  However, speaking honestly, I'm coming to

18   the point that I'm done with this.  I have held my

19   head high this entire ordeal, maintained

20   professionalism, and respected all parties especially

21   towards Michelle.  I've been accused of false

22   allegations, confronted with two letters of

23   counseling, and continued to work in an environment of

24   eggshells."

25            "The latest communication from Michelle,

Page 198

1    dated Monday, June 24th, 2019, questioned my joint

2    call activity for the previous week.  I understand and

3    have no questions with her requesting my engagement

4    with my AEs, however, I do not appreciate a generic

5    question turning into a condescending e-mail turning a

6    non-offensive subject into a reprimand of nothing but

7    wrongdoing.  She's painting the picture that this is

8    an ongoing, continuous subject that has been

9    addressed, re-addressed, and now moving into a

10   different level of discipline.  Being that I have

11   filed an EEOC, this is walking a very fine line of

12   retaliation."

13          "Being that she is a director, where is the

14   PSP?  Knowing that she did not know why, knowing that

15   she has not confronted/discipline me with any joint

16   call activity in the past, she could have simply

17   stated, Thanks for the update.  Sorry that Rosie

18   became ill and altered your week, let's stay focused

19   on the joint call activity.  Instead, Michelle chose

20   to use condescending e-mail well outside the

21   parameters of Coach 2 Grow, painting the picture of

22   ongoing issues that needed to be reprimanded."

23          "In regards to Rosie submitting a sick day,

24   she simply forgot, nothing more.  She wasn't trying to

25   hide anything.  She simply forgot.  I reminded her,

Page 199

1    and she submitted it, and I approved."  And it was a

2    snippet of the e-mail of her condescending, and it

3    went on where, "Michelle questions my call activity,

4    my response states that my schedule was Rosie, DSM

5    visit to McAllen five hours south of San Antonio.

6    Rosie advised that she became ill, Tuesday stated that

7    she was still ill.  So I made the decision to depart

8    McAllen, drove back to San Antonio, and made myself

9    available for joint calls if needed by my AEs.  None

10   of my AEs needed me which was good as I'm still

11   working through the mess of outdoor management

12   services.  I normally schedule my AEs out six weeks to

13   ensure that they have quality calls versus quantity,

14   thus the reason to why none of my San Antonio AEs

15   needed me for the days in question."

16        "I'm sorry, but I'm not going to make an AE

17   make joint calls if they are sick regardless if I'm in

18   San Antonio or in a different market.  It's to the

19   point that when I tell the truth, I'm reprimanded.

20   This is not the first time that I've been reprimanded

21   for telling the truth.  Go back and forth and review

22   my pending case.  We are condoning an environment of

23   dishonesty and lies."

24        Another little snippet from an e-mail.  "I

25   took her e-mail as condescending rhetorical format as

Page 200

1    nothing was stated that she required a response.  She

2    reached out on Thursday, June 28th, 2019, requesting a

3    response to her e-mail.  I stated, I didn't realize I

4    needed to respond.  Rosie submitted a sick day

5    request, and I approved."

6            Another little snippet from Michelle's

7    e-mail.  "Here again, her response was uncalled for.

8    One, questions require a response.  Two, she doesn't

9    need to point things out to me.  Three, I need to make

10   joint sales calls and close business.  I am not a kid.

11   I have worked for FedEx for 25 years.  I have bridged

12   time from American Freightways.  I've never been

13   treated and/or talked to in this fashion.  I have an

14   impeccable record of 24 or 25 years being tarnished by

15   Michelle and her false allegations."

16           Another little snippet.  "So in my defense,

17   which everyone requires me to provide versus taking my

18   word, I have been on vacation three weeks out of May.

19   I still ended up with 559 joint calls for the year."

20   Jennifer Harris ended up with 726 calls.  McElroy

21   ended up with 664.  Hickman ended up with 652.  Conrey

22   was 563.  Holley was 559.  Millner was 522.  Callahan

23   was 448.  Golden was 439.

24           An actual snippet of the call activity.

25   "Here's my FY '20 year-to-date call activity in line

Page 201

1    with others, add in the missed calls from Rosie Garza

2    averaging 13 calls, moves my number to 34."  Another

3    snippet.

4            And Mac turned around and responded to that

5    on Friday, June 28th, saying, "Hello, Richard.  I

6    received your voicemail message yesterday.  I can let

7    you know that Michael is conducting the final

8    interviews as he nears the end of the investigation.

9    He will share investigation findings with senior

10   leadership as well as other stakeholders.  I regret

11   that I'm not available today to discuss the e-mail

12   that Michelle sent you which you have found

13   unacceptable.  I would like to learn more about this

14   and can be available on Monday.  Kindly forward

15   Michelle's e-mail to me and Michael, letting us know

16   your availability on Monday so we can schedule a time

17   to discuss."  And if memory holds me correct, there

18   was never further conversation from that.

19        Q.   Last one in your packet.  We'll mark this as

20   Exhibit 25.

21        A.   Can I just say something real quick?

22        Q.   Sure.  Go ahead.

23        A.   Just to point it out because I know this is

24   about Jennifer.  You asked me about Jennifer.  When

25   I -- because this was my -- so I said in my defense,

Page 202

1    which everyone requires me to prove versus taking my

2    word.  I went through the system and pulled it out of

3    the system, and it was funny that of all of Michelle's

4    managers, Jennifer Harris was the highest one with

5    joint sales calls at 726.  Her ra-ra cheerleaders were

6    the lowest in the group.  Brian Golden, 439.

7    Callahan, 448.  Millner, 527.  Hickman, 652.  McElroy,

8    664.  Jennifer lead more -- almost a hundred more than

9    the highest one of, as I deemed, Michelle's

10   cheerleaders.  I was on vacation three weeks out of

11   the month of May.  I only worked one month, one week

12   in the month of May, and I came in with a respectable

13   number of 559, and she's questioning my contribution.

14          I just thought that was odd that Jennifer

15   lead the race, and Michelle still didn't appreciate

16   any of her hard work, but that's beside the point.

17       Q.   This is Exhibit 25.  I gather Exhibit 25 is

18   an e-mail from you to Mac.  Not necessary for you, by

19   the way, to read the whole thing into the record, but

20   why don't you just tell me, why did you send that

21   e-mail?

22       A.   This was a deal to where -- just a minute.

23   So basically this was an e-mail directed to Mac

24   Chonoles, and I copied myself and Michael Clark.  And

25   it was all the allegations that I brought forth from

Page 203

1   my EEOC and everything that they looked at, Michael

2   Clark only picked one to choose from, and this was a

3   very important part of my case because this was all

4   the revenue of the Mexico border situation that wasn't

5   taken into consideration which was reflecting my

6   numbers.  And basically, and I do want to read this

7   because it went to Mac which was Michael Clark's boss.

8   And I said, "Mac, I just wanted to say thank you for

9   taking the time yesterday to listen to my concerns and

10  allow this investigation to move forward."

11              MR. SANFORD:  I don't think he needs

12  you to read the whole thing.

13              THE WITNESS:  I'm not going to read the

14  whole thing.  I'm just going to read this thing.

15      A.   "I realize that I have presented a large

16  amount of issues backing up my claim which is needed

17  to give to you and Michael for a good representation

18  of what has been transpiring since the appointment of

19  Michelle Lamb.  I know without a doubt, you and

20  Michael will handle this investigation professionally,

21  non-biased, and drive towards a resolution."

22              "With that being said, I know that you and

23  Michael pick and choose what topics or questions you

24  feel support the overall claim.  However, in all

25  cases, there are additional items that need to be

Page 204

1    included as they support the original claim.  For the

2    most part, I have sent these items to you on Friday,

3    April 19th, 2018, as individual e-mails for your

4    reading and understanding the importance of the

5    supporting documents.  In addition to, items not

6    covered that I feel is extremely important to my

7    case."  And all this was was all the Mexico stuff and

8    how the revenue came into play, how the numbers didn't

9    get adjusted, the border education, accusing me that I

10   didn't do right, and just everything about Mexico

11   which they never took into consideration of my EEOC.

12   They only took one thing at the skip level.  So that's

13   why I wanted to read that to kind of give you an idea

14   of why that was there.

15        Q.   I understand.  Let's mark Exhibit 26.  And

16   we've now gone through your whole folder, by the way.

17   I'm going to give you your folder back.

18             MR. SANFORD:  Can we take a quick

19   two-minute restroom break?

20             MR. AHEARN:  Sure.  Off the record.

21             THE COURT REPORTER:  Off the record.

22             (Off the record.)

23             THE COURT REPORTER:  Back on the

24   record.

25        Q.   Exhibit 26 is dated November 1st, 2018.  Do

Page 205

1   you see that?

2          A.   Yes.

3          Q.   And she's relaying to you in this e-mail

4   that she was disappointed that you hadn't reported the

5   loss of the Allied Hand Dryer account.  And then she's

6   explaining that the loss of that revenue on top of the

7   performance issues is a matter of concern for her.  Do

8   you see that?

9          A.   Uh-huh.  Yes.

10         Q.   Do you -- now, you've already explained your

11  dispute of the performance numbers and why you think

12  those were deflated artificially, right?

13         A.   Correct.

14         Q.   So I don't want to talk about that.  We've

15  exhausted that.  But the Allied Hand Dryer account, do

16  you dispute that the account was lost on September

17  1st, 2018, and you didn't report it to her until

18  October 30th?  Do you dispute that?

19         A.   It's been a long time.  I'm not clear on the

20  dates.

21         Q.   Okay.

22         A.   It may have been that time frame.  I don't

23  know.  I don't have my calendar no more, my FedEx

24  calendar.  So I can't look.  I know there was a gap,

25  and the reason for the gap was she was never available

Page 206

1    to talk.  She wasn't in my market but maybe three

2    times, four times that year.

3           She brought it up on a one-on-one not to the

4    point of did you lose an account, but this went and

5    coincided with another document I gave you to where

6    she came in and she wanted to know if I had Patricia

7    Arenivas on a letter because of the wine sales.  And

8    then she jumped into Adrian Moralez, how come he's not

9    on a letter.  And I said, It's because he doesn't

10   deserve it.  We just lost an account.  We just knew

11   about it a couple days ago, a couple weeks ago.  So I

12   don't know if the time frames actually fit.  And

13   that's when I told her about Allied Hand Dryer, and

14   she wanted his number, his e-mail, because she was

15   going to contact and save this, and she never reached

16   out to the guy.  And then shortly after that, she sent

17   me this letter, and in all honesty, I just took the

18   letter and threw it because that's the way she

19   communicated with me.  She never could sit down and

20   have a conversation about the rights or the

21   wrongdoings.  She'd just throw an egg at you and see

22   if it hits.

23        Q.   Let's mark Exhibit 27.  Do you see

24   Exhibit 27, sir?  The first page of that document

25   appears -- purports to be a letter of termination from

Page 207

```
1    Michelle Lamb to you dated February [sic] 20.  Do you

2    see that?

3         A.   Okay.

4         Q.   The first page?

5         A.   Okay.

6         Q.   I'll ask you about the other pages in a

7    second.

8         A.   I never got this.  So I don't know what it

9    is.

10        Q.   That was going to be my question --

11        A.   I never received it.

12        Q.   You never received it?

13        A.   Because it's apparent right here, letter of

14   termination for performance.  She didn't terminate me.

15   I retired.

16             MR. SANFORD:  I think you said February

17   20, and I think you meant January 20.

18             MR. AHEARN:  I'm sorry.

19        A.   Yeah, because it's dated January 20.  That's

20   when she met me Monday in the office, and she already

21   had my retirement notice January 8th.

22        Q.   Okay.

23        A.   So how can she turn around and present --

24   I'm going to hold my composure as much as I can.  Once

25   again, this is a falsified company document.  This is
```

Page 208

1    falsified.  If HR and/or legal does not pursue this

2    with Michelle, Dave Russell, Kristie Castilow, there's

3    a problem.  I was not terminated.  I sent her a letter

4    that I am officially announcing my retirement January

5    8th at 7:29 in the morning.  She didn't respond.  She

6    met me at NIRA, which is N-I-R-A, about three weeks

7    later to where she walked in, and I gave her what she

8    needed, and I walked out the door within five minutes.

9    This is where she got Kristie on and said that I'm

10   going to give you an ultimatum to resign in lieu of or

11   I'm going to terminate you.  And I said, Michelle, you

12   can't, because I already gave you a letter that I'm

13   retiring, and all I'm asking you to do is confirm a

14   date.  That's all I'm doing, and I walked out the

15   door.

16        So how can an individual type up a letter

17   like this, submit it to the company, that she's

18   terminated me?  Once again, she's tarnished my record

19   with FedEx.  This is a falsified document, and people

20   at FedEx need to be held accountable.  If I tried to

21   get hired through some other company, and someone did

22   an HR background, this is devastating to my employment

23   career moving forward.  And I do not take this

24   lightly.  And I'm trying to hold my composure as much

25   as I can.  This is what broke the camel's back today.

1    You don't know how much I'm upset with this.  This is

2    nothing but a false lie.  And there's nothing you can

3    say that is going to cool me off.

4         Q.   I'm not going to try to.  It's not --

5         A.   This would be the same thing as that you

6    resigned from the company for whatever the reason may

7    be, and I turn around and wrote a letter that I

8    terminated you.  This is the reason why I couldn't get

9    my retirement benefits.  Because it was all screwed

10   up.  This is the reason why I was getting my

11   retirement benefits, and all of a sudden, I didn't get

12   it because I was showed terminated in the system, and

13   I never could figure out why, and HR couldn't --

14   retirement center couldn't figure out why.  Now, it's

15   exposed because she wrote a damn, blatant lie.  And

16   sorry for my French today.  That is -- I'm just -- I'm

17   madder than a hornet right now.

18             And I'm going to ask you, and whether you

19   can or you can't, this is not a rhetorical question,

20   but you represent FedEx in a legal profession, you

21   take this upon yourself to question Michelle and get

22   HR involved and get Michelle terminated from the

23   company because this is a damn, blatant lie, and this

24   is what I've dealt with for two years.  This is what

25   Jennifer Harris dealt with for two years.  If she came

Page 210

1    down, and nothing was stated prior to, and this

2    meeting actually conducted itself, I would sit there

3    and say wholeheartedly what I did is I resigned in

4    lieu of, I would take ownership of that, but it didn't

5    happen.

6            She, Dave Russell, wouldn't acknowledge my

7    retirement on January 8th.  Wouldn't respond to it.  I

8    gave you the document to where she responded twice,

9    "Congratulations on your retirement.  I will get back

10   with you."  "I'll get back with you on the 13th ASAP."

11           Q.   That's the 13th of January?

12           A.   13th of January.  She never got back with

13   me.  Her admin calls me, says she wants to meet with

14   me.  So I've had enough.  I'm done.  I'm exhausted.  I

15   bring all my stuff in.  She already has the letter in

16   hand that I've announced my retirement.  Her, Dave

17   Russell, Grant Kuhn, all of the people involved in my

18   EEOC, her management team, which is my peer group, all

19   the Houston DSMs and the Austin DSMs, my subordinates,

20   my admin, all knew Friday the day before -- two days

21   before Monday that I'm out of there, and it won't take

22   five minutes because I'm done.

23           And the conversation lasted five minutes to

24   where I told Michelle -- she's going to give me an

25   option.  I said, Michelle, you can't.  I've already

Page 211

1    done it.  And I walked out the door.  And then she

2    wants to have the audacity to type this up and submit

3    it to the company?  That is nothing but a damn, false

4    document once again.

5            And I am asking you, because I can't demand

6    you because I don't work for you no more, to take this

7    upon yourself, present it to HR, and question

8    Michelle, how does a person retire with a document

9    here?  How did you terminate him?  That's just a piece

10   of paper, I grant.  It's just wrong.  How can you

11   terminate him and tarnish his freaking record,

12   Michelle?  But that was her.  Her and Dave Russell was

13   nothing more than two vindictive damn people that if

14   they didn't get their way, this is what they were

15   going to do to get their way.  I have held my

16   composure all day, Chris, and I apologize for my

17   attitude right now.  But this totally pisses me off.

18       Q.   I understand that.

19       A.   No, you don't.  You can say you do, but

20   you're not in my shoes.

21       Q.   Well, you've explained yourself.

22       A.   This is totally uncalled for.  I never could

23   get corrections or anyone would ever tell me what

24   Michelle did.  I had rumors through the retirement

25   center because there was so many errors with my

Page 212

1   retirement program.  I didn't get my money accordingly

2   as my first plan because Michelle didn't submit the

3   paperwork right.  Six to eight months went by because

4   I retired in January.  I didn't get my first payout

5   until March 1, or March 15th, somewhere around there.

6   I missed February.

7           I had no insurance.  I had no retirement

8   insurance because they said Michelle never submitted

9   the paperwork.  I went 30/60 days with no insurance

10  covering me, period, to where retirement turnaround

11  said, Richard, if anything happens to you, pay with a

12  credit card.  We will totally reimburse you.  I am

13  blowing gaskets at the retirement center because I

14  said, This is uncalled for.  This is this damn --

15  excuse me.  This is this bitch that wants to play this

16  game with people's livelihood, just as she did with

17  Jennifer, and this is the piece of the puzzle that

18  I've never been able to see until you presented it to

19  me right now.  That's the reason why I didn't get my

20  retirement payout right.  That's the reason why I went

21  two months without any insurance.  That's why the

22  first year that when they finally got everything

23  corrected, and I came back for my next year, my health

24  benefits, where I have to enroll, they said they can't

25  enroll me probably because I've been terminated.  And

Page 213

1    I'm like, what are you talking about?  I've been

2    getting benefits from you since this year.  And it

3    became this big investigation.

4              They came back and said, we're sorry.  We

5    don't know how it happened.  We're going to put you

6    back in the system right away.  If I didn't retire,

7    why did FedEx give me a stipend for my insurance of

8    about 18-, $19,000 to help supplement the rising cost

9    of insurance, of health care?  Because when I was

10   under FedEx, my health care insurance was about 50 to

11   $60 out of my paycheck twice a week -- twice a month.

12   When I retired, my insurance went up to $1,201 per

13   month.  That's a far cry from $100 to over $1,000.  So

14   FedEx offered this stipend which gave me like $18,000,

15   $19,000 which I could supplement and offset my

16   insurance.  They also turned around, because I

17   retired, they gave my wife 25,000 as a stipend to help

18   pay for her insurance.

19              So if I didn't retire, why did FedEx give me

20   all my retirement benefits?  Once again, this is

21   nothing more than a damn, blatant lie, and I want to

22   know who I can pursue within your company, if you're

23   not going to take it upon yourself, that this thing

24   becomes evidence.  This becomes light, and I want an

25   investigation brought forth.  If not, I will seek

Page 214

1   legal somewhere.  Because this is nothing more than a

2   damn, blatant-ass lie.  And now you know how mad I am.

3        Q.   May I interject with a question?

4        A.   Yes.

5        Q.   All right.  So I hope you understand, my

6   purpose in giving you that document was not to upset

7   you.  My purpose was to ask you questions about it.

8        A.   And I understand that.  Because this is

9   exactly what she presented to the company, that ha ha,

10  I retaliated against him.  He retired.  He gave me

11  total hell.  He filed an EEOC.  He made me look bad.

12  He made Dave make bad.  We got together.  We got in

13  cahoots with one another, and we got rid of his ass.

14  Ha ha ha, the last straw is, I'm going to show that

15  he's terminated.

16       Q.   Okay.  So let me ask you a question, and I

17  think you said this.  So this is -- I think we're on

18  Exhibit 27, right?

19       A.   Plus I never got a copy of it.

20       Q.   That was going to my question.  So my

21  question to you is --

22       A.   Never got a copy to sign or nothing.

23       Q.   So today was the first day you've seen

24  Exhibit 27?

25       A.   First time it's ever laid eyes on me.  And

Page 215

1     this is why I'm looking through all the pages because

2     I have no clue what you're talking about.

3          Q.   Okay.

4          A.   And here again --

5          Q.   And I'm only asking --

6          A.   And I want time to read this because this is

7     really upsetting.  But here again, right here where

8     it's CCd in, Dave Russell, Vice President of sales.

9     Dave Russell knew that that letter went to his desk.

10    It went straight to him when I retired.  How can a

11    damn VP turn around and allow an individual to write

12    up a termination which is totally false?  How can

13    Kristie Castilow, HR?  And HR is supposed to be

14    non-biased.  Sit there and say, Michelle, under the

15    rules, as mad as you are, under the rules -- as

16    vindictive as you are, under the rules, of how much

17    hatred you carry towards this guy, under the rules,

18    you cannot terminate someone in the system if they

19    officially gave you a Word document that states their

20    intentions of leaving the company especially with

21    retirement.

22              It's written out, A, B, C, clear as mud.  It

23    outlines everything, and all it's asking you is May

24    31st -- I mean, March 31st, okay with you?  HR, like I

25    said earlier, doesn't do anything for an employee.

Page 216

1    They do it all internal, and that's exactly the reason

2    why I filed the EEOC because of Michelle, Dave, and my

3    EEOC that went down, HR didn't give a rat's ass about

4    it.  They picked only the items that they wanted to

5    pick, which was the skip level meeting.  Because if HR

6    took everything that I gave and shared to you today,

7    without a doubt, the first document that I gave you

8    when she turned around and put my infractions in

9    quotation marks, anyone with the right sense, anyone

10   with the HR, non-biased professional, doing their job,

11   they would have gotten Michelle and Dave Russell in

12   the office and said, First of all, this is a falsified

13   document.  Regardless if it was meant to.  Regardless

14   if it wasn't meant to.  This is a falsified document,

15   and the FedEx code of business ethics, we will not

16   tolerate falsification.  And unfortunately, because

17   you falsified both, you're going to be terminated

18   today.

19          That didn't happen, but instead they created

20   nothing but total hell for me for almost two years to

21   where it affected me mentally and affected my health

22   to where I finally gave in and gave up.  I could have

23   fought this, but I was totally exhausted because of

24   all the lies, all the accusations of what Michelle and

25   Dave were doing.  I left the company, and I pondered

Page 217

1    about seeking legal action to file a lawsuit against

2    FedEx.  And I didn't.  And the only reason why I

3    didn't was because my son worked there, and I could

4    not afford him, that's working for FedEx, supporting

5    his wife, his two kids, for Dave Russell and Michelle

6    Lamb, as vindictive as they are, to come back after

7    him in a roundabout way and get him terminated.  So I

8    dropped it, and I sat on it.

9         You don't know how mad this is making me,

10   Chris.  I've held my composure all day long.  This is

11   nothing more than a damn, false lie, and a question

12   again is how can people lie and keep their jobs.  And

13   people that tell the truth and follow all the policies

14   and procedures in the company, without a doubt, who

15   I'll never question, get chastised, get threatened,

16   get bullied, get discriminated against, retaliated

17   against, to where I quit, resigned from the company,

18   and these two assholes are living and still having

19   their jobs.  Dave Russell left with all the big kudos,

20   the big retirement party, and Michelle is still

21   working within the damn company spreading her lies and

22   everything else.

23        So how many people -- and I know you don't

24   answer this deal.  You don't know.  And I'm not asking

25   as a rhetorical question, and if you can answer, if

Page 218

1    you can, if you can understand, but how many people in

2    the company, HR, that has known me for 25-plus years

3    saw this letter and then turned around and started

4    communicating with internals within and saying, Did

5    you know Richard got fired today?  You talk about a

6    virus that spread it?  That's a virus that spread it

7    within the Taj Mahal of FedEx.  I had more contacts

8    and more communications over 25 years than Michelle

9    could ever create in 50 years because of her ignorance

10   and her dense mentality between her two fricken ears.

11   And how many of the people -- did the people see, and

12   how did this spread amongst the corporate office that

13   Richard got terminated today?  And she didn't even

14   have the audacity.  Dave didn't have the audacity to

15   make sure I got a copy of this where I can contest it

16   right then and there.

17          Three-plus years later, I see it for the

18   first time.  It's the last document that you want to

19   throw at me.  And I have been cordial.  I have been

20   professional.  I have answered everything in my best

21   capacity that I could.  I have never lied.  I have

22   told everything to the truth that I can best

23   recollect.  I have been probably one of the more

24   courteous individuals that you've ever dealt with in

25   quite some time.  I expressed my apologies to her

Page 219

1    before I even walked in and started because if there

2    was any profanity -- because that's the way I've

3    raised -- and I get to have this as a bald-faced, damn

4    lie thrown at me.  And all you want to do is sit there

5    and just look at me.  And I know you can't say

6    anything because you're a legal defense for FedEx.

7    But something needs to be done with this, and I am

8    going to request a copy of this.  Because if you don't

9    know anything about it, someone from FedEx doesn't

10   call me and say, Hey, we're totally sorry about this.

11   Sorry, we're going to rectify.  We're going to tarnish

12   your record, whatever you need, I may pursue legal

13   action over this.  This is nothing but a falsified

14   document.

15        Q.   And your attorney has a copy of it.

16             THE WITNESS:  Do you have a copy of

17   this?  Now, he does.  Have you seen this before?

18        A.   So Chris, let me just kind of flip this a

19   minute.  Put yourself in my shoes for the entire

20   thing.  Just as any jury out there.  And we've gone

21   through everything that you talked about today, and

22   here's this nice guy.  He's testifying.  He's doing

23   all this.  You're the one that's testifying.  And

24   you're telling everything to the best ability that you

25   possibly can.  And all of a sudden, I'm the defense

Page 220

1    attorney for FedEx, and I come over there and I say,

2    Well, Mr. Holley, you know, I'm glad you shared

3    everything that you shared with us today.  But

4    however, we have a letter of termination for you.  So

5    how can you sit there and say you're retiring?  Do you

6    not think that you'd go ballistic?  Do you not think

7    this would be a false allegation that was presented to

8    your face that never happened?  Do you not think that

9    something should be done about this?  And it's yes,

10   yes, yes.  And I'm sorry to put you on the stand.  I

11   know I'm not supposed to do that.  But you just don't

12   understand how upsetting this is.  This is, like I

13   said, over and over again, nothing but a bald-faced

14   lie.

15        Q.    May I interject for a moment?

16        A.    Sure.

17        Q.    I think you've made your feelings clear.

18   You're right.  I can't respond to your questions

19   because of what my role is in taking this deposition.

20   So I don't intend to be rude.  But that's simply not

21   something that I can respond to while we're sitting

22   here on the record right now.  I do want to ask you a

23   couple of questions.  I'm going to give you time to

24   read the second and third pages which I know you want

25   to read, but can I ask you a couple more questions

Page 221

1    about the first page first?  I'm not trying to argue

2    with you.  I just want ask you a couple of factual

3    questions.

4         A.   And do you know with this -- I'll say one

5    more thing, and then I'll let you go.  Do you know

6    with this that I became a non-hirable, re-hirable back

7    for FedEx?  Do you know that?

8         Q.   Again, I can't explain whether I know it or

9    not.

10        A.   I'm just telling you rhetorical.  Because

11   with this document, even though I'm retired, and I

12   left in good faith with good years of service, even

13   though the last two years were a total hell with my

14   life with Michelle and Dave, that if I turned around

15   and decided that I wanted to go seek employment with

16   the FedEx through one of their offices across the

17   world, whether it's a ground package handler, whether

18   it's a freight handler, whether it's an express

19   handler, whether I wanted to get back in sales, it's

20   whatever the plethora of jobs out there that FedEx

21   has, they pull up my file and they see this, you know

22   I'm not re-hirable because I was terminated.  And this

23   is in my file.  That has tarnished my entire career,

24   my entire security, my entire monetary income if I

25   ever try to pursue it, because I couldn't pursue it

Page 222

1   because she put in the record that she terminated me.

2        Q.   Let me ask you this question:  So -- and

3   again, I'm still just asking you about the first page

4   of Exhibit 27.

5        A.   I didn't even read it.  I saw the first,

6   letter of termination, but go ahead.  "You are to

7   immediately surrender your employment identification,

8   proxy card" --

9        Q.   Go ahead.  Just let me know when you're

10  ready for me to ask you the next question.

11       A.   Sorry.

12       Q.   You don't have to apologize.  I understand

13  why you're upset.  So it sounds to me like -- I want

14  to make sure I have the timeline down in terms of how

15  things proceeded procedurally with respect to your

16  departure from the company, okay?

17       A.   Okay.

18       Q.   And I'm to some degree paraphrasing

19  testimony that you gave this morning.  So if I screw

20  it up, let me know.  All right.  So my understanding

21  is that you, in part due to -- well, due to your

22  frustration with your experience with Michelle, made

23  the decision on your own to retire, correct?

24       A.   Correct.

25       Q.   And so no one suggested that to you.  No one

Page 223

1    said, Hey, you should retire, or we're going to fire

2    you.  Your testimony is that it was your decision on

3    your own independently, correct?

4         A.   Yes, I was seeking advisement from

5    retirement back in November.  That's almost two months

6    before.

7         Q.   And then at some point between November and

8    it sounds like in early January of 2020, right, you

9    announced Michelle Lamb your intent to retire,

10   correct?

11   A.   When I wrote the e-mail to her was January 12

12   8th, 2020.

13        Q.   Okay.

14        A.   When I talked to retirement back in

15   November, my plans were to retire at the first of the

16   year.  I didn't have a date because they told me they

17   couldn't discuss the entire packet unless I gave them

18   an actual date.

19        Q.   So you had given them the date of March 31st

20   in the November/December time frame, right?

21        A.   No.  I told them, I'm going to explore what

22   my avenues for retirement, what needs to take place.

23   They said, What date are you looking at?  I said

24   somewhere in January, maybe the first of the year.

25   And they I said, Is it going to be like December 31st?

Page 224

1   I said, No, probably January somewhere because it's
2   easier, whatever.
3           And so there was no time frame given to the
4   retirement people.  It was just the conversation is,
5   Richard, when you find that date out, let us know
6   because that is a very crucial part of your retirement
7   because we need to know that date with precision.
8   Because if you retire on -- I'm just going to use
9   March 31st.  If you announce your retirement that your
10  exit of the company is March 31st, we have to make our
11  retirement packet to reflect your exit date of March
12  31st.  If you exit March 30th and/or April 1, the
13  packet is void and null because it's not the actual
14  exit date that you and I talked about.
15      Q.   So then you had to agree -- the process then
16  was you had to agree with your manager, Michelle at
17  the time, on a date?
18      A.   Correct.
19      Q.   So when you e-mailed her on January 8th,
20  2020, it was in part to initiate a discussion with her
21  to get agreement on a date?
22      A.   Correct.
23      Q.   Which you were proposing to be March 31st?
24      A.   Correct.
25      Q.   And then sounds like you're saying that her

Page 225

1    reaction to that was to try to initiate a termination

2    process against you, correct?

3         A.   At that time, no.  Because if you look at

4    the document I gave you, and I don't know which

5    document it is, my retirement letter, she responded

6    that same morning acknowledging my retirement, and "I

7    will get back with you with the next steps."  A week

8    transpired.  Never heard from her, which is around the

9    13th, and she said, "I'll get back with you ASAP."

10   She never did.

11            Her admin called me and said, Michelle wants

12   to meet with you January 20th in the afternoon.  That

13   was the only interaction I had that I had a confirmed

14   date that Michelle's coming in.  At that point, I've

15   already made up my mind, I'm done with her.  I'm done

16   with her games.  She doesn't want to act like an

17   adult.  She doesn't want to act like a professional.

18   I'm out of here.  Have a great day.  Done.  And I took

19   all my stuff with me, and I had it right there on

20   January 20th at 3:00 in the afternoon.  3:00, 3:30, it

21   was right there.

22        Q.   You said all your stuff was right there?

23   What do you mean?

24        A.   My laptop, my keys, my badge, everything

25   that I had to surrender to FedEx, my credit card for

Page 226

1  my expenses, everything.  It was right there on top so

2  I could surrender it to her and walk out the door.  I

3  wasn't there five minutes.

4       Q.   So you had gotten a request from Michelle's

5  administrative assistant to meet with Michelle on

6  January 20th, yes?

7       A.   Yes, in the afternoon, around 3:00 at NIRA,

8  which N-I-R-A.

9       Q.   Did the administrative assistant explain to

10  you what the purpose of that meeting was going to be?

11       A.   No, she said, She wants to meet with you to

12  talk about your retirement.

13       Q.   Now, it -- and you've got to help me out

14  here because I wasn't involved in the situation.  So

15  you, it sounds like -- what you said was, and I'm

16  paraphrasing again, hopefully fairly, that you

17  basically said, I don't want to go to that meeting.

18  I'm done with Michelle.  I don't want to have any more

19  of her nonsense?

20       A.   Never said that.

21       Q.   All right.  Well, what -- okay.  Let me ask

22  you this --

23       A.   I met with Michelle --

24       Q.   You did meet with her?

25       A.   -- on January 20th.  I had no options.  I

1    was done.  I had to surrender my stuff.  I can't just

2    leave it somewhere and say, Go pick it up.  She was my

3    direct manager.  That's the only one I can resign to.

4    I've got to turn in things.  So I met with her.  The

5    Friday before is when I called all of my people and

6    told them that Monday afternoon at 3:00, I will no

7    longer be in the capacity of employment with FedEx.

8    I'm moving on.  I'm done.

9         Q.   You're resigning?

10        A.   Yeah, because all of them already had my

11   letter from January 8th that I'm leaving.  Because all

12   of my group and all the other e-mail I sent to all my

13   people across the system of saying my farewells and

14   goodbye, they were all under the impression that I was

15   leaving on March 31st because that's what it said in

16   my retirement letter.  So she would never acknowledge

17   it.  Dave never acknowledged it.  So then she came

18   down.  Her admin set up an appointment for me to meet

19   Michelle on January 20th around 3:00.  And that's when

20   I went.  I met with Michelle.  I had no other way to

21   do it.  I'm already done.  I'm out of here.  And

22   that's when she turned around and she got Kristie

23   Castilow, which is on this.  She's another person

24   that's falsifying.  Got her on the phone, and Michelle

25   turned around and said, Richard, I'm going to give you

Page 228

1    an ultimatum.  You can either retire -- resign in lieu

2    of or I'm going to terminate you.  I said, Michelle,

3    you can't do either one of them because I already gave

4    you a document in January that I'm retiring.  I said,

5    I'm done with you, and I walked out the door.  And she

6    said, well, you need to give me something that you're

7    leaving, which we have to.  So I scribbled on a piece

8    of paper.  In all honesty, Chris, I don't even know

9    what I wrote other than I think I said, I resign.  And

10   I walked out the door.  I wasn't there five minutes

11   with that airhead.  And then she had the audacity to

12   type this up.

13        Q.   Okay.  My next question would be:  So your

14   testimony is that she did not present you with Exhibit

15   27 in the January 20th meeting, correct?

16        A.   She didn't present me not one piece of

17   paper, nothing.

18        Q.   Did anybody -- did anyone at FedEx infer to

19   you or give you information leading you to believe

20   that you were going to be terminated?

21        A.   No.

22        Q.   So the first information that you got that

23   you were being asked to resign in lieu of termination

24   or that you were going to terminated or something to

25   that affect was when you were meeting with Michelle

Page 229

1    Lamb on January 20th, 2020?

2         A.    Correct.  And it was a statement that came

3    out of nowhere.

4         Q.    Let me ask you this question:  So you had

5    submitted the retirement paperwork already, correct?

6         A.    Which paperwork?

7         Q.    Well, you had submitted -- not confirming

8    the date, but you had submitted a notice of your

9    intent to retire, right?

10        A.    The e-mail to Michelle, Dave, and the people

11   I included on the e-mail, because that's the first

12   step of retirement, I have to declare it.  HR

13   retirement benefits will not start, will not produce,

14   will not start to work on my packet until I can give

15   them a confirmed actual departure date.

16        Q.    I understand.

17        A.    That's the first process of the step, my

18   e-mail to Michelle which she ignored until January

19   20th, that afternoon.

20        Q.    So --

21        A.    I left, and then I called when I got home.

22   I called retirement, and I said, I will make this easy

23   for you.  My exit date was today.  I walked out.

24   That's what I used on my retirement.

25        Q.    That was going to be my next question which

Page 230

1    is that the retirement people eventually processed

2    your termination as a retirement --

3         A.   It wasn't a termination.

4         Q.   I'm sorry.  They processed your --

5         A.   Retirement.

6         Q.   -- retirement. with an effective date of

7    January 20th?

8         A.   Yes, that's what it was.

9         Q.   And as far as you know, or at least your

10   understanding up through today, from the retirement

11   folks was that your separation from the company was

12   not an involuntary termination, it was a retirement,

13   at least insofar as the FedEx records are concerned?

14        A.   Correct.  Because under the FedEx policy,

15   the business ethics and guidelines, if you are

16   terminated from a company, you are not qualified for

17   retirement benefits.  It's simply stated in there.  I

18   got all the benefits.  So if I got the benefits, how

19   did I get terminated?

20        Q.   So is it a possibility then that Exhibit 27

21   is just a draft that was never submitted or

22   implemented?

23        A.   I have no clue.  This is the first time I've

24   ever seen this.  But if I look at this, and I read her

25   deal -- and here's the problem I have with this, and

Page 231

1    this is -- it's a bald, blatant lie.  She's advising

2    that my employment was terminated on January 20th.

3    I'm to immediately to surrender all my personal

4    belongings, and if I have any problem with this being

5    unfair that I can start the EXPLORE process.  If she

6    presented this letter with me, I would have

7    immediately jumped into the EXPLORE process, and I

8    would have won the EXPLORE process hands down because

9    of one document, and that one document being that I

10   sent her January 8th, 2020, that I'm officially

11   announcing my retirement.

12        Q.   Okay.

13        A.   I would have one it hands down.  No

14   questions asked.  And she did that.  I had this.  So I

15   couldn't pursue this for her.  I didn't care because I

16   retired.  Then if you have any questions call Kristie

17   Castilow.  Why would you put Kristie in there?

18   Kristie is signing off on a forged document,

19   falsified.  If I "disagree with anything contained in

20   this document, you may submit a written statement

21   explaining your position."  Never had the opportunity

22   to because it was never presented.  Then she turned

23   around, and -- do you see a signature on there?  I

24   didn't sign it because it was never presented to me.

25        Q.   Michelle didn't sign it either, right?

Page 232

```
 1        A.   I don't know.  I've never seen it.  This is
 2    the first time.  The other thing is that tells me this
 3    is true, because this reason right here, this is the
 4    termination records which is page 2 is what she has to
 5    fill out in the system in IDM, which is our management
 6    system, that starts the process of an exit of an
 7    employee whether they resign, whether they resign in
 8    lieu of, whether they're terminated, terminated with
 9    subcategories and stuff, she has to fill that out.
10    That's what starts the process to remove me from all
11    the systems, and all the acknowledgments, and all the
12    securities, and everything with FedEx.  No one can do
13    that but her because I'm her direct report.  Just as
14    when people left me, I would have to go into IDM and
15    create this document because that's the separation
16    papers.  That's what stays in the system.  This is
17    what I tell the system, and this is what I tell
18    everybody within the world of FedEx, the reason why
19    John Doe or Jane Doe left the company is because of
20    this.  So here's another bald, blatant lie that she
21    put in the system that I was terminated.
22        Q.   Let me ask you a question about the --
23        A.   This is part of next page.
24        Q.   Yeah.
25        A.   She has to fill it out.
```

Page 233

1      Q.   I actually was going to ask you a question

2   about this page.  It's identified as page 2 in the

3   lower right-hand corner.  There's a list of employees

4   there?

5      A.   Okay.

6      Q.   You see there, it says, Richard Holley,

7   Brian Golden, Jaime Golden-McElroy, Casey Millner,

8   Brian Conrey, and Brian Hickman?

9      A.   Those are her reports, not mine.  That's my

10  peer group.

11     Q.   I understand.  Let me get to my question.

12  My question is:  To your recollection, is that an

13  accurate and complete list of the people who were

14  reporting to Michelle Lamb at the time in January of

15  2020?

16     A.   Okay.  There's Golden, McElroy.  That's

17  Austin.  There's Casey.  Yes.

18     Q.   So we never talked about Matt Wheeler.

19     A.   No.

20     Q.   Was -- to your recollection, was Matt

21  Wheeler part of the cheerleading squad, or was he --

22     A.   Matt was newly hired.  He had no clue of his

23  job.  He was an account manager that never went to

24  anything, and he just got promoted because it was part

25  of Michelle, and she could run it.  The interesting

Page 234

1    thing about this is that if you look at the block

2    there with her peer group, her subordinates, look at

3    the very two last columns.  Corrective action, Richard

4    Holley, Yes.  Prior 2 years, over plan, 0/8.  No

5    consideration of Mexico.  Look at Brian Golden, 5/8.

6    No corrective action.  Look at Jaime Golden, 2/8, no

7    corrective action.  Look at Casey Millner, 0/4, no

8    corrective action.  Conrey, 7/8.  He was her best

9    account -- DSM she had because he had the Arctic

10   account.  Look at Brian Hickman, 3/8, no corrective

11   action.  Look at Matt Wheeler, 3/8, no corrective

12   action.  Why did I get corrective action and nobody

13   else did?  Rhetorical question for you.

14           This is where I'm trying to paint the

15   picture of Michelle.  She wasn't consistent in her

16   job.  The job was well over her head.  She was

17   immature, and she had nothing between her ears.  The

18   only way that she became in her job was the ra-ra

19   cheerleader to drive up bogus stories of success to

20   Mullally and Russell to sit there and paint the

21   impression that she's getting involved in doing

22   everything.  I had less communication with her than

23   anybody.  That's another example of her

24   inconsistencies with HR.  If these people were under

25   plan, and I will just give it four quarters.  If

Page 235

1     they're under plan, that's one full year of not being

2     on plan, they should have been on a letter.  No if,

3     ands, or buts.  That's company policy.  That's four

4     consecutive quarters people were not on plan.  None of

5     them were written up.

6              And poor Jennifer Harris goes to president's

7     club, works her tail off, and she gets terminated.

8     Richard Holley, 60 years or older, works his ass off,

9     nothing but good intentions, finally throws in the

10    towel and retires out.

11             And so going back to a question you asked

12    earlier, is Michelle a racist?  She damn sure is

13    because right there, it's black and white right there.

14    Because whether she's a racist and whether it falls

15    under black, white, yellow, green, orange, or

16    whatever, that is her group with nothing but young,

17    white females and males.  And none of them are written

18    up.  None of them are put on a plan.  She had to type

19    this document.  This paints a picture in corporate

20    FedEx that Richard Holley was nothing but a problem.

21             So to answer your question, yes, this is a

22    document, a company-driven document, that she had to

23    put in the system to remove me from IDM.  Nothing but

24    lies.

25        Q.   What's IDM?

Page 236

1       A.    It's a management software that we used.
2   You know it more than I do.
3       Q.    Actually, I don't, but --
4       A.    It's IDM.  It's where I have to turn around
5   when I hire, all the paperwork goes through IDM.  I
6   give you computer access.  I deny your access.  I
7   grant you access to whenever I want to, and when you
8   terminate, that's where I start my process in IDM to
9   remove you from all the FedEx systems that you have
10  privy to or access to.
11          The third page is where she turns around --
12  so you asked me a question.  And I'll go back to the
13  first page because you asked the question:  Well,
14  Michelle never signed it either.  So if you look on
15  page 3 -- no, on page 4.
16      Q.    Yes.
17      A.    It goes down to the formal complaint,
18  identify and explain them.  "An internal EEOC was
19  initiated by Richard Holley."
20      Q.    Yeah.
21      A.    The final paycheck is 1/27.  There's where
22  your Michelle Lamb signed that document, that
23  falsified document.  There's her signature on page 4.
24  Because she had to implement, and she had to close
25  this out to remove me from the system.  So you wanted

Page 237

1    to know if Michelle signed it.  Michelle created it.

2    There's your black and white.  There's your proof.

3         Q.   All right.  Do you have anything more to say

4    about Exhibit 27 because I was going to move on to a

5    couple of other questions before we wrap this up.

6         A.   Go ahead.  I think I've exhausted this one

7    here.  This is unbelievable, and I don't know how many

8    times I can sit here, and I don't know how many times

9    I can express it in how many forms, how many words,

10   how many phrases, whatever.  You can sit there and

11   say, I understand, but you don't.  You can sit there

12   and say, I feel the compassion for you, Richard, which

13   you're not going to say, but, Chris, you don't.  You

14   can sit there and say, Richard, I'm sorry.  You don't.

15              That was nothing more than a retaliating

16   gut-wrench from her.  That was her last step of taking

17   a knife, sticking it in my back, and saying, Ha ha, I

18   won.  I'm going to make your life miserable now.

19   Tarnished my record for two years.  Tarnished me for

20   any future employment with FedEx even though I retired

21   from FedEx with 25-plus years of service.

22   Non-rehirable all because of her, Kristie Castilow,

23   and Dave Russell.  And I'll leave Kristie Castilow out

24   of it because she's only the HR representative that

25   didn't do anything.

Page 238

1          But you get Dave Russell and Michelle, and

2     they are in cahoots with one another to have what they

3     want, and they don't care what they have to do to get

4     what they want.  They are the most manipulative,

5     condescending, arrogant, egotistical, I could use

6     adjectives all day long.  And they work in cahoots

7     with one another to get what they want.  And that is a

8     total shame.  And Dave Russell should have the balls

9     to sit there and call out Michelle and say, We are not

10    doing this.  But he allowed that to go down.

11          Jim Wallace allowed it.  All the people in

12    HR allowed it.  And I can go to all the people in HR.

13    They were a direct report which was Michael Clark, Mac

14    Chonoles, Adrian Webster.  These are levels of people

15    that I've escalated to because nobody would answer my

16    questions.  I even went to the right-hand person of

17    Fred Smith that runs the whole operation of HR, Judy

18    Edge.  She would never return my phone call.  It

19    started to filter down.

20        Q.   Did you ever leave her a voicemail?

21        A.   I left her voicemails and everything.  The

22    only one that returned my call was her admin saying

23    that Judy doesn't take phone calls.  What to you need?

24    And she pointed me in a different direction.  This was

25    all after retirement because of everything I was

Page 239

1    running into problems with.

2            The people from retirement finally wrote me

3    a letter saying they apologize for all the

4    inconveniences that ever has been done with my

5    retirement deal.  They were floored that how can a guy

6    retire.  How can a guy's retirement packet not be done

7    on time.  We missed his first retirement check.  He

8    went on retirement two months without any type of

9    insurance.

10           How would you like your family to be -- you

11   exit a company for retirement, and you leave your

12   company, and all of a sudden your family does not have

13   any insurance?  I think you might be a little upset.

14   Which I did.  I called retirement, and they said,

15   Richard it's a clerical deal.  We don't understand.

16   Michelle's not turning the paperwork in right.  We're

17   going to have to address that.  If you run into any

18   situation with medical, pay it on a credit.  We'll

19   totally reimburse you 100 percent.  And I said, that's

20   not the point.  I said, what happens if I had a heart

21   attack?  What happens if I'm involved in a car wreck,

22   and I'm in a hospital, and the bill is $300,000, or a

23   million dollars.  I don't have a credit limit like

24   that on my credit card.  I said, what if I die

25   somewhere?  Are you going to go ahead and repay my

Page 240

1    wife?

2            They knew I was upset, and they said,

3    Richard, we're going to fix this for you.  We promise.

4    Which they did.  I commend them for doing it.  It was

5    a lot of barriers that we went through.  And I knew

6    without a doubt -- I never could prove it.  I knew

7    without a doubt, Michelle did her last vindictive

8    thing against me just to say that she won, and her and

9    Dave Russel high-fived one another and probably did

10   whatever else they're doing with one another to sit

11   there and say, we showed him, didn't we?  And I'm the

12   only one that suffered.

13           And now you take my situation, now roll it

14   into Jennifer Harris', because Jennifer Harris was ten

15   times worse than what I got throughout the two years.

16   This is the climax of what Jennifer Harris did for her

17   tenure with Michelle, being bullied, targeting,

18   discriminating against Jennifer because she didn't

19   like her for whatever the reason may be.  She came

20   after me in the same regard.  She didn't like me

21   because I was her elder.  I knew more than her, and I

22   intimidated her from day one.  I wasn't her ra-ra, and

23   I wasn't her cheerleader.  And all the ra-ras -- if I

24   can borrow this one more time.

25        Q.   Sure.

Page 241

1      A.    That document number 27.  If you go to

2    page 3, right there, there's the ra-ras.  All the

3    single white -- all the white females, all the white

4    males in Michelle's age bracket.  They've got their

5    jobs.  They're not on plan, and she had to fill this

6    out, and none of them were on corrective action.

7           So you asked me if Michelle's a racist?  She

8    damn sure is.  Because if anything's consistent with

9    HR and human resources, they always preach, and they

10   practice, and we educate over and over again that you

11   have to remain consistent in your district.  We have

12   to remain consistent in our company.  And I can't tell

13   you how many courses of education I've taken over the

14   years with FedEx with a reminder of the code of ethics

15   of FedEx.  It's a CE that we have to take.  And it's

16   yearly.  You have to sign off on it and get reeducated

17   year after year after year.  It's the code of ethics.

18   And that's exactly what it is, and it basically

19   explains that we have to be consistent in our jobs.

20   We will not accept and/or honor a hostile work

21   environment.  We will not be racist.  We will not

22   discriminate because of whatever the case may be, and

23   they just list them, and you go through this thing.

24   And I'm sure you've taken it.

25      Q.    I'm familiar with it.

Page 242

1      A.   Yes.  This is an example right here.
2   Where's her consistency?  Why isn't her little
3   cheerleading group on corrective actions?  Why was
4   Jennifer and I the only ones on corrective action?
5   Because Michelle didn't care for Jennifer, and
6   Michelle didn't care for me.  And here we go with all
7   the whites in there, the white males, the white
8   females, nothing.  And where are they at today?  They
9   still have their job.  Where's Jennifer today?  She
10  got chastised, blackballed from the company.  She's
11  not rehirable for the company.  She had to go out and
12  search for a job.  She struggled.
13          I left.  I didn't have to go look for a job
14  because of my savings over the years on my retirement.
15  But if I ever tried to go back, which a lot of people
16  do that resign from FedEx, a lot of them go back and
17  become handlers, package handlers, whether it's
18  ground, whether it's freight, or whether it's express,
19  because they hire what they call supplementals.  It's
20  a part-time job.  And I can go in there to freight,
21  and I can go work four hours a day as a part-time job
22  to supplement my income at almost $24 an hour because
23  I'm a retiree.  And do you know, they would have
24  pulled up my file and saw this, and they would have
25  told me, Thank you, but no thanks.  Because they can't

Page 243

1   hire me because I've been terminated.  That is totally

2   uncalled for.  And I hope you understand what I'm

3   saying.

4        Q.   Your understanding is that you're -- just to

5   be clear.  Your understanding is that your -- from the

6   retirement folks is that your separation was processed

7   as a retirement not as a termination, correct?

8        A.   That's what I'm saying.  If they assumed

9   that I was terminated, I wouldn't have gotten my

10  benefits.  So that's why I said, this document is

11  false.  And all I'm asking you is to do the right

12  thing.  If you've never done anything in your life --

13  and I'm sorry to say this to you, but this is how

14  frustrated how I am -- if you've never done anything

15  for the good, take it upon yourself and do the right

16  thing for the first time in your life.  Pursue this,

17  and ask, Why was this guy terminated when he gave you

18  a letter in January 20th?  Why did you sign this,

19  Michelle?  Why did you investigate this Michelle?  I

20  want to know why.  Bring the people in HR.  Do the

21  right thing.  I've never asked anybody in my life for

22  a favor, and I'm not asking you for a favor, but what

23  I'm saying is, Chris, do the right thing.  You are the

24  employee.  You're an attorney that represents the

25  company.  This is nothing but falsification.  This is

Page 244

1    the third document that I presented to you -- or the

2    second -- I presented you two.  This is the third one

3    that I've seen where she has falsified documents, and

4    she still works for the company today.  I can't tell

5    you to do it, but I'm just telling you, your soul,

6    your conscience, do the right thing.  That's all I'm

7    going to say.  Do not answer the question because I do

8    not want to put you in jeopardy of saying yes or no.

9    It's a rhetorical.  All I'm telling you is do the

10   right thing.  Because this is nothing more than a

11   retaliated act.  And this is the prime example of what

12   she did to Jennifer, and what she did to me.  And

13   that's the reason why Conrey left because Michelle

14   Lamb turned around and said, The problem with you is

15   you'll never know how to work for a woman.  She's very

16   manipulative.  I'm so mad I can't even talk right now.

17        Q.   You meant to say manipulative?

18        A.   Yes.  And I just -- I want to be done with

19   this, but it's like a major kick in the ass.  The

20   final straw.  Oh, let me show you this.  Oh, by the

21   way, did you see you were terminated?  Final kick.  I

22   assumed I was this, but I never could prove it until

23   today.

24        Q.   Okay.  All right.  Thank you.  I hope you

25   understand that I was not intending to be sarcastic by

Page 245

1    giving you the document.

2         A.   In all fairness, I can take it either way.

3    And truly, and wholeheartedly in belief, I don't

4    believe you were being sarcastic.  I think you're just

5    trying to show what you need to discuss.  But at the

6    same time, I could take it that you're being sarcastic

7    that here, let me just throw a little dagger at you

8    because I want to be like Michelle.

9                   MR. SANFORD:  Can we take a short break

10   again?

11                   MR. AHEARN:  Sure.  Why don't we do

12   that, and then I'm actually going to change topics and

13   try to ask a few wrap-up questions.  Do you intend to

14   do any direct?

15                   MR. SANFORD:  Yeah, it's probably maybe

16   15 minutes.

17                   MR. AHEARN:  So why don't we take a few

18   minutes, take a deep breath, and let's move on.

19                   THE COURT REPORTER:  We are off the

20   record.

21                   (Off the record.)

22                   THE COURT REPORTER:  We're on the

23   record.

24        Q.   All right.  So I'm just going to ask a few

25   more questions.  I'm going to change topics and then

Page 246

1   I'm going to turn the questioning over to Mr. Sanford.

2   Earlier in your testimony, you alluded to a concept of

3   how customers get aligned to account executives.  Do

4   you remember talking about that or at least touching

5   on that topic?

6       A.   Yes.

7       Q.   Now that, as I understand it as a general

8   matter, those customer alignments to account

9   executives, I think that you said there was a goal of

10  trying to allocate it in a way that was about $5

11  million in business in mind being managed by a

12  particular account executive?

13      A.   I never said that.

14      Q.   Can you remind me what the significance of

15  the $5 million was?

16      A.   That was my district.

17      Q.   Okay.  So that's for --

18      A.   The business that is aligned to my district

19  equated out to roughly about 50, 55 mil, and so

20  territories were based around that to have an equal

21  share of about 5 million per.  So I said, simple math,

22  if I had ten employees, they would try to balance the

23  workload to create each employee to have 5 mil to

24  equate out to 50 mil.  And I had employees.  So I had

25  some employees that were 7, 8 mil, and some employees

Page 247

1   that were 6 mil, and I had some employees at 5.  But

2   it all equated out to my 55 million that I was

3   responsible for.

4        Q.   And who does those alignments?

5        A.   Dave's admin for the Central Division which

6   was Karen James.

7        Q.   Dave Russell's admin?

8        A.   Uh-huh.  One of his admins.  He had

9   multiples.  She was an analyst.

10        Q.   And does she need to get Dave's approval for

11   changes to the alignments?

12        A.   Yes and no, because she's got a task to

13   build territories because it starts from a hierarchy

14   of the division to regions to districts.

15        Q.   Okay.

16        A.   And in the old days, we were allowed to do

17   it, but then as time progressed with all the new hires

18   that didn't know anything about software and how the

19   software was utilized, Karen James or Dave or

20   corporate made the decision that there would be a

21   point person, and Dave Russell's point person was

22   Karen James.

23             So it was basically her role that she goes,

24   this is your territory.  This is how it's going to

25   work out, and if there was any exceptions to it, I

Page 248

1     didn't like it, for example, I couldn't call Karen, I

2     had to call Michelle and give her a justification of

3     why, and then Michelle took it upon herself to call

4     Karen James to get things addressed, rectified, or

5     come back and say, we're not going to do it because of

6     this.

7          Q.   And I think you said -- I'm sorry.  It's

8     been a long day.  You said it was Karen?

9          A.   Karen James.

10         Q.   Karen James, Dave Russell's assistant.  She

11    was doing those alignments under Dave's supervision,

12    correct?

13         A.   I don't even think -- yes and no.  I don't

14    think Dave looked at it.  I think he gave her

15    parameters or she knew the parameters that were

16    justified by the sales marketing group, and she took

17    it upon herself to create territories based on, here's

18    your district.  You have an average, and I have to

19    split this average amongst your number of employees to

20    give everybody an equal share.  There's a lot of

21    things that contributed to it.  It's not just as

22    simple as what you and I are talking about.  It's very

23    complicated.

24         Q.   I understand.  There's many factors that

25    could go into changes and developments in customer

Page 249

1    alignments, correct?

2         A.   Correct.  Because you could have -- she's

3    building my district amongst my 10 AEs.  Hypothetical

4    conversation.  I've got 50 mil, and she's building

5    that 50 mil to spread it amongst my 10 AEs.  But the

6    problem is, I've got one account that drives $20

7    million a quarter.  So she has to figure out how do I

8    put that one account of 20 million into play because I

9    can't do it equally.  So I may have one AE that may

10   only have 10 accounts because that 20 mil plus the

11   other 9 adds up to X.  And then the rest of the

12   district may have this, but their account load may

13   equate out to 100 to 120 accounts.  It all is based on

14   revenue contribution per account.  That's why I said,

15   It's complicated.

16        Q.   Right.  And I think you said -- it sounded

17   like you were saying that you had -- if you perceived

18   that there was some sort of inequity or incorrect

19   alignment that should be changed, you had the ability

20   to make a request for that to be changed?

21        A.   Correct.

22        Q.   Just briefly as possible, can you just maybe

23   give me a couple of examples of instances when you did

24   that?

25        A.   That I did?  I did it all the time.

Page 250

1    Q.   Okay.  So let's -- without going into all

2    the details --

3    A.   Here's a good example of what you're looking

4    for.  During the transition of a pricing program we

5    had, we went from our pricing program of PRS to the

6    new program of EPRS.  And basically the difference was

7    is that the PRS was even though we entered it into the

8    system, it was more of a manual set.  Answering

9    questions:  Yes or no.  The EPRS was designed to pull

10   historical information data from the system to allow

11   the AEs to enter a pricing request a lot quicker, a

12   lot easier, and not having to go research for all the

13   historical data.  That was the new EPRS system.

14        When the system came together, and it was

15   supposed to be this new created system, there was more

16   problems with it than you can shake a stick at.  First

17   of all, the two systems did not communicate.  This had

18   an account code which was 12 digits.  The EPR system

19   worked on nine digits.  So they had to take all these

20   account codes over here which were 12 digits and

21   create all new account codes to become nine digits so

22   EPRS could function.  During this transition of all

23   these account codes, there was a lot of account codes

24   that lost their way through the sky.  So you could

25   have your company called ABC.  And ABC, you had ten

Page 251

1    subsidiaries around you.  You had the main office, and

2    you had businesses scattered all through Texas, one in

3    Dallas, one in Houston, one in San Antonio, these are

4    all your subsidiaries or your warehouses that you sell

5    product out of.

6            Imagine a grocery store.  You know, you've

7    got a grocery store in your area.  How many of those

8    same grocery stores around Memphis?  There's multiples

9    of them.  But those are all the same thing.  They all

10   line up to the one parent office, which is your

11   office, for example.  All these have individual

12   account codes which they call an entity or a facility.

13   And it's the system that they were trying to get all

14   these 12 digits aligned to nine digits, they

15   automatically aligned roll up to what they call the

16   entity.  Because all these subsidiaries generate

17   revenue contribution for the entity.

18           During this transition, there were so many

19   problems with account codes.  The system got

20   overboard.  There was problems.  We had multiple,

21   multiple customers that were getting billed

22   incorrectly because discounts weren't applied.

23   Concessions weren't applied.  It was a total train

24   wreck.  And it got so bad that Memphis court turned

25   around and said, instead of you managers and AEs

Page 252

1    filing all these losses, all these adjustments that

2    need to be done because we're billing customers

3    incorrectly, we, as FedEx corp, are going to do this

4    ourselves, and we will send you reports quarterly

5    showing you how much credit we're going to give back

6    to your customers.  The customers were livid because

7    I'm in the system.  I'm billing, and on my discounts,

8    I should be sending a letter for 12.50.  But now all

9    of a sudden because we are moving the systems, the

10   customer, that same letter that cost me 12.50 last

11   month is now costing me $167 because I'm not getting

12   any discounts or anything.  It was a total debacle.

13        Q.   When was this?

14        A.   About two years before I left.  It was a

15   conversion of EPRS and PRS.  So the companies started

16   issuing all these things coming back, and in doing,

17   they never could get the accounts to roll up to the

18   true hierarchy.  So we were out there trying to find

19   accounts of how it goes here -- it was just picking a

20   puzzle piece.  Nothing was working.  And so it could

21   be that my numbers tumbled because I lost an account,

22   and I had to go find the account.  And once I found

23   the account, then I would tell Michelle that, Hey, I'm

24   short on revenue on this one here, or we overbilled a

25   customer here.  This affected my goals because of

Page 253

1    this, of this EPR system to PRS conversion.

2            And at that time, they would roll it up, and

3    then these reports that were being generated by

4    Memphis were also thrown to Vicki Peterson in

5    compensation.  They were trying to do everything

6    behind the scenes to make sure everybody was getting

7    compensated correctly.  It was a mess.

8            So this is how accounts rolled up and how

9    people got aligned.  I hope I answered your question.

10   It's very convoluted.  It's very confusing.

11       Q.   I think so.  Were there at least some

12   instances in which -- and I gather that, you know,

13   there were account executives on your team who had

14   problems with their composition as a result of this,

15   correct?

16       A.   Yeah.

17       Q.   And did you bring those matters to Michelle

18   Lamb's attention?

19       A.   Yes.

20       Q.   And were there at least some instances in

21   which Michelle Lamb was able to resolve those matters

22   to the satisfaction of both yourself and the account

23   executive?

24       A.   No.

25       Q.   Never was able to?

Page 254

1        A.    No.   I'll give you one good example.   There

2    was a customer we had in New Braunfels that did

3    sub-business for a company called Fanatics.   And

4    Fanatics is a company that has all the marketing

5    paraphernalia for professional sports.   So if you

6    wanted to order a Dallas Cowboy jersey with the

7    authenticity logo -- authenticated logo, Fanatics has

8    the rights to generate that shirt under the sports

9    arena that it falls under that will give you a true

10   jersey.

11            So this company out in New Braunfels does a

12   lot of the glasses, the drink glasses, the mugs, the

13   hats, the gloves, or whatever.   And during this

14   process, there was an account that came in called

15   Fanatics, and we got it, and it was totally broken.

16   This is that EPR system.   My AE got goaled or got

17   revenue contribution for, like, 160,000 which was

18   totally false.   And I talked to Michelle.   Michelle

19   told me to go talk to Melisa.   So I talked to Melisa,

20   and we got it rectified.

21            And then I turned around and I told

22   Michelle, I said, Here's my problem:   Because the

23   system is not going to correct historical data, I need

24   to make sure that this revenue contribution that we're

25   talking about today does not hit my AE next year in

Page 255

1   revenue growth.  Because we've already moved it to

2   where it belongs under Fanatics which is a national

3   account for us.  It's moved, but it will not correct

4   historical data.  So next year, he's going to be

5   goaled on it.

6                   MR. SANFORD:  When you say goaled,

7   that's G-O-A-L-E-D?

8                   THE WITNESS:  G-O-A-L.

9                   MR. SANFORD:  G-O-A-L-E-D?

10                  THE WITNESS:  Yeah, goaled.

11                  MR. SANFORD:  Not G-O-L-D?

12                  THE WITNESS:  G-O-A-L-E-D.

13       A.   He's going to be goaled on it in his

14  compensation.  And she told me I didn't know what I

15  was talking about.  We fixed it.  It's not going to

16  come to light, yada yada yada.  So I did all those

17  records.  I kept them in my deal, and I told my AE,

18  for whatever the reason may be, if I'm not here, if I

19  die, or whatever the case may be, here's the e-mail.

20  Save this e-mail because next year at this time when

21  compensation comes, I've got to make sure that you're

22  not goaled for this because it was never your account.

23  We moved the revenue a year ago.

24       Q.   And so -- and being goaled for it means that

25  that revenue is factored into your goal for the

Page 256

1    following year with a result that your goal would

2    increase?

3        A.   Right.  So I said, Fine.  So anyway, when

4    the year came up, he was goaled on it just like I told

5    Michelle was going to happen, but she turned around

6    and told me I didn't know what I was talking about.

7    So I got with Melisa which was Michelle's admin, and I

8    said, Melisa, we're here.  And she goes, I am so glad

9    you saved that e-mail.  And I said, yeah, because I

10   knew this was going to haunt me.  It was a broken

11   system, and yada yada this.

12            So we just ignored Michelle because she

13   wasn't going to do anything with it.  So Melisa turned

14   around and got with Karen James which is the one that

15   divides all these territories up on hierarchies,

16   talked to Karen, and Karen corrected it behind the

17   scenes.  But she couldn't correct it all the way

18   because it's compensated.

19            So then Karen had to send it to Vicki

20   Peterson to manually adjust Steve Scogna's numbers to

21   remove this number so he could get paid commission.

22   So if memory holds me right, and do not hold me to

23   this because I'm going off of thought, he went from

24   not getting a compensation payout that quarter to

25   getting a compensation that was a little over five

Page 257

1     grand because of that one account.

2              So it was a total messed up system, and

3     everybody in the system had it.  And the rules of

4     engagement that the company came out and said is that

5     if you have one of these accounts, bring it to light,

6     and we're going to discuss it and make sure we do the

7     right thing for the AEs.  And that was the deal.  But

8     Michelle never wanted to get involved in it because

9     she didn't know how the process worked.  And she

10    didn't want to know how the process worked.  That's

11    why I said she always said, go handle it over there

12    and come back and tell me how it did.  Just as the one

13    that I had coming from the valley, that Ricardo went

14    to president's club on which was a million dollar

15    customer at General Electric.  Remember I talked about

16    that earlier?

17         Q.   Yes.

18         A.   We got that corrected because Michelle

19    didn't want any part of it.  So Melisa and I and Karen

20    James and Vicki Peterson did it, and we got the

21    account realigned to the proper entity in

22    Pennsylvania.  And when we got it aligned to the

23    proper entity in Pennsylvania, I wasn't goaled on it,

24    and Ricardo wasn't goaled on it.  But Michelle never

25    wanted to get involved in it because she didn't know

Page 258

1    how the system worked.

2        Q.   Okay.  I don't have any more questions.

3    Mr. Sanford, do you want to?

4                       EXAMINATION

5    BY MR. SANFORD:

6        Q.   Okay.  So let's just talk about -- so early

7    on in the deposition, you talked about or you were

8    asked about characteristics that made a good district

9    sales manager.  Can you tell me whether or not

10   Jennifer Harris had characteristics of a good district

11   sales manager?

12       A.   Absolutely.

13       Q.   Can you tell me whether Michelle Lamb had

14   the characteristics of a good regional sales manager?

15       A.   No.  And that's why I said earlier in one of

16   my exhibits you got, Dave Russell asked a question in

17   one of his meetings, do you think your leader is a

18   valuable coach or something, however it was worded,

19   and my rhetorical thoughts that I wrote in red, I

20   said, absolutely not.  She's totally disengaged.

21       Q.   You talked about an analogy, a billing

22   analogy, where in terms of knowledge, the 10th floor

23   is the top level of knowledge.  You're about level 8,

24   and you said Jennifer was maybe 4 or 5 or 6, Jennifer

25   Harris.  What floor would you put Michelle Lamb's

Page 259

1    knowledge?

2                    MR. AHEARN:  Objection to form.

3                    THE WITNESS:  Can I answer?

4                    MR. AHEARN:  It's just an objection.

5    Go ahead.

6         A.   The basement or the first level.

7         Q.   So I think you explained this, but it was

8    the issue, I guess, you were written up for either

9    saying or not doing one-on-ones with your AEs?

10        A.   Okay.

11        Q.   Do you recall that?

12        A.   Yes.

13        Q.   Did you do one-on-ones with your AEs?

14        A.   All the time.  You can go back and pull my

15   calendars from FedEx, and they can still rebuild my

16   calendars from Outlook.  You will see all my

17   one-on-ones on the calendars.

18        Q.   So was the issue just a matter of geography?

19   Your one-on-ones were in person out in the field

20   rather than in an office or a Starbucks somewhere?

21        A.   Yes.  She did not want them in the car.  She

22   wanted them before, after, or a following day.  But

23   she did not want them in the car.

24        Q.   She wanted them where?

25        A.   A Starbucks, a restaurant, a gas station, my

Page 260

1    house, because at the time, we didn't have offices.

2    We worked out of our houses.  And I'm sorry, I'm not

3    bringing people to my house to conduct business.  So

4    we would have to go to a Starbucks.  Have you ever

5    tried to conduct a meeting at Starbucks?  It's noisy

6    as hell.  And if you go to a restaurant, if you go to

7    a library, whatever the case might be, that's where my

8    office became.

9         Q.   What were you supposed to do with a

10   one-on-one?

11        A.   Sat down, and we'd go over numbers.  We'd go

12   over their territory.  We'd go over any obstacles they

13   have, any issues they have, and then I'd turn around

14   and I'd make suggestions of where I can see

15   improvements or where I would like to see

16   improvements, how I can help them improve.  And it was

17   just coaching the individual to become better at his

18   job.

19        Q.   Did you go over those with her?

20        A.   Every time.  I was more detailed than

21   anybody else, and this is the reason I moved to the

22   car because having a group of baby boomers, and I've

23   managed for years, I had to constantly become creative

24   in some sort of fashion to keep their interest.  And

25   so as I sat there with them, that's why I said, I'm

Page 261

1   going to go to the car, and in the car with them, when

2   I ride with an AE, I'm there with them all day long.

3   And I use the phrase from sunup to sunset.  And

4   Michelle never could digest my terminology.  It was

5   just an analogy because my days with them, I started

6   with them at like 8:30 in the morning.  We would be

7   done anywhere between 2:30 and 4:30.

8       Q.   Did Michelle Lamb ever spend a full day with

9   you?

10      A.   No.

11      Q.   All right.  So let me ask you this:  On the

12  football issue, pass the football from one to the

13  other, and I believe you testified that one or more of

14  your AEs said if it came to us, we would just return

15  it because we're upset?

16      A.   Correct.  Because they felt they were not

17  part of the region.

18      Q.   And what was your intended solution?

19      A.   As Brian -- as I said, Brian Golden and I

20  had conversations before the meeting of how do we get

21  the ball to San Antonio?  Because this was an exercise

22  of Michelle's, how do build camaraderie, how to learn

23  to collaborate amongst the peers, and like I told

24  Brian, this hasn't made San Antonio, and for this

25  exercise to be successful, we need to include it.  And

Page 262

1    he agreed with me wholeheartedly.

2         Q.   Even at that meeting?

3         A.   That was my intent at the meeting.

4         Q.   But if your AEs said they didn't want it,

5    what was your solution?

6         A.   So when I'm talking in the meeting, I even

7    told Michelle in the meeting that Brian Golden and I

8    have had a couple of conversations on this of getting

9    it to, to continue the exercise, to make the exercise

10   successful, to have the San Antonio AEs feel like

11   they're part of the region.

12        Q.   Even if they didn't want it?

13        A.   I haven't got that far.  Brian Golden stood

14   up and said, Yes, Richard and I had those

15   conversations, and yes, we had them.  I dropped the

16   ball.  I never got it to San Antonio.  That's when I

17   said, And my AEs feel that they're not part of the

18   region.  So if the ball came, they would send it back.

19   I wanted nothing more than to get that ball to San

20   Antonio to complete the exercise.  But they were going

21   to sit there and cancel them out.  So how do you

22   cancel something out when you don't bring all the

23   parties in, especially when it's the director's

24   initiative.

25        Q.   So the point I'm asking is which way were

Page 263

1    you intending to go?  If the ball came, and your AEs

2    said, we don't want it.  What were you going to say or

3    do?

4         A.   We were going to keep it regardless.  That

5    was just frustration from the AEs.  If we got the

6    ball, we were going to cherish like everybody else in

7    the exercise.  What would have happened is, because

8    like I said earlier, the AEs from the San Antonio

9    market, the Austin market, and the Houston market

10   really didn't know anybody.  So it was very hard to

11   collaborate.  So as in Houston, as in Austin, when

12   they got the ball, the ball started passing amongst

13   their group.  So in other words, what would happen if

14   it would have come to San Antonio, say they gave it to

15   Steve Scogna, Steve Scogna would have got the ball.

16   He's not going to drive to Austin or Houston to pass

17   it around.  He doesn't really know the AEs.  So he's

18   going to go get one of his counterparts like Patricia

19   and give her the ball.  Patricia's going to get the

20   ball, and then she's going to turn around and give it

21   to William Gonzalez, and then William Gonzalez may

22   give it to Adrian Moralez.

23        Q.   Who was ultimately responsible for making

24   sure that San Antonio was not left out?

25        A.   Michelle Lamb.  It's her -- she's the

Page 264

1    director.  It's her region, and it was her initiative

2    to make this thing successful.  And all I was doing

3    was bringing it forward, you want to cancel an

4    exercise that never made it down here.

5        Q.   So you talk about the Friday right before

6    you go on vacation at 4:30, afternoon telephone.  You

7    called it a screaming match?

8        A.   It started out calm, and ended up where she

9    was screaming at me.

10       Q.   What about you, did you raise your voice?

11       A.   No.  I was taken aback, and I just held my

12   composure.  I said, Because this ain't going to go no

13   where.  She's not going to have a document of anything

14   of screaming or nothing.

15       Q.   So you kept your composure?

16       A.   Kept my cool.

17       Q.   So you got really upset today during this

18   deposition.

19       A.   Absolutely.

20       Q.   I didn't hear you raise your voice one time

21   although you were really upset.

22       A.   Okay.

23       Q.   Did you raise your voice today?

24       A.   Personally, I think I did.  But I can't

25   judge my tone.  I can't judge my sound from a decibel

Page 265

1    perspective out there.  So...

2         Q.   It didn't sound like yelling to me.

3         A.   I don't think I yelled, because I yell,

4    you'll know when I yell.

5         Q.   Right.

6         A.   I think I was more frustrated.

7         Q.   There was no screaming today?

8         A.   No, there was no screaming here at all.

9         Q.   Okay.  Then you said, Look if you want me --

10   I guess in that conversation, that 4:30 conversation,

11   If you want me to make a public apology, I'll do it.

12   You made that offer?

13        A.   Yes.

14        Q.   Was there any basis for you needing to make

15   an apology?

16        A.   No.  There was nothing I did or nothing I

17   said to warrant it.  I was just doing it to calm her

18   down.  She was screaming.  And that's why I told her

19   just to end it.  I said, Michelle, if you want me to

20   apologize, I'll make a public apology amongst the

21   group.  She goes, I just wanted to talk to you about

22   this before you go on vacation.  Jesus Christ, thank

23   you.

24        Q.   You were accused of derailing a meeting.

25   Did you derail any meeting?

Page 266

1      A.   No, I made a comment in my peer group, and
2   the comment was -- and I don't the paper.  So I can't
3   recite it, you know -- I can't even talk right now.
4   But I basically said, I don't do sitdown one-on-ones
5   now because I have a very tenured group.  They're all
6   baby boomers, and I've got to continuously change my
7   way of thinking to keep things creative to keep them
8   learning.  So what I do right now is I've incorporated
9   my one-on-ones into the car.  That's not derailing.
10  That's just an open discussion.
11      Q.   And so who was leading that discussion?
12      A.   Brad Lambert and Brian Golden.
13      Q.   Was Michelle even in that discussion?
14      A.   No, she was sitting right over here by me,
15  and she never said a word the entire meeting.  And
16  that was Michelle's pattern that she does is when she
17  had a meeting when she first came in, she never
18  conducted the meeting.  She always passed the meetings
19  on to the new people.  Did she ever choose me or
20  Jennifer to host a meeting?  No.  Who did she pick?
21  Brad Lambert, Brian Golden, Brian Hickman, Brian
22  Conrey, Jaime McElroy, and Brian Conrey.  Did she ever
23  pick Jennifer or I?  No.
24      Q.   Just to be clear, in your discipline
25  process, did Michelle Lamb follow FedEx policy and

Page 267

1    procedure for the progressive discipline with you?

2         A.    No.

3                   MR. AHEARN:  Objection to form.

4         A.    She always left out the document of

5    discussion, and she'd shortcut time frames.  Time

6    frame is a 90-day time frame.  You give the individual

7    at least a quarter to turn things around.  If things

8    do not turn around -- this is the way the policy

9    statement is written.  And this is where you have to

10   use judgment, and you bring HR in, and you bring Dave

11   Russell in, the VP.  And this is where everybody acts

12   as adults, and they don't become biased.  You put

13   someone on a documented discussion, it comes to a

14   letter.  Whether it's documented discussion or their

15   first letter, they get a 90-day period to turn the

16   course.  You can't turn a Titanic around in 30

17   minutes.  It takes time.  At the end of the quarter,

18   which is a 90-day time period, you evaluate the

19   individual based on the plans that you outlined.  Did

20   the individual correct certain things?  Is the

21   individual doing this?  Is the individual trying to

22   change things?  Is the individual doing this?  And if

23   they're all doing that, and he's showing progress in

24   his efforts to turn the ship, you have a chance as a

25   good manager to sit there and say, Okay, here's what

Page 268

1   I'm going to do.  I'm going to leave you on the letter

2   for one more quarter.  That will give you six months.

3   If you can't turn the ship by then, I may be forced to

4   give you a letter of warning.  That's how it goes.

5       Q.   How do you know this?

6       A.   Because it's written in the policy.  And

7   Michelle, she always skip leveled everything.  You

8   went -- no documented discussion, oh, I'm giving you a

9   letter today.

10      Q.   And did you meet with Russell and HR for a

11  documented discussion?

12      A.   No.  It's not Russell's or HR's documented

13  discussion.  It's Michelle.

14      Q.   Where did they get involved?

15      A.   Russell --

16      Q.   Russell and HR?

17      A.   They don't ever get involved unless she

18  presents a letter, or I present a letter to my group.

19  I cannot present a letter unless I draft it up, I send

20  it to Jim Wallace.  At that time, he was my HR

21  advisor.  I have to send it to Jim Wallace.  Jim

22  Wallace proofreads, paraphrases, he goes through to

23  make sure everything is presented accordingly as

24  outlined in the business policies.  He comes back to

25  me, and he says, This is good.

1          Then I turn around, and I send it back to

2     Jim Wallace and Dave Russell, since he's my VP, and I

3     cannot commence forth unless Jim Wallace comes back at

4     that time and says, You are good to go.  That ensures

5     that all parties of management are involved.  That

6     ensures that HR reviewed, made sure that it complied

7     with policy, we were on the same format, and once I

8     got the approval, then I could meet with my AE and

9     say, This is where we're at.

10          Michelle never did that.  She just jumped.

11     Now, do conversations take place behind the scenes?  I

12     would have to assume that because of all the letters

13     you see, Jim Wallace or Kristie Castilow or Dave

14     Russell's CCd in on it.  So it's their responsibility

15     to review it, and if they don't review it, shame on

16     them.  Because that's like giving me the keys to your

17     bank account and letting me take all your money, and

18     you didn't review your statement at the end of the

19     month.

20          Q.   Let me talk about alignment.  What are the

21     rules for alignment?  What is the rule for aligning a

22     customer in a particular district?

23          A.   The first rule -- oh, this is going to be

24     complicated.  I'm going to keep it as short as I can.

25     I'm getting tired.

Page 270

1     Q.   Well, let me ask you --

2     A.   I know what you're talking about.  The first

3  rule is every account is aligned by ZIP Codes in my

4  district, which is filtered down to my territories.

5  AEs are given a number of ZIP Codes, and every account

6  that falls in the ZIP Code aligns to that particular

7  AE.  There's things and exceptions that happen because

8  of the way our system looks at things because a lot of

9  these businesses could have their corporate office in

10  ZIP Code 1, which is in San Antonio, Texas, but on the

11  north side of San Antonio, they could have a warehouse

12  which is in total ZIP Code number 2.  The system looks

13  at it like because they align by ZIP Code, one AE gets

14  the corporate office, the other AE gets the office in

15  ZIP Code 2.  It's the AE's responsibility, as well as

16  my responsibility, to make sure we bring those things

17  together to make sure that both of those facilities

18  align to the corporate office which is in ZIP Code 1.

19  And how we do that is, we get with Michelle.  We get

20  with Melisa.  We justify the reasonings on it, and

21  then Melisa turns around and moves that account to

22  make sure it follows what we call the hierarchy of the

23  entity.

24     Q.   And the hierarchy of the entity is the

25  corporate office?

Page 271

1          A.    It's the corporate office.  The entity is

2     always the corporate office.

3          Q.    And so the customer is aligned to the ZIP

4     Code of the corporate office?

5          A.    Of the corporate office.  And this is where

6     it gets kind of confusing.  It's aligned to ZIP Code,

7     but it's actually aligned to what we call their global

8     entity, that's their DBA official name through Dun and

9     Brad.  So a Dun and Brad could be AB company, but in

10    all essence, it could be Amazon.  And I'm just kind of

11    making this up.  And you have all the Amazon

12    facilities, but if I own AB company as their global

13    entity which is in my territory, all the Amazon

14    facilities across the US get aligned to me because I'm

15    in control of the corporate office.

16         Q.    Right.

17         A.    Those things break away.  Those things fall

18    through the grapevine, and we find them through the

19    process of elimination.  And then my time's to bring

20    it, I have to do it.  If that thing gets staggered out

21    somewhere, the process is is we talk to -- I talk to

22    my peer.  So I talk to my DSM in Chicago.

23         Q.    The bottom line is, it may be complicated,

24    but at the end of the day, the rule is customer is

25    aligned at their global headquarters to the ZIP Code

Page 272

1    where that headquarters is at?

2        A.   Correct.  So in essence -- and I don't know

3    if this is part of your question, but it creates some

4    clarity to it.  If I owned the global entity, and I

5    decide that, for whatever the reason may be, we had an

6    alignment of ZIP Codes, and ZIP Code now got moved to

7    you, for whatever the reason may be, you got all the

8    accounts.  But, however, there was one account that

9    got left in my territory because it wasn't truly

10   aligned to this because I'm still waiting for EPRS to

11   make the corrections.  I'm waiting for the conversion

12   from the 12-digit to the 9-digit account code.

13          There's a lot of reasons why it was left

14   here, but this account, whether it's good or whether

15   it's detrimental, it remained with me, and it's

16   incorrect.  It needs to move to you.

17          So if I can't move it within the quarter,

18   and the revenue comes there, as a gain, I would go to

19   my director, like Michelle Lamb, and I would say,

20   Michelle, this account moved to him or her.  It left

21   this facility here.  I got revenue contribution for

22   it, and I don't deserve it.  Michelle would have to

23   take it upon herself to get with Karen James with the

24   justification I just gave her, get it corrected in the

25   system, but because the quarter completed, Michelle's

Page 273

1    next step would be she would have to get ahold of

2    Vicki Peterson which is in compensation and explain

3    the reason why she is moving X dollars from my

4    territory to your territory.  Because in their eyes,

5    it doesn't make sense, because I gained $100,000 and

6    I'm trying to move it.

7         Q.   So let me ask -- make it much more simple.

8    All right.  So -- and to give you a real-life example.

9    Jennifer Harris has an AE one quarter.

10        A.   Okay.

11        Q.   The very next quarter, this AE has been

12   moved to another district sales manager.

13        A.   Okay.

14        Q.   And all of her territories are moved to the

15   other district sales manager, and all of her customers

16   are moved to the district sales manager.

17        A.   Okay.

18        Q.   Including BJ Services, a company called BJ

19   Services.

20        A.   Okay.

21        Q.   No question about anything being left.  No

22   question about income coming in this next quarter.

23   Zero income coming in to Jennifer Harris from that BJ

24   Services.

25        A.   Okay.

Page 274

1     Q.   Zero question about if it's in her territory

2  or not.  So my question is:  What is the rule for

3  being goaled?  Going forward in the future, for

4  that -- for BJ Services because it's no longer in her

5  territory going forward?

6           MR. AHEARN:  Objection to form.

7     A.   Just to make sure I understand.  BJ

8  Services -- or the AE got removed from Jennifer's

9  hierarchy --

10     Q.   Yes.

11     A.   -- to a new district sales manager?

12     Q.   Brian Conrey.

13     A.   Okay.  She got moved to Brian Conrey.  And

14  when she got moved to Brian Conrey, all of her ZIP

15  Codes that were aligned to her under Jennifer moved as

16  well to Conrey?

17     Q.   Yes.

18     A.   So that means that all the accounts within

19  that --

20     Q.   Including BJ Services.

21     A.   So that means that all the accounts that

22  were aligned to her by ZIP Codes moved to her and

23  moved to Conrey.  Conrey is now responsible for all

24  those accounts that the new AE had.  If any account

25  was left over into Jennifer, for whatever the reason

Page 275

1    may be, there's what we call rules of engagement to

2    correct.  Number 1, it should have never been left to

3    Jennifer.

4          Q.    It wasn't.

5          A.    It should have moved.

6          Q.    Are we talking about the goal or the

7    customer?

8          A.    The customer should have moved.

9          Q.    The customer got moved.  There's no

10   question.

11         A.    Okay.

12               MR. AHEARN:  Objection to form.

13         Q.    No question whether the customer got moved.

14         A.    I'm just saying, the customer moved.  And

15   moving that, depending on a time frame, because we

16   work through a process called simulations and sims to

17   where we're moving accounts, and during this process

18   of moving accounts, because Karen James, because she's

19   the one that's doing it for Dave, she was working at

20   this thing six months in advance.  So there would be

21   this period of what they call lockdown that we cannot

22   move anything.  We cannot correct anything.  It sits

23   there until the following quarter.

24               So if this account moved to Conrey, and the

25   paperwork, or it was done during the freeze to where

Page 276

1    it could not move the revenue, and the revenue stayed

2    with Jennifer, and Jennifer got goaled on the revenue,

3    which would be totally incorrect, it's Michelle Lamb's

4    responsibility to correct it.

5        Q.    That's what I'm trying to get to.

6        A.    It's Michelle Lamb's responsibility to

7    correct it because all she --

8        Q.    Why does she correct what's incorrect?

9        A.    Because the correction would be that she

10   would get ahold of Karen James and say, We've moved

11   this AE, all the ZIP Codes, all the accounts.  There's

12   no questions, no doubt, but because we were in a

13   lockout period, we couldn't move numbers for

14   historical data.  Jennifer came to the next quarter,

15   got goaled on it.  We need to remove the goal.  And

16   Karen James would sign off.

17       Q.    Well, what about this:  Let's say that the

18   situation is -- I'll just represent to you the

19   situation is it got all moved over to Brian Conrey,

20   and what Michelle Lamb had to do is to physically go

21   to Vicki and say, No, move the goals back to Jennifer.

22   We're going to make an exception to the rule, move it

23   back to Jennifer going forward even though it's in

24   Brian Conrey's district, and everything was all set

25   up?

Page 277

1      A.   That's totally incorrect.

2           MR. AHEARN:  Objection to form.

3      A.   It's totally incorrect.

4           MR. SANFORD:  What's your objection?

5           MR. AHEARN:  Lacks foundation.

6  Incomplete hypothetical.

7           MR. SANFORD:  What's incomplete?

8           MR. AHEARN:  I don't think we need to

9  argue about the admissibility of testimony on the

10  record.

11          MR. SANFORD:  I want to meet your

12  objection.  I want to satisfy your objection.

13          MR. AHEARN:  I don't think you've laid

14  the foundation for your factual assumptions that you

15  incorporated into the question.

16     Q.   All right.  So assume, for the record, I

17  believe that the facts show that the account was moved

18  to Brian Conrey.  BJ Services was moved to Brian

19  Conrey under Jennifer Garcia.

20     A.   Okay.

21     Q.   Brian says, The price is too high.  I don't

22  want this high goal.  And rather than reducing the

23  goal for Brian Conrey, Michelle Lamb had to make an

24  exception going to Vicki Larson -- is her last name

25  Larson?

Page 278

1        A.    Peterson.

2        Q.    -- Peterson, and say, please make an

3    exception and put the goal back on to -- going

4    forward, put the goal back onto Jennifer Harris?

5        A.    Okay.  Totally incorrect.  Whether it's

6    hypothetical or whether it's assumption --

7                    MR. AHEARN:  Objection.  Objection to

8    form.

9        A.    It's totally incorrect.  Because what

10   happens is the account moves.  The revenue moves.  The

11   goal moves.  And if something doesn't go according to

12   the plan, we have what we call rules of engagement,

13   and the rules of engagement is we justify to Michelle.

14   Michelle takes the justification.  She presents it to

15   Karen James.  Karen James signs off on it.  If need

16   to, they get Dave Russell involved in it.  And then

17   the final step is we've got to call Vicki Peterson to

18   make a manual correction of compensation because the

19   previous quarter has been locked down.

20            What a lot of people don't understand about

21   our comp is is that if we finish Q1, we don't get paid

22   comp until Q3.  There's a quarter lag because during

23   Q2, they're running all the numbers.  They're making

24   sure of all the alignments.  They're making sure of

25   all the debates, all the inquiries, everything that's