Page 85

1    transfer to one of your AEs from whatever AE they

2    were then at before the adjustment?

3         A.    Yes, that is correct.

4         Q.    And the adjustment request, it could

5    submit it to the managing director, correct?

6         A.    Yes.

7         Q.    But it also goes to another place?

8         A.    It goes to the sales compensation team.

9         Q.    And that's in Memphis, Tennessee, right?

10        A.    That is correct.

11        Q.    And the sales compensation team plays a

12   role in determining where customers should align,

13   correct?

14        A.    They use verification steps to look at ZIP

15   codes, look at headquarters.  They also verify with

16   the customer's website and other details to confirm

17   those facts.

18        Q.    Yeah.

19              They're the group that, you know, will be

20   the arbitrator if there's a dispute between sales

21   professionals and who should get a customer,

22   correct?

23        A.    Correct.

24        Q.    Okay.  All right.  So going back to 4G

25   Dental in paragraph 18, you submitted an adjustment

Page 86

1    request then.  Is that fair?

2        A.   I couldn't.  That's why I went to

3    Michelle.  She did have the authority to do so.

4    Just like with BJ Services, she could go to Vicky

5    Peterson.  And when she did the negative impact to

6    me on an adjustment, she could have utilized the

7    same process.  But, instead, I had to go through the

8    segmentation and right align the customer but after

9    my white peer was already given this $80,313.54

10   positively to his attainment, which then added to

11   his compensation and commission.

12       Q.   Okay.  So the other adjustments you talked

13   about with Jerry -- I forgot his last name -- and

14   Mr.  Powell --

15       A.   Jerry Page.

16       Q.   Jerry Page.  Thank you.

17            -- with Mr.  Page and Mr.  Powell, did you

18   yourself submit the adjustment request or is that

19   something the director also had to do?

20       A.   I gave him the account details.  It goes

21   to his admin to be added to a spreadsheet, then

22   they're submitted, and then it has to go through an

23   approval process through the sales compensation

24   team.

25       Q.   Okay.  And what process did you have to

Page 87

1   follow for the 4G account?

2         A.   I had to do what's called segmentation.

3         Q.   Okay.

4         A.   It's when we right align accounts based on

5   the proper ZIP code and headquarters.

6         Q.   Okay.  And then does that information go

7   to the sales team in Memphis?

8         A.   It does not because there's not an

9   adjustment required for segmentation.  That is just

10  the alignment piece to get it aligned to the correct

11  account executive which aligns it correctly to me.

12        Q.   All right.  What facts did you -- what

13  actions did you observe Ms. Lamb taking that you

14  allege was part of her, quote, clear and retaliatory

15  plan to bolster her false accusations regarding the

16  4G account?

17        A.   Because I presented to her the email that

18  she responded to the customer after he thanked her

19  for her visit, and she then replied, and then I also

20  attached from iSell in the Salesforce reporting the

21  revenue and utilize what's called ZipWeb to type in

22  the customer's ZIP code which confirmed the correct

23  alignment to myself and Abraham Velasco that that

24  customer was improperly aligned in hopes that she

25  would do the right thing and properly align it to me

1    instead of continuing to allow my white peer Brian

2    Conrey receive the positive revenue credit and

3    commission for that account, which also helped her

4    with her false accusation of poor performance.

5         Q.   Okay.  Thank you.

6              Paragraph 19?

7         A.   Yes.

8         Q.   What facts or actions by Ms. Lamb can you

9    point me to to support your contention that Ms. Lamb

10   wanted to terminate your employment at the time she

11   put you on the performance improvement plan in

12   September of 2019?

13        A.   The negative impact of BJ Services, which

14   was a 1-plus million dollar adjustment, potentially

15   every quarter on that particular customer; in

16   addition to not properly aligning the 4G Dental

17   account, which shows and demonstrates $80,313.54 of

18   positive revenue that should have been properly

19   aligned to -- to me and my district; in addition to

20   her aggressive response to the details in her

21   Coach2Grow 2.0; and all of the other details that I

22   shared.

23             So all of those things line up with the

24   response that I sent for retaliation and

25   discrimination from Michelle Lamb.

Page 89

1      Q.   And you -- I think you've answered my next

2    question, but so I have a good record:  You believe

3    the September 13, 2019, performance improvement plan

4    is evidence of retaliation, correct?

5         A.   Yes.

6         Q.   And you also believe that you would not

7    have received the September 13, 2019, performance

8    improvement plan if you were not black?

9         A.   That is correct.  In addition to her

10   negatively aligning BJ Services and not properly

11   aligning 4G Dental.

12        Q.   You claim in paragraph 19 that the PIP --

13   can I use that phrase, PIP?  Have you heard that

14   term?

15        A.   Absolutely.  It's personal improvement

16   plan or it's --

17        Q.   Or performance.

18        A.   -- actually performance improvement plan.

19        Q.   All right.

20        A.   It's mistyped.

21        Q.   You claim that the September 2019 PIP was

22   sporadically drafted, right?

23        A.   Yes.  It is different from the performance

24   improvement plan that I drafted.

25        Q.   Okay.  What do you mean it's sporadically

Page 90

1    drafted?

2         A.    Because she used different details.  Just

3    as the example of my white peer Richard Holley being

4    given zero of six quarters and, in my letter of

5    counseling, I was given zero of four quarters, it's

6    different and inconsistent with my white peer.

7              So the details outlined in the performance

8    improvement plan actually allowed her to inflate her

9    expectation of improvement and falsely accuse me of

10   not doing well when, compared to my white peers, I

11   was doing better if not the same as them.

12        Q.    Wasn't this September 2019 PIP your second

13   PIP?

14        A.    That is correct.

15        Q.    Okay.  And wasn't the second PIP based on

16   some of the issues that were being addressed in your

17   first PIP?

18        A.    But they also aligned to her falsely

19   inflating the numbers of BJ Services and 4G Dental,

20   which should have positively impacted me.  So she

21   continued to add on those details and retaliate

22   against me due to my complaint to HR to her -- on

23   her, excuse me, for the letter of warning now with

24   the second PIP.

25              MR. BABCOCK:  I'm just going to move

Page 91

1    to strike as nonresponsive.

2         Q.   Ma'am, my question was:  Wasn't the second

3    PIP in September 2019 based on some of the contents

4    of your first PIP?

5         A.   Some of the contents, yes.

6         Q.   Okay.  And you claim in here -- it's on

7    the top of the next page -- you were only provided

8    one quarter to show improvement, correct?

9         A.   Yes.

10        Q.   And a quarter at FedEx is 90 days?

11        A.   Yes.

12        Q.   Okay.  And so who are the similarly

13   situated or worse performing white employees that

14   you're referencing in this paragraph?

15        A.   Brian Hickman, Jaime Golden-McElroy,

16   Richard Holley, and Brian Golden.

17        Q.   And that's the same discussion we had

18   before the first break where you talked about their

19   attainment goals?

20        A.   And their calls on opportunities --

21        Q.   Right.

22        A.   -- and their joint calls, all of those

23   details compiled, or details she used to falsely

24   accuse me of poor performance and not consistently

25   use those same factors to evaluate my white peers.

Page 92

1      Q.   But we discussed that already this
2    morning, right --
3      A.   Yes, that is correct.
4      Q.   -- before the break?
5           Okay.  That's what I wanted to make sure,
6    Ms. Harris.  I'm just -- I'm not here to argue with
7    you; I'm just -- I'm just here to make sure I
8    understand your --
9      A.   Sure.
10     Q.   -- story, for lack of a better term.
11     A.   Sure.
12     Q.   Or the contentions in your lawsuit.  All
13   right?
14          All right.  Paragraph 20, who -- you state
15   you're one of the top performers throughout the
16   country in paragraph 20.
17     A.   That is correct.  I won President's Club,
18   which ranks me in the top 6 percent of sales
19   managers and professionals in the company.
20     Q.   All right.  And what year did you go to
21   President's Club?
22     A.   We went in FY17.
23     Q.   Okay.  So the PIP was happening in 2019,
24   right?
25     A.   Uh-huh.  It started in FY18 and rolled

Page 93

1    into '19, yes.

2         Q.   Well, isn't the second PIP September

3    of 2019?

4         A.   Right.  But --

5         Q.   So that would be FY20, right?

6         A.   That is correct.

7         Q.   Okay.  I thought that's what you meant.  I

8    think you just misspoke.  So thank you for that

9    clarification.

10                   MR. SANFORD:  Objection; form.

11        Q.   How do you know how other sales managers

12   were performing across the country or is it just

13   based on because you went to President's Club and

14   you know the metric that's used for President's

15   Club?

16        A.   There is a dashboard where we can see.  It

17   aligns us based on our revenue attainment that we

18   can log into and evaluate those details.

19        Q.   Oh, okay.  So you have a dashboard or a

20   program you can access that will stack rank you with

21   other sales managers in the country?

22        A.   That is correct.

23        Q.   Okay.  And who is Kristi Dawson?

24        A.   She was a field sales district sales

25   manager under Grant Kuhn.

1      Q.   What part of the country was she based in;
2   do you know?
3      A.   Dallas.
4      Q.   And what's this number 86.76 percent you
5   refer to?
6      A.   That is her attainment.
7      Q.   So that's a revenue attainment goal?
8      A.   That is correct.
9      Q.   Okay.  And by most recent quarter, what --
10  do you recall what quarter you were looking at?
11     A.   I don't at this time.
12     Q.   Okay.  Does it help you if you look at the
13  beginning of paragraph 20 that you're talking about
14  this during the time you were on a PIP?  I don't
15  know if it was the first PIP or the second PIP, so
16  the June to September 2019 time frame it looks like.
17          Does that refresh your memory at all,
18  ma'am, on what quarter you might have looked at for
19  Ms. Dawson?
20     A.   At this time, I don't recall.
21     Q.   Can you tell me sitting here today what
22  Ms. Dawson's number was in the quarter previous to
23  the quarter you looked at?
24     A.   At this time, I do not recall.
25     Q.   What innovation award did Ms. Dawson

Page 95

1    receive?

2         A.   It was an award given from Dave Russell.

3         Q.   And what was it for; do you know?

4         A.    It highlighted her for being an

5    outstanding leader or a good leader but when the

6    reporting demonstrated that she was actually a low

7    performer.

8         Q.   Okay.  And when did Mr. Russell give

9    Ms. Dawson this award; do you know?

10        A.   At this time, I don't recall.

11        Q.   And was this an annual award that

12   Mr. Russell gave to a manager or was it quarterly?

13   Do you know?

14        A.   I'm not sure.  I had never seen that award

15   issued prior to that.

16        Q.   Okay.  So Ms. Dawson is the only person

17   you know that received this type of award from

18   Mr. Russell.  Is that fair?

19        A.   To my knowledge, yes.

20        Q.   Okay.  Paragraph 21.

21        A.   Okay.

22        Q.   It's your contention that at the time

23   Ms. Lamb was -- strike that.

24             It's your contention that you already had

25   an impressive performance; is that right?

Page 96

1      A.   I had good performance, yes.

2      Q.   Okay.  You used the phrase "impressive

3   performance."  Do you see that?

4      A.   I do.

5      Q.   Do you have a different -- does

6   "impressive" mean something different to you than

7   the phrase "good"?

8      A.   No, they align together.

9      Q.   Okay.  If your performance is already

10  impressive or good, why would you need additional

11  coaching?

12     A.   I'm requesting that because based upon the

13  false allegations that Michelle Lamb used to give me

14  the letter of counseling and the letter of warning,

15  her perception was I was a poor performer.  So I

16  asked that in the coaching that was required due to

17  this performance improvement plan for her to be able

18  to demonstrate the strategies on how I should

19  improve.  Instead of bullying me with reports and

20  emails that were inaccurate in the one-on-one

21  conversations, actually outline ways and strategies

22  of how I could improve, use her experience and

23  expertise and knowledge to specifically identify

24  characteristics and customers and -- and actually

25  demonstrate that goal with a rep or go to a customer

Page 97

1    and actually perform a meeting where she's able to

2    convince or encourage a customer to grow or

3    transition their revenue over to FedEx so that these

4    falsely inflated numbers that she demonstrated in

5    this letter of counseling and letter of warning

6    could demonstrate her impact on improvement.

7         Q.   Your contention is that Ms. Lamb never

8    provided you guidance on how to improve your

9    performance or your team's performance, correct?

10        A.   No strategies, no structure, that is

11   correct.

12        Q.   Okay.  Who are the white co-workers you're

13   referring to in this paragraph, paragraph 21?

14             Does that involve Mr. Holley?  I see a

15   reference to a PIP in six quarters.

16        A.   Yes, Mr. Holley is included in this

17   reference.

18        Q.   Okay.  I just...

19        A.   I'm -- I'm still reading the paragraph.

20   One moment, please.

21        Q.   Okay.  Tell me when you're done.

22        A.   (Reviewed document.)  Okay.  Yes,

23   Mr. Holley was included in that.  Brian Conrey

24   was -- excuse me, Brian Hickman, Jaime

25   Golden-McElroy, and Brian Golden was included in the

Page 98

1    peers that I was referencing for this particular

2    details of the PIP.

3        Q.   Okay.  But only -- is it your

4    understanding that only Mr.  Holley was placed on a

5    PIP during that time?

6        A.   That is correct.

7        Q.   Okay.

8        A.   But I'm using the examples that she used

9    to write the letter of counseling and the details

10   highlighted in the PIP.  My white peers were not --

11   they didn't -- she didn't use the same evaluation on

12   them that she used on myself.

13       Q.   Okay.  In paragraph 21, you reference "my

14   first written warning my subsequent PIP."  I just

15   want to make sure I know what you're referring to.

16            You're referring to your June letter of

17   counseling -- June of 2019 letter of counseling?

18       A.   Yes.

19       Q.   And then the first PIP that you were on?

20       A.   That was the first.  I had never had any

21   documented discussions or any discipline in my file

22   prior to that.

23       Q.   It says in here that -- I'm sorry.  We're

24   on paragraph 22?

25       A.   You were on 21 unless you moved --

Page 99

1      Q.  I know.  Let's move to 22.

2      A.  Okay.

3      Q.  It says in here that the recent PIP --

4  that would be the September 2019 PIP, correct?

5      A.  Yes.

6      Q.  And you say, quote, which falsely accuses

7  me of managing the district with the lowest pricing

8  activity in the region, closed quote.

9         Did I read that phrase right?

10     A.  That is correct.

11     Q.  And you're saying that that's blatantly

12  false, right?

13     A.  That is correct.

14     Q.  Okay.  Were -- was there false information

15  in your first PIP as well, ma'am?

16     A.  Yes.

17     Q.  And do you recall what that false

18  information was?

19     A.  It was the negative adjustment from

20  BJ Services that was falsely aligned to me and

21  should have been aligned to my white peer Brian

22  Conrey and the adjustment of 4G Dental, which should

23  have been positively aligned to me and was not.

24     Q.  Okay.  Was there anything correct or

25  justifiable in your mind, ma'am, in your first PIP?

Page 100

1      A.   No.

2      Q.   Okay.  Was there anything justified or

3  correct or true in your second PIP?

4      A.   No.

5      Q.   Okay.  In paragraph 22, you highlight that

6  you were number 4 in the region for daily

7  activations.

8           Do you see that?

9      A.   That is correct.

10      Q.   Do you recall, sitting here today, what

11  you ranked in all the other metrics that FedEx

12  tracks?

13      A.   I recall that I was number one in joint

14  call activity, but I don't recall which place I was

15  in calls on opportunities, but I know I was in the

16  top half, so in the top four of managers on her

17  team.

18      Q.   Besides daily -- average daily

19  activations, joint call activities, call on

20  opportunities, those three categories, what other

21  metrics did FedEx measure?

22      A.   Close business tracking.

23      Q.   Any other metrics?

24      A.   Pricing.

25      Q.   Any other metrics?

Page 101

1          A.    Can you repeat what you listed, please?

2          Q.    Yeah, absolutely.  Yeah, it's no -- it's

3     no secret.  I have average daily activations --

4     there's five that I have.  Okay.

5          A.    Okay.

6          Q.    Average daily activations, joint call

7     activities, calls on opportunities, closed business

8     tracking, and pricing.

9          A.    Yeah, closed business tracking and

10    activations are the same.

11         Q.    Okay.

12         A.    And then revenue attainment is the one

13    you're missing.

14         Q.    All right.  So there's five because closed

15    business transaction and activations are kind of the

16    same?

17         A.    Yes, they are the same.

18         Q.    Okay.  In paragraph 23, you reference you

19    consistently raised complaints to HR, right?

20         A.    Yes.

21         Q.    Have you provided testimony so far in this

22    deposition about the complaints to HR?

23         A.    Yes.  We discussed the interview that I

24    had with Michael Clark.

25         Q.    Okay.  I guess my -- that was a bad

Page 102

1    question again.  I apologize, Ms. Harris.

2         I just want to make sure that -- you also

3    talked about you had emails with Mac Chonoles --

4    A.    Yes.

5    Q.    -- you had emails and conversations with

6    Michael Clark and --

7    A.    To Dave Russell.

8    Q.    Dave Russell is not in HR.  But, yes, you

9    testified about that.  And you also testified about

10   Linda Taylor.

11        What I'm just trying to make sure I

12   understand is have you -- when you reference your

13   constant complaints to HR personnel, is there any

14   other activities you engaged in that you believe --

15   or you meant when you wrote your consistent

16   complaints to HR?

17   A.    Kristie Castilow is missing from your

18   list.  She took over for Jim Wallace after he

19   retired.

20   Q.    Okay.  And you raised concerns with her?

21   A.    Yes.

22   Q.    By email?  In person?  Phone?

23   A.    All of the above.

24   Q.    Okay.  And what do you recall raising with

25   Ms. Castilow?

Page 103

1      A.    I recapped the details that I shared

2   originally with Michael Clark and Linda Taylor and

3   with Mac.  She actually received a forward of those

4   details, which included the improper alignment of

5   BJ Services which negatively impacted me, the

6   positive alignment of 4G Dental to my white peer

7   Brian Conrey, the inconsistencies in Michelle Lamb's

8   evaluation of my performance in giving me four

9   quarters in the letter of counseling and giving my

10  white peers six quarters, the inconsistency in her

11  humiliation of coaching and details of the

12  appointments on her calendar and her requests for me

13  to step down.

14      So all of those details were shared with

15  Kristie Castilow, with Linda Taylor, with Michael

16  Clark, and with all of the professionals in the HR

17  organization that I have spoke about prior to this

18  request.

19      Q.    Do you recall, ma'am, any other complaints

20  that you made to the HR personnel that you didn't

21  testify to about yet today?

22      A.    I did an internal EEO through the portal,

23  which then, in return, went to Michael Clark.  And I

24  also did an external, which also went to an

25  investigation team, which I was not knowledgeable of

Page 104

1   who it went to within the internal FedEx

2   organization.

3       Q.   Okay.  So Michael Clark did the

4   investigations for HR with possibly the exception of

5   your external charge with the EEOC, correct?

6       A.   To my knowledge, yes.

7       Q.   Okay.  And so when you reference in

8   paragraph 23 that HR was sweeping your concerns

9   under the rug, your allegation is Michael Clark was

10  the one doing the -- sweeping your allegations under

11  the rug, correct?

12      A.   Michael Clark, Kristie Castilow, Jim

13  Wallace, Linda Taylor, Mac Chonoles, and anybody

14  else that was involved that I did not directly

15  communicate with, all of those people are who I'm

16  referring to as sweeping my concerns under the rug.

17      Q.   Okay.  You also talk about Ms. Lamb

18  showing blatant favoritism for white employees.

19           Do you see that in paragraph 23?

20      A.   Yes.

21      Q.   Have you already told me the examples of

22  what Ms. Lamb was doing that you believe showed her

23  favoritism to white employees?

24      A.   Yes.  They include the negative --

25      Q.   I mean, you're welcome to tell me again --

Page 105

1          A.   Okay.

2          Q.   -- but if you have -- if you have already

3     told me --

4          A.   Okay.

5          Q.   -- we have -- we have a transcript.

6          A.   Sure.  Okay.

7          Q.   Do you want to tell me again?  You're --

8     you're welcome to.  I'm not trying to cut you off.

9          A.   That's fine.

10              MR. SANFORD:   Just have to make sure

11    that -- yeah.  As long as you clarify that it's

12    already been said.

13         Q.   Yeah.  I mean, you have already -- you

14    have already testified to the examples of Ms. Lamb

15    showing what you believe to be favoritism to your

16    white peers, correct --

17         A.   Yes.

18         Q.   -- today?

19              MR. SANFORD:   And I'll just tell you

20    the concern always is -- I'm sure it's not -- you

21    would not do this, but we have -- generally attorneys

22    will ask the same question over and over and then

23    just assume that we have -- you know, it's all said,

24    and then only one thing is given.  And then what

25    shows up in the summary judgment motion is just that,

Page 106

1    and so we're having to explain everything when it's

2    just easier on the record if the record is clear.

3                    MR. BABCOCK:  Yeah, I'm not --

4                    MR. SANFORD:  I don't think you are

5    going to do that, but that trick is done by 9 out of

6    10 attorneys.

7                    MR. BABCOCK:  I'm trying -- I'm trying

8    to make sure the record is clear.

9                    MR. SANFORD:  Yeah, and I appreciate

10   that.

11                   MR. BABCOCK:  I'm trying not to cut

12   her off.  You know, I just want to know what we're

13   fighting about for lack of a better term --

14                   MR. SANFORD:  Right.  Right.

15                   MR. BABCOCK:  -- all right,

16   Mr.  Sanford.

17                   MR. SANFORD:  Right.

18                   MR. BABCOCK:  That's all.

19                   MR. SANFORD:  And we just want to make

20   sure that there's enough -- that the record is clear

21   when it comes to summary judgment, right.  And I

22   think -- it sounds the way you're conducting the

23   deposition that you're going to do that and I

24   appreciate that.  But that's -- as long as it's all

25   clear.

Page 107

1            MR. BABCOCK:  Yeah, and --

2        Q.   And, Ms. Harris, certainly I don't

3    represent you, right.  I'm on the other side, right.

4    But part of the reason why I have been cutting you

5    off is what -- what your counsel doesn't want to do

6    if you start listing again, he doesn't want you to

7    leave something off.

8            And so by me asking you have you already

9    told me the examples you have, I can go back in the

10   transcript that she's making and find it.  But if

11   you resuscitate it -- you know, for me, I have to be

12   able to go find it in the record, and I don't

13   unintentionally want to grab your testimony from the

14   wrong part of the record because then he and I end

15   up having to fight about it.  And so that's why I

16   have been interrupting you.  All right?

17            MR. SANFORD:  And I appreciate that,

18   the caveat "other than what we have already talked

19   about."

20            MR. BABCOCK:  Yeah.

21            MR. SANFORD:  That makes it much more

22   clear and I appreciate that.  Thank you.

23       Q.   And the other reason I'm cutting you off,

24   Mr.  Harris, is, for me, I don't live here.  This is

25   all I'm doing today, but I have a bunch I have to

Page 108

1    cover with you.  And the faster I can get through

2    it, the faster you can go about doing what you want

3    to do today.

4            All right.  I'm almost done with this

5    exhibit.

6            Paragraph 25.  I read it, Ms. Harris.  I

7    guess my question is:  Are any of pay issues part of

8    your lawsuit?

9        A.   Yes.

10       Q.   Okay.  What -- what's part of your

11   lawsuit?

12       A.   All of it.

13       Q.   Okay.  All right.  Fair enough.

14           All right.  So after you were terminated,

15   this references a communication you got from FedEx

16   after you were terminated, correct?

17       A.   Yes.

18       Q.   All right.  And that communication did not

19   come from Ms. Lamb, right?

20       A.   Correct.

21       Q.   It came from payroll or someone in

22   Memphis, Tennessee?

23       A.   Yes.

24       Q.   Okay.  And they apparently told you you

25   owed FedEx money, right?

Page 109

1      A.    That is correct.

2      Q.    Did you ever have to pay FedEx any money?

3      A.    No.

4      Q.    Okay.  Did you ever send FedEx any money?

5      A.    No.

6      Q.    And your contention is -- well, strike

7    that.

8           I believe you testified earlier today your

9    contention is you should have been reimbursed for

10   all of your incidentals like hotel, airfare, rental

11   car, meals that you incurred while you were at the

12   Pathway event in Memphis over those two days.  Is

13   that fair?

14     A.    That is correct.

15     Q.    And so that's the part -- you haven't been

16   paid that, right?

17     A.    That is correct.

18     Q.    Do you know the dollar amount of what that

19   total is?

20     A.    Not at this time.

21     Q.    All right.  And how would you go about

22   determining what that dollar amount is?

23     A.    I have the receipts in my credit card

24   statement.

25     Q.    Okay.  Have you turned that information

Page 110

1    over to your lawyers?

2         A.   I have.

3         Q.   Okay.  All right.  So we just spent some

4    time going through your amended charge.  I didn't

5    put check marks next to a couple of questions, so if

6    I have asked you this question.  I apologize,

7    Ms. Harris.

8              But you reviewed this document before it

9    was submitted to the EEOC, correct?

10        A.   Yes.

11        Q.   And you authorized it to be submitted to

12   the government to be part of your EEOC charge,

13   right?

14        A.   Yes.

15        Q.   And we just spent a lot of time going over

16   the particulars, which I think are 26 paragraphs

17   long.  We didn't go through every paragraph.  In

18   particular, we didn't go through paragraph 26.

19             But you were trying to be -- your intent

20   was to be accurate with what you were telling the

21   EEOC, correct?

22        A.   Yes.

23        Q.   And you were trying to provide this

24   information to the EEOC so the EEOC could

25   investigate your charge of discrimination, right?

Page 111

1        A.    Correct.

2        Q.    And it was -- you wanted to provide as

3    much detail as you could to the EEOC so they could

4    properly investigate your charge, right?

5        A.    Yes.

6        Q.    All right.  I'm done with Exhibit 2.

7              Do you know how many sales managers worked

8    in Dave Russell's organization in December of 2019

9    right before you were terminated?

10       A.    I believe 56, but I can't exactly recall

11   at this time, but I believe that number was 56.

12       Q.    Do you know how many of those employees

13   were men versus women?

14       A.    I do not at this time.

15       Q.    Do you know how many of those employees

16   were white versus nonwhite?

17       A.    I do not at this time.

18       Q.    Okay.

19       A.    What I do know is that I was the only

20   African-American female in his entire division.

21       Q.    Okay.  As a rule as a manager at FedEx,

22   did you have access to other managers' disciplinary

23   records?

24       A.    No.

25       Q.    Do you know if any other managers you

Page 112

```
1    worked with filed any EXPLOREs?

2         A.   EXPLOREs, no.

3         Q.   Do you know if any of the managers you

4    worked with ever filed an internal EEO?

5         A.   Yes.

6         Q.   Who?

7         A.   Richard Holley.

8         Q.   Okay.  And did you ever see Mr.  Holley's

9    internal EEO complaint?

10        A.   I did not.

11        Q.   Let me -- I'm going to re-ask that

12   question.

13             At the time you worked at FedEx, did you

14   ever see Mr.  Holley's internal EEO complaint?

15        A.   No.

16        Q.   Okay.  Do you know of any employees

17   that -- any managers that were peers of you, has

18   anyone filed charges of discrimination with the EEOC

19   or any other government agency?

20        A.   Richard Holley filed an EEOC, yes --

21        Q.   Okay.

22        A.   -- but did not see the documents.

23        Q.   Okay.  Is it your understanding of

24   Mr.  Holley's complaints that he believes Ms. Lamb

25   was discriminating against him?
```

Page 113

1      A.   Yes.

2      Q.   What race is Mr.  Holley?

3      A.   White.

4      Q.   And he's a man?

5      A.   That is correct.

6      Q.   Okay.  When you were a manager at FedEx,

7   did you have training?

8      A.   Yes.

9      Q.   Okay.  And did you -- you're aware that

10   FedEx has policies, right?

11     A.   Yes.

12     Q.   Like an EEO policy?  Are you aware of

13   those policies?

14     A.   Yes.

15     Q.   Okay.  That FedEx has a progressive

16   corrective action policy, are you aware of that

17   policy?

18     A.   Yes.  I used it myself.

19     Q.   What about that FedEx has an acceptable

20   conduct policy, are you aware of that?

21     A.   Yes.

22     Q.   Are you aware that FedEx has an equal

23   employment opportunity policy?

24     A.   Yes.

25     Q.   Are you aware that FedEx has an

Page 114

1     antiharassment policy?

2          A.   Yes.

3          Q.   Are you aware that FedEx has a policy that

4     describes the EXPLORE process?

5          A.   Yes.

6          Q.   And you went through the EXPLORE process,

7     correct?

8          A.   Yes.

9          Q.   Twice, right, once for the warning letter

10    and once for your termination?

11         A.   Yes.

12         Q.   And if I remember correctly in my review

13    of the documents, you didn't attend any meetings,

14    correct?

15         A.   No.

16         Q.   Because you were represented by counsel at

17    that point, right?

18         A.   That is correct.

19         Q.   All right.  Is it your understanding that

20    your counsel communicated with FedEx while you were

21    in the EXPLORE processes?

22         A.   Yes.

23         Q.   Okay.  Are you aware that FedEx has a code

24    of conduct?

25         A.   Yes.

Page 115

1      Q.   Okay.  And you had periodic training on

2   the code of conduct, correct?

3      A.   Yes.

4      Q.   And periodic, I believe -- well, I'll ask

5   you:  Was the training annual training, recurring

6   training about the code of conduct?

7      A.   Code of conduct, I don't recall at this

8   time if it was annual or periodic.

9      Q.   But you -- it was definitely periodic,

10  though, right?

11     A.   Yes.

12     Q.   All right.  You're aware that FedEx has an

13  Alert Line, correct?

14     A.   Yes.

15     Q.   Did you ever call the Alert Line?

16     A.   No.

17     Q.   And you're aware through your training at

18  FedEx as a manager, an employee can complain to an

19  HR professional if they choose to, right?

20     A.   Yes.

21     Q.   They can complain to another member of

22  management?

23     A.   Yes.

24     Q.   They can complain to FedEx security?

25     A.   Yes.

Page 116

1       Q.   They can call the Alert Line?

2       A.   Yes.

3            (Exhibit 3 marked.)

4       Q.   Okay.  Hand you what has been marked as

5    Exhibit --

6            MR. BABCOCK:  Do you have a pen?

7            MR. SANFORD:  A what?  A pen?  I do.

8            MR. BABCOCK:  Okay.

9       Q.   -- Exhibit 3, which is an exempt job

10   description for a sales manager.  It's Bates FXS1780

11   through 1782.

12           Have you ever seen this -- did you ever

13   see this document, ma'am?  And let me tell you, if

14   you thumb through it, it's -- the first page is --

15   let's start -- let's go page by page.  All right?

16      A.   Okay.

17      Q.   Let me start over.

18           So I'm looking at the first page of

19   Exhibit 3, which is FSX1780.  This is a manager's of

20   sales with a run date of January of 2015.

21           Do you see that?

22      A.   Yes.

23      Q.   Do you see under General Summary?

24      A.   Yes.

25      Q.   If you could read that to yourself and let

Page 117

1    me know when you're done.

2         A.    (Reviewed document.)  Okay.

3         Q.    I'm going to ask you:  Do you think that

4    describes what you believe your job duties were as a

5    manager in sales?

6         A.    Some of them yes.

7         Q.    And that goes on to talk about the

8    essential duties, correct?

9         A.    Some of the duties, yes.

10        Q.    Okay.  It lists three, correct, essential

11   duties?

12        A.    Yes.

13        Q.    All right.  And do you agree with each of

14   those three -- do you agree those are essential

15   duties of a manager at sales -- as part of the sales

16   organization?  Excuse me.

17        A.    Some of them, yes.

18        Q.    Okay.  Do you think there's more essential

19   duties?

20        A.    Yes.

21        Q.    What additional -- if you were drafting

22   the policy, what additional essential duties or

23   responsibilities would you add?

24        A.    There -- it's missing holding, you know,

25   the account executive responsible to obeying other

Page 118

1    policies that are not identified in this particular

2    document; in addition to it doesn't speak to -- it

3    talks about planning, motivating, and the

4    performance of it, but there's additional evaluation

5    that is required to identify good behavior with the

6    performance of an account manager.  So some of those

7    details are missing with -- in addition to some

8    others.

9         Q.   Okay.  Well, do you want to identify those

10    others?

11        A.   It doesn't talk about any of the specifics

12    with alignments to accounts.

13        Q.   Anything else?

14        A.   Doesn't say any specifics about pricing.

15    It doesn't talk about any of the attainment or any

16    of that information either.

17        Q.   Okay.  Anything else, Ms. Harris?

18        A.   Not at this time.

19        Q.   Okay.  Well, this is my one opportunity to

20    ask you questions.

21        A.   Okay.

22        Q.   Can you think of anything else?  It's okay

23    if you can't.

24        A.   Not at this time.

25        Q.   Hand you what has been marked as

Veritext Legal Solutions

800-567-8658                                      973-410-4098

**Appx-559**

Page 119

1    Exhibit 4.  It's the amended complaint in this

2    action.

3              Ms. Harris, have you ever seen this

4    document before?

5                   (Exhibit 4 marked.)

6         A.   Yes.

7         Q.   When is the last time you reviewed it?

8         A.   Maybe a couple of days ago.

9         Q.   Okay.  And it's long.

10        A.   Yes.

11        Q.   And so -- but the last time you reviewed

12   it a few days ago, did anything jump out at you to

13   indicate to you, wow, maybe that's wrong or that

14   should have been changed?

15        A.   I would have to review the document to --

16        Q.   Okay.

17        A.   -- be able to verify that information.

18        Q.   But sitting here today, nothing jumps out

19   at you that you remember when you were reviewing it?

20        A.   Not on this page, but I would have to

21   review the document to be able to answer that

22   question.

23        Q.   Okay.  All right.  So you testified you

24   received training at FedEx when you become a

25   manager, correct?

Page 120

1     A.   Yes.

2     Q.   Did you ever go through management

3 practices in the law training?

4     A.   I do not recall at this time.

5     Q.   Do you know who Kristy Gunn is?

6     A.   Yes.

7     Q.   Did you ever have any training from Kristy

8 Gunn?

9     A.   Not with her directly.

10     Q.   Okay.  Have you ever had training with

11 anyone else from the FedEx legal department?

12     A.   Not with them directly.  It was put on a

13 portal where we watched videos and then had to do an

14 acknowledgment and verification that we understood

15 the details that were instructed by FedEx legal and

16 other members of leadership from FedEx.

17     Q.   Okay.  How do you -- how would you

18 recognize racial discrimination, ma'am?

19     A.   There's a variety of ways.  Someone could

20 come out and directly make a racial statement or a

21 slur to someone.  Someone could be treated unfairly

22 and not allowed the same privileges of their white

23 peers or of another race.  They could also be

24 singled out to falsely make things appear that

25 they're poorly performing.  They could also

Page 121

1    incorrectly negatively adjust accounts to make it

2    appear that someone is poorly performing.  There's a

3    variety of things, but those are some of the key

4    examples.

5         Q.   Thank you.

6              Paragraph 24 of the amended complaint.

7    It's on page 4.  It alleges that you were one of the

8    most successful sales managers in the country.

9              What's that based on?

10        A.   That is based on the, at that time,

11   11 years of history from success.  I started with

12   FedEx in the inside sales position, was promoted to

13   sales executive within the inside sales

14   organization, then also promoted to field sales and

15   which I won President's Club and Ambassador's Club,

16   which ranks me and exceeds expectations of that

17   particular role.  I was then promoted to district

18   sales manager in inside sales.  And because of my

19   success there, 18 months later was promoted to

20   district sales manager in business sales field.

21             And then due to a company realignment of

22   the sales organization, then moved into the field

23   sales organization but was issued a promotion

24   because of the company's change and given a

25   14 percent raise.

Page 122

1           So the history of my performance

2    demonstrates that I was very successful in -- not

3    only as an individual contributor role but as a

4    manager because my first year as a district sales

5    manager in field sales, I was awarded President's

6    Club as well.

7           Q.   Would you agree, ma'am, in your history of

8    being a sales professional at FedEx, that probably

9    the most important job or the -- or the reason FedEx

10   has a sales team is to go out and find revenue for

11   the FedEx operating companies?

12          A.   That is one of them but maintaining

13   revenue is also as important.

14          Q.   Okay.  Because without customers shipping

15   packages, there's no -- they wouldn't be able to pay

16   the employees, right?

17          A.   Right.

18          Q.   Okay.  What criteria do you believe

19   indicates a successful manager?

20          A.   I think the consistency of territory

21   management, performance with maintaining, growing,

22   and finding new revenue, all of those components

23   aligned with each other, and it's an ongoing

24   evaluation.  It just doesn't stop with those steps.

25   You have to go back to see if the existing strategy

Page 123

1    that you're utilizing is working or if there's

2    opportunity for change.  So those are just some of

3    the characteristics of a good sales professional.

4         Q.   All right.  Thank you.

5              Looking at paragraph 42, which is on

6    page 6.  Again, some of this is another way to see

7    if it jogs your memory of anything else.

8              You write, Many other persons have

9    complained of discrimination or retaliation at

10   FedEx.

11             You testified before about Richard Holley,

12   correct?

13        A.   Yes.

14        Q.   Is there anyone else that you're aware of

15   that complained of discrimination?  We'll start

16   there.

17        A.   Yes.

18        Q.   Who?

19        A.   Blanche Bond-Hudson.

20        Q.   Who is Blanche -- and what's her last

21   name?

22        A.   Bond-Hudson.

23        Q.   Can you attempt to spell that?

24        A.   B-o-n-d, H-u-d-s-o-n.

25        Q.   And who is -- is Ms. Hudson a female?

Page 124

1       A.    Yes.

2       Q.    Okay.  So who is Ms. Bond-Hudson?

3       A.    She was an inside sales district sales

4    manager.  I'm not sure of her affiliation or role or

5    if she's even still with FedEx at -- at this time.

6       Q.    Okay.  But you believe she complained

7    about discrimination?

8       A.    Yes.

9       Q.    Where was she based at that time?

10      A.    Memphis, Tennessee.

11      Q.    All right.  And what were her allegations;

12   do you know?

13      A.    I do not know the specifics.

14      Q.    All right.  How do you know she complained

15   about discrimination?

16      A.    Because we had a conversation and

17   discussed it.

18      Q.    Okay.  And what do you recall about that

19   conversation, if anything?

20      A.    That she felt that she was treated

21   unfairly due to her race.

22      Q.    And what race is Ms. Bond-Hudson?

23      A.    She's African-American.

24      Q.    Okay.  And did -- can you identify other

25   people who have complained about retaliation at

Page 125

1  FedEx besides you, of course?

2       A.   Kym Kyker.

3       Q.   Can you spell Ms. Kyker's last name?

4       A.   K-y-k-e-r.

5       Q.   All right.  Anyone else?

6       A.   Not at this time.

7       Q.   Did you keep a diary when you worked at

8  FedEx?

9       A.   No.

10      Q.   Okay.  Did you keep notes of conversations

11 you would have with people at FedEx?

12      A.   No.

13      Q.   Okay.  So when you say "not at this time,"

14 can you identify any documents you would need to

15 review in order to tell me the identity of other

16 people who may have complained about retaliation at

17 FedEx?

18      A.   No.  I would -- I mean, it would just come

19 back to my memory.  There's no diary or no book or

20 any one note or anything of that nature that would

21 have those notes.  I have never took notes of that.

22      Q.   Okay.  And you're not taking any

23 medication that affects your memory today, are you?

24      A.   No.

25      Q.   Okay.  Is simply the reason you can't

Page 126

1    remember is because the events at FedEx occurred

2    several years ago?

3        A.   Yes.

4        Q.   All right.  So it's a passage of time?

5        A.   Yes.

6        Q.   All right.  So who is Ms. Kyker?  Where

7    did she work?

8        A.   She was at the time a director.

9        Q.   Okay.  So she was a managing director?

10       A.   Yes.

11       Q.   And was she in the sales organization?

12       A.   Yes.

13       Q.   All right.  And what was she a director

14   of?

15       A.   Field sales.

16       Q.   All right.  And where was she based?

17       A.   I know that she covered part of Louisiana.

18       Q.   Okay.  And how -- what did Ms. Kyker

19   complain about?  Do you know the specifics?

20       A.   I do not.

21       Q.   Okay.  How do you know Ms. Kyker

22   complained about retaliation?

23       A.   It came up in conversation with several

24   other people, not Ms. Kyker directly.

25       Q.   Okay.  And was it more than one

Page 127

1    conversation or was the conversation that you

2    happened to have with more than one person?

3         A.   It was several conversations.

4         Q.   Okay.  Who did you have those

5    conversations with?

6         A.   I discussed it with Brian Conrey.

7         Q.   Anyone else you can remember discussing it

8    with?

9         A.   Not at this time, no.

10        Q.   Okay.  But you don't recall exactly what

11   Ms. Kyker was complaining about?

12        A.   No.

13        Q.   All right.  Paragraph 50.  What

14   commissions did Ms. Lamb remove from you?

15        A.   Are you on a different one because when I

16   look on page 7 is there something --

17        Q.   Paragraph 50.  It says at the end of

18   paragraph 50 --

19        A.   Oh, sorry.

20        Q.   -- quote, Ms. Lamb removed some of

21   Ms. Harris's commissions.

22             It's my fault, Ms. Harris, for not telling

23   you what it says.

24        A.   It's okay.  I didn't read it to the end.

25   I apologize.

Page 128

1    Q.   What commission -- let me start over, all

2    right, so we'll get a question -- we'll get the

3    predicate question.

4         What commissions did Ms. Lamb remove from

5    you?

6    A.   The commissions I would have received if

7    BJ Services wasn't negatively impacted to my revenue

8    goals.  So sales are paid commission on the revenue

9    attainment because it was negatively impacted to me,

10   it removed the commission that I would have received

11   if BJ Services was not negatively aligned to me.

12   Q.   Okay.  All right.  Paragraph 51 says,

13   quote, When Ms. Harris complained to HR about the

14   treatment, HR began to retaliate.

15        Did I read that right?

16   A.   That is correct.

17   Q.   Who in HR began to retaliate against you?

18   A.   The entire HR organization which includes

19   Michael Clark, it includes Linda Taylor, it includes

20   Mac Chonoles.  I'm not sure if that's exactly how to

21   pronounce his name.  And Kristie Castilow was a part

22   of that process at the time.  Jim Wallace was there

23   at the beginning because instead of FedEx protecting

24   me, they retaliated against me and targeted me.

25   Q.   Okay.  What activities did Jim Wallace

1    engage in that you believe evidences he was

2    retaliating against you?

3         A.   He wasn't there when the process of me

4    getting a letter of counseling, but he did pass on

5    notes.  I was not privy to see what those notes

6    were, but he had an impact because it transitioned

7    over to Kristie Castilow.  And Kristie Castilow is

8    the adviser who evaluates if letter of counselings

9    or letter of warnings can be implemented or not.

10        Q.   Let me see if I can ask it this way:  Is

11   it your contention because you raised complaints to

12   HR but then you started receiving additional

13   discipline like the letter of counseling, being put

14   on a PIP, the letter of warning, another PIP, and

15   then terminated, that because those events occurred,

16   that's evidence of HR letting retaliation to occur

17   to you?

18        A.   It wasn't additional.  At the time that I

19   got the first letter of counseling, I had no

20   documentation in my file.  So that is when it

21   started.  But then after that, the same situation,

22   it was less than 30 days to when Michael Clark's

23   investigation was supposed to be completed that then

24   I got the letter of warning.  Same situation, his --

25   the third investigation was concluded December 31st.

Page 130

1    Then I was terminated January 7th.  So --

2        Q.   Okay.

3        A.   -- the timeline demonstrates I complained,

4    and then I'm retaliated with documentation with

5    letter of counseling and other discipline.

6        Q.   Okay.  What I'm trying to understand is

7    your allegations in this specific paragraph.  I

8    understand your retaliation claim in general.  And

9    thank you for your testimony about that.

10            What I'm trying to understand is you say

11   HR -- people in HR were actually retaliating against

12   you.  So what I'm trying to do -- and we can do them

13   one at a time.

14            I'm trying to understand what specific

15   actions or things did each member of HR do to you

16   that you believe is retaliation.

17            Does that make sense?  Does my question

18   make sense?

19                 MR. SANFORD:  Objection; form.

20                 MR. BABCOCK:  What's the basis for the

21   objection?

22                 MR. SANFORD:  It's confusing.  It's

23   asked and answered.

24                 MR. BABCOCK:  Okay.

25                 MR. SANFORD:  Yeah.

Page 131

1      Q.   Go ahead and answer.

2      A.   HR was a part of the process.  HR --

3      Q.   Okay.

4      A.   -- had to approve and research the details

5   that were provided in my complaint.  And because

6   they didn't do a proper investigation, they allowed

7   retaliation and were a part of the retaliation

8   because without their approval, Michelle Lamb

9   wouldn't be able to move forward with the letter of

10  counseling, wouldn't be able to move forward with

11  the letter of warning.

12          So HR is just as involved as Michelle Lamb

13  because I raised my concerns to them and, because it

14  requires their approval, then she can move forward.

15  So HR is just as involved as Michelle Lamb.

16     Q.   Okay.  Turning to paragraph 60, which is

17  on page 8, you allege your team was one of the top

18  teams at FedEx nationally.

19     A.   That is correct.

20     Q.   And you highlight being awarded the

21  President's Club, which was in 2017, correct?

22     A.   Yes.

23     Q.   Okay.

24     A.   I started in 2017, so the evaluation of my

25  performance from June 2017 continuing into -- up to

Page 132

1    May of 2018 is when I was evaluated and awarded

2    President's Club.

3         Q.   So you went to President's Club in FY --

4    for FY18?

5         A.   That is correct.

6         Q.   Okay.  And then when did you get selected

7    for Ambassador Club?

8         A.   That was when I was in the field sales

9    organization in FY13.

10        Q.   Okay.  So that was before you went into

11   management, correct?

12        A.   Yes.

13        Q.   And is there a specific metric you're

14   basing your contention that you were a top team

15   nationally at FedEx?

16        A.   The attainment is what is used to award

17   President's Club.

18        Q.   Okay.  What about in December of 2019, do

19   you believe during that time period you had one of

20   the top teams at FedEx nationally?

21        A.   Yes, because if I was not given the

22   negative adjustment of BJ Service and if I was

23   positively aligned with 4G Dental, then I would at

24   least be at the top because looking at the

25   calculations, I was never a poor performer.

Page 133

1        Q.    Okay.  On paragraph 74, that's when

2    Ms. Lamb asked Ms. Harris to take a demotion on

3    March 8, 2019.

4              Did I read that right?

5        A.    Yes.

6        Q.    All right.  And this was the

7    conversation -- or part of the conversation you had

8    with Ms. Lamb where you discussed the Coach2Grow 2.0

9    rollout, right?

10       A.    Yes.

11       Q.    Okay.  And it was that conversation that

12   caused you to believe Ms. Lamb was discriminating

13   against you, correct?

14       A.    Yes.  She wanted to try to bully me out of

15   my position, which I had earned.

16       Q.    In other words, up until that time period,

17   things were going fine at FedEx from your point of

18   view?

19       A.    Yes.

20       Q.    Okay.

21       A.    I had just won President's Club, and which

22   she was awarded because she is given President's

23   Club based on her managers' performance.

24       Q.    Okay.  Paragraph 75 says you reported the

25   discrimination to FedEx human resources department

Page 134

```
1    on March 11, 2019.

2              Do you see that?

3        A.   Yes.

4        Q.   Did I read that right?

5        A.   I sent the email to Dave Russell and Dan

6    Mullally.

7        Q.   Okay.

8        A.   And the policy says as long as you

9    escalate to management and you specifically state

10   those details, it is supposed to be given to HR.

11       Q.   Have you ever heard the -- strike that.

12             When you were at FedEx, did you know about

13   the EthicsPoint process or management system?

14       A.   I am not familiar.

15             (Exhibit 5 marked.)

16       Q.   Okay.  Hand you what has been marked as

17   Exhibit 5.  That's the EthicsPoint for the 3/11/2019

18   complaint -- actually, can you hand that back to me,

19   Miss?

20       A.   (Witness complies.)

21       Q.   Thanks.

22             It's Bates FXE414 through 417.

23             MR. SANFORD:  Last page is not.

24             MR. BABCOCK:  I'm not sure how another

25   page got stapled to it, but it's no longer stapled.
```

Page 135

1          MR. SANFORD:  Do you need it back?  It
2     says "privileged."
3          MR. BABCOCK:  I've already produced it
4     to you.
5     Q.   If you go to page 2, it says, Provide a
6     brief description of the general nature of this
7     matter.  Please limit it to one or two sentences.
8          And it says, quote, DSM Jennifer Harris
9     had alleged her director, Michelle Lamb, has shown
10    discrimination towards her, creating an
11    uncomfortable place to work.  She was recommended to
12    find other opportunities that are not leadership
13    roles within FedEx.
14         Did I read that right?
15    A.   Yes.
16    Q.   Okay.  And now your email, which we'll get
17    to, to Mr.  Mullally and Mr. Russell obviously was
18    more than two sentences, right?
19    A.   Yes.
20    Q.   Okay.  But the two sentences we just
21    looked at in Exhibit 5, do you believe that to
22    reference the meeting that you had in March with
23    Michelle Lamb where she suggested you find a
24    different role at FedEx?
25    A.   Part of it, yes.

Page 136

```
 1        Q.    Okay.  Were you aware before right now
 2   that the complaints you raised to Mr. Russell and
 3   Mr.  Mullally were inputted into this software
 4   program?
 5        A.    No.
 6        Q.    Okay.  Paragraph 78, this is the
 7   August 23, 2019, incident of -- I'll just read it,
 8   quote, On August 23, 2019, Ms. Harris reported
 9   discrimination and retaliation again by Ms. Lamb for
10   not assigning a customer in Ms. Harris's district to
11   Ms. Harris, closed quote.
12             Did I read that right?
13        A.    Yes.
14        Q.    This is the 4G --
15        A.    That is correct.
16        Q.    -- Dental?
17        A.    Yes.
18        Q.    Okay.  Paragraph 92 and 93.  This is on
19   page 11.  This talks about your quota being set too
20   high because a customer's moved out of your district
21   to another district.
22        A.    That is correct.  That reference is
23   BJ Services.
24        Q.    Okay.  And by "quota," you mean revenue
25   attainment?
```

Page 137

1    A.   That is correct.

2    Q.   Okay.  So, Ms. Harris, it's your

3  contention that if you back out -- or if you rectify

4  BJ Services by not inflating your revenue attainment

5  for that number and then you got credit for 4G

6  Dental, your performance gap to revenue goal

7  wouldn't exist, right?

8    A.   It would based on the data because I was

9  not given all of the quarters of BJ Services.  Based

10  on the calculation, I would be higher and the same

11  with some of my white peers on the team.

12    Q.   Would you still be missing your goal?

13    A.   But not the same as what was identified on

14  that letter of counseling.

15    Q.   Appreciate that.

16         Would you still be missing your goal?

17    A.   Yes, but not the same as listed on the

18  letter of counseling.

19    Q.   Okay.  Paragraph 95 you write -- you

20  allege, excuse me, quote, Ms. Harris's white

21  supervisor, Ms. Lamb, belittled Ms. Harris to

22  Ms. Harris's peers, closed quote.

23         Did I read that right?

24    A.   Yes.

25    Q.   I don't think we have discussed this yet

Page 138

1    today, Ms. Harris.

2            What -- let's first -- who did Ms. Lamb

3    belittle you to that were your peers?

4        A.    Brian Conrey; Richard Holley; Jaime

5    Golden-McElroy; Brian Golden; Brian Hickman; Rebecca

6    Callahan; and at the time, Brad Lambert.

7                MR. BABCOCK:  Why don't we go ahead

8    and take another break.  I think we have been going a

9    little bit more than an hour.

10                THE VIDEOGRAPHER:  We're off the

11   record at 11:53.

12                (Recess 11:53 a.m. to 12:13 p.m.)

13                THE VIDEOGRAPHER:  We're back on the

14   record at 12:13 p.m.

15       Q.    Ms. Harris, you understand you're still

16   under oath, right?

17       A.    Yes.

18       Q.    All right.  We were discussing paragraph

19   95 of the amended complaint, which is Exhibit 4.

20            Before we took a break, you provided me is

21   a list of individuals who you believe Ms. Lamb

22   belittled you to, right?

23       A.    Right.

24       Q.    So I want to cover each of those

25   individuals.

Page 139

```
1          What did Ms. Lamb say to Brian Conrey that
2    you believe was belittling to you?
3          A.    It wasn't that she said anything; it was
4    the demonstration of her Outlook calendar that we
5    discussed before that she had those inconsistencies
6    of calendar invites to make it appear she was
7    coaching me when there's other people in our region
8    who were performing worse than I was and did not
9    have the same treatment.
10         Q.    Okay.  Yeah, I remember that testimony.
11   You talked about some of your peers would say, Why
12   do you have so many one-on-ones, stuff like that,
13   right?
14         A.    Yes.
15         Q.    Okay.  Besides the issue of Ms. Lamb's
16   public calendar and the amount of one-on-ones you
17   have, did Ms. Lamb say anything to any of your peers
18   that you believe was belittling to you?
19         A.    Not to them but to me.  We --
20         Q.    Okay.  We talked about the -- the
21   March 2019 meeting involving Coach2Grow and Ms. Lamb
22   told you to -- to find a different position within
23   FedEx.  So I think you have told me all about that
24   conversation.
25              Were there other conversations you had
```

1    with Ms. Lamb where she belittled you?

2         A.   When she sent the email which falsely

3    accused me of those FedEx One Rate and Global Gold

4    Rush, we looked at -- or talked about --

5    apologize --

6         Q.   Uh-huh.

7         A.   -- those details as well.  It was --

8         Q.   Okay.

9         A.   She compared me to my white peers and that

10   I was a poor performer, and everything was a beat

11   down, but in the research in confirming the details

12   that she sent in the report, they were inaccurate.

13             So instead of acknowledging that there was

14   a mistake on her part or whoever's part in producing

15   that false information, it's that she wants to

16   continue to try to belittle me and encourage me to

17   step down from the position or leave FedEx so that

18   she could continue to discriminate and retaliate

19   against me.

20        Q.   Okay.  Did Ms. Lamb ever use a racial slur

21   towards you?

22        A.   No.

23        Q.   Are you aware of Ms. Lamb ever referring

24   to you in a racially derogatory way to another

25   person at FedEx?

Page 141

1      A.   Not to my knowledge, no.

2      Q.   Okay.  Paragraph 97 of the complaint, it's

3   on page 11 of the amended complaint.

4      A.   Yes.

5      Q.   Is -- the HR adviser, is that Jim Wallace?

6      A.   Yes.

7      Q.   Okay.  Besides the conversation involving

8   the Coach2Grow in March 1 and the additional

9   conversation you had with her about the FedEx One

10  Rate and the Global Rush, was anything said to you

11  either outside of work or while you were at work by

12  Ms. Lamb that you considered offensive or demeaning

13  slanderous?

14     A.   Yes.

15     Q.   Okay.  What conversation -- where -- where

16  were you when Ms. Lamb said these things to you?

17     A.   The first instance was an email and her

18  response to me asking her about the adjustment of

19  BJ Services.  Instead of responding and

20  acknowledging that she went through a loophole to

21  negatively adjust that account to me so that it

22  would make my white peer have a higher commission,

23  she denied it.

24          And once the sales compensation

25  representative, Vicky Peterson, forwarded us the

Page 142

1    email, it confirmed that, one, she had not only

2    already started the process but actually got

3    confirmation that the process would be completed.

4         Q.   Okay.  So you believe Ms. Lamb was lying

5    to you?

6         A.   That is correct.

7         Q.   Okay.  And the other -- let's start with

8    conversations, not email.

9              Do you recall any other conversations you

10   had with Ms. Lamb where she said something to you

11   that was offensive, demeaning, slanderous,

12   inappropriate?

13        A.   There wasn't much conversation.

14        Q.   Okay.

15        A.   All of her responses that I found

16   offensive were through email.

17        Q.   All right.  Well, if you could list the

18   topics of those emails that you recall?

19        A.   Sure.

20        Q.   You talked about the adjustment for

21   BJ Services where you believe Ms. Lamb was lying to

22   you, right?

23        A.   That is correct.

24        Q.   And we've -- there's email involving

25   Coach2Grow 2.0, correct?

Page 143

1     A.    That -- that is correct.

2     Q.    And you thought that was inappropriate,

3  right?

4     A.    Yes.

5     Q.    All right.  And then --

6     A.    The -- the conversation discussing 4G

7  Dental and her joint call with Jennifer Garcia and

8  asking for accountability of why she did not

9  identify, one, she was going on a joint call in

10  someone else's district, and instead of her

11  acknowledging and holding not only the account

12  manager and the district sales manager up to the

13  sales compensation standard, which aligns the ZIP

14  code to a customer, a customer to a district sales

15  manager, and the customers into the hierarchy, she

16  denied any understanding that she was in another

17  district, and that's not acceptable.

18         We are accountable for our actions, and

19  one is supposed to hold everybody accountable.  She

20  is supposed to hold the managers accountable and

21  she's supposed to hold the account managers

22  accountable as well if the manager isn't doing their

23  job.

24         So when those details were brought to her

25  attention, I expected for her to do the right thing

Page 144

1    instead of allowing my white peer to continue to

2    receive compensation until I filed the segmentation

3    to properly align the account.

4        Q.   Okay.  Any other emails that would be

5    responsive to my question?

6        A.   Not at this time.  We have discussed the

7    other ones already.

8                (Exhibit 6 marked.)

9        Q.   Okay.  I have handed you what has been

10   marked as Exhibit 6.  It's got an ESI Bates

11   Number 0143648, and the second page of the exhibit

12   is ESI Number 0014680.  I want to look at the first

13   document, please.

14            Do you recall asking Ms. Lamb for more --

15   more additional leadership responsibilities in May

16   of 2018?

17       A.   Yes.

18       Q.   Who is Brad that you're referencing in

19   this meeting?  He's the LPSP Ambassador?

20       A.   Brad Lambert, he was on our team but

21   transitioned to Atlanta.

22       Q.   Do you recall asking Ms. Lamb if you could

23   text her as a form of communication, and Ms. Lamb

24   responded that you needed to speak on the telephone?

25       A.   I don't recall that.

Page 145

1      Q.   Okay.  Do you recall having a discussion
2    about Tom Seagraves?
3      A.   Yes.  We had several conversations about
4    Tom Seagraves.
5      Q.   Do you recall Ms. Lamb telling you that
6    she would have advised giving Mr.  Seagraves a
7    letter of counseling had she been in the loop and
8    knew what you were doing?
9      A.   She was in the loop because she was
10   notified when I gave him the documented discussion
11   which identified the performance issues that Tom
12   Seagraves had.
13     Q.   Do you recall Ms. Lamb discussing with you
14   that she thought maybe Mr.  Seagraves should have
15   gotten a letter of counseling?
16     A.   Yes, and he did.
17     Q.   He eventually got a letter of counseling,
18   correct?
19     A.   Correct, letter of warning and terminated.
20     Q.   Do you recall Ms. Lamb telling you that
21   you needed to have three distinct activities with
22   your account executives; those being joint calls,
23   one-on-ones, and pipeline reviews?
24     A.   Yes.
25     Q.   Do you recall informing Ms. Lamb during

Page 146

1    this May 21, 2018, meeting that you wanted to do all

2    three of those activities under your joint rides

3    with your AEs?

4         A.   I don't recall that, but I also held

5    one-on-ones on my calendar as well.

6         Q.   Do you recall that members on your team,

7    some of your account executives complaining that

8    your coaching of them took place at the end of the

9    day and spilled over into the evening?

10        A.   Yes, one.

11        Q.   And who was the one?

12        A.   Lynne Hennessey.

13        Q.   Okay.  So you remember only one AE

14   complaining about that.  Is that fair?

15        A.   Yes, one of the eight.

16        Q.   And then the second page of this Exhibit 6

17   is the calendar invite for this meeting, correct?

18        A.   Yes.

19        Q.   All right.  And would Ms. Lamb often tell

20   you some of the topics you-all were to discuss

21   during your one-on-ones?

22        A.   Yes.

23        Q.   Okay.  Did you find that helpful?

24        A.   Not all the time because during the

25   meetings, we did not always follow the agenda of the

Page 147

```
 1    calendar invite.

 2         Q.   Okay.  Going back to the first page of

 3    Exhibit 6, the last sentence, it says, quote, Ended

 4    by telling her that I'm proud of her because I have

 5    seen growth this year.  She is now more vocal in

 6    meeting settings and on calls.  She needs to do

 7    more, but I have seen improvement, and I'm glad to

 8    see her building peer relationships.

 9              Did I read that right?

10         A.   Yes.

11         Q.   Do you recall Ms. Lamb having this

12    discussion with you during that meeting?

13         A.   Yes.

14              (Exhibit 7 marked.)

15              THE WITNESS:  Thank you.

16         Q.   You have been handed what has been marked

17    Exhibit 7, which is Bates ESI 0143649.  This again

18    is some meeting notes of Ms. Lamb about a one-on-one

19    she had with you in June of 2018.

20              Have you ever seen this document before?

21         A.   No.

22         Q.   Okay.  I'm going to ask you a few

23    questions about it.

24              What's GGR?

25         A.   Global Gold Rush.
```

Page 148

1        Q.    And what's an activation report and a

2    non-activation report?

3        A.    It directly relates to closed business

4    tracking.  The activation shows and confirms the

5    potential that was listed in the opportunity and the

6    non-activation shows that it was not activated.

7        Q.    Do you recall in June of 2018 that those

8    reports reflected no activity for your district?

9        A.    I do not recall.

10        Q.    Do you -- do you have any reason to

11    dispute Ms. Lamb's note?

12        A.    Yes, because in my complaint, it

13    demonstrates that the FedEx One Rate and Global Gold

14    Rush reporting that she utilized was inaccurate.  I

15    demonstrated several examples.  There were details

16    from 2014, 2016, and 2017 where neither of us were

17    in the position.

18              So the accuracy of her saying that there

19    was no activity is inconsistent because who knows if

20    she pulled a correct report or not.

21        Q.    Okay.  Do you recall discussing the

22    Empower customer?

23        A.    Yes.

24        Q.    Do you see Ms. Lamb's note, it says,

25    quote, Customer committed to stay with FedEx if we

Page 149

1    make a slight alteration to pricing, which we did.

2    Per Jennifer, Empower is now safe and no longer at

3    risk.

4         Do you recall having that discussion with

5    her?

6         A.   We had several discussions on Empower.  I

7    don't recall this specific note.

8         Q.   Do you recall ever having a discussion

9    with Ms. Lamb where you informed her that you

10   thought the account was safe and no longer at risk

11   because of a pricing adjustment?

12        A.   Yes.

13        Q.   Okay.  What's My FedEx Rewards?

14        A.   It's a rewards program, similar to how

15   someone earns rewards on a credit card, a customer

16   can earn awards on their FedEx shipping activity.

17        Q.   Okay.  And Ms. Lamb assigned you that

18   responsibility for FY19, right?

19        A.   Yes.  And it was removed shortly after

20   that and given to Casey Millner.

21        Q.   When was it removed?

22        A.   I don't recall the specific date but

23   around the letter of counseling.

24        Q.   Okay.  So the letter of counseling was in

25   June of calendar year 2019, correct?