Page 200

1    adjustment of BJ Services.

2         Q.   Okay.  And what about the next phrase,

3    your district had the lowest year to date goal

4    attainment for the Longhorn region; is that true?

5         A.   That is inaccurate as well.  Because of

6    the inflated revenue added to my district, because

7    of the impact of BJ Services, that is inaccurate.

8         Q.   Okay.  And what about zero out of eight

9    AEs were at or above plan for your fourth quarter of

10   fiscal year '19; was that true?

11        A.   That would be inaccurate also just because

12   once the removal of BJ Services and the alignment of

13   4G Dental, I could have had, if not the same as my

14   white peers, I would be equal to them.

15        Q.   Okay.  But that would only affect one or

16   two AEs, right?

17        A.   Correct.  But that would put --

18        Q.   Okay.

19        A.   -- me equal if not the same --

20        Q.   So at --

21        A.   -- or higher.

22        Q.   So at best, six out of eight of your

23   AEs -- or two of eight of your AEs would be at or

24   above plan, correct?

25        A.   Correct.

Page 201

1      Q.   And what about, did your district fail to

2   meet plan four out of four quarters in FY19?

3      A.   That is false also because I am impacted

4   by the negative adjustment of BJ Services.

5      Q.   Okay.  You were asked to create a PIP,

6   right, a performance improvement plan?

7      A.   Yes.

8      Q.   And she asked for you to send that to her

9   by close of business on July 3rd?

10      A.   Yes.

11      Q.   And then you would meet about it, correct?

12      A.   Yes.

13      Q.   Okay.  And that's the same process that

14   you filed with Mr. Seagraves when you issued him a

15   letter of counseling, correct?

16      A.   The difference is --

17      Q.   No, ma'am.  My question is --

18      A.   Yes --

19      Q.   -- did you --

20      A.   -- that is correct.

21      Q.   Thank you.

22           Hand you what has been marked as

23   Exhibit 32.  This is an email exchange between you

24   and Ms. Lamb about your PIP, correct?

25                (Exhibit 32 marked.)

Page 202

1     A.   Yes.

2     Q.   Do you recall how many categories were on

3  your PIP?

4     A.   Four.

5     Q.   Okay.  And while you're creating your PIP,

6  you spoke to Dave Russell to get his input and

7  views, correct?

8     A.   Yes.

9     Q.   Okay.  And you provided an updated action

10  plan to Michelle Lamb, correct?

11     A.   Yes.

12            (Exhibit 33 marked.)

13     Q.   Hand you what has been marked as

14  Exhibit 33.  Ms. Harris, this is just in color.

15  You'll notice it's the -- it's your July 9th letter

16  to Ms. Lamb.  It's basically the first couple pages

17  of Exhibit 32.  Okay.

18        So if you go to the bottom of the first

19  page, that's one of your categories, right, the

20  bullet point that's in black?

21     A.   Yes.

22     Q.   Okay.  And is the red comments that say,

23  on the top of page 2, How will this impact district

24  performance and how will it be measured, am I

25  correct that the red on this document is Ms. Lamb's

Page 203

1    questions to you?

2         A.   Yes.

3         Q.   And then the yellow -- I think that's

4    yellow.

5         A.   Yes.

6         Q.   -- is your response to Ms. Lamb's question

7    in red; is that right?

8         A.   Yes.

9         Q.   Okay.  And these are all the categories

10   that you had on your first PIP; is that right?

11        A.   These are all of the strategies and

12   approaches that I was going to take that I'm not

13   100 percent sure if it outlines all the details in

14   the PIP.

15        Q.   Okay.  But do you recall there were, like,

16   seven action items that you were going to work on

17   addressing?

18        A.   Strategies, yes.

19        Q.   Okay.  And that's what you and Ms. Lamb

20   agreed to?

21        A.   We didn't agree because what I submitted

22   to her was different than what she requested.

23        Q.   Okay.  The stuff that's on Exhibit --

24   okay.

25             Based on your management experience, what

Page 204

1   was your expectation on what would happen regarding

2   your first PIP?

3           Let's take it if you were successful, you

4   successfully completed it, what would have happened?

5       A.   That I wouldn't move forward to a letter

6   of warning and I wouldn't be targeted and retaliated

7   against.

8       Q.   Okay.  And if you were unsuccessful at

9   completing the PIP, what -- what is your

10  understanding as a manager would have happened to

11  you as the employee?

12      A.   That the specifics in the letter of

13  counseling and the letter of warning would be

14  consistent and used to evaluate my white peers.

15      Q.   Is your understanding that if an employee

16  doesn't successfully complete the PIP, a letter of

17  warning is typically issued?

18      A.   If it's held to the same standard, it

19  should be, but I was not.

20               (Exhibit 34 marked.)

21      Q.   Okay.  Hand you what's been marked as

22  Exhibit 34.

23           Do you recall having a meeting with

24  Ms. Lamb in September of 2019 to go over your

25  performance on your PIP?

Page 205

1       A.    Yes.

2       Q.    Okay.  And is Exhibit 34, does that

3   identify the seven categories you were being tracked

4   on in your PIP?

5       A.    Yes and held to a different standard as my

6   white peers.

7       Q.    Okay.  And am I correct, ma'am, that the

8   boldface is the PIP and the unbold statement

9   underneath is what Ms. Lamb wrote to grade you on

10   your performance on the PIP?

11       A.    Yes.

12       Q.    Is that fair?

13             And Ms. Lamb informed you that she

14   believed you only met one of the objectives and that

15   your plan -- your district had now been under plan

16   for five consecutive quarters, correct?

17       A.    That isn't correct because if I did not

18   have the negative adjustment of BJ Services, I would

19   not have had only one quarter, I would have had two

20   or more.

21       Q.    Okay.  So my question is:  Ms. Lamb,

22   though, during your meeting -- I appreciate your

23   contention that the numbers aren't fair because of

24   BJ Services and 4G Dental and some of the other

25   things you talked about this morning.  Okay?

1          My question is:  During the meeting in

2     September of 2019, September 14th, did Ms. Lamb go

3     over this document with you and highlight that she

4     believed you only met one of the objectives?

5          A.   That she believed, yes.

6          Q.   Okay.  And did she tell you -- let's look

7     at the first bullet -- that the revenue gaps

8     increased from 1.19 million to 1.36 million?

9          A.   What she doesn't say is the impact of

10    BJ Services, yes.

11         Q.   Okay.  Is she -- how about for -- and all

12    these things that are identified in the first

13    bullet, the scorecard is a weekly report; is that

14    right?

15         A.   Yes.

16         Q.   What's ROA?

17         A.   We all had different ROAs.  Mine was

18    return on -- I don't recall what the A was --

19         Q.   Okay.

20         A.   -- so I can't give you an accurate answer

21    on that.

22         Q.   So were you -- is it your testimony that

23    you were the only manager in Michelle Lamb's group

24    that had a biweekly ROA?

25         A.   Yes.

Page 207

1          Q.   What about gap to goal, what's that?

2     That's how far you are -- strike -- is that how far

3     you are revenue-wise from your goal?

4          A.   Of accomplishing the goal, yes.

5          Q.   Okay.  And is it correct that these

6     reports will show AEs' pricing activities,

7     opportunities, calls on opportunities, closes, and

8     efforts to close gaps by service?

9          A.   Yes.

10         Q.   Okay.  What about the second bullet?  Is

11    there a report -- did you hold your account

12    executives accountable for call management?

13         A.   Yes.

14         Q.   Account management?

15         A.   Yes.

16         Q.   Pipeline management?

17         A.   Yes.

18         Q.   Territory management?

19         A.   Yes.  Which is why on those same reports

20    that she used to falsely accuse me of poor

21    performance, it showed that I wasn't the lowest in

22    the region and was being treated unfairly compared

23    to my white peers.  They were not held to the same

24    standard.

25         Q.   What about -- is it true that three out of

Page 208

1    eight of your AEs did not meet the CBT expectation?

2         A.   On her expectation listed in this PIP,

3    yes, but --

4         Q.   Okay.  The next one, what does it mean,

5    Collaborate to close, each MD AE will have one

6    target account they will work per month to

7    collaborate with their BSI AE to close?

8              Can you -- can you explain that to me?

9         A.   Yes.  Collaborate to close is an

10   initiative for the market development account

11   executives only.  It did not apply to the strategic

12   development account executives.  And they were to

13   collaborate with their inside sales aligned account

14   executive to close an account in a territory that

15   aligned to both of them.

16        Q.   Okay.  And you had three of six?

17        A.   Yes.

18        Q.   Okay.  Next bullet says, quote, Goal is to

19   have 50 percent of the team over 100 percent

20   international in Q1 and continue the consistency and

21   grow that number for FY20.

22             And Ms. Lamb writes six out of eight AEs

23   on your team hit the international plan unadjusted.

24             So you met that objective, correct?

25        A.   Yes.

Page 209

1       Q.   And then you also had a target account

2   Global Healing for that quarter; is that right?

3       A.   Yes.

4       Q.   And are these all reports that could be

5   run?  Calls on the target account opportunities,

6   what does that mean?

7       A.   It means that there is a focus on not just

8   calling random customers, that they're identified as

9   an opportunity.  Whether we can win brand-new

10  business or actually grow their business, it has to

11  be identified in the system so that then the report

12  will demonstrate that not only is it a call but

13  actually a call on opportunities.  And so there's a

14  report that pulls down those details to be able to

15  demonstrate calls on -- on opportunities.

16      Q.   Okay.  And what's -- what does it mean

17  to -- to, quote, demonstration on the strategy,

18  close quote?

19      A.   Can you repeat the question?

20      Q.   Yeah.  I'm just going through this.

21           The success of target accounts will be

22  measured by calls on the target account

23  opportunities, comma --

24      A.   Uh-huh.  Sure.

25      Q.   -- and the next phrase is "demonstration

Page 210

1    on the strategy. "

2              What does that mean?

3        A.   Being able to actually go through the

4    process of how we were going to actually win the

5    business.  So we would have to be able to have

6    evidence that we actually moved forward with the

7    strategy that was outlined to try and win this

8    particular customer.

9        Q.   And what -- joint call engagement is you

10   going on joint rides with the AE.  Is that fair?

11       A.   Yes, uh-huh.

12       Q.   And she has pricing and solutions utilized

13   and activation rate once closed.

14             Can you briefly describe those three

15   concepts?

16       A.   Yes.  Pricing would be a discount program

17   that the customer was extended and accepted.  So we

18   can extend it, but if the customer doesn't accept,

19   then it causes us to have to re-evaluate and change

20   steps in the strategy.

21             And then solutions utilized is are we

22   bringing in a technician who can analyze any

23   technology that could help the customer be able to

24   automate their shipping process, are there any

25   operations or packaging engineers needed for us to

Page 211

1    be able to really show the customer the benefit of

2    why they should move forward with FedEx.  And so

3    those are a variety of things that were utilized to

4    focus on the target account.

5         Q.   Okay.  And what's activation rate once

6    closed?  How much volume they actually ship?

7         A.   Yes.

8         Q.   Okay.  And is it -- is it true that Global

9    Healing did not close in quarter 1?

10        A.   That is correct.  But I wasn't --

11        Q.   The next bullet is pricing.

12        A.   Uh-huh.

13        Q.   And it says, MD's pricing expectation is

14   to average one pricing per week.  SD's pricing

15   expectation is to price as needed based on

16   opportunities, earned discount growth, surcharge

17   extensions, protecting business all play a huge part

18   in their pricing activity.

19             So what -- is MD, is that Jennifer Lamb

20   (sic)?

21        A.   No.

22        Q.   That's you?

23        A.   MD is market development.

24        Q.   Go it.

25        A.   That would be consistent with Joel

Page 212

1    Hitchcock or with Jennifer Garcia, with Lynne

2    Hennessey.

3         Q.   Sure.

4              And SD is strategic development?

5         A.   Yes.  That would be Laura Segovia and

6    Steve Whaley.

7         Q.   And is Ms. Lamb correct that zero of the

8    six MDs you have on your team submitted one pricing

9    request per week?

10        A.   That is inaccurate.

11        Q.   So you're saying they did submit pricing

12   requests once per week?

13        A.   It wasn't zero.  It was around two or

14   three of my market development reps who submitted

15   pricing.

16        Q.   Do you remember which two or three those

17   were?

18        A.   I don't recall specifically which one, but

19   I do know that Neal Cross was even left off of the

20   allocation she used to evaluate my performance and

21   he was transitioned to my team.  He was on the

22   report that was used or shown to me, it showed under

23   another manager, which is another demonstration of

24   her trying to falsely accuse me of poor performance.

25        Q.   Okay.  The last bullet on this PIP is you

1  had agreed to achieve a hundred percent attainment

2  to your goal in quarter 1, correct?

3      A.   And I would have if I did not have that

4  negative adjustment of BJ Services.

5      Q.   Okay.  During your PIP meeting in

6  September, did you discuss Empower Pharmacy with

7  Ms. Lamb?

8      A.   I don't recall if in that particular

9  meeting we discussed Empower.  We discussed Empower

10  several times.

11      Q.   Do you -- see if this refreshes your

12  memory.

13          Do you recall Ms. Lamb pointing out to you

14  that Empower Pharmacy is the only account in Dave

15  Russell's entire organization that is approved to

16  use their own packaging for FedEx One Rate?

17      A.   I do recall they were part of that

18  program.

19      Q.   Do you recall that they were

20  Mr. Russell's only customer that was allowed to

21  participate in that program?

22      A.   I don't recall if they were the only

23  customer.

24      Q.   You don't recall being told that?

25      A.   I don't.  I know there was a pilot because

Page 214

1   FedEx wanted to allow customers to use their own

2   packaging, so I don't recall if Empower was the only

3   one in his division that was allowed to do so.

4       Q.   Do you recall at some point when Empower

5   was under you and Laura Segovia that they went to

6   UPS?

7       A.   They were already shipping with UPS.  They

8   shipped with both of us.  We were trying to win

9   majority of the business.  So it wasn't that they

10  already were transitioning; it's that they were

11  already with them.

12      Q.   Do you think it would be easier to gain

13  more business from a customer if they were allowed

14  to use their own packaging for the One Rate program?

15      A.   If it aligned with solutions they needed

16  to conduct their business, yes.  But it also didn't

17  justify any of the other solutions they needed.

18  Packaging just was one portion of the things they

19  were looking for for us to earn their business.

20      Q.   Would you agree that you were being set up

21  to succeed in closing more Empower Pharmacy business

22  by having it be the customer that was allowed to use

23  their own package in the pilot for the FedEx One

24  Rate program?

25      A.   That one factor, no.

1       Q.   Okay.  When you had the discussion about

2    your PIP and Ms. Lamb told you only met one of the

3    seven objectives, did you become disrespectful

4    during that meeting?

5       A.   No.

6       Q.   Did you become upset?

7       A.   I became frustrated.

8       Q.   And how did you exhibit your frustration

9    to Ms. Lamb, if you recall?

10      A.   I did -- I shared with her that I didn't

11   agree with the changes that were made to the PIP.

12      Q.   Did Ms. Lamb end that meeting suddenly?

13      A.   I don't recall.

14               (Exhibit 35 marked.)

15      Q.   Hand you what has been marked as

16   Exhibit 35.  It's an email exchange between you and

17   Ms. Lamb.

18          What did -- it says you have some --

19   Michelle in her email to you at the bottom of the

20   page, she says, I saw some nice close -- closes

21   reported on the Newbi by Account tab.

22          What's Newbi?  New business?

23      A.   Yeah.  That was just a different way of

24   saying closed business tracking.

25      Q.   Okay.  The beginning part of the email to

Page 216

1    you, Ms. Harris -- Ms. Lamb is indicating that she's

2    concerned about the lack of new business or closed

3    business tracking that's going on on your team,

4    correct?

5         A.   That is what she states but that's

6    inaccurate.

7         Q.   And she goes on to say in the

8    second-to-last paragraph, quote, As we discussed

9    this report further, you referenced a couple

10   specific accounts and felt strongly they should have

11   activated but they may not have been reported

12   properly.  I would like to hear more about the

13   specifics of those accounts in our next meeting one

14   week from today.

15        So you had raised concerns -- at least

16   some concerns that you thought the report was

17   inaccurate?

18        A.   Yes.  And it doesn't -- it isn't

19   consistent with her response that's saying that she

20   didn't see any closed business tracking because the

21   reports demonstrate that there was closed business

22   tracking.  I actually was ranked in the top half of

23   closed business tracking for her region.

24        Q.   Okay.  And then you respond to Ms. Lamb's

25   email in the middle email, correct?

Page 217

1      A.   Yes.

2      Q.   And you tell her that her expectations of

3  you are unrealistic, correct?

4      A.   Correct.

5      Q.   What expectation -- which of the

6  expectations were unrealistic?

7      A.   The inconsistencies of her evaluating my

8  performance.

9      Q.   What about -- going back to Exhibit 34.

10 Do you have Exhibit 34 in front of you?

11     A.   I do.

12     Q.   So these are the seven categories that

13 you're being tracked on for your PIP, right?

14     A.   Yes.

15     Q.   Which of these expectations -- which of

16 these seven do you think are unrealistic?

17     A.   All of them --

18     Q.   Okay.

19     A.   -- because they're inconsistent with the

20 evaluation of my white peers.

21     Q.   Okay.  And then you go on and you ask her

22 in the next paragraph, you asked her to engage more

23 with your team, correct, on closing business --

24     A.   Yes.  That --

25     Q.   -- and their performance, right?

Page 218

1      A.    Yes.   That aligns to my request to have

2   her demonstrate strategies and solutions on how we

3   would improve.

4      Q.    And then Ms. Lamb responds to you.   In

5   regards to that, she says, quote, I would be happy

6   to join a future call with your team to discuss

7   closed business expectations.   Please get with Tammy

8   to coordinate a date and time for that conversation.

9          Did I read that right?

10     A.    Yes.

11     Q.    Did you schedule that future conversation

12  for Ms. Lamb to talk to your team?

13     A.    I don't recall.

14          MR. BABCOCK:   Okay.   Why don't we go

15  ahead and take a break.

16          THE VIDEOGRAPHER:   We're off the

17  record at 2:50.

18          (Recess 2:50 p.m. to 3:04 p.m.)

19          THE VIDEOGRAPHER:   We are back on the

20  record at 3:04 p.m.

21     Q.    Before we took a break, we were on

22  Exhibit 35.   Do you still have that in front of you?

23     A.    Yes.

24     Q.    For those couple of accounts that you felt

25  should have been activated, I believe you testified

Page 219

1   you don't remember sitting here today which accounts

2   those were, correct?

3       A.   Which accounts are you -- what part of

4   this exhibit are you referring to?

5       Q.   If you look at the last paragraph of

6   Michelle Lamb's email to you on the bottom of the

7   page.

8       A.   No, I don't recall.

9       Q.   Okay.  Do you recall what you did, if

10  anything, to follow up about those accounts?

11      A.   Yes.  I showed her in my continuous

12  one-on-ones that instead of the false allegation

13  that she provided that I wasn't performing, that I

14  actually was.  And it demonstrated in the reports

15  that I was actually a top performer within her

16  region.

17      Q.   She says in the first paragraph, quote,

18  What concerns me most is the fact that you haven't

19  been looking at CBT or these issues would have been

20  known to you.

21           Do you agree, ma'am, that you weren't

22  monitoring the CBT report closely enough?

23      A.   I disagree.  I monitored that on a regular

24  basis, which is how I was able to identify and

25  demonstrate to her that her accusation of falsely

Page 220

1    accusing me of poor performance was wrong.

2         Q.   But you do agree that closing business and

3    generating revenue for FedEx are core expectations

4    of sales leadership like yourself, correct?

5         A.   Yes, and that's what we did.

6         Q.   And it's also a core expectation for your

7    account executives, right?

8         A.   Yes.

9                   (Exhibit 36 marked.)

10        Q.   Hand you 36.  This is an 8/12/19 email

11   exchange between you and Ms. Lamb.

12        A.   Yes.

13        Q.   What did -- does your email to Ms. Lamb

14   show?

15        A.   It's showing a graph of one of the tools

16   that I used to identify the top decliners in my

17   district.

18        Q.   Were you aware that Charbonneau Industries

19   was the second largest decliner in your district for

20   quarter 1?

21        A.   Yes.

22        Q.   Okay.  That's -- shows you in the graph

23   you were looking at?

24        A.   Yes.

25                   (Exhibit 37 marked.)

Page 221

1      Q.   Hand you Exhibit 37.  It's a copy of your

2   9/13/2019 warning letter.

3           You received this warning letter, correct?

4      A.   Yes.

5      Q.   And you initiated the EXPLORE process

6   after you received this warning letter, right?

7      A.   Yes.

8      Q.   And you still had an attorney at that

9   point, correct?

10     A.   Yes.

11     Q.   When did you switch from your first

12  counsel to your current counsel?

13     A.   I moved in January of 2021 so around about

14  that time frame.

15     Q.   Okay.  So it was well after your

16  termination?

17     A.   Yes.

18     Q.   Okay.  And I'm correct you wanted your

19  attorney to participate in the EXPLORE process,

20  right?

21     A.   Yes.

22     Q.   As a result of this warning letter, you

23  were told to do another PIP, correct?

24     A.   Yes.

25     Q.   And you were asked to submit that to

Page 222

1    Ms. Lamb, right?

2         A.   Yes.

3         Q.   And did the second PIP follow the same

4    process that the first PIP followed where you

5    provided her a draft and y'all worked on it together

6    and came to an agreement?

7         A.   We did not work together.  I created a

8    draft and then she made changes that I did not agree

9    with.

10        Q.   Okay.  And looking at the warning letter,

11   Ms. Lamb told you you failed to meet plan in FY19,

12   correct?

13        A.   Correct.

14        Q.   And she told you you failed to meet plan

15   in FY20 first quarter, correct?

16        A.   That is what the letter says but that is

17   false.

18        Q.   And she told you that in FY20 year to

19   date, your district had the lowest pricing activity

20   in the region; is that --

21        A.   That's --

22        Q.   -- is that true?

23        A.   That is false.

24        Q.   Okay.  And she went over the parts of your

25   first PIP that she believed you didn't meet,

Page 223

1    correct?

2         A.   Yes.

3         Q.   All right.  We already discussed those

4    before our last break, right?

5         A.   Yes.

6              (Exhibit 38 marked.)

7         Q.   Handing you what's marked as Exhibit 38.

8              This is a copy of the action plan that was

9    ultimately --

10        A.   Yeah.

11        Q.   -- given to you to meet?

12        A.   Yes.

13        Q.   Okay.  And do you recall, sitting here

14   today, what parts of the action plan you disagreed

15   with?

16        A.   All of it.

17        Q.   Okay.  And so what did you suggest as your

18   action plan?  Do you recall that?

19        A.   I just asked that Michelle Lamb be

20   consistent with her evaluation of our performance

21   compared to my white peers.  The reporting showed

22   that not only did several of my white peers not have

23   people who did not have market development reps who

24   couldn't achieve $250 of closed business tracking,

25   in addition to they also had strategic development

Page 224

1    account executives who didn't hit $1,000 of closed

2    business tracking, so why was I held to a different

3    standard than my white peers.  And the only

4    determining factor in her evaluation was my race.

5         Q.   And so if you look at Exhibit 33, you

6    didn't engage in a similar exercise with Ms. Lamb

7    regarding your first PIP as you did -- regarding

8    your second PIP as you did your first PIP, correct?

9         A.   Repeat the question again.

10        Q.   Do you have Exhibit 33 in front of you?

11        A.   I do.  I just got it.

12        Q.   And if you look at the second page, it

13   shows the collaboration between you and Ms. Lamb,

14   right?

15        A.   Yes.  It shows --

16        Q.   Okay.

17        A.   -- details of the -- the PIP and then --

18        Q.   So --

19        A.   -- her questions and my response.

20        Q.   And so my question to you is:  You did not

21   engage in the same back-and-forth with Ms. Lamb for

22   your second PIP; is that right?

23        A.   I don't recall.

24        Q.   Okay.  But you didn't -- is it fair to say

25   you didn't come up with these five categories on

1    Exhibit 38?

2         A.   They were from Michelle Lamb.

3         Q.   Okay.  And -- but she discussed these

4    categories with you, right?

5         A.   Yes.

6         Q.   All right.  And so she told you that each

7    of your -- for example, for the CBT, she wanted

8    100 percent of your MDs, needed to track their 250

9    average daily --

10        A.   Net revenue.

11        Q.   -- revenue in order to close territory

12   gaps in quarter 2, correct?

13        A.   That is -- yes.

14        Q.   And then for the strategic directors, she

15   wanted them to track $1,000 average daily net

16   revenue, correct?

17        A.   The strategic development, yes.

18        Q.   Did you -- I just want to make sure I

19   understand your testimony, ma'am.

20             Do you believe the numbers should have

21   been different or do you think you shouldn't have

22   had to deal with CBT at all?

23        A.   I think it should have been consistent.

24   If she was going to hold me to this standard, that

25   100 percent of my market development reps had to

Page 226

1    close $250 and 100 percent of my strategic

2    development account executives had to hit $1,000, my

3    white peers should have been held to the same

4    standard.

5              It is inconsistent based on the closed

6    business tracking and gives evidence that my white

7    peers did not have or meet this expectation but yet

8    I was held to it in this Q2 action plan.

9         Q.   Okay.  Was there ever a time in your

10   relationship with Ms. Lamb that you didn't think she

11   was being racist?

12        A.   No.

13        Q.   You thought she was racist the entire time

14   you worked for her?

15        A.   Yes, because she already had a perception

16   that I wasn't qualified for leadership or the

17   manager role for field sales because she had a

18   conversation with Grant Kuhn who never thought I

19   should be in leadership and spoke in front of

20   several inside sales managers and told them if he

21   ever had an opening, he wouldn't hire me.

22        Q.   Okay.  And when did this conversation

23   occur between Ms. Lamb and Grant Kuhn?

24        A.   I don't know when they had a conversation.

25   He was the director prior to her taking over, so I'm

Page 227

1   sure they had several conversations.

2        Q.   Did you ever ask Ms. Lamb if she had a

3   conversation with Grant Kuhn about you?

4        A.   No.  I didn't need to because several

5   other people, including Brian Conrey, told me that

6   Grant Kuhn expressed the same opinion to him as

7   well.

8        Q.   Okay.  So you're just assuming that

9   Mr.  Kuhn and Ms. Lamb had a conversation about you,

10  correct?

11       A.   It is common knowledge that Michelle Lamb

12  and Grant Kuhn had a conversation.  I just was not

13  there, so I can't verify or give you a specific date

14  or time when it actually happened.

15       Q.   Is it common knowledge that Grant Kuhn and

16  Michelle Lamb had a conversation about you?

17       A.   Yes.

18       Q.   And explain that common knowledge to me.

19       A.   I just shared with you that Brian Conrey

20  had a conversation directly with Grant Kuhn, and he

21  expressed those same details with him, that he

22  didn't feel I was fit to be in management or to be a

23  leader, and if he had a position in his region, that

24  he wouldn't hire me.

25       Q.   Is there any particular reason you didn't

Page 228

1    relay that concern to Dave Russell or Dan Mullally?

2        A.   No.   I wanted to give Michelle a fair

3    chance to build her own relationship with me.   And

4    at the time, there was not any examples or actions

5    made from her that demonstrated the discrimination

6    or retaliation.

7        Q.   I thought you testified earlier that when

8    she told you to consider finding a job somewhere

9    else in FedEx, that that occurred in the early

10   March 2019 meeting you had about Coach2Grow,

11   correct?

12       A.   Michelle took over in 2017.   The

13   conversation I'm referring to with Brian Conrey and

14   Grant Kuhn happened prior to June 2017.

15       Q.   Okay.   But you sent an email to Dave

16   Russell and Dan Mullally after you believed Michelle

17   Lamb was discriminating against you, correct?

18       A.   Correct.

19       Q.   Why in your email to Dave Russell and Dan

20   Mullally did you not bring up your suspicions about

21   a conversation that Brian Kuhn (sic) may have had

22   with Michelle Lamb?

23            MR. SANFORD:   Objection; form.

24       A.   That Grant Kuhn -- because at the time, as

25   I shared, I wanted to give Michelle a fair chance to

Page 229

1    build her own relationship with me and not assume

2    that she was going to take the feedback or

3    perception from Grant Kuhn literally and actually

4    act out discrimination and retaliation against me.

5         Q.   Okay.  Going back to Exhibit 38, do you

6    agree under International that at the time this

7    action plan was made, the current attainment was

8    86.1 percent with six out of your eight AEs missing

9    international plan?

10        A.   I don't recall that exact number.

11        Q.   Okay.  And for pricing, she -- she --

12   Ms. Lamb told you that success would be measured

13   based on MD pricing submissions averaging out to one

14   per week in quarter 2.  Correct?

15        A.   That is what it says, yes.

16        Q.   And for collaborating to close, Ms. Lamb

17   informed you that each MD on the team needed to be

18   working at least one collaborate to close

19   opportunity in quarter 2, right?

20        A.   That is what it says.

21        Q.   Okay.  And that's what Ms. Lamb told you

22   was her expectation, correct?

23        A.   Yes.

24        Q.   Okay.  So Ms. Lamb told you all these -- I

25   don't know if you call them carets, little arrow,

Page 230

1    those were her expectations of you for quarter 2,

2    correct?

3        A.   Yes.

4        Q.   December of 2019, do you recall having a

5    meeting with Ms. Lamb where you discussed your

6    performance on the action plan?

7        A.   I don't recall that specific date, but I

8    had several conversations with her in regards to the

9    performance.

10       Q.   Do you recall that at the beginning of

11   that meeting, you had a discussion about Laura

12   Segovia's letter of counseling update?

13       A.   I don't recall specifically when that was,

14   but we had several conversations about Laura

15   Segovia.

16       Q.   Do you recall having a conversation with

17   Michelle Lamb where you walked through Laura's PIP

18   and demonstrated that Laura had successfully

19   completed all of her objectives?

20       A.   I don't recall that meeting specifically,

21   but I did share the details of Laura's letter of

22   counseling and her performance improvement plan with

23   Michelle Lamb.

24       Q.   Do you recall that Ms. Lamb had a meeting

25   with Laura Segovia in early December of 2019?

1    A.   I don't recall.  Michelle had several

2    meetings with Laura.

3    Q.   Do you recall Ms. Lamb relaying to you

4    that Laura wished she had more support from you as

5    her manager?

6    A.   I don't recall.

7    Q.   Do you recall Ms. Lamb telling you that

8    that's why Laura was going to Brian Conrey for

9    strategy sessions?

10   A.   No, I don't recall.  I encouraged Laura to

11   collaborate with Brian Conrey and myself so that she

12   could try to get additional strategies from him on

13   winning Empower.

14   Q.   Do you recall Ms. Lamb telling you that

15   Laura wanted to apply for an open position in Jen

16   Amix (phonetic) --

17   A.   Amix.

18   Q.   -- Amix's organization?

19   A.   Yes.

20   Q.   Okay.  When you had a conversation with

21   Ms. Lamb about the action plan that's referenced in

22   Exhibit 38, did you admit to her that you failed to

23   meet three out of the five objectives?

24   A.   No, because these were false accusations.

25   Q.   Do you recall having a meeting with

1    Michelle Lamb where you went through each of these

2    five items on Exhibit 38 and you had a discussion

3    with Ms. Lamb on whether or not you met the

4    requirements?

5        A.   I had a discussion with her about the

6    requirements.  I don't recall having a discussion

7    with her about not hitting the requirements.

8        Q.   Do you -- so is it your testimony, ma'am,

9    that Ms. Lamb never closed out the second PIP?

10       A.   She did because I was terminated.

11       Q.   Okay.  And to close out a PIP, she would

12   need to talk to the employee who was on the PIP,

13   correct?

14       A.   No, she could talk to HR because she

15   doesn't have to consult with me to terminate me.

16       Q.   Okay.  Is it your -- so your testimony

17   today is you don't recall Ms. Lamb ever discussing

18   the second PIP with you?

19       A.   I never said that.  I said we discussed

20   it.  Your other question was did we close it out.

21   We discussed the PIP and reviewed those details

22   highlighted in the PIP.

23       Q.   Okay.  And do you recall discussing the

24   details highlighted in the PIP on whether or not

25   your team successfully met those objectives?

Page 233

1          A.   I do not.

2          Q.   Do you recall Ms. Lamb telling you that as

3     of 12/5/2019, one -- looking at Exhibit 38, one of

4     your MDs failed to meet this requirement on the

5     close to business tracking?

6          A.   I don't recall; she could have.

7          Q.   Do you recall that she told you that as of

8     12/5/2019, two strategic directors failed to meet

9     this requirement?

10         A.   As I shared, I don't recall this

11    specifically but she could have.

12         Q.   Do you recall her telling you that your

13    team didn't meet the international requirement

14    referenced in the action plan?

15         A.   I don't recall her going through the

16    completion or conclusion of this action plan.

17         Q.   Do you recall -- but you don't deny that

18    she did, you just don't remember it?

19         A.   Correct.

20         Q.   Okay.  See if this refreshes your memory.

21    Do you recall involving pricing -- so the third

22    category on Exhibit 38.

23              Do you recall Ms. Lamb informing you that

24    the requirement was not met because four out of six

25    MDs did not meet this requirement?

Page 234

1     A.   I don't recall her specifically

2    identifying those, no.

3     Q.   And do you recall on the fourth one,

4    collaborate to close, that Ms. Lamb told you the

5    requirements had been met?

6     A.   I do not recall if she gave me an update

7    on how the results of this particular collaborate to

8    close ended, no.

9     Q.   And on Exhibit 38 under Performance where

10   you have the different types of FedEx Service

11   offerings --

12     A.   Uh-huh.

13     Q.   -- listed and with a percentage, those

14   were the goals that Ms. Lamb told you you needed to

15   meet, correct?

16     A.   No.  That demonstrates what my actual

17   goals were is what she stated, but it's actually

18   inaccurate because it does not include the addition

19   of 4G Dental and the removal of BJ Services.

20     Q.   Okay.  But this is what Ms. Lamb told you

21   she expected you to meet, correct?

22     A.   That is correct.

23     Q.   Okay.  And did she go over what your

24   percentages were for those four different service

25   offerings; do you recall?

Page 235

1          A.    I do not.

2          Q.    Does it refresh your memory at all, ma'am,

3     that after Ms. Lamb went through your second PIP

4     action plan December of 2019, that you asked her if

5     you will have another meeting and Ms. Lamb told you

6     that will be scheduled ad hoc and more than likely

7     follow the holidays?  Do you recall that?

8          A.    I don't, but I know I was terminated

9     shortly after that.

10         Q.    After what?

11         A.    In January so after the holiday.

12               (Exhibit 39 marked.)

13         Q.    Okay.  Handing you what has been marked as

14    Exhibit 30.

15               MR. SANFORD:  30?  We skipped over --

16    oh.

17         Q.    What does it say?

18         A.    It says 39.

19         Q.    39.  Thank you.

20               Exhibit 39 is the termination letter dated

21    1/7/2020.

22               You received a copy of this letter, right?

23         A.    Yes.

24         Q.    Okay.  And you went through the EXPLORE

25    process regarding this letter, correct?

Page 236

1      A.   Yes.

2      Q.   Returning to 38, it's your belief that

3   Ms. Lamb put you on your second PIP because of your

4   race, correct?

5      A.   Yes.

6      Q.   In other words, had you been a race other

7   than black, Ms. Lamb would have not put you on the

8   PIP.  Is that your contention?

9      A.   Yes.

10      Q.   And again, at the time you were terminated

11   you were represented by a law firm, correct?

12      A.   Yes.

13      Q.   And you wanted that law firm to

14   participate in the EXPLORE process, correct?

15      A.   Yes.

16      Q.   Okay.

17           MR. BABCOCK:  Let's go off the record

18   for a minute.

19           THE VIDEOGRAPHER:  Off the record at

20   3:27.

21           (Recess 3:27 p.m. to 3:37 p.m.)

22           THE VIDEOGRAPHER:  We are back on the

23   record at 3:37 p.m.

24           (Exhibit 40 marked.)

25      Q.   All right.  Exhibit 40 is an email

Page 237

1    exchange between you and Ms. Lamb dated August 4,

2    2017.

3              This is where you're informing your boss

4    you had jury duty and you were having some surgery;

5    is that correct?

6         A.   Yes.

7         Q.   And Ms. Lamb the telling you -- asking if

8    you have a ride for your surgery because she would

9    be happy to take you if needed, correct?

10        A.   It doesn't specifically say she would give

11   me a ride; she just says, Do you have a ride.

12        Q.   It says -- Michelle says, quote, Thanks.

13   Do you have a ride on the 11th?  Would be happy to

14   take you if needed, close quote.

15             Did I read that right?

16        A.   I didn't see that part.  Yes.

17        Q.   Okay.  And you informed her that you were

18   fine, you did not need a ride, right?

19        A.   Correct.

20        Q.   Did it surprise you that Ms. Lamb was

21   going to offer you a ride if you think she's a

22   racist?

23        A.   At that time, no.

24        Q.   At that time you didn't think she was a

25   racist or at that time you weren't surprised she was

Page 238

1    offering you a ride?

2         A.   Both.  I did not -- was not surprised that

3    she offered me a ride, and at that time, I didn't

4    think she was a racist.

5         Q.   I may have misunderstood your earlier

6    testimony.

7              When did you develop the opinion that

8    Ms. Lamb was a racist?

9         A.   After I had my own experience with her

10   over and over and over and discrimination and retaliation.

11        Q.   And did those experiences start when she

12   had the meeting with you about Coach2Grow 2.0 and

13   told you maybe you should find a different job at

14   FedEx?

15        A.   Yes.

16        Q.   Okay.

17             MR. BABCOCK:  Let's go ahead and go

18   off the record.

19             THE VIDEOGRAPHER:  We're off the

20   record at 3:39.

21             (Off-the-record conversation.)

22             THE VIDEOGRAPHER:  Back on the record

23   at 3:40.

24        Q.   Ms. Lamb, we had a -- Ms. Lamb.

25             Ms. Harris, excuse me, we had a colloquy

Page 239

1    off the record.  Can you -- I was confused about

2    your earlier testimony about Ms. Lamb -- your

3    opinion that Ms. Lamb was a racist.

4            Can you describe for me again what your

5    perception was and is?

6        A.    I shared with you that there was a

7    perception from Grant Kuhn that I wasn't qualified

8    to be a leader, and in his opinion, if he had any

9    open positions, he wouldn't hire me.

10       Q.    Okay.

11       A.    And those details were shared with

12   Michelle Lamb.  At the time, she had not

13   demonstrated any discrimination or retaliation

14   against me, and I didn't feel the need to report

15   that to Dave Russell or HR because I didn't want to

16   assume she would believe the perception of someone

17   else.

18       Q.    Again, right before we just went off the

19   record, you developed that opinion that Ms. Lamb was

20   a racist after you had -- during the meeting you had

21   about the Coach2Grow and she told you to find a

22   different job at FedEx.  Is that fair?

23       A.    In addition to her negative adjustment of

24   BJ Services, the inaccurate alignment of 4G Dental,

25   and her going into that customer and not properly

Page 240

1   holding the account manager, which was my white peer

2   Brian Conrey, accountable for making sure that I

3   received the positive revenue for that and holding

4   me to a different standard than my white peers.

5          After that, I believe that because of

6   Michelle's actions and responses, that the

7   determining factor in her evaluating my performance

8   was my race.

9          Q.   Regarding the BJ Services issue, you

10   identified it in 2017, right, the fall of 2017,

11   correct?

12          A.   October 2017, yes.

13          Q.   And there's email traffic between you and

14   Ms. Lamb that we went over starting in January

15   of 2018, correct?

16          A.   Correct.

17          Q.   And at the time that email traffic started

18   in January of 2018, had you formed your opinion that

19   Ms. Lamb was a racist?

20          A.   Yes.

21          Q.   Okay.  Because the 4G Dental customer

22   issue occurred after that time period, correct?

23          A.   Correct.  But BJ Services happened during

24   that time frame.

25          Q.   Okay.  And was the BJ Services the

Page 241

1    earliest incident or issue that you identified that

2    caused you to believe Ms. Lamb was a racist or is a

3    racist?

4          A.    No.

5          Q.    What was the earliest issue?

6          A.    It was the comment that she made in March

7    that also identified as her being a racist.

8          Q.    Okay.

9          A.    So it's not just one; it's the

10   BJ Services, it's the 4G Dental, it's the

11   inconsistencies of evaluating my performance --

12         Q.    If we --

13         A.    -- all of those things.

14         Q.    If we look at -- I'm trying to understand

15   when the earliest date was.

16               The comment that was made to you to

17   self-demote was March of 2019?

18         A.    That is correct.

19         Q.    That's after the emails you were

20   exchanging with her about BJ Services, which were in

21   January of 2018, right?

22         A.    Correct.  So BJ Services started before

23   then.

24         Q.    Correct.

25               Is there any issue that leads you to

Page 242

1    believe or led you to believe that Ms. Lamb was a

2    racist that occurred prior to the emails involving

3    BJ Services in January of 2018?

4         A.   No.

5         Q.   Thank you.

6              MR. BABCOCK:  All right.  Let's go off

7    the record.

8              THE VIDEOGRAPHER:  Off the record at

9    3:44.

10             (Recess 3:44 p.m. to 3:58 p.m.)

11             THE VIDEOGRAPHER:  We are back on the

12   record at 3:58.

13             (Exhibit 41 marked.)

14        Q.   Hand you what has been marked as

15   Exhibit 41.  It's an email exchange between you and

16   Ms. Lamb, dated January 12 of 2018.

17             And this is a concern you brought to

18   Ms. Lamb that you needed her help with, correct?

19        A.   I'm reviewing it.

20             Yes, issues with a pickup.

21        Q.   Okay.  And Ms. Lamb responds to you, Good

22   morning, Jennifer.  I will elevate to Shawn's MD,

23   Clint McCoy.  Correct?

24             It's on the first page.

25        A.   Yes.

Page 243

1    Q.   And then you respond to Ms. Lamb, Good

2    morning, Michelle.  Thanks.  I appreciate it.

3    Right?

4        A.   Yes.

5        Q.   So Ms. Lamb was elevating a concern that

6    you had to a managing director even though, at this

7    point in time, you developed the opinion that she

8    was a racist, right?

9        A.   This email says it was in January.  I

10   identified Michelle Lamb as being racist in March.

11       Q.   At the meeting you had with -- where she

12   told you to find a new position?

13       A.   Yes.

14       Q.   And about Coach2Grow 2.0?

15       A.   Yes.

16            (Exhibit 42 marked.)

17       Q.   Okay.  Hand you what has been marked

18   Exhibit 42.

19            What's the 110 percent Club?

20       A.   It means that an account manager or a

21   district sales manager has reached the attainment of

22   110 or above.

23       Q.   Okay.  And so you set a meeting -- a lunch

24   engagement with Ms. Lamb because of the 110 percent

25   Club achievement, correct?

Page 244

```
 1        A.   I was given an opportunity to pick my
 2    reward, and that was one of the options for me to
 3    pick a reward where we went to lunch and did a
 4    manicure and pedicure.
 5        Q.   Okay.  And this is around April of 2018,
 6    correct?
 7        A.   Yes.
 8        Q.   All right.  And so Ms. Lamb was willing to
 9    go to lunch with you and have a mani and pedi
10    appointment with you even though you believed she
11    had racist intentions; is that right?
12        A.   Yes.
13                 (Exhibit 43 marked.)
14        Q.   Hand you what has been marked as
15    Exhibit 43.  This is a June 18, 2018, email exchange
16    between you and Ms. Lamb where on June 15 you were
17    asking Ms. Lamb for a write-off.
18             And Ms. Lamb wrote to you on June 17th
19    saying, quote, Hello, I approve this write-off
20    request and have highlighted the requested
21    information below.  Please advise if further
22    questions exist.  Thank you.
23             Did I read that right?
24        A.   Yes, data process.
25        Q.   And then --
```

Page 245

1      A.    -- was required.

2      Q.    And then you respond to her, Thanks for

3    your help with this.  I really appreciate it.

4    Correct?

5      A.    Yes.  Because she was the person who could

6    approve it.  Without her approval, it couldn't be

7    done.

8      Q.    And Ms. Lamb was approving this request

9    for you even though by this point in time you

10   believed she had racist intentions, correct?

11     A.    Yeah, because that was her responsibility.

12   I couldn't approve write-off requests.

13               (Exhibit 44 marked.)

14     Q.    Exhibit 44, it's an email exchange from

15   July of 2018.

16          At the bottom, Ms. Lamb writes to you and

17   it looks like her entire team in which she says,

18   quote, Hi Team, due to the importance of cost

19   cutting, our joint region meeting with Chicago is

20   being canceled (for now anyways).  Please mark your

21   calendars for 8/3 -- 13 and 8/14 as potential dates

22   for our next meeting, which will take place

23   somewhere in the Houston area.  I'll pass along more

24   information as I have it, closed quote.

25          Did I read that right?

Page 246

1      A.    Yes.

2      Q.    Okay.  So there was some cost cutting

3  going on in June of 2018.  Fair?

4      A.    Yes.

5                (Exhibit 45 marked.)

6      Q.    Hand you what's been marked as Exhibit 45.

7  This is an email exchange between you and Ms. Lamb

8  in September of 2018.

9            And on September 17th, and in part you

10 write, quote, They are looking at putting a facility

11 in Memphis near our hub.  Would it be possible for

12 us to cover the cost of doing a hub tour with two of

13 our executives, close quote.

14            Did I read that request right?

15     A.    Yes.

16     Q.    And she said -- Ms. Lamb responded to you,

17 quote, Hi, Jennifer, I would be happy to investigate

18 the possibility of us providing them with a hub

19 tour.  Will you please send me a separate email

20 outlining our justification for the invitation

21 (opportunity size, names and titles attendees,

22 et cetera)?  I will then send to Dave and request

23 his approval.

24            Then you respond to her, and you end your

25 email, "I appreciate your help," correct?

```
                                            Page 247

1        A.   Yes.

2        Q.   Did a hub tour ever take place?

3        A.   No.

4        Q.   Did the customer end up putting a Memphis

5   facility in?

6        A.   They were still thinking about it at that

7   particular time.

8        Q.   Okay.  And so Ms. Lamb was willing to help

9   you try to get a customer a hub tour in September

10  of 2018 even though you believed she was a racist,

11  right?

12       A.   Yes, that is correct.

13                 (Exhibit 46 marked.)

14       Q.   Hand you what has been marked Exhibit 46.

15                 MR. BABCOCK:  Hand that back to make

16  sure I don't have writing on your copy, Mr.  Sanford.

17                 MR. SANFORD:  Oh --

18                 MR. BABCOCK:  Just make --

19                 MR. SANFORD:  -- do I have it?

20                 MR. BABCOCK:  Just make sure I don't

21  have writing on the second page.

22                 MR. SANFORD:  Oh, okay.

23                 MR. BABCOCK:  I don't think I do.

24  Perfect.

25       Q.   This is your email that you sent to
```

Page 248

1   Michael Clark on March 20th of 2019, correct?

2       A.   Yes.

3       Q.   And it says at the beginning, It was great

4   speaking with you today.

5            So you had -- this is when you had your

6   phone conversation with Mr. Clark?

7       A.   Yes.

8       Q.   To discuss the concerns you raised about

9   the meeting you had with Michelle Lamb where she

10  asked you to self-demote, right?

11      A.   And my other concerns with BJ Services,

12  Global Gold Rush, FedEx One Rate, and other details

13  with Pathway and the inconsistences of how she

14  treated me against my white peers.

15      Q.   Okay.  And was your goal to provide

16  Mr. Clark with examples of the unfair treatment you

17  received from Lamb up until that point in time?

18      A.   Yes.

19      Q.   Okay.  Had you visited with an attorney

20  yet about your experiences at the time you wrote

21  this email?

22      A.   Yes.

23      Q.   Did you have help writing this email?

24      A.   They evaluated but the details came from

25  me.

Page 249

1      Q.   Okay.  And please when we tread around

2   topics about your attorneys, try to answer my

3   question because I'm not entitled to know about

4   conversations you had with anyone that you may have

5   visited with.  Okay?

6      A.   Okay.

7      Q.   And so if you answer my question, I'll do

8   a good job of hopefully not delving into that

9   material.

10          All right.  And so am I correct your

11   attorneys reviewed the email before you submitted it

12   to Michael Clark?

13      A.   Yes.

14              (Exhibit 47 marked.)

15      Q.   Okay.  Hand you what has been marked as

16   Exhibit 47.  This is the June 28th ethics case which

17   references a June 26th date.

18          Are you aware, ma'am, on who inputted this

19   into the EthicsPoint software?

20      A.   No.  Prior to today, I have never seen

21   this.

22      Q.   Okay.  And do you recall ever filling out

23   on a website concerns you were having at FedEx?

24      A.   Yes.

25      Q.   Okay.  If you go to page 2 of this

Page 250

1    document, which is FXC 8, it says, quote, Jennifer

2    is concerned that she's being retaliated against due

3    to filing an EEO just after receiving a letter on

4    June 3, 2019, which is attached that states, quote,

5    Each issue brought forth has been thoroughly

6    investigated with the determination that corrective

7    action will be taken, close quote.

8           Do you recall raising a concern that you

9    thought you were being retaliated against in late

10   June of 2019?

11        A.   Yes.

12        Q.   Okay.  And who did you raise that concern

13   with?

14        A.   I went to Michael Clark with an email, as

15   well as Kristie Castilow.

16        Q.   Okay.  It says at the end, Jennifer states

17   that it has been 23 days since this letter and

18   things haven't improved; yet, it has gotten worse.

19           Did I read that right?

20        A.   Yes.

21        Q.   Is that part of the concern you were

22   raising at that time?

23        A.   Yes, at that time.

24        Q.   And the 23 days since the letter, that's

25   the letter of counseling, correct?

Page 251

1    A.    Yes.

2    Q.    Okay.  And what happened during that 23

3    days that caused you to tell FedEx that things had

4    gotten worse?

5    A.    The timeline is I make a complaint,

6    23 days later I'm given a letter of counseling with

7    the requirement of a performance improvement plan.

8    That outlines details that could highlight

9    retaliation.  I complain; I'm given a letter of

10   counseling.  That process continued throughout my

11   complaint process with HR.

12              (Exhibit 62 marked.)

13   Q.    Okay.  It's out of order, Ms. Harris, but

14   the record will be fine.  This is Exhibit 62.

15              MR. BABCOCK:  62, Brian.

16   Q.    This is the June 3, 2019, letter you got

17   from Ms. Clark (sic), and that's the letter you're

18   referencing in Exhibit 47, correct?

19   A.    Yes.

20              MR. BABCOCK:  Where did we go to?

21              THE WITNESS:  62.

22              MR. BABCOCK:  What was after 62?  47?

23   Q.    Okay.  And looking at Exhibit 62, that's

24   not the only closure letter you received from

25   Michael Clark, correct?

Page 252

```
 1        A.    Correct.
 2              (Exhibit 48 marked.)
 3        Q.    Hand you what has been marked as
 4    Exhibit 48.
 5              Is this another closure letter you
 6    received?
 7        A.    Yes.
 8              THE WITNESS:   This says 48, not 62.
 9    Are we going backwards?
10              MR. BABCOCK:   Yeah, 62 was marked out
11    of turn.
12              THE WITNESS:   Okay.
13              MR. SANFORD:   They can do that.  They
14    can order it however they want to order it.
15              THE WITNESS:   Okay.
16        Q.    And we already discussed your warning
17    letter, but you entered to the EXPLORE process after
18    that, right?
19        A.    Yes, because I was concerned after now
20    several complaints to HR that FedEx wasn't
21    protecting me; they were targeting me.
22        Q.    And you actually inputted the information
23    in the EXPLORE process online, right?
24        A.    Yes.
25        Q.    I'm just going to go with the numbers.
```

Page 253

1    Here is Exhibit 54.

2           This is your first EXPLORE, right?

3              (Exhibit 54 marked.)

4      A.   I'm looking at the details.  One moment.

5    (Reviewed document.)

6           Yes.

7      Q.   Okay.  And you didn't receive any

8    follow-up with this because at the time, you had an

9    attorney that you wanted involved in the process,

10   right?

11     A.   Yes.

12     Q.   And FedEx wouldn't permit that?

13     A.   Correct.

14     Q.   Okay.  And then you complained again after

15   you received the warning letter, correct?

16     A.   Yes.

17     Q.   All right.  How did you raise your

18   complaint in December of 2019, do you recall, ma'am?

19     A.   I sent a message to Michael Clark.

20              (Exhibit 55 marked.)

21     Q.   Okay.  Hand you what has been marked as

22   Exhibit 55.

23           You testified earlier that you hadn't seen

24   any EthicsPoints until today, correct?

25     A.   That is correct.

Page 254

1      Q.   If you go to page 2 of this document,
2    there's -- under "provide a brief description,"
3    someone entered in information, correct?
4      A.   Yes.
5      Q.   And looking at the information, where it
6    says, Please see the details below of my ongoing
7    complaint of retaliation, humiliation,
8    discrimination treatment by Michelle Lamb, and then
9    it goes on, is that the information you were
10   providing to Mr. Clark?
11     A.   For the follow-up complaint, yes --
12     Q.   Okay.
13     A.   -- not for the initial.
14     Q.   Correct.
15          In the first paragraph, five lines from
16   the bottom, it says, quote, While I didn't meet all
17   my goals in the action plan, I did demonstrate
18   improvement in my teams.
19          Did I read the first part of that sentence
20   correctly?
21     A.   Yes.
22     Q.   All right.  So you admitted to Mr. Clark
23   that you had not met all the goals in your action
24   plan, correct?
25     A.   That is correct.  He also knew that those

Page 255

1    goals were falsely created different from the

2    expectation of my white peers.

3        Q.   Okay.

4        A.   It specifically talks about details of two

5    of my white peers, Brian Hickman and Jaime

6    Golden-McElroy.

7        Q.   Okay.  And then if you go on to page 3 of

8    this document, the first paragraph under -- talks

9    about the Pathway program, correct?

10       A.   Yes.

11       Q.   Then you talk about a Travis coming to

12   Houston, right, in the second paragraph?

13       A.   Yes.  It's inconsistent with Michelle's --

14       Q.   Is that -- is it Travis Tiernan?

15       A.   Yes.

16       Q.   Okay.

17       A.   This --

18       Q.   And when do you recall him coming to

19   Houston?  Was that towards the end of that calendar

20   year --

21       A.   November --

22       Q.   -- of 2019?

23       A.   Yes.

24       Q.   So it was November 2019?

25       A.   Yes.

Page 256

1      Q.   Okay.

2      A.   It's inconsistent with Michelle --

3      Q.   And you also -- there's no question

4  pending, ma'am.

5           Do you have -- did you -- do you recall,

6  ma'am, did you have any follow-up conversations with

7  Mr. Clark after you raised this -- these concerns to

8  him?

9      A.   I don't recall if I had a follow-up

10  conversation with him.  After this, he sent me

11  several questionnaires confirming details of the

12  information that I submitted.  But I don't recall at

13  this time what date or when that took place.

14           (Exhibit 56 marked.)

15      Q.   Okay.  Hand you what has been marked as

16  Exhibit 56.  If you go to the second page of this

17  document, Exhibit 56, it mentioned you were -- I was

18  ultimately terminated on January 7, 2020.  Correct?

19      A.   Yes, that is correct.

20      Q.   Okay.  So this was your second -- the

21  EXPLORE you put in after your termination, correct,

22  Exhibit 56?

23      A.   I'm just looking at Exhibit 54 and 56

24  because it has the date issue occurred 1/7/2020,

25  both of them have that, so I'm trying to identify

Page 257

1   which of these EXPLORE processes this was, was it

2   after the letter of warning or after termination,

3   because it already lists -- termination listed on

4   there, both of them do.

5        Q.   Okay.  But Exhibit 56 doesn't --

6   Exhibit -- I'm sorry, what was the other exhibit

7   you're looking at, Miss?

8        A.   54.

9        Q.   54 does not talk about your termination on

10  page 2 under explain why management's action -- oh,

11  it does.

12       A.   Yes.  That's why I'm saying these --

13  something is not accurate.

14       Q.   Okay.

15       A.   Yet again another example of FedEx not

16  protecting me; they targeted me.

17       Q.   The documents came from your lawyers,

18  ma'am.

19       A.   Well, this says it's an EXPLORE Complaint

20  Intake, so that --

21       Q.   Okay.

22       A.   -- would mean it went to an HR adviser

23  within FedEx.

24       Q.   I'm going to show you -- but in any event,

25  you did enter the EXPLORE process after your

Page 258

1    termination, right?

2         A.   That is correct.  So it should be two

3    separate reports.

4                   (Exhibit 57 marked.)

5         Q.   I'm going to show you Exhibit 57.

6              This is a letter you received in late

7    January of 2020 from Dave Russell about your -- his

8    decision in the EXPLORE process, correct?

9         A.   Yes.

10        Q.   Okay.  And I didn't see any record of you

11   going to step 2.

12             Did you go to step 2 of the EXPLORE

13   process?

14        A.   I did.

15        Q.   How did you count -- how did you enter the

16   step 2 of the EXPLORE process?

17        A.   I FedEx'd a letter to Dan Mullally.

18        Q.   Okay.  Did you ever get a response from

19   Mr.  Mullally?

20        A.   I don't recall if I got a response, but I

21   got confirmation that the package with my letter was

22   received.

23        Q.   Okay.  Did you save a copy of that --

24        A.   I do.

25        Q.   -- packet?

Page 259

1       A.   Yes.

2       Q.   Have you provided that to your attorneys?

3       A.   Yes.

4            MR. BABCOCK:   Let me go off the record

5    for a second, please.

6            THE VIDEOGRAPHER:   We're off the

7    record at 4:22.

8            (Recess 4:22 p.m. to 4:26 p.m.)

9            THE VIDEOGRAPHER:   We're back on the

10    record at 4:26.

11           (Exhibit 63 marked.)

12       Q.   Hand you what has been marked as

13    Exhibit 63.  If you look at the first page of this

14    document -- I appreciate, Ms. Harris, that you

15    haven't seen these documents until today's

16    deposition -- you'll see where it says, Intake

17    method.

18           Do you notice that?

19       A.   Yes.  It says EXPLORE.

20       Q.   And it says EXPLORE.

21           Okay.  And if you flip to the second page

22    of this document, talks about the date of the

23    discussion, 9/13 of 2019.

24           That was the date you received the warning

25    letter, right?

1          A.    Yes.

2          Q.    And then where it explains why

3    management's actions were unfair, does -- if you

4    could read the beginning part of that paragraph,

5    does that look like words you had submitted to

6    FedEx?

7          A.    (Reviewed document.)  Looks like it, yes.

8          Q.    Okay.  You allege that you have suffered

9    emotional distress damages because of the issues

10   that you experienced at FedEx, correct?

11         A.    Yes.

12         Q.    Can you describe for me the three most

13   emotional distressing things that have occurred to

14   you in your life?

15         A.    Can you repeat the -- the question,

16   please?

17         Q.    Right.

18              Can you describe for me the three most

19   emotional distressing things or events that have

20   occurred to you in your life?

21         A.    The experience at FedEx of discrimination

22   and retaliation; the termination after being falsely

23   accused of poor performance and inconsistencies with

24   my evaluation to my white peers; and I would say

25   number three, the death of my father.

Page 261

1    Q.   And if you had to rank those three

2  experiences, how would you rank them?

3    A.   As I shared, the number one would be the

4  entire process of discrimination and retaliation

5  from Michelle Lamb and getting no help from HR or

6  anybody in the organization to really evaluate the

7  facts and inconsistencies.

8    Q.   Okay.  So you -- so you believe that's the

9  most emotional distressing thing that has occurred

10 to you in your life?

11   A.   Yes.  Two, termination and, three, my

12 father.

13             (Exhibit 58 marked.)

14   Q.   Okay.  Hand you what has been marked

15 Exhibit 58.  These are your responses to FedEx's

16 interrogatory answers.

17             Have you seen this document before?

18   A.   Yes.

19   Q.   And you signed it on the last page, right?

20   A.   Yes.

21   Q.   Have you reviewed this document since you

22 signed it in November of 2021?

23   A.   Yes.

24   Q.   When was the last time you reviewed the

25 document?

Page 262

1        A.    A couple days ago.

2        Q.    Turning to page 2 of this document, you

3    list a Dr. Diane Nuar --

4        A.    Yes.

5        Q.    -- as a therapist?

6        A.    Yes.

7        Q.    When did you start treating with Dr. Nuar?

8        A.    It has been years ago.  Dr. Nuar has been

9    my therapist for a few years now.

10       Q.    Okay.  Did you start treating with him

11   before you were terminated from FedEx?

12       A.    It's a her.  Yes.

13       Q.    Her.  Yeah.  Thank you.

14             Did you start treating -- is she based in

15   Houston?

16       A.    Yes.

17       Q.    Okay.  So obviously you started treating

18   with her after you moved to Houston.  Is that fair?

19       A.    Yes.

20       Q.    All right.  If you moved to Houston around

21   2017, does -- can you provide an estimate when you

22   started treating with her?

23       A.    I didn't move to Houston in 2017.

24       Q.    When did you move to Houston?

25       A.    I moved prior to that when I was the

Veritext Legal Solutions

800-567-8658                                973-410-4098

Page 263

1    business sales field district sales manager at the

2    beginning in -- or the end of 2015.

3         Q.   Okay.  All right.  So when did -- if you

4    moved here in 2015, when did you start treating with

5    her?  Can you provide a better estimate?

6         A.   I don't recall exactly when the specific

7    date I started seeing Dr. Nuar.

8         Q.   Was it a particular issue that caused you

9    to go start seeking treatment from Dr. Nuar?

10        A.   Yes.

11        Q.   What was the issue?

12        A.   The treatment that I was receiving from

13   Michelle Lamb and the lack of support that I was

14   receiving from FedEx HR to protect me instead

15   retaliate against me.

16        Q.   And when did you -- are you still seeking

17   treatment from Dr. Nuar?

18        A.   Yes, remotely.

19        Q.   Okay.  And how often are you treating with

20   her now?

21        A.   Every few months.  We don't go every week

22   or month anymore.

23        Q.   Okay.  Did Dr. Nuar ever prescribe any

24   medications to you?

25        A.   No.

Page 264

1     Q.   Did doctor Nuar ever share with you any

2     diagnosis she made of -- of you?

3     A.   No.

4     Q.   When you were working for Ms. Lamb and you

5     were treating with Dr. Nuar, during that time period

6     how often would you treat with Dr. Nuar?

7     A.   It ranged from biweekly to month.  It all

8     depended on how I was feeling, what I was

9     experiencing.

10                 (Exhibit 59 marked.)

11    Q.   Okay.  Hand you what has been marked as

12    Exhibit 59.  It's your W-2 earnings.

13                 MR. BABCOCK:  Mr.  Sanford, I noticed

14    my paralegal did not redact her Social Security

15    number.

16                 MR. SANFORD:  Oh.

17                 MR. BABCOCK:  So if you'd like, why

18    don't -- can you scratch it off on the original

19    exhibit so it's not there.

20                 THE WITNESS:  Give it to you?

21                 MR. SANFORD:  I want the original.  Is

22    that the only place?

23                 MR. BABCOCK:  I think that's -- I

24    think it's only on there one place.

25                 MR. SANFORD:  On one place?  Okay.

Page 265

```
 1              MR. BABCOCK:  Oh, no, it's --
 2              MR. SANFORD:  There it is again, too,
 3      here.
 4              THE WITNESS:  Right here, too.
 5              MR. BABCOCK:  Yeah, it's all the way
 6      across.
 7         Q.   While he's doing that, you can look at my
 8      copy --
 9         A.   Okay.
10         Q.   -- of Exhibit 59.
11              Did you receive wages from anyone but
12      FedEx in 2019?
13         A.   Yes, this shows my tax return here.
14         Q.   Okay.  My question was:  Did you receive
15      any wages from anyone else besides FedEx?
16         A.   In 2019, no.
17         Q.   Okay.  And in Box 1, it references the
18      wages, tips, and other compensation you received
19      from FedEx, correct?
20         A.   Yes.
21         Q.   Looks like it also indicated you were
22      contributing to a 401(k), correct?
23         A.   Yes.
24         Q.   All right.  Put this back.
25         A.   It is back.  Okay.
```

Page 266

```
1                    MR. BABCOCK:  Counsel, I'm going to
2    hand this to you so I'm not walking around with it.
3                    MR. SANFORD:  I don't need it.
4                    MR. BABCOCK:  I have another copy of
5    it.
6                    MR. SANFORD:  Okay.
7                    MR. BABCOCK:  So I'll give you all the
8    copies of them.
9                    MR. SANFORD:  Okay.
10       Q.   Can you describe for me the symptoms of
11   the emotional distress that you believe you suffered
12   because of FedEx?
13       A.   Yes.  It was very stressful.  I had
14   anxiety, depression, sleeplessness, weight gain,
15   nightmares, humiliation, embarrassment, frustration,
16   disappointment, sadness, anger.  The list could go
17   on and on.
18       Q.   Okay.  Have you -- has any medical
19   professional ever prescribed you any medication for
20   any of these symptoms?
21       A.   No.
22       Q.   All right.  And are you still experiencing
23   sleeplessness?
24       A.   Yes.
25       Q.   When did you first begin -- has any -- did
```

Page 267

1   any doctor ever tell you you were paranoid?

2        A.   No.

3        Q.   Did you ever seek treatment from a

4   psychologist?

5        A.   No.

6        Q.   Ma'am, are you able to pinpoint the event

7   at FedEx when you first began experiencing the

8   emotional distress?

9        A.   It began in -- around October of 2017

10  because of the stress of the pricing with

11  BJ Services and us not being able to get it

12  resolved, and it continued my entire -- rest of my

13  career under Michelle Lamb's leadership due to the

14  negative adjustment of BJ Services, the improper

15  alignment of 4G Dental, her inconsistently holding

16  me to different standards than my white peers,

17  putting me on a letter of counseling with four

18  quarters instead of six quarters compared to my

19  white peer, her not allowing me to go to Pathway and

20  denying me that privilege where my white peers were

21  given the opportunity go in Dallas.  It went on and

22  on with the discrimination and retaliation given by

23  Michelle Lamb.

24       Q.   Okay.  And does that refresh your memory

25  on when you may have sought -- did you seek

Page 268

1    treatment from Dr. Nuar right when you started

2    experiencing this emotional distress?

3         A.   I started seeing Dr. Nuar -- I don't

4    recall specifically what date, but the issues that I

5    had with stress, I went to see Dr. David Wolf, who

6    is listed on there as well.

7         Q.   Okay.  When did you start seeing Dr. Wolf?

8         A.   I've been -- I have been seeing Dr. Wolf

9    for maybe four years or so just because the issues

10   with my stomach continue to progress and the stress

11   to -- it definitely increased the sharp pains and

12   the issues that I was having with my stomach and

13   esophagus.  So it was an ongoing process of

14   surgeries and evaluations that he suggested to try

15   to repair that.

16        Q.   Okay.  And did those -- when did those

17   issues start?  When did you start experiencing the

18   issues that you had to seek treatment with Dr. Wolf?

19        A.   It escalated with Dr. Wolf.  I can't

20   recall specifically what date without looking at my

21   medical records.

22        Q.   Okay.  And did Dr. Wolf diagnose you with

23   any conditions?

24        A.   Yes.  He said that there was issues with

25   my esophagus and a potential hypo hernia due to

Page 269

1    different digestive things, but he related them all

2    to stress, the impact of stress caused them to

3    increase in intensity, and it caused issues with

4    acid reflux.  So many different things were impacted

5    by the dry heaving of, you know, me intaking and

6    breathing and not being able to process foods the

7    right way.  But all of that he boiled down to was

8    intensified because of stress.

9        Q.   Okay.  And did the issues with your

10   stomach or esophagus start prior to the BJ

11   adjustments issue in 2017?

12       A.   They intensified around that time.

13       Q.   All right.

14       A.   On one of those notes, it shows that

15   Michelle -- me asking her for time off so that I

16   could have a procedure to get that evaluated.

17       Q.   Okay.  So the surgery you were going to?

18       A.   Was during my time under Michelle Lamb's

19   leadership.

20       Q.   Okay.  And that was the surgery with

21   Dr. Wolf?

22       A.   Yes.

23       Q.   Excuse me.

24            Did Dr. Wolf prescribe you any medications

25   at all during your treatments?

Page 270

1          A.   Yes, a variety of different medications.

2    I don't have the specific list of what they are.

3          Q.   Are you on any medication now?

4          A.   Only birth control.  That's the only

5    medicine I'm on.

6          Q.   Okay.  How long were you on -- strike

7    that.

8               Were you on the medications from Dr. Wolf

9    because of the issues with your stomach and/or

10   esophagus?

11         A.   And the stress that intensified the

12   esophagus and the function of the esophagus and the

13   digestive lining in my stomach.  So all of those

14   were impacted because of stress.

15         Q.   Can you estimate when you started taking

16   medication or when he first prescribed medication?

17         A.   Without looking at my medical records, I

18   cannot.

19         Q.   Okay.  How did you take -- once you

20   started taking medication that Dr. Wolf prescribed,

21   did you continue to take that medication through the

22   remainder of your tenure at FedEx?

23         A.   Yes, a different variety of them but I had

24   to stop before the end of my tenure with FedEx

25   because it started to impact my liver.

Page 271

1      Q.   Okay.

2      A.   I'm not on medication now for it.  I can't

3   take it.

4      Q.   All right.  Are you still seeking

5   treatment from Dr. Wolf?

6      A.   I am not.  He has transitioned me to a

7   local doctor here in the North Richland Hills area

8   of Eric Miller.

9      Q.   Is that Eric Miller or Eric Hill?

10     A.   Hill.  I apologize.

11     Q.   That's fine.

12          And when did you start seeing Dr. Hill?

13     A.   Shortly after my move from Houston because

14   I still -- I mean, it's an ongoing process.  I have

15   to seek medical attention to evaluate these issues,

16   so I have been under Dr. Hill's treatment for quite

17   some time.  I had a surgery with him also.

18     Q.   What was the surgery on?

19     A.   For them to try to look at the damage

20   caused to my esophagus and determine if they needed

21   to repair anything in the esophagus in addition to

22   looking at my colon and other things that have been

23   impacted due to the strain of the dry heaving over

24   such a long period of time.

25     Q.   Okay.  And who is Dr. Alok Kushwaha.

Page 272

1      A.   Sorry, his last name is very difficult.

2    He's just my general doctor.  Him and Dr. Hill

3    compare notes --

4      Q.   Okay.

5      A.   -- you know, running my blood and other

6    tests to compare and see, you know, what they could

7    do collectively to try to help me get better.

8      Q.   Have either of them prescribed you

9    medication?

10     A.   They did.  But after looking at Dr. Wolf's

11   recommendations, I was removed from even having that

12   prescription because I couldn't take it.

13     Q.   Ma'am, do you use social media at all?

14     A.   I do.

15     Q.   What social media do you use?

16     A.   I use LinkedIn.  I use Facebook.  I use

17   Instagram.

18     Q.   Okay.

19     A.   And I look at TikTok.  I don't have a lot

20   of activity -- activity on TikTok, but I have posted

21   a few videos.

22     Q.   Okay.  And on any of that social media,

23   did you ever post about your experiences at FedEx?

24     A.   Some of the customer engagements and

25   celebrations and team building with my team and with

Page 273

1    my peers throughout my career in collaboration with

2    couriers and community service events like March of

3    Dimes, things of that nature, yes.

4         Q.   Did you ever post on any of the social

5    media sites about the issues you were having at

6    FedEx?

7         A.   No.

8         Q.   All right.  After you were terminated at

9    FedEx, you eventually got a job in Houston, right?

10        A.   I did not.

11        Q.   Not in Houston; in the Dallas area,

12   correct?

13        A.   Correct.  I could not find a job in

14   Houston.

15        Q.   And that was with Brinks Home?

16        A.   Yes, that is correct.

17        Q.   And what kind of business is Brinks Home?

18        A.   Security.

19        Q.   Okay.  What is it that you do for Brinks

20   Home?

21        A.   I did.  I no longer work for Brinks Home.

22   I was a district sales manager for a field sales

23   team as well.

24        Q.   When did you leave Brinks Home?

25        A.   I didn't leave.  We were all laid off in

Page 274

1    December of 2021.

2         Q.   Okay.  You have in your interrogatory you

3    started with them around September 30 of 2020.

4              Does that sound right?

5         A.   That is correct.

6         Q.   Okay.  And so what did you do, if

7    anything, between January 7, 2020, and starting the

8    job at Brinks Home?

9         A.   I applied for hundreds and hundreds of

10   jobs.  I connected with recruiters and headhunters

11   on LinkedIn and tried to leverage my premium

12   LinkedIn account to be able to look for

13   opportunities.  I also worked with the Texas

14   Workforce Commission because I was receiving

15   unemployment to try to find jobs with them.  I

16   looked on Indeed.  I looked on Glassdoor.  I

17   utilized all the resources possible to try and find

18   a job.

19        Q.   Okay.  And where are you working now?

20        A.   I work for McKesson.

21        Q.   And what do you do for McKesson?

22        A.   I'm a pharmacy sales consultant.

23        Q.   When did you start that sales position?

24        A.   I started that position in April.  The

25   first position that I held with McKesson, I started

Page 275

1    in February and have already since been promoted.

2         Q.   You started in February of twenty --

3         A.   '22.

4         Q.   Okay.  And what's your current job title?

5         A.   Pharmacy sales consultant.  I started

6    originally as a sales solution manager.

7         Q.   Okay.  And as a pharmacy sales consultant,

8    do you supervise anyone?

9         A.   I do not.

10        Q.   Did you supervise anyone when you worked

11   at Brinks Home?

12        A.   I did.

13        Q.   How many people did you supervise?

14        A.   That ranged.  It started at five, and as

15   the customer engagement transitioned from COVID, it

16   went to six, and the expectation was eight, but we

17   never got there due to issues with hiring and

18   turnover in the industry because it was door-to-door

19   sales.

20        Q.   And how much do you make per year in your

21   current position?

22        A.   At McKesson, 72,000, and I have the

23   potential of earning commission based on my

24   performance.

25        Q.   Okay.  Is there a floor or a ceiling to

Page 276

1    the commission payments you might earn?

2         A.   I haven't seen any documentation of that.

3    They just changed the compensation, so we haven't

4    seen any specifics on a floor or a layout of that.

5              MR. BABCOCK:  I assume, Mr. Sanford,

6    you will update your discovery?

7              MR. SANFORD:  Yeah.

8              MR. BABCOCK:  Okay.

9         Q.   I think I can get all the rest of the

10   information from your counsel on that.

11             Have you talked to any FedEx employees

12   since your termination from FedEx?

13             MR. SANFORD:  I'm going to instruct

14   you not to answer that.  We claim work product for

15   any communications.

16        Q.   Did you have -- do you understand my

17   question, ma'am?

18        A.   Yes.

19        Q.   Are you going to listen to your attorney's

20   advice and not answer it?

21        A.   Yes.

22        Q.   Okay.  I'm going to lay some more

23   foundation.

24             Did you have -- I don't think your

25   attorney wants you to tell me who, so listen to my

Page 277

1    question carefully.  Okay?

2              Have you spoken to anyone who worked at

3    FedEx since your termination from FedEx outside the

4    presence of your attorneys or anyone that works for

5    your attorneys?

6              MR. SANFORD:  And I instruct you not

7    to answer that question either.

8              THE WITNESS:  Okay.

9              MR. BABCOCK:  What's the basis of

10   that?

11             MR. SANFORD:  Work product.

12             MR. BABCOCK:  On who a nonlawyer talks

13   to?

14             MR. SANFORD:  Yes.  Work product

15   applies to parties and attorneys.  The rule has it.

16   The initial case talks about it.  Yes.

17             MR. BABCOCK:  Okay.

18        Q.   Did you understand my question, ma'am?

19        A.   Yes.

20        Q.   You're not going to answer the question;

21   you're going to listen to your attorney's advice?

22        A.   Yes.

23             MR. BABCOCK:  Why don't we go ahead

24   and take a break.

25             THE VIDEOGRAPHER:  Off the record at

Page 278

1    4:52.

2              (Recess 4:52 p.m. to 5:17 p.m.)

3              THE VIDEOGRAPHER:  We are back on the

4    record at 5:17.

5              (Exhibit 61 marked.)

6    Q.   You've been handed what has been marked as

7    Exhibit 61.  It's a copy of your initial

8    disclosures.

9         Have you seen this document before, Miss?

10   A.   Yes.

11   Q.   Okay.  Starting on the bottom of page 1

12   and -- to page 8, you list several numerous

13   individuals.  And have you spoken to any of these

14   individuals since your termination from FedEx?

15             MR. SANFORD:  I instruct you not to

16   answer.  Work product.

17   Q.   Do you understand my question?

18   A.   Yes.

19   Q.   If I ask the same question -- so I guess

20   let me set the -- let me lay the foundation for the

21   first one --

22             MR. SANFORD:  Sure.

23   Q.   -- and we'll see what we can do.

24        All right.  So you identify Chelsea

25   Bullock on the bottom of page 1, right?

Page 279

1          A.    Yes.

2          Q.    And it says you don't know the person's

3     address; is that true?

4          A.    Yes.

5          Q.    And it also says that the telephone number

6     is unknown at this time; is that true?

7          A.    Yes.

8                MR. SANFORD:  You can answer that.

9          Q.    And you then resuscitate on the top of

10    page 2 what you believe the subject of the

11    information that this Ms. Bullock may have to

12    support your claims against FedEx, correct?

13         A.    Yes.

14         Q.    Okay.  When was the last time you spoke to

15    Ms. Bullock?

16                MR. SANFORD:  If it -- if it --

17                MR. BABCOCK:  I'll rephrase my

18    question.  I know what you're trying to get at.

19    Sorry, Mr. Sanford.

20         Q.    Have you spoken to Ms. Bullock since your

21    termination from FedEx?

22                MR. SANFORD:  I instruct you not to

23    answer that question based on work product doctrine.

24         Q.    Do you understand my question, ma'am?

25         A.    Yes, I understand your question.

Page 280

1      Q.   Okay.  And do you intend to follow your
2    attorney's advice and not provide an answer?
3      A.   Yes, that's correct.
4      Q.   Would that be the same scenario we would
5    go through for all these individuals --
6               MR. SANFORD:  Yes.
7      Q.   -- going up to page, I guess, 8 --
8               MR. SANFORD:  Yes.
9      Q.   -- ending in Miriam Zapata?  Zapata?
10     A.   Zapata.
11     Q.   Thank you.
12     A.   Uh-huh.
13              MR. SANFORD:  Yes, we claim it for all
14   witnesses after she was terminated.
15              MR. BABCOCK:  Okay.
16     Q.   So what you've been saying for a large
17   portion of the day, at the beginning, we talked
18   about -- we talked about the three -- you're one of
19   three black managers in sales at FedEx.
20          Do you recall that?
21     A.   District sales manager in the field sales
22   organization.
23     Q.   All right.  And you -- this morning you
24   recalled the first name of one of those individuals,
25   correct?

Page 281

1        A.    Kristen Hunter, yes.

2        Q.    Oh, we now know her last name, perfect.

3        A.    I knew her last name earlier.  I stated

4   it.

5        Q.    All right.  And the other individual was

6   based in California, correct?

7        A.    Yes.  I don't recall her name.

8        Q.    Okay.  Did you ever talk about with

9   Ms. Hunter your concerns of race discrimination at

10  FedEx?

11       A.    Yes.

12       Q.    Okay.  And when did you talk to Ms. Hunter

13  about those concerns?

14       A.    On several occasions.  I can't recall

15  specifically what date.

16       Q.    Okay.  Did any of those occasions -- have

17  you spoken to Ms. Hunter since your termination from

18  FedEx?

19            MR. SANFORD:  Instruct you not to

20  answer that question based on work product.

21       Q.    Did you understand my question, ma'am?

22       A.    Yes.

23       Q.    Do you to intend to follow your attorney's

24  advice not to answer that question?

25       A.    Yes.

Page 282

1      Q.   And same question -- well, I'll start the

2   questions over.

3           For the person you don't remember her name

4   at all, can you describe what she looks like?

5      A.   She is African-American, she's tall, has

6   about shoulder-length hair.

7      Q.   Do you recall what she did at FedEx before

8   she became a manager?

9      A.   Yes.  She was a worldwide account manager.

10      Q.   Okay.  Do you recall any of her

11   supervisors when she worked at FedEx?

12      A.   I can't recall who was in the worldwide

13   manager organization for California, no.

14      Q.   Okay.  Do you recall her -- who her

15   managing director was when she was promoted into

16   management?

17      A.   No.

18      Q.   Okay.  And did you ever speak to this

19   unnamed individual in California about your concerns

20   of racial discrimination at FedEx?

21           MR. SANFORD:  The question is -- and

22   I'm going to limit it --

23           MR. BABCOCK:  I'm sorry.

24           MR. SANFORD:  You know my --

25           MR. BABCOCK:  Let me rephrase it.

Page 283

```
1              MR. SANFORD:  Okay.
2       Q.   Don't answer that question yet.
3            Did you have any discussions with this
4   unnamed individual prior to your termination from
5   FedEx about the concerns you had about racial
6   discrimination at FedEx?
7       A.   No.
8       Q.   Have you spoken to that individual -- have
9   you ever -- did you ever speak to that individual on
10  the telephone while you worked at FedEx?
11      A.   Yes, when she was scheduling her shadowing
12  to come to Memphis.
13      Q.   Okay.  And have you spoken to that
14  individual since your termination from FedEx?
15              MR. SANFORD:  And I instruct you not
16  to answer based on work product.
17      Q.   Did you understand my question, ma'am?
18      A.   Yes.
19      Q.   Are you intending to listen to your
20  attorney's advice and not answer that question?
21      A.   Yes.
22      Q.   Is there -- can you describe for me,
23  ma'am, why you rank the death of your father as less
24  emotionally and distressful to you than your
25  experiences at FedEx that you identified earlier in
```

Page 284

1    the deposition?

2         A.   Because FedEx's process was really, really

3    impactful and will be impactful for the rest of my

4    life.  When I think about everything that I

5    experienced with trying to get help from HR and Dave

6    Russell and Dan Mullally, it's, like, you can't go

7    anywhere for help.  It's like someone slowly giving

8    you poison.

9              It's, like, okay, I'm trying to turn to HR

10   for a resource to get help and identify the unfair

11   treatment and the continued discrimination and

12   retaliation of me and the treatment that I was given

13   different from my white peers.  And you continue to

14   escalate concerns, and then after that, you're

15   retaliated.

16              So it's an ongoing process of you trying

17   to allow FedEx to be held accountable to prevent

18   discrimination and retaliation in the workplace, but

19   nobody is listening.  They're doing sham

20   investigations.  They're not interviewing witnesses.

21   They're not evaluating all of the evidence that has

22   been given.

23              So I think about that process and the

24   termination higher than the death of my father

25   because it was ongoing and will be ongoing for the