Page 285

1    rest of my life.

2         Q.   Okay.  How old was your father when he

3    passed away, ma'am?

4         A.   He was 71 when he died.

5                   (Exhibit 60 marked.)

6         Q.   Hand you what has been marked as

7    Exhibit 60.

8              Have you ever seen a PeopleSoft report

9    from FedEx?

10        A.   I don't recall.

11        Q.   Okay.  You notice it says 12/15/2019, the

12   first line, and it says your earnings were

13   $5,229.34.  That was your gross pay.

14             Was that your typical paycheck towards the

15   end of your employment with FedEx?

16        A.   I don't recall specifically what my pay

17   was at the end of my career, but if this is from

18   PeopleSoft that would have transitioned to ADP,

19   then, yes, that would be accurate.

20        Q.   Okay.  When you worked at Brinks Home, did

21   you receive health benefits?

22        A.   I did.

23        Q.   Did you -- were you able to participate in

24   a 401(k) or other retirement plan?

25        A.   I did but I did not participate.

Page 286

1     Q.   Okay.  Did Brinks Home offer any employer

2  match to their 401(k) had you chosen to participate?

3     A.   I don't recall.

4     Q.   Okay.  What about McKesson, do you

5  currently receive health benefits from McKesson?

6     A.   Yes.

7     Q.   Do you participate in any retirement plans

8  or any other ERISA-type plans?

9     A.   Not yet; I just started.

10    Q.   Okay.  There's a waiting period until --

11    A.   Yes.

12    Q.   -- you can participate?

13    A.   Uh-huh.

14    Q.   When you're eligible to participate, do

15  they have a 401(k)?

16    A.   Yes.

17    Q.   And do you know, ma'am, whether or not

18  they provide an employer match for their 401(k)?

19    A.   I haven't seen the specifics so I can't

20  give you details on that.

21          MR. SANFORD:  I'll get you details.

22          MR. BABCOCK:  Okay.  Thanks.

23    Q.   What's JHShopSpot, LLC?

24    A.   It's actually JH, it's my initials,

25  ShopSpot.

Page 287

```
 1        Q.    Okay.  JHShopSpot, LLC?

 2        A.    Yes.

 3        Q.    That's how you pronounce it?

 4        A.    That is correct.

 5        Q.    Okay.  And what is that entity?

 6        A.    It's a T-shirt and apparel business.

 7        Q.    And are you the sole member of that LLC?

 8        A.    Yes.

 9        Q.    Okay.  And you obviously do custom

10   T-shirts and other apparel?

11        A.    Unique designs that I create myself and,

12   yes, some custom designs.

13        Q.    And when did you start that company?

14        A.    It will be two years June 1st.

15        Q.    So you started it June 1st of 2020?

16        A.    Yes.

17        Q.    Okay.  And is the company profitable?

18        A.    I can't recall, like, the specifics of my

19   accounting right now.  My accountant is looking at

20   that.

21        Q.    Okay.  So you pay someone to keep the

22   books?

23        A.    Yes.  I have not paid them yet, but I will

24   pay them.

25        Q.    Fair enough.
```

Page 288

1          And do you -- is it your intention to

2    still run that business even though you're working

3    at McKesson?

4          A.   Yes.

5          Q.   Did you ever apply for a job at UPS?

6          A.   Yes.

7          Q.   And what kind of job did you apply for at

8    UPS?

9          A.   I don't recall specifically.  I applied

10   for several jobs.

11         Q.   Were they in the UPS's sales organization?

12         A.   I don't recall specifically.

13         Q.   Did you ever receive an interview from

14   UPS?

15         A.   No.

16         Q.   Did you ever apply for a job with DHL?

17         A.   No.

18         Q.   Do you know what DHL is?

19         A.   Yes.

20         Q.   Do you know, does DHL have salespeople in

21   the United States?

22         A.   Yes.

23         Q.   Why didn't you apply for a job at DHL?

24         A.   Because at the time when I researched,

25   they didn't have any openings, and the stability of

Page 289

1    their U.S. sales organization has been unstable.

2         Q.   Okay.  When is the last time you checked

3    on whether or not DHL had any job openings?

4         A.   Not since I have been employed.

5         Q.   Okay.  Same question about UPS, when is

6    the last time you checked to see if UPS had any open

7    jobs that you would be qualified for?

8         A.   Not since I have been employed.

9         Q.   Did you ever apply for a position with the

10   United States Postal Service?

11        A.   Yes.

12        Q.   And what kind of job did you apply for

13   with the post office?

14        A.   I applied for several.  I don't recall

15   specifically which one.

16        Q.   Did you ever receive an interview?

17        A.   No.

18        Q.   When is the last time you looked to see if

19   the post office was hiring?

20        A.   Not since I have been employed.

21        Q.   From the time you were employed with

22   Brinks Home until you were laid off in December

23   of 2021, did you apply for any other jobs while you

24   were employed by Brinks Home?

25        A.   While I was employed or after I was laid

Page 290

1    off?

2         Q.   While you were employed by Brinks Home,

3    did you ever apply for another job?

4         A.   No.

5         Q.   And since you started a job with McKesson,

6    have you applied for any other jobs?

7         A.   No.  I applied for them all at the same

8    time.

9         Q.   Okay.  During the period of unemployment

10   between Brinks Home and McKesson, did you apply for

11   any jobs with UPS?

12        A.   Not that I can recall at this time.

13        Q.   Did you apply for any jobs with DHL?

14        A.   No.

15        Q.   Do you know whether or not UPS or DHL had

16   any job openings during that window of unemployment

17   between Brinks Home and McKesson?

18        A.   Not that I can recall at this time.

19        Q.   Did you apply for a job with the post

20   office between the Brinks Home position and the

21   McKesson position?

22        A.   No.

23        Q.   Do you recall whether or not you looked to

24   see if the post office was hiring during that window

25   of unemployment after the Brinks job before the

Page 291

1      McKesson job?

2           A.   I do not recall.

3           Q.   I apologize, Ms. Harris, I meant to ask

4      you this question when we were going through the

5      initial disclosures.

6                Are you aware, ma'am, whether or not

7      anyone has signed any statements regarding your

8      lawsuit?

9                MR. SANFORD:  Yeah, it's work product.

10     It wouldn't be in state court, but in federal court,

11     it's work product.  But I don't mind telling you we

12     don't have any statements at this time, but I do

13     claim that that is work product.

14               That was Hickman v. Taylor.  I mean,

15     you know, but Hickman v. Taylor was whether or not a

16     witness statement could be produced.  And the

17     defense -- insurance defense guy said no, and the

18     Supreme Court upheld it and said witness statements

19     by defense -- insurance defense attorney not --

20     cannot be produced to the plaintiff's attorney.  And

21     then they went further and said it also includes

22     mental process and whatever else.  So state court

23     Texas, yes, anyway.

24               But I will tell you we don't have

25     any --

Page 292

1          MR. BABCOCK:  Okay.

2          MR. SANFORD:  -- at this time.

3     Q.   Ms. Harris, did you turn over all

4  documents in your possession about your allegations

5  involving FedEx to your attorneys?

6     A.   Yes.

7     Q.   And is it your understanding that your

8  first set of attorneys turned over documents you may

9  have provided them to your -- either to you or to

10  your new lawyers?

11     A.   Yes.

12     Q.   I notice in your document production, you

13  include what appear to be pictures of Michelle Lamb.

14          Do you know what I'm talking about?

15     A.   I don't recall.

16     Q.   They're pictures of Michelle Lamb in a

17  bathing suit from a magazine?

18     A.   I don't recall.

19     Q.   Okay.  Can you think of any reason why a

20  picture of Michelle Lamb in a bathing suit would be

21  relevant to your lawsuit?

22     A.   Yes.

23     Q.   Okay.  Why would a picture of Michelle

24  Lamb in a bathing suit be relevant to your lawsuit?

25     A.   Because it contradicts a complaint that

Page 293

1   was made about me of my profile picture on Facebook

2   from Casey Millner that it was inappropriate that I

3   had a spaghetti strap dress on and that I was

4   supposed to be someone's manager and that that

5   didn't demonstrate good leadership.

6            So if I was accused of poor leadership

7   because of a spaghetti strap dress that he used to

8   try and determine my character because of that, the

9   pictures of Michelle Lamb being a director that is

10  public information to a mass of people -- customers,

11  employees, things of that nature where she is

12  exposed in less clothing than I have is something

13  that should have been considered and requested to be

14  removed also.

15       Q.   Okay.  So Casey Millner raised a complaint

16  to someone about a social media profile picture you

17  had?

18       A.   Yes.

19       Q.   And who did -- who's Casey Millner again?

20       A.   He was my white peer on Michelle's team.

21       Q.   Okay.  And who did Casey Millner raise

22  this concern to?

23       A.   He raised it in a team meeting in which I

24  wasn't in attendance.

25       Q.   Okay.  And what happened to Mr. Millner's

Page 294

1    complaint?  Were you told you had to take the

2    picture down?

3         A.    Yes.  They said it was inappropriate.

4         Q.    Who said it was inappropriate?

5         A.    Several people.

6         Q.    Do they have names or can you tell me

7    their names?

8         A.    I don't recall specifically, but I did

9    have a conversation with Jim Wallace about it.  And

10   while there wasn't any supporting evidence on why

11   this picture was inappropriate, I still respected

12   the guidance.  And while the picture is still on my

13   social media page, it is not a part of my profile

14   anymore.

15        Q.    Okay.  So Jim Wallace instructed you to

16   take the picture down?

17        A.    He didn't force me; he encouraged.

18        Q.    Okay.  Did anyone tell you you had to take

19   the picture down at FedEx?

20        A.    Jim Wallace encouraged but did not

21   require.

22        Q.    Okay.  Did anyone else at FedEx tell you

23   you had to take the picture down?

24        A.    Not that I can recall but --

25        Q.    Okay.  How did you find the picture of --

1  pictures of Michelle Lamb?

2       A.   Google.

3       Q.   All right.  So you just enter her name in

4  a Google search engine?

5       A.   Yes.

6       Q.   Okay.  And were you just searching to see

7  if you could find pictures of Michelle Lamb or did

8  you have reason to believe those pictures existed?

9       A.   No.  A customer had one of them

10  screenshotted on their phone, and so they brought it

11  to my attention first.

12      Q.   Which customer was that?

13      A.   It was a customer, Nailor.  I don't

14  remember specifically who the person at Nailor

15  Industries was, but he had the screenshot of her

16  picture on his phone.

17      Q.   Was Nailor your customer?

18      A.   Yes.

19      Q.   Are you married, ma'am?

20      A.   No.

21      Q.   Are you divorced?

22      A.   No.

23      Q.   Never been married?

24      A.   No.

25      Q.   Do you have any children?

Page 296

1       A.   No.

2       Q.   Are you in a current relationship?

3       A.   No.

4       Q.   Do you live alone?

5       A.   Yes.

6       Q.   And do you live in a house?  Do you rent

7   an apartment?

8       A.   Rent an apartment.

9       Q.   Okay.  What did you do to prepare for

10  today's deposition?

11      A.   I met with my attorneys on several

12  occasions.

13      Q.   Be careful not to tell me what you

14  discussed with your attorneys.

15      A.   I won't.

16      Q.   All right.

17      A.   And --

18      Q.   So you met with your attorneys on several

19  occasions?

20      A.   Yes.

21      Q.   Anything else?

22      A.   And reviewed several documents.

23      Q.   Okay.  And do you remember what documents

24  you may have reviewed?

25      A.   I don't recall specifically.  There was a

Page 297

1    lot of documents.

2        Q.   Okay.  How much time -- or how long did it

3    take you to review documents to prepare for today's

4    deposition?

5        A.   Several weeks.  We have been going through

6    documents for a while.

7        Q.   Okay.  Have you spoken to anyone else

8    about the allegations in your lawsuit?

9            MR. SANFORD:  To the extent you have

10   talked to somebody to prepare for the lawsuit in

11   anticipation of trial, don't answer the question.  If

12   you want to talk about you talked to your family

13   members or something about what you're going through,

14   fine.

15       A.   I talked to several of my family members

16   about the impact that this has made on me, my

17   pastor, I mean, a number of people that are

18   personally connected with me.

19       Q.   All right.  When did you start your

20   employment at FedEx?

21       A.   In 2007.

22       Q.   And can you walk me through briefly the

23   jobs you have held?

24       A.   Sure.  I started in 2007 as an inside

25   sales account executive in the Irving office, and I

Page 298

1   managed customers over the phone in that

2   organization.  And I was there for roughly two years

3   because I had eight consecutive quarters and was

4   promoted to sales executive in the inside sales

5   organization.  And then in 2009, I was promoted to

6   field sales and relocated to Houston.  And while in

7   Houston, I received President's Club and

8   Ambassador's Club which demonstrates my success in

9   not only meeting but exceeding performance.  And

10  because of that performance, I was promoted to sales

11  executive in the field sales organization.  And

12  during that process, I wanted to get into the

13  manager trainee program and LeadUp and went into the

14  application process of LeadUp.  And --

15      Q.   What year are we in when you went into the

16  application process for LeadUp?

17      A.   The process started roughly -- roughly

18  around 2014, 2015.

19      Q.   Okay.

20      A.   I was awarded an opportunity to get in

21  LeadUp but didn't even complete the course because I

22  actually had a unique opportunity to get promoted to

23  inside sales in Memphis.  There was a new position

24  that they were creating to expand the market, so I

25  applied for that and was promoted to district sales

Page 299

1    manager inside sales and relocated to Memphis.

2        Q.    Where did you relocate from again?

3        A.    From Houston.

4        Q.    Okay.

5        A.    And during that process, they actually

6    used me as a mentor to the LeadUp program because

7    instead of them looking at a manual to say, oh,

8    well, this is the potential things you would face in

9    a 30-, 60-, 90-day manager program, I was actually

10   promoted.

11            So I got to go to LeadUp and announce my

12   promotion to the class and be a direct resource to

13   them on what the expectations of the role would be.

14       Q.    Okay.  And then from that position, is

15   that when you promoted into the position you held

16   under Michelle Lamb?

17       A.    No.

18       Q.    Okay.

19       A.    I was promoted again roughly 18 months

20   later in --

21       Q.    So what year are we in?

22       A.    Started 2015 to the middle of 2018.  I

23   went to be a district sales manager in the business

24   sales field organization.

25       Q.    Okay.

Page 300

1      A.   And then from there, that is when they --
2  FedEx decided to dissolve the position of district
3  sales manager business sales field, and they made
4  the decision to promote us to district sales manager
5  field sales.  And that's when in 2017 I began to
6  work under Michelle Lamb's leadership.
7      Q.   And you relocated from Memphis back to
8  Houston?
9      A.   Yes.  Well, I had already done that when I
10 went to the district sales manager business sales
11 field.  I just traveled from Houston and Atlanta
12 covering both areas.
13     Q.   Okay.  We talked earlier about that the
14 sales organization's job is to generate revenue.
15 When you have an AE, account executive, not
16 producing the required revenue, is that when you as
17 a manager kind of digs in and tries to determine why
18 the account executive is not producing the revenue?
19     A.   I look at other things because the impact
20 of revenue could be falsely inflated just like mine
21 was falsely inflated with BJ Services and not
22 impacted by 4G Dental.
23     Q.   Okay.  After you determine whether there's
24 some falsely inflated revenue goals in a situation
25 where you determine there aren't any for that

Page 301

1    account executive, is that when you then kind of dig

2    in more deeper to determine why the account

3    executive is not producing the required revenue?

4         A.   Yes.  I look at their calls, focus in on

5    their calls and opportunities.  I look at their

6    closed business tracking.  I look at their

7    engaging -- engagement with their pipeline,

8    territory management, and a variety of things to

9    help me determine what is the source of their

10   performance.

11        Q.   Okay.  But in a situation where you have

12   some account executives who are hitting their

13   revenue goals, is it fair to say then you're -- for

14   those individuals, you're not as focused or digging

15   down as deep about why they're hitting the revenue

16   numbers?

17        A.   False.  Because I use their success to be

18   able to leverage that and help partner those account

19   executives with the ones who may be or a B performer

20   or a C performer to help them be able to get

21   peer-to-peer development.  So I look at them the

22   same.

23        Q.   Okay.

24             MR. BABCOCK:  We can go ahead and take

25   a break.  I think I'm done.

Page 302

1              THE VIDEOGRAPHER:  We're off the

2      record at 5:45.

3              (Recess 5:45 p.m. to 5:57 p.m.)

4              THE VIDEOGRAPHER:  We are back on the

5      record at 5:57.

6      Q.   Ms. Harris, do you have any hobbies or

7      personal interests besides the T-shirt business?

8      A.   Yes.  I like to travel, spend time with my

9      family, shop.  I like technologies or researching

10     new technology, phones, computers, programs.  I'm

11     very competitive, so activities where I can

12     leverage, you know, my athletic background from

13     track.  And community service, I love being engaged

14     with helping kids or senior citizens with projects.

15     Heavily involved in activities with my church and

16     just love being around, you know, people and being

17     able to shed positive light.  And hopefully now with

18     everything transitioning from COVID, I can get back

19     to a lot of those things.

20     Q.   Do you still run for recreation?

21     A.   Sometimes.  I have really bad knees, so I

22     can't do as much running.  But uphill walking,

23     things of that nature I do incorporate, bike riding

24     sometimes.  That's not the best for my shins, but I

25     love activities where I could be physically fit.

Page 303

1      Q.   Okay.  And how often would you say you

2   engage in these types of activities?  Is that on a

3   regular basis?

4      A.   It depends.  Now with this new position,

5   my schedule is different, so I don't have as much

6   flexibility as I used to.

7      Q.   Okay.

8      A.   So I try to engage with -- in it as much

9   as possible.

10      Q.   And did you do that when you worked at

11   Brinks Homes as well?

12      A.   Oh, yeah.

13      Q.   Okay.  And before you moved from Houston

14   up to Dallas, did you engage in those hobbies and

15   personal interests as well?

16      A.   Yes.

17      Q.   Okay.  How many hours a week would you

18   estimate you spend on the JHShopSpot?

19      A.   It ranges.  I mean, sometimes two or three

20   hours, sometimes four or five on the weekends.  It

21   just depends.  I don't have, like, a large customer

22   base yet, so the demand isn't huge.

23      Q.   All right.  Has that been pretty steady

24   since you started the business two years ago?

25      A.   It has been up and down.  Like I said, I'm

Page 304

1    still trying to establish myself.  There's people

2    that have been doing the business for a long time

3    so...

4        Q.   Where do you find customers for that?

5        A.   A lot of it is word of mouth.  I do posts

6    on social media with the T-shirts and people, you

7    know, wearing those shirts and hats and sweatshirts.

8    And sometimes I get customers from there, but a lot

9    of it is word of mouth or repeat.

10            MR. BABCOCK:  I understand that your

11   counsel has some questions, so I'm going to tender

12   the witness.

13            MR. SANFORD:  Okay.  How long have we

14   gone?

15            THE VIDEOGRAPHER:  Six hours and eight

16   minutes.

17            MR. SANFORD:  Okay.  All right.  Yes,

18   I have a few questions.

19                    EXAMINATION

20   BY MR. SANFORD:

21       Q.   Let me go back to your EEOC charge.  There

22   was two of them, right?

23       A.   Yes.

24       Q.   Was it possible to provide every single

25   detail or everything that happened at FedEx in your

Page 305

1    EEOC charges?

2         A.    No.

3         Q.    Do you know what the word "ubiquitous"

4    means?

5         A.    Yes, everywhere.

6         Q.    You learned about -- if I understand it

7    correctly, you learned about the pricing issue, the

8    problem with the overpricing with BJ Services in

9    2017?

10        A.    Yes.

11        Q.    And I think it's all been explained, but

12   the transition issue about you having the attainment

13   goal after Jennifer Garcia has moved out, that's

14   different from the pricing issue change in 2017 --

15             MR. BABCOCK:   Object to the form.

16        Q.    -- is that right?

17             MR. BABCOCK:   Object to the form.

18        A.    Yes.

19        Q.    How so?

20        A.    The issue prior to is what led up to the

21   inflated goal when she was aligned to me and was how

22   they evaluated President 's Club, which is previous.

23             The impact of BJ Services with the

24   negative adjustment that Michelle did was for the

25   future where I didn't have any engagement or

Page 306

1    Jennifer Garcia or the customer was no longer

2    aligned to me.

3        Q.   So -- and I'm going to pull out the

4    document if I get to it, but I think you talked

5    about President's Club and Ambassador's Club, and

6    there was some other award --

7        A.   Rewards Club.

8        Q.   -- in the exhibit -- Rewards Club?

9        A.   Uh-huh.

10       Q.   And maybe I don't need go to the exhibit

11   and we just talk about it here.

12            Is -- you said, hey, it's the right thing.

13            Explain why it's the right thing to --

14   what was the right thing to do with President's

15   Club, Rewards Club, and Ambassador Club?

16            MR. BABCOCK:   Object to form.

17       A.   The right thing was to look at the

18   previous alignment of the revenue, which they were

19   going to use to determine if Jennifer Garcia and

20   myself earned President's Club.

21            So the right thing to do was to remove the

22   inflated revenue attached to our attainment at the

23   time so that we could accurately look at the

24   customer revenue that we had minus the inflation.

25       Q.   And by doing that, would that negatively

Page 307

1    impact you?

2         A.   Yes.

3         Q.   And you were willing to be negatively

4    impacted?

5         A.   Yes.

6         Q.   Why?

7         A.   Because I wanted to be considered for

8    President's Club with accurate numbers.  I didn't

9    want them to be inflated and for them to give me an

10   award that I did not deserve.

11        Q.   What's the difference between agreeing to

12   be negatively impacted for the purpose of

13   President's Club or Ambassador Club or Rewards Club

14   and not agree to be negatively impacted on your

15   attainment goals?

16             MR. BABCOCK:  Object to form.

17        A.   Because the President's Club, Ambassador's

18   Club, and Rewards Club was prior.  The adjustment of

19   BJ Services was for the future.

20        Q.   So I think I heard something that you

21   would be willing to take a credit or something or --

22        A.   Yes.

23        Q.   -- discount on commissions on past?

24        A.   Yes, because I wanted to be evaluated

25   accurately.

Page 308

1          Q.    Right.

2                And would -- do you know whether or not

3    Michelle Lamb received inflated credit for

4    BJ Services?

5                     MR. BABCOCK:   Object to the form.

6          A.    She did, yes.

7          Q.    Do you know whether or not she would be

8    willing to have the discounted credit?

9                     MR. BABCOCK:   Object to the form.

10         A.    She never verified that she would be

11   willing to do that.

12         Q.    Do you know about how much you would end

13   up giving back for that in commissions?

14                    MR. BABCOCK:   Object to the form.

15         A.    I don't know specifically.  I wasn't given

16   those details, but no matter the amount, I wanted it

17   to be done accurately.

18         Q.    Do you have an idea of a range?

19                    MR. BABCOCK:   Object to the form.

20         A.    It could range from a few hundred dollars

21   to potentially over 1,000.

22         Q.    But not tens of thousands of dollars?

23         A.    No.

24         Q.    And so -- and are you clear about what

25   FedEx's rules are in setting goals going forward in

Page 309

1    the future?

2         A.   Yes.

3         Q.   What are those rules for setting goals in

4    the future?

5         A.   They are based on ZIP code, which is

6    aligned to an account manager, which is then based

7    on customers' headquarters to that ZIP code, and

8    then aligned to a district.

9         Q.   So if FedEx says that that's not the rule,

10   do you dispute that?

11        A.   Yes.  That is why I disputed the negative

12   adjustment of BJ Services.

13        Q.   And so is that just a conclusion that

14   you're making or do you base that on something?  How

15   do you know that's the rule?

16              MR. BABCOCK:  Object to the form.

17        A.   Because it's a part of the sales

18   compensation policy.

19        Q.   How is it part of the sales compensation

20   policy?

21        A.   Because we have to have rules and

22   regulations for us to follow in order for us to

23   properly have accounts aligned, which then properly

24   allow FedEx to evaluate the revenue goals and

25   stretch which will be applied to our future

Page 310

1    attainment.

2         Q.   Is it in writing or is it just a practice?

3         A.   No, it's in writing.

4         Q.   And so to get an exception for that, what

5    do you have to do --

6                   MR. BABCOCK:   Object to the form.

7         Q.   -- to that rule; do you know?

8         A.   Yes.  A director has to specifically ask

9    for a process that overrides the policy, and that

10   goes against the standard rules which state a ZIP

11   code aligns to a customers' headquarters, aligns to

12   an account executive, which links them to a

13   district.

14        Q.   And would there be any valid justification

15   for an exception for that rule for you to have a

16   goal for a company who is not in your territory for

17   it to be -- you to be judged on it to be in your

18   territory going forward?

19                  MR. BABCOCK:   Object to the form.

20        A.   No.  The only determining factor in why

21   that was done in -- compared to why my peers weren't

22   given, you know, a negative adjustment on

23   BJ Services being that they were white is only

24   because of my race.

25        Q.   So if the reason for putting a company

Page 311

1   going forward that you have no control over, is not

2   in your territory, as part of your attainment goals

3   going forward is because you got past credit that

4   was inflated in the past, does that have any

5   reasonable -- is that reasonable at all?

6             MR. BABCOCK:  Object to the form.

7        A.   No.

8        Q.   Why not?

9        A.   Because that customer and that account

10  manager are no longer aligned to my district.

11  Michelle Lamb made the decision to not only move

12  Jennifer Garcia from my district to Brian Conrey,

13  but it also aligned the ZIP codes which would align

14  the customers which would pull the revenue and the

15  stretch for the future to Brian Conrey.

16       Q.   Why isn't it fair for -- since you have

17  been getting extra credit in the past for a year or

18  two, why isn't it fair for you now to be punished

19  going forward --

20            MR. BABCOCK:  Object to form.

21       Q.   -- and get -- and have that -- get -- have

22  that counted against you in the future for your next

23  year?  Why is that not fair?

24            MR. BABCOCK:  Object to the form.

25       A.   Because it's inconsistent with the rules

Page 312

1    and alignment, one, that's in the sales compensation

2    policy and the treatment that was given to my white

3    peers.

4        Q.   Is it part of the policy -- do you know

5    whether or not it's part of the policies at FedEx or

6    practice that if there's going to be an exception to

7    FedEx's rules for assignment and goals going forward

8    that the person affected has -- is informed or has a

9    say in it?

10               MR. SANFORD:  Object to the form.

11       A.   Yes.

12       Q.   What is that -- what is your

13   understanding?

14       A.   That all details should be communicated.

15   And anybody that would be impacted, whether it's

16   positively or negatively, they should have

17   communication when the discussion begins not after

18   it's impacting their revenue.

19       Q.   On what are you basing your statement that

20   that is the pattern or that is the practice or

21   policy at FedEx?

22               MR. BABCOCK:  Object to the form.

23       A.   It's always been the -- the practice to

24   make sure, no matter what style of adjustment,

25   whether it's prospecting, whether it's realignment,

Page 313

1    that it's communication in advance to both the

2    managers that will receive the negative and the

3    positive impact and a director gives approval to

4    that.  When it doesn't follow the policy and the

5    rules of the sales compensation, then there is a

6    request of overriding of that policy.

7        Q.   When you say it's always been that way,

8    how do you know it has always been that way?

9        A.   My years of experience as a manager in

10   three different levels of sales have all been

11   consistent and the same.

12       Q.   Consistent and the same -- is somebody

13   telling you this?  Are you seeing it in writing?

14   How -- give me more -- how do you know?

15       A.   Directors in manager training walk through

16   intensely the process of what justifies as an

17   adjustment and should be submitted.  So it's

18   communicated quarterly so that, one, it can be put

19   on a spreadsheet which then could be evaluated by

20   the director to verify the facts of all the

21   customers and the services that are included in that

22   request and then communication to the director who

23   it's moving to on the positive or negative impact

24   has to approve it.

25            If it's in the same organization, then

Page 314

1  there's no conversation that should be had. It's

2  only going to be impacting by the director who is

3  involved in that decision.

4  MR. BABCOCK: Object to the last

5  answer.

6  Q. Well, you didn't mention anything about

7  account executives or district managers as part of

8  that communication.

9  A. We initiate the process on the

10  spreadsheet, but the final decision is made by the

11  director.

12  Q. What about -- what I'm asking is, if

13  you're saying that -- if there's an exception to the

14  rule, it's that the account executive or the

15  district manager is notified and has participation

16  and communication about should it happen or not?

17  A. It should happen, yes.

18  Q. On what are you basing that?

19  A. Because in past experiences, it has always

20  been that way. It doesn't specifically state that

21  in the policy, but the rules say that an account is

22  aligned to a ZIP code, which is aligned to account

23  manager, which is then connected to a district.

24  Q. So what about Conrey, Brian Conrey, is

25  it -- is it fair for Brian Conrey to have to have

Veritext Legal Solutions

Appx-755

Page 315

1    inflated goal going forward that you -- when you had

2    an inflated goal going forward in the past?

3         A.   Yes.  Because the account manager with the

4    ZIP codes and the customer was now aligned to his

5    district.

6         Q.   So you complained about it in the past; is

7    that right?

8         A.   Yes, of the error of the pricing not being

9    loaded correctly.

10        Q.   And about whether or not it was part of

11   your goals?

12        A.   Yes.

13        Q.   And Brian Conrey complains about it for

14   the future?

15        A.   Correct.

16        Q.   And what happens to Brian Conrey?

17        A.   The difference between myself and Brian

18   Conrey is that he was able to influence Michelle to

19   make a decision to negatively impact me with

20   adjusting me for the future.  When the customer and

21   the account executive were moved to his district, he

22   should have received the inflated goal because now

23   that was a customer that belonged to his direct.

24             MR. BABCOCK:  Object to the last

25   answer.

Page 316

1     Q.    Well, let me ask it, so what race is Brian

2     Conrey?

3     A.    White.

4     Q.    And Michelle Lamb listened to him when he

5     complained about BJ Services?

6     A.    Yes.

7              MR. BABCOCK:   Object to the form.

8     Q.    Listened to you?

9     A.    No.

10    Q.    And then you say it would be fair for

11    him -- what about just leaving the goals with Brian

12    Conrey, but instead of inflating it based on the

13    pricing, just deflate the goal for Brian Conrey and

14    leave it with him?

15    A.    That is what should -- what should have

16    happened.  The goal, the revenue, the inflation, or

17    the removal of the inflation should have stayed with

18    him.

19    Q.    So just make it fair for Brian Conrey

20    going forward and not set you up for failure?

21    A.    Correct.

22    Q.    Okay.  Did you try to explain any of this

23    to HR?

24    A.    Yes, on several occasions.

25    Q.    Do you think they understood?

Page 317

1      A.   They didn't even try.

2      Q.   How about Dave Russell, did he understand?

3           MR. BABCOCK:  Object to the form.

4      A.   He did.

5      Q.   He did.

6           So -- and his response was?

7      A.   That I didn't have any substantiating

8   evidence to why I shouldn't have the negative goal

9   adjusted to me.

10     Q.   And what was your substantiating evidence?

11  Have we talked about all that?

12     A.   We talked about some of it, but I showed

13  him where Michelle Lamb made the decision to move

14  Jennifer Garcia from my district to Brian Conrey's

15  district, which would then align BJ Services as a

16  customer to Jennifer Garcia and Brian Conrey for the

17  future.  And he completely disregarded any of those

18  details that I shared.

19     Q.   So you talked about HR.  You talked about

20  investigating.  So if FedEx says they did a fair,

21  thorough investigation, do you dispute that?

22          MR. BABCOCK:  Object to the form.

23     A.   Yes.

24     Q.   And you have already talked about it a

25  lot, but just to make sure, on what basis do you

Page 318

1    dispute that FedEx conducted fair investigations of

2    your complaints?

3              MR. BABCOCK:  Object to the form.

4         A.   They didn't.  Their investigation on every

5    escalation and complaint that I made was a sham

6    investigation, very bogus.  I provided specific

7    people for them to talk to in interviews.  I

8    provided documents that they never verified.  They

9    only interviewed me and people who they felt could

10   influence and help Michelle Lamb with this

11   discrimination and retaliation.  So instead of

12   protecting me, they targeted me.

13             MR. BABCOCK:  Object to the last

14   answer.

15        Q.   And as part of the investigation, did they

16   consider the rules that FedEx have for alignment?

17             MR. BABCOCK:  Object to the form.

18        A.   They did not.

19        Q.   So talk about cost controls.  So just to

20   make sure I understand, who has the decision to

21   decide whether or not costs should be reduced across

22   the board, is that FedEx or Michelle Lamb?

23             MR. BABCOCK:  Object to the form.

24        A.   Michelle can make decisions on if she

25   allows approval of expense reports or if she

Page 319

1    declines them.

2        Q.   Right.

3            So it's one thing for FedEx to say we want

4    to lower costs, and it's another thing to say to

5    someone like Michelle Lamb, we want you to lower

6    costs by this amount, you have discretion to choose

7    how that's going to be done?

8        A.   That is correct.

9        Q.   And she chose you in reducing costs and

10   not your white peers?

11       A.   Correct.

12            MR. BABCOCK:   Object to the form.

13       Q.   And how do you know this?

14       A.   Because when originally she approved my

15   travel and trip to Memphis for the Memphis Pathway

16   program, that included for me to give the expenses

17   to FedEx for my flight, my hotel, and my rental.

18   She came back and said when it was time for me to

19   book that specific travel that now the company was

20   on cost constraints and that I was not allowed to be

21   able to attend.

22            But what she didn't share is that there's

23   a program in Dallas in which, as a team, as peers,

24   my white peers specifically could drive to and be

25   afforded the same opportunity to still attend the

Page 320

1   Pathway program.  She said nobody from the region is

2   going.

3           So I took her word at face value that

4   nobody was going to be given the privilege to attend

5   when, in fact, her and two of my white peers

6   attended and FedEx reimbursed them for the mileage

7   and for their lunch.

8           So that's inconsistent with her reasoning

9   for why I couldn't attend in addition to cover my

10  costs.

11      Q.   And could you have driven --

12           MR. BABCOCK:  Object to -- move to

13  strike the last question -- answer.

14           MR. SANFORD:  What.

15           MR. BABCOCK:  I said I object and move

16  to strike the last answer.

17           MR. SANFORD:  I don't think that's a

18  valid objection but okay.

19      Q.   So the -- so were you willing to drive

20  from Houston to Dallas to attend --

21      A.   Yes.

22      Q.   -- that event?

23           And why didn't you?

24      A.   Because I wasn't even extended the

25  opportunity that my white peers were given.

Page 321

1        Q.   When did you find out that they had

2   attended the event or were going to attend the

3   event, before or after?

4        A.   Before.

5        Q.   And then -- so why didn't you go?

6        A.   They laughed in my face and said that they

7   were going and that the excuse that Michelle used

8   that I couldn't go to Memphis wasn't correct because

9   they were going.  And I was never extended the same

10  invitation.

11       Q.   Why didn't you just show up?

12       A.   Because I had used vacation time so that I

13  could still honor my commitment to the director

14  Jerry Page in Memphis to come to the Pathway program

15  there in Memphis and still be able to demonstrate my

16  leadership skills and help coach and develop the

17  people who aspire to, you know, grow and develop in

18  the company.

19       Q.   So was Michelle Lamb the first time you

20  experienced discrimination at FedEx?

21       A.   No.

22       Q.   So you have been through this before --

23       A.   Yes.

24       Q.   -- right?

25            But it had a different outcome?

Page 322

1      A.   It did.

2      Q.   Because you had different vice presidents.

3      A.   That is correct.

4      Q.   It wasn't Dave Russell; it was somebody

5   else -- it was a better or worse outcome?

6      A.   It was a better outcome.

7      Q.   Okay.  So tell me about what happened

8   there.  Did it involve any type of leadership?

9      A.   Yes, it did.

10      Q.   What happened?

11      A.   It involved a manager who had demonstrated

12   racist comments, Erika Tolar, who referenced black

13   people as being monkeys and not real people in a

14   team meeting and --

15      Q.   And this is somebody that you reported to?

16      A.   In the future, I would report to her.  I

17   sat across from her team when she made the comment

18   and saw the drastic impact that it made on the

19   African-Americans on her team and how they felt,

20   like, embarrassed and ashamed that FedEx would still

21   allow her to be in leadership after publicly making

22   a racist statement about black people.

23      Q.   So then eventually did you report to her

24   directly?

25      A.   Unfortunately --

Page 323

1      Q.   What's her name again?

2      A.   Erika Tolar.

3      Q.   Erika Tolar, you eventually reported to

4  her?

5      A.   Unfortunately FedEx did allow her to be

6  promoted from an inside sales manager to a district

7  sales manager in field sales.  And while I was

8  there, I had to embrace --

9      Q.   Let me ask you, what race is she?

10     A.   She's white.

11     Q.   Okay.  Go ahead.  While you were there,

12 you had to embrace something?

13     A.   Yes.  The anxiety that I faced with her

14 known comments of, you know, monkeys referencing to

15 black people and experienced my own discrimination.

16 When I was wanting to apply for a LeadUp, she --

17     Q.   What is LeadUp?

18     A.   It's a manager trainee program designed

19 for people in sales capacity that desire to be in

20 management.

21     Q.   Is that similar to Pathway?

22     A.   Very similar.  They are almost identical.

23     Q.   This is -- we're talking about something

24 earlier than the Pathway incident?

25     A.   That is correct.

Page 324

1          Q.   Several years earlier.  Do you know about
2     when?
3          A.   Yes.  I worked fork Erika 2013 up until my
4     promotion to district sales manager in inside sales
5     in Memphis.
6          Q.   So tell us about what happened with
7     LeadUp.
8          A.   I went to her and always consistently
9     talked to her about me wanting to get into
10    management.  And when they opened up the LeadUp
11    program again -- because it had been shut down --
12    that I wanted to be a part of the application
13    process.
14         Q.   What did she say?
15         A.   She declined.  She said that I wasn't
16    ready for leadership but never give -- gave any
17    substance to why.  And all I could relate that to is
18    her being racist and discriminating against me
19    because on her team, there was no other
20    African-Americans at the time.  And if there's no
21    substance or reason to why I couldn't apply, I
22    didn't understand that.  So I escalated --
23         Q.   What did you do?  You escalated?
24         A.   I escalated and went to the director who
25    was on the panel, Jerry Page, and asked him if it's

Page 325

1    a requirement that your manager approve you to be in

2    LeadUp.  And he said, no, it's not required, it's

3    encouraged, so you still have the ability to apply,

4    which I did.

5            And so --

6        Q.   Then what happened?

7        A.   I was granted an interview with a panel of

8    directors who allowed me an opportunity to share why

9    I felt that I was successful as an individual

10   contributor and would be good in the LeadUp program

11   that consisted of eight months of engagement to

12   really transition your skill set from a sales rep to

13   a manager.

14       Q.   So was there any type of communication

15   back from management back to Ms. Tolar about you

16   going?

17       A.   Yes.

18       Q.   What happened?

19       A.   There was an email where Erika Tolar

20   canceled my trip because at that time, I had already

21   been promoted and awarded the inside sales district

22   sales manager position, which is another

23   demonstration of her discrimination because she

24   didn't want me to apply for that either but it

25   didn't require her approval.

Page 326

1          So I escalated that.  Instead of going

2     back to Jerry Page, I went to the vice president,

3     Pat Galvin, and he was very --

4          Q.   What did he -- what did he say?

5          A.   He was very frustrated that she took it

6     upon herself, not even a part of the LeadUp

7     committee, to cancel my travel.  And she

8     communicated that she told Grant Kuhn that it was a

9     waste of the company's resources for me to even go.

10    And so Pat --

11         Q.   Grant Kuhn?  She communicated to Grant

12    Kuhn?

13         A.   Yes.

14         Q.   That name has come up before?

15         A.   Yes.

16         Q.   Okay.  That's the one where you said he

17    didn't want you to be anything either?

18         A.   Correct.

19         Q.   Okay.  So she's -- Erika Tolar is

20    communicating with Grant Kuhn?

21         A.   Yes.  That was our director at the time.

22         Q.   Okay.  And so what did Mr. Galvin do?

23         A.   Yes.  He responded and said that Erika

24    Tolar is up to her old tactics.  And all I could

25    related his response to is the constant issues that

Page 327

1    she had with complaints of racism and the monkey

2    comment for black people.  And he said, no worries,

3    I would handle it.

4              And shortly after, Erika Tolar called me

5    and apologized.  And Pat Galvin worked with his own

6    administrative assistant to rebook my trip so that

7    then I could be awarded the opportunity to still

8    participate in the LeadUp travel.  And he used me to

9    be a mentor so that I could show actual engagement

10   with 30-, 60-, 90-day plan instead of a manual.

11             MR. BABCOCK:  Object to the -- part of

12   that last answer.

13   Q.   And so then -- then what position was that

14   that you were in when you were -- went to LeadUp and

15   you had been promoted?

16   A.   I was a district sales manager for

17   business sales inside.

18   Q.   Inside.

19             And then did you go on to get -- you went

20   on to get promoted even more after that?

21   A.   That is correct.  18 months later, I was

22   promoted to a district sales manager in the business

23   sales field organization.

24   Q.   And then eventually you were moved and

25   promoted up under Michelle Lamb, right?

1        A.   Yes, that is correct.

2        Q.   And that was at the time she was promoted

3   to director?

4        A.   That is correct.

5        Q.   Now, she's white?

6        A.   That's correct.

7        Q.   They didn't promote you to a director?

8        A.   No.

9        Q.   You're black?

10        A.   That's correct.

11        Q.   Did you have qualifications to be a

12   director?

13        A.   Yes.

14        Q.   Would you have had the same -- how did

15   your qualifications with Michelle Lamb compare?

16             MR. BABCOCK:   Object to the form.

17        A.   I had been promoted more times than

18   Michelle.  I had demonstrated success consistently

19   more than Michelle Lamb.

20        Q.   So now she's over you, right?  She's

21   talking to Mr. Kuhn?

22        A.   Uh-huh.

23        Q.   Who knows Erika Tolar?

24        A.   Yes.

25        Q.   Tell me about Mr. Kuhn.  Do you know

Page 329

1    whether or not he's racist?

2         A.   Yes.

3         Q.   Why do you say that?

4         A.   There has been several instances of

5    complaints with Grant Kuhn not hiring

6    African-Americans into his region for district sales

7    manager positions.  Specifically a complaint was

8    made from Gail Harris in the business sales inside

9    office that she had applied on several occasions,

10   had years of experience, years of success, but never

11   granted the opportunity to be in a sales -- field

12   sales organization.

13        Q.   So I want to -- there's some questions

14   about -- there was a panel, a diverse panel.

15             Do you remember questions about a diverse

16   panel, being on a diverse panel?

17        A.   Yes.

18        Q.   And that -- were you the only

19   African-American on the panel?

20        A.   Yes.

21        Q.   But you don't know the religion or sexual

22   preference of other people there --

23             MR. BABCOCK:  Object to the form.

24        Q.   -- on the panel, right?

25        A.   No.

Page 330

1          Q.    So are you aware of whether or not any of
2     those persons who are not black are your
3     comparators?
4          A.    Yes.
5          Q.    Are they?
6          A.    Yes, several of them.
7          Q.    Okay.  And do you know whether or not you
8     are to be compared -- let me ask you this:  Do you
9     know whether or not the law allows a token exception
10    to discrimination?
11         A.    No.
12         Q.    You don't know whether or not, hey, I
13    treat this black person really good so there's no
14    way I could discriminate against this black person?
15         A.    Yeah, no.
16         Q.    Or I treat this person really good because
17    of their religion; there's no way I could
18    discriminate against black people?
19         A.    No.
20         Q.    Or I treat women really good; there's no
21    way I discriminate against black people?
22         A.    No.
23         Q.    You don't know whether or not -- you don't
24    know that the law says there's no token exception to
25    discrimination?

Page 331

1      A.   No.

2      Q.   Do you know whether or not FedEx has been

3   trained on whether or not there's no token exception

4   to discrimination?

5              MR. BABCOCK:   Object to the form.

6      A.   I would hope so.

7      Q.   You're able to go to Pathway?

8      A.   At my own expense and using vacation.

9      Q.   So did Michelle Lamb give you any

10   assistance, help you at all --

11      A.   No.

12      Q.   -- in that process?

13           I think you -- I think you said that

14   Michelle Lamb wanted you to do Coach2Grow 2.0

15   different ways than you were doing it.   What do you

16   mean?

17              MR. BABCOCK:   Object to the form.

18      A.   Yes.   She rolled out the Coach2Grow 2.0

19   program, and there were specific ways that she

20   wanted it done.

21      Q.   Like what?

22      A.   There was a lengthy PowerPoint

23   presentation that instead of going to the facts of

24   what Coach2Grow 2.0 was, she wanted me to go through

25   every slide with each account executive and then

Page 332

1    allow them to take an assessment based on that which

2    would identify their strengths or ways for them to

3    be focused on me to coach them with the new

4    Coach2Grow 2.0.  But the approaches of my white

5    peers, they didn't go through every slide.  They

6    highlighted slides just like I did but weren't given

7    the aggressive treatment.  And --

8         Q.   So -- so two things, so -- let me stop.

9              So what you did that was different is you

10   didn't go through every slide; you highlighted

11   certain slides?

12        A.   Yes.

13        Q.   And she wanted you to go through every

14   single slide?

15        A.   Yes.

16        Q.   And you're saying your peers, other

17   district managers, didn't go through all the slides

18   with their account executives?

19             MR. BABCOCK:  Object to the form.

20        A.   No.

21        Q.   How do you know?

22        A.   Because we talked about their process, and

23   that is why I reached out to Brian Conrey and

24   Rebecca Callahan to get best -- best practices from

25   them but was denied that opportunity because

Page 333

1    Michelle wanted it to be done her way.

2        Q.   So how do you know they didn't go through

3    their slides?

4        A.   Because they told me the details they went

5    through.  They went through more slides than I did

6    but not every slide as she requested.

7        Q.   So why wouldn't you go through every slide

8    initially?

9        A.   Because I wanted to focus on the key

10   components that would really transition what we were

11   doing and coaching prior to Coach2Grow 2.0.  That

12   wasn't the first time we had Coach2Grow.  This just

13   was a transition of what Coach2Grow was.  We had

14   regular Coach2Grow and Coach2Grow 2.0.

15           So the account managers were already

16   familiar with the original Coach2Grow 2.0.  And in

17   my attempt to just reiterate what the changes were,

18   I highlighted what those were instead of going

19   through every slide that was given in that

20   presentation.

21       Q.   Because they already knew it?

22       A.   Yes.

23       Q.   So after she instructed you to go through

24   every slide, did she want you to go back and do it

25   again?

Page 334

1      A.   Yes.  And I did.

2      Q.   And you did?

3      A.   Yes.

4      Q.   Every single slide?

5      A.   Yes.

6      Q.   You complied with her request?

7      A.   That is correct.

8      Q.   And she still -- I mean, we know you're

9  terminated.

10          Okay.  So let me ask you -- let's go

11  through this.  Well, let me -- before I do that, I

12  want to -- I think you talked about the team needed

13  to be led by a strong coach, meeting strong metrics.

14          Do you remember talking about that?

15      A.   Yes, that was the reference of Michelle

16  saying that I was not a strong coach.

17      Q.   Yeah.

18          And so what about your peers, were they

19  meeting their metrics?

20      A.   No.

21          MR. BABCOCK:  Object to the form.

22      Q.   Okay.  And do you dispute that you were

23  not a strong coach?

24      A.   Yes.

25      Q.   On what basis do you dispute that you are

Page 335

1    not a strong coach?

2        A.   Because my experience and success as a

3    leader demonstrated that I was a strong coach.  I

4    had developed and coached several people to be

5    successful and maintain, grow, and find revenue for

6    FedEx in addition to help them get promoted.  So

7    those details demonstrate that I was a strong coach.

8        Q.   What about the metrics, did the metrics

9    demonstrate you're a strong coach?

10                MR. BABCOCK:   Object to form.

11       A.   Yes.

12       Q.   How so?

13       A.   Because my closed business tracking

14   contradicts the false allegations that Michelle used

15   in my letter of counseling and letter of warning

16   that I was a poor performer.  Yet, I was in the top

17   half of her district sales manager on all of the

18   metrics that she used on closed business tracking,

19   on joint calls, on calls on opportunities, on

20   pricing.

21                So it's very inconsistent the expectation

22   that was set for me compared to my white peers.

23       Q.   I believe there was -- you had a question

24   about if there's an exception to the rule on setting

25   goals for attainment compensation, that at the end

Page 336

1    of the day, FedEx gets to decide.

2             Somebody at FedEx is the arbiter and gets

3    to decide whether or not they're going to follow

4    their own rule or not?

5             MR. BABCOCK:  Object to form.

6        A.    That is correct.

7        Q.    Okay.  You don't get to decide that?

8        A.    No.

9        Q.    Right.

10            FedEx at the end of the day gets to decide

11   whether they're going to discriminate against you;

12   you don't get to decide that, right?

13       A.    True.

14       Q.    At some point you said -- I believe you

15   said that Michelle Lamb's perception of you was as a

16   poor performer.

17            Did she actually perceive you as a poor

18   performer?

19            MR. BABCOCK:  Object to the form.

20       A.    No.  She actually made it appear that way

21   on reports and on the letter of counseling and to

22   Dave Russell, Dan Mullally, and the human resources.

23       Q.    Couldn't she honestly -- just be an honest

24   mistake?  She honestly believed you're a poor

25   performer?

Page 337

1    A.    No.

2    Q.    Why not?

3    A.    Because on several occasions, her actions

4    demonstrated that she was intentionally trying to

5    target me because I was black.

6    Q.    How so?

7    A.    BJ Services goes against the sales

8    compensation policy which aligns a customer with

9    territories and ZIP codes.  And she overrode that

10   process to negatively impact me and make it appear

11   on the reporting that I was a poor performer.

12   Q.    She had access to see all your performance

13   records?

14   A.    Yes.

15   Q.    Performance records that showed that you

16   were a good performer?

17   A.    Yes.

18   Q.    You have seen their policies against

19   discrimination and retaliation?

20   A.    Yes.

21   Q.    So they have a written policy saying it.

22         Do you dispute that they follow that

23   policy?

24   A.    Yes, they did not follow the policy.

25   Q.    Well, they say they don't tolerate

Page 338

1    discrimination.

2           Do you dispute that statement in their

3    policy?

4         A.   I experienced them tolerating

5    discrimination and retaliation.

6         Q.   Well, they have got -- I mean, how can

7    they?  They have a policy that says we do not

8    discriminate.  We do not tolerate discrimination.

9    So how can they discriminate if they -- I mean, it's

10   right there.  Their policy says we don't do it.

11        A.   Policies have to be --

12              MR. BABCOCK:  Object to form.

13        A.   -- enforced by the actual employees.  So

14   if they don't monitor or supervise if that behavior

15   is being demonstrated to an employee and investigate

16   the complaints made when they share the specifics

17   and facts, then FedEx isn't following those

18   policies.

19        Q.   Does that go the same for retaliation?

20        A.   Yes.

21        Q.   Did you take advantage of their policies

22   to try and contest what was happening to you?

23        A.   Yes.

24        Q.   What did you do?

25        A.   I escalated to Dave Russell, to Dan

Page 339

1    Mullally, to Jim Wallace, to Kristie Castilow, to

2    Michael Clark, to Linda Taylor, to Mac Chonoles, to

3    everybody.  I filed an internal EEO, an external.

4    I --

5         Q.   What do you say to someone who says you

6    didn't take every reasonable opportunity to try to

7    contest it and take advantage of their appeals

8    process?

9              MR. BABCOCK:  Object to the form.

10        A.   That it's false.

11        Q.   Why?

12        A.   Because I went through every process

13   possible to try to bring awareness so that FedEx

14   could be held accountable to prevent discrimination

15   and retaliation.

16        Q.   So if FedEx says you didn't take advantage

17   of every -- reasonably -- you unreasonably failed to

18   take advantage of any preventative or corrective

19   opportunity.

20             Do you dispute that?

21             MR. BABCOCK:  Object to form.

22        A.   Yes.

23        Q.   Based on what we just talked about?

24        A.   Yes.

25        Q.   And if FedEx says that they exercised

Page 340

1    reasonable care to prevent discrimination, did you

2    dispute that?

3         A.   Yes.

4         Q.   It's based on what you have testified here

5    today?

6         A.   Yes.

7         Q.   And that they promptly corrected any

8    discrimination, do you dispute that?

9         A.   Yes, that is correct.

10        Q.   Same goes for retaliation?

11        A.   Yes.

12        Q.   So I think in paragraph 50 of the

13   complaint -- the complaint is Exhibit 4, I think.

14             MR. BABCOCK:   Yeah, it's Exhibit 4.

15             MR. SANFORD:   Okay.   Thank you.

16        Q.   Removed some of your commissions, right?

17   We talked about that on paragraph 50.

18             Do you see paragraph 50?

19        A.   Yes.

20        Q.   And Ms. Lamb removed some of your

21   commissions, and you talked about, if I recall

22   correctly, it was BJ Services negatively impacted

23   you?

24        A.   Yes.   That removed some of my positive

25   commission because of the negative impact from

Page 341

1    BJ Services.

2         Q.   What about 4G?

3         A.   Yes, because it wasn't positively aligned

4    to me, it impacted my commissions as well.

5         Q.   Paragraph 60, Ms. Harris's team was one of

6    the top teams at FedEx nationally, being awarded

7    President's Club.

8              Okay.  We talked about being belittled by

9    Michelle Lamb.

10             Do you remember that?

11        A.   Yes.

12        Q.   Did any of your one-on-one -- did any of

13   the one-on-one coaching, did you experience any

14   belittlement?

15        A.   Yes.

16        Q.   How so?

17        A.   Because every time I was engaged with

18   those meetings with me that was drastically

19   different to the treatment of my peers, the presence

20   of those meetings belittled me because it was

21   inconsistent with the coaching and one-on-ones that

22   she gave other people.

23        Q.   Exhibit 11.  I know we have explained

24   this.

25             Exhibit 11 is where you're saying you

Page 342

```
1    agree to the -- reducing BJ Services in the past in

2    looking at your numbers to qualify for President's

3    Club --

4        A.   Yes.

5        Q.   -- or Ambassador or the other Rewards,

6    right?

7        A.   Correct.

8        Q.   Does that email anywhere talk about future

9    attainment goal number 11?

10       A.   No.

11       Q.   Does anywhere talk about you agreeing to

12   take on future attainment of -- once Jennifer Garcia

13   is moved out and BJ Services is moved out of your

14   territory?

15               MR. BABCOCK:   Object to the form.

16       A.   No.

17       Q.   It's all past?

18       A.   That is correct.

19       Q.   Not future?

20       A.   Correct.

21       Q.   And you agreed to voluntarily reduce

22   your -- the revenue even though it came in?   Right,

23   did the revenue actually come in?

24       A.   Yes.

25       Q.   FedEx got the money?
```

Page 343

1       A.   Yes.

2                 MR. BABCOCK:   Object to form.

3       Q.   And you're willing to say, look, I don't

4   have to have credit for it because the customer was

5   overpaying?

6       A.   Correct.

7       Q.   And you still made President's Club?

8       A.   Yes.

9       Q.   And because of that, Jennifer -- I mean,

10  Michelle Lamb also made President's Club?

11      A.   Correct.

12      Q.   FedEx come back and say, hey, thank you

13  for doing that?

14      A.   No.

15      Q.   Did you follow the proper procedure of

16  progressive discipline with Mr. Seagraves?

17      A.   Yes.

18      Q.   Did FedEx follow the proper procedure in

19  discipline with you?

20      A.   No.

21      Q.   Exhibit -- let me just look -- okay.

22  Let's look at Exhibit 31.

23           I believe this is the letter of counseling

24  for unacceptable performance right?  Do you have it?

25      A.   Yes.

Page 344

1     Q.   So we talked about -- I remember you

2   talked about the 91.6 was not accurate?

3     A.   That is correct.

4     Q.   And zero out of eight you said was not

5   accurate?

6     A.   That is correct.

7     Q.   Does she put on here anywhere how many of

8   the AEs under your white peers are not making plan?

9     A.   No.

10     Q.   Does she put on here whether or not she's

11   making plan?

12     A.   No.

13     Q.   In any of her -- do you recall -- we can

14   go through it, but did she ever compare you with

15   your white peers and how that you're performing

16   compared to them?

17     A.   Yes.

18     Q.   How?

19     A.   She falsely accused me of poor performance

20   and being at the bottom.  In response to -- I would

21   have to look to confirm, but in my letter of

22   warning, but on several coaching conversations, she

23   always referenced that I was at the bottom of the

24   region.

25         In addition, she falsely accused me of not

Page 345

1    having any FedEx One Rate and Global Gold Rush

2    opportunities compared to my white peers, and that

3    was false.  So there's several occasions that --

4         Q.   When you say it's false, you dispute --

5         A.   Yes.

6         Q.   -- her statement --

7         A.   That is correct.

8         Q.   -- that you were at the bottom?

9         A.   Yes.

10         Q.   So let's just go -- this is Plaintiff's

11    Exhibit 1.

12              MR. BABCOCK:  Do you want to just...

13              MR. SANFORD:  Yeah.  Oh, I can make

14    it.  Add it?

15              MR. BABCOCK:  Yeah, why not.

16              MR. SANFORD:  Why not.  Thanks.

17              (Exhibit 64 marked.)

18         Q.   This is Exhibit 64.  So it says you failed

19    the meet plan throughout FY19.

20              Do you dispute that?

21         A.   Yes.

22         Q.   And you failed to meet plan FY20 quarter,

23    unadjusted.

24              Do you dispute that?

25         A.   Yes.

Page 346

1          Q.    FY20 year to date, your district has the

2    lowest pricing activity in the region.

3                Do you dispute that?

4          A.    Yes.

5          Q.    Says you did not meet action plan

6    objectives which you created to improve performance.

7                Do you dispute that?

8          A.    Yes.

9          Q.    Says you did not meet the CBT expectation.

10               Do you dispute that?

11         A.    Yes.

12         Q.    You did not meet the collaborate to close

13   expectation.

14               Do you dispute that?

15         A.    Yes.

16         Q.    You did not meet pricing expectation.

17               Do you dispute that?

18         A.    Yes.

19         Q.    You did not close gaps performance gaps.

20               Do you dispute that?

21         A.    Yes.

22         Q.    You did not meet the attainment

23   expectation.

24               Do you dispute that?

25         A.    Yes.

Page 347

1          Q.   So let's go to second page of

2    Exhibit 60 -- what is it?

3          A.   64.

4          Q.   -- 64.

5               Down at the bottom, it says, PC impact to

6    DSM and AEs with large invoice adjustments.  Discuss

7    timeline.  All are in agreement that we are doing

8    the right thing here.

9               We have talked about the right thing?

10         A.   Yes.

11         Q.   Right thing is lowering your revenue for

12   President's Club in the past?

13         A.   Correct.

14         Q.   Does the right thing have anything to do

15   with goals going forward?

16         A.   No.

17         Q.   You dispute that the right thing -- so if

18   Michelle Lamb or FedEx says the right thing here,

19   that you're agreeing to the right thing is it's the

20   right thing for you to have goals for a business

21   that's not in your territory, do you to dispute

22   that?

23               MR. BABCOCK:   Object to the form.

24         A.   Yes.

25         Q.   The next page it says on -- down at the

Page 348

```
1    bottom, 144992, one out of six regions are at plan

2    for -- oh, I don't know if you dispute this at all.

3           One out of six regions are at plan for Q4.

4    Now, regions, who is responsible for regions?

5         A.   Michelle Lamb and her peers.

6         Q.   And her peers.

7              So do you know if Michelle Lamb was out of

8    plan at this time?

9                   MR. BABCOCK:  Object to the form.

10        A.   Yes.

11        Q.   So she's -- she -- you're making plan,

12   she's not, but she's writing you up?

13        A.   That is correct.

14        Q.   Only 14 of 56 DSMs are above plan, right?

15        A.   Yes.

16        Q.   And if FedEx says they're not singling you

17   out, do you dispute that?

18        A.   Yes.

19        Q.   Do you know if whatever 56 minus 14, if

20   all those other people were written up?  We don't

21   know, do we?

22        A.   We don't.

23        Q.   We just know that your peers weren't

24   written up except for Richard Holley, right?

25        A.   That is correct.
```

Page 349

1      Q.   If we can -- this looks like -- this looks

2   like it -- if 14 of 56 DSMs are not -- are not at

3   plan and only one out of six regions is not at plan,

4   that sounds like a -- does that sound like it's a

5   problem across the country --

6      A.   Yes.

7      Q.   -- at FedEx?

8      A.   Yes.

9      Q.   People not making plan?

10     A.   Yes.

11     Q.   And did you see any wholesale layoffs and

12  terminations because people weren't making plans?

13     A.   No.

14         MR. BABCOCK:   Object to form.

15     Q.   So the next one is My FedEx Rewards, Casey

16  Millner, 145011.

17         Do you see that?

18     A.   Yes.

19     Q.   And that -- you had responsibility for

20  that?

21     A.   Prior to Casey Millner, yes.

22     Q.   But that was taken away from you?

23     A.   That is correct.

24     Q.   Let's go to the next one, 14 -- these

25  are -- do you know whose notes these are?

Page 350

1          A.   Michelle Lamb's.

2          Q.   That she's relying on for you or do you

3     know?

4               MR. BABCOCK:   Object to the form.

5          A.   These are her notes, so that's what she's

6     using.

7          Q.   Okay.  So let's look at where -- pricing

8     activity, right?

9          A.   Uh-huh.

10         Q.   Year-to-date FY20 and you're at 6.6.  Do

11    you see that?

12         A.   Yes.

13         Q.   So where does that rank you in the seven

14    or eight people?

15         A.   Fifth.

16         Q.   Okay.  So there's -- who is below you?

17         A.   Brian Hickman, Casey Millner, and that's

18    all.

19         Q.   Brian Hickman white?

20         A.   Yes.

21         Q.   Put on a plan --

22         A.   No.

23         Q.   -- performance improvement plan?

24              Casey Millner --

25         A.   White.

Page 351

1       Q.    -- white?

2       A.    Yes.

3       Q.    Put on a performance improve plan?

4             MR. BABCOCK:   Object to form.

5       A.    No.

6       Q.    And then we're looking at -- what's the

7    next one?  Sum of average, quarter, what is that?

8       A.    That is closed business tracking for Q1

9    FY19.

10      Q.    And so where are you in this ranking?

11      A.    Number 4.

12      Q.    And four out of eight, is that the top

13   half or the bottom half?

14      A.    The top half.

15      Q.    So if we go to the next one, I guess we

16   have F20 -- FY -- this is the next page, 145019.

17      A.    Uh-huh.

18      Q.    Fiscal year '20?

19      A.    Year to date.

20      Q.    Year to date.  Q1.  Do you see the 10,000?

21      A.    Yes.

22      Q.    Where does that put you?

23      A.    Number 4.

24      Q.    Number 4.

25            The right column, why are those numbers so

Page 352

1   small?

2        A.   Because that's the beginning of when the

3   closed business tracking was starting to be

4   calculated.

5        Q.   So can we look at those numbers?  Do they

6   mean anything?

7                  MR. BABCOCK:  Object to the form.

8        A.   Not at that time, no.

9        Q.   Okay.  If we go to -- because not all the

10  numbers are in?

11       A.   Correct.

12       Q.   The calls, right, F2 calls and

13  opportunities, where are you at?

14       A.   I'm number 2.

15       Q.   If we go to 145026, it says, Performance:

16  Read performance numbers, ending with international

17  numbers leading into MyQuote.

18          Do you see that?

19       A.   Yes.

20       Q.   What does that first column that says,

21  total dom payer primary?

22       A.   Total domestic FedEx payer primary.

23       Q.   What does that mean?

24       A.   That is the column that's used to evaluate

25  the performance.

Page 353

1    Q.    And you're not in there?

2    A.    That is correct.

3    Q.    Is -- who replaced you?

4    A.    Virginia Solgot.

5    Q.    But that didn't happen yet?

6    A.    No.

7    Q.    Which one are you?  There's two open

8    positions.

9    A.    I am District 14.

10   Q.    So it's the one that's 90.1?

11   A.    Yes.

12   Q.    You're already gone?

13   A.    Yes.

14   Q.    And you're still at 90.1, your team?

15   A.    Yes.

16   Q.    And let's see, I don't see anybody --

17   there's -- we'll there's somebody -- Brian Conrey is

18   100 percent because you round up at 99.5, right?

19   A.    Yes.

20   Q.    And Matthew Wheeler is over, right?

21   A.    Yes.

22   Q.    And Jaime is at 100 percent because you

23   round up?

24   A.    Yes.

25   Q.    But what about Casey Millner?

Page 354

1   A.   No.

2   Q.   And she gets the FedEx award -- reward --

3   A.   He does.  Yes.

4   Q.   -- responsibility -- or he does.

5   A.   Yes.

6   Q.   And yet his number's 94.5?

7   A.   That is correct.

8   Q.   Next page, LHR, is that Longhorn region?

9   A.   Yes.

10  Q.   That's the name of --

11  A.   Michelle's region.

12  Q.   -- Michelle Lamb's region -- your region

13  with Michelle?

14  A.   Uh-huh.

15  Q.   And then the next one, it's all yellow

16  but -- 145257.

17       How many AEs haven't closed business in

18  one, two, three months?

19       Do you see that?

20  A.   Yes.

21  Q.   This would be, I guess, a watch or your

22  concern -- what's the purpose of this is your

23  understanding of this block here?

24  A.   She used it in reference in a manager

25  meeting to identify account managers who, based on

Page 355

1    this report, alleged have not closed business in

2    one, two, or three months.

3         Q.   So that you may want to get with them and

4    start working on them; they need to start closing

5    business?

6         A.   Yes.

7         Q.   So I see that you have got three people?

8         A.   Yes.

9         Q.   What about Jaime Golden-McElroy, three

10   people?

11        A.   Yes.

12        Q.   What about Rebecca Callahan, three people?

13        A.   Yes.

14        Q.   Fiscal year '19 FTIP.  What's that?

15        A.   It is what's called FTIP.  It is the

16   automation allowance used --

17        Q.   Oh.

18        A.   -- to help try and encourage customers to,

19   one, grow their automation solutions with FedEx.

20        Q.   So it's budget money that you can use and

21   spend on customers?

22        A.   Yes.

23        Q.   And so you're kind of in the middle of the

24   pack of spending the money?

25        A.   Yes.

Page 356

1    Q.   Does that cut both ways; if you spend the
2    money, then FedEx doesn't have it, but if you don't
3    spend the money, the customers don't have it?
4    A.   That is correct, and it means that they're
5    not utilizing the tools and resources based on what
6    FedEx will cover.
7    Q.   Okay.  That may be all.  No.
8         So if we look at -- on the page 145292.
9    If you can go to that.
10   A.   Yes.
11            MR. BABCOCK:  Hang on, I'm not there.
12            MR. SANFORD:  Oh, sorry.
13            MR. BABCOCK:  Keep flipping?
14            MR. SANFORD:  That's it -- maybe not
15   that's it.  There you go.  There you go.
16   Q.   LHR, that's Longhorn region?
17   A.   Yes.
18   Q.   And it's fourth quarter fiscal year 2019
19   performance?
20   A.   Yes.
21   Q.   So this will be the performance of
22   Michelle Lamb?
23   A.   Yes.
24   Q.   And she's not at 100 percent?
25   A.   Correct.

Page 357

1        Q.   And then we go to the next page, 145296.

2    This is Q1 fiscal year 20 AE performance.

3             AE are the people that report to you?

4        A.   Yes.

5        Q.   And so you're looking at them at whether

6    or not they're above plan or not above plan?

7        A.   Yes.

8        Q.   So comparing you with other people --

9        A.   Yes.

10       Q.   -- right, because she's saying that you

11   have, like, zero people in plan?

12       A.   That is correct.

13       Q.   But we got here you have 93.6 in

14   attainment, right?

15       A.   Yes.

16       Q.   Where does that put you in the pack?  I

17   guess it's in order.  There's two people below you.

18       A.   Yes.

19       Q.   On whether or not they're at plan?

20       A.   That is correct.

21       Q.   We don't know how -- it doesn't show how

22   close they are at plan --

23       A.   No.

24       Q.   -- it's just there, right?

25       A.   Yes.

Page 358

1      Q.   Okay.  And percent of AEs above plan

2   versus below plan, you're at 50 percent?

3      A.   Right.  That contradicts her saying

4   zero --

5      Q.   Right.

6      A.   -- of eight.

7      Q.   And so where does that -- let's see.  The

8   50 percent, where does that put you in the group of

9   the eight?

10     A.   Number 4.

11     Q.   Is it number 4 out of 8 the top half or

12   the lower half?

13     A.   The top half.

14     Q.   So not only is she wrong about the zero,

15   you're -- you're in the top half?

16     A.   Correct.

17     Q.   So how about improvement?  Closing the

18   gaps on improvement, right?

19          Let's look at 145319.  Did we improve?  So

20   we have some down arrows.  What's down arrow

21   signify?

22     A.   It means that instead of improvement from

23   the previous meeting, that it went down.

24     Q.   And if it goes up, what's that?

25     A.   That you did improve.

Page 359

1      Q.   So let's look at the first one, Capital of
2    Texas.  It's got two down arrows and two up arrows.
3           Do you see that?
4      A.   Yes.
5      Q.   And what do you have?
6      A.   I have three up arrows and one down arrow.
7      Q.   So you did better than Capital of Texas
8    group?
9      A.   Yes.
10     Q.   In terms of closing the gap?
11     A.   Yes.
12     Q.   And Alamo has three up arrows and one
13   down, right?
14     A.   Yes.
15     Q.   Same as you?
16     A.   Correct.
17     Q.   And Bayou Bruisers, all down?
18     A.   Correct.
19     Q.   You did better?
20     A.   Yes.
21     Q.   Summit, all down.  You did better?
22     A.   Yes.
23     Q.   Now, who is Capital of Texas?
24     A.    It's either Jaime Golden-McElroy or Brian
25   Golden.  They split Austin.

Page 360

```
 1        Q.    What -- what's their race?

 2        A.    White.

 3        Q.    Put on a plan --

 4        A.    No.

 5        Q.    -- performance improvement plan?

 6              Terminated?

 7        A.    No.

 8        Q.    Bayou Bruisers, who is that?

 9        A.    I don't recall specifically who that was,

10   but it was a white peer.

11        Q.    Okay.  Put on a plan?

12        A.    No.

13        Q.    Unless it's Richard, I guess.  Would it

14   have been Richard?

15        A.    No, Richard is Alamo.

16        Q.    Okay.  Summit, all down.  Who's that?

17        A.    Based on the percentage, that appears to

18   be Brian Conrey, but I can't 100 percent verify

19   that.

20        Q.    He's white?

21        A.    Yes.

22        Q.    Westside Warriors, three down, one up,

23   right?

24        A.    Correct.

25        Q.    Do you know who Westside Warriors is?
```

Page 361

```
 1        A.    No.
 2        Q.    But we know this is -- each one of these
 3   is the eight -- your eight peers?
 4        A.    Yes.
 5        Q.    You're the only nonblack -- you're the
 6   only black person --
 7        A.    Yes.
 8        Q.    -- of the peers, right?
 9        A.    Yes.
10        Q.    And so whoever it is, you're doing better
11   than them?
12        A.    Yes.
13        Q.    And we know it's not Richard Holley
14   because he's Alamo?
15        A.    That is correct.
16        Q.    So they weren't put on a plan --
17        A.    Correct.
18        Q.    -- performance improvement plan or
19   terminated, right?
20        A.    Right.
21        Q.    And then there's Central Texas, which is
22   three down and one up.
23              You did better than Central Texas?
24        A.    Yes.
25        Q.    Not put on performance improvement plan?
```

Page 362

1      A.   No.

2      Q.   Not terminated?

3      A.   No.

4      Q.   Q4 FY20.  This shows your replacement?

5      A.   Yes.

6      Q.   Your replacement is only 87.7.

7      A.   That is correct.

8      Q.   Replacement is not doing as good as you

9   did?

10      A.   No.

11      Q.   And same thing on the next -- the last

12   page, 145340, 87.6, not doing as good as you?

13      A.   Correct.

14      Q.   And are you relying on any of this as part

15   of the reasons for your disputing that you failed

16   to -- all the things on the first page of 64?

17      A.   Yes.

18      Q.   And disputing the -- the plan that you

19   have?

20      A.   Yes.

21      Q.   And disputing your termination?

22      A.   Yes.

23      Q.   And disputing that they conducted a fair

24   investigation?

25      A.   Yes.

Page 363

1                    MR. SANFORD:  Pass the witness.

2                    MR. BABCOCK:  Let's take a break.

3                    THE VIDEOGRAPHER:  We're off the

4        record at 7:11.

5                    (Recess 7:11 p.m. to 7:25 p.m.)

6                    THE VIDEOGRAPHER:  We're back on the

7        record at 7:25.

8                    FURTHER EXAMINATION

9        BY MR. BABCOCK:

10            Q.   Ms. Harris --

11            A.   Yes.

12            Q.   -- direct your attention, do you recall

13       responding to questions from your counsel about the

14       steps Michael Clark took or didn't take when he

15       investigated your concerns that you raised?

16            A.   Yes.

17            Q.   How do you know what steps Michael Clark

18       took during his investigation?

19            A.   Because in his follow-up conversation and

20       then his letter response, there was no difference in

21       the treatment.  And I confirmed with the people that

22       I listed on the details of the interview that he did

23       not reach out to them and even engage them to verify

24       any of the information that I provided.

25            Q.   And who did you reach out to?

Page 364

1      A.   Richard Holley.  I reached out to Brian

2   Conrey, and he was one of the few that did confirm

3   that he was interviewed.  But --

4      Q.   Okay.

5      A.   -- Jaime Golden-McElroy, Rebecca Callahan,

6   all of them.

7      Q.   Do you know who Michael Clark interviewed

8   for your various complaints?

9      A.   I know for sure that he interviewed Brian

10   Conrey, but specifically the others, no.

11      Q.   Do you know what documents Mr. Clark

12   looked at when he was conducting his investigations

13   into your complaints?

14      A.   I know what documents I submitted to him

15   as evidence that contradicted the false allegations

16   that Michelle used in the letter of counseling and

17   letter of warning.

18      Q.   Okay.

19      A.   But outside of that, no, I don't know what

20   other documents he used.

21      Q.   Okay.  As a sales manager at FedEx, how

22   would you learn about open MD jobs in the sales

23   organization?

24      A.   It was on portal -- the portal for Workday

25   is how we were able to look up details for jobs.

Page 365

1       Q.   And did you ever apply for an MD job?

2       A.   No.

3       Q.   Okay.  You testified, I believe, about

4  several instances involving Grant Kuhn.

5          Do you remember that testimony?

6       A.   Yes.

7       Q.   Okay.  One was about Gail Harris; is that

8  right?

9       A.   Yes.

10      Q.   And can you ballpark a time, like a year,

11  when that took place?

12      A.   No, I can't recall.

13      Q.   Okay.  Was it before or after you started

14  raising concerns about Michelle Lamb at FedEx?

15      A.   I don't recall specifically when it was.

16      Q.   Okay.  Do you recall where you were

17  working?

18      A.   At FedEx.

19      Q.   Do you recall where at FedEx you were

20  working or what job you had?

21      A.   No.  Specifically what position I had, no,

22  I don't recall.

23      Q.   And how do you know what Gail Harris's

24  concerns were?

25      A.   Because I talked to Gail Harris, and she

Page 366

1    shared those concerns with several of the district

2    sales manager.

3         Q.   Okay.  Are you aware of anyone else that

4    raised complaints about Grant Kuhn?

5         A.   Not specifically, no.

6         Q.   Okay.  Regarding Erika Tolar -- did I

7    pronounce her name right?

8         A.   Tolar, yes.

9         Q.   Can you spell that for me?

10        A.   T-o-l-a-r.

11        Q.   Okay.  And where was she -- she was a

12   manager in Memphis?

13        A.   No.

14        Q.   Where was she a manager?

15        A.   She was a manager in several places.  She

16   was a manager in the inside sales office in Dallas

17   where she made the comment in reference to black

18   people being monkeys, then she was promoted to be my

19   manager in Houston in the field sales organization.

20        Q.   Okay.  And did you work in the Dallas

21   office at the time that Ms. Tolar made this comment?

22        A.   Yes.

23        Q.   Okay.  And what was your job in the Dallas

24   office at that time?

25        A.   I was an inside sales account executive.

Page 367

1      Q.   Okay.  And did you tell anyone about that

2  comment?

3      A.   I didn't have to tell anyone.  I wasn't on

4  her team.  Her team complained to HR about that and

5  then told us after the meeting.

6      Q.   Okay.  So am I correct you didn't complain

7  to anyone about Ms. Tolar's comments?  Is that fair?

8      A.   Not specifically the comment but the

9  treatment that she gave me, yes.  It went to Pat

10  Galvin.

11      Q.   Okay.  I was first talking about the

12  comment.  I just wanted to clear up you didn't

13  report that to anyone, correct?

14      A.   I did not but her team did file a

15  complaint.

16      Q.   Okay.  And then her treatment of you dealt

17  with the LeadUp application, correct?

18      A.   And my application to the district sales

19  manager role for inside sales in Memphis.

20      Q.   All right.  And you got the district

21  manager position -- you got promoted to the district

22  manager position inside sales before or after the

23  LeadUp --

24      A.   LeadUp was --

25      Q.   -- program?

Page 368

1          A.    -- first.

2          Q.    Okay.

3          A.    The promotion was second.

4          Q.    All right.  And I believe you testified

5     that Ms. Tolar canceled or attempted to cancel your

6     trip to the LeadUp -- LeadUp meeting; is that right?

7          A.    She did cancel; not attempted.

8          Q.    Okay.  And that's where you raised the

9     concern to Pat Galvin, the VP?

10         A.    Yes, that is correct.

11         Q.    And then Pat Galvin -- strike that.

12               After you raised the concern to Pat

13    Galvin, you were permitted to go on the LeadUp?

14         A.    Because he reinstated the trip, yes.

15         Q.    Okay.  So Pat Galvin did that is your

16    understanding?

17         A.    Yes.

18         Q.    Do you know for a fact that Pat Galvin did

19    that or is that just an assumption you're making?

20         A.    No, he told me.

21         Q.    Okay.  Okay.  So you went to the LeadUp

22    place and then program, correct?

23         A.    Correct.

24         Q.    And then you ultimately applied for the

25    management position and received -- was selected for

Page 369

1    that position, right?

2        A.   Yes.

3        Q.   Reflecting now on all the preparation you

4    did for this deposition, can you think of any

5    specific details you could have or should have put

6    in your EEOC amended charge that's not in there?

7        A.   Not at this time.

8            MR. SANFORD:  Objection; form.

9        Q.   Okay.

10           MR. BABCOCK:  Let's go off the record

11   for a quick second.

12           THE VIDEOGRAPHER:  We're off the

13   record at 7:31.

14           (Off the record.)

15           THE VIDEOGRAPHER:  We're back on the

16   record at 7:33.

17           MR. BABCOCK:  Ms. Harris, I don't have

18   any more questions.  Good luck to you.

19           MR. SANFORD:  Let me just ask one

20   thing, follow-up.

21              FURTHER EXAMINATION

22   BY MR. SANFORD:

23       Q.   On the investigation, you talked to

24   Mark -- Michael Clark -- is that his name?

25       A.   Yes.

Page 370

1    Q.   That's the one that -- and after he talked

2    to whoever he talked to and looked at whoever -- he

3    got your side of the story?

4        A.   Correct.

5        Q.   And then after he talked to and looked at

6    whatever documents, did he ever circle back to you

7    and say, look, what I found is conflicting, what do

8    you have to say to explain what these people say?

9        A.   No.

10       Q.   Never gave you that opportunity --

11       A.   No.

12       Q.   -- as part of his investigation?

13       A.   No.

14               MR. SANFORD:   Pass the witness.

15               MR. BABCOCK:   No more questions.

16               THE VIDEOGRAPHER:   Off the record at

17   7:33.

18               (Deposition concluded at 7:33 p.m.)

19

20

21

22

23

24

25

Page 371

1                    DEPOSITION CHANGES

   Job No. CS5236668

2   WITNESS:  JENNIFER HARRIS

3   PAGE NO.  LINE NO.    CHANGE   REASON FOR CHANGE

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Page 372

1

2

3

4                    _____
                        (Signature of the Witness)
5

6

7

8    THE STATE OF _____

9    COUNTY OF _____

10

11        Subscribed and sworn to before me by the said

12   witness, JENNIFER HARRIS, on this the _____ day

13   of _____, 2022.

14

15
                          _____
16                        Notary Public in and for the

                          State of _____
17                        County of _____

18   My commission expires:  _____

19

20

21

22

23

24
        Job No. CS5236668

25

Page 373

1    STATE OF TEXAS    )

2    COUNTY OF DALLAS  )

3         I, Michelle L. Munroe, Certified Shorthand

4    Reporter in and for the State of Texas, certify that

5    the foregoing deposition of JENNIFER HARRIS was

6    reported stenographically by me at the time and place

7    indicated, said witness having been placed under oath

8    by me, and that the deposition is a true record of

9    the testimony given by the witness;

10        That the amount of time used by each party at

11   the deposition is as follows:

          Mr. Babcock   -     6 hours, 16 minutes

12        Mr. Sanford   -    11 minutes

13        I further certify that I am neither counsel for

14   nor related to any party in this cause and am not

15   financially interested in its outcome.

16        Given under my hand on this the 6th day

17   of June, 2022.

18

19

20

21

          Michelle L. Munroe, CSR No. 6011

22        Commission expires 1-31-24

          Firm Registration #571

23        VERITEXT LEGAL SOLUTIONS

          300 Throckmorton Street, Suite 1600

24        Fort Worth, Texas  76102

          817.336.3042  telephone

25

Page 374

1    Brian Sanford, ESQ.

2    bsanford@sanfordfirm.com

3                      June 6, 2022

4    RE:    Harris, Jennifer v. Fedex Corporate Services, Inc.

5        5/19/2022, Jennifer Harris (#5236668)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   Erratas-cs@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19    If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25