# Exhibit 24

Michelle Lamb - 4/27/2022

**1**

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                      HOUSTON DIVISION
3 JENNIFER HARRIS,              *
                               *
4        Plaintiff,            *
                               *
                               *    CIVIL ACTION
5 vs.                          *    4:21-cv-1651
                               *
6 FEDEX CORPORATE SERVICES,    *
  INC.,                        *
7                              *
        Defendant.             *
8
9
10       ***********************************
11       ORAL AND VIDEOTAPED DEPOSITION OF
                  MICHELLE LAMB
12               APRIL 27, 2022
               (Conducted Remotely)
13
         ***********************************
14
15
16       ORAL AND VIDEOTAPED DEPOSITION OF MICHELLE
17 LAMB, produced as a witness at the instance of the
18 Plaintiff, and duly sworn, was taken in the above-styled
19 and -numbered cause on the 27th day of April, 2022, from
20 8:29 a.m. to 11:13 a.m., before Leah K. Osteen Dow, CSR
21 in and for the State of Texas, reported remotely by
22 machine shorthand, with the witness being located in
23 Houston, Texas, taken pursuant to the Federal Rules of
24 Civil Procedure and any provisions, stipulations, or
25 agreements stated on the record by counsel.

**3**

1                          I N D E X
2                                              PAGE
3 Appearances ........................................   4
4
5
MICHELLE LAMB
6
     Examination by Ms. Sanford ...................   5
7
8
Errata ........................................ 96 - 97
9
Reporter's Certification ...................... 98 - 99
10
11
12
13                         EXHIBITS
   EXHIBIT NO.           DESCRIPTION              PAGE
14
                      (None offered.)
15
16
17
18
19
20
21
22
23
24
25

**2**

1              A P P E A R A N C E S
               (Appearing remotely)
2
3
4 FOR THE PLAINTIFF:
5    Ms. Elizabeth "BB" Sanford (videographer)
     THE SANFORD FIRM
6    1910 Pacific Avenue
     Suite 15400
7    Dallas, Texas  75201
     (214) 717-6653
8    esanford@sanfordfirm.com
9
10
11 FOR THE DEFENDANT:
12    Mr. Barak J. Babcock
      FEDERAL EXPRESS CORPORATION
13    3620 Hacks Cross Road
      Building B, 3rd Floor
14    Memphis, Tennessee  38125
      (301) 739-0512
15    barak.babcock@fedex.com
16
17
18
   ALSO PRESENT:
19
      Ms. Jennifer Harris
20
21
22
23
24
25

**4**

1              P R O C E E D I N G S
2         THE REPORTER:  Going on the record at 8:29
3    a.m., April 27, 2022, for the deposition of Michelle
4    Lamb, being conducted remotely in the matter of Jennifer
5    Harris vs. FedEx Corporate Services, Inc.
6         My name is Leah Osteen, Texas CSR 3916,
7    reporting remotely from Hurst, Texas.  The witness is
8    located in Houston, Texas.
9         Would counsel state their appearances and
10   any agreements for the record.
11        MS. SANFORD:  BB Sanford for the
12   Plaintiff, Jennifer Harris.  And Brian Sanford may be
13   joining later, too, but he's not here now.
14        MR. BABCOCK:  Good morning.  Barak Babcock
15   for FedEx.
16        And, Counsel, we've had email traffic, but
17   just to reiterate what we wrote in our March 6, 2022,
18   email, we believe that Zoom deposition recordings
19   recorded in the Zoom app are objectionable to be
20   submitted to the Court or a jury.  So we'll just put
21   that objection on the record.
22        THE REPORTER:  Ms. Lamb, if you'll raise
23   your right hand, I'll swear you in.
24        (Witness placed under oath.)
25             MICHELLE LAMB,

                                    1 (Pages 1 to 4)

Michelle Lamb - 4/27/2022

5

1  having been first duly sworn, testified as follows:
2       EXAMINATION
3  BY MS. SANFORD:
4     Q.  All right.  Good morning, Ms. Lamb.  My name is
5  BB Sanford.  I'll be the one asking you most of the
6  questions today.
7     A.  Okay.
8     Q.  Have you ever had your deposition taken before?
9     A.  No, I have not.
10    Q.  Okay.  I assume your attorney probably told you
11 how this is going to go.  But he may make certain
12 objections throughout the course of the deposition.  You
13 may still continue to answer even if he objects unless
14 he instructs you not so.
15       Do you understand that?
16    A.  Yes, I do.  Thank you.
17    Q.  And where are you located today?
18    A.  I'm located in Houston, Texas.
19    Q.  Are you at your office?  Are you at your
20 attorney's office?
21    A.  I am in a FedEx office, not my FedEx office.
22    Q.  Where is your FedEx office located?
23    A.  I work out of my home presently.
24    Q.  And when you don't, do you have an office?  Do
25 you have a spot that you go to at a building that's not

6

1  your home when you work?
2     A.  No, I do not.
3     Q.  When did that change?
4     A.  That changed at some point during COVID.
5     Q.  In the time that you were Ms. Harris's manager,
6  where did you office?
7     A.  I officed in a location that was shared with
8  FedEx SmartPost, and that was also in Houston, Texas.
9     Q.  Does that building have a certain name?
10    A.  It is -- it's referred to as "FedEx SmartPost."
11    Q.  Where did you go to school, Ms. Lamb, college
12 and any post college?
13    A.  I went to college at Bowling Green State
14 University in Ohio.
15    Q.  What was your degree?
16    A.  My degree was international business and
17 marketing.
18    Q.  Did you get any postgraduate degrees?
19    A.  No.
20    Q.  And prior to work- -- when did you start
21 working at FedEx?
22    A.  I started working at FedEx in January of 2006.
23    Q.  What was your starting position there?
24    A.  Starting position was an account executive in
25 Detroit, Michigan.

7

1     Q.  Was that a managerial position?
2     A.  No, it was not.
3     Q.  Prior to FedEx, have you ever been in a
4  managerial position?
5     A.  No, I had not.
6     Q.  When did you become manager at FedEx?
7     A.  I became a manager at FedEx -- I'd have to
8  double-check the exact date, but approximately I'd say
9  two thousand- -- excuse me, 2014 would be my assumption,
10 but I'd have to double-check my records to confirm.
11    Q.  Could you walk me through your timeline at
12 FedEx?  Started off as account executive.  What happened
13 after that?
14    A.  Yes.  I was hired in as an account executive.
15 I was identified as a high performer and promoted to a
16 sales manager position, also in Detroit, Michigan.
17    Q.  And is that the around 2014 one?
18    A.  Correct.
19    Q.  And what happened after that?
20    A.  I maintained that position until May of 2017
21 when I was promoted to the managing director of field
22 sales in Houston, Texas.
23    Q.  When you were a sales manager in Detroit, did
24 that have anything -- what type of sales were you doing?
25    A.  That was face-to-face sales activity, calling

8

1  on FedEx's accounts within a specified geography.
2     Q.  How does that position compare to being a
3  manager of -- director of field sales?
4     A.  As a director, I am leading a group of managers
5  who lead account executives who perform the same
6  functions that I had performed as an account manager
7  myself.
8     Q.  So when you were a sales manager in Detroit, is
9  that a comparable position to what Ms. Harris was doing
10 when she was under you?
11    A.  Yes, it is comparable.
12    Q.  And why did you move to Texas all the way from
13 Detroit?
14    A.  I was promoted to managing director of field
15 sales.
16    Q.  Is there a reason the location was -- that
17 seems like a big move to me.  Is there ...
18    A.  It was a big move, but that's where the
19 position was domiciled, and so my family relocated from
20 Michigan to Houston.
21    Q.  Have you ever lived in Texas before?
22    A.  No, I had not.
23    Q.  Where did you grow up?
24    A.  I grew up in Ohio.
25    Q.  And are you still the director of field sales?

2  (Pages 5 to 8)

Michelle Lamb - 4/27/2022

9

1    A.  No.  I have since moved into a director of
2  worldwide sales position.
3    Q.  Is that a promotion?
4    A.  Not --
5        MR. BABCOCK:  Object to form.
6        Go ahead and answer, ma'am.
7    A.  Not technically.
8    Q.  What does that mean, "not technically"?
9    A.  There are no additional pay associated with my
10  move to worldwide sales.
11    Q.  So would you characterize it as a lateral move?
12    A.  Yes.
13    Q.  What are your job functions as a director of
14  worldwide sales?
15    A.  My primary job function is to ensure that my
16  organization grows revenue for the company.
17    Q.  So when you were a managing director of field
18  sales, what territories did you have?
19    A.  I had central and southern Texas as my
20  geography.
21    Q.  And as a director of worldwide sales, what are
22  your territories?
23    A.  I touch roughly 15 states throughout the U.S.
24  Large geography.
25    Q.  When did you change positions to director of

10

1  worldwide sales?
2    A.  I changed positions in June of 2021.
3    Q.  And could you tell me how that transition
4  occurred?  Did you request it?  Did FedEx approach you?
5    A.  FedEx went through a restructure of our sales
6  team, and as a result, I was moved into this new
7  position in worldwide sales.
8    Q.  Do you know why there was a restructuring?
9    A.  I can't speak to that specifically.
10    Q.  And why can't you speak to that?
11    A.  I wasn't involved in the decision to
12  restructure sales.
13    Q.  So what is your understanding, since you
14  weren't involved in those discussions, of why there was
15  a restructuring?
16    A.  My understanding is that we have created
17  specific verticals within our worldwide sales
18  organization.  One of them, which is the vertical in
19  which I reside, is our commercial vertical, meaning I
20  call on businesses that primarily ship B2B.
21    Q.  Okay.  That was a lot of -- it sounds like
22  FedEx lingo.  Could you explain to me "vertical" and
23  then what "B2B" means?
24    A.  Sure.  A vertical is a specialty group of sales
25  professionals that call on specific industries or

11

1  specific segments of business.  And my vertical in which
2  I work specifically targets business-to-business
3  shipments.
4    Q.  So sounds like -- when you say a "vertical," is
5  that kind of like chain of command, like, everyone in
6  your department?
7    A.  Yes.  Everyone on my team is devoted to
8  pursuing business from a B2B perspective.
9    Q.  And "B" stands for "business"?
10    A.  Correct.
11    Q.  It's not like A to B, B to C?  It's just
12  business to business?  That's just a shorthand?
13    A.  Correct.
14    Q.  When you were a manager of -- managing director
15  of field sales, how many direct reports did you have?
16    A.  I had eight direct reports.
17    Q.  Currently how many direct reports do you have?
18    A.  I currently have seven direct reports.
19    Q.  And what are -- what's the job title of those
20  direct reports?  Are they all the same?  Are they
21  different?  Of your current direct reports.
22    A.  They are managers, worldwide sales managers.
23    Q.  And who is -- who do you report to currently?
24    A.  I report to a vice president of sales by the
25  name of Patrick Charles.

12

1    Q.  And who does Mr. Charles report to?
2    A.  He reports to a senior vice president of sales
3  by the name of Nick Gennari.
4    Q.  Spell "Gennari."
5    A.  G-e-n-n-a-r-i.
6    Q.  And who does Nick Gennari report to?
7    A.  Nick Gennari reports to Jill Brannon.
8    Q.  How do you spell that last name?
9    A.  B-r-a-n-n-o-n.
10    Q.  And what is Jo [sic] Brannon's title?
11    A.  She is our chief sales officer.
12    Q.  Just to clarify, Jo Brannon is a female?
13    A.  Correct.
14    Q.  And does Ms. Brannon report to the CEO of FedEx
15  Services?
16    A.  Yes.
17    Q.  And who is that right now?
18    A.  It is Fred Smith.
19    Q.  All right.  So when you were the director of
20  field sales, you had eight direct reports.
21        And who did you report to?
22    A.  I reported to a vice president of sales by the
23  name of Dave Russell.
24    Q.  And who did Dave Russell report to?
25    A.  Dave reported to a senior vice president of

Osteen & Associates Reporting Services
817-498-9990

**Appx-846**

Michelle Lamb - 4/27/2022

13

1  sales by the name of Dan Mullally.
2      Q.  Could you spell "Mullally" for me?
3      A.  M-u-l-l-a-l-l-y.
4      Q.  And who did Mr. Mullally report to?
5      A.  He reported to Jill Brannon.
6      Q.  Oh, I'm sorry.  I must have mis- -- I thought
7  you said Jo Brannon.  It's Jill Brannon?
8      A.  Jill, J-i-l-l.
9      Q.  Thank you.  And she is the chief sales officer
10  who reports to the CEO?
11      A.  Correct.
12      Q.  The eight direct reports that you had as the
13  director of field sales, what were their job titles?
14      A.  They were district sales managers.
15      Q.  And how many direct reports did each district
16  sales manager have?
17      A.  It varied.  Anywhere from six, eight.
18      Q.  So each district sales manager had about six to
19  eight sales representatives?
20      A.  Yes, thereabouts, six to eight.
21      Q.  And the sales representatives, did they have
22  anyone reporting to them?
23      A.  No.
24      Q.  Are the sales representatives classified as
25  individual contributors?

14

1      A.  Yes, that's correct.
2      Q.  And the district sales managers are not
3  classified as individual sales contributors -- or
4  individual contributors?
5      A.  Correct.
6      Q.  What is your understanding of what an
7  "individual contributor" means?
8      A.  An "individual contributor" is someone who is
9  responsible for growing revenue in their defined
10  territory and also retaining business for FedEx.
11      Q.  When Ms. Harris worked for you, she was one of
12  the eight district sales managers from 2017 until she
13  was terminated in 2022; is that correct?
14          MR. BABCOCK:  Object to the form.
15      A.  Yes, that's correct.
16      Q.  I think you said you were promoted from being
17  an account executive to a sales manager because you were
18  a high performer.
19          Could you tell me -- did you win -- or
20  what makes you say you were a high performer?  Did you
21  have high performance reviews?  Did you get any
22  accolades?
23      A.  Yes.  I had high performance reviews, and I was
24  someone that my director had seen as having leadership
25  potential.

15

1      Q.  And who was that director?
2      A.  At that time, it was Dale Hyde.
3      Q.  H-i-d-e or H-y-d-e?
4      A.  H-y-d-e.
5      Q.  What type of performance were you getting --
6  let me rephrase that.
7          How [sic] did performance reviews look
8  like during that time frame of 2006 up until when you
9  were promoted to be a manager?
10      A.  Performance was based on your attainment to
11  goal.  At that time, we also had apex reviews, which
12  were formal reviews.
13      Q.  And the apex in your scenario would be your
14  boss?
15      A.  It would have been conducted by my boss.
16      Q.  So the apex review is just a review by your
17  boss?
18      A.  Correct.
19      Q.  And it was a scale of one to ten or one out of
20  five?
21      A.  It was so many years ago, I couldn't speak to
22  the specifics of how it was laid out.
23      Q.  Do you remember if you were getting exceeds
24  expectations, satisfactory, meets, below, however FedEx
25  did it?  Do you remember that?

16

1      A.  No, I do not recall.  Again, it was many years
2  ago.
3      Q.  When you moved to Texas, did you do performance
4  reviews for your direct reports?
5      A.  No, I did not.
6      Q.  Why not?
7      A.  As a corporation, we had discontinued the use
8  of a formal review process.
9      Q.  So is that FedEx-wide, like, FedEx
10  Services-wide?
11      A.  Yes.
12      Q.  Were you given any information on why FedEx
13  decided to stop formal performance reviews?
14      A.  Nothing official; however, we were meeting with
15  our direct reports on a regular basis to assess
16  performance.
17      Q.  Was there any structure to that assessment?
18  Any guides?  Paperwork?
19      A.  There was no formal structure; however, there
20  were certain attributes or activities that were
21  certainly measured and monitored in terms of determining
22  performance.
23      Q.  Did FedEx have a policy on what attributes to
24  measure and how to measure those attributes?
25          MR. BABCOCK:  Object to the form.

4  (Pages 13 to 16)

Michelle Lamb - 4/27/2022

17

1    A.  Not a policy, no.
2    Q.  So how did you know what attributes to measure
3  and how to measure for your direct reports in 2017 to
4  2020?
5    A.  There are certain attributes that correlate
6  with success in the role, and those are measurable.  And
7  those are the things that were focused on for the
8  purpose of performance conversations.
9    Q.  So what attributes are you talking about that
10  are measurable for performance contributions, I think
11  you said?
12    A.  I won't claim to state all of them, but some of
13  them that are top of mind in terms of measuring
14  performance and indicating future performance would
15  include attainment, would include call activity, pricing
16  activity, coaching interactions, ensuring that we are
17  holding our people, you know, accountable for doing the
18  things that it takes to -- to succeed in the role.
19    Q.  When you say "attainment," is that like a sales
20  goal?
21    A.  Correct.
22    Q.  Are you setting the sales goals for your direct
23  reports?
24    A.  No, I am not.
25    Q.  Who is setting those?

18

1    A.  Our compensation team sets them.
2    Q.  And how are those set, if you know?
3    A.  They are set based on the revenue generated by
4  a specific -- excuse me -- a specific set of customers,
5  plus a stretch goal to ensure that we are growing
6  revenue for the company.
7    Q.  So I think I have the attributes that you
8  measure for your direct reports as attainment, call
9  activity, pricing activity, coaching interactions, and
10  holding people accountable.
11        Do you just use -- measure those
12  attributes for your direct reports -- let me rephrase
13  that.
14        How do you know to measure those specific
15  attributes?  Personal experience?  Were you trained?
16  Did you just make them up?  Do you see other people
17  doing it?  Something else?
18        MR. BABCOCK:  Object to --
19    A.  I'm sorry.  Could you rephrase the question?
20    Q.  Yeah.  How do you know the attributes that you
21  listed are attributes that should be measured for your
22  direct reports?
23    A.  Sure.  There is a direct correlation between
24  those activities and success in the role.
25    Q.  And you know those directly correlate to

19

1  success in the role because of your personal experience?
2    A.  Yes.
3    Q.  FedEx did not have any specific training to
4  tell you what attributes to measure for your direct
5  reports?
6        MR. BABCOCK:  Object to form.
7    A.  I wouldn't say that.  You know, those specific
8  activities I referenced were measured throughout my VP
9  organization.
10    Q.  But there was no formal training by FedEx on
11  how to evaluate the performance of your reports, direct
12  reports?
13        MR. BABCOCK:  Object to the form.
14    A.  No.
15    Q.  And FedEx did not have a policy on how you
16  measured the performance of your direct reports, true?
17    A.  True.
18    Q.  All right.  So you moved to Texas in -- what
19  did you say? -- 2017, May 2017.
20        And when you moved to the manager --
21  managing director of field sales role, was Jennifer
22  Harris already a district sales manager?
23    A.  I moved into the managing director position in
24  May of 2017, as you stated.  As a result of a
25  restructure of our sales team, Jennifer began reporting

20

1  to me as a district sales manager in June of 2017.
2    Q.  Do you know Ms. Harris's role at FedEx prior to
3  June '17?
4    A.  No.
5    Q.  Did you know that she had a previous managerial
6  role prior to being on your team?
7    A.  I did.
8    Q.  How did you know that?
9    A.  I knew she had a managerial role.  I won't
10  claim to know -- to recall the title, nor would I know
11  of her key responsibilities.
12    Q.  Do you know how long she had a managerial role
13  prior to your team?
14    A.  I do not recall.
15    Q.  Did you know at the time how long she had
16  worked at FedEx?
17        MR. BABCOCK:  What time?
18    Q.  At the time that Ms. Harris reported to you in
19  June 2017, did you know how long Ms. Harris had worked
20  at FedEx?
21    A.  I did.  I don't recall how long at this
22  particular moment.
23    Q.  In the 2017 to 2020 time frame, what did --
24  what was your understanding of Ms. Harris's
25  performance -- job performance at FedEx prior to being

5  (Pages 17 to 20)

Michelle Lamb - 4/27/2022

21

1  on your team?
2        MR. BABCOCK: Object to the form.
3     A. I wouldn't be able to speak to that.
4     Q. You didn't know if she had good performance
5  reviews or bad performance reviews?
6     A. I knew that she had had promotions to get to
7  where she was, but I could not speak to any specifics to
8  her performance prior to reporting to myself.
9     Q. And so if an employee of FedEx is getting
10 promotions, what does that tell you about their
11 performance?
12    A. Means that they performed their job to the
13 expectations of that particular position, probably were
14 very successful.
15    Q. Have you ever seen FedEx promote someone who
16 was a low performer?
17    A. I have not.
18    Q. Did you know if Ms. Harris had received any
19 discipline prior to being on your team? Performance
20 discipline, like a write-up or an action plan.
21    A. I recall seeing a communication in her file
22 that was -- would have been considered a documented
23 discussion, documented email. That happened prior to
24 her reporting to me. But that's all I can recall at
25 this moment.

22

1     Q. And what do you remember about this documented
2  discussion? The facts surrounding it? Who sent it?
3  The time frame?
4     A. Without looking at the document at this moment,
5  I would not be comfortable telling you what it said.
6     Q. In 2017, could you list off your direct
7  reports, the names of them? So one was Jennifer Harris.
8  Who were the others?
9     A. Brian Hickman, Brian Conrey, Rebecca Callahan.
10 Forgive me, this goes back several years. I had Brian
11 Golden, Jaime Golden-McElroy, Richard Holley. And
12 there's one other in Houston. I'm drawing a blank.
13    Q. Casey Millner?
14    A. No.
15    Q. Matt Wheeler?
16    A. No.
17    Q. Who are those two people?
18    A. They were added to the team.
19    Q. When did they come to the team?
20    A. I couldn't tell you the exact dates, but they
21 were hired in after I was managing director.
22    Q. Like 2018 or 2019? Do you remember which year?
23    A. Not without looking at my records, I don't.
24    Q. They were -- but they were there at the time
25 Ms. Harris worked there under you?

23

1     A. Yes.
2     Q. And they were peers of Ms. Harris, true?
3     A. Yes.
4     Q. Richard Holley, what was his race -- or what is
5  his race?
6     A. He is a white male.
7     Q. Brian Golden?
8     A. White male.
9     Q. Jaime Golden-McElroy?
10    A. White female.
11    Q. Casey Millner?
12    A. He's a white male.
13    Q. Brian Conrey?
14    A. White male.
15    Q. Brian Hickman?
16    A. White male.
17    Q. Matt Wheeler?
18    A. He's a white male.
19    Q. Rebecca Callahan?
20    A. White female.
21    Q. Was Jennifer Harris the only African American
22 or black employee on your team in 2017 to 2020?
23    A. Yes, she was.
24    Q. Did you have any other non-white employees from
25 2017 to 2020?

24

1     A. Not as direct reports.
2     Q. Currently, what is the racial makeup of your
3  direct reports?
4     A. In my position in worldwide?
5     Q. Yes.
6     A. I have seven sales managers, as I mentioned
7  before. Let's see. One Hispanic male. I've got --
8  let's see. I believe the remainder are probably white
9  males and females.
10    Q. You said "probably." You're not sure?
11    A. I would just need to check their -- how they
12 have identified themselves in our Workday system. But,
13 yes, I believe that the remainder are white males and
14 white females.
15    Q. So you do not have any African American or
16 black employees reporting to you currently?
17    A. No, I do not.
18    Q. Since Jennifer Harris, have you had an African
19 American or black employee report to you?
20    A. No, I have not.
21    Q. And currently do you have anyone reporting to
22 you that is over the age of 50?
23    A. Yes, I do.
24    Q. How many?
25    A. I believe two. I hesitate because I've not set

6  (Pages 21 to 24)

Michelle Lamb - 4/27/2022

25

1  their -- their birthdays to memory, but I believe that
2  there are two of seven in my current team that are over
3  50.
4      Q.  As a manager, have you ever had any direct
5  reports make a complaint about you at FedEx?
6      A.  As a manager?  No.
7      Q.  Well, did Jennifer Harris make a complaint
8  about you?
9      A.  As a director, yes.
10     Q.  Okay.  Let me clarify.  At any of your roles
11 where you held managerial responsibilities.
12          With that understanding, have any of your
13 direct reports made complaints about you?
14     A.  Yes.
15     Q.  All right.  Who were they?
16     A.  Jennifer Harris and Richard Holley.
17     Q.  Anybody prior to those two people?
18     A.  No.
19     Q.  And none since?
20     A.  No.
21     Q.  What is your understanding of Richard
22 Holley's --
23          MS. SANFORD:  Yes?
24          MR. BABCOCK:  I'm sorry.  I think that was
25 a double negative, so I'll object to that --

26

1          MS. SANFORD:  Okay.
2          MR. BABCOCK:  -- about complaints since
3  Holley and Harris.  The way you phrased that and the way
4  she answered I think were a double negative.
5          MS. SANFORD:  Oh, I understand.
6      Q.  You don't have any other complaints besides
7  Richard Holley and Jennifer Harris that you know of,
8  true?
9      A.  True.
10     Q.  What is your understanding of Richard Holley's
11 complaints against you?
12     A.  My understanding is that Richard Holley felt I
13 was discriminating against him.
14     Q.  On what basis?
15     A.  Based on age.
16     Q.  Was there, like, an HR investigation at FedEx
17 surrounding Mr. Holley's complaints about you?
18          MR. BABCOCK:  Object to the form.
19     Q.  That you know of?
20     A.  Yes.
21     Q.  And were you interviewed as a part of those
22 investigations or that investigation?
23     A.  Yes, I was.
24     Q.  Were you told the results of that
25 investigation?

27

1      A.  Yes.
2      Q.  What were the results that you were told?
3      A.  I was told that the investigation resulted in
4  no findings of unfair treatment.
5      Q.  Were you told -- HR seems to be using the words
6  "substantiated" or "not substantiated."
7          Were you told that his claims were not
8  substantiated?
9          MR. BABCOCK:  Object to the form.
10     A.  I don't recall that terminology specifically.
11     Q.  Did you receive any coaching because of
12 Mr. Holley's complaints?
13     A.  Yes, I did.
14     Q.  What coaching did you receive?
15     A.  I was coached by my VP, Dave Russell, on the
16 format of a meeting that took place with Richard
17 Holley's team in which Richard was not present.  And I
18 was advised to not perform those types of meetings in
19 the future.
20     Q.  So what was wrong about the meeting or -- what
21 was the type of meeting -- let me see if I can phrase
22 this better.
23          I guess, what was wrong with the meeting?
24 Why did it change?  Was it because Mr. Holley wasn't
25 there?  Because of what you said?

28

1      A.  Mr. Holley wasn't there.
2      Q.  Okay.  And so in the future, what were you
3  instructed to do?
4      A.  I was instructed not to conduct meetings of
5  that form.
6      Q.  I am a little confused.  So in the future, all
7  meetings have to be with Richard Holley, or only certain
8  types of meetings have to be with Richard Holley
9  included?  What's the form that has to change?
10     A.  The fact that Richard Holley was not included
11 in the meeting was something that I should discontinue.
12 So in the future, I have a meeting with Richard Holley's
13 team, he would be in the room.
14     Q.  Okay.  So what type of meeting was this?
15     A.  It was -- call it a "touch-base meeting" to
16 have an open conversation with the team of what's going
17 well, what's not going well, and any feedback that they
18 might want to bring to a director.
19     Q.  So you were meeting with Mr. Holley's direct
20 reports without Mr. Holley?
21     A.  That's correct.
22     Q.  And this is an in-person meeting?  This is
23 pre-COVID?
24     A.  Yes, that's correct.
25     Q.  What is your understanding of the complaints

7  (Pages 25 to 28)

Michelle Lamb - 4/27/2022

29

1  Ms. Harris brought about you?
2      A.  My understanding is Ms. Harris felt that she
3  was treated unfairly.
4      Q.  Were you told any specifics of why she thought
5  she was being treated unfairly?
6      A.  She felt that I wasn't treating her the same as
7  her peers.  That pretty much summarizes what I was told.
8      Q.  Were you told it was because of her race that
9  she felt she was being treated unfairly?
10     A.  Initially I don't recall seeing race as a
11 factor.  Just unfair treatment.
12     Q.  Were you told it was a discrimination
13 complaint?
14     A.  I don't recall that word being used.
15     Q.  Do you recall retaliation complaint?
16     A.  Yes.
17     Q.  And what was your understanding of a
18 retaliation complaint?
19     A.  Jennifer had made some allegations against me
20 and shortly thereafter was issued some performance
21 feedback, disciplinary action.  And she felt that that
22 was done in retaliation for her complaint.
23     Q.  So the timeline is Jennifer Harris makes a
24 complaint about you; she's written up or gets a
25 disciplinary action, and then -- immediately after; and

30

1  so then she complains about retaliation.  True?
2          MR. BABCOCK:  Object to the form.
3      A.  That's my understanding.
4      Q.  Prior to her making a complaint about you, had
5  she received any disciplinary action from you?
6          MR. BABCOCK:  Object to form.
7      A.  Not official disciplinary action; however, we
8  had multiple conversations on performance concerns.
9      Q.  Just oral conversations?
10     A.  That's correct.  I retract.  There were email
11 conversations as well.
12     Q.  But no documented discipline prior to
13 Ms. Harris complaining about you of unfair treatment,
14 true?
15     A.  Correct.
16     Q.  What were some of these -- or could you
17 describe to me or to the jury, prior to documented
18 discipline, these oral and sometimes email discussions
19 you were having about Ms. Harris's performance?
20         MR. BABCOCK:  Object to the form.
21     A.  Generally speaking, our written and verbal
22 coaching conversations centered around performance
23 metrics, and they also centered around some of the
24 activities that I previously referenced as being
25 critical indicators of long-term success.

31

1      Q.  Okay.  So which attributes are you speaking
2  about that Ms. Harris needed improvement on?
3          MR. BABCOCK:  Object to the form.
4      A.  Number one, performance, attainment.
5      Q.  So that's sales goals?  She wasn't meeting her
6  sales goals?
7      A.  That's correct.
8      Q.  And meeting your sales goals is pretty
9  important to FedEx for people in the sales department,
10 true?
11         MR. BABCOCK:  Object to the form.
12     A.  True.
13     Q.  Was she having any issues with call activity?
14         MR. BABCOCK:  Object to the form.
15     A.  I do not recall call numbers being an issue.  I
16 would further say probably call quality, but call
17 numbers were not an issue.
18     Q.  So are you -- were you addressing your concerns
19 with her call quality?
20     A.  Yes, yes.
21     Q.  And what were those concerns?  What did you
22 tell her?
23     A.  Quality sales calls typically will result in
24 pricing activity, opportunities uncovered, and the other
25 activities that I mentioned that lead to performance.

32

1      Q.  Sorry.  Could you explain that to me?
2      A.  Yes.  A productive, well-planned sales call
3  will lead to the uncovering of opportunities, the need
4  to input pricing into our system, and ultimately will
5  lead to closed business.
6      Q.  And so what was Ms. Harris not doing?
7          MR. BABCOCK:  Object --
8      A.  Closing business.
9      Q.  Did Ms. Harris have problems with pricing
10 activity?
11         MR. BABCOCK:  Object to the form.
12     A.  Yes.
13     Q.  What were those problems?
14     A.  There was not adequate call activity generated
15 by her team to impact her performance.
16     Q.  So that sounds the same thing as the call
17 activity.
18         How is call activity different from
19 pricing activity?
20     A.  They're quite closely related from a standpoint
21 of if you execute a great call, you're going to find an
22 opportunity, and that opportunity will result in a need
23 to input pricing for a customer.
24     Q.  So if Ms. Harris is not -- or an employee is
25 not doing good at call activity, they're also by default

8  (Pages 29 to 32)

Michelle Lamb - 4/27/2022

33

1  not going to do well at pricing activity, true?
2      MR. BABCOCK:  Object to the form.
3  A.  It depends, but ...
4  Q.  Could you tell me a scenario where if an
5  employee is doing poorly at call activity, they would
6  still do well at pricing activity?
7  A.  No.
8  Q.  You can't think of any scenario, true?
9  A.  Unless they're putting pricing in unnecessarily
10  to inflate numbers, then that's true.
11  Q.  I think one of the attributes you mentioned was
12  coaching interactions that you measured.
13      Was Ms. Harris -- did she have problems
14  with coaching interactions, according to you?
15      MR. BABCOCK:  Object to the form.
16  A.  Not from a quantity perspective.
17  Q.  Any other perspective did she have problems?
18  A.  Not having sat in on her coaching conversations
19  with her team, I wouldn't be able to answer that
20  question further.
21  Q.  Okay.  So these coaching interactions are
22  Harris coaching her direct reports?
23  A.  Correct.
24  Q.  And that's what you measure as a part of
25  Ms. Harris's performance, true?

34

1  A.  Yes.
2  Q.  So, objectively speaking, Ms. Harris was
3  meeting with her team the appropriate amount of times,
4  true?
5      MR. BABCOCK:  Object to the form.
6  A.  I believe so.
7  Q.  And you did not sit in on any of the
8  interactions with her team, true, those coaching
9  interactions?
10  A.  I -- I sat in on a couple but certainly not the
11  majority.
12  Q.  The ones you sat in on, did you find any
13  problems with?
14  A.  No.
15  Q.  Did anybody report to you any problems of her
16  coaching interactions with her team?
17  A.  No.
18  Q.  As far as you know, there were no quality
19  concerns of Ms. Harris's coaching interactions with her
20  team?
21      MR. BABCOCK:  Object to the form.
22  A.  Could you repeat the question?
23  Q.  So as far as you know, there were no quality or
24  quantity concerns of Ms. Harris meeting with her team
25  for these coaching interactions?

35

1      MR. BABCOCK:  Object to the form.
2  A.  I received a complaint that oftentimes
3  Jennifer's coaching conversations took place late in the
4  day and sometimes even extended into the evening.
5  That's the only complaint that I recall about her
6  specific coaching interactions with her team.
7  Q.  And was that just one complaint or numerous
8  complaints?
9  A.  That came up in a group conversation with her
10  team, but one individual mentioned it.
11  Q.  Who was that individual?
12  A.  That was -- you know what?  I'm not going to
13  guess.  I have it in my notes, and I'd like to refer to
14  those before naming the individual.  But I do have
15  record of who said it.
16  Q.  Okay.  So the only complaint about Ms. Harris's
17  coaching interaction with her team was this one person
18  saying she met with her team too late in the afternoon
19  and sometimes extended into the evening, true?
20  A.  No.  As a matter of fact, there was another
21  complaint from an individual who said that their
22  coaching conversations were not strategic in nature.
23  Q.  Do you remember who said that?
24  A.  That was Steve Whaley.
25  Q.  How do you spell that last name?

36

1  A.  W-h-a-l-e-y.
2  Q.  Was this in the same meeting or a different
3  meeting?
4  A.  No, this was a different meeting.
5  Q.  One-on-one or a group meeting?
6  A.  One-on-one.
7  Q.  Is this meeting documented anywhere?
8  A.  I don't recall.  It was an informal meeting
9  where Steve and I happened to see each other at an
10  office, and we engaged in a conversation in which he
11  provided me with that feedback.
12  Q.  And do you remember about what time this was?
13  2017?  2018?
14  A.  2018.
15  Q.  And the other person who said sometimes she
16  starts her meetings late in the day, when was that?
17  2018 as well?
18  A.  I'm going to say that was 2019.  I would have
19  to check my notes to confirm.
20  Q.  No other complaints besides those two?
21      MR. BABCOCK:  Object to the form.
22  A.  Correct.
23  Q.  I think the last of the attributes you told me
24  that you measure was holding people accountable.
25      Did you see Ms. Harris have problems in

9  (Pages 33 to 36)

Michelle Lamb - 4/27/2022

37

1  that category?
2          MR. BABCOCK:  Object --
3      A.  Yes, I did.
4      Q.  What were those problems?
5      A.  As a team that was underperforming, I did not
6  see evidence of -- let me say I did not see sufficient
7  evidence of coaching, individuals moving towards, you
8  know, PIP plans, performance improvement plans.  Didn't
9  see evidence of that except for with one individual by
10  the name of Tom Seagraves.
11      Q.  So Ms. Harris did put one of her direct reports
12  on a performance improvement plan?
13      A.  Yes, she put one on a performance improvement
14  plan on her own.  She eventually put a second on a
15  performance improvement plan after I told her that she
16  needed to move forward or I was going to do it for her.
17      Q.  Okay.  So you think her team -- or you thought
18  her team was underperforming and more people besides Tom
19  Seagraves and this other individual should have been on
20  performance improvement plans?
21      A.  Yes.
22      Q.  Who was the other individual besides Tom
23  Seagraves?
24      A.  Laura Segovia.
25      Q.  Who else on Ms. Harris's team did you think

38

1  should have been on a performance improvement plan?
2          MR. BABCOCK:  Object to form.
3      A.  I would say the majority of her team, based on
4  performance, needed to have some form of formal coaching
5  for improvement, and I did not see evidence of that.
6      Q.  Is that unusual for a district sales manager to
7  have -- to need that many --
8      A.  Yes.
9      Q.  -- reps on a --
10          MR. BABCOCK:  Ms. Lamb, you need to let
11  Ms. Sanford finish her question, okay, even though you
12  know where she might be going, just so the court
13  reporter can get everything down, again.  Okay?
14          THE WITNESS:  I apologize.
15          MR. BABCOCK:  It's fine.  It's --
16      A.  Please repeat your question.
17          MR. BABCOCK:  It's a unique process you're
18  going through.
19      Q.  Sure.  I know it's a little artificial, the
20  questions.  It's not like a normal conversation.  The --
21  let me think of my question.  Oh.
22          Was it unusual that a district sales
23  manager would need so many sales representatives on a
24  performance improvement plan?
25      A.  Yes.

39

1      Q.  Did you see other district sales managers at
2  that time that Ms. Harris worked there need to put their
3  sales reps on performance improvement plans?
4      A.  Nowhere near to the extent that Jennifer had a
5  need.
6      Q.  Okay.  So there are about -- there are eight
7  district sales managers, and the only one that needs to
8  put the majority of the sales rep team on performance
9  improvement plans is Jennifer Harris, true?
10          MR. BABCOCK:  Objection.
11      A.  Just to clarify, I -- the majority of the team
12  needed some specific help and items for coaching
13  purposes.  I'm not saying that they all needed to be on
14  a performance improvement plan, but they definitely
15  needed some strong coaching and guidance from Jennifer.
16      Q.  Okay.  So I think earlier you said the majority
17  of the team should have been on a performance
18  improvement plan.
19          Are you saying the majority of the team
20  did not need to be on a performance improvement plan
21  now?
22          MR. BABCOCK:  Object to the form.
23      A.  They needed to be coached by Jennifer on
24  specific activities to improve their performance.  Some
25  of them probably should have been on a performance

40

1  improvement plan that were not.
2      Q.  In 20- -- while Ms. Harris was a district sales
3  manager at FedEx, did you think the majority of her team
4  should have been on a performance improvement plan?
5          MR. BABCOCK:  Object to the form.
6      A.  They needed to be coached for their performance
7  deficiencies.  Whether that's a formal plan or a
8  coaching conversation that results in improved
9  performance, at the end of the day their performance
10  needed to improve and was not improving.
11          MS. SANFORD:  We've been going for about
12  an hour.  Is it okay to take a five-minute break?
13          MR. BABCOCK:  Yes.
14          THE WITNESS:  Yes.
15          THE REPORTER:  Off the record at 9:29.
16          (Recess taken from 9:29 to 9:36.)
17          THE REPORTER:  Back on the record at 9:36.
18      Q.  Ms. Lamb, I want to talk to you about the
19  process of moving accounts from one district manager to
20  another district manager.
21      A.  Okay.
22      Q.  Can you tell me just generally how that process
23  happens?
24          MR. BABCOCK:  Object to the form.
25      A.  Typically it happens when there is a need to

10  (Pages 37 to 40)

Osteen & Associates Reporting Services
817-498-9990

Michelle Lamb - 4/27/2022

41

1 balance head count and revenue responsibility amongst a
2 team.
3     Q.   So could you give me an example of a scenario
4 that you're describing?
5     A.   Hypothetically, if one manager has
6 significantly higher revenue responsibility in their
7 territory versus another, the decision may be made to
8 either move a specific geography or specific account
9 executives to help create balance because we want to
10 make sure that there's fairness throughout a sales
11 organization.
12     Q.   So typically does that -- so an account always
13 speaks to a sales representative?  A customer talks to
14 the sales representative before they talk to a district
15 sales manager, true?
16     A.   I'm sorry.  Could you repeat that question?
17     Q.   Yeah.  The front-line sales representative is
18 the direct communication person with an account, a
19 customer, true?
20     A.   True.
21     Q.   So a customer is attached to a sales
22 representative, right?
23     A.   Yes.
24     Q.   And that could be -- it's based on territory
25 usually, location?

42

1     A.   Correct.  In field sales, it is based on
2 geography, ZIP code alignment.
3     Q.   And just to take it a little bit further, the
4 ZIP code alignment of a customer, of a customer's
5 headquarters, true?
6     A.   True.
7     Q.   So for Ms. Harris, do you remember her
8 territory, her geographic region that her ZIP codes fell
9 in?
10     A.   I don't remember all of the ZIP codes --
11     Q.   Sure.
12     A.   -- if that's the question.
13     Q.   Just, like, her general territory.
14     A.   Yes.
15     Q.   What was it?
16     A.   She had northern Houston suburbs, I'll say.
17     Q.   All right.  So if you need to move an account
18 from one district sales manager's team to another, do
19 you just move the account, or do you move the sales
20 representative with the account?  How does that process
21 work?
22         MR. BABCOCK:  Object to form.
23     A.   It depends.
24     Q.   What are the different scenarios?  Could you
25 walk me through some of them or all of them?

43

1         MR. BABCOCK:  Object to form.
2     A.   It may be that a ZIP code is moved from one
3 district to another.  It may be that several ZIP codes
4 are moved.  It may be that a sales professional and ZIP
5 codes are moved.  It varies depending on the need of the
6 organization.
7     Q.   Which of those scenarios would you say is the
8 most common?
9         MR. BABCOCK:  Object to the form.
10     A.   I wouldn't want to guess.
11     Q.   Who is making these -- how would you classify
12 it?  Is this a movement?  A realignment?  What's the
13 terminology?
14     A.   Realignment is typically the terminology we
15 use.
16     Q.   Who is making the decision to realign a
17 territory or a ZIP code or a sales professional?
18         MR. BABCOCK:  Object to form.
19     A.   Our VPA, our vice president analyst, is
20 typically responsible for those types of -- of moves.
21     Q.   So back in 2017 to 2020, was there one specific
22 VP analyst who was making those decisions for field
23 sales?
24     A.   Yes.
25     Q.   Who was that?

44

1     A.   Her name was Karen James.
2     Q.   Structurally, like, if I was looking at an
3 organizational chart, how would she compare to you?  Is
4 she your peer?  Is she a dotted-line report?  Or what's
5 your connection to the VP analyst?
6     A.   She reports directly to the vice president.
7 And as for my time in field sales, she reported to Dave
8 Russell.
9     Q.   Does that classify her as a peer to you?
10     A.   No.
11     Q.   No?  Okay.
12         So you have the same direct -- the same
13 boss?  You are directly reporting to the same person,
14 but she is not a peer?
15     A.   No, she is not a director.
16     Q.   But looking at an organizational chart, you-all
17 would be on the same line, right?  You both directly
18 report to the same person, if that makes sense?
19         MR. BABCOCK:  Object to form.
20     A.   We directly report to the same person, correct.
21     Q.   Do you have any communication with the VP
22 analyst or any input on the alignment of the -- your
23 district territories?
24         MR. BABCOCK:  Object to the form.
25     A.   Yes.  If the VP analyst makes a recommendation

11 (Pages 41 to 44)

Michelle Lamb - 4/27/2022

45

1  that I don't agree with, it would be a conversation.
2    Q.  Can you make recommendations to the VP analyst;
3  say, Hey, I think this should be realigned?
4    A.  I can.
5    Q.  Have you ever done that before?
6    A.  Yes.
7    Q.  How often do you make recommendations versus
8  the VP analyst making recommendations on her own?
9    A.  I would say the vast majority of the
10 recommendations come from a VP analyst, and a smaller
11 percentage would be a recommendation from me.
12   Q.  All right.  So let's talk about the scenario --
13 I'm going to share my screen and write this out because
14 I'm a visual person.  Let's see.
15       Can you see that?  Just a piece of paper.
16   A.  Yes.
17   Q.  Okay.  How do you spell your first name?
18   A.  M-i-c-h-e-l-l-e.
19   Q.  And it's L-a-m-b, as in boy?
20   A.  Correct.
21   Q.  Okay.  If your -- the process for moving -- all
22 right.  So you have a district manager.  Do you-all call
23 those "DSMs," for short?
24   A.  Yes.
25   Q.  As a sales rep and a customer -- do you call

46

1  them "customers" or "accounts"?
2    A.  We actually refer to them as either.
3    Q.  Okay.  Either.
4        So this scenario where a customer and the
5  sales rep is going to move from one district manager to
6  a new direct manager, in this scenario, what happens to
7  the sales goals of the former versus the new district
8  manager?  How does that work?
9    A.  The inheriting or the new district manager
10 would receive the account revenue and stretch goals
11 associated with the account.
12   Q.  And if -- instead of revenue, if the account or
13 the customer has a loss, does the new inheriting manager
14 get the loss as well?
15   A.  Yes.
16   Q.  And the associated goals with that, or how
17 does --
18   A.  The loss and the goal, a stretch goal.
19   Q.  Okay.  So do you remember an account or a
20 customer called "BJ Services"?
21   A.  Yes, I do.
22   Q.  Now, that was an account, as I understand it,
23 that was moved from Jennifer Harris's department to --
24 Brian Conley [sic] was the inheriting district sales
25 manager.  Is that true?

47

1    A.  Conrey.
2    Q.  Conrey.  Thank you.
3    A.  C-o-n-r-e-y.
4    Q.  And the sales rep that went with BJ Services,
5  is that Jennifer Garcia?
6    A.  Yes.
7    Q.  Sorry.  Was that a yes?
8    A.  Yes.
9    Q.  Okay.
10   A.  Along with the other accounts Jennifer Garcia
11 called on.
12   Q.  Do you remember the time frame that BJ Services
13 and Jennifer Garcia was moved from Jennifer Harris to
14 Brian Conrey?
15   A.  I'm sorry.  Would you repeat that?
16   Q.  Uh-huh.  Do you remember around the time frame
17 that the BJ Services account and Jennifer Garcia as a
18 sales rep was moved from Jennifer Harris's team to Brian
19 Conrey's team?
20   A.  Not without referring to my notes.
21   Q.  Was this before Jennifer Harris made a
22 complaint about you or after?
23       MR. BABCOCK:  Object to the form.
24   A.  I believe it was before.
25   Q.  Okay.  And for the -- this BJ Services account,

48

1  Brian Conrey was originally going to inherit a loss?
2  BJ Services was going to be a loss.  Is that true?
3    A.  That is true.
4    Q.  Do you know about how much of a loss that was
5  going to be?
6    A.  About $1 million.
7    Q.  Is 1 million -- is that a lot?  Is that
8  typical?
9    A.  It's a large customer.
10   Q.  Did Brian Conrey receive the loss of
11 $1 million?
12   A.  No, he did not.
13   Q.  Who received that loss?
14   A.  Jennifer Harris.
15   Q.  Would receiving a loss of $1 million negatively
16 impact your sales performance and goals?
17       MR. BABCOCK:  Object to the form.
18   A.  Yes.
19   Q.  That's a big customer, so this negatively
20 impacted Jennifer Harris's performance, true?
21   A.  It negatively impacted her performance; that is
22 true.
23   Q.  And it's true that in the transfer of the
24 BJ Services account, the normal process was not
25 followed, true?

12  (Pages 45 to 48)

Michelle Lamb - 4/27/2022

49

1              MR. BABCOCK:  Object to the form.
2       A.   That is true.
3       Q.   Why was the normal process not followed?
4              MR. BABCOCK:  Object to the form.
5       A.   Because initially Jennifer Harris was overpaid
6  on BJ Services due to a discount issue that took place
7  with the account.
8       Q.   So the price of BJ Services was inflated, true?
9       A.   Yes.  BJ Services' revenue activity was
10  inflated due to a pricing issue that had initially
11  benefited Jennifer Harris.
12      Q.   And if I tell you that's around 2017, does that
13  sound about right?
14      A.   It sounds about right.
15      Q.   So 2017, Jennifer Harris receives the benefit
16  of a -- of a pricing issue, true?
17      A.   Yes.
18      Q.   And that basically means her commissions were
19  higher, true?
20      A.   Yes.
21      Q.   Do you know why there was a pricing issue and
22  the revenue was inflated?  Whose fault was that?
23             MR. BABCOCK:  Object to the form.
24      A.   There were a variety of factors impacting that,
25  one of which was the fact that the account had lost

50

1  pricing due to a spin-off.  For a period of about ten
2  months, they were without discounts.  And it was the
3  responsibility of Jennifer Garcia to fix that issue and
4  quickly respond by providing discounts to the customer.
5       Q.   Okay.  So Jennifer Garcia made a mistake, and
6  it caused Jennifer Harris to benefit in extra
7  commissions, true?
8              MR. BABCOCK:  Object to the form.
9       A.   Jennifer Garcia also benefited from the extra
10  commissions.
11      Q.   Okay.  And this is the same year, 2017, that
12  Jennifer Harris received a President's Club award, true?
13      A.   It was our fiscal year '18.
14      Q.   Which looks back to 2017?
15      A.   Correct.
16      Q.   And you also benefit from this mistake that
17  Jennifer Harris did, true?  I'm sorry, that Jennifer
18  Garcia did?
19             MR. BABCOCK:  Object to the form.
20      A.   Me personally?
21      Q.   Yes.
22      A.   I -- I experienced the benefit and the loss, so
23  it's a neutral for me.
24      Q.   Sure.  But just in 2017 or fiscal year 2018
25  looking back, before anyone discovers the mistake, you

51

1  are benefiting just like Garcia and Harris, true?
2       A.   Without looking at the specific dates, I could
3  not answer that.
4       Q.   Before the mistake is discovered, you are
5  benefiting at the same time Garcia and Harris are, true?
6       A.   True.
7       Q.   What's the normal process of -- if an employee
8  receives too much commissions for a mistake?  Do you
9  take the commissions away?  What do you do?
10      A.   That employee has the option to request to have
11  the revenue removed so that they don't have an inflated
12  goal the following year.
13      Q.   You said they have the option to do that.  Is
14  there another option?
15      A.   They can benefit from the goal and, you know,
16  deal with the -- they can benefit from the revenue and
17  also, on the flip side, have that goal added to their
18  numbers the following year.
19      Q.   And then once the loss is discovered or a
20  mistake is discovered, that goal would be too high,
21  true?
22             MR. BABCOCK:  Object to the form.
23      A.   I'm sorry.  Would you -- would you say that
24  again?
25      Q.   If an employee, a district sales manager,

52

1  benefits from a mistake, commissions are high --
2       A.   Uh-huh.
3       Q.   -- the following year, the stretch goal is also
4  going to be high?
5       A.   That's correct, which is why they have the
6  option of having the inflated goal -- inflated revenue
7  removed on the front end --
8       Q.   And how --
9       A.   -- so they see that.
10      Q.   How is a district manager made aware of those
11  options?
12      A.   It's part of our adjustment policy.
13      Q.   This is not something that you communicate with
14  the district sales manager; a district sales manager is
15  just supposed to know because it's in a policy?
16      A.   Yes.  They know where to find the policy if
17  they have any questions on adjustments.
18      Q.   Is -- a mistake as large as BJ Services, is
19  that unusual, or is that, umm, it just happens
20  sometimes?
21             MR. BABCOCK:  Object to form.
22      A.   I'd say it's more unusual.
23      Q.   How often do district sales managers need to
24  have their goals adjusted because of mistakes?
25      A.   I would not be a person who could answer that.

13  (Pages 49 to 52)

Michelle Lamb - 4/27/2022

53

1    Q.  Why are you not that person?
2    A.  Because I am not on the receiving end of
3  adjustments.  I wouldn't have that information.
4    Q.  You don't know the adjustments and the goals of
5  your team?
6    A.  I know for my team.
7    Q.  Okay.
8    A.  I don't know in general.  I can't speak to
9  that.
10    Q.  Okay.  So limiting my question to your team and
11  your realm of knowledge, how often does that occur?
12    A.  I -- I don't want to guess, but I'll just say
13  it's -- it's unusual, but it does happen.  I couldn't
14  give you a number.
15    Q.  If Jennifer Harris says that she told you,
16  confronted you, reported to you unusual activity about
17  the pricing of BJ Services prior to this mistake being
18  found, does that ring any bells for you?
19    A.  I remember having multiple conversations on the
20  subject of BJ Services.
21    Q.  Prior to the mistake being found?
22    A.  Yes.
23    Q.  With Jennifer Harris?
24    A.  Yes.
25    Q.  What is your understanding of why BJ Services

54

1  and Jennifer Garcia and her other accounts were moved
2  from Jennifer Harris's team to Brian Conrey's team?
3    A.  It was to create better revenue and head count
4  balance amongst the managers who reported to me.
5    Q.  Did you make that recommendation, or did the VP
6  analyst make the recommendation?
7    A.  I believe the VP analyst made that
8  recommendation.
9    Q.  But you don't remember for sure either way?
10    A.  No.
11    Q.  So you said -- I'm not sure what the exact
12  words were.  You wanted to realign the accounts for your
13  district sales managers, the revenue, and that's why
14  BJ Services and Garcia were moved, right?
15        MR. BABCOCK:  Object to the form.
16    A.  Revenue and head count.
17    Q.  Revenue and head count.
18        Head count of what?  Who's the head count?
19    A.  The number of sales professionals who report to
20  a manager.
21    Q.  Okay.  So did Jennifer Harris have too many
22  sales representatives, or did Brian Conrey have too many
23  sales representatives?
24        MR. BABCOCK:  Object to the form.
25    A.  Jennifer had one additional sales professional

55

1  who could be moved over to Brian Conrey to create a
2  situation where they both had the same amount after that
3  move took place.
4    Q.  So when you're moving -- sorry.  When Garcia
5  and BJ Services are moved from Jennifer Harris to Brian
6  Conrey, is it because Brian Conrey -- excuse me --
7  Jennifer Harris had one too many sales representatives
8  and Brian Conrey needed an extra sales representative,
9  or did it have to do with Jennifer Harris's revenue was
10  too high and Conrey's was too low, or was it a
11  combination?
12    A.  It would be a combination.
13    Q.  And describe that combination for me.  So was
14  Jennifer --
15    A.  I'm not following your question.
16    Q.  Sure.  So -- okay.  We've discussed head count.
17  Jennifer Harris had one too many; Brian Conrey had one
18  too few.  True?
19    A.  Yes.
20    Q.  So revenue.  Is it fair to say that Jennifer
21  Harris's revenue was too high and Conrey's was too low
22  and that's another reason why the service -- the account
23  and representative was moved?
24        MR. BABCOCK:  Object to form.
25    A.  Correct.

56

1    Q.  Okay.  So BJ Services and Jennifer Garcia get
2  moved to Brian Conrey.
3        Does 2018 sound about right to you?
4    A.  It sounds about right.
5    Q.  And the mistake about the pricing issue with
6  BJ Services is discovered under Brian Conrey's team,
7  true?
8    A.  False.
9    Q.  When was the mistake discovered, or how was it
10  discovered?
11        MR. BABCOCK:  Object to the form.
12    A.  Jennifer knew of the mistake.
13    Q.  And -- okay.  So if there's a mistake and
14  there's going to be a loss, why is it being transferred
15  to Brian Conrey if his revenue needs to increase?
16        MR. BABCOCK:  Object to the form.
17    A.  When you're referring to a "mistake," I am
18  interpreting that as the mistake in pricing, which
19  Jennifer was well aware of.
20        Would you repeat your question?
21    Q.  Yes.  So the mistake in the pricing issue for
22  BJ Services, Jennifer reaps the reward in her
23  commissions.
24    A.  Yes.
25    Q.  The mistake is discovered.  That means there's

14  (Pages 53 to 56)

Michelle Lamb - 4/27/2022

57

1   going to have to be a consequence, right?  A loss?
2       A.   There will be a loss associated with the
3   account the following year, correct.
4       Q.   So if BJ Services and Jennifer Garcia are being
5   moved to Brian Conrey's team in part because Brian
6   Conrey's revenue needs to increase, why would a loss, a
7   large loss, be moved over to Brian Conrey's team?
8            MR. BABCOCK:  Object to form.
9       A.   It -- that is not a factor in the decision to
10  realign sales professionals and their geography.
11  It's -- you know, we're looking at more accounts than
12  just the BJ Services.  We're talking about every account
13  that aligned to Jennifer Garcia at that time.
14      Q.   Okay.  So Jennifer Garcia, all of her accounts
15  get moved over to Brian Conrey, and the loss has to be
16  accounted for now, this million-dollar loss.
17           It's true Brian Conrey goes to you and
18  says, Hey, I don't want this loss associated with me and
19  my team.  That's too high.  It should go back to
20  Jennifer Harris.
21           Right?
22           MR. BABCOCK:  Object to the form.
23      A.   Yes.
24      Q.   Tell me about that conversation.
25      A.   I told Brian Conrey I would take his concerns

58

1   into consideration.  I had a conversation with Jennifer
2   as well, and she agreed that Brian should not be stuck
3   with that goal.
4       Q.   Brian Conrey -- okay.  So make sure I get this
5   right in my head.  You are the person as managing
6   director of field sales to move the million-dollar loss
7   from Brian Conrey and his team to Jennifer Harris, true?
8   That was your decision?
9            MR. BABCOCK:  Object to the form.
10      A.   Yes, that's my decision.
11      Q.   Okay.  If a manager has a -- okay.  Let me just
12  talk specifically.
13           So Jennifer Harris has this
14  one-million-dollar loss associated with her team for
15  BJ Services but no longer has -- sorry.  Let me start
16  over.
17           Jennifer Harris has this million-dollar
18  loss on her team associated with her goals, and her
19  stretch goal has already been increased because of the
20  inflated price of BJ Services formerly, true?
21      A.   True.
22      Q.   So it's going to be hard for Jennifer Harris to
23  meet her goals at this point, right?
24           MR. BABCOCK:  Object to the form.
25      A.   Jennifer had many other accounts aligned to her

59

1   to impact her numbers.  BJ Services was not her only
2   customer.
3       Q.   But it was a really -- it was a large customer,
4   though, true?
5       A.   It was a large customer, yeah.
6       Q.   So Jennifer Harris has a really good year in
7   2017.  She wins an award.  And part, because of -- part
8   of her goals for the new year are because of inflated
9   prices.  So her stretch goal is already large, and she
10  receives a million-dollar loss.
11           And you're saying she has other accounts
12  that can make up for it and she can just meet all of her
13  goals just like that?
14           MR. BABCOCK:  Object to the form.
15      A.   She missed her goals by $5 million, not 1.
16      Q.   And what document would show that?
17      A.   I have multiple documents that would show that.
18      Q.   If you had to explain to a jury how Jennifer
19  Harris missed $5 million, how would you do that?
20           MR. BABCOCK:  Object to the form.
21      A.   I would show them a breakdown of performance
22  goals over the course of the year, with specific revenue
23  figures attached.
24           THE WITNESS:  Would it be possible to take
25  a quick break?

60

1            MS. SANFORD:  Yes.
2            THE WITNESS:  Okay.  Thank you.
3            THE REPORTER:  Off the record at 10:09.
4            (Recess taken from 10:09 to 10:11.)
5            THE REPORTER:  Back on the record at
6   10:11.
7       Q.   Is there anything you'd like to change or add
8   to your answer?
9       A.   No.
10      Q.   Okay.  When did you start documenting the
11  performance issues that you found for Ms. Harris?
12      A.   I kept very detailed records of all of our
13  coaching conversations throughout the time Ms. Harris
14  reported to me.
15           THE REPORTER:  Mr. Babcock, did you
16  object?
17           MR. BABCOCK:  Yeah.  I object to the form.
18           THE REPORTER:  Okay.  Thank you.
19           MR. BABCOCK:  I'm sorry.
20           THE REPORTER:  That's okay.
21           MR. BABCOCK:  I had my hand over my face.
22  I apologize.  Sorry.
23      Q.   What did these very detailed records look like?
24  Were they handwritten records, or were they emails?
25           MR. BABCOCK:  Object to the form.

15  (Pages 57 to 60)

Michelle Lamb - 4/27/2022

61

1    A.  A combination.  I kept emails, communications,
2  I retained written notes from our conversations, and I
3  also had a very detailed OneNote file.
4    Q.  When did you write -- all right.  So explain
5  the process of how you started documenting Jennifer
6  Harris's performance issues as you saw them.
7    A.  I'm sorry.  I'm not understanding the question.
8  I'm sorry.
9    Q.  Yes.  So before Jennifer Harris -- well, when
10  does Jennifer Harris receive a documented discipline --
11  documented discipline?
12        MR. BABCOCK:  Documented discipline, did
13  you say, Ms. Sanford?
14        MS. SANFORD:  Yes.
15        MR. BABCOCK:  I'm sorry.  There was a
16  hiccup.
17        Object to the form.
18    A.  Are you referring to a letter of counseling?
19    Q.  Yes.  The first time that you wrote Jennifer
20  Harris up.
21        MR. BABCOCK:  Object to the form.
22    Q.  I think it's called a "letter of counseling"
23  for FedEx.
24    A.  Okay.  It would have been June of '19.
25    Q.  Prior to June 2019, was there any documented

62

1  verbal warning?
2    A.  Documented verbal warning?  No.  There were
3  documented email discussions and coaching conversations
4  that were face-to-face.
5    Q.  And how were those face-to-face conversations
6  documented?
7    A.  They were documented in OneNote.
8    Q.  So your personal computer, you just kept notes
9  of discussions you had with Jennifer Harris?
10    A.  That's correct.
11    Q.  And the first time that you document discipline
12  in any capacity with FedEx, not just internally with
13  you, is in June 2019 with a letter of counseling; is
14  that right?
15        MR. BABCOCK:  Object to the form.
16    A.  Would you say that one more time, please?
17    Q.  Uh-huh.  Prior to June 2019 -- yeah, how can I
18  word that better?
19        Prior to June 2019, you did not give
20  Jennifer Harris any formal documented disciplinary
21  action, true?
22    A.  No formal disciplinary action.  That's true.
23    Q.  So June 2019 occurs, and you give her a letter
24  of counseling.  And describe the performance -- okay.
25  So, actually, before that -- excuse me.

63

1        Prior to the letter of counseling in June
2  2019, could you describe the performance issues that you
3  saw with Jennifer Harris?
4    A.  Yes.  There were performance issues with
5  respect to her attainments.  There were performance
6  issues with respect to new business closes and a lack of
7  pricing activity.  Probably other things that are not
8  coming to mind at this moment.
9    Q.  In June 2019, when you write the letter of
10  counseling, is there anything new, or is it basically
11  everything that you already saw and you had talked about
12  with Jennifer Harris and wrote in your OneNote document?
13        MR. BABCOCK:  Object to the form.
14    A.  I -- it was -- the letter of counseling very
15  much mirrored the coaching conversations I had had with
16  Jennifer up until that point.
17    Q.  Could you explain to me what the Pathways
18  Program is?
19    A.  Yes.  Pathways Program is a program that was
20  designed for some of our high-performing account
21  executives who are located within our inside sales
22  offices.  And this program is intended to help them
23  refine their skills so that they can eventually be
24  promoted into a field sales territory.
25    Q.  How are account executives chosen for this

64

1  program?
2    A.  I am not a part of that selection process.  I
3  would not be able to answer that question.
4    Q.  Are district sales managers chosen to attend
5  this program?
6    A.  On occasion, district sales managers are
7  encouraged to be visible with those individuals, whether
8  that's face-to-face or on the phone, in hopes of, you
9  know, enticing those individuals to promote to their
10  specific districts.
11    Q.  So a district -- if a district sales manager
12  goes to a Pathways Program, they are there to encourage
13  the attendees to come be part of their team or to come
14  show them what it's like to be in field sales; is that
15  right?
16    A.  Yes, to show them what it's like to be in field
17  sales and to speak to the responsibilities that they
18  would be taking on after they are promoted.
19    Q.  So it sounds like if a district sales manager
20  is invited to go, it's to teach an attendee or to even
21  potentially mentor an attendee.
22        Is that fair?
23        MR. BABCOCK:  Object to form.
24    A.  Not teach.  Well, I would say more network.
25  The teaching takes place within the program itself.  And

16  (Pages 61 to 64)

Michelle Lamb - 4/27/2022

65

1  within our inside sales offices, there are facilitators
2  who work on the education piece.  It's mainly a -- a
3  networking, informational-type opportunity for field
4  sales to interact with Pathway participants.
5      Q.  Did it surprise you that Jennifer Harris was
6  asked to come be one of those district sales managers at
7  one of the Pathway Programs in Memphis?
8      A.  No.
9      Q.  Why did it not surprise you?
10     A.  She had previously worked in that office.
11     Q.  The Pathways Program in Memphis that Jennifer
12  Harris was invited to took place in January 2019; is
13  that right?
14     A.  Yes.
15     Q.  She -- Jennifer Harris originally comes to you
16  prior to January 2019 and asks for approval, and you
17  give it to her, true?
18     A.  True.
19     Q.  Later in January, right before the program, you
20  tell her -- you take away that approval; is that right?
21     A.  Yes.
22     Q.  You say it's because FedEx couldn't pay for her
23  travel or expenses; is that right?
24         MR. BABCOCK:  Object to the form.
25     A.  Yes.  We were asked to reduce costs wherever

66

1  possible.  And based on that and that direction from my
2  boss, Jennifer was asked to cancel her trip to Memphis.
3      Q.  Who asked her to cancel her trip to Memphis?
4      A.  I did.
5      Q.  And she responds by saying, I'll take a
6  vacation day instead; is that right?
7          MR. BABCOCK:  Object to the form.
8      A.  She mentioned taking a vacation day, but not
9  specifically for the purpose of going to Pathway.
10     Q.  So how did she mention vacation day during that
11  meeting if it wasn't to involve the Pathway Program?
12         MR. BABCOCK:  Object to the form.
13     A.  I don't recall the exact conversation.  And if
14  Jennifer wants to take a vacation day to go to Memphis
15  on her own, that's none of my business.  She did not
16  tell me she was going to take a vacation day to go to
17  Pathway.
18     Q.  So -- but she tells you she's going to take a
19  vacation during this conversation, this Pathway
20  conversation that you're saying, Hey, we need to cancel
21  it?
22         MR. BABCOCK:  Object to the form.
23     A.  That's right.
24     Q.  And employees, when they request vacation days,
25  that's documented in FedEx's system, true?

67

1      A.  Yes.
2      Q.  And there's a -- is that a yes?  Sorry.
3      A.  Yes, that's true.
4      Q.  And in FedEx's system, there's a place to put
5  notes on that an employee can say what the vacation is
6  for, true?
7      A.  Yes.
8      Q.  So if Jennifer Harris took a vacation day on
9  the date of the Pathways Program, it's in the system,
10  requested that date, and there's a note that references
11  the Pathway system, that's easy for FedEx to see, true?
12     A.  Yes.
13         MR. BABCOCK:  Object to form.
14     Q.  That's easy for you to see, true?
15     A.  Yes, if I approve the Workday request.
16     Q.  And did you approve Jennifer Harris's vacation
17  for that time?
18     A.  Typically my admin approves vacation time on my
19  behalf.
20     Q.  And so on your behalf, your admin approved
21  Jennifer Harris's vacation for the exact dates of the
22  Pathway Program, true?
23     A.  Yes.
24     Q.  Were you at the Memphis Pathways Program?
25     A.  No.

68

1      Q.  You went to the Irving one; is that right?
2      A.  I don't believe I went to either meeting in
3  January.  I've been to Pathways, but I don't recall
4  going in January at all.
5      Q.  So were you aware that other district sales
6  managers in the Memphis Pathways Program received -- had
7  their expenses paid for, or you're not aware of that;
8  you don't know?
9      A.  That's not -- no, I don't know.
10     Q.  Other district sales managers on your team
11  traveled to a different Pathways Program and had their
12  expenses paid for, true?
13         MR. BABCOCK:  Object to the form.
14     A.  True.
15     Q.  And who were those people?  Wait, I think I
16  have them.  Mary Cassella?
17     A.  No.
18     Q.  No?  Holly Hayes?
19     A.  Are you referring to managers who reported to
20  me?
21     Q.  Yes.
22     A.  Neither of those individuals reported to me.
23     Q.  Who are those -- Mary Cassella and Holly Hayes,
24  what is their job title?
25     A.  I don't -- I don't know.

17 (Pages 65 to 68)

69

1    Q.   Okay.  The district sales managers that you
2  approved and allowed FedEx to expense those costs,
3  who were -- who were those people?
4         MR. BABCOCK:  Object to the form.
5    A.   I recall Rebecca Callahan, Brian Conrey, and
6  possibly Casey Millner.
7    Q.   And -- sorry.  What?
8    A.   They carpooled to Dallas, there and back, same
9  day, without the need for airline expense nor hotel
10  expense.
11    Q.   So the three individuals that FedEx could
12  budget that you approved to go to the Dallas Pathways
13  Program, they were all white, true?
14    A.   True.
15    Q.   I don't want to take up too much more of your
16  time.
17         Could you explain to me what the
18  Coach2Grow2.0 Program was?
19    A.   Coach2Grow2.0 is a -- was a rollout of coaching
20  expectations for our managers, which would allow them
21  the ability to customize their coaching approach based
22  on the needs of the individual that they are coaching.
23    Q.   And it's fair to say you weren't pleased with
24  how Harris -- Ms. Harris was rolling out her -- the
25  Coach2Grow2.0 Program with her team; is that -- is that

70

1  accurate?
2    A.   That's accurate.
3    Q.   Describe what Ms. Harris was doing wrong, in
4  your opinion.
5         MR. BABCOCK:  Object to the form.
6    A.   My -- I spent three and a half hours with
7  Ms. Harris reviewing expectations for her rollout of
8  Coach2Grow2.0 with her team.  At that meeting, she took
9  no notes and had no questions.
10         I later followed up with her to establish
11  how those conversations went, and she said to me that
12  she had abbreviated the rollout and had only discussed a
13  couple of the slides with her team, which was not
14  following the direction that I had given her.
15    Q.   And so you confronted Ms. Harris about these
16  issues?
17         MR. BABCOCK:  Object to the form.
18    A.   Yes.
19    Q.   How did you do so?  How did you do that?
20    A.   I started by asking her questions.  I asked her
21  for the results of her Coach2Grow rollout and quickly
22  identified that there are these gaps.  I explained to
23  her that I was very disappointed and I needed her to
24  make sure that she understood the material and was
25  capable of rolling out to her team as instructed and as

71

1  her peers were doing.
2    Q.   What was Ms. Harris's response?
3    A.   She said she would consult with her peers to
4  learn how to roll out the material.
5         And I said, No.  We are going to have
6  another conversation.  I'm your manager.  I need to
7  teach you this material.  Your peers are also learning
8  it for the first time themselves.
9         And so I went through it with her yet
10  again.
11    Q.   And what happened after that?
12    A.   After that, she proceeded to roll out the
13  material to her team.  And I asked her for confirmation
14  that it was done with each individual, and she provided
15  that for me.
16    Q.   And it met your satisfaction?  You coached her,
17  and she did it right?
18         MR. BABCOCK:  Object to the form.
19    A.   Yes.
20    Q.   All right.  Explain -- would you explain to me
21  your process -- let me start over.
22         It was your decision to terminate
23  Ms. Harris in January 2020, true?
24    A.   True.
25    Q.   When did you make that decision?

72

1    A.   I made that decision after the unsuccessful
2  completion of her second performance improvement plan.
3    Q.   So if I'm remembering right, she had two -- you
4  gave Ms. Harris two letters of counseling and two
5  performance improvement plans?
6         MR. BABCOCK:  Object to the form.
7    A.   There was a letter of counseling, a letter of
8  warning, and two performance improvement plans.
9    Q.   And what expectation -- or what did she not
10  meet in the second performance improvement plan that led
11  to her termination for you?
12    A.   There were five objectives outlined within that
13  performance improvement plan.  Three of the five
14  objectives were not met.  The details of that
15  performance improvement plan are not in front of me at
16  the moment, but I know that those documents have been
17  provided.
18    Q.   The -- you created a request for termination
19  form; is that true?
20    A.   That's true.
21    Q.   And in that -- okay.  So it looks to me that
22  when you gave Ms. Harris the letter of counseling, the
23  first performance improvement plan came with it, that it
24  was like a bundle.
25         Is that right?

18  (Pages 69 to 72)

Michelle Lamb - 4/27/2022

73

1          MR. BABCOCK:  Object to the form.
2      A.  The performance -- no, that's not right.  The
3  performance improvement plan was created with insight
4  from Jennifer and was not a bundle with the letter of
5  counseling.
6      Q.  So in your request for termination form, you
7  say on June 26, 2019, letter of counseling and
8  performance improvement plan created.
9          Is that not accurate?
10     A.  I'd have to look at the documents.
11     Q.  Let's go ahead ...  I'm showing you what's
12  Bates-labeled FX 19.  It says -- is this the request for
13  termination form that you filled out?
14     A.  Yes.
15     Q.  Let me see if I can zoom in.
16          Down at the bottom it says, June 26, 2019,
17  letter of counseling and performance improvement plan
18  created on the same day.
19          Is that accurate or inaccurate?
20     A.  The performance improvement plan would have
21  followed after the letter of counseling.
22     Q.  So this is not accurate (indicating)?
23          MR. BABCOCK:  Object to the form.
24     A.  No.
25     Q.  Okay.  Sorry.  This is for the record, of

74

1  course, and I just said "this" and pointing, and the
2  court reporter is not going to pick that up.
3          So in the request for termination form,
4  where it says June 26, 2019, letter of counseling and
5  performance improvement created, that is not accurate
6  because the performance improvement plan was not created
7  on the same day as the letter of counseling, true?
8      A.  That's true.  We had a -- the full amount of
9  time required to address the items in the performance
10  improvement plan, but they were not delivered on the
11  exact same day.
12     Q.  And where it says September 13th, 2019, letter
13  of warning and performance improvement plan created,
14  that is also not true, because they were created on
15  different days; is that right?
16          MR. BABCOCK:  Object to the form.
17     A.  That's right.
18     Q.  It says all coaching sessions have been
19  documented in OneNote.
20          Is that the same OneNote that you were
21  talking about earlier in the deposition?
22     A.  Yes.
23     Q.  Did you provide this OneNote documentation of
24  the coaching sessions you had with Jennifer Harris to
25  anyone in HR at the time of Ms. Harris's termination?

75

1      A.  Would you repeat the question, please?
2      Q.  Yeah.  Did you provide any of these OneNote
3  notes to anybody at HR at Ms. Harris's time of
4  termination?
5      A.  Surrounding the time of termination, yes.
6      Q.  Who did you give them to?
7      A.  I worked closely in conjunction with HR
8  regarding all of the disciplinary action involving
9  Ms. Harris.
10     Q.  Who were the HR representatives that you worked
11  closely with?
12     A.  There were -- there were two.  Initially Jim
13  Wallace was my HR advisor.  He has since retired.  And
14  then following his retirement, his position was
15  backfilled with Kristie Castilow.
16     Q.  Anybody else?
17     A.  No.
18     Q.  Could you tell me about the day of Ms. Harris's
19  termination?  What day of the week was it?
20     A.  I don't know.
21     Q.  Sorry.  I think there was a -- I couldn't hear
22  you.  What did you say?
23     A.  I don't recall what day of the week it was.
24     Q.  Do you remember the time of day that you had
25  the conversation?

76

1      A.  No.
2      Q.  Was this a one-on-one meeting?  Was there
3  anybody else in the room?
4      A.  It was a meeting with three people:  Jennifer
5  Harris; myself; and one of my peer directors, Mr. Grant
6  Kuhn.
7      Q.  How do you spell his last name?
8      A.  K-u-h-n.
9      Q.  Grant Kuhn was another director -- managing
10  director of field sales?
11     A.  Correct.
12     Q.  What was his territory?
13     A.  He had the northern half of the state of Texas.
14     Q.  You did not have any HR present with you while
15  you were terminating Ms. Harris that day?
16     A.  That's correct.
17     Q.  Why not?
18     A.  Our requirement is that a peer be present with
19  me, and I had met that expectation.
20     Q.  Did you want HR to be in that room with you, or
21  you just didn't -- did it cross your mind?  Did they not
22  want to be with you, or ...
23     A.  I had worked closely with HR up to that
24  point and didn't feel that it was necessary for them to
25  be in the room.

19  (Pages 73 to 76)

Michelle Lamb - 4/27/2022

77

1    Q.  And describe that meeting.  What happened at
2    that meeting?
3    A.  The meeting was relatively brief.  Ms. Harris
4    came in, I believe, with the expectation of that being
5    her last meeting because she had cleared out her office.
6    The meeting was short.  I provided her with the letter.
7    She refused to sign it.  Grant Kuhn signed on -- as a
8    witness to the fact that she refused to sign, and the
9    meeting adjourned.  She --
10    Q.  What did you --
11    A.  -- left her FedEx property with me.  Laptop,
12    employee ID, credit card, those items.
13    Q.  How did you tell Ms. Harris that she was being
14    terminated?  What did you say?
15    A.  I don't recall the exact conversation.  It was
16    quite some time ago.  But I know the conversation was
17    today, that day, would be her last day at FedEx.  And I
18    gave her the letter and an opportunity to read the
19    letter and answer any questions.  She didn't have any
20    questions.  And as I mentioned, the meeting was very
21    brief.
22    Q.  Did you say the reasons why you were
23    terminating her?
24    A.  It was all contained within the letter that she
25    read.

78

1    Q.  Did you draft that letter, or did someone draft
2    it for you?
3    A.  I drafted the letter and had approval from HR
4    on the terminology.
5    Q.  And what -- do you remember what that letter
6    said?
7    A.  Not without having it in front of me.
8    Q.  Was it just that you were terminated today, or
9    did it give reasons for her termination?
10        MR. BABCOCK:  Object to the form.
11    A.  I would have to look at it again to tell you
12    what it says.
13    Q.  You don't remember if that letter contained any
14    reasons for her termination?
15        MR. BABCOCK:  Object to the form.
16    A.  I don't recall what it said.
17    Q.  When you created the request for termination
18    form, that form was created before Ms. Harris was
19    terminated, true?
20    A.  True.
21    Q.  And Ms. Harris never received that form, true?
22    A.  Correct.
23    Q.  While she was employed.
24        During this time that you give Ms. Harris
25    performance improvement plans and a letter of counseling

79

1    and letter of warning, there are ongoing investigations
2    about Ms. Harris's complaints against you, true?
3    A.  True.
4    Q.  While these investigations are ongoing and
5    pending, did HR ever come to you and ask you to halt any
6    potential disciplinary action?  Any termination?  Wait
7    until these investigations are over?  Anything like
8    that?
9        MR. BABCOCK:  Object to the form.
10    A.  Yes.  It's the right thing to do to let an
11    investigation be completed in its entirety.
12    Q.  So what did HR tell you to do?
13        MR. BABCOCK:  Object to the form.
14    A.  To table any concerns until the investigation
15    had been completed.
16    Q.  When did HR tell you to table any concerns
17    until the investigation is completed?
18    A.  I couldn't say specific- -- specifically.
19    Q.  She makes her first complaint against you early
20    2019.  You give your first letter of counseling June
21    2019.  There's an invest- -- is it around -- when
22    does -- do you remember when the investigation started?
23        MR. BABCOCK:  Object to the form.
24    A.  No.  In fact, I don't know that I am
25    immediately notified.  So I cannot answer that question.

80

1    Q.  And so does that refresh your memory on,
2    ballpark, when HR told you to table any concerns until
3    the investigation is completed?
4    A.  No.
5    Q.  Do you remember if it was snowing outside?  Was
6    it Christmastime?  Was it summertime?
7    A.  I do not know the answer to that question.
8    Q.  So then how do you -- when do you table any of
9    your concerns?  When does that take place?  How do you
10    do that?
11    A.  Based on the fact that Jennifer's performance
12    was not improving, there was a need to continue on a
13    progressive disciplinary process; however, I waited
14    until any type of allegations and investigations had
15    been completed.  I don't recall the dates of those
16    without looking at my records, of course.
17    Q.  So while HR is doing an ongoing investigation,
18    you are continuing with the progressive disciplinary
19    process; you just aren't terminating her until the
20    investigation is over?
21        MR. BABCOCK:  Object to the form.
22    A.  I'm continuing to coach her for improvement and
23    to coach her based on those items that were outlined
24    on -- you know, in her PIPs, the entire process.
25    Q.  Okay.  So the PIP is ongoing while the

20  (Pages 77 to 80)

Michelle Lamb - 4/27/2022

81

1 investigation is ongoing, true?
2      MR. BABCOCK: Object to the form.
3   A.  These are questions HR would be better suited
4 to respond to because I do not know the dates in which
5 their investigations began nor concluded.
6   Q.  Were you interviewed as a part of an HR
7 investigation about Jennifer Harris while Jennifer
8 Harris was on an active PIP by you?
9   A.  I was interviewed by HR.  I could not tell you
10 specifically if it was during the time of her PIP.
11   Q.  When did you get the green light to terminate
12 Ms. Harris?
13   A.  It was shortly after the submission of the RFT,
14 request for termination, document.
15   Q.  When you submit the request for termination
16 document, were you aware that Ms. Harris's investigation
17 about the complaints had concluded?
18   A.  I believe so.
19   Q.  But you're not sure?
20   A.  No, I don't recall.
21   Q.  Did HR notify you that the investigation about
22 you by Ms. Harris had been concluded?
23   A.  I do not recall.
24   Q.  They didn't sit you down and say, Hey, these
25 are the results of the investigation about you?

82

1   A.  If there were concerns with the timeline of the
2 investigation and the request for termination, that
3 would have been brought to my attention and the RFT
4 would have been declined.
5   Q.  HR did not -- but HR didn't do that; is that
6 correct?
7   A.  Correct.
8   Q.  HR let you terminate Jennifer Harris, true?
9   A.  They did.
10   Q.  Did HR sit down with you and discuss the
11 results of Ms. Harris's complaints and the corresponding
12 investigation?
13      MR. BABCOCK: Object to the form.
14   A.  They did not sit down with me and go over the
15 results of the investigation.
16   Q.  Did you receive any coaching as a result of the
17 complaints and investigation?
18   A.  No, I did not.
19   Q.  Did -- so did HR tell you, Hey, the complaints
20 that Jennifer Harris brought against you were
21 unsubstantiated?  Did they do that?
22      MR. BABCOCK: Object to form.
23   A.  As I stated earlier, HR did not sit down with
24 me and go over the results of the investigation.
25   Q.  Did they notify you in any way that the

83

1 complaints were unsubstantiated or substantiated?
2   A.  I do not recall.
3   Q.  Do you think it's a big deal if one of your
4 employees makes a discrimination or retaliation
5 complaint against you?
6   A.  Yes, I do.
7   Q.  Would you want to know the results of that
8 complaint?
9   A.  Yes.
10   Q.  Would you just -- you said HR did interview you
11 as a result of Ms. Harris's complaints, true?
12   A.  True.
13   Q.  As a part of an investigation, true?
14   A.  Yes.
15   Q.  How did that -- what did that look like?  Did
16 HR email you and say, We would like to set up a time to
17 interview you?  Did somebody come into your office?  How
18 did that start or take place?
19   A.  I received a request for a meeting to respond
20 to questions that were a part of the investigation and
21 allegations made against me.
22   Q.  By whom?  Who sent you that request?
23   A.  Michael Clark.
24      I responded to his questions.  I responded
25 via email as well.  And that was the format that was

84

1 used.
2   Q.  When he sends you this request for a meeting,
3 is that -- is that an email, or is that a calendar
4 invite, or both?
5   A.  I believe he sent me an email asking for a
6 convenient time to set aside for this purpose.
7   Q.  And in that email, did he also send you
8 questions that you responded to, or did that come later?
9   A.  It came later.
10   Q.  So a separate -- so a separate email had
11 specific questions from Michael Clark to you which you
12 answered in a responsive email, true?
13   A.  I'm sorry.  Would you say that again?
14   Q.  Yeah.  There was a separate email from Michael
15 Clark to you where Michael Clark asked you specific
16 interview questions, and you responded to those
17 interview questions?
18   A.  Michael Clark asked me questions on -- during a
19 phone conversation and later followed up with an email
20 recap of the questions and my responses.
21   Q.  I gotcha.
22      So the interview that you had for the
23 investigation was a phone -- initial phone call?
24   A.  Yes.
25   Q.  With a follow-up email recapping the

21 (Pages 81 to 84)

Osteen & Associates Reporting Services
817-498-9990

Appx-864

Michelle Lamb - 4/27/2022

85

1 conversation?
2    A.  Correct.
3    Q.  Who was on the phone call?
4    A.  Michael Clark and myself.
5    Q.  What did -- what do you remember about that
6 phone call?
7    A.  I remember that he asked me a series of
8 questions and that was -- that was the purpose of the
9 call.
10    Q.  How long did the call last?
11    A.  I had several calls with him.  I don't recall
12 how many with follow-up questions.  And I could not tell
13 you how long those calls lasted.
14    Q.  If you had to ballpark the first interview
15 call, would you say hours?  Minutes?
16    A.  Ballpark, hour.
17    Q.  And follow-up, less than that?
18    A.  Similar to that.
19    Q.  So you had multiple hour-long phone calls,
20 estimated, with HR representative Michael Clark about
21 Jennifer Harris's complaints as a part of an
22 investigation as you knew it?
23        MR. BABCOCK:  Object to the form.
24    A.  Yes.  Again, ballpark, hour.
25    Q.  During those phone conversations, did Michael

86

1 Clark ever tell you to keep the investigation
2 confidential, to -- Hey, don't terminate Ms. Harris
3 during this time?  Any type of those questions or
4 comments?
5    A.  There were comments about confidentiality.
6 There were not ever conversations about termination.
7    Q.  Did you tell Mr. Clark that Jennifer Harris was
8 on a PIP, progressive -- progressive disciplinary
9 process --
10        MR. BABCOCK:  Object to the form.
11    Q.  -- in those conversations?
12        MR. BABCOCK:  I'm sorry.  Object to the
13 form.
14    A.  I don't recall.  My responses to the questions
15 asked by Mr. Clark were all documented.  I would have to
16 resort to those to tell you exactly what was discussed.
17    Q.  And you didn't volunteer the fact that you had
18 Jennifer Harris on a performance improvement plan?
19        MR. BABCOCK:  Object to the form.
20    A.  Again, I don't recall.
21    Q.  How did the conversation end?  Did Mr. Clark
22 say, All right, we'll tell you the results of this
23 investigation when it's done, or, This is ongoing?
24 Anything like that?
25    A.  I do not recall him indicating that he would

87

1 let me know the results.  And it was an ongoing
2 investigation, which is why I spoke to Mr. Clark on
3 multiple occasions.
4    Q.  Is this the same process that you went through
5 for Richard Holley, or was that one different?
6    A.  Same in format.
7    Q.  Was Michael Clark the person who interviewed
8 you as a part of Richard Holley's investigation?
9    A.  I believe so.
10    Q.  Did you have multiple phone conversations or
11 just one for Richard Holley's investigation?
12    A.  I believe it was just one.
13    Q.  Were you notified of -- you said you were
14 notified of the results for Richard Holley's
15 investigation, and you received coaching; is that true?
16        MR. BABCOCK:  Object to the form.
17    A.  I received coaching based on the way I had
18 managed his specific team meeting; that is true.
19    Q.  Did that coaching come in an email or a phone
20 call or some other way?
21    A.  I believe that was a phone call from Dave
22 Russell to myself.
23    Q.  And did that coaching -- was it -- was it
24 documented in a letter, like, a follow-up email saying,
25 Hey, Michelle Lamb needs to do "X," "Y," and "Z" as a

88

1 result?
2    A.  I believe so.
3    Q.  You did not receive that -- anything like that
4 for Jennifer Harris?
5    A.  I do not recall receiving anything like that
6 from [sic] Jennifer Harris.
7    Q.  Did -- so Dave Russell was -- for Richard
8 Holley's investigation, Dave Russell was the person who
9 said you had to do some coaching?  It wasn't HR?  It
10 wasn't Michael Clark?
11        MR. BABCOCK:  Object to the form.
12    A.  The message came to me from Dave Russell.
13        MS. SANFORD:  Okay.  I think I'm about
14 done.  If we take a five-minute break, I'll check my
15 notes and use the restroom.
16        MR. BABCOCK:  Okay.
17        THE REPORTER:  Off the record at 10:58.
18        (Recess taken from 10:58 to 11:01.)
19        THE REPORTER:  Back on the record at
20 11:01.
21    Q.  Ms. Lamb, did you receive any training from
22 FedEx about discrimination or retaliation in the
23 workplace?
24    A.  Yes.  I have received training on -- on both of
25 those topics.

22  (Pages 85 to 88)

Michelle Lamb - 4/27/2022

89

1    Q.  Could you describe that training for me?
2    A.  There was new manager training that takes place
3  anytime a person moves into a leadership position, and
4  of course we have policies that are associated with the
5  topic as well.
6    Q.  So you receive -- so you got new training when
7  you became a manager around 2014, potentially, in
8  Detroit, true?
9    A.  Yes, I became a manager in Detroit.  The
10  training itself took place in Memphis.
11    Q.  So it was in-person training?
12    A.  Correct.
13    Q.  And how long was it?  Was it, like, a week?  A
14  day?  An hour?
15    A.  It was several days, if not a week.
16    Q.  And part of that several days, maybe a week
17  training, discrimination and retaliation in the
18  workplace was part of that?
19    A.  That's correct.
20    Q.  So it wasn't like a whole week on
21  discrimination training alone?
22    A.  Right.
23    Q.  And in this in-person training, did you have to
24  take -- or what did they teach you, if you remember, at
25  that in-person training in Memphis?

90

1    A.  It was several years ago.  I would struggle to
2  remember the exact content, so I'm not going to be able
3  to answer the question.
4    Q.  After that in-person training in Memphis when
5  you got your first managerial role for FedEx, did you
6  have any training after that that referenced
7  discrimination or retaliation?
8        MR. BABCOCK:  Object to the form.
9    A.  We periodically have training throughout FedEx
10  on the importance of, you know, diversity, equity, and
11  inclusion.
12    Q.  Is that in Memphis as well?
13    A.  No.
14    Q.  How does that -- what does it look like?
15    A.  Well, we have a -- we have a series of online
16  modules that are reviewed on a regular basis.  We also
17  have a DE&I focus groups that meet with managers,
18  directors, and account executives on a regular basis for
19  that purpose.
20    Q.  How often did you complete an online module
21  about discrimination or retaliation?
22        MR. BABCOCK:  Object to the form.
23    A.  Without checking, I couldn't answer that
24  question.
25    Q.  Could you ballpark it?  Like, once a year?  Did

91

1  it a couple of times throughout my time?
2    A.  I'll say once a year.
3    Q.  Did you have to take a test as part of those
4  online modules, or it was just click through the slides?
5    A.  I don't recall.
6    Q.  What does "EE&I" [sic] stand for?
7    A.  DE&I.  Diversity, equity, and inclusion.
8    Q.  And could you describe what a DE&I focus group
9  is?
10    A.  Yes.  A group of individuals who help keep
11  topics relative to DE&I front and center, to also
12  provide as a network for anyone who may be having
13  struggles in that area or have concerns in that area.
14  And those individuals are really educating our entire
15  sales force on the importance of DE&I.
16    Q.  So who are those -- is that, like, HR
17  representatives that are a part of this focus group?
18    A.  They would be director nominees.  They are not
19  HR professionals.  They are director nominees based on,
20  you know, their interest and passion for the subject.
21    Q.  And did they just travel around to different
22  departments, like, in Houston for you, and give talks,
23  or how did -- how did that work?
24    A.  I can only speak to my representative, and that
25  person primarily addresses our team via Zoom calls.

92

1    Q.  Who is that person?
2    A.  The person on my current team is Ivette Bear.
3    Q.  How do you spell her last name?
4    A.  B-e-a-r.
5    Q.  Was Ms. Bear the same person when Ms. Harris
6  was reporting to you?
7    A.  No.
8    Q.  Who was that person?
9    A.  The teams were established after Ms. Harris's
10  termination.  But when I was in field sales, the DE&I
11  point person was Virginia Solgot, S-o-l-g-o-t.
12    Q.  So what was Virginia Solgot's role if there was
13  no DE&I focus group, that you call it?
14    A.  I'm sorry?
15    Q.  So what did Virginia Solgot do since these
16  focus groups had not been formed yet?
17        MR. BABCOCK:  Object to the form.
18    A.  She actually helped write the content that was
19  delivered to all of the DE&I representatives across our
20  sales organization.  So Virginia was a tremendous leader
21  in that respect.
22    Q.  Did she meet with you via Zoom, or was that in
23  person?
24    A.  Primarily via Zoom.
25    Q.  And how often did you meet to discuss DE&I

23  (Pages 89 to 92)

Michelle Lamb - 4/27/2022

93

1  topics?
2      A.  Say, on average, monthly.
3      Q.  Did you ever bring any concerns to her about
4  Jennifer Harris?
5      A.  No.
6      Q.  What did Virginia Solgot teach or talk about
7  during these monthly Zoom meetings?
8      A.  Anything from, you know, different aspects
9  of -- different aspects of, you know, inequality,
10 whether that's racial inequality, gender, sexual
11 orientation.  She would bring different discussion items
12 up.  She would perform different activities to just
13 really share awareness.  She would share special holiday
14 information that might be specific to certain religious
15 groups.  It was very much an educational group that was
16 formed by Virginia.
17     Q.  Who all was involved in this group?
18     A.  Each individual district had a representative
19 that was working with Virginia and cascading her message
20 to their individual teams.
21     Q.  Could you describe to me what you were taught
22 of how race discrimination looks like in the workplace?
23     A.  It's any instance of treating someone
24 disrespectfully and any instance that attacks a person's
25 dignity.  All people have the right to work in a safe

94

1  and fair environment.
2      Q.  And were you trained that discrimination in the
3  workplace, race discrimination, can still occur even if
4  no one uses a racial slur?
5      A.  Yes.
6      Q.  Race discrimination can occur if no symbols,
7  like a swastika symbol, is drawn, right?  There can
8  still be discrimination occurring, true?
9      A.  True.
10     Q.  Do you agree with me that a manager has the
11 power to treat her direct reports differently from one
12 another?
13     A.  Yes.
14     Q.  Do you agree with me that discrimination --
15 sorry.  Do you agree with me that a company should
16 prevent discrimination in the workplace, not just react
17 to it?
18     A.  Yes.
19     Q.  Same with retaliation?
20     A.  Yes.
21         MS. SANFORD:  All right.  That's all the
22 questions I have for you today.  Thank you, Ms. Lamb.
23         MR. BABCOCK:  Thank you.
24         THE WITNESS:  Thank you.
25         THE REPORTER:  Mr. Babcock, I send the

95

1  original to you for signature?
2          MS. SANFORD:  He logged off.
3          THE REPORTER:  That's okay.
4          MS. SANFORD:  But, yeah.
5          THE REPORTER:  Thank you.
6          (Proceedings concluded at 11:13 a.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

96

1                      ERRATA
2  WITNESS: MICHELLE LAMB          DATE:  APRIL 27, 2022
3  PAGE NO.   LINE NO.   CHANGE          REASON FOR CHANGE
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25

24  (Pages 93 to 96)

Michelle Lamb - 4/27/2022

97

```
1              ACKNOWLEDGMENT OF DEPONENT
2      I,_____, do hereby certify that I
3  have read the foregoing pages, and that the same is a
4  correct transcription of the answers given by me to the
5  questions therein propounded, except for the corrections
6  or changes in form or substance, if any, noted on the
7  attached Errata.
8
9      _____
10       MICHELLE LAMB              DATE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

99

```
1       _____ was not requested by the deponent or a
2  party before the completion of the deposition.
3       I further certify that I am neither counsel
4  for, related to, nor employed by any of the parties or
5  attorneys to the action in which this proceeding was
6  taken.  Further, I am not a relative or employee of any
7  attorney of record in this cause, nor am I financially
8  or otherwise interested in the outcome of the action.
9       Subscribed and sworn to on this the 19th day
10 of May, 2022.
11
12
13
14
15      Leah K. Osteen
        LEAH K. OSTEEN DOW, Texas CSR
16      Certification expires:  4/30/2023
        Firm Registration No. 392
        Osteen & Associates Reporting Services
17      313 Northglen Dr.
        Hurst, Texas  76054-3024
18      (817) 498-9990
        osteenreporting@gmail.com
19
20
21
22
23
24
25
```

98

```
1       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
2                HOUSTON DIVISION
3  JENNIFER HARRIS,
                           *
4       Plaintiff,         *
                           *   CIVIL ACTION
5  vs.                     *   4:21-cv-1651
                           *
6  FEDEX CORPORATE SERVICES, *
   INC.,                    *
7                           *
        Defendant.          *
8
        ********************************************
9           REPORTER'S CERTIFICATION
        ORAL AND VIDEOTAPED DEPOSITION OF
10               MICHELLE LAMB
                 APRIL 27, 2022
11      ********************************************
12      I, LEAH K. OSTEEN DOW, Certified Shorthand
13 Reporter in and for the State of Texas, hereby certify
14 to the following:
15      That the witness, MICHELLE LAMB, was duly
16 sworn by me and that the transcript of the oral
17 deposition is a true record of the testimony given by
18 the witness;
19      I further certify that pursuant to FRCP Rule
20 30(f)(1) that the signature of the deponent:
21      _XX__ was requested by the deponent or a party
22 before the completion of the deposition and is to be
23 returned within 30 days from date of receipt of the
24 transcript.  If returned, the attached Errata contain
25 any changes and the reasons therefor;
```

25  (Pages 97 to 99)

Osteen & Associates Reporting Services
817-498-9990

**Appx-868**