# Exhibit 26

Mac Chonoles - 5/11/2022

**1**

```
1           IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
2                    HOUSTON DIVISION
3   JENNIFER HARRIS,            *
                                *
4        Plaintiff,             *
                                *
                                *   CIVIL ACTION
5   vs.                         *   4:21-cv-1651
                                *
6   FEDEX CORPORATE SERVICES,   *
     INC.,                      *
7                               *
         Defendant.             *
8
9   *********************************
10     ORAL AND VIDEOTAPED DEPOSITION OF
               MAC CHONOLES
11               MAY 11, 2022
             (Conducted Remotely)
12
       *********************************
13
14
15        ORAL AND VIDEOTAPED DEPOSITION OF MAC
16  CHONOLES, produced as a witness at the instance of the
17  Plaintiff, and duly sworn, was taken in the above-styled
18  and -numbered cause on the 11th day of May, 2022, from
19  10:08 a.m. EDT to 12:50 p.m. EDT, before Leah K. Osteen
20  Dow, CSR in and for the State of Texas, reported
21  remotely by machine shorthand, with the witness being
22  located in Memphis, Tennessee, taken pursuant to the
23  Federal Rules of Civil Procedure and any provisions,
24  stipulations, or agreements stated on the record by
25  counsel.
```

**3**

```
1                    I N D E X
2                                            PAGE
3   Appearances ........................................   4
4
5
    MAC CHONOLES
6
       Examination by Ms. Sanford ..................   6
7
8
9   Errata .........................................  92 - 93
10  Reporter's Certification .......................  94 - 95
11
12
13                      EXHIBITS
14  EXHIBIT NO.        DESCRIPTION              PAGE
15  Exhibit 1     Documents in the possession of the   4
                  witness during the deposition
16
17
18
19
20
21
22
23
24
25
```

**2**

```
1              A P P E A R A N C E S
                (Appearing remotely)
2
3
4   FOR THE PLAINTIFF:
5      Ms. Elizabeth "BB" Sanford (videographer)
       THE SANFORD FIRM
6      1910 Pacific Avenue
       Suite 15400
7      Dallas, Texas  75201
       (214) 717-6653
8      esanford@sanfordfirm.com
9
10
11  FOR THE DEFENDANT:
12     Mr. Barak J. Babcock
       FEDERAL EXPRESS CORPORATION
13     3620 Hacks Cross Road
       Building B, 3rd Floor
14     Memphis, Tennessee  38125
       (301) 739-0512
15     barak.babcock@fedex.com
16
17
18
    ALSO PRESENT:
19
       Ms. Jennifer Harris
20
21
22
23
24
25
```

**4**

```
1              P R O C E E D I N G S
2           THE REPORTER:  We are going on the record
3   at 9:08 a.m., on May the 11th, 2022, for the deposition
4   of Mac Chonoles, Chonoles --
5           THE WITNESS:  Chonoles.
6           THE REPORTER:  -- in the matter of Harris
7   vs. FedEx.
8           My name is Leah Osteen, Texas CSR 3916,
9   reporting remotely from Hurst, Texas.  The witness is
10  located in Memphis, Tennessee.
11          Would counsel state their appearances and
12  any agreements for the record, and also identify anyone
13  else in attendance.
14          MS. SANFORD:  BB Sanford for the
15  Plaintiff, Jennifer Harris.
16          And I believe we have come to the
17  agreement that -- Mr. Chonoles has a stack of papers
18  with him, and that's going to be all Exhibit 1 for us.
19          And Barak Babcock, FedEx's attorney, is
20  going to send that over to you, Leah --
21          THE REPORTER:  Okay.
22          MS. SANFORD:  -- for the exhibit.
23          (Exhibit 1 referenced.)
24          MR. BABCOCK:  Barak Babcock for the
25  Defendant.
```

1 (Pages 1 to 4)

Mac Chonoles - 5/11/2022

5

1          Ms. Osteen, if you can send me your email
2   address.  Do you want it by PDF, or do you want paper?
3          THE REPORTER:  PDF is fine.
4          MR. BABCOCK:  Or do you --
5          THE REPORTER:  PDF is fine.  PDF.
6          MR. BABCOCK:  And we'll try -- I do
7   have -- my assistant is in today, so hopefully we can
8   get that done today, but it will certainly be done in
9   the next little bit.  We'll get it all scanned in.  It
10  doesn't -- I don't think there's much color, so it
11  shouldn't be that big of a PDF.
12          And then as I indicated in my April 6,
13  2022, email, FedEx asserts the use of the video
14  recording made in the Zoom platform as objectionable and
15  cannot be submitted to the Court or jury.
16          And then I talked with Ms. Sanford prior
17  to going on the record.  This is a 30(b)(6) deposition.
18  I'm going to object to form questions as a normal
19  deposition.  I'm also going to object and say the phrase
20  "object, outside the scope."  And we've agreed that
21  means that FedEx is objecting to the witness providing
22  30(b)(6) testimony on the question asked because we
23  believe it's outside the scope of what we designated the
24  witness to testify on behalf of FedEx for, but the
25  witness will be allowed to answer in the witness's

6

1   personal capacity.  But just so I don't have to say all
2   that after every time I want to make that objection,
3   we've agreed that the phrase "object, outside the scope"
4   will mean that.
5          THE REPORTER:  Okay, sir, if you'll raise
6   your right hand, I'll swear you in.
7          (Witness placed under oath.)
8          MAC CHONOLES,
9   having been first duly sworn, testified as follows:
10          EXAMINATION
11  BY MS. SANFORD:
12   Q.  Good morning, Mr. Chonoles.
13   A.  Good morning.
14   Q.  My name is BB Sanford.  I'll be the one
15  deposing you today.  I'm just going to jump right in.
16          Do you agree that a company should hire
17  qualified human resource managers?
18   A.  Yes.
19   Q.  Do you agree a company should adequately train
20  managers to follow discrimination and retaliation laws?
21   A.  Yes.
22   Q.  Do you agree that a supervisor -- excuse me,
23  that a company should supervise managers to follow
24  discrimination and retaliation laws?
25          MR. BABCOCK:  What topic are you on,

7

1   Ms. Sanford?
2          MS. SANFORD:  I don't -- I mean, so
3   normally what I do -- if you think it's outside of a
4   topic, I don't want to have to link every one of my
5   questions, go back and say, oh, that's two; oh, that's
6   ten.  If you think it's outside of a topic, you can just
7   object and we can talk about it later.
8          MR. BABCOCK:  Okay.  I'll just object,
9   outside the scope.
10   Q.  Okay.  Mr. Chonoles, do you agree that a
11  company should supervise managers to follow
12  discrimination and retaliation laws?
13          MR. BABCOCK:  Object, outside the scope.
14   A.  From a personal perspective?  I don't believe
15  so, no.
16   Q.  Why don't you believe so?
17   A.  Well, we -- we set up policies at the company
18  that work to prevent harassment, discrimination, and
19  retaliation, and we have expectations of conduct that
20  managers are to follow.  And we have -- you know, we do
21  train our team members and all employees.  And everybody
22  who works with FedEx, there's reporting mechanisms for
23  them to report issues.  And when we do receive
24  complaints, we investigate them thoroughly and take
25  appropriate action.

8

1          So I don't feel it's something that we
2   should be supervising managers.  Rather, we've set up an
3   environment that -- that self-monitors itself and that
4   we -- we oversee and address.
5   Q.  Do you agree that a corporation must prevent
6   discrimination and retaliation?
7          MR. BABCOCK:  Object, outside the scope.
8   A.  From a personal perspective, I believe that --
9   that we work very hard to prevent all types of
10  discrimination, retaliation, and harassment.  And we do
11  that through, as I mentioned, those established
12  processes that I just mentioned in my prior answer.
13   Q.  So it sounds like you work really hard to do
14  that, but do you think companies should prevent
15  discrimination and retaliation?
16   A.  Absolutely, yes.
17   Q.  Should corporations care about workplace laws?
18          MR. BABCOCK:  Form.  Outside the scope.
19   A.  From a personal perspective, yes.
20   Q.  Do you agree that corporations should make sure
21  human resource representatives have the ability to act
22  with integrity, professionalism, and confidentiality?
23          MR. BABCOCK:  Object to the form.
24   A.  From a personal perspective, yes.
25   Q.  So when you say "from a personal perspective,"

2 (Pages 5 to 8)

Mac Chonoles - 5/11/2022

9

1  you are not -- the company is not agreeing that human
2  resource representatives should act -- have the ability
3  to act with integrity, professionalism, and
4  confidentiality?
5      A.  I believe that -- yes, I believe that that is
6  the approach we take.  That is the approach we take at
7  FedEx Services.
8      Q.  So to be clear, you're answering in your
9  personal capacity and as a corporate representative, you
10  agree with that last statement, true?
11     A.  Yes, yes.
12     Q.  Do you agree that a company should make sure
13  human resource representatives have a thorough knowledge
14  of employment-related laws and regulations?
15         MR. BABCOCK:  Object to the form.  Object,
16  outside the scope.
17     A.  From a personal perspective, yes.
18     Q.  So you are not answering in your corporate
19  representative capacity; is that true?
20     A.  From my understanding, that if this is outside
21  the scope of, that I'm to answer from my personal
22  perspective.
23     Q.  So to be clear, FedEx is not going to answer
24  that a corporation should make sure human resource
25  representatives have a thorough knowledge of

10

1  employment-related laws and regulations; is that true?
2         MR. BABCOCK:  What topic does it cover?
3      Q.  Is that true or --
4         MR. BABCOCK:  Can you reference me to the
5  topic, Ms. Sanford?
6         MS. SANFORD:  Yeah.  So you can object to
7  outside the scope or --
8         MR. BABCOCK:  Well, I --
9         MS. SANFORD:  It's going to take a long
10 time if we're going to go through every -- this one goes
11 to a number of them.  Policies and procedures.  Any
12 number of the policy and procedure ones.  Yeah, any of
13 the ones, policies and procedures.
14        MR. BABCOCK:  Yeah, I'm going to object.
15 That's outside the scope as that question is phrased.
16     Q.  So, for the record, Mr. Chonoles, FedEx is not
17 going to answer whether or not it thinks a corporation
18 should make sure human resource representatives have a
19 thorough knowledge of employment-related laws and
20 regulations; is that true?
21        MR. BABCOCK:  Object to the form.
22     A.  I can answer from a personal perspective on --
23 on that, that question.
24     Q.  And you refuse to answer on behalf of FedEx,
25 true?

11

1      A.  I am answering on a personal perspective, as --
2  as the attorney said that that was outside of the scope.
3      Q.  And therefore you are not answering on behalf
4  of FedEx, true?
5      A.  That's correct.
6      Q.  Do you agree that corporations should make sure
7  human resource representatives have strong analytical
8  and problem-solving skills?
9         MR. BABCOCK:  Object to the form.
10     A.  From a personal perspective, yes.
11     Q.  It's true that FedEx is refusing to answer
12 whether or not corporations should make sure human
13 resource representatives have strong analytical and
14 problem-solving skills; is that fair?
15        MR. BABCOCK:  No.  I objected to the form.
16 The witness can answer that question.
17        MS. SANFORD:  The witness said from a
18 personal perspective.
19     Q.  So, Mr. Chonoles, is FedEx or you agreeing that
20 a human resource representative should have strong
21 analytical and problem-solving skills?
22        MR. BABCOCK:  Object to the form.
23     A.  From a personal perspective, the answer to that
24 is yes.
25     Q.  Is FedEx refusing to answer whether it thinks

12

1  human resource representatives should have strong
2  analytical and problem-solving skills?
3         MR. BABCOCK:  Object to the form.
4         Mr. Chonoles, there's a difference between
5  object to the form and object to outside the scope.
6         THE WITNESS:  Okay.
7         MR. BABCOCK:  Okay?  If I object to the
8  form, I'm objecting to some part of the question, and
9  that's between Ms. Sanford and me and a judge in the
10 future.
11        THE WITNESS:  Okay.
12        MR. BABCOCK:  So you can go ahead and
13 answer questions --
14        THE WITNESS:  Okay.
15        MR. BABCOCK:  -- unless I object outside
16 the scope.  All right?
17        THE WITNESS:  Outside scope?  Okay.  All
18 right.
19     A.  So from that perspective, yes.  From a company
20 perspective, we do -- the answer to that question is
21 yes.
22     Q.  Do you agree that corporations should make sure
23 human resource representatives have the ability to
24 prioritize tasks and delegate them when appropriate?
25        MR. BABCOCK:  Object to the form.

3  (Pages 9 to 12)

Mac Chonoles - 5/11/2022

13

1    A.  Yes.
2    Q.  Do you agree that a company should train its
3  managers to prevent discrimination and retaliation by,
4  number one, defining discrimination and retaliation and
5  state that those are illegal and they will not be
6  tolerated?
7         MR. BABCOCK:  Object to the form.
8    A.  Could you repeat the question for me, please?
9    Q.  Sure.  Do you believe that a corporation should
10 train its managers of the ways a company should be able
11 to define discrimination and retaliation and state that
12 they are illegal and will not be tolerated?
13        MR. BABCOCK:  Object to the form.
14   A.  Yes.
15   Q.  Do you agree that a corporation should --
16 should review the company's policies regarding
17 discrimination and retaliation?
18        MR. BABCOCK:  Object to the form.
19   A.  Yes.
20   Q.  Do you agree that the company should ensure
21 that managers understand the responsibility not to
22 discriminate or retaliate?
23        MR. BABCOCK:  Object to the form.
24   A.  Yes.
25   Q.  Do you agree that corporations should ensure

14

1  that managers understand how to investigate, stop, and
2  correct discrimination and retaliation?
3    A.  I'm sorry.  Could you repeat that one more time
4  for me?
5    Q.  Do you agree that a corporation should ensure
6  that managers understand how to investigate, stop, and
7  correct discrimination and retaliation?
8         MR. BABCOCK:  Object to form.
9    A.  Yes, but, you know, I think as far as from an
10 investigation standpoint, we don't train managers to
11 conduct workplace investigations that involve that,
12 those types of matters.  We -- it's the HR department
13 that conducts investigations.
14   Q.  Do you agree that a company should explain the
15 consequences of violating the company's policies against
16 discrimination and retaliation?
17        MR. BABCOCK:  Object to the form.
18   A.  Yes.
19   Q.  So you may disagree with this one because of
20 your prior answer.  I'm not sure.
21        Do you agree that a company should monitor
22 the workplace?
23        MR. BABCOCK:  Object to the form.
24   A.  Can you --
25   Q.  Excuse me.  Let me rephrase that.  Yeah, sure.

15

1  It was a bad question.
2         Do you agree that corporations must
3  supervise managers to follow discrimination and
4  retaliation laws by monitoring the workplace?
5         MR. BABCOCK:  Object to the form.
6    A.  No.
7    Q.  Do you agree that a company should investigate
8  complaints of discrimination and retaliation?
9         MR. BABCOCK:  Object to the form.
10   A.  Yes.
11   Q.  Do you agree that a company should keep records
12 of all investigations and complaints of discrimination
13 and retaliation?
14        MR. BABCOCK:  Object to the form.
15   A.  Yes.
16   Q.  Do you agree that a company should analyze the
17 information it receives as part of the investigation and
18 complaints of discrimination and retaliation?
19        MR. BABCOCK:  Object to the form.
20   A.  Yes.
21   Q.  Do you agree that a company should reward
22 compliance of those who follow the discrimination and
23 retaliation laws and policies?
24        MR. BABCOCK:  Object to the form.
25   A.  Could you repeat the question for me, please?

16

1    Q.  Do you think a company should reward compliance
2  for those who follow the discrimination and retaliation
3  laws and policies?
4         MR. BABCOCK:  Object to the form.
5    A.  That's kind of a -- no, I don't believe so.
6    Q.  Some examples of monitoring the workplace
7  include installing cameras, unannounced inspections,
8  anonymous surveys, and conducting exit interviews.
9         Do you agree or disagree?
10        MR. BABCOCK:  Object to the form.
11   A.  Yes.
12        MR. BABCOCK:  I think it's outside of the
13 scope, too.
14   A.  From a --
15        MR. BABCOCK:  Mr. Chonoles, you don't have
16 to say "from a personal" --
17        THE WITNESS:  Okay.
18        MR. BABCOCK:  -- answer.  The lawyers know
19 what the objection means.
20        THE WITNESS:  Okay.
21        MR. BABCOCK:  And you answered the
22 question.
23        THE WITNESS:  Yes.
24   Q.  When investigating a complaint of
25 discrimination or retaliation based on race, do you

4  (Pages 13 to 16)

Mac Chonoles - 5/11/2022

17

1  consider race-related statements made by decision-makers
2  or persons influential to the decision?
3         MR. BABCOCK:  Object to the form.
4     A.  Yes.
5     Q.  Do you consider comparative-treatment evidence
6  when investigating complaints of discrimination or
7  retaliation?
8         MR. BABCOCK:  Object to the form.
9     A.  Yes.
10    Q.  Do you consider relevant background facts when
11 investigating complaints of discrimination or
12 retaliation?
13    A.  Yes.
14    Q.  Do you consider relevant personnel policies
15 when investigating complaints of discrimination or
16 retaliation?
17    A.  Yes.
18    Q.  Do you consider the decision-maker's race when
19 investigating complaints of race discrimination and
20 retaliation?
21        MR. BABCOCK:  Object to the form.
22    A.  No.
23    Q.  Why not?
24    A.  Discrimination can occur regardless of the race
25 of the alleged party, named party, or -- or the victim.

18

1  Primarily the alleged party in this -- based on your
2  question.
3     Q.  Do you consider statistical evidence when
4  looking at -- sorry -- when investigating complaints of
5  discrimination or retaliation?
6         MR. BABCOCK:  Object to the form.
7     A.  I'm not sure what you mean about -- could you
8  provide an example for what you mean is "statistical"
9  information?
10    Q.  Statistics like how many complaints have been
11 brought against a certain person before; or in a
12 department, how many complaints have been brought in
13 this department before.  Things like that.
14    A.  Thank you.  Yes, we do.
15    Q.  To conduct a fair investigation, an employer
16 should ensure confidentiality, true?
17    A.  True.
18    Q.  To conduct a fair investigation, an employer
19 should provide interim protection for the complainant,
20 true?
21    A.  True.
22    Q.  To conduct a fair investigation, an employer
23 should select an investigator, true?
24    A.  Yes, true.
25    Q.  And then an employer should create a plan for

19

1  the investigation, true?
2     A.  True.
3     Q.  It should also develop interview questions,
4  true?
5     A.  True.
6     Q.  Should conduct interviews, true?
7     A.  True.
8     Q.  Then make a decision, true?
9     A.  True.
10    Q.  Then close the investigation, true?
11    A.  True.
12    Q.  And then develop written summary investigation
13 results, true?
14    A.  True.
15    Q.  Mr. Chonoles, it's true that Jennifer Harris is
16 an African American or black woman, yes?
17    A.  Yes, that is correct.
18    Q.  And race is a protected class, true?
19    A.  True.
20    Q.  So Jennifer Harris is in a protected class,
21 true?
22    A.  True.
23    Q.  Do you agree that Jennifer Harris was qualified
24 for her job as a district sales manager?
25        MR. BABCOCK:  Object to form.  I'm going

20

1  to object it's outside the scope.
2         Go ahead and answer.  Sorry.
3     A.  I have not evaluated her qualifications for the
4  position.
5     Q.  Have you ever seen FedEx hire an unqualified
6  district sales manager?
7     A.  No.
8     Q.  It's true Jennifer Harris was terminated by
9  FedEx, yes?
10    A.  True.
11    Q.  She was replaced by Virginia Solgot; is that
12 true?
13        MR. BABCOCK:  Object to the form.  It's
14 outside the scope.
15    A.  I'm not aware.
16    Q.  Do you know who Jennifer Solgot is?
17    A.  I am not familiar.  I have not prepared, as
18 part of my deposition, for that answer.
19    Q.  So you don't know who she is; is that -- is
20 that true?
21    A.  No.
22    Q.  It's true that Jennifer Harris made a complaint
23 of discrimination and retaliation, yes?
24    A.  True.
25    Q.  Mr. Chonoles, what is your job title?

5  (Pages 17 to 20)

Mac Chonoles - 5/11/2022

21

1    A.  Manager, human resources.
2    Q.  And what does your job description -- what do
3  you do?
4    A.  I am responsible for leading a team that
5  conducts workplace investigations along with some other
6  HR activities.
7    Q.  What other activities?
8    A.  Those include running a U.S. immigration
9  program, HR customer service, unemployment program,
10  emergency contingency planning.
11    Q.  I'm going to share my screen with you.
12       So it's my understanding from talking to
13  other human resource professionals at FedEx, like
14  Michael Clark, that under that HR department, there's
15  employee resolutions department and a business
16  consulting department.
17       Is that true?
18       MR. BABCOCK:  Object, outside the scope.
19    A.  Yes, that's true.
20    Q.  Are there any other main HR departments, like
21  payroll or ...
22       MR. BABCOCK:  Objection, outside the
23  scope.
24    A.  Yes, there are.
25    Q.  Could you list some of those for me, or list

22

1  them?
2       MR. BABCOCK:  Same objection.
3    A.  We have a talent acquisition.
4       MR. BABCOCK:  Mac, can you see what she's
5  writing?  Do you know you can --
6       THE WITNESS:  Yeah.
7       MR. BABCOCK:  -- use your mouse to move
8  the windows?
9       THE WITNESS:  Yeah.
10       MR. BABCOCK:  Okay.
11    A.  We have a compensation, organizational
12  effectiveness, talent management.  We've got, let's see,
13  data analytics, and these are under -- in my VP's
14  organizations.  That's -- I believe this is complete.
15  There are -- yeah.
16    Q.  Under your -- what did you say?  Your VP?
17    A.  Those are the organizations under my VP's
18  organization.
19    Q.  And VP of HR?
20    A.  Uh-huh, yes.
21    Q.  And what's that person's name?
22    A.  Mike Lauderdale.
23    Q.  How do you spell "Lauderdale"?
24    A.  L-a-u-d-e-r-d-a-l-e.
25    Q.  Thank you.

23

1       The only HR department at FedEx that
2  conducts investigations of complaints of discrimination
3  or retaliation is the employee resolutions department,
4  true?
5    A.  True.
6    Q.  All right.  And -- oops, excuse me.
7       All right.  I'm showing you an org chart
8  that I did with Michael Clark the other day.  I just
9  want to double-check it with you.  I can zoom in.
10       So it starts with -- HR strategic advisors
11  have no direct reports, true?
12       MR. BABCOCK:  Object to the org chart line
13  of questions as outside the scope.  I don't want to
14  interrupt you, Ms. Sanford.
15       Is that all right?
16       MS. SANFORD:  Yes, that's fine.
17    A.  True.
18    Q.  And Michael Clark is an HR strategic advisor,
19  true?
20    A.  True.
21    Q.  There are six HR strategic advisors?
22    A.  No.
23    Q.  How many HR advisors are there?
24    A.  I'd have to refer to notes.  I believe I have
25  total of ten employees.  Of those, as of today, I have

24

1  two strategic advisors and then a mix of -- and -- and
2  as far as -- this is including the red -- this is
3  including my entire team, which extends beyond
4  investigations as well.  Two strategic advisors.  Both
5  of them work in the employee resolutions area.
6    Q.  And then the rest of the eight employees are
7  not strategic advisors?
8    A.  That's correct, as of today.
9    Q.  As of 2017 to 2019, is that the same?
10    A.  That is -- I've had two consistently.
11    Q.  Okay.  So all of these people (indicating)
12  report to you?  Yes?
13    A.  Correct.
14    Q.  Could you describe the basic job functions of
15  your other eight employees, just generally?
16    A.  Generally speaking, I've got -- let me
17  calculate that in my head here just to make sure I've
18  got that right.
19       So, generally speaking, with the exception
20  of two of those employees, the rest of those
21  employees -- so out of the ten, eight of them work in
22  the employee resolutions space or conduct workplace
23  investigations.  The other two conduct HR support
24  functions and run processes and programs.
25    Q.  So how many -- I'm a little confused.  How

6  (Pages 21 to 24)

Mac Chonoles - 5/11/2022

```
                                                    25
 1   many -- how many of your employees conduct
 2   investigations at FedEx?
 3      A.  Should be eight.  Eight employees conduct
 4   investigations.
 5      Q.  What is their job title for the employees that
 6   conduct investigations?
 7      A.  There's HR strategic advisor, HR advisor, and
 8   an HR generalist are the three titles.
 9      Q.  Okay.  HR strategic advisor, HR generalist.
10   And what was the third?
11      A.  HR advisor.
12      Q.  You have two strategic advisors.
13          How many generalists do you have?
14      A.  One.
15      Q.  And how many advisors do you have?
16      A.  Five.
17      Q.  All right.  So eight employees at FedEx conduct
18   investigations, true?
19      A.  You had mentioned EEO investigations.  So, yes,
20   eight conduct EEO investigations.
21      Q.  And it's my understanding from talking to
22   Michael Clark that everyone offices at the Collierville,
23   Tennessee, office.
24          Is that true?
25      A.  No, that's not true.
```

```
                                                    26
 1      Q.  Where does everyone office?
 2      A.  I've got -- let's see.  Michael is officed out
 3   of there.  I have one team member out of Harrison,
 4   Arkansas.
 5      Q.  Okay.  Are the rest in Tennessee?
 6      A.  Yes.
 7      Q.  So just talking about ...
 8      A.  And that's -- just for your reference, it's
 9   "AR."
10      Q.  Oh, thank you.
11          MR. BABCOCK:  There might be a Harrison,
12   Alaska.
13          THE WITNESS:  There may be.  That's why I
14   thought I'd bring it up.
15      Q.  There are no EEO investigators at FedEx who
16   office in Texas, true?
17      A.  On my team, yes, that's correct.
18      Q.  Are there any other teams at FedEx who conduct
19   investigations?
20          MR. BABCOCK:  Object to the form.
21      A.  Kathie Walthall's team will conduct
22   investigations into matters that don't involve EEO type
23   of issues.
24      Q.  All right.  So no employee -- let me try to
25   rephrase that better.
```

```
                                                    27
 1          No FedEx employee who conducts EEO
 2   investigations offices in Texas, true?
 3      A.  That's true.
 4      Q.  Is Kathie Walthall a peer to you?
 5      A.  She is.
 6      Q.  And then is it true that you report to Adrian
 7   Webster, the director of HR?
 8      A.  That's true.
 9      Q.  And the next person in the chain of command is
10   VP of HR, Mike -- what was his last name?
11      A.  Lauderdale.
12      Q.  So that's true?
13      A.  That's true.
14      Q.  And Mike Lauderdale reports to SVP of HR?  Yes?
15      A.  Correct.
16      Q.  And what is his name?
17      A.  Chris Winton.
18      Q.  How do you spell that last name?
19      A.  I believe he -- W-i-n-t-o-n.  I believe he may
20   be a CVP, corporate vice president, not an SVP.
21      Q.  And then does Mr. Winton report to the CEO of
22   FedEx?
23      A.  That's true.
24      Q.  And Kathie Walthall also reports to Adrian
25   Webster?
```

```
                                                    28
 1      A.  That's true.
 2      Q.  Okay.  Is Kathie Walthall also in the employee
 3   resolutions department?
 4      A.  She's in the employee relations organization
 5   under Adrian Webster.  Her official organization title's
 6   name is business consulting.
 7      Q.  I'll share my screen again.
 8          MR. BABCOCK:  Ms. Sanford, are we off the
 9   org chart?
10          MS. SANFORD:  Yes.
11          MR. BABCOCK:  Okay.  Thank you.
12      Q.  I'm showing you FedEx's policy and procedure
13   labeled "Anti-Harassment."  Do you see that?
14      A.  I do.
15      Q.  It starts on Bates label 1273.  It states that
16   FedEx Corporate Services, Inc., does not tolerate any
17   form of harassment based on race.
18          Do you see that?
19      A.  I do.
20      Q.  And do you agree that FedEx does not tolerate
21   harassment based on race?
22      A.  I do.
23      Q.  The next page, it says the same thing about
24   retaliation.  FedEx Services will not tolerate any
25   retaliatory action against any employee for making a
```

7 (Pages 25 to 28)

Mac Chonoles - 5/11/2022

29

1    harassment complaint.
2              Do you see that and agree with that?
3              MR. BABCOCK:  I can't see it, but maybe
4    you can.
5       A.  I can see it, and --
6              MR. BABCOCK:  Okay.
7       A.  -- agree with it.
8       Q.  Do you see where it states, "Before the
9    resolution of any discrimination or harassment
10   complaint, an employee may not be involuntarily
11   transferred, reassigned, or subjected to any
12   disciplinary action without concurrence from Human
13   Resources and Legal"?
14      A.  I do see that.
15      Q.  What does "concurrence" mean?
16      A.  Without -- from -- it means to -- agreement
17   between -- with human resources.  So there has to be a
18   consultation agreement.
19      Q.  The next policy is the equal employment
20   opportunity policy that I'm showing you, Bates-labeled
21   1275.  It says one of the human resources roles is to
22   investigate complaints.
23              Do you see that?
24      A.  Yes.
25      Q.  There is no -- it doesn't look like to me in

30

1    this policy there is a policy that says how to
2    investigate complaints.
3              Is that fair?
4       A.  That is correct, yes.  Let me take a look at --
5    can you go back to the prior page, please?
6       Q.  Sure.
7       A.  Yes, that's correct.
8       Q.  I'm now showing you the "Explore - A Complaint
9    Review Process" policy and procedure.  It starts on
10   Bates label 1277.
11              Do you see that?
12      A.  I do.
13      Q.  It looks like on this first page it doesn't
14   talk about investigations, or on the second page.
15              Is that fair?
16      A.  I'd like to refer to -- can you go back to that
17   prior page and zoom out?
18      Q.  (Complies.)
19      A.  And could you move to the next page, please?
20      Q.  (Complies.)
21      A.  There are some very high-level guidelines
22   around the investigation process, but it doesn't dictate
23   how investigations are to be accomplished.
24      Q.  The next policy I'm showing you starts on Bates
25   label 1279.  It's the internal EEO discrimination

31

1    complaint process.
2              Do you see that?
3       A.  I do.
4       Q.  I'll zoom in.  It states again FedEx does not
5    tolerate discrimination based on race.
6              Do you see that?
7       A.  I do.
8       Q.  Because it's the law.
9              Do you see that?
10             MR. BABCOCK:  Object to the form.
11      Q.  Or do you -- sorry.  Let me the rephrase.
12             Do you agree that it is the law to not
13   discriminate based on race?
14      A.  Yes.
15      Q.  And it's FedEx's intention to prevent
16   discrimination, true?
17      A.  True.
18      Q.  Same for retaliation.  FedEx will not tolerate
19   any retaliatory action, true?
20      A.  True.
21      Q.  It is FedEx's intention to prevent retaliation,
22   true?
23      A.  True.
24      Q.  So I want to ask about the investigations
25   again.  I want to show you the second page, where it

32

1    talks about investigations.  But the first page does not
2    talk about how to conduct an investigation.
3              Is that fair?
4       A.  That's fair.
5       Q.  The second page, it looks like the -- one, two,
6    three -- fourth paragraph down is the only paragraph
7    that talks about how to conduct an investigation.
8              Is that fair?
9       A.  True.  I would add to that the third-party
10   representation is also a guideline related to
11   investigation process.
12      Q.  So just to talk about that third-party
13   representation, it says, "During the internal review
14   process, attorneys are not permitted to serve as
15   advocates on behalf of employees, nor appear on behalf
16   of employees or former employees.  Attorneys or other
17   such representatives must be directed to contact legal.
18   No third party is permitted to participate in any manner
19   in the internal complaint procedure."
20             Did I read that correctly?
21      A.  You did.
22      Q.  Is it fair to say that section says attorneys
23   aren't allowed for internal complaint investigations?
24      A.  That's true.
25      Q.  So it doesn't talk about how to conduct an

8  (Pages 29 to 32)

Mac Chonoles - 5/11/2022

33

1  investigation, true?
2      A.  True.
3      Q.  Looking at the paragraph labeled
4  "Investigation," it states, "An e-mail designating all
5  communications as 'Privileged and Confidential' must be
6  received from Legal before initiating an investigation
7  of any employee discrimination issues."
8          Did I read that correctly?
9      A.  You did.
10     Q.  So step one, it looks like legal sends an email
11  designating everything as privileged and confidential?
12  Is that fair?  That's step one?
13     A.  That -- that is correct.
14     Q.  The next sentence states, "The Director of the
15  employee submitting the complaint is typically
16  responsible for the investigation and the content of the
17  report, and is accountable for meeting the timeframes
18  established for the process."
19          Do you see that?
20     A.  I do.
21     Q.  It goes on to say, "Should complainant make
22  allegations against the Director, the investigation will
23  be conducted by appropriate leadership.  Timeframes are
24  generally within 30 days depending upon the complexity
25  of the investigation."

34

1          Did I read that correctly?
2      A.  You did.
3      Q.  Do you see anywhere that it says an HR
4  representative should -- will conduct an investigation?
5      A.  Not in that paragraph.
6      Q.  It says the director of the employee.
7          Is that a non-HR professional?
8      A.  That is not -- the director is not an HR
9  professional; however, HR is a support organization, and
10  HR conducts all EEO investigations.  They conduct the
11  investigations in support of the director or the
12  appropriate level of leadership.  And so we conduct the
13  investigation.  We provide findings and recommendations
14  to them, to that member of leadership.
15     Q.  But that is not what -- I mean, that's not what
16  this policy says, right?
17     A.  That is correct.
18     Q.  So there's another policy that you're talking
19  about?
20     A.  No.  That is -- what I'm referring to is
21  practice.  This is not an all-inclusive description of
22  the investigation process, but it is a high-level
23  expectation on who conducts the investiga- -- or who's
24  involved in the investigation from the business.
25     Q.  I'm showing you the progressive corrective

35

1  action policy.
2          Is there any other policy that speaks
3  about how to conduct an investigation that I haven't
4  shown you?
5      A.  No, not that I can think of.
6      Q.  Mr. Chonoles, would you describe your training
7  from FedEx about discrimination and retaliation,
8  conducting investigations surrounding discrimination and
9  retaliation?
10         MR. BABCOCK:  Object to the form; and,
11  object, that's outside the scope.
12         Go ahead and answer.
13     A.  So as far as my training from FedEx, they
14  provided me funds in order to get a -- complete a course
15  related to preparation for certification of -- the SHRM
16  SCP certification.  I obtained certification in 2007
17  which extended through, I believe, 20- -- 2011.
18         I worked with experienced HR advisors on
19  my team to learn the investigation process.  I
20  participated in Management Practices and the Law when I
21  became a manager and conduct- -- and went through
22  refresher training when I took on this -- this role
23  leading this team.
24         And so, yes.  So those are some of the
25  forms of preparation that -- for this role.

36

1          Also, attended a training with our
2  in-house legal counsel on multiple occasions related to
3  investigation process and the reporting process.  And I
4  have regular ongoing discussions with -- with my legal
5  counsel related to all matters where I have questions
6  related to the investigations that I'm personally
7  investigating.
8      Q.  The training with legal about investigation
9  process and reporting processes, did that come with any
10  PowerPoint slides, any type of materials?
11     A.  The attorneys do prepare materials and do share
12  that with us while we're in the class.
13     Q.  And you rely on that as a part of your
14  investigations?
15     A.  I utilize it and absorb that material during
16  the course.  And I don't know if I -- I'm sure -- I
17  haven't had a need to go back for the material, but --
18  but, yes, I utilize that.
19     Q.  Let me ask you, do you have any degrees, post
20  high school degrees?
21     A.  Yes.
22     Q.  And what are those?
23         MR. BABCOCK:  Object.  It's outside the
24  scope.
25         But go ahead and answer this line of

Osteen & Associates Reporting Services
817-498-9990

Mac Chonoles - 5/11/2022

37

1  question, sir.
2      A.  I have a bachelor's degree in business
3  administration with an emphasis in human resources from
4  Regis University in Denver, Colorado.
5      Q.  Are you from Colorado?
6      A.  I am.
7      Q.  What part?
8      A.  I lived in Aurora.  I've lived everywhere, but
9  Aurora was ...
10     Q.  I'm in Steamboat right now, actually.
11     A.  Love that area.
12     Q.  Do you have any other degrees?
13     A.  No.
14     Q.  And do you have any current HR certifications?
15         MR. BABCOCK:  Object as outside the scope.
16         Go ahead and answer.
17     A.  No.
18     Q.  But you did have an HR certification from 2007
19  to 2011, yes?
20     A.  I believe those are the dates, yes.
21     Q.  Is that your SHRM SCP certification?
22     A.  That's correct.
23     Q.  How long have you been an HR manager, or when
24  did you -- let me rephrase that.  When did you first
25  come into the role as HR manager?

38

1          MR. BABCOCK:  I have a standing objection,
2  Ms. Sanford, that's outside the scope, his history and
3  all that stuff.  Is that a yes?
4          MS. SANFORD:  Yes, I knowledge that you
5  have a standing objection.  That's fine.
6          MR. BABCOCK:  Okay.  Thank you.
7      A.  I believe it was 2013 that I became an HR
8  manager.
9      Q.  And so in 2013 you became the HR manager.
10  That's when you took your refresher training that you
11  were speaking about, true?
12     A.  Yes, 2013 or 2014.
13     Q.  What was your prior role?
14     A.  I was an HR strategic advisor.
15     Q.  And what dates were you an HR strategic
16  advisor?
17     A.  I believe it was September 2010 is when I
18  became an HR strategic advisor.
19     Q.  Did you say September 2010?
20     A.  Yes.
21     Q.  And before that, what was your job title?
22     A.  I believe I was a -- what was the exact title?
23  It was -- it was a project manager role.  I think it was
24  a solutions strategic advisor.
25     Q.  At FedEx?

39

1      A.  Yes.
2      Q.  And when did you start that role?
3      A.  I believe that was April of 2007.
4      Q.  And what about before that?
5      A.  Before that, I was a senior sales analyst.
6      Q.  At FedEx?
7      A.  Yes.
8      Q.  And what time frame were you a senior sales
9  analyst at FedEx?
10     A.  I believe that was sometime in 2004.
11     Q.  Before that, what did you do?
12     A.  Director admin at FedEx.
13     Q.  What time frame?
14     A.  Would have been June 2002.
15     Q.  And anything before that?
16     A.  Outside of FedEx?
17     Q.  Was that when you first started at FedEx, was
18  2002?
19     A.  That's when I first started at FedEx, yeah.
20     Q.  So prior to FedEx, were you in an HR role?
21     A.  No.
22     Q.  So how long would you say you have been in the
23  HR industry, working in the HR industry?
24     A.  Twelve years.
25     Q.  So when you said you took the Management

40

1  Practices and Law course, when did you take that?  When
2  you were a strategic advisor, HR strategic advisor?
3      A.  Back in -- around -- Management Practice and
4  the Law, I would have taken that actually when I became
5  an HR strategic advisor the first time, sometime around
6  September 2010.
7      Q.  Okay.  So you have -- you took a course to get
8  your SHRM certification; you had a SHRM certification
9  but expired in 2011; you worked with experienced HR
10  advisors; you took a Management Practices and Law course
11  in 2010 when you became an HR strategic advisor; you
12  took a refresher training when you became an HR manager
13  in 2013 or 2014; and you have attended training with
14  legal about investigation processes and reporting
15  processes sporadically.
16         Is that true?
17         MR. BABCOCK:  Object to the form.
18     A.  Yes.  I would add to that I've also attended a
19  law conference at the Memphis SHRM in 2019, I believe it
20  was.  And I also attended a law -- Ogletree law seminar
21  in Chicago in 2016.
22     Q.  Ogletree Deakins, the defense employment law
23  firm?
24     A.  That's correct.
25     Q.  Sorry.  What year did you take that?

10  (Pages 37 to 40)

Mac Chonoles - 5/11/2022

41

1    A.  I believe in 2016.
2    Q.  Why are you taking a law seminar class at an
3  employer defense law firm?
4         MR. BABCOCK:  Object as outside the scope.
5      You can go ahead and answer.
6    A.  I found it -- interesting topics related to the
7  foreign national program that I lead.  And at the time,
8  Ogletree was a client of ours.
9    Q.  Would you explain to me the importance of
10 attending --
11   A.  I'm sorry.  They were an attorney of ours, not
12 a client of ours.
13   Q.  Got it.
14        Would you explain the importance of
15 attending law conferences as an HR professional?
16        MR. BABCOCK:  Outside the scope, and
17 object to the form.
18   A.  Found it important to -- see if there are
19 any interesting new -- new areas or things that I
20 could -- could learn that maybe I could discuss with my
21 own attorneys, and as well as, you know, see if there's
22 any things -- things that we could incorporate into our
23 own program, make it more efficient and more effective.
24   Q.  So you agree that it's important that HR
25 professionals understand basic workplace laws, true?

42

1         MR. BABCOCK:  Object to the form.
2    A.  Yes.
3         MS. SANFORD:  Do you want a take a quick,
4  five-minute break?  Is this a good time?
5         MR. BABCOCK:  Yes.  Thank you.
6         (Recess taken from 10:07 to 10:15.)
7         THE REPORTER:  Back on the record at
8  10:15.
9    Q.  How many reports of discrimination or
10 retaliation did Ms. Harris make at FedEx?
11   A.  Ms. Harris filed -- or we -- we have three
12 cases, three EEO investigations that were conducted
13 internally.  She filed a complaint with -- externally, I
14 believe, with the EEOC.  That was investigated by legal.
15 And she filed two Explore cases with us as well.
16   Q.  What was your involvement in any of those
17 complaints or investigations?
18        MR. BABCOCK:  Object.  That's outside the
19 scope, obviously.
20        I think you can tell by the question, but
21 go ahead and answer.
22   A.  I believe I may have received an email from her
23 that initiated one of the investiga-- one of the
24 investigations, and I may have responded to her in an
25 email.

43

1         As far as, you know, my involvement during
2  the investigation, you know, I do have regular coaching
3  sessions with my team on a -- you know, I think, weekly
4  or biweekly meeting.  I don't know what my frequency is
5  with Michael.  But, you know, we do discuss each of the
6  cases, and if there's any questions or lines of --
7  avenues we're going down, we may have discussions about
8  that and/or recommendations.
9    Q.  What was the date of the first report of
10 discrimination?  Do you have that?
11   A.  Yes.  March 11th, 2019.
12   Q.  And Michael Clark conducts that investigation,
13 true?
14   A.  Yes.
15   Q.  You select Michael Clark for -- to conduct that
16 investigation?
17   A.  Yes, correct.
18   Q.  And could you describe the process that he went
19 through for that investigation?
20   A.  When I assign a case to him, he receives that
21 information.  He reviews it.  He formulates a plan and
22 puts together interview questions and who he's going to
23 be interviewing and data he needs to collect.  He
24 conducts that investigation, formulates recommendations
25 and -- conclusions and any recommendations, if

44

1  applicable.
2         Obviously, one of the things he's doing
3  early on in the investigation is, you know, working with
4  the lead -- business leadership or partner, the VP or
5  the director.  I think in this situation, we would have
6  been a VP involved in -- in this given Michelle Lamb is
7  a director.  Discussing the situation, gaining their
8  perspective, explaining the process to that -- to
9  that -- to that VP.
10        And after the -- his report is completed,
11 he will, you know, work with legal if there is any
12 review, you know, associated with that and if he has any
13 questions.  And then he presents that information back
14 to the business for their review and consideration.  And
15 if there are any types of recommendations that need to
16 be implemented, we leave the case open until all the --
17 until all the recommendations are implemented.
18        We notify the complainant that the
19 investigation has been completed, sharing that, you
20 know, if there were any opportunities or corrective
21 action that was required, it would have been
22 implemented.  And then we close that case out.
23   Q.  I think you said if -- and correct me if I'm
24 wrong.  I don't want to misstate anything.  If Mr. Clark
25 had questions, he would go to legal.

11 (Pages 41 to 44)

Osteen & Associates Reporting Services
817-498-9990

Mac Chonoles - 5/11/2022

45

1    Why would he not go to -- to you or HR?
2 Why would he go to legal instead?
3    A.  He goes to me as well.  As -- as I discussed in
4 my earlier answer, you know, we have regular meetings
5 and we talk about those things.
6    Sometimes -- sometimes those -- you know,
7 we seek legal guidance as well in those situations.  If
8 it's -- and sometimes I direct the team members to go to
9 legal if it's something -- I don't feel that it's
10 something that I can answer directly and we'd like to
11 consult our attorneys.
12    Q.  Did you direct Mr. Clark to legal in any of
13 those scenarios or cases with Ms. Harris?
14    A.  I can't recall.  I can't recall.
15    Q.  You mentioned that Mr. Clark or the strategic
16 advisor would submit the report to the business for
17 review and recommendations.
18    "The business," do you mean the non-H- --
19 what do you mean by "the business"?
20    A.  Yeah, as listed in the internal EEO policy,
21 that -- that section where it talks about the
22 investigation, it's either the director or the VP in
23 that situation are the appropriate leadership.
24    Q.  So you submit it to the VP.  In this --
25 director of VP.  In this case, VP Dave Russell, true?

46

1    A.  That would be correct, yes.
2    Q.  And you have Dave Russell review it and give
3 recommendations, or how does that work?
4    A.  Yeah, we share the findings and recommendations
5 and conclusions with -- with Dave.  He -- or Michael
6 would have done that.  And seeking agreement, or if
7 there's any -- that would be for the VP to review and
8 consider in making sure he's in agreement with those --
9 with those recommendations.
10    Q.  And you said you notify the complainant of a
11 complete investigation; is that true?
12    A.  That is part of our process, yes.
13    Q.  Do you tell the complainant the findings of
14 your investigation?
15    A.  No, we don't.
16    Q.  Do you consult with the complainant on who is
17 an appropriate witness to interview?
18    A.  That is part of our process, yes.
19    Q.  I'll share my screen with you.  I'm showing you
20 a document.  It's Bates-labeled FXS_ESI_0141750.  It
21 goes all the way down to 141757.
22    A.  What's the date of that invest- -- that
23 investigative report?
24    Q.  It looks like it says June 7th, 2019.
25    A.  Thank you.

47

1    MR. BABCOCK:  Have you got yours out?
2    THE WITNESS:  Yes.  I have it here.
3    Q.  Is this the first investigation report done by
4 Mr. Clark for Ms. Harris's complaint in March?
5    A.  It is.
6    Q.  So when it says June 7, 2019, that is the date
7 that the investigation is completed, or what does that
8 date mean?
9    A.  That is the date the report is completed and
10 signed by -- by the investigator.
11    Q.  While an investigation is pending, is it
12 policy, practice -- or practice at FedEx to make sure
13 there is not any disciplinary action against the
14 complainant while investigation is pending?
15    A.  Let me refer to the policy here.  So according
16 to policy -- and the Bates number is FXS 1280 -- it
17 says, "Before the resolution of any discrimination,
18 harassment, or retaliation complaint, an employee may
19 not be involuntary transferred, reassigned, or subjected
20 to any disciplinary action without concurrence from
21 Human Resources and Legal."
22    Q.  Are you aware that Jennifer Harris was given a
23 letter of counseling and then a performance improvement
24 plan on June 26, 2019?
25    A.  Refer to that documentation here.  But it

48

1 doesn't seem unreasonable as long as there was
2 concurrence, but let me take a look.  I believe I have
3 the document here.
4    Q.  I can share my screen, too.  Are you seeing
5 this termination form?
6    A.  Yeah, I've actually found -- yeah, I have --
7 I'm referencing Bates FXS_ESI_0145375.  States on
8 June 26 she received a letter of counseling for
9 unacceptable performance.
10    Q.  And then when is Ms. Harris's next complaint of
11 discrimination or retaliation?  I have September 6.
12 Does that sound about right to you?
13    A.  That was an investigative report date of
14 September 6.  I have a June 26, 2019, complaint.  I
15 think that is, let's see, FX -- Bates FXE 7.
16    Q.  All right.  And is there investigation that
17 follows that complaint?
18    A.  That complaint was investigated, and the report
19 was produced, signed on September 6, 2019.
20    Q.  And what Bates number is that one?
21    A.  FXS_ESI_0145369.
22    Q.  And then Jennifer Harris receives a letter of
23 warning, and then a performance improvement plan was
24 created on September 13, 2019.
25    Does that sound right to you?

12  (Pages 45 to 48)

Mac Chonoles - 5/11/2022

49

1   A.  I'd have to go through the -- through the
2   documents to get the exact date, but I -- I can say that
3   she did receive a letter of warning subsequent to that.
4   And ...
5   Q.  And then when is Ms. Harris's next complaint?
6   A.  I show it being received on December 4th, 2019.
7   Q.  And what Bates-number document are you looking
8   at?
9   A.  It looks like it is FXE 351.
10   Q.  And she is terminated on -- oh, is there a
11   report -- investigation or report done from that
12   complaint?
13   A.  Yes.  That's FXS_ESI_0142290.
14   Q.  And when is that completed?
15   A.  That has a report date of 12/31/2019.
16   Q.  And she's terminated on January 7, true, 2020?
17   A.  I don't have that information in front of me.
18   Q.  All right.  Let me go back and let's look at
19   the June 7, 2019, investigation report.  It looks like
20   Michael Clark sends this to you and Linda Taylor.
21        Who is Linda Taylor?
22   A.  Linda Taylor is a former HR manager with the
23   business consulting team.
24   Q.  It states -- there's a section that says
25   "Witnesses:  The following employees were interviewed."

50

1   And it lists -- one, two, three, four -- five people
2   besides Ms. Harris.
3        Do you see that?
4   A.  Yes.
5   Q.  Do you see Michelle Lamb listed as a witness
6   that was interviewed in this box?
7   A.  No.
8   Q.  But when I look further down, it does look like
9   Michelle Lamb was interviewed.
10   A.  It does.
11   Q.  Do you know why it's not put in the witness
12   box?
13   A.  I don't know the answer to that question.
14        MS. SANFORD:  It looks like my computer's
15   being slow.
16   Q.  It starts off under the investigation and
17   findings section.  It looks like it's Ms. Harris's side
18   of the story.
19        Is that what it looks like to you?
20   A.  It does.
21   Q.  And then further down that page, it looks like
22   Michael Clark gets Ms. Lamb's side of the story.
23        Is that what it looks like to you?
24   A.  It does.
25   Q.  And that's it for that section.  Just

51

1   Ms. Harris's side and Ms. Lamb's side of the story.  I
2   don't see any other people interviewed about -- in this
3   section, Section A.
4   A.  That seems correct, yes.
5   Q.  If we go to Section B, looks like we get
6   Ms. Harris's side of the story first, then Brian
7   Conrey's side of the story, and then Ms. Lamb's side of
8   the story.
9        Is that what it looks like to you?
10   A.  Yeah.  I mean, I'd have to go reread the
11   section to make sure there wasn't any miscellaneous
12   comments that specifically refer to any other
13   interviews, but I'm not seeing any other reference to
14   another interview in that section.
15   Q.  If we move to Section C, it looks like you get
16   Ms. Harris's side of the story and then Ms. Lamb's side
17   of the story.
18        Do you see that?
19   A.  Yes, correct.
20   Q.  Section D, as in dog, looks like we get
21   Ms. Harris's side of the story and then Ms. Lamb's side
22   of the story, and then maybe -- is that -- is there
23   anybody -- does it look like Millner and Callahan's side
24   of the story, or is that just part of Ms. Lamb's
25   interview?  Do you know?

52

1   A.  I don't know.  That would be a question for
2   Michael.
3   Q.  And then Section E, it looks like you've got
4   Ms. Harris's side of the story and then Ms. Lamb's side
5   of the story.  No other witnesses or interviewees for
6   that section?
7   A.  That appears to be correct, yes.
8   Q.  And then there's an attachment.  Attachment A
9   looks like a piece of documentary evidence, so not just
10   an interview.  That's the first time we see that.  True?
11   A.  Yes.
12   Q.  And then we come to a conclusion,
13   recommendations, Michael Clark's signature?
14   A.  Correct.
15   Q.  And then, of course, Attachment A, which is a
16   single email, follows.  True?
17   A.  True.
18   Q.  So I want to go back to the witness section at
19   the top.  How do we know any of these people -- well,
20   besides Ms. Harris, Brian Conrey, maybe even -- I can
21   see how you can know Brian Conrey was interviewed.
22   There's a specific section talking about his side of the
23   story.
24        But how do we know Rebecca Callahan, Jaime
25   Golden, Casey Millner, or Richard Holley were

13  (Pages 49 to 52)

53

1 interviewed and what they said as part of their
2 interviews?
3    A.  That would be part of Michael Clark's
4 investigative documentation.
5    Q.  So he would have a specific document that says,
6 I interviewed Richard Holley on "X" date and Richard
7 said "Y"?
8    A.  Correct.
9    Q.  Is that a policy or a procedure that FedEx has?
10 You have to keep records of interviewee notes?
11    A.  That is our practice.
12    Q.  How do you know it's followed, that the
13 investigator is doing that?
14    A.  We conduct reviews to make sure the documents
15 are -- are uploaded to our case management system.
16    Q.  Is there a specific --
17    A.  And we rely on -- and we rely on our employees
18 to follow the procedures as well.
19    Q.  When you say upload it to your system, is there
20 a specific, like, form that they have to upload that
21 says, I interviewed Richard Holley on "X" date; he said
22 "Y"?
23    A.  Yes.  We call them the interview notes, and
24 those are documented and retained.
25    Q.  So "interview notes" is a specific --

54

1 "interview notes" is a specific document and form that
2 FedEx has that its investigators use to document when
3 they interviewed a witness and what the witness said?
4    A.  That's correct.
5    Q.  And if there are no interview notes, is it fair
6 to -- is it a fair conclusion that the investigator did
7 not interview a particular witness?
8        MR. BABCOCK:  Object to form.
9    A.  Yeah, I don't know, or it could be missing or
10 it could be misplaced.  I mean, I would assume if we
11 interviewed someone, we'd have the notes.
12    Q.  But those notes do not go into this -- into an
13 investigation report?
14    A.  No.
15    Q.  I want to go to the conclusions section.  The
16 conclusion section states, "None of the Complainant's
17 allegations is substantiated.  As to the adjustment on
18 the BJ Services account, it was unsubstantiated that
19 Lamb was trying to hide anything from Complainant.
20 Complainant should not have attended the Pathways event
21 because Lamb had specifically instructed her not to do
22 so."
23        Did I read that correctly?
24    A.  Yes.
25    Q.  So let's just take the BJ Services section.

55

1 "As to the" -- specifically, it states, "As to the
2 adjustment on the BJ Services account, it was
3 unsubstantiated that Lamb was trying to hide anything
4 from Complainant."
5        We go back up to the BJ Services section.
6 We have complainant's side of the story, Brian Conrey
7 says some things, and Lamb's side of the story.  And
8 that's it.
9        It doesn't look like the -- Michael Clark
10 looked at any documents, does it?  Do you know if he
11 looked at any documents?
12    A.  I don't know the answer to that question.
13    Q.  It says, "Brian Conrey confirmed raising
14 concerns with Lamb about the negative adjustment
15 Complainant would receive due to a pricing error."
16        Do you see that?
17    A.  I do.
18    Q.  It looks like Brian Conrey is confirming
19 something that the complainant says.
20        Is that what it looks like to you?
21    A.  I think his statement, you know, he raised a
22 concern with Lamb about the negative adjustment.  I
23 don't -- I don't know.
24        I'm sorry.  Could you repeat that question
25 for me?

56

1    Q.  Yeah.  It looks like Brian Conrey is confirming
2 that he agrees with Jennifer Harris about a pricing
3 error and a negative adjustment.
4    A.  It looks like he did raise a concern.  I
5 can't -- I can't go to what Brian is truly stating
6 there, but it -- you know, I think his statement
7 basically says he raised a concern with Lamb about the
8 negative adjustment that she would receive.  I don't
9 know if that -- if that directly goes to -- to the -- to
10 the conclusion that was made.
11    Q.  Well, do you see the first sentence on page 3
12 under Section B, as in boy?  "Complainant alleges she
13 raised concerns on July 18, 2018, about the potential
14 $1 million negative adjustment she would receive due to
15 a pricing error for this account."
16    A.  Uh-huh, yes.
17    Q.  And then Brian Conrey confirms raising concerns
18 with Lamb about the negative adjustment complainant
19 would receive due to a pricing error?  Do you see that?
20    A.  I do see that.
21    Q.  So does that not look like to you that Brian
22 Conrey is confirming what Jennifer Harris is saying?
23        MR. BABCOCK:  Object to the form.
24    A.  I think he's saying -- based on this statement
25 alone, Brian Conrey is confirming -- confirmed raising

14  (Pages 53 to 56)

Mac Chonoles - 5/11/2022

57

1  concerns with Lamb, that he brought up concerns with
2  Lamb about the negative adjustment. I don't know if
3  that's an agreement with Jennifer or not.
4      Q. It states in the middle, "Conrey researched the
5  issue and discovered there was a large billing error on
6  the account. Thus, Conrey asked Lamb if that account
7  could be returned to Complainant since he was not being
8  paid on the revenue and did not believe it was
9  appropriate for him to absorb the loss. Lamb was able
10 to move this account back to Complainant."
11     Do you see that?
12     A. Yes.
13     Q. Did you know that part of -- or maybe you don't
14 know -- that this is not the normal process for moving
15 accounts and losses between district sales managers?
16     MR. BABCOCK: Object as outside the scope.
17     A. Yeah, I -- I was not aware.
18     Q. It doesn't state that that was not the normal
19 process, does it?
20     A. I --
21     MR. BABCOCK: Object to the form.
22     A. I don't recall reading that in the report.
23     Q. It just says Lamb was able to do it, right?
24     A. It does appear that Lamb did make that
25 adjustment, yes.

58

1      Q. So if we go back to the conclusion, as to the
2  adjustment, it was unsubstantiated that Lamb was trying
3  to hide anything from complainant. It doesn't talk
4  about how Lamb actually made a negative adjustment to
5  the complainant, to Jennifer Harris, does it?
6      A. No, it does not.
7      Q. It doesn't address or conclude anything about
8  Ms. Harris's concern about getting a negative adjustment
9  for her goals, her attainment, her sales because of
10 Lamb's moving the BJ Services account, does it?
11     MR. BABCOCK: Object to the form.
12     A. It does not, but I think when you review the
13 entire section, I think there's -- the context is
14 important to -- to Michael's conclusion.
15     Q. What do you mean?
16     A. I think, you know, if I -- based on my view of
17 this issue, I think the concern from Michael at that
18 point may have been he was concerned that -- that
19 Ms. Harris would ultimately not learn about this
20 adjustment. I think his point he's trying to make here
21 is that based on Ms. Lamb's statement, it was a timing
22 issue more than anything and not -- not an intentional
23 hiding. It was just a timing issue. That's my
24 assessment based on reading the report.
25     Q. So your assessment, this report is a timing

59

1  issue, not the actual adjustment of the $1 million loss?
2      A. Correct.
3      Q. Does a $1 million loss sound like a really big
4  loss to you?
5      MR. BABCOCK: Object to the form. Also,
6  outside the scope.
7      A. I think in context of the rest of the testimony
8  and the rest of the report, I think that Michael lays
9  out Ms. Lamb's statement that she received a benefit
10 of -- of a significant amount of goal or revenue that
11 was not appropriate or was in error in some way and her
12 justification for making that adjustment was based on --
13 on fairness to the program, to the future manager.
14 That's based on my review of that report.
15     Q. I thought you just said it was a timing issue,
16 not an adjustment issue.
17     A. That appears to be the case, yes, based on my
18 review of the report.
19     Q. Do you think a district manager would notice if
20 there was a million-dollar loss on their account?
21     MR. BABCOCK: Object to the form. Object
22 to the scope. Outside the scope. Excuse me.
23     A. Yes.
24     Q. And then it says in the conclusion,
25 "Complainant should not have attended the Pathways event

60

1  because Lamb had specifically instructed her not to do
2  so."
3      Those are the only two specific
4  conclusions I see. Is that what you see as well?
5      A. Specific, yes. I think none of the other
6  allegations as substantiated addresses the others, but,
7  yes.
8      Q. So after getting the complainant's side of the
9  story and Michelle Lamb's side of the story and for sure
10 interviewing one witness about BJ Services, Brian
11 Conrey, Michael Clark comes up with the conclusion the
12 allegations are unsubstantiated?
13     MR. BABCOCK: Object to the form.
14     Go ahead and answer.
15     A. Yes.
16     Q. Does it look like Michael Clark is giving the
17 benefit of the doubt to Michelle Lamb and not
18 Ms. Harris?
19     MR. BABCOCK: Object to the form.
20     A. I don't know if that's an accurate statement.
21 I believe he's conducted an investigation to the best of
22 his ability and conducted witnesses and gathered
23 evidence and made his conclusion.
24     Q. What evidence did he gather?
25     A. Somewhere there's an Exhibit A. Maybe I'm

15 (Pages 57 to 60)

Osteen & Associates Reporting Services
817-498-9990

Appx-917

Mac Chonoles - 5/11/2022

61

1  confusing this with another.  Let me take a look.
2      Q.  There is an Exhibit A.
3      A.  Yeah, Attachment -- Attachment A.
4      Q.  The one single email that states Ms. Harris
5  wants to stay connected and consistent and schedule some
6  more one-on-ones?  That's the only evidence Michael
7  Clark gathers for his investigation?
8      A.  That is correct.
9      Q.  Other than that, he relies on the testimony of
10  Michelle Lamb and Jennifer Harris?
11          MR. BABCOCK:  Object to the form.
12      A.  Yes, and the other witnesses that he -- that he
13  had interviewed as well.
14      Q.  Well, we for sure know -- it looks like, at
15  least, he interviewed Brian Conrey about one specific
16  thing about BJ Services.  I don't see in this report
17  where he interviewed anybody else or what the other
18  people said besides this one little -- this box.
19          Do you see anywhere in the report on what
20  Rebecca Callahan, Jaime Golden, Casey Millner, or
21  Richard Holley said?  Confirmed?  Denied?  Supported?
22  Unsupported?
23      A.  I don't see it in the report.
24      Q.  And you notice --
25      A.  I think there was a section that referenced --

62

1  I think we mentioned that we weren't -- I wasn't exactly
2  sure if that was -- that was the -- FXS_ESI_0141754, the
3  last paragraph that references Millner and Callahan.
4      Q.  And Jennifer Harris makes a race discrimination
5  complaint, true?
6      A.  I'm not sure.  (Reviewing document.)
7          See a reference to discrimination, but not
8  on the basis of a protected status.
9      Q.  So her protected status could be because she's
10  a woman or because of her race, true?  Those are the two
11  options?
12      A.  Could be.
13      Q.  What other protected status does she have that
14  she could be discriminated against because of?
15      A.  Well, I can certainly go through the list, but
16  I'm not familiar with the rest of her demographics.  But
17  I can tell you that -- I just don't see a -- you know,
18  there wasn't a reference to race in this situation.
19          People use the term "discrimination" to
20  mean a lot of things.  They're being treated
21  differently.  And there was no specific reference to
22  race in her complaint --
23      Q.  Was there a specific reference to gender --
24      A.  -- or her sex.
25      Q.  But there is a column that mentions the sex of

63

1  these alleged witnesses, true?
2      A.  True.
3      Q.  There's not a column that mentions race, true?
4      A.  That's correct.
5      Q.  If there were a column that mentioned race, it
6  would say black or African American for Harris, white
7  for all the other witnesses, true?
8      A.  I would have to research the -- the
9  demographics of those other individuals.
10      Q.  You don't know that Brian Conrey --
11      A.  There would -- there would be a column that
12  would list the demograph- -- the race and a code
13  associated with that.
14      Q.  Do you know that Brian Conrey is a white male?
15      A.  I did not know that.
16      Q.  Did you know Rebecca Callahan is a white
17  female?
18      A.  I did not know that.
19      Q.  Do you know Jaime Golden is a white female?
20      A.  Did not know that.
21      Q.  Did you know Casey Millner is a white female?
22      A.  Did not know that.
23      Q.  Did you know Richard Holley is a white male?
24      A.  I didn't know that.
25      Q.  Could it be a sign of race discrimination if

64

1  white employees on a team are treated differently than a
2  black employee on the team?
3          MR. BABCOCK:  Objection as outside the
4  scope.
5      A.  I think it's worth -- worth considering, yes.
6      Q.  If we go back down to the last page of the
7  report, there are some recommendations.  It states,
8  "Director Lamb is coached to ensure she responds
9  accordingly to all of her managers regarding work
10  related questions in an effort to ensure any concerns
11  are addressed accordingly and timely to ensure accuracy
12  of reporting."
13          Do you see that?
14      A.  I do.
15      Q.  What does that mean?
16      A.  I believe there is a reference to an allegation
17  where Michelle Lamb had not responded to the complainant
18  in a timely manner, and I believe that that is the
19  recommendation to resolve that type of issue from
20  occurring again.
21      Q.  So even though everything is unsubstantiated in
22  this report, according to Michael Clark, he's
23  instructing Lamb to fix something?
24          MR. BABCOCK:  Object to the form.
25      A.  If I recall correctly, I think in this report,

16  (Pages 61 to 64)

Mac Chonoles - 5/11/2022

65

1 it wasn't a primary allegation that -- that was one of
2 the specific allegations, that she wasn't responding to
3 her. But during the course of the interview, it was
4 discovered that -- that Michelle had not responded to
5 Michael [sic]. So Michael, to ensure that appropriate
6 conduct occurs in the future, put in a recommendation,
7 that particular recommendation.
8   Q.  Did you just say Michelle Lamb did not respond
9 to Michael Clark timely?
10   A.  No.  I'm sorry.  I meant to Ms. Harris.
11   Q.  So Michelle Lamb did not respond to Ms. Harris
12 timely.  That part is true.  But the rest of the
13 complaint is unsubstantiated?
14       MR. BABCOCK:  Object to the form.
15   A.  The specific allegations listed were not --
16 were not substantiated, but I think we discovered there
17 was a secondary concern that was discovered that she
18 didn't respond to Ms. Harris.  So Mr. Clark, Michael
19 Clark, entered that recommendation as a form of
20 corrective action.
21   Q.  All right.  So to be clear, the report states
22 that none of the complainant's allegations are -- is
23 substantiated.  However, Michael Clark did find that
24 Lamb did not respond to Ms. Harris timely and felt that
25 Ms. Lamb needed coaching to ensure that doesn't happen

66

1 again, true?
2       MR. BABCOCK:  Object to the form.
3   A.  I would add to that -- essentially true, but I
4 would also add that he -- that she didn't respond to
5 Ms. Harris in a timely manner, and that was the conduct
6 that was addressed through that recommendation.
7   Q.  So is it fair to say at least one thing
8 Ms. Harris said about Ms. Lamb, not responding in a
9 timely manner, was true?
10   A.  Yes, correct.  Ms. -- Ms. Lamb did not respond
11 to Ms. Harris in a timely fashion related to one -- one
12 issue.
13   Q.  The second bullet point in the recommendations
14 category states, Complainant is coached to ensure that
15 she carries out instructions provided by her -- director
16 Lamb as they have been provided and not deviate without
17 prior approval from director Lamb.
18       Do you see that?
19   A.  I do.
20   Q.  So it looks like this one is for Jennifer
21 Harris, true?
22   A.  True.
23   Q.  Do you know how Michael Clark communicated this
24 recommendation to Jennifer Harris?
25   A.  No, I don't have any reference to how that that

67

1 was communicated.
2   Q.  Do you know how he communicated -- Michael
3 Clark communicated the first bullet point recommendation
4 to Michelle Lamb?
5   A.  No, I don't.
6   Q.  So if there are recommendations in a report but
7 that report is confidential and Michelle Lamb and
8 Jennifer Harris don't get to see the report, how do they
9 know they have recommendations they have to fulfill?
10   A.  It -- our process is that Michael is to work
11 with appropriate people that he is recommending to
12 conduct corrective action and to not close out that --
13 that -- that investigation until -- until all
14 recommendations have been implemented.
15   Q.  And would there be documentation showing a
16 recommendation is completed or given?
17       MR. BABCOCK:  Object to the form.
18   A.  Yes.
19   Q.  What type of documentation would that be?
20   A.  Should be a closure memo that is issued to
21 the -- to the parties who are responsible for
22 implementing that corrective action.
23   Q.  Let me show you -- I'm showing you -- it's
24 Bates-labeled FXS_ESI_141748.
25       Is this a closure memo?

68

1   A.  It's a closure memo with the -- with the
2 complainant.  That is not the closure memo I was
3 referencing.
4   Q.  Oh.  So what were you referencing?
5   A.  It's another document that -- that -- that
6 Michael will complete and send to the individuals
7 responsible for implementing that.  And it basically
8 outlines their responsibility and what they're to do.
9 Once completed, it's signed and sent back.
10   Q.  So in this -- hold on.  In this particular
11 instance, a closure memo would be issued by Michael
12 Clark to Dave Russell to make sure that Jennifer --
13 Michelle Lamb followed the recommendations?
14   A.  That would be correct.  I'm not sure if Dave
15 Russell was -- was the individual.  Sometimes we pick
16 alternate people to conduct that.  But typically it
17 would be Dave Russell in that situation.
18   Q.  So I'm going to show this memo again to you.
19       MR. BABCOCK:  Ms. Sanford, what's the
20 Bates number on that again, please?  I'm sorry.
21       MS. SANFORD:  141748.
22   Q.  It says -- it's from Michael Clark to Jennifer.
23       Dear Jennifer:  This letter is to notify
24 you regarding the closure of your Internal EEO
25 Complaint.  Each issue brought forth has been thoroughly

17 (Pages 65 to 68)

investigated with the determination that corrective action will be taken.

Thank you for bringing your concerns to the attention to HR. Your complaint was treated confidentially to the extent possible while still allowing us to conduct a full investigation. The identity of witnesses and information gathered is confidential and therefore no additional information will be provided.

FedEx Services has a responsibility to promote and foster a culture in which ethical conduct is recognized, valued and exhibited by all team members. Our commitment is to address alleged violations promptly when they occur.

If you have any questions or additional concerns now or in the future, please contact me directly. Regards, Michael Clark.

Do you see that?

A. I do.

Q. So this is what Jennifer receives -- Jennifer Harris receives about the investigation for her March 11th complaint, true?

A. True. Correct.

Q. She doesn't -- she does not get any other information about the specifics of the report, who was

interviewed, what the interviewees said, true?

A. True.

Q. So if an interviewee contradicts Jennifer Harris, she doesn't get to know or have a chance to respond, to give a rebuttal to that conflicting answer, does she?

MR. BABCOCK: Object to the form.

A. It is investigator discretion whether or not something needs to be brought back to the -- to the complaining party. It depends on a variety of factors.

Q. So the answer here is no, she did not get a chance to rebut any contradictory statements, did she?

MR. BABCOCK: Form.

A. I can't tell by just looking at that document.

MS. SANFORD: All right. This is a good time for a break.

(Recess taken from 11:04 to 11:13.)

THE REPORTER: Back on the record at 11:13.

Q. I'm going to share my screen with you again, Mr. Chonoles. This is just a timeline I was making while you -- while you were speaking.

So it looks like March 11, Jennifer Harris makes her first report. The report was completed and signed on June 7th. And less than 30 days later,

Jennifer Harris receives a letter of counseling and performance improvement plan.

Is that accurate?

MR. BABCOCK: Object. Outside the scope. Go ahead.

A. Let me refer to documentation here.

MR. BABCOCK: Just so you know, when you mumble to yourself --

THE WITNESS: Oh.

MR. BABCOCK: -- the court reporter needs to transcribe that.

THE WITNESS: I'm sorry about that.

MR. BABCOCK: You're welcome to talk to yourself. That's fine. Other witnesses do it. But she might ask you to speak up because she has to be able to -- if you make an audible sound, she's supposed to record it. All right?

THE WITNESS: Yeah.

A. Let me refer to the document here.

Okay. June 26th. Everything after June 26th is correct.

Q. So it's true that less than 30 days after a report is completed about Ms. Harris's discrimination complaint, she is put on a progressive discipline -- she's put on disciplinary action, true?

A. True.

Q. Correct me if I'm wrong. I thought your policy said that investigations should be completed within 30 days of a complaint unless they are complicated, but then it looks to me that Jennifer Harris's complaint on June 26 isn't completed until September 6, over 30 days.

A. That's true. That happened in that situation.

Q. Do you know why? Was it overly complicated?

A. I'd have to check with Michael Clark on that, but, you know, if he has -- depending upon how he -- the work he has to do in that investigation, it may take longer than 30 days. We -- we strive to conduct a thorough investigation as well as a timely investigation.

Q. So your policy states that investigations should be completed within 30 days to the extent possible. And that was not done in this situation -- in the situation involving Ms. Harris's second complaint. True?

A. Let me refer back to the policy here. I'm referencing on a document FXS 1280. It says time frames are generally within 30 days depending upon the complexity of the investigation.

Q. So your policy says generally investigations should be completed within 30 days. And that was not --

Mac Chonoles - 5/11/2022

73

1    that did not happen for Ms. Harris's second complaint.
2    True?
3        A.   Well, it says that time frames are generally
4    within 30 days.  And you are correct that it was not
5    completed within 30 days.
6        Q.   Was the first report completed within 30 days,
7    Ms. Harris's report?
8        A.   The complaint was received on March 11th, so it
9    would have been April 11th.  And so, no, the report was
10   not completed within 30 days.
11       Q.   It looks like the second report for
12   Ms. Harris's second complaint is completed on September
13   6th.  Less than 30 days later, Ms. Harris receives a
14   second disciplinary action, a letter of warning,
15   performance improvement plan.
16       A.   Let me refer to the document here.
17            MR. BABCOCK:  What are you looking for,
18   Mac?  Maybe --
19            THE WITNESS:  I've got it.  I think I've
20   got it here.  Sorry, a lot of documents.
21       A.   So let's see here.  Yes, so September 13th,
22   Michelle Lamb issued a letter of warning to Jennifer
23   Harris; that's correct.
24       Q.   Michelle Lamb issues disciplinary action for
25   Ms. Harris less than 30 days after the second report

74

1    into Ms. Harris's second complaint, true?
2        A.   True.
3        Q.   And then if it's true -- I'll represent to you
4    it's true, but if it's true Jennifer Harris is
5    terminated on January 7th, that is less than 30 days
6    from the issuance of an investigative report into
7    Ms. Harris's third complaint.  True?
8        A.   Assuming that January 7th date is correct, yes.
9        Q.   Pull up a different document for you, if I can
10   find it.
11            All right.  I'm showing you -- it's
12   Bates-labeled 141844.  This is -- I think this is the
13   December 4th third complaint you were speaking about for
14   Jennifer Harris.
15       A.   Uh-huh.
16       Q.   Is that a yes?
17       A.   That's correct.  Yes.
18       Q.   She states, "Please see the details below of my
19   ongoing complaint of retaliation, humiliation, and
20   discrimination treatment by Michelle Lamb."
21            Do you see that?
22       A.   I do.
23       Q.   She doesn't say race discrimination there, but
24   she does say, "I am held to a different performance
25   standard than my white peers which is unfair," true?

75

1        A.   True.
2        Q.   So while she doesn't say race discrimination,
3    it seems pretty obvious that she's talking about race
4    discrimination based on the context of her complaint,
5    true?
6        A.   Correct, based on that December 4th email.
7        Q.   One sentence in the first paragraph, about
8    halfway down, says, "There are two of my white peers
9    Brian Hickman and Jaime Golden McElroy who have not hit
10   plan in 5 quarters yet have not" -- "haven't been issued
11   any discipline with an LOC or LOW or threats of
12   termination.  Quarter to date Jaime has the lowest
13   performing district at 79.5 percent FY20Q2, which is the
14   same evaluation referenced in my LOC."
15            Do you see that?
16       A.   I do.
17       Q.   If someone is going to make a discrimination
18   complaint, you would want them to detail the types of
19   discrimination they are receiving, true?  Like, race
20   discrimination:  I'm being treated differently because
21   of the color of my skin.  Right?
22            MR. BABCOCK:  Object to the form.  It's
23   outside the scope.
24            Go ahead and answer.
25       A.   Yes.

76

1        Q.   You'd want them to list examples, right?
2            MR. BABCOCK:  Object, outside the scope.
3        A.   Yes.
4        Q.   And Ms. Harris goes on and she details examples
5    in her email, true?
6        A.   True.
7        Q.   She gives examples about how her white peers
8    are not hitting plan and they're not receiving
9    disciplinary actions or threats of termination; and, in
10   contrast, she is receiving disciplinary action and
11   threats of termination?  Is that what Ms. Harris is
12   saying?
13            MR. BABCOCK:  Object to the form.
14       A.   Could you repeat the question again?
15       Q.   Ms. Harris states that some of her white peers
16   who are not hitting plan are not receiving disciplinary
17   action or threats of termination while at the same time
18   she is receiving threats of termination and disciplinary
19   action, which is unfair, and she states she's being held
20   to a different standard than her white peers?
21       A.   Yes, that's what she's stating.
22       Q.   And it's true that Michael Clark found
23   Ms. Harris's complaints, every time she complained, as
24   unsubstantiated, true?
25       A.   Well, let me refer to the documentation on that

19 (Pages 73 to 76)

Mac Chonoles - 5/11/2022

77

1 particular report. (Reviewing document.)
2        Yes. Conclusion, which is FX- -- the
3 document is FXS_ESI_0142290. Michael's conclusion was
4 "None of the Complainant's allegations is
5 substantiated."
6    Q.   So in coming to that conclusion, did he go and
7 look at the spreadsheets, the plan, the goals,
8 performance of Ms. Harris's peers versus her?
9    A.   Yes, he did.
10   Q.   I'm going to show you -- it's FXS_ESI_144991.
11 I'll represent to you that these are Michelle Lamb's
12 notes. I think they're OneNotes, but they are her notes
13 that she created.
14       Have you seen these before?
15   A.   I don't recall seeing those, no.
16   Q.   Scrolling down to the second page, there's a
17 bullet point that says "Performance." Oh, let me go
18 back up to the date so we have some context here.  So
19 this is April 23rd, 2019, leadership meeting, day one.
20 So April 2019.
21       It says, "One out of 6 regions are at plan
22 for Q4 currently."
23       Do you see that?
24       MR. BABCOCK:  I'm going to object to this
25 line of questions as outside the scope based on the

78

1 witness saying he hasn't reviewed this document.
2       But you can go ahead and answer.
3    A.   Yeah.  No, I do see that.
4       MS. SANFORD:  And, Mr. Babcock, I'm fine
5 if this is a standing objection for this line of
6 questioning.
7       MR. BABCOCK:  Thank you, Ms. Sanford.
8    Q.   A region, that would be -- Michelle Lamb is
9 over a region, true?
10   A.   That's correct.
11   Q.   And then Jennifer Harris is over -- is a
12 district sales manager, less than a -- part of a region,
13 true?
14   A.   Correct.
15   Q.   So when it says one out of six regions are at
16 plan for Q4 currently, that means five out of six are
17 not meeting the plan, true?
18   A.   True.
19   Q.   And "plan" is a goal for an employee, true?
20   A.   True.
21   Q.   It's a metric used by FedEx to evaluate if the
22 employee is meeting expectations, true?
23   A.   That particular expectation, yes.  There are
24 many expectations, but that's -- it's probably
25 referencing revenue or goal attainment.

79

1    Q.   And for a sales manager and for a sales
2 director, revenue and sales are pretty important goals,
3 true?
4    A.   They are one of many, but it is an important
5 one, yes.
6    Q.   So we don't know who this one is, but only one
7 out of Michelle Lamb's peers is meeting the plan.
8       That means the majority are not meeting
9 the plan, true?
10   A.   That seems fair.
11   Q.   And I haven't seen any evidence.  Have you
12 seen -- do you know if any of the regional directors,
13 Michelle Lamb, was put on a performance improvement plan
14 or received any disciplinary action for not meeting the
15 plan?
16   A.   I'm not aware of myself reviewing that, no.
17   Q.   And do you see where it says only 14 of 56
18 DSMs, district sales managers, are above plan?
19   A.   I do see that.
20   Q.   So that's -- we're talking about now Jennifer
21 Harris's level, true?
22   A.   That would be correct.
23   Q.   And the majority are not meeting the plan,
24 based on Ms. Harris's [sic] notes, true?
25   A.   That would be true.

80

1    Q.   So if Ms. Harris is one of those that are not
2 meeting her plan, she's in the majority, true?
3    A.   That would be true.
4    Q.   Could it be a sign of discrimination if
5 Ms. Harris is put on a performance improvement plan and
6 receives disciplinary action for not meeting a plan when
7 white peers are also not meeting plan but not put on a
8 performance improvement plan?  Could that be a red flag,
9 a sign of discrimination?
10       MR. BABCOCK:  Object to the form.
11   A.   I think it's something to look into for sure,
12 yes.
13   Q.   I'm going to scroll to -- starts on page
14 145011.  So this is September 2019.  It's a conference
15 call.  Jennifer Harris looks -- looks like she's on this
16 conference call.
17       Have you heard of a My FedEx Rewards
18 program?
19   A.   No, I'm not familiar with that.
20   Q.   If it is a program that Jennifer Harris was in
21 charge of, and then in September 2019 Casey Millner is
22 put in charge of the reward program, taking away
23 Jennifer Harris's responsibilities, a decision made by
24 Michelle Lamb, could that be a sign of discrimination,
25 taking away responsibilities from Ms. Harris and giving

20  (Pages 77 to 80)

Mac Chonoles - 5/11/2022

81

1 it to a white peer?
2      MR. BABCOCK: Object to the form.
3      A. I think it's something worth understanding if
4 that was something we were made aware of. Yes, that
5 would have ...
6      MS. SANFORD: Getting messy.
7      Q. If it's true that Jennifer Harris was taken off
8 the My Rewards program and that was given to a white
9 peer less than 30 days after an investigation is
10 finalized about Ms. Harris's complaints of
11 discrimination or retaliation -- that was a bad
12 question. Let me start over.
13          Taking away job responsibilities from an
14 employee is an adverse employment action, true?
15      MR. BABCOCK: Object to the form. It's
16 outside the scope as well.
17          Go ahead and answer.
18      A. I believe it's something worth investigating to
19 determine if it is, the context and the reason for that,
20 and determine if it was -- what is the rationale. It
21 could be a -- could be a sign of discrimination.
22      Q. And if that happens 30 days -- less than 30
23 days after a report of discrimination, could that be a
24 sign of retaliation?
25      MR. BABCOCK: Same objection.

82

1      A. Yeah, I think it's something worth
2 investigating to see if it is, the context and the
3 rationale, and if it was a form of retaliation.
4      Q. Let me go back to Ms. Lamb's notes.
5      MR. BABCOCK: I'll just reinstitute my
6 standing objection.
7      MS. SANFORD: Understood.
8      MR. BABCOCK: I can't read what's popping
9 up, but there's stuff popping up on your screen.
10      MS. SANFORD: They're my notes. I mean,
11 it's not -- it's work product, but it's not going to --
12 it's fine.
13          All right. So this is Bates-labeled
14 145018, for the record.
15      Q. I'll represent to you L- -- do you know "LHR"
16 means Longhorn Region staff meeting? I don't know if
17 you knew that.
18      A. No. Thank you. Yeah, I wasn't aware of that.
19      Q. The date says November 2019. Do you see that?
20      A. I do.
21      Q. And if we're looking at pricing activity,
22 pricing activity is another metric that FedEx looks at
23 to evaluate if an employee is meeting expectations,
24 true?
25      A. True.

83

1      Q. If we're looking at price activity, and
2 that's -- "YTD" means year to date; is that accurate?
3      A. Correct. That's correct.
4      Q. "FY20" means fiscal year 2020?
5      A. That's correct.
6      Q. It lists a table of Jennifer Harris and her
7 peers. Do you see that?
8      A. I see -- I see that.
9      Q. And if we're looking at comparative
10 information, looks like Brian Conrey's at the top, with
11 12.3. Do you see that?
12      A. I do.
13      Q. And then looks like Brian Hickman is at the
14 bottom, 6.14. Do you see that?
15      A. I do.
16      Q. Then the next lowest is Casey Millner, at 6.25.
17 Do you see that?
18      A. I do.
19      Q. And then we get to Jennifer Harris, at 6.6. Do
20 you see that?
21      A. I do.
22      Q. So there are two people, two peers, lower in
23 pricing activity than Jennifer Harris in November 2019,
24 according to Michelle Lamb's notes, true?
25      A. Correct.

84

1      Q. Michelle Lamb -- sorry. Jennifer Harris is
2 black, and her peers are white, true?
3      A. That's based off your -- the information you've
4 provided me. I was not aware of that.
5      Q. And it's true that Brian Hickman and Casey
6 Millner were not put on performance improvement plans,
7 and they did not receive disciplinary action, true?
8      A. I'm going to have to refer back to the report.
9 So I'm referring to document FXS_ESI_0142288. Third
10 paragraph down, the middle of that paragraph, it states,
11 "Lamb further explained that while Golden McElroy's
12 performance is under plan, the performance has not been
13 under plan consistency for the same length of time.
14 Complainant's performance has. Lamb explained peer
15 employee Holley is the only other employee that had
16 consistently been under plan for the same length of time
17 as Complainant and also received discipline."
18      MR. BABCOCK: Mr. Chonoles, her question
19 was about discipline and performance improvement plans,
20 I believe.
21      THE WITNESS: Right.
22      A. My answer was, is that's the only -- that's the
23 only corrective action that I'm aware of.
24      Q. So Richard Holley received corrective action,
25 true?

21 (Pages 81 to 84)

Mac Chonoles - 5/11/2022

85

1   A.  True.
2   Q.  Casey Millner did not receive corrective
3 action, true?
4   A.  That's -- that's true.
5   Q.  Brian Hickman did not receive corrective
6 action, true?
7   A.  True.
8   Q.  And at least in November 2019, Brian Hickman
9 and Casey Millner have lower performance -- sorry, lower
10 pricing activity numbers than Jennifer Harris, true?
11   A.  True.
12   Q.  Do you know what "CBT" stands for?
13   A.  Closed business tracking.
14   Q.  And we're looking at the closed business
15 tracking for Q1, fiscal year 2019, in this table.
16       Do you see that?
17   A.  Yes.
18   Q.  Looks like -- one, two, three -- four people,
19 peers, are lower than Jennifer Harris in this category.
20       Do you see that?
21   A.  Let me review it one more time.
22   Q.  Sure.
23   A.  (Reviewing document.)  Yes, true.
24   Q.  Ms. Harris is in the top half of the closed
25 business tracking Q1 FY19 in November 2019 compared to

86

1 her peers?  She's in the top half, true?
2   A.  True.
3   Q.  Let's see.  Matthew Wheeler did not receive
4 progressive discipline, did he?
5   A.  No.
6   Q.  Casey Millner -- no.  Excuse me.
7       Brian Hickman did not receive disciplinary
8 action, true?
9   A.  True.
10   Q.  Brian Golden did not receive disciplinary
11 action, true?
12   A.  True.
13   Q.  The next page looks at fiscal year '20 YTD.
14       Do you see that?
15   A.  Yes.
16   Q.  So this is --
17   A.  Could you scroll up for a second, go to the
18 prior page?
19   Q.  Sure.
20   A.  I want to see -- is there a header to that?
21   Q.  Yeah.  Give me one second.  My computer is not
22 functioning correctly.
23       So there's not a header, but I'll tell you
24 that this is an average of CBT, closed business
25 tracking.

87

1   A.  Okay.
2   Q.  Well ...
3       MR. BABCOCK:  I think it was.  Isn't there
4 a reverse arrow?  There you go.
5   Q.  It looks like -- one, two, three -- four people
6 are lower in this category, FY20 Q1 CBT average.
7       Do you see that?
8   A.  Yes.
9   Q.  So Ms. Harris is in the top half of her peers
10 in this category, true?
11   A.  True.
12   Q.  The -- Casey Millner, Brian Golden, and Brian
13 Hickman did not receive progressive discipline, true?
14   A.  True.
15   Q.  And in this instance, the average for FY20 Q1,
16 they are lower than Jennifer Harris, true?
17   A.  I'm sorry.  Could you repeat that question?
18   Q.  Uh-huh.  In this category, average FY20 Q1,
19 they are below Jennifer Harris?
20   A.  Yes, that's true.
21   Q.  I'll stop sharing.  Too many things are going.
22       All right.  Let me share my screen again
23 with you.  This is the same page.  This second box,
24 spreadsheet, entitled "Calls on Opps," F2F Calls on
25 Opportunities for week ending in -- October 28th, 2019,

88

1 do you see that?
2   A.  Yes.
3   Q.  And measuring number of calls, sales calls, is
4 a performance metric for district sales managers, true?
5   A.  True.
6   Q.  And do you see here that Jennifer Harris is
7 second out of all of her peers, out of eight?  She's
8 second out of eight?
9   A.  Yes.
10   Q.  Could it be a sign of discrimination if
11 Jennifer Harris is -- let me -- let me rephrase this.
12       Do you know if Michael Clark went back and
13 looked at specific reports like the ones I'm showing you
14 to verify whether or not Michelle Lamb's general
15 statements of Ms. Harris underperforming consistently
16 was accurate or not?
17   A.  Let me refer back to the documents to see if
18 there was any of these statistics included.  (Reviewing
19 documents.)
20       I don't see anything attached to the
21 documents I have.  Doesn't -- I can't see -- I can't
22 tell if he's referred back to any of those documents.
23   Q.  Does it look like he just took Michelle Lamb's
24 word for it?
25   A.  It's -- potentially.

22  (Pages 85 to 88)

Mac Chonoles - 5/11/2022

89

```
 1    Q.  Do you know what "President's Club" is?
 2    A.  Yes.
 3    Q.  How would you explain that to a jury, if you
 4  had to?
 5         MR. BABCOCK:  Object, outside the scope.
 6         But go ahead and answer, sir.
 7    A.  The President's Club is for sales -- for
 8  high-performing sales professionals who achieved good
 9  results or outstanding results and based off a variety
10  of different metrics.  And they are then chosen and
11  selected to participate in travel and meetings, usually
12  at -- at destinations that are fun.  And there's usually
13  a lot of, you know, ceremonies and events to celebrate
14  the performance of those individuals.
15    Q.  Is it true that some employees at FedEx go
16  their entire career and never make the President's Club?
17         MR. BABCOCK:  Object to -- object.  It's
18  outside the scope.
19    A.  I don't know the answer to that.  I would say
20  it's possible.
21    Q.  Let me switch topics to insurance.
22         Does FedEx have an insurance policy that
23  covers claims by employees for discrimination and
24  retaliation, things like this?
25    A.  Yes.
```

90

```
 1    Q.  And how much is that insurance policy?
 2    A.  So that -- FedEx's response -- let me ...
 3  FedEx obtains primary employment practice liability
 4  insurance which provides coverage to the company.  The
 5  company is responsible for covering claims up to
 6  $10 million.  Any claims exceeding that will be covered,
 7  up to 25 million, by the insurance provider.
 8    Q.  So anything up to $10 million FedEx is
 9  responsible for.  Insurance kicks in after $10 million.
10  True?
11    A.  True.
12    Q.  Is a good way of saying it, like, for a
13  layperson, would be FedEx is essentially self-insured up
14  to $10 million?
15    A.  That sounds fair.
16    Q.  So that money comes out of FedEx's pocket if
17  it's less than $10 million, true?
18    A.  True.
19         MS. SANFORD:  Let me check my notes.  I
20  think I'm almost done.
21         (Brief pause.)
22         MS. SANFORD:  All right.  That's all the
23  questions I have for you today, Mr. Chonoles.
24         I'll pass the witness.
25         THE WITNESS:  Thank you so much.
```

91

```
 1         THE REPORTER:  Off the record at 11:50
 2  a.m.
 3         (Proceedings concluded at 11:50 a.m.)
```

92

```
        1              ERRATA
        2  WITNESS: MAC CHONOLES      DATE:  MAY 11, 2022
        3  PAGE NO.   LINE NO.   CHANGE        REASON FOR CHANGE
```

Osteen & Associates Reporting Services
817-498-9990

Appx-925

**Mac Chonoles - 5/11/2022**

93

```
1              ACKNOWLEDGMENT OF DEPONENT

2       I,_____, do hereby certify that I

3  have read the foregoing pages, and that the same is a

4  correct transcription of the answers given by me to the

5  questions therein propounded, except for the corrections

6  or changes in form or substance, if any, noted on the

7  attached Errata.

8

9       _____

10      MAC CHONOLES                  DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

95

```
1  party before the completion of the deposition.

2       I further certify that I am neither counsel

3  for, related to, nor employed by any of the parties or

4  attorneys to the action in which this proceeding was

5  taken.  Further, I am not a relative or employee of any

6  attorney of record in this cause, nor am I financially

7  or otherwise interested in the outcome of the action.

8       Subscribed and sworn to on this the 23rd day

9  of May, 2022.

10

11

12

13

14  LEAH K. OSTEEN DOW, Texas CSR

    Certification expires:  4/30/2023

15  Firm Registration No. 392

    Osteen & Associates Reporting Services

16  313 Northglen Dr.

    Hurst, Texas  76054-3024

17  (817) 498-9990

    osteenreporting@gmail.com

18

19

20

21

22

23

24

25
```

94

```
1          IN THE UNITED STATES DISTRICT COURT

       FOR THE SOUTHERN DISTRICT OF TEXAS

2              HOUSTON DIVISION

3  JENNIFER HARRIS,

                           *

4       Plaintiff,         *

                           *    CIVIL ACTION

5  vs.                     *    4:21-cv-1651

                           *

6  FEDEX CORPORATE SERVICES, *

   INC.,                   *

7       Defendant.         *

                           *

8

   *********************************************

9          REPORTER'S CERTIFICATION

       ORAL AND VIDEOTAPED DEPOSITION OF

10              MAC CHONOLES

              MAY 11, 2022

11  *********************************************

12       I, LEAH K. OSTEEN DOW, Certified Shorthand

13  Reporter in and for the State of Texas, hereby certify

14  to the following:

15       That the witness, MAC CHONOLES, was duly sworn

16  by me and that the transcript of the oral deposition is

17  a true record of the testimony given by the witness;

18       I further certify that pursuant to FRCP Rule

19  30(f)(1) that the signature of the deponent:

20       _XX__ was requested by the deponent or a party

21  before the completion of the deposition and is to be

22  returned within 30 days from date of receipt of the

23  transcript.  If returned, the attached Errata contain

24  any changes and the reasons therefor;

25       _____ was not requested by the deponent or a
```

24  (Pages 93 to 95)

**A**

**a.m** 1:19 4:3
91:2,3
**ability** 8:21 9:2
12:23 60:22
**able** 13:10 57:9
57:23 71:15
**above-styled**
1:17
**Absolutely** 8:16
**absorb** 36:15
57:9
**accomplished**
30:23
**account** 54:18
55:2 56:15
57:6,6,10
58:10 59:20
**accountable**
33:17
**accounts** 57:15
**accuracy** 64:11
**accurate** 60:20
71:3 83:2
88:16
**achieved** 89:8
**ACKNOWLE...**
93:1
**acquisition** 22:3
**act** 8:21 9:2,3
**action** 1:4 7:25
28:25 29:12
31:19 35:1
44:21 47:13,20
65:20 67:12,22
69:2 71:25
73:14,24 76:10
76:17,19 79:14
80:6 81:14
84:7,23,24
85:3,6 86:8,11
94:4 95:4,7
**actions** 76:9
**activities** 21:6,7
**activity** 82:21,22

83:1,23 85:10
**actual** 59:1
**add** 32:9 40:18
66:3,4
**additional** 69:8
69:15
**address** 5:2 8:4
58:7 69:13
**addressed** 64:11
66:6
**addresses** 60:6
**adequately** 6:19
**adjustment**
54:17 55:2,14
55:22 56:3,8
56:14,18 57:2
57:25 58:2,4,8
58:20 59:1,12
59:16
**admin** 39:12
**administration**
37:3
**Adrian** 27:6,24
28:5
**adverse** 81:14
**advisor** 23:18
25:7,7,9,11
38:14,16,18,24
40:2,2,5,11
45:16
**advisors** 23:10
23:21,23 24:1
24:4,7 25:12
25:15 35:18
40:10
**advocates** 32:15
**African** 19:16
63:6
**agree** 6:16,19,22
7:10 8:5,20
9:10,12 11:6
12:22 13:2,15
13:20,25 14:5
14:14,21 15:2
15:7,11,16,21

16:9 19:23
28:20 29:2,7
31:12 41:24
**agreed** 5:20 6:3
**agreeing** 9:1
11:19
**agreement** 4:17
29:16,18 46:6
46:8 57:3
**agreements** 1:24
4:12
**agrees** 56:2
**ahead** 12:12
20:2 35:12
36:25 37:16
41:5 42:21
60:14 71:5
75:24 78:2
81:17 89:6
**Alaska** 26:12
**all-inclusive**
34:21
**allegation** 64:16
65:1
**allegations**
33:22 54:17
60:6,12 65:2
65:15,22 77:4
**alleged** 17:25
18:1 63:1
69:13
**alleges** 56:12
**allowed** 5:25
32:23
**allowing** 69:6
**alternate** 68:16
**American** 19:16
63:6
**amount** 59:10
**analyst** 39:5,9
**analytical** 11:7
11:13,21 12:2
**analytics** 22:13
**analyze** 15:16
**and/or** 43:8

**anonymous** 16:8
**answer** 5:25
8:12 9:21,23
10:17,22,24
11:11,16,23,25
12:13,20 14:20
16:18 20:2,18
35:12 36:25
37:16 41:5
42:21 45:4,10
50:13 55:12
60:14 70:5,11
75:24 78:2
81:17 84:22
89:6,19
**answered** 16:21
**answering** 9:8
9:18 11:1,3
**answers** 93:4
**Anti-Harassm...**
28:13
**anybody** 51:23
61:17
**appear** 32:15
57:24
**appearances** 3:3
4:11
**Appearing** 2:1
**appears** 52:7
59:17
**applicable** 44:1
**approach** 9:6,6
**appropriate**
7:25 12:24
33:23 34:12
45:23 46:17
57:9 59:11
65:5 67:11
**approval** 66:17
**April** 5:12 39:3
73:9 77:19,20
**AR** 26:9
**area** 24:5 37:11
**areas** 41:19
**Arkansas** 26:4

**arrow** 87:4
**asked** 5:22 57:6
**asserts** 5:13
**assessment**
58:24,25
**assign** 43:20
**assistant** 5:7
**associated** 44:12
63:13
**Associates** 95:15
**assume** 54:10
**Assuming** 74:8
**attached** 88:20
93:7 94:23
**attachment** 52:8
52:8,15 61:3,3
**attainment** 58:9
78:25
**attendance** 4:13
**attended** 36:1
40:13,18,20
54:20 59:25
**attending** 41:10
41:15
**attention** 69:4
**attorney** 4:19
11:2 41:11
95:6
**attorneys** 32:14
32:16,22 36:1
41:21 45:11
95:4
**audible** 71:16
**Aurora** 37:8,9
**Avenue** 2:6
**avenues** 43:7
**average** 86:24
87:6,15,18
**aware** 20:15
47:22 57:17
79:16 81:4
82:18 84:4,23

**B**

**B** 2:13 51:5

56:12
**Babcock** 2:12
4:19,24,24 5:4
5:6 6:25 7:8,13
8:7,18,23 9:15
10:2,4,8,14,21
11:9,15,22
12:3,7,12,15
12:25 13:7,13
13:18,23 14:8
14:17,23 15:5
15:9,14,19,24
16:4,10,12,15
16:18,21 17:3
17:8,21 18:6
19:25 20:13
21:18,22 22:2
22:4,7,10
23:12 26:11,20
28:8,11 29:3,6
31:10 35:10
36:23 37:15
38:1,6 40:17
41:4,16 42:1,5
42:18 47:1
54:8 56:23
57:16,21 58:11
59:5,21 60:13
60:19 61:11
64:3,24 65:14
66:2 67:17
68:19 70:7,13
71:4,7,10,13
73:17 75:22
76:2,13 77:24
78:4,7 80:10
81:2,15,25
82:5,8 84:18
87:3 89:5,17
**bachelor's** 37:2
**back** 7:5 30:5,16
36:17 40:3
42:7 44:13
49:18 52:18
55:5 57:10

58:1 64:6 68:9
70:9,18 72:20
77:18 82:4
84:8 88:12,17
88:22
**background**
17:10
**bad** 15:1 81:11
**Barak** 2:12 4:19
4:24
**barak.babcoc...**
2:15
**based** 16:25
18:1 28:17,21
31:5,13 56:24
58:16,21,24
59:12,14,17
75:4,6 77:25
79:24 84:3
89:9
**basic** 24:14
41:25
**basically** 56:7
68:7
**basis** 62:8
**Bates** 28:15
30:10,24 47:16
48:7,15,20
68:20
**Bates-labeled**
29:20 46:20
67:24 74:12
82:13
**Bates-number**
49:7
**BB** 2:5 4:14 6:14
**behalf** 5:24
10:24 11:3
32:15,15
**believe** 4:16
5:23 7:14,16
8:8 9:5,5 13:9
16:5 22:14
23:24 27:19,19
35:17 37:20

38:7,17,22
39:3,10 40:19
41:1 42:14,22
48:2 57:8
60:21 64:16,18
81:18 84:20
**benefit** 59:9
60:17
**best** 60:21
**better** 26:25
**beyond** 24:3
**big** 5:11 59:3
**billing** 57:5
**bit** 5:9
**biweekly** 43:4
**BJ** 54:18,25 55:2
55:5 58:10
60:10 61:16
**black** 19:16 63:6
64:2 84:2
**bottom** 83:14
**box** 50:6,12
61:18 87:23
**boy** 56:12
**break** 42:4
70:16
**Brian** 51:6
52:20,21 55:6
55:13,18 56:1
56:5,17,21,25
60:10 61:15
63:10,14 75:9
83:10,13 84:5
85:5,8 86:7,10
87:12,12
**Brief** 90:21
**bring** 26:14
**bringing** 69:3
**brought** 18:11
18:12 57:1
68:25 70:9
**Building** 2:13
**bullet** 66:13
67:3 77:17
**business** 21:15

28:6 34:24
37:2 44:4,14
45:16,18,19
49:23 85:13,14
85:25 86:24

---
**C**
**C** 2:1 4:1 51:15
**calculate** 24:17
**call** 53:23 80:15
80:16
**Callahan** 52:24
61:20 62:3
63:16
**Callahan's**
51:23
**calls** 87:24,24
88:3,3
**cameras** 16:7
**capacity** 6:1 9:9
9:19
**care** 8:17
**career** 89:16
**carries** 66:15
**case** 43:20 44:16
44:22 45:25
53:15 59:17
**cases** 42:12,15
43:6 45:13
**Casey** 52:25
61:20 63:21
80:21 83:16
84:5 85:2,9
86:6 87:12
**category** 66:14
85:19 87:6,10
87:18
**cause** 1:18 95:6
**CBT** 85:12
86:24 87:6
**celebrate** 89:13
**CEO** 27:21
**ceremonies**
89:13
**certain** 18:11

**certainly** 5:8
62:15
**certification**
3:10 35:15,16
35:16 37:18,21
40:8,8 94:9
95:14
**certifications**
37:14
**Certified** 94:12
**certify** 93:2
94:13,18 95:2
**chain** 27:9
**chance** 70:4,12
**CHANGE** 92:3
92:3
**changes** 93:6
94:24
**charge** 80:21,22
**chart** 23:7,12
28:9
**check** 72:9
90:19
**Chicago** 40:21
**Chonoles** 1:10
1:16 3:5 4:4,4
4:5,17 6:8,12
7:10 10:16
11:19 12:4
16:15 19:15
20:25 35:6
70:21 84:18
90:23 92:2
93:10 94:10,15
**chosen** 89:10
**Chris** 27:17
**Civil** 1:4,23 94:4
**claims** 89:23
90:5,6
**Clark** 21:14
23:8,18 25:22
43:12,15 44:24
45:12,15 47:4
49:20 50:22
55:9 60:11,16

61:7 64:22
65:9,18,19,23
66:23 67:3
68:12,22 69:17
72:9 76:22
88:12
**Clark's** 52:13
53:3
**class** 19:18,20
36:12 41:2
**clear** 9:8,23
65:21
**client** 41:8,12
**close** 19:10
44:22 67:12
**closed** 85:13,14
85:24 86:24
**closure** 67:20,25
68:1,2,11,24
**Club** 89:1,7,16
**coached** 64:8
66:14
**coaching** 43:2
65:25
**code** 63:12
**collect** 43:23
**Collierville**
25:22
**color** 5:10 75:21
**Colorado** 37:4,5
**column** 62:25
63:3,5,11
**come** 4:16 36:9
37:25 52:12
**comes** 60:11
90:16
**coming** 77:6
**command** 27:9
**comments** 51:12
**commitment**
69:13
**communicated**
66:23 67:1,2,3
**communicatio...**
33:5

**companies** 8:14
**company** 6:16
6:19,23 7:11
7:17 9:1,12
12:19 13:2,10
13:20 14:14,21
15:7,11,16,21
16:1 90:4,5
**company's**
13:16 14:15
**comparative**
83:9
**comparative-t...**
17:5
**compared** 85:25
**compensation**
22:11
**complainant**
18:19 33:21
44:18 46:10,13
46:16 47:14
54:19,20 55:4
55:15,19 56:12
56:18 57:7,10
58:3,5 59:25
64:17 66:14
68:2 84:17
**complainant's**
54:16 55:6
60:8 65:22
77:4 84:14
**complained**
76:23
**complaining**
70:10
**complaint** 16:24
20:22 29:1,10
30:8 31:1
32:19,23 33:15
42:13 47:4,18
48:10,14,17,18
49:5,12 62:5
62:22 65:13
68:25 69:4,22
71:24 72:4,5

72:18 73:1,8
73:12 74:1,7
74:13,19 75:4
75:18
**complaints** 7:24
15:8,12,18
17:6,11,15,19
18:4,10,12
23:2 29:22
30:2 42:17
76:23 81:10
**complete** 22:14
35:14 46:11
68:6
**completed** 44:10
44:19 47:7,9
49:14 67:16
68:9 70:24
71:23 72:3,6
72:16,25 73:5
73:6,10,12
**completion**
94:21 95:1
**complexity**
33:24 72:23
**compliance**
15:22 16:1
**complicated**
72:4,8
**Complies** 30:18
30:20
**computer** 86:21
**computer's**
50:14
**concern** 55:22
56:4,7 58:8,17
65:17
**concerned** 58:18
**concerns** 55:14
56:13,17 57:1
57:1 64:10
69:3,16
**conclude** 58:7
**concluded** 91:3
**conclusion**

52:12 54:6,16
56:10 58:1,14
59:24 60:11,23
77:2,3,6
**conclusions**
43:25 46:5
54:15 60:4
**concurrence**
29:12,15 47:20
48:2
**conduct** 7:19
14:11 18:15,18
18:22 19:6
24:22,23 25:1
25:3,6,17,20
26:18,21 32:2
32:7,25 34:4
34:10,12 35:3
43:15 53:14
65:6 66:5
67:12 68:16
69:6,11 72:12
**conduct-** 35:21
**conducted** 1:11
33:23 42:12
60:21,22
**conducting** 16:8
35:8
**conducts** 14:13
21:5 23:2 27:1
34:10,23 43:12
43:24
**conference**
40:19 80:14,16
**conferences**
41:15
**confidential**
33:11 67:7
69:8
**Confidential'**
33:5
**confidentiality**
8:22 9:4 18:16
**confidentially**
69:5

**confirmed** 55:13
56:25 61:21
**confirming**
55:18 56:1,22
56:25
**confirms** 56:17
**conflicting** 70:5
**confused** 24:25
**confusing** 61:1
**connected** 61:5
**Conrey** 52:20,21
55:6,13,18
56:1,17,22,25
57:4,6 60:11
61:15 63:10,14
**Conrey's** 51:7
83:10
**consequences**
14:15
**consider** 17:1,5
17:10,14,18
18:3 46:8
**consideration**
44:14
**considering** 64:5
**consistency**
84:13
**consistent** 61:5
**consistently**
24:10 84:16
88:15
**consult** 45:11
46:16
**consultation**
29:18
**consulting** 21:16
28:6 49:23
**contact** 32:17
69:16
**contain** 94:23
**content** 33:16
**context** 58:13
59:7 75:4
77:18 81:19
82:2

contingency 21:10
contradictory 70:12
contradicts 70:3
contrast 76:10
corporate 1:6 9:9,18 27:20 28:16 94:6
corporation 2:12 8:5 9:24 10:17 13:9,15 14:5
corporations 8:17,20 11:6 11:12 12:22 13:25 15:2
correct 11:5 14:2,7 19:17 24:8,13 26:17 27:15 30:4,7 33:13 34:17 37:22 40:24 43:17 44:23 46:1 51:4,19 52:7,14 53:8 54:4 59:2 61:8 63:4 66:10 68:14 69:23 71:21 72:2 73:4,23 74:8 74:17 75:6 78:10,14 79:22 83:3,3,5,25 93:4
corrections 93:5
corrective 34:25 44:20 65:20 67:12,22 69:1 84:23,24 85:2 85:5
correctly 32:20 33:8 34:1 54:23 64:25 86:22

counsel 1:25 4:11 36:2,5 95:2
counseling 47:23 48:8 71:1
course 35:14 36:16 40:1,7 40:10 52:15 65:3
court 1:1 5:15 71:10 94:1
cover 10:2
coverage 90:4
covered 90:6
covering 90:5
covers 89:23
create 18:25
created 48:24 77:13
Cross 2:13
CSR 1:20 4:8 95:14
culture 69:11
current 37:14
currently 77:22 78:16
customer 21:9
CVP 27:20

---
**D**
D 3:1 4:1 51:20
Dallas 2:7
data 22:13 43:23
date 43:9 46:22 47:6,8,9 48:13 49:2,15 53:6 53:21 74:8 75:12 77:18 82:19 83:2 92:2 93:10 94:22
dates 37:20 38:15
Dave 45:25 46:2

46:5 68:12,14 68:17
day 1:18 23:8 77:19 95:8
days 33:24 70:25 71:22 72:4,6,12,16 72:22,25 73:4 73:5,6,10,13 73:25 74:5 81:9,22,23 94:22
Deakins 40:22
Dear 68:23
December 49:6 74:13 75:6
decision 17:2 19:8 80:23
decision-make... 17:18
decision-make... 17:1
Defendant 1:7 2:11 4:25 94:7
defense 40:22 41:3
define 13:11
defining 13:4
degree 37:2
degrees 36:19 36:20 37:12
delegate 12:24
demograph- 63:12
demographics 62:16 63:9
Denied 61:21
Denver 37:4
department 14:12 18:12,13 21:14,15,16 23:1,3 28:3
departments 21:20
depending

33:24 72:10,22
depends 70:10
deponent 93:1 94:19,20,25
deposing 6:15
deposition 1:10 1:15 3:15 4:3 5:17,19 20:18 94:9,16,21 95:1
describe 24:14 35:6 43:18
description 3:14 21:2 34:21
designated 5:23
designating 33:4 33:11
destinations 89:12
detail 75:18
details 74:18 76:4
determination 69:1
determine 81:19 81:20
develop 19:3,12
deviate 66:16
dictate 30:22
difference 12:4
different 74:9 74:24 76:20 89:10
differently 62:21 64:1 75:20
direct 23:11 45:8,12
directed 32:17
directly 45:10 56:9 69:17
director 27:7 33:14,22 34:6 34:8,11 39:12 44:5,7 45:22

45:25 64:8 66:15,17 79:2
directors 79:12
disagree 14:19 16:9
disciplinary 29:12 47:13,20 71:25 73:14,24 76:9,10,16,18 79:14 80:6 84:7 86:7,10
discipline 71:24 75:11 84:17,19 86:4 87:13
discovered 57:5 65:4,16,17
discretion 70:8
discriminate 13:22 31:13
discriminated 62:14
discrimination 6:20,24 7:12 7:18 8:6,10,15 13:3,4,11,17 14:2,7,16 15:3 15:8,12,18,22 16:2,25 17:6 17:11,15,19,24 18:5 20:23 23:2 29:9 30:25 31:5,16 33:7 35:7,8 42:9 43:10 47:17 48:11 62:4,7,19 63:25 71:23 74:20,23 75:2 75:4,17,19,20 80:4,9,24 81:11,21,23 88:10 89:23
discuss 41:20 43:5
discussed 45:3

Discussing 44:7
discussions 36:4
  43:7
district 1:1,1
  19:24 20:6
  57:15 59:19
  75:13 78:12
  79:18 88:4
  94:1,1
DIVISION 1:2
  94:2
document 46:20
  48:3 49:7 53:5
  54:1,2 62:6
  68:5 70:14
  71:19 72:21
  73:16 74:9
  77:1,3 78:1
  84:9 85:23
documentary
  52:9
documentation
  47:25 53:4
  67:15,19 71:6
  76:25
documented
  53:24
documents 3:15
  49:2 53:14
  55:10,11 73:20
  88:17,19,21,22
dog 51:20
doing 44:2 53:13
double-check
  23:9
doubt 60:17
Dow 1:20 94:12
  95:14
Dr 95:16
DSMs 79:18
due 55:15 56:14
  56:19
duly 1:17 6:9
  94:15

**E**
E 2:1,1 3:1 4:1,1
  52:3
e-mail 33:4
earlier 45:4
early 44:3
EDT 1:19,19
EEO 25:19,20
  26:15,22 27:1
  30:25 34:10
  42:12 45:20
  68:24
EEOC 42:14
effective 41:23
effectiveness
  22:12
efficient 41:23
effort 64:10
eight 24:6,15,21
  25:3,3,17,20
  88:7,8
either 45:22
Elizabeth 2:5
email 5:1,13
  33:10 42:22,25
  52:16 61:4
  75:6 76:5
emergency
  21:10
emphasis 37:3
employed 95:3
employee 21:15
  23:3 24:5,22
  26:24 27:1
  28:2,4,25
  29:10 33:7,15
  34:6 47:18
  64:2 78:19,22
  81:14 82:23
  84:15,15 95:5
employees 7:21
  23:25 24:6,15
  24:20,21 25:1
  25:3,5,17
  32:15,16,16

49:25 53:17
  64:1 89:15,23
employer 18:15
  18:18,22,25
  41:3
employment
  29:19 40:22
  81:14 90:3
employment-r...
  9:14 10:1,19
ensure 13:20,25
  14:5 18:16
  64:8,10,11
  65:5,25 66:14
entered 65:19
entire 24:3
  58:13 89:16
entitled 87:24
environment 8:3
equal 29:19
Errata 3:9 92:1
  93:7 94:23
error 55:15 56:3
  56:15,19 57:5
  59:11
esanford@san...
  2:8
essentially 66:3
  90:13
established 8:11
  33:18
ethical 69:11
evaluate 78:21
  82:23
evaluated 20:3
evaluation 75:14
event 54:20
  59:25
events 89:13
everybody 7:21
evidence 17:5
  18:3 52:9
  60:23,24 61:6
  79:11
exact 38:22 49:2

exactly 62:1
Examination
  3:6 6:10
example 18:8
examples 16:6
  76:1,4,7
exceeding 90:6
exception 24:19
excuse 6:22
  14:25 23:6
  59:22 86:6
exhibit 3:14,15
  4:18,22,23
  60:25 61:2
exhibited 69:12
EXHIBITS 3:13
exit 16:8
expectation
  34:23 78:23
expectations
  7:19 78:22,24
  82:23
experienced
  35:18 40:9
expired 40:9
expires 95:14
explain 14:14
  41:9,14 89:3
explained 84:11
  84:14
explaining 44:8
Explore 30:8
  42:15
EXPRESS 2:12
extended 35:17
extends 24:3
extent 69:5
  72:16
externally 42:13

**F**
F2F 87:24
factors 70:10
facts 17:10
fair 11:14 18:15

18:18,22 30:3
  30:15 32:3,4,8
  32:22 33:12
  54:5,6 66:7
  79:10 90:15
fairness 59:13
familiar 20:17
  62:16 80:19
far 14:9 24:2
  35:13 43:1
fashion 66:11
Federal 1:23
  2:12
FedEx 1:6 4:7
  5:13,21,24
  7:22 9:7,23
  10:16,24 11:4
  11:11,19,25
  20:5,9 21:13
  23:1 25:2,17
  26:15,18 27:1
  27:22 28:16,20
  28:24 31:4,18
  35:7,13 38:25
  39:6,9,12,16
  39:17,19,20
  42:10 47:12
  53:9 54:2
  69:10 78:21
  80:17 82:22
  89:15,22 90:3
  90:8,13 94:6
FedEx's 4:19
  28:12 31:15,21
  90:2,16
feel 8:1 45:9
felt 65:24
female 63:17,19
  63:21
filed 42:11,13,15
finalized 81:10
financially 95:6
find 65:23 74:10
findings 34:13
  46:4,13 50:17

fine 5:3,5 23:16
38:5 71:14
78:4 82:12
firm 2:5 40:23
41:3 95:15
first 6:9 30:13
32:1 37:24
39:17,19 40:5
43:9 47:3 51:6
52:10 56:11
67:3 70:24
73:6 75:7
fiscal 83:4 85:15
86:13
five 25:16 50:1
78:16
five-minute 42:4
fix 64:23
flag 80:8
Floor 2:13
follow 6:20,23
7:11,20 15:3
15:22 16:2
53:18
followed 53:12
68:13
following 49:25
94:14
follows 6:9
48:17 52:16
foregoing 93:3
foreign 41:7
form 5:18 8:18
8:23 9:15
10:21 11:9,15
11:22 12:3,5,8
12:25 13:7,13
13:18,23 14:8
14:17,23 15:5
15:9,14,19,24
16:4,10 17:3,8
17:21 18:6
19:25 20:13
26:20 28:17
31:10 35:10

40:17 41:17
42:1 48:5
53:20 54:1,8
56:23 57:21
58:11 59:5,21
60:13,19 61:11
64:24 65:14,19
66:2 67:17
70:7,13 75:22
76:13 80:10
81:2,15 82:3
93:6
former 32:16
49:22
forms 35:25
formulates
43:21,24
forth 68:25
foster 69:11
found 41:6,18
48:6 76:22
four 50:1 85:18
87:5
fourth 32:6
frame 39:8,13
frames 72:21
73:3
FRCP 94:18
frequency 43:4
front 49:17
fulfill 67:9
full 69:6
fun 89:12
functioning
86:22
functions 24:14
24:24
funds 35:14
further 50:8,21
84:11 94:18
95:2,5
future 12:10
59:13 65:6
69:16
FX 48:15

FX- 77:2
FXE 48:15 49:9
FXS 47:16 72:21
FXS_ESI_014...
46:20
FXS_ESI_014...
62:2
FXS_ESI_014...
84:9
FXS_ESI_014...
49:13 77:3
FXS_ESI_014...
48:21
FXS_ESI_014...
48:7
FXS_ESI_141...
67:24
FXS_ESI_144...
77:10
FY19 85:25
FY20 83:4 87:6
87:15,18
FY20Q2 75:13

**G**

G 4:1
gaining 44:7
gather 60:24
gathered 60:22
69:7
gathers 61:7
gender 62:23
general 88:14
generalist 25:8,9
generalists
25:13
generally 24:15
24:16,19 33:24
72:22,24 73:3
getting 58:8
60:8 81:6
give 46:2 70:5
86:21
given 44:6 47:22
67:16 81:8

93:4 94:17
gives 76:7
giving 60:16
80:25
go 7:5 10:10
12:12 20:2
30:5,16 35:12
36:17,25 37:16
41:5 42:21
44:25 45:1,2,8
49:1,18 51:5
51:10 52:18
54:12,15 55:5
56:5 58:1
60:14 62:15
64:6 71:5
75:24 77:6,17
78:2 81:17
82:4 86:17
87:4 89:6,15
goal 59:10 78:19
78:25
goals 58:9 77:7
79:2
goes 10:10 33:21
45:3 46:21
56:9 76:4
going 4:2,18,20
5:17,18,19
6:15 9:23 10:9
10:10,14,17
19:25 21:11
43:7,22 68:18
70:20 75:17
77:10,24 80:13
82:11 84:8
87:21
Golden 52:25
61:20 63:19
75:9 84:11
86:10 87:12
good 6:12,13
42:4 70:15
89:8 90:12
guidance 45:7

guideline 32:10
guidelines 30:21

**H**

Hacks 2:13
half 85:24 86:1
87:9
halfway 75:8
hand 6:6
happen 65:25
73:1
happened 72:7
happens 81:22
harassment 7:18
8:10 28:17,21
29:1,9 47:18
hard 8:9,13
Harris 1:3 2:19
4:6,15 19:15
19:20,23 20:8
20:22 42:10,11
45:13 47:22
48:22 50:2
52:20 56:2,22
58:5,19 60:18
61:4,10 62:4
63:6 65:10,11
65:18,24 66:5
66:8,11,21,24
67:8 69:21
70:4,23 71:1
73:13,23,25
74:4,14 76:4
76:11,15 78:11
80:1,5,15,20
80:25 81:7
83:6,19,23
84:1 85:10,19
85:24 87:9,16
87:19 88:6,11
88:15 94:3
Harris's 47:4
48:10 49:5
50:17 51:1,6
51:16,21 52:4

58:8 71:23
72:5,18 73:1,7
73:12 74:1,7
76:23 77:8
79:21,24 80:23
81:10
**Harrison** 26:3
26:11
**head** 24:17
**header** 86:20,23
**heard** 80:17
**held** 74:24 76:19
**Hickman** 75:9
83:13 84:5
85:5,8 86:7
87:13
**hide** 54:19 55:3
58:3
**hiding** 58:23
**high** 36:20
**high-level** 30:21
34:22
**high-performi...**
89:8
**hire** 6:16 20:5
**history** 38:2
**hit** 75:9
**hitting** 76:8,16
**hold** 68:10
**Holley** 52:25
53:6,21 61:21
63:23 84:15,24
**hopefully** 5:7
**HOUSTON** 1:2
94:2
**HR** 14:12 21:6,9
21:14,20 22:19
23:1,10,18,21
23:23 24:23
25:7,7,8,9,9,11
27:7,10,14
34:3,8,9,10
35:18 37:14,18
37:23,25 38:7
38:9,14,15,18

39:20,23,23
40:2,5,9,11,12
41:15,24 45:1
49:22 69:4
**human** 6:17
8:21 9:1,13,24
10:18 11:7,12
11:20 12:1,23
21:1,13 29:12
29:17,21 37:3
47:21
**humiliation**
74:19
**Hurst** 4:9 95:16

**I**
**identify** 4:12
**identity** 69:7
**illegal** 13:5,12
**immigration**
21:8
**implemented**
44:16,17,22
67:14
**implementing**
67:22 68:7
**importance** 41:9
41:14
**important** 41:18
41:24 58:14
79:2,4
**improvement**
47:23 48:23
71:2 73:15
79:13 80:5,8
84:6,19
**in-house** 36:2
**include** 16:7
21:8
**included** 88:18
**including** 24:2,3
**incorporate**
41:22
**indicated** 5:12
**indicating** 24:11

**individual** 68:15
**individuals** 63:9
68:6 89:14
**industry** 39:23
39:23
**influential** 17:2
**information**
15:17 18:9
43:21 44:13
49:17 69:7,8
69:25 83:10
84:3
**initiated** 42:23
**initiating** 33:6
**inspections** 16:7
**installing** 16:7
**instance** 1:16
68:11 87:15
**instructed** 54:21
60:1
**instructing**
64:23
**instructions**
66:15
**insurance** 89:21
89:22 90:1,4,7
90:9
**integrity** 8:22
9:3
**intention** 31:15
31:21
**intentional**
58:22
**interested** 95:7
**interesting** 41:6
41:19
**interim** 18:19
**internal** 30:25
32:13,19,23
45:20 68:24
**internally** 42:13
**interrupt** 23:14
**interview** 19:3
43:22 46:17
51:14,25 52:10

53:23,25 54:1
54:5,7 65:3
**interviewed**
49:25 50:6,9
51:2 52:21
53:1,6,21 54:3
54:11 61:13,15
61:17 70:1
**interviewee**
53:10 70:3
**interviewees**
52:5 70:1
**interviewing**
43:23 60:10
**interviews** 16:8
19:6 51:13
53:2
**invest-** 46:22
**investiga-** 34:23
42:23
**investigate** 7:24
14:1,6 15:7
29:22 30:2
**investigated**
42:14 48:18
69:1
**investigating**
16:24 17:6,11
17:15,19 18:4
36:7 81:18
82:2
**investigation**
14:10 15:17
18:15,18,22
19:1,10,12
30:22 32:2,7
32:11 33:1,4,6
33:16,22,25
34:4,13,22,24
35:3,19 36:3,8
40:14 43:2,12
43:16,19,24
44:3,19 45:22
46:11,14 47:3
47:7,11,14

48:16 49:11,19
50:16 54:13
60:21 61:7
67:13 69:6,21
72:11,13,14,23
81:9
**investigations**
14:11,13 15:12
21:5 23:2 24:4
24:23 25:2,4,6
25:18,19,20
26:19,22 27:2
30:14,23 31:24
32:1,23 34:10
34:11 35:8
36:6,14 42:12
42:17,24 72:3
72:15,24
**investigative**
46:23 48:13
53:4 74:6
**investigator**
18:23 47:10
53:13 54:6
70:8
**investigators**
26:15 54:2
**involuntarily**
29:10
**involuntary**
47:19
**involve** 14:11
26:22
**involved** 34:24
44:6
**involvement**
42:16 43:1
**involving** 72:18
**issuance** 74:6
**issue** 57:5 58:17
58:22,23 59:1
59:15,16 64:19
66:12 68:25
**issued** 67:20
68:11 73:22

75:10
**issues** 7:23
26:23 33:7
73:24

**J**

**J** 2:12
**Jaime** 52:24
61:20 63:19
75:9,12
**January** 49:16
74:5,8
**Jennifer** 1:3
2:19 4:15
19:15,20,23
20:8,16,22
47:22 48:22
56:2,22 57:3
58:5 61:10
62:4 66:20,24
67:8 68:12,22
68:23 69:20,20
70:3,23 71:1
72:5 73:22
74:4,14 78:11
79:20 80:15,20
80:23 81:7
83:6,19,23
84:1 85:10,19
87:16,19 88:6
88:11 94:3
**job** 19:24 20:25
21:2 24:14
25:5 38:21
81:13
**judge** 12:9
**July** 56:13
**jump** 6:15
**June** 39:14
46:24 47:6,24
48:8,14 49:19
70:25 71:20,20
72:6
**jury** 5:15 89:3
**justification**

59:12

**K**

**K** 1:19 94:12
95:14
**Kathie** 26:21
27:4,24 28:2
**keep** 15:11
53:10
**kicks** 90:9
**kind** 16:5
**knew** 82:17
**know** 7:20 14:9
16:18 20:16,19
22:5 36:16
41:21 43:1,2,3
43:4,5 44:3,11
44:12,20 45:4
45:6 50:11,13
51:25 52:1,19
52:21,24 53:12
54:9 55:10,12
55:21,23 56:6
56:9 57:2,13
57:14 58:16
60:20 61:14
62:17 63:10,14
63:15,16,18,19
63:20,21,22,23
63:24 66:23
67:2,9 70:4
71:7 72:8,10
79:6,12 82:15
82:16 85:12
88:12 89:1,13
89:19
**knowledge** 9:13
9:25 10:19
38:4

**L**

**L-** 82:15
**L-a-u-d-e-r-d-...**
22:24
**label** 28:15

30:10,25
**labeled** 28:13
33:3
**Lamb** 44:6 50:5
50:9 54:19,21
55:3,14,22
56:7,18 57:1,2
57:6,9,23,24
58:2,4 60:1,17
61:10 64:8,17
64:23 65:8,11
65:24,25 66:8
66:10,16,17
67:4,7 68:13
73:22,24 74:20
78:8 79:13
80:24 84:1,11
84:14
**Lamb's** 50:22
51:1,7,16,21
51:24 52:4
55:7 58:10,21
59:9 60:9
77:11 79:7
82:4 83:24
88:14,23
**large** 57:5
**Lauderdale**
22:22,23 27:11
27:14
**law** 31:8,12
35:20 40:1,4
40:10,19,20,20
40:22 41:2,3
41:15
**laws** 6:20,24
7:12 8:17 9:14
10:1,19 15:4
15:23 16:3
41:25
**lawyers** 16:18
**layperson** 90:13
**lays** 59:8
**lead** 41:7 44:4
**leadership** 33:23

34:12,14 44:4
45:23 77:19
**leading** 21:4
35:23
**Leah** 1:19 4:8,20
94:12 95:14
**learn** 35:19
41:20 58:19
**leave** 44:16
**legal** 29:13
32:17 33:6,10
36:2,4,8 40:14
42:14 44:11,25
45:2,7,9,12
47:21
**length** 84:13,16
**let's** 22:12 26:2
48:15 49:18
54:25 73:21
86:3
**letter** 47:23 48:8
48:22 49:3
68:23 71:1
73:14,22
**level** 34:12
79:21
**LHR** 82:15
**liability** 90:3
**Linda** 49:20,21
49:22
**line** 23:12 36:25
77:25 78:5
92:3
**lines** 43:6
**link** 7:4
**list** 21:25,25
62:15 63:12
76:1
**listed** 45:20 50:5
65:15
**lists** 50:1 83:6
**little** 5:9 24:25
61:18
**lived** 37:8,8
**LOC** 75:11,14

**located** 1:22
4:10
**long** 10:9 37:23
39:22 48:1
**longer** 72:12
**Longhorn** 82:16
**look** 29:25 30:4
48:2 49:18
50:8,8 51:23
55:9 56:21
60:16 61:1
77:7 80:11
88:23
**looked** 55:10,11
88:13
**looking** 18:4
33:3 49:7
70:14 73:17
82:21 83:1,9
85:14
**looks** 30:13 32:5
33:10 46:24
49:9,19 50:14
50:17,19,21,23
51:5,9,15,20
52:3,9 55:18
55:20 56:1,4
61:14 66:20
70:23 72:5
73:11 80:15,15
82:22 83:10,13
85:18 86:13
87:5
**loss** 57:9 59:1,3
59:4,20
**losses** 57:15
**lot** 62:20 73:20
89:13
**Love** 37:11
**LOW** 75:11
**lower** 83:22 85:9
85:9,19 87:6
87:16
**lowest** 75:12
83:16

Mac Chonoles - 5/11/2022

**M**

**Mac** 1:10,15 3:5
  4:4 6:8 22:4
  73:18 92:2
  93:10 94:10,15
**machine** 1:21
**main** 21:20
**majority** 79:8,23
  80:2
**making** 28:25
  46:8 59:12
  70:21
**male** 63:14,23
**management**
  22:12 35:20
  39:25 40:3,10
  53:15
**manager** 19:24
  20:6 21:1
  35:21 37:23,25
  38:8,9,23
  40:12 49:22
  59:13,19 78:12
  79:1
**managers** 6:17
  6:20,23 7:11
  7:20 8:2 13:3
  13:10,21 14:1
  14:6,10 15:3
  57:15 64:9
  79:18 88:4
**manner** 32:18
  64:18 66:5,9
**March** 43:11
  47:4 69:21
  70:23 73:8
**material** 36:15
  36:17
**materials** 36:10
  36:11
**matter** 4:6
**matters** 14:12
  26:22 36:5
**Matthew** 86:3
**McElroy** 75:9

**McElroy's** 84:11
**mean** 6:4 7:2
  18:7,8 29:15
  34:15 45:18,19
  47:8 51:10
  54:10 58:15
  62:20 64:15
  82:10
**means** 5:21
  16:19 29:16
  78:16 79:8
  82:16 83:2,4
**meant** 65:10
**measuring** 88:3
**mechanisms**
  7:22
**meeting** 33:17
  43:4 77:19
  78:17,22 79:7
  79:8,14,23
  80:2,6,7 82:16
  82:23
**meetings** 45:4
  89:11
**member** 26:3
  34:14
**members** 7:21
  45:8 69:12
**memo** 67:20,25
  68:1,2,11,18
**Memphis** 1:22
  2:14 4:10
  40:19
**mentioned** 8:11
  8:12 25:19
  45:15 62:1
  63:5
**mentions** 62:25
  63:3
**messy** 81:6
**metric** 78:21
  82:22 88:4
**metrics** 89:10
**Michael** 21:14
  23:8,18 25:22

26:2 43:5,12
  43:15 46:5
  49:20 50:22
  52:2,13 53:3
  55:9 58:17
  59:8 60:11,16
  61:6 64:22
  65:5,5,9,18,23
  66:23 67:2,10
  68:6,11,22
  69:17 72:9
  76:22 88:12
**Michael's** 58:14
  77:3
**Michelle** 44:6
  50:5,9 60:9,17
  61:10 64:17
  65:4,8,11 67:4
  67:7 68:13
  73:22,24 74:20
  77:11 78:8
  79:7,13 80:24
  83:24 84:1
  88:14,23
**middle** 57:4
  84:10
**Mike** 22:22
  27:10,14
**million** 56:14
  59:1,3 90:6,7,8
  90:9,14,17
**million-dollar**
  59:20
**Millner** 51:23
  52:25 61:20
  62:3 63:21
  80:21 83:16
  84:6 85:2,9
  86:6 87:12
**miscellaneous**
  51:11
**misplaced** 54:10
**missing** 54:9
**misstate** 44:24
**mix** 24:1

**money** 90:16
**monitor** 14:21
**monitoring** 15:4
  16:6
**morning** 6:12,13
**mouse** 22:7
**move** 22:7 30:19
  51:15 57:10
**moving** 57:14
  58:10
**multiple** 36:2
**mumble** 71:8

**N**

**N** 2:1 3:1 4:1
**name** 4:8 6:14
  22:21 27:10,16
  27:18 28:6
**named** 17:25
**national** 41:7
**need** 36:17
  44:15
**needed** 65:25
**needs** 43:23 70:9
  71:10
**negative** 55:14
  55:22 56:3,8
  56:14,18 57:2
  58:4,8
**neither** 95:2
**never** 89:16
**new** 41:19,19
**non-H-** 45:18
**non-HR** 34:7
**normal** 5:18
  57:14,18
**normally** 7:3
**Northglen** 95:16
**noted** 93:6
**notes** 23:24
  53:10,23,25
  54:1,5,11,12
  77:12,12 79:24
  82:4,10 83:24
  90:19

**notice** 59:19
  61:24
**notify** 44:18
  46:10 68:23
**November** 82:19
  83:23 85:8,25
**number** 10:11
  10:12 13:4
  47:16 48:20
  68:20 88:3
**numbered** 1:18
**numbers** 85:10

**O**

**O** 4:1
**oath** 6:7
**object** 5:18,19
  5:20 6:3 7:7,8
  7:13 8:7,23
  9:15,15 10:6
  10:14,21 11:9
  11:22 12:3,5,5
  12:7,15,25
  13:7,13,18,23
  14:8,17,23
  15:5,9,14,19
  15:24 16:4,10
  17:3,8,21 18:6
  19:25 20:1,13
  21:18 23:12
  26:20 31:10
  35:10,11 36:23
  37:15 40:17
  41:4,17 42:1
  42:18 54:8
  56:23 57:16,21
  58:11 59:5,21
  59:21 60:13,19
  61:11 64:24
  65:14 66:2
  67:17 70:7
  71:4 75:22
  76:2,13 77:24
  80:10 81:2,15
  89:5,17,17

objected 11:15
objecting 5:21
  12:8
objection 6:2
  16:19 21:22
  22:2 38:1,5
  64:3 78:5
  81:25 82:6
objectionable
  5:14
obtained 35:16
obtains 90:3
obvious 75:3
obviously 42:19
  44:2
occasions 36:2
occur 17:24
  69:14
occurring 64:20
occurs 65:6
October 87:25
office 25:23 26:1
  26:16
officed 26:2
offices 25:22
  27:2
official 28:5
Ogletree 40:20
  40:22 41:8
oh 7:5,5 26:10
  49:10 68:4
  71:9 77:17
Okay 4:21 6:5
  7:8,10 12:6,7
  12:11,14,17
  16:17,20 22:10
  24:11 25:9
  26:5 28:2,11
  29:6 38:6 40:7
  71:20 87:1
Once 68:9
one-on-ones
  61:6
OneNotes 77:12
ones 10:12,13

88:13
ongoing 36:4
  74:19
oops 23:6
open 44:16
opportunities
  44:20 87:25
opportunity
  29:20
Opps 87:24
options 62:11
oral 1:10,15
  94:9,16
order 35:14
org 23:7,12 28:9
organization
  22:18 28:4,5
  34:9
organizational
  22:11
organizations
  22:14,17
Osteen 1:19 4:8
  5:1 94:12
  95:14,15
osteenreporti...
  95:17
outcome 95:7
outlines 68:8
outside 5:20,23
  6:3 7:3,6,9,13
  8:7,18 9:16,20
  10:7,15 11:2
  12:5,15,17
  16:12 20:1,14
  21:18,22 23:13
  35:11 36:23
  37:15 38:2
  39:16 41:4,16
  42:18 57:16
  59:6,22 64:3
  71:4 75:23
  76:2 77:25
  81:16 89:5,18
outstanding

89:9
overly 72:8
oversee 8:4

_____
P
P 2:1,1 4:1
p.m 1:19
Pacific 2:6
page 3:2,14
  28:23 30:5,13
  30:14,17,19
  31:25 32:1,5
  50:21 56:11
  64:6 77:16
  80:13 86:13,18
  87:23 92:3
pages 93:3
paid 57:8
paper 5:2
papers 4:17
paragraph 32:6
  32:6 33:3 34:5
  62:3 75:7
  84:10,10
part 12:8 15:17
  20:18 36:13
  37:7 46:12,18
  51:24 53:1,3
  57:13 65:12
  78:12
participate
  32:18 89:11
participated
  35:20
particular 54:7
  65:7 68:10
  77:1 78:23
parties 67:21
  95:3
partner 44:4
party 17:25,25
  18:1 32:18
  70:10 94:20
  95:1
pass 90:24

Pathways 54:20
  59:25
pause 90:21
payroll 21:21
PDF 5:2,3,5,5,11
peer 27:4 81:1,9
  84:14
peers 74:25 75:8
  76:7,15,20
  77:8 79:7 80:7
  83:7,22 84:2
  85:19 86:1
  87:9 88:7
pending 47:11
  47:14
people 24:11
  50:1 51:2
  52:19 61:18
  62:19 67:11
  68:16 83:22
  85:18 87:5
percent 75:13
performance
  47:23 48:9,23
  71:2 73:15
  74:24 77:8,17
  79:13 80:5,8
  84:6,12,12,14
  84:19 85:9
  88:4 89:14
performing
  75:13
permitted 32:14
  32:18
person 18:11
  27:9
person's 22:21
personal 6:1
  7:14 8:8,19,24
  8:25 9:9,17,21
  10:22 11:1,10
  11:18,23 16:16
personally 36:6
personnel 17:14
persons 17:2

perspective 7:14
  8:8,19,24,25
  9:17,22 10:22
  11:1,10,18,23
  12:19,20 44:8
phrase 5:19 6:3
phrased 10:15
pick 68:15
piece 52:9
placed 6:7
Plaintiff 1:4,17
  2:4 4:15 94:4
plan 18:25 43:21
  47:24 48:23
  71:2 73:15
  75:10 76:8,16
  77:7,21 78:16
  78:17,19 79:7
  79:9,13,15,18
  79:23 80:2,5,6
  80:7,8 84:12
  84:13,16
planning 21:10
plans 84:6,19
platform 5:14
please 13:8
  15:25 30:5,19
  68:20 69:16
  74:18
pocket 90:16
point 58:18,20
  66:13 67:3
  77:17
policies 7:17
  10:11,13 13:16
  14:15 15:23
  16:3 17:14
policy 10:12
  28:12 29:19,20
  30:1,1,9,24
  34:16,18 35:1
  35:2 45:20
  47:12,15,16
  53:9 72:2,15
  72:20,24 89:22

90:1
popping 82:8,9
position 20:4
possession 3:15
possible 69:5
  72:17 89:20
post 36:19
potential 56:13
potentially
  88:25
PowerPoint
  36:10
practice 34:21
  40:3 47:12,12
  53:11 90:3
Practices 35:20
  40:1,10
preparation
  35:15,25
prepare 36:11
prepared 20:17
PRESENT 2:18
presents 44:13
president 27:20
President's 89:1
  89:7,16
pretty 75:3 79:2
prevent 7:18 8:5
  8:9,14 13:3
  31:15,21
price 83:1
pricing 55:15
  56:2,15,19
  82:21,22 83:23
  85:10
Primarily 18:1
primary 65:1
  90:3
prior 5:16 8:12
  14:20 30:5,17
  38:13 39:20
  66:17 86:18
prioritize 12:24
privileged 33:5
  33:11

probably 78:24
problem-solvi...
  11:8,14,21
  12:2
procedure 1:23
  10:12 28:12
  30:9 32:19
  53:9
procedures
  10:11,13 53:18
proceeding 95:4
Proceedings
  91:3
process 30:9,22
  31:1 32:11,14
  33:18 34:22
  35:19 36:3,3,9
  43:18 44:8
  46:12,18 57:14
  57:19 67:10
processes 8:12
  24:24 36:9
  40:14,15
produced 1:16
  48:19
product 82:11
professional
  34:7,9 41:15
professionalism
  8:22 9:3
professionals
  21:13 41:25
  89:8
program 21:9,9
  41:7,23 59:13
  80:18,20,22
  81:8
programs 24:24
progressive
  34:25 71:24
  86:4 87:13
project 38:23
promote 69:11
promptly 69:13
propounded

93:5
protected 19:18
  19:20 62:8,9
  62:13
protection 18:19
provide 18:8,19
  34:13
provided 35:14
  66:15,16 69:9
  84:4
provider 90:7
provides 90:4
providing 5:21
provisions 1:23
Pull 74:9
pursuant 1:22
  94:18
put 50:11 65:6
  71:24,25 79:13
  80:5,7,22 84:6
puts 43:22

Q

Q1 85:15,25
  87:6,15,18
Q4 77:22 78:16
qualifications
  20:3
qualified 6:17
  19:23
Quarter 75:12
quarters 75:10
question 5:22
  10:15,23 11:16
  12:8,20 13:8
  15:1,25 16:22
  18:2 37:1
  42:20 50:13
  52:1 55:12,24
  76:14 81:12
  84:18 87:17
questioning
  78:6
questions 5:18
  7:5 12:13 19:3

23:13 36:5
  43:6,22 44:13
  44:25 64:10
  69:15 77:25
  90:23 93:5
quick 42:3

R

R 2:1 4:1
race 16:25 17:18
  17:19,24 19:18
  28:17,21 31:5
  31:13 62:4,10
  62:18,22 63:3
  63:5,12,25
  74:23 75:2,3
  75:19
race-related
  17:1
raise 6:5 56:4
raised 55:21
  56:7,13
raising 55:13
  56:17,25
rationale 81:20
  82:3
read 32:20 33:8
  34:1 54:23
  82:8 93:3
reading 57:22
  58:24
really 8:13 59:3
reason 81:19
  92:3
reasons 94:24
reassigned
  29:11 47:19
Rebecca 52:24
  61:20 63:16
rebut 70:12
rebuttal 70:5
recall 45:14,14
  57:22 64:25
  77:15
receipt 94:22

receive 7:23
  49:3 55:15
  56:8,14,19
  84:7 85:2,5
  86:3,7,10
  87:13
received 33:6
  42:22 48:8
  49:6 59:9 73:8
  79:14 84:17,24
receives 15:17
  43:20 48:22
  69:20,21 71:1
  73:13 80:6
receiving 75:19
  76:8,10,16,18
Recess 42:6
  70:17
recognized
  69:12
recommendati...
  64:19 65:6,7
  65:19 66:6,24
  67:3,16
recommendati...
  34:13 43:8,24
  43:25 44:15,17
  45:17 46:3,4,9
  52:13 64:7
  66:13 67:6,9
  67:14 68:13
recommending
  67:11
record 1:24 4:2
  4:12 5:17
  10:16 42:7
  70:18 71:17
  82:14 91:1
  94:17 95:6
recording 5:14
records 15:11
  53:10
red 24:2 80:8
refer 23:24
  30:16 47:15,25

51:12 71:6,19
72:20 73:16
76:25 84:8
88:17
**reference** 10:4
26:8 51:13
62:7,18,21,23
64:16 66:25
**referenced** 4:23
61:25 75:14
**references** 62:3
**referencing** 48:7
68:3,4 72:21
78:25
**referred** 88:22
**referring** 34:20
84:9
**refresher** 35:22
38:10 40:12
**refuse** 10:24
**refusing** 11:11
11:25
**regarding** 13:16
64:9 68:24
**regardless** 17:24
**Regards** 69:17
**region** 78:8,9,12
82:16
**regional** 79:12
**regions** 77:21
78:15
**Regis** 37:4
**Registration**
95:15
**regular** 36:4
43:2 45:4
**regulations** 9:14
10:1,20
**reinstitute** 82:5
**related** 32:10
35:15 36:2,5,6
41:6 64:10
66:11 95:3
**relations** 28:4
**relative** 95:5

**relevant** 17:10
17:14
**relies** 61:9
**rely** 36:13 53:17
53:17
**remotely** 1:11
1:21 2:1 4:9
**repeat** 13:8 14:3
15:25 55:24
76:14 87:17
**rephrase** 14:25
26:25 31:11
37:24 88:11
**replaced** 20:11
**report** 7:23
24:12 27:6,21
33:17 43:9
44:10 45:16
46:23 47:3,9
48:13,18 49:11
49:11,15,19
54:13 57:22
58:24,25 59:8
59:14,18 61:16
61:19,23 64:7
64:22,25 65:21
67:6,7,8 69:25
70:24,24 71:23
73:6,7,9,11,25
74:6 77:1
81:23 84:8
**reported** 1:20
**reporter** 4:2,6
4:21 5:3,5 6:5
42:7 70:18
71:10 91:1
94:13
**Reporter's** 3:10
94:9
**reporting** 4:9
7:22 36:3,9
40:14 64:12
95:15
**reports** 23:11
27:14,24 42:9

88:13
**represent** 74:3
77:11 82:15
**representation**
32:10,13
**representative**
9:9,19 11:20
34:4
**representatives**
8:21 9:2,13,25
10:18 11:7,13
12:1,23 32:17
**requested** 94:20
94:25
**required** 44:21
**reread** 51:10
**research** 63:8
**researched** 57:4
**resolution** 29:9
47:17
**resolutions**
21:15 23:3
24:5,22 28:3
**resolve** 64:19
**resource** 6:17
8:21 9:2,13,24
10:18 11:7,13
11:20 12:1,23
21:13
**resources** 21:1
29:13,17,21
37:3 47:21
**respond** 65:8,11
65:18,24 66:4
66:10 70:5
**responded** 42:24
64:17 65:4
**responding** 65:2
66:8
**responds** 64:8
**response** 90:2
**responsibilities**
80:23,25 81:13
**responsibility**
13:21 68:8

69:10
**responsible** 21:4
33:16 67:21
68:7 90:5,9
**rest** 24:6,20 26:5
59:7,8 62:16
65:12
**results** 19:13
89:9,9
**retained** 53:24
**retaliate** 13:22
**retaliation** 6:20
6:24 7:12,19
8:6,10,15 13:3
13:4,11,17
14:2,7,16 15:4
15:8,13,18,23
16:2,25 17:7
17:12,16,20
18:5 20:23
23:3 28:24
31:18,21 35:7
35:9 42:10
47:18 48:11
74:19 81:11,24
82:3 89:24
**retaliatory**
28:25 31:19
**returned** 57:7
94:22,23
**revenue** 57:8
59:10 78:25
79:2
**reverse** 87:4
**review** 13:16
30:9 32:13
44:12,14 45:17
46:2,7 58:12
59:14,18 85:21
**reviewed** 78:1
**reviewing** 62:6
77:1 79:16
85:23 88:18
**reviews** 43:21
53:14

**reward** 15:21
16:1 80:22
**Rewards** 80:17
81:8
**Richard** 52:25
53:6,6,21
61:21 63:23
84:24
**right** 6:6,15
12:16,18 23:6
23:7,15 24:18
25:17 26:24
34:16 37:10
48:12,16,25
49:18 57:23
65:21 70:15
71:17 74:11
75:21 76:1
82:13 84:21
87:22 90:22
**Road** 2:13
**role** 35:22,25
37:25 38:13,23
39:2,20
**roles** 29:21
**Rule** 94:18
**Rules** 1:23
**run** 24:24
**running** 21:8
**Russell** 45:25
46:2 68:12,15
68:17

---
**S**

**S** 2:1 4:1
**sales** 19:24 20:6
39:5,8 57:15
58:9 78:12
79:1,1,2,18
88:3,4 89:7,8
**Sanford** 2:5,5
3:6 4:14,14,22
5:16 6:11,14
7:1,2 10:5,6,9
11:17 12:9

23:14,16 28:8
28:10 38:2,4
42:3 50:14
68:19,21 70:15
78:4,7 81:6
82:7,10 90:19
90:22
**saying** 56:22,24
76:12 78:1
90:12
**says** 28:23 29:21
30:1 32:13,22
34:3,6,16
46:24 47:6,17
49:24 53:5,21
55:7,13,19
56:7 57:23
59:24 68:22
72:21,24 73:3
75:8 77:17,21
78:15 79:17
82:19
**scanned** 5:9
**scenarios** 45:13
**schedule** 61:5
**school** 36:20
**scope** 5:20,23
6:3 7:9,13 8:7
8:18 9:16,21
10:7,15 11:2
12:5,16,17
16:13 20:1,14
21:18,23 23:13
35:11 36:24
37:15 38:2
41:4,16 42:19
57:16 59:6,22
59:22 64:4
71:4 75:23
76:2 77:25
81:16 89:5,18
**SCP** 35:16 37:21
**screen** 21:11
28:7 46:19
48:4 70:20

82:9 87:22
**scroll** 80:13
86:17
**Scrolling** 77:16
**second** 30:14
31:25 32:5
66:13 72:18
73:1,11,12,14
73:25 74:1
77:16 86:17,21
87:23 88:7,8
**secondary** 65:17
**section** 32:22
45:21 49:24
50:17,25 51:3
51:3,5,11,14
51:15,20 52:3
52:6,18,22
54:15,16,25
55:5 56:12
58:13 61:25
**see** 22:4,12 26:2
28:13,18 29:2
29:3,5,8,14,23
30:11 31:2,6,9
33:19 34:3
41:18,21 48:15
50:3,5 51:2,18
52:10,21 55:16
56:11,19,20
57:11 60:4,4
61:16,19,23
62:7,17 64:13
66:18 67:8
69:18 73:21
74:18,21 75:15
77:23 78:3
79:17,19 82:2
82:19 83:7,8,8
83:11,14,17,20
85:16,20 86:3
86:14,20 87:7
88:1,6,17,20
88:21
**seeing** 48:4

51:13 77:15
**seek** 45:7
**seeking** 46:6
**seen** 20:5 77:14
79:11,12
**select** 18:23
43:15
**selected** 89:11
**self-insured**
90:13
**self-monitors**
8:3
**seminar** 40:20
41:2
**send** 4:20 5:1
68:6
**sends** 33:10
49:20
**senior** 39:5,8
**sent** 68:9
**sentence** 33:14
56:11 75:7
**September**
38:17,19 40:6
48:11,14,19,24
72:6 73:12,21
80:14,21
**serve** 32:14
**service** 21:9
**Services** 1:6 9:7
28:16,24 54:18
54:25 55:2,5
58:10 60:10
61:16 69:10
94:6 95:15
**sessions** 43:3
**set** 7:17 8:2
**sex** 62:24,25
**share** 21:11 28:7
36:11 46:4,19
48:4 70:20
87:22
**sharing** 44:19
87:21
**shorthand** 1:21

94:12
**show** 31:25 49:6
67:23 68:18
77:10
**showing** 23:7
28:12 29:20
30:8,24 34:25
46:19 67:15,23
74:11 88:13
**shown** 35:4
**SHRM** 35:15
37:21 40:8,8
40:19
**sic** 65:5 79:24
**side** 50:17,22
51:1,1,6,7,16
51:16,21,21,23
52:4,4,22 55:6
55:7 60:8,9
**sign** 63:25 80:4
80:9,24 81:21
81:24 88:10
**signature** 52:13
94:19
**signed** 47:10
48:19 68:9
70:25
**significant**
59:10
**single** 52:16
61:4
**sir** 6:5 37:1 89:6
**situation** 44:5,7
45:23 62:18
68:17 72:7,17
72:18
**situations** 45:7
**six** 23:21 78:15
78:16
**skills** 11:8,14,21
12:2
**skin** 75:21
**slides** 36:10
**slow** 50:15
**Solgot** 20:11,16

**solutions** 38:24
**sorry** 14:3 18:4
20:2 31:11
40:25 41:11
55:24 65:10
68:20 71:12
73:20 84:1
85:9 87:17
**sound** 48:12,25
59:3 71:16
**sounds** 8:13
90:15
**SOUTHERN**
1:1 94:1
**space** 24:22
**speak** 71:15
**speaking** 24:16
24:19 38:11
70:22 74:13
**speaks** 35:2
**specific** 52:22
53:5,16,20,25
54:1 60:3,5
61:15 62:21,23
65:2,15 88:13
**specifically**
51:12 54:21
55:1 60:1
**specifics** 69:25
**spell** 22:23
27:18
**sporadically**
40:15
**spreadsheet**
87:24
**spreadsheets**
77:7
**stack** 4:17
**staff** 82:16
**standard** 74:25
76:20
**standing** 38:1,5
78:5 82:6
**standpoint**
14:10

**stands** 85:12
**start** 39:2 81:12
**started** 39:17,19
**starts** 23:10 28:15 30:9,24 50:16 80:13
**state** 1:20 4:11 13:5,11 57:18 94:13
**stated** 1:24
**statement** 9:10 55:21 56:6,24 58:21 59:9 60:20
**statements** 17:1 70:12 88:15
**states** 1:1 28:15 29:8 31:4 33:4 33:14 48:7 49:24 54:16 55:1 57:4 61:4 64:7 65:21 66:14 72:15 74:18 76:15,19 84:10 94:1
**stating** 56:5 76:21
**statistical** 18:3,8
**statistics** 18:10 88:18
**status** 62:8,9,13
**stay** 61:5
**Steamboat** 37:10
**step** 33:10,12
**stipulations** 1:24
**stop** 14:1,6 87:21
**story** 50:18,22 51:1,6,7,8,16 51:17,21,22,24 52:4,5,23 55:6 55:7 60:9,9
**strategic** 23:10 23:18,21 24:1 24:4,7 25:7,9 25:12 38:14,15 38:18,24 40:2 40:2,5,11 45:15
**strive** 72:12
**strong** 11:7,13 11:20 12:1
**stuff** 38:3 82:9
**subjected** 29:11 47:19
**submit** 45:16,24
**submitted** 5:15
**submitting** 33:15
**Subscribed** 95:8
**subsequent** 49:3
**substance** 93:6
**substantiated** 54:17 60:6 65:16,23 77:5
**Suite** 2:6
**summary** 19:12
**supervise** 6:23 7:11 15:3
**supervising** 8:2
**supervisor** 6:22
**support** 24:23 34:9,11
**Supported** 61:21
**supposed** 71:16
**sure** 8:20 9:12 9:24 10:18 11:6,12 12:22 13:9 14:20,25 18:7 24:17 30:6 36:16 46:8 47:12 51:11 53:14 60:9 61:14 62:2,6 68:12 68:14 80:11 85:22 86:19 86:23 88:22
**surrounding** 35:8
**surveys** 16:8
**SVP** 27:14,20
**swear** 6:6
**switch** 89:21
**sworn** 1:17 6:9 94:15 95:8
**system** 53:15,19

**T**

**table** 83:6 85:15
**take** 7:24 9:6,6 10:9 30:4 40:1 40:25 42:3 48:2 54:25 61:1 72:11
**taken** 1:17,22 40:4 42:6 69:2 70:17 81:7 95:5
**talent** 22:3,12
**talk** 7:7 30:14 32:2,12,25 45:5 58:3 71:13
**talked** 5:16
**talking** 21:12 25:21 26:7 34:18 52:22 75:3 79:20
**talks** 32:1,7 45:21
**tasks** 12:24
**Taylor** 49:20,21 49:22
**team** 7:21 21:4 24:3 26:3,17 26:21 35:19,23 43:3 45:8 49:23 64:1,2 69:12
**teams** 26:18
**tell** 42:20 46:13 62:17 70:14
**ten** 7:6 23:25 24:21
**Tennessee** 1:22 2:14 4:10 25:23 26:5
**term** 62:19
**terminated** 20:8 49:10,16 74:5
**termination** 48:5 75:12 76:9,11,17,18
**testified** 6:9
**testify** 5:24
**testimony** 5:22 59:7 61:9 94:17
**Texas** 1:1,20 2:7 4:8,9 26:16 27:2 94:1,13 95:14,16
**thank** 18:14 22:25 26:10 28:11 38:6 42:5 46:25 69:3 78:7 82:18 90:25
**therefor** 94:24
**thing** 28:23 61:16 66:7
**things** 18:13 41:19,22,22 44:2 45:5 55:7 62:20 87:21 89:24
**think** 5:10 7:3,6 8:14 14:9 16:1 16:12 35:5 38:23 42:20 43:3 44:5,23 48:15 55:21 56:6,24 58:12 58:13,16,17,20 59:7,8,19 60:5 61:25 62:1 64:5,25 65:16 73:19 74:12 77:12 80:11 81:3 82:1 87:3 90:20
**thinks** 10:17 11:25
**third** 25:10 32:18 74:7,13 84:9
**third-party** 32:9 32:12
**thorough** 9:13 9:25 10:19 72:13
**thoroughly** 7:24 68:25
**thought** 26:14 59:15 72:2
**threats** 75:11 76:9,11,17,18
**three** 25:8 32:6 42:11,12 50:1 85:18 87:5
**time** 6:2 10:10 14:3 39:8,13 40:5 41:7 42:4 52:10 70:16 72:21 73:3 76:17,23 84:13 84:16 85:21
**timeframes** 33:17,23
**timeline** 70:21
**timely** 64:11,18 65:9,12,24 66:5,9,11 72:13
**timing** 58:21,23 58:25 59:15
**title** 20:25 25:5 38:21,22
**title's** 28:5
**titles** 25:8
**today** 5:7,8 6:15

23:25 24:8
90:23
**tolerate** 28:16
28:20,24 31:5
31:18
**tolerated** 13:6
13:12
**top** 52:19 83:10
85:24 86:1
87:9
**topic** 6:25 7:4,6
10:2,5
**topics** 41:6
89:21
**total** 23:25
**tracking** 85:13
85:15,25 86:25
**train** 6:19 7:21
13:2,10 14:10
**training** 35:6,13
35:22 36:1,8
38:10 40:12,13
**transcribe** 71:11
**transcript** 94:16
94:23
**transcription**
93:4
**transferred**
29:11 47:19
**travel** 89:11
**treated** 62:20
64:1 69:4
75:20
**treatment** 74:20
**true** 9:10,19
10:1,3,20,25
11:4,11 18:16
18:17,20,21,23
18:24 19:1,2,4
19:5,6,7,8,9,10
19:11,13,14,15
19:18,19,21,22
20:8,10,12,20
20:22,24 21:17
21:19 23:4,5

23:11,17,19,20
25:18,24,25
26:16 27:2,3,6
27:8,12,13,23
28:1 31:16,17
31:19,20,22,23
32:9,24 33:1,2
38:11 40:16
41:25 43:13
45:25 46:11
49:16 52:10,16
52:17 62:5,10
63:1,2,3,7
65:12 66:1,3,9
66:21,22 69:22
69:23 70:1,2
71:22,25 72:1
72:7,19 73:2
74:1,2,3,4,4,7
74:25 75:1,5
75:19 76:5,6
76:22,24 78:9
78:13,17,18,19
78:20,22 79:3
79:9,21,24,25
80:2,3 81:7,14
82:24,25 83:24
84:2,5,7,25
85:1,3,4,6,7,10
85:11,23 86:1
86:2,8,9,11,12
87:10,11,13,14
87:16,20 88:4
88:5 89:15
90:10,11,17,18
94:17
**truly** 56:5
**try** 5:6 26:24
**trying** 54:19
55:3 58:2,20
**Twelve** 39:24
**two** 7:5 24:1,4
24:10,20,23
25:12 32:5
42:15 50:1

60:3 62:10
75:8 83:22,22
85:18 87:5
**type** 26:22 36:10
64:19 67:19
**types** 8:9 14:12
44:15 75:18
**typically** 33:15
68:16

___

### U

**U.S** 21:8
**Uh-huh** 22:20
56:16 74:15
87:18
**ultimately** 58:19
**unacceptable**
48:9
**unannounced**
16:7
**underperform...**
88:15
**understand**
13:21 14:1,6
41:25
**understanding**
9:20 21:12
25:21 81:3
**Understood**
82:7
**unemployment**
21:9
**unfair** 74:25
76:19
**UNITED** 1:1
94:1
**University** 37:4
**unqualified** 20:5
**unreasonable**
48:1
**unsubstantiated**
54:18 55:3
58:2 60:12
64:21 65:13
76:24

**Unsupported**
61:22
**upload** 53:19,20
**uploaded** 53:15
**use** 5:13 22:7
54:2 62:19
**usually** 89:11,12
**utilize** 36:15,18

___

### V

**valued** 69:12
**variety** 70:10
89:9
**verify** 88:14
**versus** 77:8
**vice** 27:20
**victim** 17:25
**video** 5:13
**videographer**
2:5
**VIDEOTAPED**
1:10,15 94:9
**view** 58:16
**violating** 14:15
**violations** 69:13
**Virginia** 20:11
**VP** 22:16,19
27:10 44:4,6,9
45:22,24,25,25
46:7
**VP's** 22:13,17
**vs** 1:5 4:7 94:5

___

### W

**W-i-n-t-o-n**
27:19
**Walthall** 27:4
27:24 28:2
**Walthall's** 26:21
**want** 5:2,2 6:2
7:4 23:9,13
31:24,25 42:3
44:24 52:18
54:15 75:18
76:1 86:20

**wants** 61:5
**warning** 48:23
49:3 73:14,22
**wasn't** 51:11
62:1,18 65:1,2
82:18
**way** 46:21 59:11
90:12
**ways** 13:10
**we'll** 5:6,9
**we're** 10:10
36:12 43:7
79:20 82:21
83:1,9 85:14
**we've** 5:20 6:3
8:2 22:12
**Webster** 27:7,25
28:5
**week** 87:25
**weekly** 43:3
**welcome** 71:13
**went** 35:21
43:18 88:12
**weren't** 62:1
**Wheeler** 86:3
**white** 63:6,14,16
63:19,21,23
64:1 74:25
75:8 76:7,15
76:20 80:7
81:1,8 84:2
**windows** 22:8
**Winton** 27:17
27:21
**witness** 1:16,21
3:15 4:5,9 5:21
5:24,25 6:7
7:1,16,17 12:6
12:11,14,17
16:17,20,23
22:6,9 26:13
46:17 47:2
50:5,11 52:18
54:3,3,7 60:10
71:9,12,18

73:19 78:1
84:21 90:24,25
92:2 94:15,17
**witness's** 5:25
**witnesses** 49:25
52:5 60:22
61:12 63:1,7
69:7 71:14
**woman** 19:16
62:10
**word** 88:24
**work** 7:18 8:9
8:13 24:5,21
44:11 46:3
64:9 67:10
72:11 82:11
**worked** 35:18
40:9
**working** 39:23
44:3
**workplace** 8:17
14:11,22 15:4
16:6 21:5
24:22 41:25
**works** 7:22
**worth** 64:5,5
81:3,18 82:1
**writing** 22:5
**written** 19:12
**wrong** 44:24
72:2

---

**X**

**X** 3:1 53:6,21
**XX** 94:20

---

**Y**

**Y** 53:7,22
**yeah** 10:6,12,14
14:25 22:6,9
22:15 39:19
45:20 46:4
48:6,6 51:10
54:9 56:1
57:17 61:3

71:18 78:3
82:1,18 86:21
**year** 40:25 83:2
83:4 85:15
86:13
**years** 39:24
**YTD** 83:2 86:13

---

**Z**

**zoom** 5:14 23:9
30:17 31:4

---

**0**

---

**1**

**1** 3:15 4:18,23
56:14 59:1,3
**10** 90:6,8,9,14
90:17
**10:07** 42:6
**10:08** 1:19
**10:15** 42:6,8
**11** 1:11 70:23
92:2 94:10
**11:04** 70:17
**11:13** 70:17,19
**11:50** 91:1,3
**11th** 1:18 4:3
43:11 69:22
73:8,9
**12.3** 83:11
**12/31/2019**
49:15
**12:50** 1:19
**1273** 28:15
**1275** 29:21
**1277** 30:10
**1279** 30:25
**1280** 47:16
72:21
**13** 48:24
**13th** 73:21
**14** 79:17
**141748** 68:21
**141757** 46:21
**141844** 74:12

**145011** 80:14
**145018** 82:14
**15400** 2:6
**18** 56:13
**1910** 2:6

---

**2**

**20** 86:13
**20-** 35:17
**2002** 39:14,18
**2004** 39:10
**2007** 35:16
37:18 39:3
**2010** 38:17,19
40:6,11
**2011** 35:17
37:19 40:9
**2013** 38:7,9,12
40:13
**2014** 38:12
40:13
**2016** 40:21 41:1
**2017** 24:9
**2018** 56:13
**2019** 24:9 40:19
43:11 46:24
47:6,24 48:14
48:19,24 49:6
49:19 77:19,20
80:14,21 82:19
83:23 85:8,15
85:25 87:25
**2020** 49:16 83:4
**2022** 1:11,18 4:3
5:13 92:2
94:10 95:9
**214** 2:7
**23rd** 77:19 95:8
**25** 90:7
**26** 47:24 48:8,14
72:6
**26th** 71:20,21
**28th** 87:25

---

**3**

**3** 56:11
**30** 33:24 70:25
71:22 72:3,6
72:12,16,22,25
73:4,5,6,10,13
73:25 74:5
81:9,22,22
94:22
**30(b)(6)** 5:17,22
**30(f)(1)** 94:19
**301** 2:14
**313** 95:16
**351** 49:9
**3620** 2:13
**38125** 2:14
**3916** 4:8 95:14
**392** 95:15
**3rd** 2:13

---

**4**

**4** 3:3,15
**4/30/2023** 95:14
**4:21-cv-1651** 1:5
94:5
**498-9990** 95:17
**4th** 49:6 74:13
75:6

---

**5**

**5** 75:10
**56** 79:17

---

**6**

**6** 3:6 5:12 48:11
48:14,19 72:6
77:21
**6.14** 83:14
**6.25** 83:16
**6.6** 83:19
**6th** 73:13

---

**7**

**7** 47:6 48:15
49:16,19
**717-6653** 2:7
**739-0512** 2:14

**75201** 2:7
**76054-3024**
95:16
**79.5** 75:13
**7th** 46:24 70:25
74:5,8

---

**8**

**817** 95:17

---

**9**

**9:08** 4:3
**92** 3:9
**93** 3:9
**94** 3:10
**95** 3:10