

# EXPERT REPORT OF CONEISHA SHERROD

JENNIFER HARRIS

vs.

FEDEX CORPORATE SERVICES, INC.

PREPARED BY CONEISHA SHERROD

February 18, 2022

## PURPOSE OF TESTIMONY

Attached is my resume. I have been retained by the Sanford firm in the case of Jennifer Harris vs. FedEx Corporate Services, INC. The purpose of my testimony is to provide insight, explanation, and opinions about employment practices, policies and procedures implemented, enforced, and overseen by corporate boards, officers, human resource managers, and supervisors, and as adopted and applied by Defendants.

## STATISTICS

46% of persons who saw workplace violation and did not report it said that fear retaliation was the reason according to an ethics study in Washington, DC. See attached.

According to a study by a private foundation, 50% of adults have experienced or witnessed bullying in their workplace. See attached.

According to a report noted by the EEOC, 75% of employees who spoke out against workplace mistreatment faced some form of retaliation.

Reference: https://www.eeoc.gov/eeoc/task_force/harassment/upload/report.pdf

According to the EEOC, about 4,200 claims of retaliation are filed in Texas each year.

Reference: https://www1.eeoc.gov/eeoc/statistics/enforcement/state_18.cfm?redirected=1

## ASSUMPTIONS AND EXAMINATION OF EVIDENCE

I have reviewed the plaintiff's fourth amended complaint and jury demand and have been requested to assume that the facts in the amended complaint are true.

To the extent on assumptions of facts alleged in the amended complaint is insufficient, I am willing to examine the depositions, exhibits, and witness statements as they may become available in the case.

## SYSTEM FAILURE

Based upon my review of the facts as assumed and reviewed, I have identified a system failure in the case. The system failure is that the defendant who had responsibility for employees and the safety of people in the workplace failed to hire qualified Human Resources Managers, failed to train managers adequately, and failed to supervise the managers to enforce the laws to protect the safety of employees in the workplace.

## ROOT CAUSE

The root cause of the system failure in this case was failure to monitor the workplace to enforce the law. FedEx Corporate Services, INC. failed to supervise their own employees to prevent the discrimination and retaliation. FedEx Corporate Services, INC. failed to enforce its contract preventing violations of the law, including discrimination and retaliation.

Prevention is the best tool to eliminate harassment in the workplace.

Reference: www.eeoc.gov

JOB SAFETY PROTOCOLS

I have identified three job safety protocols that, if followed, would have prevented damages to the plaintiffs and would protect employees in the workplace. These job safety protocols, like all human resource job safety protocols, guidelines, and policies are based on laws, regulations, government guidelines, accepted industry standards and common sense.

The first job safety protocol is: Hire qualified Human Resources Managers.

The second job safety protocol is: Adequately train managers to follow discrimination and retaliation laws.

The third job safety protocol is: Supervise managers to follow discrimination and retaliation laws.

The fourth job safety protocol is: Corporations must prevent discrimination and retaliation.

The fifth job safety protocol is: Corporations must care about workplace laws.

We know that these rules are accurate because they are supported by the Civil Rights Act of 1866, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, EEOC regulations and guidelines, state common law, accepted industry standards and practices, and common sense. Virtually every employer will have similar rules in their employee handbook.

CHECKLIST FOR FIRST JOB SAFETY PROTOCOL

To determine whether a corporation is complying with the first job safety protocol, corporations should make sure Human Resources Representatives have:

1. The ability to act with integrity, professionalism, and confidentiality.
2. A thorough knowledge of employment-related laws and regulations.
3. Strong analytical and problem-solving skills.
4. Ability to prioritize tasks and to delegate them when appropriate.

Reference: https://www.shrm.org/resourcesandtools/tools-and-samples/jobdescriptions/pages/human-resource-generalist.aspx

CHECKLIST FOR SECOND JOB SAFETY PROTOCOL

To determine whether a corporation is complying with the second job safety protocol, in addition to hiring qualified HR representatives, corporations should train managers to prevent discrimination and retaliation by doing the following:

1. Define discrimination and retaliation and state that they are illegal and will not be tolerated.
2. Review the company's policies regarding discrimination and retaliation.
3. Ensure that managers understand the responsibility not the discriminate or retaliate.
4. Ensure that managers understand how to investigate, stop, and correct discrimination and retaliation.
5. Explain the consequences of violating the company's policies against discrimination and retaliation

Reference: https://www.eeco.gov (Manager Training Tips)

CHECKLIST FOR THIRD JOB SAFETY PROTOCOL

To determine whether a corporation is complying with the third job safety protocol, in addition to hiring qualified HR representatives and training managers, corporations must supervise managers to follow discrimination and retaliation laws by:

1. Monitoring the workplace.
2. Investigating complaints.
3. Keeping records.
4. Analyzing information; and
5. Rewarding compliance,

MONITORING THE WORKPLACE

Corporations should monitor the workplace looking for warning signs. The methodology is supported by generally accepted human resource practices. The following provides support and reliability upon which these general accepted human resource practices are found.

The EEOC states that employers should monitor the workplace for patterns of potential discrimination.

Reference: www.eeoc.gov

An employer has an affirmative duty to maintain a working environment free from harassment on the basis of national origin, 29 C.F.R. § 1606.8(a).

Ethnic slurs and other verbal or physical conduct related to an individual's national origin constitute harassment when this conduct, (1) has the purpose or effect of creating an intimidating, hostile or offensive working environment; (2) has the purpose or effect of unreasonably interfering with an individual's work performance; or (3) otherwise adversely affects an individual's employment opportunities. 29 C.F.R. § 1606.8(b).

With respect to conduct between fellow employees, an employer is responsible for acts of harassment in the workplace on the basis of national origin, where the employer, its agent or supervisory employees, knows or should have known of the conduct, unless the employer can show that it took immediate and appropriate corrective action. 29 C.F.R. § 1606.8(d).

An employer may also be responsible for the acts of non-employees with respect to harassment of employees in the workplace on the basis of national origin, where the employers or its agents or supervisory employees knows or should have known of the conduct and fail to take immediate and appropriate corrective action. Consideration is given of the extent of the employer's control and any other legal responsibility which the employer may have in respect to the conduct of such non-employees. 29 C.F.R. § 1606.8(e).

See also article: Managing Workplace Monitoring and Surveillance (SHRM)

Some examples of monitoring include:

- ✓ Installing cameras
- ✓ Unannounced inspections
- ✓ Using anonymous surveys
- ✓ Conducting exit interviews

INVESTIGATE COMPLAINTS

The EEOC states that a corporation should give clear assurance that employees who oppose discrimination will be protected against retaliation, and assurance that the employer will take immediate and appropriate action when determined that harassment has occurred.

Reference: www.eeoc.gov

The EEOC states that all employers should have an anti-harassment policy and complaint procedure that includes a complaint process that provides a prompt, thorough, and impartial investigation; and assurance that the employer will take immediate and appropriate action when it is determined that harassment has occurred.

Because discrimination often is subtle, and there rarely is a "smoking gun," determining whether race played a role in the decision making requires examination of all of the surrounding facts and circumstances. The presence or absence of any one piece of evidence often will not be determinative. Sources of information can include witness statements, including consideration of their credibility; documents; direct observation; and statistical evidence such as EEO-1 data, among others. See EEOC Compl. Man., Vol. I, Sec. 26, "Selection and Analysis of Evidence." A non-exhaustive list of important areas of inquiry and analysis is set out below.

Reference: https://www.eeoc.gov/policy/docs/race-color.html#VA1

Matters to consider are:

- Race-related statements (oral or written) made by decisionmakers or persons influential to the decision.
- Comparative treatment evidence.
- Relevant background facts.
- Relevant personnel policies.
- The decisionmaker's race.
- Statistical evidence.

Reference: https://www.eeoc.gov/policy/docs/race-color.html#VA1

To conduct a fair investigation, an employer should:

1. Ensure confidentiality.
2. Provide interim protection.
3. Select the investigator.
4. Create a plan for the investigation.
5. Develop interview questions.
6. Conduct interviews.
7. Make a decision.
8. Close the investigation.
9. Develop written summary investigation results.

Reference: https://blog.shrm.org/workforce/hr-tools-and-tech-how-to-conduct-an-investigation

When investigating, all important witnesses should be interviewed or re-interviewed for explanations if the witnesses are not consistent with each other.

KEEP RECORDS

Employers must keep records of information to make EEO-1 reports which identify racial or ethnic diversity. 29 C.F.R. § 1602.7. Employers must keep additional information related to personnel records to determine if discrimination or retaliation is happening in their workplace. 29 C.F.R. § 1602.11., § 1602.12., § 1602.14. § 1602.12.

A corporation should always keep records of complaints.

ANALYZE INFORMATION

The EEOC states that a corporation should conduct a self-analysis to determine whether current employment practices disadvantage people of color, treat them differently, or leave uncorrected the effects of historical discrimination in the company.

Reference: www.eeoc.gov

The analysis should include a review of the information gathered to monitor the investigation to determine if discrimination or retaliation is occurring or likely to occur in the workplace or whether additional preventative measures can be taken.

REWARD COMPLIANCE

Rewarding compliance is the flip side to immediate and corrective action. Corrective action addresses past violations. Rewarding compliance helps to prevent future violations.

Prevention is better than correction, or worse, a cover-up.

Reference: https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=2ahUKEwjBqtfWmLbnAhULH80KHe5DDjsQFjAAegQIARAB&url=https%3A%2F%2Fassets.hccainfo.org%2FPortals%2F0%2FPDFs%2FResources%2Flibrary%2F814_0_IncentivesCEProgram-Murphy.pdf&usg=AOvVaw01ftQAUn2uafE6tsa_ndfd

CHECKLIST FOR FOURTH JOB SAFETY PROTOCOL

To determine whether a corporation is complying with the fourth job safety protocol, corporations must prevent discrimination and retaliation. The following are checklists to determine if discrimination or retaliation has occurred:

DISCRIMINATION

1. Employee is in a protected class.
2. Employee is qualified for their job.
3. A tangible adverse action occurred.
4. Persons who are not in the same class either replaced the employee or were similarly situated and did not suffer the same treatment.
5. The reasons given for the adverse action are not credible.

RETALIATION

1. Employee reported or opposed discrimination.
2. Employee experienced an adverse action.
3. Short timeframe between the report and the adverse action.

4. The reasons given for the adverse action are not credible.

Reference: www.eeoc.gov

APPLICATION OF JOB SAFETY PROTOCOLS

Based on my understanding of the facts in the first amended complaint, defendants in practice did not comply with the job safety protocols, which resulted in damages to plaintiffs.

METHODOLOGY

The methodology used to reach my explanations and opinions is valid. As supported by the articles and regulations cited in this report, my explanations meet the following criteria:

1. The theories and techniques I used can be and have been tested.
2. They are supported by peer review and publications.
3. They do not have known or potential error rate or the potential error rate is low because they are supported by law, regulations, industry standards, and common sense.
4. They are supported by the existence and maintenance of standards controlling the operation of conduct in the workplace.
5. They have attracted widespread acceptance within a relevant scientific community.

COMPENSATION

I have agreed to be compensated at $175 an hour for my time for preparing the report and testifying in this case.

PREVIOUS TESTIMONY

I have testified in several cases previously by deposition and/or court testimony in the following cases:

1. September 22, 2020: Hernandez v. Rush Enterprises, Inc., et al., U.S. District Court, Eastern District of Texas, Case No. 4:19-cv-638; and
2. February 25, 2021: Owens v. Circassia Pharmaceuticals, Inc. U.S. District Court, Northern District of Texas, Case No. 3:19-cv-02231-M.
3. June 29, 2021: Sullivan v. Schlumberger Limited, et.al., U.S. District Court, Eastern District of Texas, Case No. 4:20-CV-662-ALM
4. February 8, 2022: Yarbrough, et al. v. Glow Networks, Inc., Eastern District of Texas, Case No. 4:19-cv-905-SDJ.

CONEISHA L. SHERROD

# CONEISHA SHERROD

SENIOR HUMAN RESOURCES PROFESSIONAL

## +CONTACT

817.602.9179

CONEISHASHERROD@YAHOO.COM

P.O. BOX 172127
Arlington, TX 76003

## +EDUCATION

MBA // BUSINESS ADMINISTRATION
University of Phoenix (2005)

BA // CORPORATE COMMUNICATIONS
University of Houston (2003)

## +CERTIFICATIONS

SHRM-CP CERTIFICATION

PROFESSIONAL IN HUMAN RESOURCES (PHR)

STRATEGIC WORKFORCE PLANNING

HUMAN CAPITAL STRATEGIST

TRAINING THE TRAINER

## +LICENSES

GENERAL LINES INSURANCE LICENSE
Life, Accident, and Health
(2017-Present)

UNITED HEALTHCARE
Medicare Certification
(August 18, 2020)

NOTARY SIGNING AGENT (12858073-9)
Expire: 04/25/2023

## +PROFESSIONAL EXPERIENCE

### HUMAN RESOURCES CONSULTANT

LeapNeat LLC // Arlington, TX// 2017-Present

- Develop and implement company policies and programs
- Ensure HR programs and services are in compliance with established policies and procedures and state/federal laws and regulations
- Oversight of all HR functions and staff
- Develop, monitor, and implement the people management strategy
- Conduct audits of HR programming and services
- Management of the HR department annual budget
- Report on the performance and progress of the HR Department to stakeholders
- Direct change management and organizational development

### DIRECTOR, HUMAN RESOURCES

United Way of Tarrant County // Fort Worth, TX// 2013 – 2017

United Way of Tarrant County is a national system of volunteers, contributors, and local charities helping people in their own communities. As the Director, Human Resources, I had oversight of the Human Resources department, staff, policies, and programs for the entire organization.

- HR Management oversight of offices in Fort Worth, Arlington and Bedford, Texas
- Planned, developed, implemented, directed and evaluated human resources performance annually
- Enhanced, developed, implemented and enforced organizational policies and procedures
- Full oversight and development of on-boarding, off-boarding, recruitment and development of talent
- Developed progressive and proactive compensation and benefits programs
- Continually assessed the competitiveness of all programs and practices against relevant comparable organizations, industries and markets
- Managed the budget and other financial measures for the Human Resources Department
- Active staff member on the UWW National Talent Advisory Committee, Compensation and Benefits, Governance, Internal Campaign, Diversity and Employee Engagement Committees.

CAREER HIGHLIGHTS

- Within the first (3) weeks of employment, conducted an audit that uncovered immediate risks to the organization
- Developed a performance management system that linked performance to compensation
- Redesigned benefit plans and implemented policies to attract and retain staff; decreased turnover rates annually
- Reviewed, evaluated and implemented a new HRIS system (ADP to Paycom)

## + SKILLS

Executive Presentations

Succession Planning & Development

Benefits Administration

Talent Acquisition Management

Change Management

Merger & Acquisition Restructuring

Contract Negotiation

Diversity and Inclusion

Compensation Analysis

Department Management

Human Resources Information Systems

## + TRAINING

Leading with Emotional Intelligence

Strategic Workforce Planning

Internal Investigations

7 Habits of Highly Effective Leaders

Successfully Managing People

Recruiting, Interviewing, Selection

## + VOLUNTEERISM

Youth Administrative Volunteer (MHMB Church) (Current)

Site Based Decision Making Team
MG Ellis Elementary (2013-2017)

Business Advisory Committee
TCC NW Campus (2016-2017)

## + EXPERIENCE *CONTINUED...*

### SR HUMAN RESOURCES MANAGER

Forex Capital Markets (FXCM) // Dallas, TX// 2005 – 2012

FXCM Inc. (NYSE: FXCM) is a Fortune 500 international company and global online provider of foreign exchange trading and related services.

- Management of (8) direct staff members in various departments, administration, benefits administration, training and development, recruitment, employee relations and over 300+ indirect staff members
- Full cycle recruitment for Operations, Sales, Administration, Human Resources, Compliance, Information Technology, Dealing, Business Development and Marketing departments
- Workforce Planning, worked with management to develop strategies to fill vacancies and developing candidate bases
- Employee relations, management coaching, conducted trainings to enhance skills, employee satisfaction surveys, internal investigations, terminations, grievances, performance reviews, job evaluations, exit interviews, unemployment process/hearings, immigration compliance
- Benefits administration, enrolled employees in benefit plans, corporate programs, negotiated contracts, assured compliance with laws
- Performance/Talent Management, working with management to utilize talent within the organization, managing out under-performers and creating reward systems to acknowledge high performers
- Policy and procedure design, employee handbook design, policy interpretation
- Training and Development, staff and management level trainings on various topics

CAREER HIGHLIGHTS

- Began with (5) total employees and (2) departments in the Dallas, TX office in 2005 and hired over 300+ staff members and managers, while expanding to a total of 10+ departments over a (3-5) year period of time
- HR Lead for the merger and acquisition of ODL in London; remained for several months to conduct redundancy metrics and meetings, reorganize departments, meet with management and conduct strategy meetings
- Created a first-time management training series program that successfully integrated new managers into the workforce that was implemented throughout the organization
- Project lead for the compay-wide applicant tracking system (Virtual Edge) integration and initiated the development of a company-wide career site

## + REFERENCES

**MARILYN JONES**
EXECUTIVE VICE PRESIDENT
Girls Scouts
817.312.3168
Marilynj1010@gmail.com

**MICHAEL PRICE**
EXECUTIVE VICE PRESIDENT
United Way of Tarrant County
682.225.0042
michael@michaeldprice.net

**MELANIE LENNEAR**
REGIONAL MANAGER
EISAI
832.524.5036
mlennear08@gmail.com

**BRIAN SANFORD**
LEAD COUNSEL
The Sanford Firm
214.957.1407
bsanford@sanfordfirm.com



ERC
ETHICS
RESOURCE
CENTER

# RETALIATION: When Whistleblowers Become Victims

*A Supplemental Report of the 2011 National Business Ethics Survey®*

Strategy
Pressure
Reporting
Finance
Culture
Ethics
Misconduct
Sales
Prospects

DEF. APPX. 000013

Library of Congress Cataloging-in-Publication Data

ISBN  978-0-916152-20-8

This report is published by the Ethics Resource Center (ERC). All content contained in this report is for informational purposes only. The Ethics Resource Center cannot accept responsibility for any errors or omissions or any liability resulting from the use or misuse of any information presented in this report.

©2012  Ethics Resource Center.

All rights reserved. Printed in the United States of America.

Additional copies of this report and more information about permission and licensing may be obtained by calling 703-647-2185 or by visiting www.ethics.org/nbes.

## RETALIATION: WHEN WHISTLEBLOWERS BECOME VICTIMS

*was conducted with the generous support of:*



*and*



The findings and conclusions of this report are those of the Ethics Resource Center alone and do not represent the views of the sponsors of this research project.

For more information about how to support the NBES or other ERC research projects, please visit www.ethics.org.

# About the National Business Ethics Survey® (NBES®)

The National Business Ethics Survey® (NBES®) generates the U.S. benchmark on ethical behavior in corporations. Findings represent the views of the American workforce in the private sector.

Since 1994, the NBES and its supplemental reports have provided business leaders a snapshot of trends in workplace ethics and an identification of the drivers that improve ethical workforce behavior. With every report, ERC researchers identify the strategies that business leaders can adopt to strengthen the ethical cultures of their businesses.

To view past issues of the NBES, please visit our website at www.ethics.org/nbes.

To support the NBES or other ERC research projects,
please visit our website
www.ethics.org.



The Ethics Resource Center (ERC) is America's oldest nonprofit organization devoted to independent research and the advancement of high ethical standards and practices in public and private institutions. Since 1922, ERC has been a resource for public and private institutions committed to a strong ethical culture. ERC's expertise informs the public dialogue on ethics and ethical behavior. ERC researchers analyze current and emerging issues and produce new ideas and benchmarks that matter — for the public trust.

# Table of Contents

Introduction 1

Retaliation: Why Does It Matter? 3

A Long-Term Look at Retaliation and the Troubling Picture it Paints 5

Not All Reports Are Created Equal: Reporting Location(s) & Retaliation 6

Under Pressure: Situations That Put Employees at Risk 7

Who Is at Greatest Risk? The (Changing) Profile of the Victim 8

No Good Deed Goes Unpunished? 12

What Can Be Done About It? Factors Linked to Lower Retaliation Rates 13

What Is a Leader to Do? Steps That Management Can (& Should) Take 16

Appendix: Other Findings and Trends 18

# RETALIATION: WHEN WHISTLEBLOWERS BECOME VICTIMS

*If only she'd walked by a few minutes earlier, or a few minutes later, she wouldn't be in this mess. But she did walk by – right then – at that unfortunate moment. She heard what she heard, and now she is stuck dealing with it. She knows that someone has to do something about the situation and, it seems, she's going to have to be that someone.*

*A few days later, she reports what she overheard to her supervisor. He acknowledges the seriousness of the allegation, promises to protect her anonymity, and vows to keep her as informed about the investigation as he is allowed to by policy. A few weeks pass and she hears nothing. Finally, her supervisor notifies her that management determined there's not enough evidence to go forward. The next month, she learns she is being transferred to an office with lots of problems and a terrible reputation. Within a year, she decides to return to a previous employer with whom she'd maintained a good relationship.*

*When her friends at work inquire about why she is leaving, she reveals the shocking things she heard, the way her supervisor promised to look out for her and didn't, and how the sudden transfer was the last straw. After hearing her story, her colleagues look at their managers – their whole workplace – in a new way. Not that it was perfect before, but now people are getting away with things that are clearly wrong; management stands up for the people with power, but no integrity, and pushes out people who try to speak up. Her two closest coworkers, both trusted and respected employees, stop speaking their mind at meetings and become less and less invested in their company and their work. Within a year, they, too, choose to leave.*

RETALIATION AGAINST WHISTLEBLOWERS
45%
of U.S. workers
observed misconduct
65%
of those who witnessed wrongdoing
reported misconduct
22%
of those who reported said they
experienced some kind of retaliation

© 2012 ETHICS RESOURCE CENTER

It's the kind of thing that happens every day in workplaces across America. An employee stumbles upon a troubling situation, then does the right thing and reports it to her[1] supervisor. Management tries to handle it in the best way possible, but the employee feels like she has not been heard. She has a negative experience at work, which she feels must be related to her report, and sees it as a sign that the supervisor she entrusted to report to has now set her adrift. Her positive view of management, her commitment to her company, and her connection to work fade. And, even if she does stay with the company, she will have formed an opinion about 'how things are really done around here' and will be unlikely to report ever again. Her attitude might be noted by other employees and may discourage them from taking appropriate action.

The 2011 National Business Ethics Survey® (NBES®) revealed that nearly half (45 percent) of employees observe misconduct each year. The majority (65 percent) of those who observe misconduct report it. Unfortunately, more than one in five (22 percent) employees who reports perceives retaliation for doing so. Additional research conducted on the NBES dataset reveals that, not only is retaliation on the rise nationally, it is rapidly becoming an issue even at companies with a demonstrated commitment to ethics and integrity. The rapid rise in retaliation is troubling on a number of levels.

The 2011 data from the NBES research revealed some additional findings. Most importantly:

- Employees who feel more secure and supported (who are more likely to report misconduct) are more likely to experience retaliation;
- The more an employee persists in reporting a concern, the more likely he/she is to experience retaliation; and
- Where an employee chooses to report also makes a difference.

Furthermore, whistleblowers[2] whose reports are substantiated are equally likely to experience retaliation as those whose claims are not.

1. Because both men and women experience retaliation, we will use both masculine and feminine pronouns throughout this report. Unless otherwise noted, comments and findings refer to both genders, regardless of which pronoun is used in a particular sentence.

2. At Ethics Resource Center (ERC), we use the terms "reporter" and "whistleblower" interchangeably to refer to employees who report observed misconduct, either internally or externally. Some argue that they are distinct groups of people. Yet our data reveals that "reporters" and "whistleblowers" are essentially the same people. The stigma assigned to a "whistleblower" as a rogue and disloyal employee is inaccurate.

Retaliation, as defined in this report, is a negative consequence experienced by an employee for reporting observed misconduct. While not all claims of retaliation have merit, some coming from disgruntled employees and others being the result of unfortunate miscommunications and/or misperceptions, there are ramifications for every incident of misconduct that is observed by an employee. Companies that are committed to ethics work hard to address every claim of misconduct they receive and recognize that some claims will be substantiated. Whether substantiated or not, each claim and the means by which it is handled will leave the employee with an impression about the way things are done within the company. Even when retaliation is nothing more than a misperception, employee concerns merit attention. In a similar vein, given that as researchers we are not in a position to determine the veracity of victims' claims, we respond as if each claim were retaliation and consider its potential impact on the company.

# Retaliation:
## Why Does It Matter?

Whether merely an errant perception (like being passed over for a promotion that she would not have received anyway), or an unequivocal experience of victimization (like receiving harassing calls or emails), retaliation against reporters has a profound impact on both the victim and the company.

When retaliation occurs, companies have two new problems:

1 ) A second form of misconduct has been observed[3] and a new victim emerges – the whistleblower;

2 ) Retribution against the reporter can create an environment that is cancerous to the organization.

These new issues have major ramifications in terms of the victim's commitment to her company and the likelihood that, going forward, she and her coworkers will alert management to problems they observe.

Retaliation weakens employee commitment. When we looked at workers who observed and reported misconduct, two of three (67 percent) workers said they felt engaged in their company. When looking at this same

3. As stated previously, it may be the case that no actual wrongdoing took place. Nonetheless, even the perception of wrongdoing has ramifications in terms of the (perceived) victim's workplace experiences as well as those he interacts with.

## PUTTING THE FINDINGS IN CONTEXT

### THE INCREASE IN RETALIATION IS HISTORIC

In 2011, 22 percent of American workers who reported misconduct experienced retaliation, compared to 15 percent in 2009.

2.3M

The number of workers experiencing retaliation jumped by 2.3 million Americans from the 2009 NBES when 15 percent of reporters said they were retaliated against.

Houston, Texas
Population = 2.1 million*

New Mexico
Population = 2 million**

The Daily Show
averaged
2.3 MILLION
viewers a night in
May 2011***

* Houston (city), Texas. (2010). Retrieved from http://quickfacts.census.gov/qfd/states/48/4835000.html

** 2010 Census Interactive Population Search: NM – New Mexico. (2010). Retrieved from http://2010.census.gov/2010census/popmap/ipmtext.php?fl=35

*** Albani, S. & Luczak, R. (2011, June 2). *"The Daily Show with John Stewart" Tops the Competition in May as the Highest-Rated Late Night Talk Show among Persons 18-49, Persons 18-34, Persons 18-24, Men 18-34 and Men 18-24* [Press Release]. Retrieved from http:// www.comedycentral.com/press/press_releases/2011/060211_daily-show-dominates-late-night-in-may.jhtml

DEF. APPX. 000021

group of reporters, but splitting them up based on who experienced retaliation, the engagement levels were dramatically different. Of those who experienced retaliation, only 54 percent of the reporters said they felt engaged. In contrast, 72 percent of those reporters who did not experience retaliation felt engaged in their companies.

## RETALIATION LINKED TO DRAMATIC DECREASES IN EMPLOYEE ENGAGEMENT

Similarly, employees who experience retaliation are far more likely to leave imminently. Among all employees, only about one in 10 (11 percent) plans to leave within the year, but that number more than doubles (to 23 percent) among reporters who experience retaliation. And only about half as many victims of retaliation (31 percent) plan to stay for five years or more compared to employees in general (59 percent).

## EMPLOYEES EXPERIENCING RETALIATION INTEND TO LEAVE COMPANY MUCH SOONER

Not only are victims of retaliation less engaged and more likely to leave imminently, they are also significantly more likely to take their concerns outside the company. Fewer than half (46 percent) of those who reported and did not experience retaliation would consider reporting to the federal government or government agency if it meant losing their job. However, a sizeable majority (62 percent) of those who experienced retaliation would be willing to go to the federal government even if their job was at risk.

DEF. APPX. 000022

Case 4:21-cv-01651 Document 55-1 Filed on 08/18/22 in TXSD Page 20 of 48

**One of the most common reasons that employees choose not to report misconduct is fear of retaliation.** This has consistently appeared across Ethics Resource Center's (ERC) research.[4] Both reporters and nonreporters take cues about the consequences for reporting from the experience of others who have reported. Once employees perceive that others are retaliated against for reporting, they will refrain from coming forward when they have concerns. Misconduct that goes unreported can continue, increasing risk, because management is never given the opportunity to address the problem.

# A Long-Term Look at Retaliation and the Troubling Picture it Paints

Because of the many problems created by even a single incident of retaliation, the ERC has identified retaliation as a key topic in its National Business Ethics Survey.[5]

Unfortunately, since 2007, retaliation has increased steadily. During this time period, reporting rates have also increased - but at a far slower rate. In the last five years, there has been an 83 percent increase in the rate of retaliation, but reporting has only increased by 12 percent.[6] The increase in reporting is certainly positive news, but, as retaliation becomes more prevalent, it is likely to drive down reporting rates.

## RETALIATION RATES RISING FAR MORE QUICKLY THAN REPORTING

4. Nearly half (46 percent) of those who choose not to report observed misconduct cite fear of retaliation as the cause. Ethics Resource Center. (2005). *National Business Ethics Survey®: How employees view ethics in their organizations 1994-2005*. Washington, DC: Ethics Resource Center.

5. Although ERC surveyed NBES participants about retaliation prior to 2007, those data are not comparable. Prior to 2007, only reporters who indicated their dissatisfaction with the reporting process were asked whether they had experienced retaliation. Beginning in 2007, all those who observed then reported misconduct were asked about possible experiences of retaliation.

6. Rates of increase measure the magnitude of change. By nature, smaller initial numbers can increase more substantially than higher numbers. For example, an increase of five percent to 10 percent, while only a five percentage point increase, is a 100 percent increase in magnitude. An increase from 50 percent to 55 percent, however, is only a 10 percent increase in magnitude.

DEF. APPX. 000023

Along with retaliation in general, several specific forms of retaliation have increased dramatically since 2009. Traceable retaliation (see description on page 10) has increased 27 percentage points (ppt)[7] in just two years; traceable, managerial retaliation has increased as much as 17 ppt.

### STRIKING INCREASES IN SPECIFIC TYPES OF RETALIATION

**Managerial**
Not given promotions or raises

**Traceable**
Experienced physical harm to person or property

**Managerial & Traceable**
Relocated or reassigned
Demoted

# Not All Reports Are Created Equal:

## Reporting Location(s) & Retaliation

Many companies already recognize the need to actively protect reporters from retaliation and to manage their perceptions so they do not feel retaliated against unintentionally. But it can be difficult to pinpoint when employees are most likely to be at risk and who is the most vulnerable. Recognizing that reporting happens in many different ways, ERC explored how decisions about reporting impact the likelihood of experiencing retaliation. We learned reporting rates vary considerably depending on where a person chooses to report and how many times he sounds the alarm.

Reporters who go to higher management, and especially to the hotline, are significantly more likely to say they experienced retaliation. More than one in four (27 percent) employees who first report to higher management experience retaliation, and 40 percent of whistleblowers who go first to the hotline experience retaliation. Far fewer employees (17 percent) who feel comfortable enough to report first to their supervisor end up experiencing retaliation. It is likely that differences in retaliation rates by reporting locations are indicative of the seriousness of the kinds of misconduct being reported. It seems likely many reporters would choose to go to higher management when their supervisors are the ones who committed the misconduct. Employees often report significant violations of the law (e.g., insider trading[8]) to the hotline because it provides an assurance of anonymity and protection which an in-person report does not.

7. "Percentage points" (ppt) express the percentage-point change. For example, while an increase from five percent to 10 percent would be a 100 percent increase in magnitude, it would only be a five percentage-point increase.

8. For example, insider trading is first reported to the hotline at a much higher rate (22 percent) than many other kinds of misconduct. By way of comparison, among all forms of misconduct, only five percent are reported to the hotline first.

Regardless of the location, it is essential that companies promptly and thoroughly address any reports they receive, and make it clear reports have been taken seriously and are being addressed. Many reporters who do not feel sufficiently heard and/or who see misconduct persist feel compelled to report in multiple ways. With each additional reporting location the likelihood that a reporter becomes a victim of retaliation increases. Only 12 percent of those who reported to a single location experienced retaliation, compared to four out of five (80 percent) of those who reported in six different ways;[9] basically, the more people a reporter tells, the greater the risk of retaliation.

**RETALIATION INCREASES ALONG WITH NUMBER OF REPORTING LOCATIONS**[7]

# Under Pressure:

## Situations That Put Employees at Risk

Certain situations seem to breed perceptions of retaliation. Again and again,[11] we have found that pressure and stress are linked to increased retaliation. The majority of reporters (52 percent) who feel pressure to compromise standards end up experiencing retaliation after reporting. But only 12 percent of reporters without such pressures experience retaliation. And, among employees who observed misconduct and chose to report it, those who had to work harder than two years ago were more likely to experience retaliation than those who work about the same (30 percent vs. 17 percent).

In addition to stressors at the individual level, business strategies and management decisions are linked to dramatic changes in retaliation rates. Employees in companies with recent[12] mergers and/or acquisitions are at

9. As stated previously, it may be the case that no actual wrongdoing took place. Nonetheless, even the perception of wrongdoing has ramifications in terms of the (perceived) victim's workplace experiences as well as those he interacts with.

10. Analysis showed that there was no statistically significant difference between the two retaliation rates of those whose reports were substantiated and those who reports that were not.

11. E.g., Ethics Resource Center. (2010). *2009 National Business Ethics Survey®: Retaliation: The cost to your company and its employees*. Arlington, VA: Ethics Resource Center.

12. Specifically, "recent" refers to any occurring within the last two years.

© 2012 ETHICS RESOURCE CENTER

far greater risk of experiencing retaliation. At companies in transition, one in three (34 percent) reporters experienced retaliation; this is more than twice the number in more stable workplaces where 16 percent of whistleblowers experienced retaliation. Retaliation rates also rose considerably when management responded to the recession by creating an environment of increased pressure and compelled compliance (see table below).

| Recession-survival tactics related to increased pressure and/or compelled compliance | Retaliation Rates | | |
|---|---|---|---|
| | Among reporters who Disagree/ Strongly Disagree the tactic occurs | Among reporters who Agree/ Strongly Agree the tactic occurs | PPT Increase in Retaliation Rate |
| Watched more by management | 11% | 37% | 26 ppts |
| Bad actors are laying low | 16% | 36% | 21 ppts |
| Employees are more cautious | 17% | 29% | 13 ppts |

It is difficult to discern whether retaliation is actually more common in highly stressful environments or if it is merely that employees in such situations are more likely to perceive themselves as being victims. From the point of view of the victim and, in terms of retaliation's negative impact on the company, the outcome is the same. There is a critical lesson for management in companies undergoing stressful changes (e.g., in companies undergoing mergers and acquisitions): be particularly mindful of whistleblowers' feelings of vulnerability; make sure to provide adequate support and protection; and intentionally manage expectations and perceptions.

## Who Is at Greatest Risk?

### The (Changing) Profile of the Victim

To determine who is at the greatest risk of retaliation, we explored how company culture and demographic factors relate to rates of retaliation. The Appendix (p. 18) includes a full list of demographic groups at increased or decreased risk of each form of retaliation. Not surprisingly, many of the groups at heightened risk for specific forms of retaliation mirror ERC's earlier findings.[13]

But, in 2011, retaliation also rose sharply among some surprising groups. Retaliation is up among employees in positions of greater job security (e.g., unions and management); those with increased power (higher levels of management); and employees with increased personal

13. See Ethics Resource Center. (2010). Supplemental research brief to the *2009 National Business Ethics Survey®: Retaliation: The cost to your company and its employees.* Arlington, VA: Ethics Resource Center.

security. In 2007 and 2009, members of unions were somewhat more likely to experience retaliation than their nonunion coworkers (by a difference of two ppts and eight ppts, respectively). In 2011, the percentage of union employees experiencing retaliation doubled, resulting in a 25 ppt difference between union and nonunion workers. Also, management status no longer seems to bring with it protection from retaliation for reporting. **For the first time in NBES history, managers are now more likely to experience retaliation than nonmanagement employees.**

## GREATER DIFFERENCE IN RETALIATION RATES BETWEEN UNION MEMBERS AND NONUNION EMPLOYEES

## MANAGEMENT NOW MORE LIKELY TO EXPERIENCE RETALIATION

## SENIOR MANAGERS FACE GREATEST RISE IN RETALIATION

Furthermore, the biggest jump in retaliation rates of all employee levels occurred among senior management. What is more, employees at higher management levels are more likely to experience traceable forms of retaliation. Traceable forms of retaliation are those that leave proof of having happened: physical harm, online harassment, harassment at home[14], job shift, demotion, cuts to hours or pay.

## SENIOR MANAGERS MORE LIKELY TO EXPERIENCE TRACEABLE RETALIATION

Percentage of Reporters Experiencing Traceable Retaliation

14. Harassment at home might or might not leave traces, but could if it were a threatening phone call or property damage.

2011 NBES SUPPLEMENTAL RESEARCH REPORT | RETALIATION

Moving from one's professional to personal situation, we see that traditional sources of security (finances and personal supports[15]) do not shield a reporter from retaliation. Retaliation is significantly more common among whistleblowers whose financial situation has become more secure over the last two years (31 percent) than among those whose situation is less secure (22 percent) or about the same (19 percent).

### HIGHER RATES OF RETALIATION AMONG EMPLOYEES WHOSE PERSONAL FINANCIAL SITUATION IMPROVED

Compared to two years ago, my personal financial situation is...
22%
78%
Less Secure
19%
81%
About the Same
31%
69%
More Secure
Did NOT Experience Retaliation
Experienced Retaliation

And the more a whistleblower feels supported personally, the more he/she is likely to experience retaliation. As reporters' personal support becomes stronger, the likelihood of experiencing retaliation increases from one in seven, to one in five, and finally, among those with the strongest personal supports, to one in two.

### THOSE WITH MORE PERSONAL SUPPORTS ARE MORE LIKELY TO EXPERIENCE RETALIATION

Percentage of Reporters Experiencing Retaliation
60%
40%
20%
14%
24%
50%
WEAK Feeling of Support
MODERATE Feeling of Support
STRONG Feeling of Support
Extent of Personal Support

15. Personal supports include family, religious community, neighbors, classmates, online friends, social clubs, and public resources.

DEF. APPX. 000029
© 2012 ETHICS RESOURCE CENTER | 11

Case 4:21-cv-01651 Document 55-1 Filed on 08/18/22 in TXSD Page 27 of 48

# No Good Deed Goes Unpunished?

Previous research[16] conducted by ERC uncovered several positive factors which empower employees to report (i.e., awareness; agency; security and investment; and support and connectedness). Unfortunately, it seems that these attributes also make one vulnerable to retaliation; **employees with greater supports and security are more likely to report and, therefore, report in situations that put them at heightened risk for retaliation.**

For example, employees who are more supported and connected are more likely to report to the federal government even at the expense of their jobs. Our data reveal that one in three reporters willing to blow the whistle to the government experiences retaliation, far higher than the national retaliation rate of 22 percent. Also, supported and committed employees report repeatedly if their reports are not addressed, and each additional report brings with it an increased likelihood of retaliation. Finally, as the next chart illustrates, reporting and retaliation rates rise in tandem as one's level of personal support increases.

## REPORTING AND RETALIATION RATES SIGNIFICANTLY HIGHER FOR THOSE WITH STRONG PERSONAL SUPPORT

16. See Ethics Resource Center. (2012). *Inside the Mind of a Whistleblower: A supplemental report to the 2011 National Business Ethics Survey®.* Arlington, VA: Ethics Resource Center.

DEF. APPX. 000030

It appears that the positive aspects of a strong ethical culture, which increase support and encourage reporting, put employees at risk. The more committed an employee is to reporting, the more likely she is to report in situations that leave her vulnerable to becoming a victim of retaliation. The connection between increased support and heightened vulnerability to retaliation helps explain one of the most surprising findings of the 2011 NBES: while retaliation rates are up across the board, the most striking change is in companies with strong ethical cultures. In workplaces where employees at all levels demonstrate a commitment to integrity and ethical business conduct, the rate of retaliation is nearly four times as high as in 2009. (It should be noted that retaliation has risen comparatively little in weaker ethical cultures.)[17]

### ALTHOUGH OVERALL RATES ARE UP, BIGGEST INCREASES ARE IN STRONG CULTURES

17. Some conjectures as to why retaliation might not have risen appreciably in weaker cultures are that: the rate is already high and might have hit its upper limit; employees report to fewer locations, decreasing the likelihood of a vast rise in retaliation, and; employees do not perceive retaliatory behavior as retaliation (it is the norm).

# What Can Be Done About It?

## Factors Linked to Lower Retaliation Rates

Increasingly, retaliation is becoming a problem for employees at all levels and in a variety of work situations. But victimhood is not inevitable. There are steps companies can take to build nonretaliatory work environments which protect employees. Confirming past research,[18] in 2011 the data demonstrate that ethics and compliance programs, strong ethical cultures, high standards of accountability that are consistently applied, and positive management behaviors are all linked to a reduced likelihood of experiencing retaliation.

**Ethics and compliance programs** are highly effective in reducing retaliation. In companies which lack all of the standard program elements,[19] more than one in three (36 percent) reporters experiences retaliation. Retaliation rates decline steadily as the program improves. In fact, only one in 50 reporters at companies with comprehensive ethics and compliance programs becomes a victim of retaliation.

18. See Ethics Resource Center. (2010). *2009 National Business Ethics Survey®: Retaliation: The cost to your company and its employees.* Arlington, VA: Ethics Resource Center.

19. The six elements considered in the chart include: 1) written standards of ethical workplace conduct, 2) training on the standards, 3) company resources that provide advice about ethics issues, 4) a means to report potential violations confidentially or anonymously, 5) performance evaluations of ethical conduct, and 6) systems to discipline violators. A seventh element is a stated set of guiding values or principles.

© 2012 ETHICS RESOURCE CENTER

2011 NBES SUPPLEMENTAL RESEARCH REPORT | RETALIATION

## AS THE NUMBER OF THE PROGRAM ELEMENTS INCREASES, RETALIATION DECREASES

100%
80%
60%
40%
20%
Percentage of Reporters Experiencing or Not Experiencing Retaliation
64%
36%
76%
24%
98%
2%
None or don't know to all
Fewer than six but at least one
All six
Ethics & Compliance Program Comprehensiveness
Did NOT Experience Retaliation
Experienced Retaliation

Furthermore, retaliation decreases when employees are prepared to handle situations which could lead to violations of company ethics standards, company policy, or the law. This feeling of preparedness, which is linked to training[20] efforts, relates to a decline in retaliation from 50 percent among reporters who feel poorly prepared or very poorly prepared to 19 percent among those feeling well prepared or very well prepared.

20. It is likely that training also helps employees have a clearer understanding of what does and does not constitute retaliation, preemptively reducing the number of employees who will feel retaliated against.

Although (as noted previously) retaliation is up significantly in stronger ethics cultures,[21] it is still true that there is less retaliation in companies where employees at all levels share a commitment to integrity. As the graph below demonstrates, retaliation declines precipitously when top management and supervisors make ethics a priority and model ethical conduct. In such workplaces, retaliation rates are half of those at companies with weaker ethical commitments. The ethical commitment of coworkers also has an impact in retaliation rates, albeit a less significant one.

## RETALIATION IS FAR LESS COMMON IN STRONGER ETHICS CULTURES

60%
40%
20%
Percentage of Reporters Who Experienced Retaliation
27%
15%
30%
14%
30%
15%
24%
19%
OVERALL
TOP MGMT.
SUPERVISOR
COWORKER
Ethical Cultures
Weak or Weak Leaning
Strong or Strong Leaning

21. As we have seen, it appears that the marked increase in retaliation at companies with strong ethics cultures seems to be an unfortunate and troubling side effect of a positive trend. In stronger ethics cultures, employees feel more committed and supported. As a result, they feel empowered and beholden to report even in situations that put them in danger of experiencing retaliation.

14 | © 2012 ETHICS RESOURCE CENTER
DEF. APPX. 000032

In terms of specific cultural factors that are drivers of retaliation rates, **accountability and the actions of management** are both important. A comparison of retaliation rates at companies with strong accountability (i.e., where employees agree that top management would be held accountable if caught violating the company's ethics standards, company policy, or the law) to those with weaker accountability, reveals that **accountability at all levels** is critical. In workplaces where employees agree that top management would not get away with breaking the rules, retaliation is far less common (17 percent vs. 42 percent) than in those with weak accountability. Accountability at the supervisor level is also associated with a 25 ppt decrease in retaliation rates. While a less dramatic difference occurs when nonmanagement employees are held accountable, the improvement is still noteworthy.

Managers can take heart (and should take heed) that their actions and decisions have the power to curb retaliation. When they are trustworthy and clearly committed to ethics, retaliation is far less likely. In order to protect reporters (and encourage reporting in the future), managers should work to create a transparent environment where employees feel safe voicing their opinions and concerns and where trustworthiness and promise-keeping are the norms at all levels. In such environments, retaliation declines from 27 percent to 17 percent. The impact of each of these positive management behaviors is detailed below.

## WHEN ACCOUNTABILITY IS HIGH, RETALIATION IS SIGNIFICANTLY LESS COMMON

## RETALIATION IS FAR LESS COMMON IF MANAGEMENT IS TRUSTWORTHY & COMMITTED TO ETHICS

DEF. APPX. 000033

# What Is a Leader to Do?

## Steps That Management Can (& Should) Take

When whistleblowers suffer retaliation (or even just perceive that they have been the targets of retaliation), what was once a single issue, i.e., the original act of misconduct that was observed, balloons into several complex problems. In addition to the precipitating event, there is now a second form of misconduct – the retaliation that took place. This has also created a new victim who is now more likely to report outside the company, perhaps to the media or a government agency, and who probably will not want to report in the future. She becomes less engaged in and committed to her work. And, as long as she remains with the company, she may share her story with colleagues, weakening their trust in leadership and making them less likely to report any misconduct that they observe. Retaliation is a problem that takes on a life of its own.

Accordingly, we encourage leaders to:

- **Assess your organization.** Find out the extent to which employees believe they will experience retaliation for reporting misconduct. Conduct a survey of your employees, and ask them about their views of the reporting process and protection of individuals who come forward to report concerns.

- **Target managers.** Implement targeted anti-retaliation training so managers know how to recognize when reports are being made, accurately address them, move them through the system, effectively update reporters on the status of their reports (e.g., whether an investigation will take place) and interact with reporters in ways that are not perceived as being retaliatory.

- **Communicate broadly among employees your company's efforts related to the reporting process as well as its protections for those who report.** Inform employees what the reporting process should look like so they feel reassured things are progressing appropriately. And it's not enough just to provide training of managers. Other employees need to know that training is provided to their supervisors, so they will have more faith in their management if/when they need to report.

- **Move the investigation process along quickly and pay particular attention to individuals who report more than once.** Many whistleblowers bring up their concerns in multiple ways, especially if they feel that they are not being heard and that no progress is being made. With each additional report, the likelihood that they will experience retaliation increases. Ensure procedural justice[22] (and manage expectations about the reporting process) to avoid putting reporters in such a position.

22. In their report on procedural justice, the ERC Fellows note that when employees are aware of the process by which decisions are made, they are more likely to be accepting of the outcome. Specifically, we recommend that companies take concrete steps to communicate how they proceed through the decision-making process, how investigators are selected, and how they ensure the impartiality of the investigators. In addition, supplemental training for investigators on the principals of procedural justice is recommended to help increase the perception of a fair and just process.

- **Take steps to ensure retaliation does not happen.** A zero-tolerance policy for retaliation is a recognizable symbol to employees but alone it might only be seen as a tool to coerce compliant behavior. Put in place systems and procedures that ensure confidentiality, provide for anonymity, and actively protect reporters – systems that help in determining if actions are retaliation and that show fairness and consistency are the norms in the company.

- **When a claim of retaliation is substantiated, take action in a way that is both decisive and, to the extent possible, visible to employees.** Accountability matters. As we have seen, in workplaces where employees feel that retaliation is not tolerated, retaliation is far less common.

- **Track progress and periodically check up on reporters.** Instead of merely hoping reporters will be safe, regularly check in with them after any investigation is complete to make sure they continue to be safe and feel supported.

(For policymakers and enforcement officials):

- **Encourage protections and follow-up by designing policy which encourages pre-emptive protection for whistleblowers.**

- **Include retaliation statistics as a key metric when judging the effectiveness of ethics and compliance programs.**

© 2012 ETHICS RESOURCE CENTER

# APPENDIX: OTHER FINDINGS & TRENDS

## WHO EXPERIENCES WHAT? DEMOGRAPHICS & SPECIFIC FORMS OF RETALIATION

| Form of retaliation | Percentage | Groups LEAST likely to experience this form of retaliation[1,2] | Groups MOST likely to experience this form of retaliation |
|---|---|---|---|
| Experienced Retaliation in general | 22% | 30-44 years-old (21%)[3]<br>45-63 years-old (18%)[3] | 18-29 years-old (29%) |
| | | 6-10 years tenure (16%) | 3-5 years tenure (25%) |
| | | Privately held (18%) | Publicly-traded (29%) |
| | | Workers who do not supervise others (18%) | Workers who supervise others (24%) |
| | | Nonmanagement (19%) | First line supervisors (27%) |
| | | Workers who are not members of unions (17%) | Members of unions (42%) |
| Other employees gave a cold shoulder | 62% | 18-29 years-old (56%)[3]<br>45-63 years-old (59%)[3] | 30-44 years-old (75%) |
| | | 1-2 years tenure (54%)[3]<br>6-10 years tenure (50%)[3] | 3-5 years tenure (72%)[3]<br>11+ years tenure (72%)[3] |
| | | Privately held (51%) | Publicly-traded (70%) |

1. All numbers in the LEAST and MOST categories are significantly different from each other.
2. The following groups were too small and were not included in the analysis:
   Age: 64 years-old and older
   Tenure: less than one year
   Foreign vs U.S.: Foreign companies operating in the U.S.
3. These demographic groups are not significantly different from each other, but are significantly different from the opposite (LEAST/MOST) demographic group.

| Form of retaliation | Percentage | Groups LEAST likely to experience this form of retaliation[1,2] | Groups MOST likely to experience this form of retaliation |
|---|---|---|---|
| Supervisor or management excluded from decisions and work activity | 64% | 45-63 years-old (53%) | 18-29 years-old (72%) |
| | | 6-10 years tenure (51%) | 3-5 years tenure (68%) |
| | | Employees of U.S. companies operating in the U.S. only (54%) | Employees of U.S. companies operating also in foreign countries (71%) |
| | | Top management (48%) | Nonmanagement (68%)[3]<br>Middle management (66%)[3] |
| Verbally abused by supervisor or someone else in management | 62% | 45-63 years-old (54%) | 30-44 years-old (69%) |
| | | First line supervisors (52%) | Nonmanagement (70%) |
| Verbally abused by other employees | 51% | 18-29 years-old (42%) | 30-44 years-old (63%) |
| | | 1-2 years tenure (44%) | 3-5 years tenure (61%) |
| | | Privately-held (43%) | Publicly-traded (61%) |
| | | Workers who do not supervise others (41%) | Workers who supervise others (58%) |
| | | Nonmanagement (45%)<br>First line supervisors (45%) | Middle management (66%) |
| | | Workers who are not members of unions (46%) | Members of unions (60%) |

1. All numbers in the LEAST and MOST categories are significantly different from each other.
2. The following groups were too small and were not included in the analysis:
   Age: 64 years-old and older
   Tenure: less than one year
   Foreign vs U.S.: Foreign companies operating in the U.S.
3. These demographic groups are not significantly different from each other, but are significantly different from the opposite (LEAST/MOST) demographic group.

DEF. APPX. 000037

| Form of retaliation | Percentage | Groups LEAST likely to experience this form of retaliation[1,2] | Groups MOST likely to experience this form of retaliation |
|---|---|---|---|
| Experienced physical harm to person or property | 31% | Females (16%) | Males (41%) |
| | | 45-63 years-old (24%) | 18-29 years-old (37%) |
| | | 1-2 years tenure (20%)[3]<br>11+ years tenure (23%)[3] | 3-5 years tenure (46%) |
| | | Privately held (17%) | Publicly-traded (42%) |
| | | Employees of U.S. companies operating in the U.S. only (29%) | Employees of U.S. companies operating also in foreign countries (44%) |
| | | Workers who do not supervise others (20%) | Workers who supervise others (35%) |
| | | Nonmanagement (15%) | First line supervisors (31%)[3]<br>Middle management (45%)[3]<br>Top management (38%)[3] |
| | | Workers who are not members of unions (17%) | Members of unions (46%) |

1. All numbers in the LEAST and MOST categories are significantly different from each other.
2. The following groups were too small and were not included in the analysis:
   Age: 64 years-old and older
   Tenure: less than one year
   Foreign vs U.S.: Foreign companies operating in the U.S.
3. These demographic groups are not significantly different from each other, but are significantly different from the opposite (LEAST/MOST) demographic group.

| Form of retaliation | Percentage | Groups LEAST likely to experience this form of retaliation[1,2] | Groups MOST likely to experience this form of retaliation |
|---|---|---|---|
| Harassment online | 31% | Females (14%) | Males (44%) |
| | | 45-63 years-old (18%) | 18-29 years-old (30%)[3]<br>30-44 years-old (41%)[3] |
| | | 1-2 years tenure (19%)[3]<br>6-10 years tenure (25%)[3]<br>11+ years tenure (26%)[3] | 3-5 years tenure (53%) |
| | | Privately held (23%) | Publicly-traded (43%) |
| | | Workers who do not supervise others (13%) | Workers who supervise others (44%) |
| | | Nonmanagement (13%) | Top management (57%) |
| | | Workers who are not members of unions (18%) | Members of unions (53%) |
| Harassment at home | 29% | Females (19%) | Males (36%) |
| | | 45-63 years-old (13%) | 18-29 years-old (35%)[3]<br>30-44 years-old (39%)[3] |
| | | 6-10 years tenure (21%)[3]<br>11+ years tenure (22%)[3] | 3-5 years tenure (40%) |
| | | Privately held (19%) | Publicly-traded (37%) |
| | | Workers who do not supervise others (15%) | Workers who supervise others (36%) |
| | | Nonmanagement (11%) | Middle management (43%)[3]<br>Top management (45%)[3] |
| | | Workers who are not members of unions (14%) | Members of unions (47%) |

1. All numbers in the LEAST and MOST categories are significantly different from each other.
2. The following groups were too small and were not included in the analysis:
   Age: 64 years-old and older
   Tenure: less than one year
   Foreign vs U.S.: Foreign companies operating in the U.S.
3. These demographic groups are not significantly different from each other, but are significantly different from the opposite (LEAST/MOST) demographic group.

© 2012 ETHICS RESOURCE CENTER

| Form of retaliation | Percentage | Groups LEAST likely to experience this form of retaliation[1,2] | Groups MOST likely to experience this form of retaliation |
|---|---|---|---|
| Not given promotions or raises | 55% | Females (37%) | Males (68%) |
| | | 11+ years tenure (49%) | 3-5 years tenure (65%) |
| | | Privately held (46%) | Publicly-traded (65%) |
| | | Nonmanagement (46%) | First line supervisors (67%) |
| Relocated or reassigned | 44% | 45-63 years-old (30%) | 18-29 years-old (50%)[3]<br>30-44 years-old (50%)[3] |
| | | 1-2 years tenure (17%) | 3-5 years tenure (61%) |
| | | Privately held (40%) | Publicly-traded (52%) |
| | | Nonmanagement (37%) | Top management (57%) |
| | | Workers who are not members of unions (37%) | Members of unions (58%) |
| Demoted | 32% | Females (26%) | Males (36%) |
| | | 1-2 years tenure (26%)[3]<br>11+ years tenure (28%)[3] | 3-5 years tenure (42%) |
| | | Privately held (23%) | Publicly-traded (45%) |
| | | Workers who do not supervise others (20%) | Workers who supervise others (40%) |
| | | Nonmanagement (19%) | First line supervisors (38%)[3]<br>Middle management (39%)[3]<br>Top management (54%)[3] |
| | | Workers who are not members of unions (25%) | Members of unions (44%) |

1. All numbers in the LEAST and MOST categories are significantly different from each other.
2. The following groups were too small and were not included in the analysis:
   Age: 64 years-old and older
   Tenure: less than one year
   Foreign vs U.S.: Foreign companies operating in the U.S.
3. These demographic groups are not significantly different from each other, but are significantly different from the opposite (LEAST/MOST) demographic group.

| Form of retaliation | Percentage | Groups LEAST likely to experience this form of retaliation[1,2] | Groups MOST likely to experience this form of retaliation |
|---|---|---|---|
| Hours or pay cut | 46% | 45-63 years-old (39%) | 18-29 years-old (54%) |
| | | 1-2 years tenure (32%) | 3-5 years tenure (50%) |
| Almost lost job | 56% | 45-63 years-old (47%) | 18-29 years-old (60%) |
| | | 1-2 years tenure (44%) [3]<br>6-10 years tenure (42%) [3] | 3-5 years tenure (61%) |
| | | Workers who are not members of unions (48%) | Members of unions (65%) |
| Other | 14% | Males (8%) | Females (20%) |
| | | 18-29 years-old (7%) [3]<br>30-44 years-old (8%) [3] | 45-63 years-old (25%) |

1. All numbers in the LEAST and MOST categories are significantly different from each other.
2. The following groups were too small and were not included in the analysis:
   Age: 64 years-old and older
   Tenure: less than one year
   Foreign vs U.S.: Foreign companies operating in the U.S.
3. These demographic groups are not significantly different from each other, but are significantly different from the opposite (LEAST/MOST) demographic group.

DEF. APPX. 000041

**NATIONAL BUSINESS ETHICS SURVEY® SUPPLEMENTAL REPORTS**

*A Supplemental Report on Generational Differences is Coming Soon.*

## HELP SUPPORT ERC'S NATIONAL BUSINESS ETHICS SURVEY®

Since 1994, ERC has conducted its business ethics survey with financial support from companies who recognize its value. NBES is disseminated free of charge. Over the years, it has become a highly effective research instrument, relied upon by ethics professionals, executives, academics and policy makers as the U.S. benchmark for ethics in the workplace. Our supporters receive well-deserved recognition and gratitude, as well as a wealth of useful information and analysis.

For more information, visit www.ethics.org



# OVERVIEW OF UPCOMING SUPPLEMENTAL REPORTS

## Generational Differences

In this update to the popular 2009 report, ERC will investigate how age, generational cohort, and time in the workforce impact ethics experiences at work.  Key questions include:

- Do different generations observe different kinds of misconduct? Are different generations equally likely to report misconduct when observed?
- What factors drive reporting decisions in each age group, and what sorts of targeted efforts can management take to maximize reporting?

## Social Networkers in the Workplace

One of the key findings of NBES 2011 was the unique–and often troubling–experiences of active social networkers. This report will investigate key questions related to this important movement in the workplace:

- Who are active social networkers, and how do their beliefs about their companies compare to non-networkers?
- How can companies support active social networkers and leverage opportunities to make social networking a positive force for creating stronger ethics cultures?



The report was made possible in part by generous contributions from our sponsors:

For more information, please contact:
Ethics Resource Center
2345 Crystal Drive, Suite 201
Arlington, VA 22202
USA
Telephone: 703.647.2185
FAX: 703.647.2180
Website: http://www.ethics.org
Email: ethics@ethics.org



# Bullying Statistics

## Data and information about the basics of bullying behavior and how you can make a difference today.

**If you are facing any kind of stress, harassment or feelings of hopelessness, don't wait another moment to reach out for help.** Here are some great organizations that can help you now: The National Suicide Prevention Lifeline (1-800-273-8255), The Trevor Project (1-866-488-7386) and the Jed Foundation

## Bullying: Fast Facts

**20%** of U.S. students in grades 6–12 have experienced bullying.[1]

**20%** of U.S. students in grades 9–12 have experienced bullying.[3]

**9%** of students in grades 6–12 experienced cyberbullying.[1]

**15%** of high school students (grades 9–12) were electronically bullied in the past year.[4]

**55.2%** of LGBT students experienced cyberbullying.[5]

**30%** of young people admit to bullying others in surveys.[2]

**70.6%** of young people say

## Bullying: Myths vs Facts

Right-click and save the images to your desktop.

Privacy - Terms

they have seen bullying in their schools.[2]

**70.4%** of school staff have seen bullying.

**62%** witnessed bullying two or more times in the last month and 41% witness bullying once a week or more.[2]

**Statistics for how many Muslim-American students experience bullying**

Click to see full image



When bystanders intervene, **bullying stops within 10 seconds 57% of the time.**[4]

**STOP BULLYING ON #DAY1!**

# Bullying: The Basics

## What is Bullying?

Bullying is defined as any unwanted and harmful verbal, physical, psychological, sexual or social act committed by an individual or group, as well as any real or perceived threat or imbalance of power.

According to the U.S. Department of Justice, bullying includes teasing, name-calling, intimidation, humiliation, taunting, spreading rumors or lies, demands for money, online harassment (known as cyberbullying), sexual harassment, physical assault, theft and destruction of property.

Those harmed by bullying may be targeted on the basis of their sex, gender, race, ethnicity, religion, sexual orientation, gender identity, physical appearance and/or disability.

Although bullying is widespread in schools and on campuses across the United States, it is oftentimes less visible than people imagine, and it is often underreported.

In order to be considered bullying, the behavior must be aggressive and include:

- **An Imbalance of Power:** Kids who bully use their power—such as physical strength, access to embarrassing information, or popularity—to control or harm others. Power imbalances can change over time and in different situations, even if they involve the same people.
- **Repetition:** Bullying behaviors happen more than once or have the potential to happen more than once.
  Bullying includes actions such as making threats, spreading rumors, attacking someone physically or verbally, and excluding someone from a group on purpose.

## Are there Types of Bullying?

There are three types of bullying[6]:
**Verbal bullying** is saying or writing mean things. Verbal bullying includes:

- Teasing
- Name-calling
- Inappropriate sexual comments
- Taunting
- Threatening to cause harm

**Social bullying**, sometimes referred to as relational bullying, involves hurting someone's reputation or relationships. Social bullying includes:

- Leaving someone out on purpose
- Telling other children not to be friends with someone
- Spreading rumors about someone
- Embarrassing someone in public

**Physical bullying** involves hurting a person's body or possessions. Physical bullying includes:

- Hitting/kicking/pinching
- Spitting
- Tripping/pushing
- Taking or breaking someone's things
- Making mean or rude hand gestures

### Bullying By the Numbers

Right-click and save the infographic to your desktop.

64 — 64% of American adults believe bullying to be more prevalent among young people today than it was during their own childhood. (Source: TCF)

50 — 50% of adults have experienced or witnessed bullying in their workplace. (Source: TCF)

15.8 — 15.8% of youth in grades 9-12 in 2011. (Source: CDC)

20 — 20% of students in grades 9–12 reported being bullied in 2013. (Source: CDC)

20 — Suicide accounts for 20% of all deaths annually for 15 to 24-year-olds. (Source: CDC)

## Why Does Bullying Matter?

Bullying is a serious educational issue, and a matter of public health and safety. It creates a climate of fear and panic within schools, on playgrounds and throughout neighborhoods – and in today's digital age, bullying is carried out after school hours over the Internet.
Children, adolescents and adults harmed by bullying often suffer from a wide range of psychological and school-related problems, including anxiety, depression, low self-esteem, suicidal ideation, chronic lateness and absences, and difficulty concentrating.

## What Are the Effects of Bullying?

Bullying can often have painful physical and emotional effects such as:

- Emotional Distress
- Substance Abuse
- Missing Work & School
- Suicide

## How Can We Prevent Bullying?

School administrators, staff, educators, parents and community members can help prevent bullying by discussing it in classes, building a safe school environment and by creating a bullying prevention strategy in their community. The #Day1 Campaign is an effective, immediate and free way to reduce bullying, harassment and humiliation. Bullying can also be prevented through legislation, including the proposed Tyler Clementi Higher Education Anti-Harassment Act that will grant protections from online and offline bullying for college students, as well as the Safe Schools Improvement Act that promises to do the same at the K-12 level.

**MORE IN-DEPTH BULLYING FACTS AND RESEARCH**

---

## REFERENCES

1. National Center for Education Statistics and Bureau of Justice Statistics, School Crime Supplement, 2017.
2. Bradshaw, C.P., Sawyer, A.L., & O'Brennan, L.M. (2007). Bullying and peer victimization at school: Perceptual differences between students and school staff. *School Psychology Review*, 36(3), 361-382.
3. Centers for Disease Control and Prevention, Youth Risk Behavior Surveillance System, 2013
4. Hawkins, D. L., Pepler, D., and Craig, W. M. (2001). Peer interventions in playground bullying. *Social Development*, 10, 512-527.
5. Kosciw, J. G., Greytak, E. A., Bartkiewicz, M. J., Boesen, M. J., & Palmer, N. A. (2012). The 2011 National School Climate Survey: The

experiences of lesbian, gay, bisexual and transgender youth in our nation's schools. New York: GLSEN.

6. StopBullying.Gov

## SOURCES

1. https://d3n8a8pro7vhmx.cloudfront.net/themes/51172dcc1ad07a63d6000002/attachments/original/1361410358/BullyingToday.pdf?1361410358
2. http://ojp.gov/newsroom/factsheets/ojpfs_bullying.html
3. https://www.psychologytoday.com/basics/bullying
4. http://www.pacer.org/bullying/about/media-kit/stats.asp
5. http://www.stopbullying.gov/news/media/facts/#listing
6. http://www.stopbullying.gov/what-is-bullying/definition/index.html#types

# TAKE ACTION

**JOIN THE MILLION UPSTANDER MOVEMENT**
Help us reach our goal of recruiting 1 million Upstanders.

**TAKE UPSTANDER PLEDGE >**

**HOW DOES KINDNESS AND RESPECT IMPACT YOU?**
In your words, your experience.

**SHARE YOUR UPSTANDER STORY >**

**GET INVOLVED**
You can make a difference in other people's lives.

**BECOME A VOLUNTEER >**

**SPREAD THE WORD**
Be part of the movement and the conversation.

**FOLLOW US ON TWITTER >**

**LIKE US ON FACEBOOK >**

**SUBSCRIBE TO OUR NEWSLETTER >**

The Tyler Clementi Foundation
104 West 29th St., 11th Floor, NYC, NY 10001 • (646) 598-8204
The Tyler Clementi Foundation is a 501(c)(3) non-profit organization working to end online and offline bullying, harassment and humiliation.

© Tyler Clementi Foundation. All rights reserved. Privacy Policy Contact Us