# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **JENNIFER HARRIS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:21-cv-1651** |
| | § | |
| **FEDEX CORPORATION,** | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

## FEDEX'S EVIDENTIARY APPENDIX

<u>Exhibit</u>                                                          <u>Beginning Page No.</u>

1. Declaration of Michael Lauderdale ..................................................................3

2. June 1, 2022 email about "If you see something, say something" .....................7

3. Alert Line Fundamentals video script ..............................................................10

4. Verification of Employment to Outside Organizations ....................................13

5. *Garner v. BP Amoco Chemical Company,* No. 3:07-cv-00221, 2010 WL 1049794 (S.D. Tex. Mar. 16, 2010) ..................................................................16

6. *Kalina v. Brazoria County, et al.,* No. G-10-96, 2011 U.S. Dist. LEXIS 105212 (S.D. Tex. Sept. 16, 2011) ..................................................................23

7. *K.J.P. v. Cnty of San Diego,* No. 15-cv-02692, 2022 U.S. Dist. LEXIS 221068 (S.D. Cal. Aug. 17, 2022) ..................................................................31

DATED: December 12, 2022        Respectfully submitted,

                                */s/ Christopher M. Ahearn*
                                Barak J. Babcock
                                Tennessee Bar No. 024021
                                SD No. 2522941
                                ATTORNEY-IN-CHARGE
                                Christopher M. Ahearn
                                California State Bar No. 239089
                                Tennessee Bar No. 040043
                                (Admitted *Pro Hac Vice*)
                                FEDERAL EXPRESS CORPORATION
                                3620 Hacks Cross Road
                                Bldg. B, 3rd Floor
                                Memphis, TN 38125-8800
                                Telephone: (901) 434-8523
                                Facsimile: (901) 492-9930
                                Email: barak.babcock@fedex.com
                                Email: Christopher.ahearn@fedex.com

                                **ATTORNEYS FOR DEFENDANT**

                        **CERTIFICATE OF SERVICE**

        I hereby certify that the foregoing document was filed with the Clerk of the Court using

the CM/ECF system, which will send a copy to all attorneys of record.

                                s/Christopher M. Ahearn

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JENNIFER HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action 4:21-cv-1651 |
| | ) | |
| FEDEX CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF MICHAEL LAUDERDALE

I, Michael Lauderdale, declare and state as follows.

1.      I am over the age of eighteen (18) and I am competent to testify as to the matters set forth herein.

2.      The facts stated in this declaration are true as of the date of my signature below.

3.      I am currently Vice President of Human Resources for FedEx Corporate Services, Inc. ("FedEx"). I have held my current position since September 1, 2020. FedEx Services is one of the subsidiaries of FedEx Corporation. I have worked for various FedEx entities since I began my employment with Federal Express Corporation on June 27, 1985. As a Vice President of Human Resources, I have access to and knowledge of FedEx's training records. I also have personal knowledge of the current organization of FedEx.

4.      My office is in Collierville, Tennessee, and has been at all times during my tenure as Vice President of Human Resources at FedEx Services. I make this declaration based on my direct, personal knowledge, including my knowledge of FedEx documents that I have had continual access to throughout my tenure as a Vice President. If called as a witness, I could and

DECLARATION OF MICHAEL LAUDERDALE —Page 1

would competently testify as to the facts set forth in this declaration.

5.     FedEx has over 14,000 employees based in the United States.  In addition to the Human Resources team I lead, FedEx has seven other distinct business units - Information Technology (IT) team, Sales and Solutions team, Communications team, Customer Experience team, Finance team, Revenue Management team and Marketing team.  Each FedEx business unit is led by its own leadership team.  For example, FedEx's Sales business unit currently has five Senior Vice Presidents and thirteen Vice Presidents that are responsible for the Sales functions at FedEx.

6.     In addition to the initial training managers receive upon entering the management ranks and the recurring training managers must complete annually, FedEx periodically reminds FedEx employees about its Alert Line.  For example, attached hereto as Exhibit A is a true and correct copy of a June 1, 2022 email that was sent to all FedEx employees reminding them that "If you see something, say something" and inviting them to watch a video of Chief Compliance Officer Justin Ross discussing the Alert Line.  Attached hereto as Exhibit B is a true and correct copy of the script that Mr. Ross used in the "Alert Line Fundamentals" video identified in the June 1, 2022 email.

7.     FedEx has its "Verification of Employment To Outside Organizations" policy which sets forth the information that FedEx will provide to prospective employers of its current and/or former employees.  Attached hereto as Exhibit C is a true and correct copy of this policy.

DECLARATION OF MICHAEL LAUDERDALE —Page 2

I declare under penalty of perjury under the laws of the State of Tennessee and of the United States of America that the foregoing statements are true and correct, and that I executed this declaration on December 8, 2022 in Memphis, Tennessee.

MICHAEL LAUDERDALE

DECLARATION OF MICHAEL LAUDERDALE —Page 3

# Exhibit  A

**Barak Babcock**

| | |
|---|---|
| **From:** | TheScan |
| **Sent:** | Wednesday, June 1, 2022 6:01 AM |
| **To:** | ▮▮▮▮▮▮ |
| **Subject:** | 🎆 Happy New (Fiscal) Year! 🎆 |



June 1, 2022                                                    FDX $224.58 ▲



## We're going to party like it's … FY23!

Today marks the first day of the new fiscal year! With so many exciting things happening, we can't wait to see all that will be in FY23!

Do you have any resolutions for the new fiscal year? Let us know!

1



## 🚨 **If you see something, say something** ☎️

If you've ever gotten a cup of coffee in a FedEx break room, you've probably seen a <u>FedEx Alert Line</u> poster on the wall or hanging on a bulletin board. But have you ever wondered how it actually works? What really happens to those reports after they're submitted? Go behind the scenes with Chief Compliance Officer Justin Ross in the new <u>Alert Line Fundamentals</u> video to find out.

Calling the Alert Line is something we hope you never have to do. But if you do see someone you think is breaking the law, violating company policy, or showing any other unethical or unsafe behavior, the Alert Line is here for you. You can submit a report online or by phone — and you can choose to keep it completely confidential. And did we mention it's available 24/7, 365 days a year? The Alert Line is an important way we protect our company, and it helps make sure we have a safe, secure, and ethical workplace. But we can't do it without your help. If something doesn't seem right, trust your instincts and speak up.

Scanned for FedEx Corporate and FedEx Services team members

2

Appendix 008

# Exhibit  B

**FedEx Alert Line Video Filming**

| | |
|---|---|
| **Date:** | Wednesday, January 26, 2022 (11:30a-1:00p reserved) |
| **Location:** | WHQ Building E studio |
| **Attire:** | Business casual (jacket, no tie) |

| Notes/Talking Points |
|---|

- Hi everyone. I'm Justin Ross, the Chief Compliance Officer of FedEx Corporation.

- Today I want to talk to you about the FedEx Alert Line.

- You've probably heard about the Alert Line, you've seen posters around the office, and you have a general idea of what it is.

- But have you ever wondered how the Alert Line really works or what happens when you submit a question or concern?

- The FedEx Alert Line is available for reporting any suspected violation of the law, the FedEx Code of Conduct or company policy, or any other unethical or unsafe behavior.

- And it's available 24/7, 365 days a year.

- You can submit a report by **phone** by calling 1.866.423.3339 or **online** at fedexalertline.com or you can just type in keyword "alert line" in the search box on the intranet home page.

- In addition to the Alert Line, you can always report concerns to your manager, HR, Security, or the Legal Department.

- Most times, your concern can be resolved by having an open conversation with one of these groups.

- But we understand there may be situations when you are not comfortable reporting your concern to an internal group, so the Alert Line is always available to you.

---

- Reports to the Alert Line are confidential and they'll only be shared with those people who have a legitimate business need to know the information – such as those investigating the report or those taking disciplinary action.

- You can also report anonymously if you prefer.

- The FedEx Alert Line system is managed by an independent third-party, and they are not allowed to try to uncover a reporter's identity if that reporter wants to remain anonymous.

- Just to show you how serious we take protecting anonymity, for phone reports, caller ID information is stripped from incoming calls before the calls reach the call center and

- No recordings of the phone calls are made, so there is no way to link a call to a particular individual.

- For online reports, you can file a report using any computer with an internet connection but

- The third-party system strips away any identifying information, so there is no way to link the computer you are using to the report itself.

- So, what if you are not sure if what you saw or heard violates policy or involves unethical conduct?

- Trust your instinct. If something does not seem right, go ahead and speak up.

- We'd rather you report a situation that turns out to be harmless than let potentially unethical behavior go unchecked because you remained silent.

- We also prohibit retaliation for reporting concerns in good faith; and reporting in good faith means that you believe what you are reporting is true.

- We take this seriously and if retaliation is found to have occurred, it will be dealt with appropriately.

---

- So, here is the process -- When you submit a report, you will be given a unique report key and you'll create a password.

- With the report key and your password, you can return to the system again, either by web or telephone, and you can access the original report.

- You can add more details, add attachments, or respond to questions posted to you.

- Any follow-ups you provide are held in the same strict confidence as the original report.

- Please provide as many details as you can in your report.

- If you report anonymously, we strongly encourage you to check in on the report, because the only way for us to contact you, is through the Alert Line system.

---

- The FedEx Alert Line is an integral part of our overall philosophy of integrity and compliance, and it helps us ensure a safe, secure, and ethical workplace.

- ***But we can't do it without your help.***

- We cannot address concerns unless we first know about them, which is why you play such a critical role.

- By reporting any concerns, you allow us the opportunity to take action to minimize any potential negative impact on our company and our people.

- When you speak up, you are helping preserve our culture of integrity and protecting others.

- Thank you; and remember Speak Up.

# Exhibit  C

## Policies and Procedures

## Verification of Employment to Outside Organizations

Effective Date: 09/23/2003

Content Revision Date: 9/26/2016

| Resources |
| --- |
| www.theworknumber.com/Verifiers |
| www.theworknumber.com/employee |
| www.theworknumber.com/socialservices |
| HR Customer Service Support Center |

### Policy

FedEx Services provides verification of employment of its employees to authorized agencies and companies according to the guidelines of this policy. This policy includes all current and former FedEx Services employees..

**Guidelines**

*Legal Department*

Responds to all Company-related subpoenas and litigation matters to which FedEx Services is a party.

*Confidential Information*

When in doubt concerning the release of the requested information, the Legal Department should be consulted. All other information requests that are part of litigation to which FedEx Services is a party should be directed to the Legal Department.

Requests for information concerning current employees from law enforcement agencies, federal regulatory agencies, summonses, subpoenas, and judicial orders should be forwarded to the Legal Department.

*Verification of Employment/Income Procedures*

The company utilizes The Work Number Automated Service for verification of employment for outside organizations (e.g., mortgage applications, reference checks, loan applications, and apartment leases). The automated service is secure, accurate, and is available 24 hours a day, seven days a week. The system is updated each Sunday. **Note:** Additions/changes to the system during the week will not be reflected in the data file until the following Sunday.

The procedures for using The Work Number Automated Service are as follows:

*Verification of Employment Procedure*

The employee instructs the verifier to:

- Visit www.theworknumber.com/Verifiers or call 1-800-367-5690.
- Enter FedEx Employer Code (11349).
- Enters social security number of the employee.

*Verification of Employment plus Income Procedure (Obtaining a salary key)*

The employee must request a Salary Key from the Work Number and provide it to the verifier/lender before a verification with income can be conducted:

## Policies and Procedures

Employee Role:

1.  Visit www.theworknumber.com or call 1-800-367-2884
2.  Enters FedEx Employer Code (11349)
3.  Enters social security number
4.  Enters PIN number (last 4 digits of employee's social security number + 4-digit birth year)
5.  Selects the Salary Key option and documents information: the system will provide a Salary Key, which is a 6 digit number. The employee should give the Salary Key to verifier/lender

Verifier/Lender Role:

The verifier visits www.theworknumber.com  or calls 1-800-367-5690. When prompted, the verifier should input the Salary Key provided by the employee in order to obtain the verification that includes income.

If an employee is ever charged for verification by a lender/verifier, the employee will be fully reimbursed after submitting written proof of the charge to The Work Number Client Team via fax at (314) 214-7587.

*Public Service Agencies*

All Social Services agencies (e.g., food stamps, Medicaid, housing authorities, state human services, Social Security Administration, child support enforcement,) may use The Work Number access options. For employment information, visit Social Services via the web at www.theworknumber.com/socialservices or call 1-800-660-3399.

The Work Number Client Service Center:

- 1-800-996-7566 (voice) Mon.-Fri. 7 a.m. - 8 p.m. (CST)
- 1-800-424-0253 (TTY/Deaf)
- 1-314-214-7587 (fax)

### Releasing Information on Present Employees

| If the employee…. | And the inquiry is for…. | Then the inquirer receives…. |
| --- | --- | --- |
| Does not provide written authorization | Salary Information | Employment dates, current job title, but no salary information |
| Provides written authorization | Employment information | Employment dates and current job title. |
| | Employment and salary information | Employment dates, current job title, and all recorded payroll earnings for a period of up to 2 years. |

Appendix 014

# Policies and Procedures

*Releasing Information / Terminated and Retired Employees*

All outside requests for employment information on terminated and retired employees should be referred to The Work Number.

*Resetting Access if Locked Out*

Employees who are unable to access the Work Number due to being locked out, must contact the HR Customer Service Support Team to have access restored. You may submit an Online Service Request or speak to an HR Customer Service representative by visiting the HR Customer Service Support Center. Please be prepared to provide the following information listed below. Allow 1-2 business days for the reset to occur.

- Employee FedEx ID:
- Employee Name:
- Employment Status: [Active or Non-Active]
- Employee Phone:
- Employee E-Mail: [Active or Non-Active]

*Release of Company Records*

Human Resources or the Legal Department must approve the release of information.

The policies and procedures contained herein are intended solely as a guide for management and employees during employment. It is not a contract of employment, and no such contract may be implied from its provisions. Nothing contained within these policies and procedures shall be construed to abrogate the employment agreement signed upon application for employment preserving the Company's and the employee's right to terminate this relationship at the will of either party. The male gender is used in these policies for ease of writing style. Whenever the male gender is used, it applies to both male and female employees. The information contained herein may be modified, amended, or deleted by the Company at any time at its sole discretion without prior notice. All amendments to FedEx Corporate Services policies and procedures shall be made solely by the chief executive officer (CEO) or other senior officer designated with such authority. Copyright 2014. FedEx Corporation All rights reserved.

Verification of Employment to Outside Organizations

KeyCite Red Flag - Severe Negative Treatment

Reversed by Pearson v. BP Products North America, Inc., 5th Cir.(Tex.),
November 10, 2011

2010 WL 1049794

Only the Westlaw citation is currently available.

United States District Court,

S.D. Texas,

Galveston Division.

Aaron Wilson GARNER, et al, Plaintiffs,

v.

BP AMOCO CHEMICAL

COMPANY, et al, Defendants.

Civil Action No. G–07–221.

|

March 16, 2010.

West KeySummary

1    **Negligence**   🗝 Dangerous Substances

Sufficient evidence supported a finding that a
refinery was the source of toxic odor and that
it was negligent in causing or permitting a
leak, spill, escape or release of an unidentified
toxic substance at its refinery, allegedly causing
injuries to subcontractors' employees who had
been working at the refinery. Evidence showed
that decontamination exercises occurred at
the refinery on the day the toxic odor was
released and that based on treating physicians'
observations, the odor had an adverse impact
on the workers. Evidence showed that when
the workers first detected the toxic odor, the
wind was blowing from a northerly direction,
which refuted the refinery's suggestion that it
came from a refinery located southwest from
the refinery. Evidence also did not support the
other two places that the refinery alleged the odor
could have come from as there was no evidence
of upset from the venues, the Texas Commission
on Environmental Quality did not register any
release by them, and there were no complaints
from the community that a release occurred.

**Attorneys and Law Firms**

Anthony G. Buzbee, Peter Kelley Taaffe, Sean Edward
O'Rourke, The Buzbee Law Firm, Houston, TX, for Plaintiffs.

James B. Galbraith, McLeod Alexander Powel & Apffel,
Galveston, TX, Scott A. Brister, Thomas W. Taylor, Andrews
Kurth LLP, Austin, TX, for Defendants.

*MEMORANDUM OPINION AND ORDER*

KENNETH M. HOYT, District Judge.

**I. INTRODUCTION**

 *1  Before the Court are the plaintiffs', Gilbert Cantu,
Rosa Fernandez–Claudio, Jose A. Estrada, Gregorio Fuentes,
Eleno Guerra, Wayne Jefferson, Willy Mays, Edwin Munoz,
Wayne Pearson, and Charles Taylor, motion for severance
and for entry of judgment [Inst. No. 285] and the defendant,
BP Products North America, Inc., opposition to the plaintiffs'
motion [Inst. No. 287]. The plaintiffs filed a reply brief [Inst.
No. 290], the defendant filed a sur-response [Inst. No. 293]
and the plaintiff a sur-reply [Inst. No. 294]. The Court has
examined the pleadings, reviewed the testimonial evidence,
examined the exhibits and considered the arguments of
counsel and determines that the plaintiffs' motion for
severance and entry of judgment should be granted in part and
denied in part.

**II.   HISTORICAL   AND   PROCEDURAL
BACKGROUND**

On or about June 8, 2007, the plaintiffs and over 100
other individuals filed suit against the defendant asserting
that the defendant released an unidentified toxic substance
into the atmosphere at its refinery causing personal injuries
to workers. Scores of workers were transported to local
hospital(s) where they were examined, treated and released.
At the time, the plaintiffs were employees of various sub-
contractors and were assigned by the general contractor, the
Fluor Corporation, to various duties pursuant to the contract
between the defendant and Fluor Corporation. The plaintiffs
allege that on or about March 19, April 10, April 16 and
April 19, 2007, the defendant released an unidentified toxic
substance into the air that caused injuries to them.

Garner v. BP Amoco Chemical Co., Not Reported in F.Supp.2d (2010)

2010 WL 1049794

In response to the plaintiffs' claims and complaint, the defendant asserted that there is no evidence of a toxic leak and suggested, at the time of the occurrence, that the incident may have been a hoax triggered by disgruntled workers. The defendant never identified the substance nor the source of the released, but set out instead to establish that the substance that the plaintiffs were exposed to, if anything, came from off-site, the possibilities included the ship channel, railroad tank cars and the Valero refinery, all located to the south or southwest of the defendant's refinery. Because the substance was unidentified at the time, the hospital(s) and physicians were loath to treat the plaintiffs. Hence, the sum of each plaintiff's treatment, with one exception, was a physical examination and/or decontamination and release.

### III. JURY TRIAL—VERDICT

On or about November 6, 2009, the Court entered an Order designating ten (10) plaintiffs as the first trial group. On December 1, 2009, a jury was selected and trial commenced. A verdict was reached by the jury on December 18, finding that, due to the negligence of the defendant, a toxic substance had been released at the defendant refinery, that the release was due to the negligence of the defendant and that such negligence was a proximate cause of the plaintiffs' injuries. The jury then answered the interrogatory on damages as to each plaintiff as follows:

**Interrogatory Number 3**

**\*2** What compensatory damages, if any, do you find as to each plaintiff for whom you answered "yes" in the Interrogatory Number 2? Answer in dollars and cents, if any.

| | | |
|---|---|---|
| **1.** | **Gilberto Cantu** | |
| | Mental Anguish/Pain and Suffering | *$5,000.00* |
| | Past Medical Expenses | *$1,529.30* |
| | Lost Income | *$0* |
| **2.** | **Rosa Claudio** | |
| | Mental Anguish/Pain and Suffering | *$5,000.00* |
| | Past Medical Expenses | *$4,193.26* |
| | Lost Income | *$720.00* |
| **3.** | **Jose A. Estrada** | |
| | Mental Anguish/Pain and Suffering | *$5,000.00* |
| | Past Medical Expenses | *$2,050.93* |
| | Lost Income | *$1,287.00* |
| **4.** | **Gregorio Fuentes** | |
| | Mental Anguish/Pain and Suffering | *$5,000.00* |
| | Past Medical Expenses | *$1,091.68* |
| | Lost Income | *$0* |
| **5.** | **Eleno Guerra** | |
| | Mental Anguish/Pain and Suffering | *$5,000.00* |
| | Past Medical Expenses | *$1,915.35* |

Appendix 017

|  |  |  |
|---|---|---|
|  | Lost Income | $0 |
| 6. | **Wayne Jefferson** | |
|  | Mental Anguish/Pain and Suffering | $5,000.00 |
|  | Past Medical Expenses | $3,612.00 |
|  | Lost Income | $0 |
| 7. | **Willy Mays** | |
|  | Mental Anguish/Pain and Suffering | $5,000.00 |
|  | Past Medical Expenses | $917.79 |
|  | Lost Income | $0 |
| 8. | **Edwin Munoz** | |
|  | Mental Anguish/Pain and Suffering | $10,000.00 |
|  | Past Medical Expenses | $19,386.21 |
|  | Future Medical Expenses | $215,000.00 |
|  | Lost Income | $0 |
| 9. | **Wayne Pearson** | |
|  | Mental Anguish/Pain and Suffering | $7,500.00 |
|  | Past Medical Expenses | $4,755.45 |
|  | Lost Income | $0 |
| 10. | **Charles Taylor** | |
|  | Mental Anguish/Pain and Suffering | $5,000.00 |
|  | Past Medical Expenses | $12,297.38 |
|  | Lost Income | $0 |

The jury went on to find that the conduct of the defendant was such that punitive damages should be awarded. It awarded punitive damages of $10 million to each plaintiff. The plaintiffs' request that based on the verdict, their claims be severed from the remaining plaintiffs untried claims and that a final judgment be entered pursuant to Fed.R.Civ.P., Rule 58(a)(1). For the reasons set out hereafter, the Court enters judgment in behalf of the plaintiffs pursuant to Fed.R.Civ.P., Rule 49(b) and 50(b)(1).

**IV. CONTENTIONS OF THE PARTIES**

In their suit, the plaintiffs contended that the release of a toxic substance was caused by the negligence of the defendant in that the defendant: (a) caused or permitted the release of a toxic substance at its refinery; (b) failed to maintain a safe work place; (c) failed to have a reliable system at the plant to prevent releases, such as the one that the plaintiffs complain about; (d) failed to perform its daily operations in a safe and prudent manner; (e) failed to exercise reasonable and prudent care in the operations of its facility; (f) failed to implement, follow and enforce proper operations procedures; (g) failed to implement, follow and enforce property safety procedures;

and, (h) failed to implement, follow and enforce proper hazard analysis.

**\*3** The plaintiffs seek individual judgments in their respective behalves based on the jury verdict. In this regard, the plaintiffs argue that they sought and proved negligence and gross negligence on the part of the defendant and, therefore, are entitled to the jury awards on both. The plaintiffs argue that the jury's finding of gross negligence was based on the "hundreds of leaks, spills, releases and odor events that occurred at [the defendant's] refinery in the five years preceding the "April 19th event."

The defendant argues that the plaintiffs are not entitled to an award of punitive damages based on the facts as presented. Alternatively, if an award is to be made, it cannot exceed the statutory limits established by Texas statute. *See* Tex. Civ. Proc. & Rem.Code Ann. § 41.008(b). In addressing its claim that the plaintiffs are not entitled to punitive damages, the defendant contends that: (a) the plaintiffs failed to prove gross negligence; (b) the plaintiffs failed to prove that the defendants' Sulphur Recovery Unit ("SRU") actually released the toxic substance that they claimed to have experienced; (c) it had no actual subjective awareness of and did not act with conscious indifference to the risk to the plaintiffs; (d) the doctrine of *res ipsa loquitur* does not supply the necessary state of mind to establish gross negligence on the part of the defendant; (e) the defendant's conduct or lack thereof, as it relates to general maintenance, cannot establish gross negligence; (f) the punitive damage awards are constitutionally excessive and therefore, violates the "due process" clause of the Fourteenth Amendment; and, (g) any award for punitive damages should not be more than the compensatory damage award.

In counter arguments, the plaintiffs asserts that: (a) the maintenance and investigative practices of the defendant prove gross negligence; (b) the Texas statutory cap on punitive damages does not apply; (c) the punitive damage award does not violate the "due process" clause of the Fourteenth Amendment to the federal Constitution; (d) the ratio of punitive damages to compensatory damages is appropriate; and (e) because the punitive damage awards are comparable to the civil or criminal penalties that could be imposed by a governmental authority for comparable conduct, the awards should stand.

**V. STANDARD OF REVIEW**

State law provided the basis for the plaintiffs' suit and, therefore, provides the bases upon which punitive damage factors are to be determined. *See Quest Med. Inc., v. Apprill,* 90 F.3d 1080, 1090 (5th Cir.1996) (citing *Browning–Ferris Indus. of Vt., Inc. vs. Kelco Disposal, Inc.,* 492 U.S. 257, 278, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). Chapter 41 of the Texas Civil Practices and Remedies Code defines exemplary damages as damages to be awarded as a penalty or by way of punishment, but not for compensatory purposes. *See* Tex. Prac. & Rem.Code Ann. § 41.001(5). Hence, punitive damages may be awarded where the evidence supports a finding that the actor has committed gross negligence. *Id.* at §§ 41.002(a) and 41.003(a).

**\*4** In determining whether an actor's act or omission constituted "gross negligence," the evidence must be: (a) viewed objectively from the standpoint of the actor at the time of the occurrence and involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; *and,* (b) of which the actor has actual, subjective awareness of the risk involved, but nevertheless, proceeds with conscious indifference to the rights, safety, or welfare of others. *Id.* at § 41.001(11).

Proof of gross negligence must be established by clear and convincing evidence as opposed to simple negligence which is established by a preponderance of the evidence. *See Dunbar Med. Sys. Inc. v. Gammax, Inc.,* 216 F.3d 441, 455 (5th Cir.2000). In other words, in determining gross negligence it is the state of mind of the actor that is under review. The evidence must establish that the actor knew about an extreme risk and by his conduct demonstrated that he did not care. *See Diamond Shamrock Ref. Co. v. Hall,* 168 S.W.3d 164, 173 (Tex.2005).

**VI. ANALYSIS**

In arguing against severance and entry of judgment, the defendant presents alternative positions. First, the defendant argues that there is no clear and convincing evidence that supports a finding of gross negligence. In this regard, the defendant points to the strictures of § 41.001(11) and cites to *Smith v. O'Donnell,* 288 S.W.2d 417, 423–24 (Tex.2009). Alternatively, the defendant asserts that the Texas statutory limits on a punitive damage award must be applied, with one exception, Edwin Munoz. However, the defendant argues that even the maximum state statutory award is constitutionally excessive. Finally, in a volley of contentions, the defendant asserts that gross negligence cannot be based on an unknown source, dissimilar events, or *res ipsa loquitor.* The Court will

Appendix 019

2010 WL 1049794

address the defendant's positions as necessary but will first address the propriety of the evidence that supports a finding of simple negligence on the part of the defendant.

A) Lack of Negligence—Unknown Source Contention

The defendant first argues that the plaintiffs failed to prove the source of the release of the toxic substance, the basis for a finding of negligence. The defendant points to the Court's comment, that the odor event resulted from the SRU, an unidentified source within the defendant's refinery, a source outside the defendant's refinery, or was a hoax perpetuated by unknown parties. The evidence before the Court and jury excludes the latter two; a source outside the refinery and a hoax perpetrated by unknown parties.

The defendant also challenges the legal sufficiency of the evidence arguing that it does not would permit the jury to reach the verdict under review. In this regard, the Court must review the evidence in the light most favorable to the challenged finding, crediting any favorable evidence if a reasonable fact-finder while disregarding any contrary evidence unless a reasonable fact-finder could not. *See Stevenson v. E.I. Dupont DeNemours,* 327 F.3d 400, 405 (5th Cir.2003); *see also Rentech Steel, LLC v. Teel,* 299 S.W.3d 155, 159 (Tex.App–Eastland, 2009) (internal citations omitted). Hence, in order for the Court to set aside the jury's verdict, there must be a complete absence of a vital fact, or less than a mere scintilla of evidence supporting the vital fact, or the evidence must conclusively establishes the opposite of a vital fact. *Id.* at 159–60.

**\*5** The evidence establishes that a toxic substance was released and that it had an adverse impact on the plaintiffs. Both the decontamination exercises and the observations of the treating physicians would lead a reasonable fact finder to conclude that the event was not the result of a hoax. The jury heard the testimony of scores of witnesses, including the defendant's officials. None asserted, during trial that the event was a hoax. And, there was no evidence presented by the defendant that contradicted the plaintiffs' assertions of injuries that compelled the jury to disbelieve the plaintiffs' claim. Therefore, the Court is of the opinion that the evidence before the jury was such that a reasonable jury could find that the plaintiffs were exposed to a toxic substance. *See Vogler v. Blackmore,* 352 F.3d 1050, 154–55 (5th Cir.2003).

As well, there is no evidence that the odor event was the work or fault of an unidentified source outside the defendant's refinery. On the contrary, when the evidence is viewed in the light most favorable to the verdict, the evidence supports the jury's finding that the source was the defendant's refinery. During the presentation of evidence, the defendant presented testimony that there were three (3) possible sources, outside of the defendant's refinery, from which the toxic odor could have migrated. The defendant proffered that there was a Valero refinery southwest of the BP refinery. And, since the wind was blowing out of the southwest, it was a likely source. They also posited that railroad tank cars, containing sulfur, stationed to the east, or that general direction, could have been the source. And third, because vessels in the ship channel discharge toxic waste from time to time into the ship channel, the ship channel was a possible source.

While the defendant made proffers concerning wind direction and arguments that any one of these venues could have been the source of the toxic odor, the evidence failed to support either of the three sources. Admittedly, there was no evidence of upsets from these three venues. Moreover, TCEQ did not register any release by either of these venues. Nor were there complaints from the community that a release had occurred. Any release would have traveled through the nearby community. Except for the direction of the wind at 9:00 p.m., there was no evidence presented by the defendant that either of the three possible venues could have been a source of release of a toxic substance. While the defendant expended a substantial sum of money investigating these three venues, it too was left to conclude that neither was the source. And, except for wind direction at 9:00 p.m., there was no evidence that should have raised a suspicion. The jury disbelieved the defendant and, therefore rejected its argument, since there was no evidence that an unidentified source, outside the defendant's refinery, was at fault.

The evidence shows that the jury had a good and valid reason to reject the defendant's hypothesis. First, and foremost is the fact that at the time that the plaintiffs first detected the toxic odor, the wind was blowing from a northerly direction. This fact is confirmed by at least one of the workers and the defendant's own internal wind registers. At the relevant time of the wind readings, the defendant's SRU was operating to the north of the workers' work site.[1] Strikingly, there is no evidence of an off-site source to the north of the defendant's SRU or the refinery that could have been the source of the toxic odor. Hence, a reasonable jury could find that the source of the plaintiffs' injuries was either the defendant's SRU or another source within the defendant's refinery. *See Mobil Chemical Company v. Bell,* 517 S.W.2d 245 (Tex.1974). Without doubt the wind shifted from a northerly direction

Garner v. BP Amoco Chemical Co., Not Reported in F.Supp.2d (2010)

2010 WL 1049794

to a southeasterly direction and then a southerly direction during the course of an hour, for 8 p.m. to 9 p.m. This fact is undisputed and does not disturb the jury's verdict. Therefore, the Court is of the opinion and holds that there is sufficient evidence upon which a reasonable jury could conclude, by a preponderance of the evidence, that the defendant was the source of the toxic odor and that it was negligent on April 19, 2007, in causing or permitting a leak, spill, escape or release of an unidentified toxic substance at its refinery that was also a proximate cause of the plaintiffs' injuries.

1    At the beginning and throughout the trial, the defendant argued that the plaintiffs' evidence failed to show that the source of the toxic odor, even if in its refinery, was under its control. The evidence is undisputed that the SRU was under the control of the defendant on April 19.

   B. Dissimilar Events—No Gross Negligence Contention
 *6  The defendant asserts that a verdict for gross negligence cannot rest on evidence of various or dissimilar events. In this regard, the defendant refers to the plaintiffs' evidence and argument that the April 19, event was simply in a long string of spills or releases that resulted in workers being exposed to toxic substances. The defendant argues that the plaintiffs must prove that the April 19, release was of the same type, nature and/or from the same location as earlier spills or releases in order to establish the "actual, subjective awareness of and conscious indifference to [extreme] risk" required to prove gross negligence. *See* § 41.001(11); *see also Quest Int'l Commc'ns, Inc. v. AT & T Corp.,* 167 S.W. 3rd 324, 326 (Tex.2005); *Dunbar Med. Sys. Inc. v. Gammex, Inc.,* 216 F.3d 441, 455 (5th Cir.2000).

The plaintiffs' claims against the defendant charge that the defendant failed to put in place proper safety and operations procedures so as to warn workers when a spill or release might or was about to occur. As well, the plaintiffs point to the defendant's failed maintenance program, that the defendant admits is several years in arrears, as the cause of worker exposure to toxic hazards beyond those ordinarily expected in a refinery. To support their arguments, the plaintiffs offered evidence that less than 24 hours earlier, a release occurred in the same general work area, and that the release caused five (5) workers to become ill, two of whom were medically treated. The plaintiffs contend that this evidence supports a finding of gross negligence because the defendant did not investigate the source or cause of this earlier event. Hence, the plaintiffs argue conscience indifference.

The plaintiffs also point out that a week earlier, on or about April 10, a release occurred that also resulted in injuries. Finally, the plaintiffs proffer that the evidence shows that during the preceding five (5) years, the defendant's facility had over 500 recorded leaks, spills and/or releases other than permitted or scheduled releases. This evidence, the plaintiffs argue, supports their claim of subjective awareness and callousness on the defendant's part.

A jury could conclude that releases, spills or leaks, on average, every third or fourth day means that the defendant knew of a possible peril that its workers were exposed to and that it was, nevertheless, willing to allow them suffer the risk and inconvenience. Moreover, they could conclude that a decision to repeatedly expose workers to such serious risk of harm could mean that the defendant is indifferent to the welfare and health of its workers. Nevertheless, even these findings by a jury are insufficient to establish gross negligence.

The defendant correctly asserts that in order to recover exemplary damages the plaintiffs must establish gross negligence. The statute requires that the evidence pass both an objective and subjective test. *Id.* § 41.001(11)(A)(B). The objective test requires a showing of an extreme risk of harm—"one that involves both high probability and high potential severity" of an occurrence. (citation omitted.) Here, the evidence fails to establish a legal connection between the event(s) and a known extreme risk. The nature of refinery work is such that workers are subject to a variety of toxic odors at all times. Both the defendant, the employees and contractors are fully aware of the potential hazards that exists in a refinery. As well, all workers are aware of the potential severity that a release might cause were it to occur. A disconnect exists here, however, because while the history of the defendant's refinery shows a high probability that a worker will be frequently exposed to a toxic substance, the evidence does not support the high potential severity side of the test. Nor does the evidence show a high probability of same source. In fact, the abundance of evidence shows that even though there have been hundreds of releases or spills, injuries are not always associated with each event and there is no showing of source.

 *7  Also missing from the equation is the element of specific intent. The statute requires that the plaintiff establish a "specific intent" by clear and convincing evidence. *Id.* at 41.001(7). Specific intent requires more than a showing that a defendant had an awareness of the possibility of a spill

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

or release. *See Diamond Shamrock Refining Co. v. Hall,* 168 S.W.3d 164, 171 (Tex.2005). It requires a showing that a defendant ignored the obvious or known risk and took no precautions that would minimize or arrest the harm anticipated. *Id.* at 171–72. The evidence shows that the defendant implemented safety precautions requiring each worker to wear a monitor to detect the most deadly toxic chemicals present at the refinery. And, there is evidence that on the occasion, monitors were installed and operational on the ground as well as on the towers in the refinery. Therefore,

the Court concludes, as a matter of law, that gross negligence was not proved by clear and convincing evidence and that the jury's exemplary damage award must be set aside.

It is so Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1049794

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 Neutral

As of: December 8, 2022 2:36 PM Z

# *Kalina v. Brazoria County*

United States District Court for the Southern District of Texas, Galveston Division

September 16, 2011, Decided; September 16, 2011, Filed

CIVIL ACTION NO. G-10-96

**Reporter**

2011 U.S. Dist. LEXIS 105212 *; 2011 WL 4352372

MIKKI KALINA, et al, Plaintiffs, vs. BRAZORIA COUNTY, TEXAS, et al, Defendants.

**Subsequent History:** As Amended September 20, 2011

Motion granted by, Costs and fees proceeding at *Kalina v. Brazoria County, 2012 U.S. Dist. LEXIS 19027 (S.D. Tex., Feb. 15, 2012)*

**Prior History:** *Kalina v. Brazoria County, 2011 U.S. Dist. LEXIS 159859 (S.D. Tex., Apr. 6, 2011)*

## Core Terms

plaintiffs', sexual harassment, bodily integrity, hugs, intentional infliction of emotional distress, punitive damages, harassment, buttock, preponderance of evidence, statute of limitations, work environment, grabbed, hostile

**Counsel:** [*1] For Mikki Kalina, Estella Strawn, Rebecca Sirmans, Plaintiffs: Martin A Shellist, Shellist Lazarz LLP, Houston, TX.

For James A. Blackstock, being sued individually and in his official capacity, Defendant: Anthony P Griffin, LEAD ATTORNEY, A Griffin Lawyers, Galveston, TX.

**Judges:** Kenneth M. Hoyt, United States District Judge.

**Opinion by:** Kenneth M. Hoyt

## Opinion

### AMENDED MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Before the Court is the defendant, James Blackstock's amended motion for judgment notwithstanding the verdict ("JNOV") (Document No. 49); and (the defendant filed his original JNOV on July 25 as Document No. 47) and the plaintiffs' response (Document No. 51). The Court has reviewed the motion, the response and transcript and, being fully advised on the law, is of the opinion that the amended motion should be denied in part and granted in part.

### II. PROCEDURAL AND FACTUAL BACKGROUND

The plaintiffs brought this suit against the defendant on claims that he violated their civil rights, and in particular the right to be free from sexual harassment and a hostile work environment, pursuant to *42 U.S.C. § 1983*. Without restating the facts as pled and presented to the jury, suffice it to say that the plaintiffs contended and [*2] presented testimony that the defendant sexually harassed them by touching and/or fondling them, thereby violating their bodily integrity. The plaintiffs also pled a claim for intentional infliction of emotional distress and sought both compensatory and punitive damages.

A jury was empaneled and testimony and exhibits were presented to the jury over 5 days. On July 15, 2011, the jury returned its unanimous verdict on behalf of the plaintiffs, finding as follows to the Interrogatories presented:

### INTERROGATORIES

**Do you find from a preponderance of the evidence that:**

### INTERROGATORY NUMBER 1:

(1) James Blackstock subjected the plaintiff to a hostile work environment? Each plaintiff has the burden of

 Neutral
As of: December 8, 2022 2:36 PM Z

## *Kalina v. Brazoria County*

United States District Court for the Southern District of Texas, Galveston Division

September 16, 2011, Decided; September 16, 2011, Filed

CIVIL ACTION NO. G-10-96

**Reporter**
2011 U.S. Dist. LEXIS 105212 *; 2011 WL 4352372

MIKKI KALINA, et al, Plaintiffs, vs. BRAZORIA COUNTY, TEXAS, et al, Defendants.

**Subsequent History:** As Amended September 20, 2011

Motion granted by, Costs and fees proceeding at *Kalina v. Brazoria County, 2012 U.S. Dist. LEXIS 19027 (S.D. Tex., Feb. 15, 2012)*

**Prior History:** *Kalina v. Brazoria County, 2011 U.S. Dist. LEXIS 159859 (S.D. Tex., Apr. 6, 2011)*

## Core Terms

plaintiffs', sexual harassment, bodily integrity, hugs, intentional infliction of emotional distress, punitive damages, harassment, buttock, preponderance of evidence, statute of limitations, work environment, grabbed, hostile

**Counsel:** [*1] For Mikki Kalina, Estella Strawn, Rebecca Sirmans, Plaintiffs: Martin A Shellist, Shellist Lazarz LLP, Houston, TX.

For James A. Blackstock, being sued individually and in his official capacity, Defendant: Anthony P Griffin, LEAD ATTORNEY, A Griffin Lawyers, Galveston, TX.

**Judges:** Kenneth M. Hoyt, United States District Judge.

**Opinion by:** Kenneth M. Hoyt

## Opinion

### AMENDED MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Before the Court is the defendant, James Blackstock's amended motion for judgment notwithstanding the verdict ("JNOV") (Document No. 49); and (the defendant filed his original JNOV on July 25 as Document No. 47) and the plaintiffs' response (Document No. 51). The Court has reviewed the motion, the response and transcript and, being fully advised on the law, is of the opinion that the amended motion should be denied in part and granted in part.

### II. PROCEDURAL AND FACTUAL BACKGROUND

The plaintiffs brought this suit against the defendant on claims that he violated their civil rights, and in particular the right to be free from sexual harassment and a hostile work environment, pursuant to *42 U.S.C. § 1983*. Without restating the facts as pled and presented to the jury, suffice it to say that the plaintiffs contended and [*2] presented testimony that the defendant sexually harassed them by touching and/or fondling them, thereby violating their bodily integrity. The plaintiffs also pled a claim for intentional infliction of emotional distress and sought both compensatory and punitive damages.

A jury was empaneled and testimony and exhibits were presented to the jury over 5 days. On July 15, 2011, the jury returned its unanimous verdict on behalf of the plaintiffs, finding as follows to the Interrogatories presented:

### INTERROGATORIES

**Do you find from a preponderance of the evidence that:**

### INTERROGATORY NUMBER 1:

(1) James Blackstock subjected the plaintiff to a hostile work environment? Each plaintiff has the burden of

proof on her individual claim by a preponderance of the evidence.

Answer "Yes" or "No" as to each plaintiff.

*Go to table1*

**INTERROGATORY NUMBER 2:**

(2) James Blackstock violated the bodily integrity of the plaintiff? Each plaintiff has the burden of proof on her individual claim by a preponderance of the evidence.

Answer "Yes" or "No" as to each plaintiff:

*Go to table2*

**INTERROGATORY [*3] NUMBER 3:**

(3) James Blackstock intentionally inflicted emotional distress upon the plaintiff? Each plaintiff has the burden of proof on her individual claim by a preponderance of the evidence.

Answer "Yes" or "No" as to each plaintiff:

*Go to table3*

Only if you have answered Interrogatory Number 1, 2, or 3 "Yes" as to one or more of the plaintiffs, then answer Interrogatory Number 4.

**INTERROGATORY NUMBER 4:**

(4) What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the plaintiff for her compensatory damages, if any, that resulted from the sexual harassment, violation of bodily integrity, and/or the intentional infliction of emotional distress?

Answer in dollars and cents as to each plaintiff:

*Go to table4*

**INTERROGATORY NUMBER 5:**

(5) Did James Blackstock act intentionally, with callous indifference, or with reckless disregard when harassing and/or violating the bodily integrity of the plaintiff? Each plaintiff has the burden of proof on her individual claim

by a preponderance of the evidence.

Answer "Yes" or "No" as to each **[*4]** plaintiff:

*Go to table5*

Only if you have answered Interrogatory Number 5 "Yes" as to one or more of the plaintiffs, then answer Interrogatory Number 6.

**INTERROGATORY NUMBER 6:**

(6) What sum of money, if any, do you award the plaintiff as punitive damages? Answer as to each plaintiff:

*Go to table6*

We, the jury, have answered the above and foregoing questions as herein indicated, and herewith return our unanimous verdict into the Court.

/s/ Jury Foreperson

July 15, 2011

**III. CONTENTIONS OF THE PARTIES**

**A. The Defendant's Contentions**

The defendant asserts that his motion for JNOV should be granted on the basis that: (a) the plaintiffs' claims of sexual harassment and hostile work environment should be dismissed on the basis of insufficient evidence; (b) the plaintiffs' pleadings and the evidence fail to support a claim or submission for bodily integrity under the *Fourteenth Amendment*; (c) the Court lacks jurisdiction over the plaintiffs' sexual harassment and bodily integrity claims because they are barred by the two-year statute of limitations; (d) **[*5]** the plaintiffs' intentional infliction of emotional distress claims are not supported by sufficient evidence, nor can these claims be charged under Texas law in the employment context; (e) state law prohibits any recovery by the plaintiffs against Brazoria County because the plaintiffs' suit was dismissed with prejudice pursuant to a stipulation between the parties. As well, the defendant argues this stipulation also bars any recovery by the plaintiffs against him individually; and (f) because the plaintiffs' claims for punitive damages arise out of their bodily integrity claims, the award should be disregarded.

## B. The Plaintiffs' Responsive Contentions

The plaintiffs contend that: (a) the defendant failed to move for a directed verdict on all the grounds that he now seeks a JNOV, and so the post-verdict review should be based on plain error; (b) the defendant is being sued individually for sexual harassment and violation of the plaintiffs' bodily integrity, such that suit is appropriate under *Section 1983*, rather than Title VII; (c) the statute of limitations is an affirmative defense that the defendant never pled; (d) federal law permits the plaintiffs' claims for intentional infliction **[*6]** of emotional distress against the defendant individually, and, state law does not bar these claims; and (e) the plaintiffs' punitive damages question was properly submitted to the jury.

## IV. STANDARD OF REVIEW

This case was presented to a jury, which had the responsibility to discern the evidence by weighing conflicting evidence and inferences and determining the credibility of the witnesses. *See Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir. 1969)* (*en banc*), (overruled on other grounds). Hence, a jury verdict is entitled to great deference and should be set aside only where the facts and any reasonable inferences instruct overwhelmingly that a reasonable jury could not have arrived at the verdict rendered. *Boeing Co., 411 F.2d at 374-75; Scottish Heritable Trust, PLC v. Peat Marwick Main & Co., 81 F.3d 606, 610 (5th Cir. 1996). Federal Rule of Civil Procedure, Rule 50(b)* instructs that "a motion for judgment notwithstanding the verdict will not lie unless it was preceded by a motion for a directed verdict made at the close of all the evidence." Therefore, in the instance where a directed verdict was not properly lodged, a court's post-verdict review is limited to a plain error. **[*7]** *See Bay Colony, Ltd. v. Trendmaker, Inc., 121 F.3d 998, 1003 (5th Cir. 1997)*.

## V. ANALYSIS AND DISCUSSION

An analysis of the defendant's stated contentions, for setting aside the jury verdict, lends itself to the defendant's global arguments that: (a) the evidence fails to support the plaintiffs' claims (sufficiency of the evidence); and (b) state and federal law do not support the plaintiffs' claims under the circumstances. The Court will address the defendant's contentions under these two broad categories.

## A. Sufficiency of the Evidence (Sexual Harassment)

The defendant asserts that the evidence fails to support the plaintiffs' claim for sexual harassment under Title VII. To establish this claim, the evidence must establish that: (a) the plaintiff belongs to a protected class; (b) she was subjected to unwelcomed sexual harassment; (c) the harassment was based on their sex or gender; (d) the harassment affected a term, condition or privilege of employment; and (e) the employer knew or should have known of the harassment and failed to take remedial action. *See Green v. Adm'rs of Tulane Educ. Fund, 284 F.3d 642, 655 (5th Cir. 2002)*. However, where the evidence shows that the defendant was **[*8]** a supervisor of a plaintiff, having the authority to either terminate or cause the employee's termination, the employee need not establish that the employer knew or should have known of the harassment and failed to correct it. *See Watts v. Kroger Co., 170 F.3d 505, 509 (5th Cir. 1999)*. A summary of the plaintiff's testimony sheds light on the defendant's insufficiency claim.

Rebecca Sirmans testified that she had worked for Brazoria County for some 17 years when, without warning or provocation, the defendant put his hand on her buttock. She entered the elevator and as they were descending he stroked her with several of his fingers. She asked him to stop "playing" with her, and he remarked "it was sticking out and got in [his] way." Earlier, he had sent Sirmans a pornographic image that she did not solicit. After these events, the plaintiff avoided the defendant as much as she could and informed her immediate supervisor about the events. However, no action was taken against the defendant.

Mikki Kalina testified that she had known the defendant her whole life. She worked on his campaign, graduated from high school with his son and saw him occasionally at softball games. On several occasions, **[*9]** he touched her breast when he grabbed her from behind as she was leaving his office. On several occasions, he grabbed her buttock and slapped her buttock with his hand. He made the remark "drop one out for me" and asked her what he needed to do to get in her pants. It started in 2007, when he asked her for a hug. When she attempted to hug him from the side, he "bear hugged" her. When she spoke to her immediate supervisor, she was cautioned that she would be terminated. Eventually, she spoke to the District Attorney about the matter.

Estella Strawn began working for Brazoria County in 1996. She interacted with the defendant four to five

times per month as a legal secretary for the Juvenile Probation Department. The defendant first touched Strawn in 2005-06. On one occasion, he slapped and squeezed her buttock in the courtroom in the presence of another probation officer. In March of 2007, he came from behind his bench and grabbed Strawn's breast. She demanded that he stop and reported the incident to her supervisor. Strawn changed her routine and would not go to the defendant's office without another person accompanying her. Nevertheless, he continued, however, to request hugs, which **[*10]** were refused. The plaintiff talked with a female colleague of the defendant, Judge Mills, about the situation. She was advised by Judge Mills that others had complained and had been fired or let go.

In the case at bar, the evidence shows that the defendant, in his capacities as Chair of the Juvenile Board and as a state judge, interacted with the plaintiffs on a regular basis as a supervisor in either or both capacities. Starting in 2007, the defendant began engaging the plaintiffs to give him hugs after meetings that he scheduled with them or that were necessary to their job performance. These meetings were conducted in the privacy of the defendant's office and concerned either the business of the court and/or the business of the Juvenile Board.

The requests of the defendant progressed from a request to engage in a simple side hug to frontal "bear"-like hugs. In his testimony, the defendant freely admits that he "popped" [with his hand] one or more of the plaintiffs on the buttocks, and that he, on at least one occasion, sent a pornographic email to at least one of the plaintiffs. When the plaintiffs requested that he cease the conduct, he refused. The plaintiffs soon learned that they, **[*11]** as individuals, were not the only employees subjected to this conduct. They took the matter to another judge, a female colleague of the defendant, but to no immediate avail. Shortly thereafter, however, the District Attorney was contacted and an investigation was commenced. As a result of the investigation, the defendant was charged with the offense of "official oppression by sexual harassment." See _Tex. Penal Code Ann., Sec. 39.03(c)_ (Vernon Statutes). He entered a plea of "_nolo contendere_" to the charge.

The Court is of the opinion that the evidence at trial was sufficient to overcome the defendant's insufficient evidence claims. Considering the totality of the evidence, the Court opines that the facts and inferences to be drawn strongly support the plaintiffs' claims and

that a reasonable jury would determine that the plaintiffs belonged to a protected class, that they were subjected to unwelcomed sexual harassment, that the harassment was based on the plaintiffs' sex or gender, and that the defendant's conduct affected a term, condition or privilege of their employment. See _Green, 284 F.3d at 655_. Therefore, the defendant's contention of insufficient evidence is overruled.

## B. Sufficiency  **[*12]** of the Evidence (Hostile Work Environment)

Next, the defendant argues that the evidence fails to establish that his conduct was "severe or pervasive," relying on _Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 434 (5th Cir. 2005)_. Moreover, the evidence, argues the defendant, must be "subjectively and objectively offensive," citing _Green v. Admin'rs of the Tulane Educ. Fund, 284 F.3d at 655_.

In the Court's view, severity reaches beyond how the victim felt. It considers the damage done to the employment relationship. While the record does support the jury finding that the plaintiffs were severely and emotionally harmed by the bold and rampant conduct of the defendant, the evidence also shows that the plaintiffs could not function in their employment capacities for fear of further unwanted touching and reprisal for not cooperating. The defendant admitted that his conduct was not well received by all women. Hence, he admitted that he would consider his own conduct offensive in certain circumstances.

The Court is of the opinion that the defendant's request for a JNOV on the plaintiffs' hostile work environment claim based on insufficient evidence should be overruled. Equally, the Court's **[*13]** conclusion and ruling is the same on the defendant's contention that the plaintiffs failed to establish the he violated their "bodily integrity" under _Section 1983_. The evidence is clear that the plaintiffs were greeted with grabbing of their breasts, grabbing and stroking of their buttocks, frontal "bear" hugs, kisses and the stroking of their bodies generally during hugs. This conduct is considered violative of one's bodily integrity. See _Gonzalez v. Ysleta I.S.D., 996 F.2d 745, 750 (5th Cir. 1999)_. This contention is overruled. However, the Court is of the opinion that the punitive damage award is excessive.

It is difficult for a jury to calculate an amount to award as punitive damages to fairly and reasonably compensate a plaintiff for the damages associated with a violation of

bodily integrity. While the defendant's overall conduct caused a substantial disruption in the workplace and adversely impacted the parties' professional relationships, the award of $ 1,000,000 in punitive damages to each plaintiff is excessive. The amount of the award is 10 to 20 times the pecuniary damages award. Based on the Court's observation of the testimonies and the totality of harm that resulted, the Court is of the opinion that the punitive damage awards indicate a bias based on the defendant's status and position. While the defendant's status and position in the community merits consideration in this type case, it does not merit an excessive recovery. Therefore, a remittitur is appropriate. *See* [Texas Civil Practices and Remedies *§ 41.008(b)*]; *see also Smith v. City of Seven Points, 608 F.Supp. 458, 465 (E.D. Tex. 1985)*. An award of $ 100,000 to each plaintiff is appropriate and sufficient under the facts.

## C. The Defendant's Statute of Limitations Claim

The evidence and pleadings show that the defendant failed to plead the affirmative defense of a two-year statute of limitations. A *Section 1983* cause of action does not present a limitations issue, in and of itself. Therefore, a party may rely upon a state statute of limitations as a defense to a claim or suit. *See Stanley v. Foster, 464 F.3d 565, 568 (5th Cir. 2006)*. After the trial began, it became clear that the defendant intended to present evidence in **[*14]** support of a two (2) year statute of limitations. And, at the conclusion of the plaintiffs' case, the defendant asserted the limitations defense as a basis for a directed verdict. The Court denied the motion on the basis that the defense had not been pled, and the defense had not been tried by consent. The facts have not changed, and no excuse has been offered for the defendant's failing. The Court stands on its earlier ruling and, therefore, denies the defendant's JNOV based on this contention.

## D. State Law Claims Against the Defendant Not Barred

The defendant asserts that the plaintiffs' claim for intentional infliction of emotional distress should fail because: (a) it is barred by state law; (b) a settlement was effected between the plaintiffs and Brazoria County; and (c) there is insufficient evidence to support the verdict. Addressing these in turn, the Court is of the opinion that *Texas Civil Practices and Remedies Code § 101.106* does not bar a suit against an official in his

individual capacity. The law is clear that the plaintiffs could not sustain a suit against Brazoria County, their employer, for intentional infliction of emotional distress. *See Franka v. Velasquez, 332 S.W.3d 367 (Tex. 2011)*. **[*15]** Likewise, the plaintiffs could not sustain a Title VII suit against the defendant, as their employer.

However, every person is responsible for his individual torts unless they are covered by state law. *See Tex. Civ. Prac. & Rem. Code § 101.106*. Here, the conduct was personal and beyond the scope of the defendant's official duties. Therefore, the defendant's contention fails.

## E. Remaining Claims of Error

The defendant's contention, that a settlement by the plaintiffs with their employer under Title VII bars their *Section 1983* and state law claims against the defendant, is without merit. The two defendants, Brazoria County and Blackstock, engaged in separate and divisible conduct against the plaintiffs. Hence, the single tort, single recovery theory does not apply. This contention is also overruled.

Finally, the defendant contends that there is insufficient evidence to support the plaintiffs' state tort claim of intentional infliction of emotional distress. The Court agrees. In order for the jury verdict on this claim to stand, the evidence must establish that an event or harm occurred that exceeded [reached beyond] the harm caused by the allegation, sexual harassment, that can be quantified. **[*16]** *See Hoffmann-La Roche Inc. v. Zeltwanger,144 S.W.3d 438, 441 (Tex. 2004)*. In the case at bar, the facts presented are classic and unique, to sexual harassment. Hence, there is no evidence of aggravation that supports a separate independent tort. Therefore, the Court sustains the defendant's motion for JNOV on this contention.

The Court GRANTS the defendant's motion for JNOV on the plaintiffs' state law tort claim and DENIES the motion on the remaining claims.

It is so ORDERED.

SIGNED at Houston, Texas this 16th day of September, 2011.

/s/ Kenneth M. Hoyt

Kenneth M. Hoyt

2011 U.S. Dist. LEXIS 105212, *16

United          States          District          Judge

2011 U.S. Dist. LEXIS 105212, *16

**Table1** (*Return to related document text*)

| a. Mikki Kalina | Yes |
| b. Estella "Christy" Strawn | Yes |
| c. Rebecca "Becky" Sirmans | Yes |

**Table1** (*Return to related document text*)

---

**Table2** (*Return to related document text*)

| a. Mikki Kalina | Yes |
| b. Estella "Christy" Strawn | Yes |
| c. Rebecca "Becky" Sirmans | Yes |

**Table2** (*Return to related document text*)

---

**Table3** (*Return to related document text*)

| a. Mikki Kalina | Yes |
| b. Estella "Christy" Strawn | Yes |
| c. Rebecca "Becky" Sirmans | Yes |

**Table3** (*Return to related document text*)

---

**Table4** (*Return to related document text*)

| a. Mikki Kalina | $ 50,000 |
| b. Estella "Christy" Strawn | $ 100,000 |
| c. Rebecca "Becky" Sirmans | $ 50,000 |

**Table4** (*Return to related document text*)

---

**Table5** (*Return to related document text*)

| a. Mikki Kalina | Yes |
| b. Estella "Christy" Strawn | Yes |
| c. Rebecca "Becky" Sirmans | Yes |

**Table5** (*Return to related document text*)

---

**Table6** (*Return to related document text*)

| a. Mikki Kalina | $ 1,000,000 |
| b. Estella "Christy" Strawn | $ 1,000,000 |
| c. Rebecca "Becky" Sirmans | $ 1,000,000 |

**Table6** (*Return to related document text*)

2011 U.S. Dist. LEXIS 105212, *16

---

**End of Document**

No *Shepard's* Signal™
As of: December 10, 2022 3:01 PM Z

# *K.J.P. v. Cnty. of San Diego*

United States District Court for the Southern District of California

August 16, 2022, Decided; August 17, 2022, Filed

Case No.: 3:15-cv-02692-H-MDD

**Reporter**
2022 U.S. Dist. LEXIS 221068 *

K.J.P., a minor; and K.P.P., a minor; individually, by and through their mother; LOAN THI MINH NGUYEN, who also sues individually and as successor in interest to her now deceased husband, Lucky Phounsy, Plaintiffs, v. COUNTY OF SAN DIEGO; and RICHARD FISCHER, Defendants.

## Core Terms

training, Plaintiffs', ambulance, video, maximum, damages, excessive force, use of force, breathing, new trial, constitutional right, failure to train, restrained, qualified immunity, sheriff's deputy, resistance, discovery, pain and suffering, paramedics, reasonable jury, instruction of a jury, use excessive force, wrongful death, firefighter, rights, jury instructions, district court, blood, objected, parties

**Counsel: [*1]** For K.J.P., a minor, individually, by and through their mother, Loan Thi Minh Nguyen, Loan Thi Minh Nguyen, who also sues individually and as successor in interest to her now deceased husband, Lucky Phounsy, Plaintiffs: Gerald B. Singleton, LEAD ATTORNEY, Kimberly Sue Trimble, Singleton Schreiber, LLP, San Diego, CA USA; Mark F Fleming, LEAD ATTORNEY, Law Offices of Mark F Fleming, Encinitas, CA USA; Timothy A. Scott, LEAD ATTORNEY, Marcus S. Bourassa, McKenzie Scott PC, San Diego, CA USA; John C. Burton, The Law Offices of John Burton, Pasadena, CA USA.

For K.P.P., a minor, individually, by and through their mother, Loan Thi Minh Nguyen, Plaintiff: Gerald B. Singleton, LEAD ATTORNEY, Kimberly Sue Trimble, Singleton Schreiber, LLP, San Diego, CA USA; Timothy A. Scott, LEAD ATTORNEY, Marcus S. Bourassa, McKenzie Scott PC, San Diego, CA USA; John C. Burton, The Law Offices of John Burton, Pasadena, CA USA.

For San Diego, County of, Defendant: Juan Fernando Kish, LEAD ATTORNEY, County Counsel, San Diego, CA USA; Morris G Hill, Ronald Lenert, LEAD ATTORNEYS, County of San Diego Office of County Counsel, San Diego, CA USA; Sylvia Soliman Aceves, LEAD ATTORNEY, Office of County Counsel, San **[*2]** Diego, CA USA; Jeffrey Patrick Michalowski, Paul, Plevin, Sullivan & Connaughton LLP, San Diego, CA USA.

For San Diego County Sheriff's Department, Defendant: Juan Fernando Kish, LEAD ATTORNEY, County Counsel, San Diego, CA USA; Morris G Hill, Ronald Lenert, LEAD ATTORNEYS, County of San Diego Office of County Counsel, San Diego, CA USA.

For Richard Fischer, Sheriff's Department deputy (#3003), Defendant: Mildred K. O'Linn, LEAD ATTORNEY, Manning & Kass, Ellrod, Ramirez, Trester LLP, Los Angeles, CA USA; Sylvia Soliman Aceves, LEAD ATTORNEY, Office of County Counsel, San Diego, CA USA; Scott W. Davenport, Manning & Kass, Los Angeles, CA USA; Steven Jeff Renick, Manning & Marder Kass Ellrod Ramirez LLP, Los Angeles, CA USA.

**Judges:** MARILYN L. HUFF, United States District Judge.

**Opinion by:** MARILYN L. HUFF

## Opinion

**ORDER**:

**(1) DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO *FEDERAL RULE OF CIVIL PROCEDURE 50(b)*; AND**

[Doc. No. 552.]

2022 U.S. Dist. LEXIS 221068, *2

**(2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR A NEW TRIAL PURSUANT TO** *FEDERAL RULE OF CIVIL PROCEDURE 59*

[Doc. No. 551.]

On April 14, 2022, Defendants County of San Diego and Richard Fischer (collectively, "Defendants") filed two post-trial motions: (1) a motion for judgment as a matter of law pursuant to *Federal Rule of Civil Procedure 50(b)*; and (2) a motion **[*3]** for a new trial pursuant to *Federal Rule of Civil Procedure 59*. (Doc. Nos. 551, 552.) On April 15, 2022, the Court issued a scheduling order setting a briefing schedule on Defendants' post-trial motions. (Doc. No. 554.) On May 9 and 11, 2022, Plaintiffs K.J.P., K.P.P., and Loan Thi Mihn Nguyen (collectively, "Plaintiffs") filed an opposition to Defendants' post-trial motions. (Doc. Nos. 563, 564.) On May 23, 2022, Defendants filed their replies. (Doc. Nos. 568, 569.) On June 13, 2022, the Court held a hearing on Defendants' post-trial motions. (Doc. No. 576.) Mildred K. O'Linn, Ronald Lenert, Sylvia Soliman Aceves, Jeffrey Patrick Michalowski, and Steven Jeff Renick appeared on behalf of Defendants. Mark F. Fleming, Timothy A. Scott, Kimberly Sue Trimble, and Marcus S. Bourassa appeared on behalf of Plaintiffs. For the reasons that follow, the Court denies Defendants' motion for judgment as a matter of law and grants in part and denies in part Defendants' motion for a new trial.

**Background**

**I. Introduction**

This case arises out of the death of Lucky Phounsy, a thirty-two-year-old husband, son, and father of two small children. On April 13, 2015, Mr. Phounsy experienced a mental health crisis. Mr. Phounsy called 9-1-1 for **[*4]** help, and San Diego County Sheriff's deputies responded. During the approximately forty-five-minute altercation that followed between Mr. Phounsy and the sheriff's deputies, Mr. Phounsy was tased multiple times, punched, handcuffed, put in maximum restraints, strapped to a gurney, and had prolonged pressure applied to his head and torso. (Doc. Nos. 499, Tr. I-198-99, 271; 535, II-67; 537, V-200-02, 249-55, 198-99, 221-25; 539, VII-177-78; 541, VIII-263-65, 268, 270.) While in the ambulance to the hospital, Mr. Phounsy went into cardiac arrest and coded. (Tr. II-151; Doc. No. 536, III-

106.) Mr. Phounsy remained in a coma at the hospital for several days until his family made the decision to remove him from life support. (Tr. III-229.) Following Mr. Phounsy's death, Mr. Phounsy's wife, Loan Nguyen, and their two children, K.J.P. and K.P.P., filed the present action alleging, among other claims, that San Diego County Sheriff deputy Defendant Fischer used excessive force against Mr. Phounsy resulting in his death and that the County failed to train its deputies under *Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 691 (1978)*.

On March 2, 2022, almost seven years after Mr. Phounsy's death, a jury of eight individuals representing a cross section **[*5]** of the San Diego community were impaneled to try this case. Throughout the trial, each juror thoughtfully listened to the evidence and arguments presented by both sides. The jury eventually returned a unanimous verdict in favor of Plaintiffs on all claims, awarding $5 million for Mr. Phounsy's mental, physical, and emotional pain and suffering and $80 million to the family Mr. Phounsy left behind for their loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, and guidance. Ultimately, Mr. Phounsy's death was a tragedy that left two small children without a father and a young mother forced to raise them on her own. The jury's verdict reflected that loss.

**II. Procedural History** [1]

On March 2, 2022, the case proceeded to a jury trial. (Doc. No. 495.) Pursuant to the pretrial order, the trial proceeded on the following claims: (1) *42 U.S.C. § 1983* excessive force claim by Mr. Phounsy's successor in interest against Defendant Fischer; (2) *42 U.S.C. § 1983* Monell claim by Mr. Phounsy's successor in interest against the County; (3) violation of *California's Bane Act, Cal. Civ. Code § 52.1*, by Mr. Phounsy's successor in interest against Defendant Fischer; (4) negligence by Mr. Phounsy's successor in interest **[*6]** against Defendant Fischer; and (5) wrongful death, Cal. Civ. Proc. Code § 337.60, by Plaintiffs Loan Nguyen, K.J.P., and K.P.P. against Defendant Fischer and the County. (Doc. No. 493 at 3-12.) The Court also bifurcated the determination of the amount of punitive damages if the jury were to make a finding that Defendants' conduct was malicious, oppressive, or in reckless disregard to

---

[1] See Doc. Nos. 171 and 488 for a detailed summary of this case's lengthy procedural history.

2022 U.S. Dist. LEXIS 221068, *6

Mr. Phounsy's rights. (Id. at 78-79.)

On March 8, 2022, Defendants made an oral Rule 50(a) motion for judgment as a matter of law, and on March 10, 2022, Defendants file a written Rule 50(a) motion. (Doc. Nos. 513, 517.) On March 14, 2020, the parties concluded closing arguments, and the jury began deliberations. (Doc. No. 524.)

On March 15, 2016, the jury returned the verdict, and the jurors were polled. (Doc. No. 525.) The jury unanimously found for Plaintiffs on all claims. (Id.; see also Doc. Nos. 532, 533.) Specifically, on Claim I § 1983 excessive force, the jury found by a preponderance of the evidence that Defendant Fischer used excessive force against Mr. Phounsy in violation of the Fourth Amendment; that Defendant Fischer's excessive force was the cause of Mr. Phounsy's death; and that Defendant Fischer's excessive force was malicious, oppressive, or done in reckless [*7] disregard for Mr. Phounsy's right to be free from excessive force. (Doc. No. 532 at 2.)

On Claim II § 1983 Monell failure to train, the jury found by a preponderance of the evidence that one or more San Diego County Sheriff's deputies violated Mr. Phounsy's right to be free from excessive force, that the violation of Mr. Phounsy's constitutional rights was a foreseeable result of a failure to train by the County to avoid violating a constitutional right to be free from excessive force, and that the County's failure to train caused injury to Mr. Phounsy. (Id. at 3.) The jury listed Defendant Fischer and dismissed Defendant Collins as the sheriff's deputies who violated Mr. Phounsy's constitutional rights. (Id.)

On Claim III Bane Act, the jury found by a preponderance of the evidence that Defendant Fischer acted violently against Mr. Phounsy, that Defendant Fischer intended to deprive Mr. Phounsy of his right to be free from excessive force or acted in reckless disregard of Mr. Phounsy's right to be free from excessive force, and that Defendant Fischer's conduct was a substantial factor in causing harm to Mr. Phounsy. (Id. at 4.) The jury also found by clear and convincing evidence that Defendant [*8] Fischer's conduct was malicious or oppressive. (Id.)

On Claim IV negligence, the jury found by a preponderance of the evidence that one or more San Diego County Sheriff's deputies were negligent on April 13, 2015. (Id. at 5.) The jury listed Defendant Fischer and dismissed Defendants Collins, Ralph, and Allen as the Sheriff's deputies who were negligent. (Id. at 5.) The

jury found by a preponderance of the evidence that the negligence of one or more San Diego County Sheriff's deputies on April 13, 2015 was a substantial factor in causing harm to Mr. Phounsy. (Id.) The jury also found by a preponderance of the evidence that Mr. Phounsy was not negligent. (Id.) Finally, the jury assigned the following percentage of responsibility for negligence:

> Richard Fischer: 20%
> Other Sheriff's deputies: 70% (Specify Names(s): Collins, Allen, Ralph)[2]
> Lucky Phounsy: 0%
> Other: 10% (Specify Name(s): Paramedic Firefighters Poynter, Hackett)

(Id.)

On Claim V wrongful death, the jury found by a preponderance of the evidence that Mr. Phounsy's death was caused by the violation of one or more of his constitutional rights, and that Mr. Phounsy's death was caused by the negligence of one or more San Diego County Sheriff's [*9] deputies. (Id. at 6.)

The jury awarded $2 million in damages for the mental, physical, and emotional pain and suffering experienced by Mr. Phounsy up until the time he was placed in the ambulance and $3 million in damages for the mental, physical, and emotional pain and suffering experience by Mr. Phounsy from the ambulance until the time of his death. (Id. at 7.) The jury also awarded K.J.P., K.P.P., and Loan Nguyen a total of $20 million in damages for the loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, and guidance from April 20, 2015 through the present and $60 million in damages for the loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, and guidance for the future. (Id.)

The jury found Defendant Fischer acted maliciously, oppressively, or in reckless disregard to Mr. Phounsy's rights for both Plaintiffs' excessive force and Bane Act claims. (Id. at 2, 4.) The Court directed the jury to return

_____

[2] When the jury first returned the verdict on March 15, 2022, the jury also included dismissed Defendants Billy Tennison III and Aaron Brooke in the list of Sheriff's deputies responsible for 70% of the negligence in Subsection E but did not list them as deputies who were negligent on April 13, 2015 in Subsection A. (Doc. No. 544, Tr. XI-6.) On March 16, 2022, at Defendants' request, the Court requested the jury clarify this inconsistency. (Doc. No. 526.) The jury unanimously decided to remove deputies Tennison and Brooke from Subsection E. (Doc. No. 532 at 5.)

2022 U.S. Dist. LEXIS 221068, *9

the following day to proceed to the punitive damages stage. (Doc. No. 525.) After the jurors were dismissed for the day, Plaintiffs and Defendant Fischer stipulated **[*10]** to $10,000 in punitive damages. (Doc. No. 543, Tr. X-27-29.) On March 16, 2022, the Court notified the jury that Plaintiffs and Defendant Fischer had reached a stipulation on punitive damages. (Doc. No. 526.) After consultation with the parties, the Court also asked the jury to reconcile an inconsistency in the verdict form.[3] (Id.) After the jury reconciled the inconsistency, the Court polled the jury again. (Doc. No. 526.)

On April 14, 2022, Defendants filed the present post-trial motions. (Doc. Nos. 551, 552.) On May 2, 2022, the Court granted Defendants' motion to waive the requirement for a supersedeas bond and stay enforcement of judgment until after the post-trial motions were resolved. (Doc. Nos. 547, 558, 560.) On May 9 and 11, 2022, Plaintiffs filed an opposition to the present motions. (Doc. Nos. 563, 564.) On May 23, 2022, Defendants replied. (Doc. Nos. 568, 569.) On June 13, 2022, the Court held a hearing on Defendants' post-trial motions. (Doc. No. 576.)

### Discussion

### I. Legal Standards

### A. Motion for Judgment as a Matter of Law Pursuant to *Rule 50(b)*

Under *Federal Rule of Civil Procedure 50(b)*, "[n]o later than 28 days after the entry of judgment...the movant may file a renewed motion for judgment as a matter of law **[*11]** and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Fed. R. Civ. P. 50(b)(1)-(3).*

"The standard for judgment as a matter of law . . . 'mirrors' the summary judgment standard." *Reed v. Lieurance, 863 F.3d 1196, 1204 (9th Cir. 2017)* (citing *Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)*). "Judgment as a matter of law is proper if

the evidence, construed in the light most favorable to the non-moving party, allows only one reasonable conclusion." *Headwaters Forest Def. v. Cnty. of Humboldt, 240 F.3d 1185, 1197 (9th Cir. 2000)* (citations omitted) (vacated on other grounds); see also *Jorgensen v. Cassiday, 320 F.3d 906, 917 (9th Cir. 2003).* "[I]n entertaining a motion for judgment as a matter of law, the court should review all the evidence in the record." *Reeves, 530 U.S. at 150.* The court "may not make credibility determinations or weigh the evidence" but instead "must draw all reasonable inferences in favor of the nonmoving party." *Velazquez v. City of Long Beach, 793 F.3d 1010, 1018 (9th Cir. 2015)* (quoting *Reeves, 530 U.S. at 150*).

### B. Motion for a New Trial Pursuant to *Rule 59*

Pursuant to *Federal Rule of Civil Procedure 59*, a district court "may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." *Fed. R. Civ. P. 59(a)(1)(A).* "Rule 59 does not specify the grounds on which a motion for **[*12]** a new trial may be granted." *Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007)* (quoting *Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1035 (9th Cir. 2003)*). Instead, district courts in the Ninth Circuit are "bound by the grounds that have been historically recognized." Id. "Historically recognized ground include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" Id. (quoting *Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940)*). A district court "may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." Id. (quoting *Passantino v. Johnson & Johnson Consumer Prods., 212 F.3d 493, 510 n.15 (9th Cir. 2000)*). In considering a Rule 59 motion, courts are "not required to view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd., 762 F.3d 829, 842 (9th Cir. 2014).* A district court's grant or denial of a motion for a new trial under Rule 59(a) is reviewed for an abuse of discretion. See *Claiborne v. Blauser, 934 F.3d 885, 893 (9th Cir. 2019)*; *Molski, 481 F.3d at 728.*

---

[3] See supra note 2.

2022 U.S. Dist. LEXIS 221068, *12

## II. Defendants' *Rule 50(b)* Motion for Judgment as a Matter of Law

Defendants move for judgment as a matter of law pursuant to Rule 50(b) arguing that the jury's findings in favor of Plaintiffs on all claims was not supported by substantial evidence. (Doc. No. 552-1.) **[*13]** Plaintiffs oppose. (Doc. No. 563.) The Court concludes that substantial evidence supported the jury's findings.

## A. Plaintiffs' Excessive Force Claim Against Defendant Fischer

Defendants argue that there was not substantial evidence to support the jury's finding Defendant Fischer used excessive force in violation of Mr. Phounsy's Fourth Amendment rights. (Doc. No. 552-1 at 2.) The Court disagrees.

"Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances." *LaLonde v. Cnty. of Riverside, 204 F.3d 947, 959 (9th Cir. 2000)* (citing *Graham v. Connor, 490 U.S. 386, 397 (1989)*). "In assessing the objective reasonableness of a particular use of force, we consider: (1) 'the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted,' (2) 'the government's interest in the use of force,' and (3) the balance between 'the gravity of the intrusion on the individual' and 'the government's need for that intrusion.'" *Rice v. Morehouse, 989 F.3d 1112, 1121 (9th Cir. 2021)* (quoting *Lowry v. City of San Diego, 858 F.3d 1248, 1256 (9th Cir. 2017)*).

In evaluating the type and amount of force inflicted, "the nature and degree of physical contact are relevant . . . as are the risk of harm and the actual harm experience." *Williamson v. City of Nat'l City, 23 F.4th 1146, 1152 (9th Cir. 2022)* (citations omitted). In evaluating the government's interest, a district court must consider "(1) how severe the crime at issue was, (2) whether **[*14]** the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id. at 1153* (quoting *Rice, 989 F.3d at 1121*) (internal quotation marks omitted). The most important factor is whether the suspect posed an immediate threat. See *Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011)* (en banc). Other factors relevant in evaluating if the use of force is objectively reasonable include "the availability of less intrusive alternatives to the force

employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington Cnty., 673 F.3d 864, 872 (9th Cir. 2011)* (citations omitted); see also *Deorle v. Rutherford, 272 F.3d 1272, 1283 (9th Cir. 2001)*. "Where an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or should have accurately perceived that fact." *Torres v. City of Madera, 648 F.3d 1119, 1124 (9th Cir. 2011)* (citing *Jensen v. City of Oxnard, 145 F.3d 1078, 1086 (9th Cir. 1998)*).

Viewing the facts in the light most favorable to Plaintiffs, and drawing all reasonable inferences in their favor, substantial evidence was presented at trial to support the jury's conclusion that Defendant Fischer used excessive force against Mr. Phounsy in the ambulance. See *Shafer v. Cnty. of Santa Barbara, 868 F.3d 1110, 1115 (9th Cir. 2017)* (internal quotation marks and citation omitted) ("Because this appeal **[*15]** comes after the jury's verdict, we must construe the facts in the light most favorable to the jury's verdict—in this case, in favor of the Plaintiffs."). First, Defendant Fischer's own testimony indicated that the amount of force he used on Mr. Phounsy in the ambulance was great. See *Rice, 989 F.3d at 1121*. Defendant Fischer testified that as soon as he got into the back of the ambulance with Mr. Phounsy and the firefighter paramedics, he put both of his hands on Mr. Phounsy's head and pushed down as hard as he could with "9 out of 10 pressure" for approximately six minutes. (Tr. I-271; II-67.) Defendant Fischer testified that while his hands were on Mr. Phounsy's head, he learned Mr. Phounsy had coded. (Tr. I-286.) Defendant Fischer never attempted to have any verbal communication with Mr. Phounsy during the entire ambulance ride to check if Mr. Phounsy was okay. (Tr. I-280.) Defendant Fischer testified that he stood up while continuing to apply pressure on Mr. Phounsy. (Tr. I-271-72.) Defendant Fischer is over six feet tall and weighed 225 pounds at the time of the incident. (Tr. I-197, 274.) Both Plaintiffs' medical experts, Dr. Thrush and Dr. Sperry, provided opinions that the force used by Defendant **[*16]** Fischer in the ambulance contributed to Mr. Phounsy's death. (Tr. II-187; Tr. III-5.) As a result, substantial evidence was presented that the amount of force Defendant Fischer used on Mr. Phounsy in the ambulance was great.

Second, by the time Defendant Fischer applied force on Mr. Phounsy's head in the ambulance, the government's interest in the use of such force was low. See *Rice, 989 F.3d at 1121*. Mr. Phounsy called 9-1-1 for help. (Tr. III-

2022 U.S. Dist. LEXIS 221068, *16

206.) Although Mr. Phounsy had fought with the sheriff's deputies earlier that night, the most important factor is whether he posed an immediate threat to the officers or others at the time of the application of force. See *Graham, 490 U.S. at 396*; *Mattos, 61 F.3d at 440*; *Alexander v. City & Cnty. of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1995)* ("[I]t is the need for force which is at the heart of the consideration of the *Graham* factors."). Substantial evidence was presented at trial that by the time Mr. Phounsy was placed in the ambulance with Defendant Fischer and the firefighter paramedics, "the need for more forced [had] waned as circumstances changed." *Hyde v. City of Willcox, 32 F.4th 863, 871 (9th Cir. 2022)*. Defendant Fischer testified that Mr. Phounsy was strapped to a gurney with thick, secure straps around his chest, and was still in maximum restraints and handcuffs when he was placed in the back of the ambulance. (Tr. I-262-63, 276-77; **[*17]** II-61-62.) Photographic evidence of Mr. Phounsy's condition before he was placed in the ambulance also supported the conclusion that "the need for more forced [had] waned." (See Attachment A); *Hyde, 32 F.4th at 871*. Thus, a reasonable jury could conclude that Mr. Phounsy was fully restrained in the ambulance. See *Hyde, 32 F.4th at 863* ("[W]e have never required that a suspect's ever inch be immobilized before he is considered restrained for a reasonable force analysis. To the contrary, out cases routinely call suspects 'restrained' after they have been handcuffed...or simply pinned down by officers.").

Furthermore, by the time Mr. Phounsy was placed in the ambulance, Mr. Phounsy had been in handcuffs and maximum restraints for approximately thirty minutes and had been administered two doses of Versed, a sedative. (Tr. I-198-99; I-252.) As such, a reasonable jury could conclude "it was no longer a frantic and fast-evolving situation requiring officers to make split-second decisions." *Hyde, 32 F.4th at 871*. In fact, Defendant Fischer testified that he had never seen someone break out of maximum restraints during his entire time working for the San Diego County Sheriff's Department. (Tr. I-268.) Plaintiffs' use of force expert, Mr. DeFoe, also provided **[*18]** the opinion at trial that "[i]t was absolutely unnecessary to push down on his head with a 9 to 10 -- what he describes 9 out of 10 or 90 percent of the strength of 220 pounds when someone[]s hogtied in a partially supine position on his back . . . " (Doc. No. 546, Tr. IV-223-24.) In sum, substantial evidence was presented at trial that the government's interest in using force against Mr. Phounsy in the ambulance was low. Thus, when viewing the evidence presented in the light most favorable to Plaintiffs, a reasonable jury could

"balance . . . the gravity of the intrusions . . . and the government's need" and conclude that the force Defendant Fischer used on Mr. Phounsy in the ambulance was excessive. *Rice, 989 F.3d at 1121* (internal quotation marks omitted).

The Court rejects Defendants' argument that Plaintiffs did not offer evidence to refute Defendant Fischer's testimony that he only applied force to Mr. Phounsy in response to Mr. Phounsy's resistance. (Doc. No. 552-1 at 3-4.) Taking the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that Mr. Phounsy was severely battered and nearly unconscious prior to being placed in the ambulance and therefore not capable of meaningfully **[*19]** resisting Defendant Fischer. Both Plaintiffs' medical expert, Dr. Thrush, and use of force expert, Mr. DeFoe, provided testimony that could support the conclusion that any movement by Mr. Phounsy in the ambulance was not resistance, but Mr. Phounsy's attempt to breathe. (Tr. II-187; IV-191.) During Mr. Phounsy's initial interaction with the Sheriff's deputies, Mr. Phounsy was punched, hit with a baton, and tased multiple times. (Tr. V-249-55, 198-99, 221-25; VII-177-78; VIII-263-65, 268, 270.) Mr. Phounsy was then placed in handcuffs and maximum restraints by several deputies, including Defendant Fischer. (Tr. I-199; V-200-02.) After being restrained, Mr. Phounsy was held down by several deputies inside the house and outside on the driveway for approximately thirty minutes. (Tr. I-198-99; I-252.) While restrained in the driveway, Mr. Phounsy was also given two doses of Versed. (Doc. No. 538, Tr. VI-71, VIII-61, 73.) At trial, Defendant Fischer admitted that Mr. Phounsy looked like he did in Exhibit 72 before Defendant Fischer used force on him. (Tr. I-263, 265; Attachment A.) A reasonable jury could conclude from the photographic evidence[4] and the record that Mr. Phounsy's

---

[4] This case also illustrates the importance of policies requiring the use of body-worn cameras by law enforcement. When the present incident occurred in 2015, San Diego County Sheriff's deputies did not have body-worn cameras. As a result, there was no video evidence of the altercation between Mr. Phounsy and the Sheriff's deputies. The only visual evidence from that night were still photographs taken by one of the Sheriff's deputies on scene, only a few of which were of Mr. Phounsy. Five of those photographs are attached to this order. (Attachment A.) The lack of video evidence in the present case created a challenge for the jurors to piece together what happened seven years ago between Mr. Phounsy and the Sheriff's deputies largely from the still photographs and the memories of individuals present. Since this incident occurred, the San Diego County Sheriff's Department has adopted the

demeanor [*20] prior to being placed in the ambulance was inconsistent with active resistance. (See Attachment A; Exs. 69-70, 72-73.)

Further, evidence presented at trial by both Plaintiffs' and Defendants' witnesses also supported the conclusion that Mr. Phounsy was not capable of offering meaningful resistance in the ambulance. Plaintiffs' medical expert, Dr. Sperry, testified there was evidence Mr. Phounsy had cyanosis prior to being placed in the ambulance. (Tr. III-16-17; Attachment A.) Dr. Sperry testified that:

> Cyanosis is the appearance on someone[]s skin and, notably, their fingernail beds and their lips especially, where there is a bluish discoloration which denotes a very -- a low oxygen level in the blood, and that is how visually, well, a doctor or a paramedic, anybody can see that and understand the relevance, but even anybody else can see blue lips or blue fingernail beds. That means there is inadequate level of oxygen in the blood.

(Tr. III-14.) Evidence was presented at trial that the firefighter paramedics gave Mr. Phounsy two doses of Versed before he was put in the ambulance. (Tr. VI-71; VIII-61, 73.) Dr. Sperry testified that the toxicology report indicated Mr. Phounsy did not have [*21] Versed in his system, which Dr. Sperry testified indicated that:

> . . . at and around and shortly after the time the Versed was given to him, was injected to him, his circulation was impaired. That is, his heart was not beating and adequately and pumping blood throughout the body, which is what then would allow the Versed to get in the blood and carry it elsewhere. Most of really, if one could measure it, would still be in the area of muscle around where the injections were given. So, none of it -- none of the Versed made it into the blood because the heart was not working properly, and the blood then could not pick up the drug and carry it to other parts of the body and be measured.

(Tr. III-21.) Dr. Sperry further testified that the cyanosis and lack of Versed in Mr. Phounsy's blood indicated Mr. Phounsy was "already suffering low oxygen levels before Fischer did what he did." (Tr. III-19.)

Plaintiffs' medical expert, Dr. Thrush, testified that when Mr. Phounsy "got into the ambulance, his mental status

---

use of body-worn cameras. This policy change is an important step in both protecting officers who are often placed in the difficult position of making split-second decisions in dangerous situations and holding officers accountable who overstep their authority, like the jury concluded as to Defendant Fischer.

wasn't normal. His vital signs were not normal." (Tr. II-181.) Dr. Thrush also testified that there was evidence that Mr. Phounsy was suffering from cyanosis when he was placed in the [*22] ambulance. (Tr. II-181-82.) Specifically, Dr. Thrush testified:

> His lips appear quite cyanotic to me. And if you see the -- the tip of his ear, his right ear, the downward ear is cyanotic or bluish as well. You see a little bit of his cheek you see the same coloration at the very top of the -- the screen just by the top of his left ear. And if you compare this in particular with either other people on scene with a similar skin tone or compare it with Mr. Phounsy himself as he's intubated on the ventilator where he has good oxygenation, the -- this is very different than that appears, and this appears to me consistent with cyanosis.

(Tr. II-181-82; Attachment A.) Dr. Thrush further testified that there was no trace of Versed in Mr. Phounsy's toxicology screening, (Doc. No. I-222-23), which Dr. Thrush stated indicated that Mr. Phounsy's:

> ...blood flow state was probably very very low. His blood pressure was not measured in the field. It was probably very very extremely low. He had a high catecholamine state or construction of his blood vessels so that they didn't pick up the -- the drug and transport it. If it was a urine test, I would say, well, maybe it didn't get excreted because blood [*23] flow to the kidney was very very low, but this was a blood test, you see. So, my impression, in the driveway, he was very very sick. He was, by this evidence, near death already before he got into the ambulance, and, you know, the trip in the ambulance unfortunately, it was not good, as we discussed.

(Tr. II-224.)

Firefighter paramedic Aaron Bagley, who was present on scene at the incident, was asked to examine a photograph of Mr. Phounsy taken shortly before he was placed in the ambulance, (Attachment A, Ex. 70), and testified:

Q: I want you now to look at his lips.

A: Okay.

Q: Knowing what you now know, wouldn't you agree that this picture shows evidence that this man was lacking oxygen when this picture was taken?

A: So his lips appear to be cyanotic, a little. They appear to be somewhat cyanotic. So, according to this picture, potentially, yes.

Q: All right. You admit now under oath that this man

appears to be cyanotic in this picture?
A: In this picture, just based on his lips, yes, that the lips appear somewhat cyanotic. So there's a lot of tools we use to determine that, but just according to the way his lips look, I'd say they look blue to me.

(Tr. VII-118.) Evidence was also presented **[*24]** at trial that Mr. Phounsy was not given oxygen in the ambulance. (Tr. VI-42, VI-83.)

Finally, a reasonably jury could accept the admitted deposition testimony of Defendant Fischer at trial that Mr. Phounsy never actually struck or kicked or attempted to strike or kick Defendant Fischer or any of the other deputies. (Doc. No. 563 at 9.) A reasonable jury could also accept the admitted deposition testimony of Defendant Fischer at trial that he did not check whether Mr. Phounsy's restraints were correctly applied in the ambulance or whether Mr. Phounsy could breathe in the restraints. (Id. at 10.) Similarly, a reasonable jury could accept Defendant Fischer's admitted deposition testimony at trial that he applied downward pressure on the right side of Mr. Phounsy's head with both hands and that he was holding Mr. Phounsy's head down with "a good 9 to 10" pressure. (Id. at 11.)

Defendants also argue that the firefighter paramedics present in the ambulance corroborated Defendant Fischer's testimony. (Doc. No. 552-1 at 3-4.) However, during the ambulance ride, the firefighter paramedics repeatedly asked Defendant Fischer whether Mr. Phounsy was resisting, (Tr. VI-87-88), and so a reasonable **[*25]** jury could conclude that the paramedics' accounts of Mr. Phounsy's resistance were based on misinformation Defendant Fischer told them. Further, the testimony of Defendant Fischer and the firefighter paramedics contradicted each other. Defendant Fischer testified that, "after approximately six minutes of downward pressure, [Mr. Phounsy] stopped resisting. So, I released the pressure, keeping my hands over his head in case he started up again. About a minute — one or two minutes later, we learned [Mr. Phounsy] had coded." (Tr. I-286.) However, firefighter paramedic Marc Poynter testified that Defendant Fischer "was holding [Mr. Phounsy's] shoulders and his head on the gurney in place" for the entire ambulance ride. (Tr. VIII-96, 106.) Firefighter paramedic Aaron Hackett testified that Defendant Fischer "was pressing down on both the torso and the head for the majority of the ride." (Tr. VI-86-87.) The firefighter paramedics also testified that Defendant Fischer continued to hold Mr. Phounsy down even after the firefighter paramedics could see Mr. Phounsy had "stopped moving" and

started grinding his teeth, which indicated Mr. Phounsy was suffering from cardiac arrest. (Tr. VIII-106.) **[*26]** Finally, the jury heard testimony from the firefighter paramedics that they were previously defendants in this case, (Tr. VI-79-80, 94), and the record reflects that the firefighter paramedics settled their claims with Plaintiffs while on interlocutory appeal. (Doc. Nos. 208, 211-13, 215-16, 218-19, 221, 223, 225-26, 229, 233, 235, 244, 245.)

Finally, the Court disagrees with Defendants' argument that "[P]laintiffs offered no evidence that Fischer's actions in the ambulance were a substantial factor in causing injury or death." (Doc. No. 552-1 at 3.) At trial, Dr. Thrush provided the opinion that:

Mr. Phounsy died from complications of cardiopulmonary arrest, brain death, and multi-organ failure. This was caused by him not being able to breathe enough moving oxygen into his body and $CO_2$ or carbon dioxide out of his body. And this caused the arrest, and this also caused the brain death. That is when the [b]rain doesn't get enough oxygen, it basically dies, doesn't function. Same with organs like the kidneys and liver.

(Tr. II-154.) (typo in original.) Dr. Thrush further testified:
Q: In your view, did Deputy Fischer pressing down on Mr. Phounsy contribute to Mr. Phounsy's death?

A: It did, **[*27]** and I think it did by -- by two main mechanisms. First was the restriction of breathing because Mr. Phounsy's starting point, again, wasn't to be a healthy individual by that point. He was very sick. The evidence shows that Deputy Fischer pushed down on the -- the head over the temple and the ear with a 9 out of 10 force. And, as I recall, Deputy Fischer was 220 to 225 pounds. And this would have twisted the neck. This may have and I believe likely did on an anatomic basis constrict the airway. In addition, evidence from the paramedics by their run sheet indicated that Deputy Fischer was also pushing on the torso of Mr. Phounsy.

(Tr. II-187.) Dr. Sperry also testified that:

In my opinion, [Mr. Phounsy] died as a consequence of restricted breathing. That is, during the course of the entire incident, he was unable to breathe adequately and get enough oxygen into his body and at the same time expel the carbon dioxide that had accumulated in his body, and these conditions really cause severe complications that really included his heart stopping and damage to other organs. But, ultimately, the basic cause of death was interference with his breathing or

pressure on his body that caused him **[*28]** to be able to-- well, not be able to breathe adequately. (Tr. III-5.) Dr. Thrush and Dr. Sperry both testified that the toxicology reports conducted on Mr. Phounsy's blood and urine indicated that there was marijuana, Benadryl, and trace amounts of MDMA (ecstasy) in Mr. Phounsy's system. (Tr. II-217-20; III-5-10, 12-14.) However, both Dr. Thrush and Dr. Sperry testified that, in their opinion, drug use did not contribute to Mr. Phounsy's death. (Tr. II-219; III-5-10, 12.) Accordingly, substantial evidence supported the jury's finding that Defendant Fischer used excessive force against Mr. Phounsy causing his death.

**B. Plaintiffs' Bane Act Claim**

Defendants also argue that Plaintiffs' California Bane Act claim was not supported by substantial evidence. (Doc. No. 552-1 at 20-22.) The Court disagrees.

The Bane Act provides a private cause of action against anyone who "interferes by threats, intimidation, or coercion or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by an individual or individuals of rights secured by the Constitution or laws of the United States, or laws and rights secured by the constitution or laws of California." _Cal. Civ. Code § 52.1(b)_. "[T]he elements **[*29]** of the excessive force claim under [The Bane Act] are the same as under § 1983[.]" _Reese v. Cnty. of Sacramento, 888 F.3d 1030, 1044 (9th Cir. 2018)_ (quoting _Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1105 (9th Cir. 2014)_). However, "the Bane Act [also] requires a 'specific intent to violate the arrestee's right to freedom from unreasonable seizure.'" _Reese, 888 F.3d at 1043_. To meet the specific intent standard, a defendant must have "intended not only the force, but its unreasonableness, its character as 'more than necessary under the circumstances.'" _Id. at 1045_ (quoting _United States v. Reese, 2 F.3d 870, 885 (9th Cir. 1993)_). Municipal defendants may be held vicariously liable for an officer's violation of the Bane Act. See _Cal. Gov. Code § 815.2(a)_; see also _Cameron v. Craig, 713 F.3d 1012, 1023 (9th Cir. 2013)_; _Berns v. City of Redwood City, 737 F. Supp. 2d 1047, 1065 (N.D. Cal. 2010)_.

Substantial evidence was presented at trial that Defendant Fischer used excessive force against Mr. Phounsy in the ambulance. Substantial evidence was also presented at trial that Defendant Fischer intended his use of force to be "more than necessary under the

circumstances." _Reese, 888 F.3d at 1045_. Defendant Fischer testified that he helped carry Mr. Phounsy out of the home to the driveway in the prone position along with other deputies. (Tr. I-252.) Defendant Fischer and the other deputies then put Mr. Phounsy down in the driveway in the prone position and did not immediately roll Mr. Phounsy into the recovery position. (Tr. I-252-53.) Defendant Fischer testified that he left Mr. Phounsy **[*30]** in the prone position with other deputies and accompanied another deputy to take photographs of the inside of the house. (Tr. I-257; II-60-61.) While inside the home, Defendant Fischer testified he saw another deputy's equipment on the floor. (Id.) Defendant Fischer testified he knew that equipment had got there because the deputy "was in a fight with Mr. Phounsy." (Tr. II-61.) Defendant Fischer further testified that when he accompanied Mr. Phounsy in the back of the ambulance, he knew two deputies had been taken to the hospital due to injuries they sustained from Mr. Phounsy. (Tr. I-269.) Defendant Fischer testified that he was "on extra high alert" in the ambulance "based on the circumstances of the initial fight" between Mr. Phounsy and deputies Collins and Krull. (Tr. I-269-70.) Defendant Fischer also testified that he directed one of the firefighter paramedics to put a spit sock on Mr. Phounsy's head in the ambulance even though Mr. Phounsy was not spitting on him. (Tr. I-295.) Defendant Fischer also testified that he continued to apply downward pressure on Mr. Phounsy's head with the spit sock on. (Id.) A reasonable jury could conclude from this evidence that Defendant Fischer **[*31]** acted in reckless disregard of Mr. Phounsy's rights in the ambulance in retaliation for Mr. Phounsy's actions against other deputies. As a result, substantial evidence supports the jury's finding of liability under the Bane Act.

**C. Qualified Immunity**

Defendants argue that even if Plaintiffs' evidence at trial was sufficient to prove a constitutional violation, Defendant Fischer would be entitled to qualified immunity. (Doc. No. 552-1 at 5-8.) Plaintiffs argue Defendant Fischer is not entitled to qualified immunity because he violated clearly established law under _Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052 (9th Cir. 2003)_. (Doc. No. 563 at 8-10.)

"Qualified immunity shields a police officer from liability for civil damages under section 1983 'unless the officer [violated a clearly established constitutional right.' Thus, the qualified-immunity analysis involves two prongs: (1) whether the officer's conduct violated a constitutional

2022 U.S. Dist. LEXIS 221068, *31

right, and (2) whether the right 'was clearly established at the time of the events at issue.'" *Williamson, 23 F.4th at 1151* (quoting *Monzon v. City of Murrieta, 978 F.3d 1150, 1156 (9th Cir. 2020)*). Because a reasonable jury could find Defendant Fischer used excessive force against Mr. Phounsy in violation of the Fourth Amendment, the Court turns to the second prong of qualified immunity analysis.

"A Government official's conduct **[*32]** violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable officer would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)* (alterations in original) (quoting *Anderson v. Creighton, 483 U.S. 635, 640 (1987)*). In determining whether a right was clearly established, there does not need to be "a case directly on point" but "existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna, 142 S. Ct. 4, 7-8 (2021)* (per curiam) (quoting *White v. Pauly, 137 S. Ct. 548, 551 (2017)*).

This Court and the Ninth Circuit have considered Defendant Fischer's claims of qualified immunity on multiple occasions. On April 12, 2019, on remand from the Ninth Circuit, this Court denied in part Defendants' motions for summary judgment. (Doc. No. 171.) The Court noted:

> [G]enuine issues of material fact remain as to whether Officer Fischer violated Phounsy's rights in the ambulance. Officer Fischer himself describes that he was pushing down on Phounsy's head in the ambulance with nearly full force. This poses a significant intrusion on Phounsy's rights. Factual disputes remain as to whether such a use of force was warranted and justified based on the governmental interests given the circumstances. **[*33]** Phounsy still had maximum restraints on and was handcuffed to the gurney. Phounsy had already been given two doses of a sedative. Plaintiffs' expert opines that a reasonable officer would not have applied such downward pressure on Phounsy's head.

(Id. at 18) (citations omitted). The Court concluded that Defendant Fischer was not entitled to qualified immunity because genuine issues of material fact remain as to whether Defendant Fischer violated Mr. Phounsy's constitutional rights in the ambulance and whether such rights were clearly established at the time. (Id. at 17-19.)

Defendants filed an interlocutory appeal of this Court's denial of their motion for summary judgment on the basis of qualified immunity, and, on March 31, 2020, the Ninth Circuit denied Defendants' appeal. See *K.J.P et al. v. Cnty. of San Diego, No. 19-55527, 800 Fed. Appx. 545, 546 (9th Cir. 2020)*. The Ninth Circuit held "Defendants failed to present all relevant acts in the light most favorable to Plaintiffs."[5]Id. at 2-3. On February 28, 2022, the Court again held Defendant Fischer was not entitled to qualified immunity in its denial of Defendants' Rule 50(b) from the first trial in this case. (Doc. No. 428 at 26.)

In 1989, the Supreme Court established in *Graham v. Connor* that law enforcement use of force must be calibrated **[*34]** to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *490 U.S. at 396*; see also *C.B. v. City of Sonora, 769 F.3d 1005, 1030 (9th Cir. 2014)*. As of 2011, it was clearly established that the "'most important' factor . . . is whether the suspect posed an immediate threat to officers." *Anderson v. City of Henderson, 35 F.4th 710, 716 (9th Cir. 2022)* (quoting *Mattos, 661 F.3d at 441*).

In *Drummond*, decided in 2003, the Ninth Circuit considered the *Graham* factors in the context of the application of force on a restrained individual. *343 F.3d at 1059*. The facts in *Drummond* are similar to the facts in the present case. In *Drummond*, officers responded to a call from one of Drummond's neighbors who sought help for Drummond. *Id. at 1054*. Drummond was hallucinating, in an agitated state, and endangering himself. Id. Two responding officers brought Drummond to the ground, cuffed Drummond's arms behind his back as he lay on his stomach, and placed their knees and body weight on Drummond's neck and upper torso. *Id. at 1054-55*. Drummond offered no resistance. *Id. at 1054*. Drummond told the officers he could not breath and eventually he fell into respiratory distress. *Id. at 1054-55*. The Ninth Circuit held that "squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas **[*35]** for air involves a

---

[5] The Ninth Circuit also held that "to the extent Defendants seek to challenge the district court's holding that clearly established law protected Phounsy's rights, Defendants waived those arguments by failing to advance an argument that the law was not clearly established that takes the facts in the light most favorable to Plaintiffs." *K.J.P. et al., 800 Fed. Appx. at 546*.

degree of force that is greater than reasonable." *Id. at 1059*.

The Ninth Circuit reaffirmed *Drummond* recently in *Hyde v. City of Willcox, 32 F.4th 863, 871 (9th Cir. 2022)*. In Hyde, the Ninth Circuit held officers were not entitled to qualified immunity for forced used after an individual was "subdued and restrained." *Id. at 872*. The decedent was arrested on suspicion of drunk driving and booked overnight. *Id. at 868*. The decedent suffered from mental health issues, and after not receiving his medication, sprinted out of his cell around the booking area. Id. In response, several officers tased, tackled, and struck the decedent with closed fists while other officers fasted leg irons on him. Id. The officers then handcuffed the decedent and placed him on a restraint chair. Id. While four of the officers fastened the decedent into the chair, one officer tased the decedent and another officer used her arms to place the decedent's head into a restraint hold. Id. Approximately twenty minutes later, the decedent stopped breathing and later passed away. Id.

The Ninth Circuit held that the officers in Hyde were entitled to qualified immunity for the force used before the decedent was "subdued and restrained" by having his "hands handcuffed behind his back and his legs [*36] shackled," but were not entitled to qualified immunity for force used after that point. *Id. at 870-72*. Specifically, the Ninth Circuit held that the force used before the decedent "was subdued and restrained" - tasing and closed-fist strikes — was reasonable because "(i) [the decedent] violently scuffled with the officers, (ii) the officers had not yet restrained [the decedent], and (iii) the officers were 'forced to make split-second judgments — in circumstances that [were] tense, uncertain, and rapidly evolving.'" *Id. at 870* (citing *Graham 490 U.S. at 397*). However, once the decedent was "subdued and restrained," the Ninth Circuit acknowledged that "the need for more force waned as circumstances changed" and "it was no longer a frantic and fast-evolving situation requiring officer to make split second decision." Id. As such, the Ninth Circuit held that the force used by the officers after this point — tasing and a head restraint — was unreasonable because the officers had "two minutes to realize that [the decedent] - who was handcuffed, shackled, and exhausted — could no longer resist and did not pose a threat." Id. The Ninth Circuit further held that it was clearly established law under *Drummond* that "the use of a head restraint on [*37] [the decedent] was unreasonable when he had both his hands and feet shackled for two minutes and no longer could resist." *Id. at 872*.

In addition, the Ninth Circuit has reaffirmed *Drummond* on several other occasions in cases where officers used force on a restrained or subdued individual. See, e.g., *Valenzuela v. City of Anaheim, No. 20-55371, 2021 WL 3362847, at *2 (9th Cir. 2021)* (holding officers were not entitled to qualified immunity under *Drummond* after the officers placed the decedent in a multiple choke holds while the decedent was lying on the ground with his arms pinned down); *Tuumalemalo v. Greene, 946 F.3d 471, 477 (9th Cir. 2019)* (holding officers were not entitled to qualified immunity under *Drummond* for using "a chokehold on a non-resisting, restrained person" and noting that "there was little chance [the plaintiff] could initiate resistance with five other officers fully restraining him and pinning him to the ground"); *Zion v. Cnty. of Orange, 874 F.3d 1072, 1076 (9th Cir. 2017)* (holding an officer was not entitled to qualified immunity for shooting and stomping on the decedent's head after the suspect had been brought to the ground because the law was clearly established that "use of deadly force against a non-threatening suspect is unreasonable" and "continued force against a suspect who has been brought to the ground can violate the Fourth Amendment" under Drummond); *Abston v. City of Merced, 506 Fed. Appx. 650, 652-53 (9th Cir. 2013)* (holding an officer was not entitled to [*38] qualified immunity for applying body weight pressure to the decedent for one minute and seven seconds while the decedent was "face-down, handcuffed and ankle-shackled," even though the decedent had actively resisted arrest and injured an officer); *Davis v. City of Las Vegas, 478 F.3d 1048, 1053 (9th Cir. 2007)* (holding an officer was not entitled to qualified immunity after pushing an unarmed, handcuffed man into a wall multiple times and punching him in the face while the man lay face-down on the ground); see also *Andrews v. City of Henderson, 35 F.4th 710, 719 (9th Cir. 2022)* (holding that it was clearly established in 2007 that "an officer violates the Fourth Amendment by tackling and piling on top of a 'relatively calm,' non-resisting suspect who poses little threat of safety" (citing *Blackenhorn v. City of Orange, 485 F.3d 463, 478, 481 (9th Cir. 2007)*); *Hughes v. Rodriguez, 31 F.4th 1211, 1223 (9th Cir. 2022)* (holding that it was clearly established in 1992 that "beating a handcuffed convict violates the Eighth Amendment" prohibition on excessive force (citing *Hudson v. McMillian, 504 U.S. 1, 3 (1992)*); *LaLonde v. Cnty. of Riverside, 204 F.3d 947, 961 (9th Cir. 2000)* (holding that where "an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon [e.g., pepper sprays; police dogs] or a refusal without cause to alleviate its harmful effects constitutes excessive force").

In the present case, Defendant Fischer was involved in the application of force on Mr. Phounsy on April 13, 2015 during three periods [*39] of the interaction: first, attaching the maximum restraint cords to Mr. Phounsy in the hallway; second, carrying Mr. Phounsy to the driveway; and third, applying pressure to Mr. Phounsy in the ambulance. The Court concludes Defendant Fischer is entitled to qualified immunity for his actions in the hallway and driveway. When Defendant Fischer arrived on scene, he entered into a "frantic and fast-evolving situation" requiring him to "make split second decisions." _Hyde, 32 F.4th at 870_ (citing _Graham 490 U.S. at 397_). Mr. Phounsy had just "violently scuffled with the officers" and was in the process of being restrained. Id.; (see, e.g., Tr. III-218-27.) Defendant Fischer assisted other deputies in applying maximum restraints to Mr. Phounsy. (Tr. I-199.) Defendant Fischer then assisted with carrying Mr. Phounsy from inside the home to the driveway outside. (Tr. I-252; III-57-58.) Defendant Fischer then left Mr. Phounsy in the driveway with other deputies and accompanied Deputy Tamani Pugh as she took photographs inside the home. (Tr. I-257-58; II-59, 60; VI-125.) Taking the facts in the light most favorable to Plaintiffs, the case law as established in April 2015 did not give every reasonable officer in Defendant Fischer's position [*40] notice that his pre-ambulance conduct was unlawful. See _Ashcroft, 563 U.S. at 741_.

But by the time Mr. Phounsy was placed in the ambulance, it was no longer a "frantic and fast-evolving situation" requiring Defendant Fischer to "make split second decisions." _Hyde, 32 F.4th at 870_ (citing _Graham 490 U.S. at 397_). At that point, Mr. Phounsy had been in handcuffs and maximum restraints surrounded by officers for approximately thirty minutes and was securely strapped to a gurney. In other words, Mr. Phounsy was "subdued and restrained" before Defendant Fischer used force on him and had been for a significant period of time. _Id. at 870-72_.

Not only was the force used by Defendant Fischer excessive, but it was clearly established in April 2015 by _Drummond_ that Defendant Fischer's actions of pushing down "as hard as he could" on Mr. Phounsy's head and torso for approximately six minutes with "9 out of 10 pressure" while Mr. Phounsy was handcuffed, in maximum restraints, and strapped to a gurney until Mr. Phounsy stopped breathing and went into cardiac arrest was excessive force in violation of Mr. Phounsy's Fourth Amendment rights. Accordingly, Defendant Fischer is not entitled to qualified immunity for his actions in the ambulance.[6]

## D. Plaintiffs' Monell Failure [*41] to Train Claim

Defendants argue that the jury's verdict in favor of Plaintiffs on the _Monell_ failure to train claim against the County was not supported by substantial evidence. (Doc. No. 552-1 at 9-19.) Plaintiffs argue that the jury's _Monell_ finding was supported by substantial evidence, including Defendant Fischer, on preventing excessive force, "particularly as it relates to escalating force against a person in restraints causing them to asphyxiate." (Doc. No. 563 at 10-12.) The Court agrees with Plaintiffs.

A municipality cannot be held liable under § 1983 under a respondent superior theory. _Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 691_

---

[6] Defendants attempt to distinguish the present case from _Drummond_ based on Mr. Phounsy's resistance. (Doc. No. 552-1 at 7-8.) Defendants' argument is not persuasive because the Defendants' assumption that Mr. Phounsy was actively resisting Defendant Fischer in the ambulance fails to take the facts in the light most favorable to Plaintiffs. See _K.J.P. et al., 800 Fed. Appx. at 546_. Further, Defendants' argument rests almost entirely on analogizing the present case to an unpublished memorandum disposition, _A.B. v. San Diego, No. 20-56140, 2022 WL 1055558 (9th Cir. 2022)_, which is readily distinguishable from the present case. The district court in _A.B._ granted qualified immunity to officers at the summary judgment stage, which the Ninth Circuit affirmed on appeal. See _A.B. v. Cnty. of San Diego, No. 18-cv-1541-MMA, 2020 WL 5847551, at *9 (S.D. Cal. Oct. 1, 2020)_; _A.B., 2022 WL 1055558, at *2_. In coming to this conclusion, the Ninth Circuit distinguished the degree of force used by the officers in _Drummond_ as "much greater than the force" used by the officers in _A.B. Id. at *2_. In the present case, the degree of force employed by Defendant Fischer on Mr. Phounsy in the ambulance ("9 out of 10 pressure" on the head of a fully restrained individual) was much more equivalent to the force used in _Drummond_ (kneeling on the defendant's neck) than in _A.B._ (varying degrees of force on parts of the decedent's body but never with the officer's full body weight). _A.B., 2020 WL 5847551, at *20_. Further, the amount of time Defendant Fischer applied pressure to Mr. Phounsy while Mr. Phounsy was subdued and restrained was much more equivalent to the time in _Drummond_ (approximately twenty minutes) than in _A.B._ (approximately thirty seconds). At most, the force used in _A.B._ in analogous to the force used on Mr. Phounsy in the home and driveway or the force used before the decedent was "subdued and restrained" in _Hyde_. However, once Mr. Phounsy was fully restrained in the ambulance, _A.B._ is not analogous.

*(1978)*. Instead, § 1983 liability may be imposed on a municipality only when "a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011)* (citing *Monell, 436 U.S. at 694*). "In order to establish liability for governmental entities under Monell, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force **[*42]** behind the constitutional violation.'" *Dougherty, 654 F.3d at 900* (quoting *Plumeau v. Sch. Dist. No. 400 Cnty. of Yamhill, 130 F.3d 432, 438 (9th Cir. 1997)*); see also *City of Canton v. Harris, 489 U.S. 388 (1989)*.

"A policy can be one of action or inaction." *Long v. City of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006)*. "A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1143 (9th Cir. 2012)* (citing *Oviatt v. Pearce, 954 F.2d 1470, 1477 (9th Cir. 1992)*); J.K.J. v. City of San Diego, No. 20-55622, __ F.4th __, 2021 WL 9194183, at *5 (9th Cir. Nov. 15, 2021, amended Aug. 2, 2022) ("[R]ecognizing that a failure to train can be a policy under Monell" (internal quotation marks and citation omitted).). For a Monell claim based on failure to train, "[a] plaintiff must show, in addition to a constitutional violation, that this policy amounts to deliberate indifference to the plaintiff's constitutional right and that the policy caused the violation, in the sense that the [municipality] could have prevented the violation with an appropriate policy." *Tsao, 698 F.3d at 1143* (internal quotation marks and citations omitted); see also *City of Canton, 489 U.S. at 390* (holding that to show "deliberate indifference" for failure to train claims, a plaintiff must prove that "in light of the duties assigned to specific officers or employees the need for different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need"). It **[*43]** is not enough to "prove that an injury or accident could have been avoided if an officer had had better or more training." *City of Canton, 489 U.S. at 391*.

Failure to train can be the basis of municipal liability under several circumstances. See *Long, 442 F.3d at 1188* (citing *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown, 530 U.S. 397, 407 (1997)*). "The first is a deficient training program, 'intended to apply over time

to multiple employees'" where "the continued adherence by policymakers 'to an approach that they know or should know has failed to prevent tortious conduct by employees may establish . . . 'deliberate indifference.'" Id. Second, "the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." Id. Finally, "[a] plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where 'a violation of federal rights may be a highly predictable consequence of failure to handle recurring situations.'" Id.

## 1. Constitutional Violation

Substantial evidence supported the jury's finding that Defendant **[*44]** Fischer's used excessive force on Mr. Phounsy in the ambulance in violation of Mr. Phounsy's Fourth Amendment rights.[7]See supra Part II.A.

## 2. Policy that Amounted to Deliberate Indifference

A reasonable jury could find based on the evidence presented at the trial that the County's training program was deficient on training its deputies on how to avoid using excessive force on a restrained individual, which "amount[ed] to deliberate indifference" to Mr. Phounsy's constitutional rights. *Dougherty, 654 F.3d at 900*. At trial, both Plaintiffs' use of force expert, Mr. DeFoe, and medical expert, Dr. Thrush, testified about signs of

---

[7] Defendants also argue that "the inclusion of Collins on the 'failure to train' verdict form demonstrates that the Monell finding was incurably infected with a misunderstanding of law." (Doc. No. 552-1 at 12-13.) In Section II of the special verdict form, the jury listed deputy Collins as an officer who used excessive force against Mr. Phounsy in addition to Defendant Fischer. (Doc. No. 532 at 3.) On August 9, 2021, the Court dismissed deputy Collins as a defendant from this action with prejudice pursuant to the parties' joint motion to dismiss. (Doc. Nos. 315, 316.) "[A] stipulated dismissal of an action with prejudice in a federal district court generally constitutes a final judgment on the merits and precludes a party from reasserting the same claim in a subsequent action in the same court." **Headwaters, 399 F.3d at 1052**. As a matter of law, the jury could not find deputy Collins liable. However, the jury's finding of Monell liability for the County is independently supported by the jury's finding of excessive force by Defendant Fischer and so the jury's finding of Monell liability is not in error.

asphyxiation, including movements and sounds a person may make. Mr. DeFoe testified that when a person is in a prone position in maximum restraints, they "are going to try to create some space between the ground and [their] diaphragm so [they] can breathe," and "officers may perceive that [the person] is trying to get up . . . that you're resisting . . . which translates into more weight, which translates into more force . . . [a]n that continues on, and on so the end game is either someone asphyxiates based on compression and/or position." (Tr. IV-191.) Mr. DeFoe further **[*45]** testified that when compression is put on the back or neck of an individual in maximum restraints, "the end result is the person can't breathe. So when you're looking at the person's trying to draw in breath, they're trying to basically — so, we hear guttural gurgling, agonal breathing . . . ." (Id. at 192.) Dr. Thrush testified that "human beings, when we're in severe respiratory distress, we'll kind of grunt at the end of an expiration in order to get a little more pressure to get a little more oxygen in." (Tr. II-187.)

At trial, Defendant Fischer testified that he did not remember being trained on if placing pressure on a person in maximum restraints would increase the risk of asphyxiation:

> Q: Are -- are there additional concerns in terms of the safety of having somebody in the prone position while they're being maximally restrained when additional weight is placed on the individual's back? Is that -- is that part of your training, that that -- that could increase the danger of asphyxiation?
> A: You're talking about downward pressure on someone's back in the process of applying max restraints?
> Q: Yes.
> A: For a prolonged period of time I would believe so, yes.
>
> Q: What's a prolonged period **[*46]** of time in your view?
> A: I don't know. I would just -- to put on max restraints, depending on the level of combativeness of the suspect, it just depends.
> Q: But additional pressure, as you've been trained, while you're maximally restraining an individual, adding pressure on the back would increase the danger of positional asphyxiation, right? That's how you're trained, right?
> A: As I sit here today, I honestly don't remember specifically that. I can only assume that. I would think there's training on that, but --
> Q: But you don't remember?

> A: I don't remember.

(Tr. I-227-28.)

Plaintiffs also elicited testimony from Defendant Fischer regarding two prior incidents of use of force. First, on July 9, 2014, Defendant Fischer testified that he was working as a correction officer for the County when he used force against an inmate, Mr. Christopher Weaver. (Tr. I-177-78.) Defendant Fischer testified that while he was escorting Mr. Weaver with four other deputies to a holding cell, Mr. Weaver "tensed" his forearm and turned around. (Tr. I-178-81.) Defendant Fischer testified he wrapped his arm around Mr. Weaver's head, drove Mr. Weaver into the floor, and delivered two closed fist punches to Mr. Weaver. **[*47]** (Tr. I-181.) Defendant Fischer testified that, in response to Mr. Weaver's alleged resistance, he then applied pressure on Mr. Weaver's back while Mr. Weaver was in a prone position on the floor. (Tr. I-182.) Defendant Fischer also testified that Mr. Weaver had not struck or kicked or attempted to strike or kick him or any of the other deputies present. (Tr. I-182-84.)

The second incident occurred on February 23, 2015, just a few months before the incident with Mr. Phounsy, while Defendant Fischer was working as a sheriff's deputy. (Tr. I-186.) Defendant Fischer testified that while on patrol, he recognized Mr. David Williams as someone who was a "Fourth Waiver," or had a court order "in place that the Fourth Amendment would not apply to that individual because of some criminal conviction." (Tr. I-187.) Defendant Fischer testified that he knew he did not need probable cause to stop and detain Mr. Weaver. (Id.) Defendant Fischer testified that he searched Mr. Williams, handcuffed him, and brought Mr. Williams behind his patrol vehicle. (Tr. I-189.) Defendant Fischer testified that Mr. Williams, while handcuffed, took a step toward Defendant Fischer. (Tr. I-191.) In response, to Defendant Fischer "applied **[*48]** a head takedown" by wrapping his right arm around Mr. William's head and then driving Mr. Williams to the ground. (Id.) Defendant Fischer then applied downward pressure on Mr. Williams while he was in the prone position for approximately ten seconds. (Tr. I-191-92.) Defendant Fischer testified that the County jail would not let Defendant Fischer book Mr. Williams due to his injuries and instead directed Defendant Fischer to take Mr. Williams to the hospital. (Tr. I-193-94.) Mr. Williams did not want to go to the hospital with Defendant Fischer, and so Mr. Williams was booked and sent to a different station. (Tr. I-194.)

Both Mr. Weaver and Mr. Williams filed complaints

2022 U.S. Dist. LEXIS 221068, *48

against Defendant Fischer. (Tr. I-194-95.) As a result, the San Diego County Sheriff's Department conducted investigations into both incidents and cleared Defendant Fischer of any wrongdoing. (Tr. I-194-95.) Defendant Fischer testified that the County never suggested after either incident that he "should review any training materials that would relate to the appropriate use of force" or suggest how Defendant Fischer could have handled either situation differently. (Tr. I-195-96.) A reasonable jury could conclude from [*49] Defendant Fischer's testimony that he received deficient training on avoiding excessive use of force against restrained individuals and resistance.

Plaintiffs also elicited testimony from several other deputies from which a reasonable jury could conclude the deputies as a group had received deficient training in preventing excessive force on a restrained individual. Several deputies testified that Mr. Phounsy was making "grunting," "animalistic noises," "groaning," "moaning" while in maximum restraints, but that the deputies interpreted those noises to be a sign Mr. Phounsy was breathing. (See, e.g., IV-158, 160, 164 (Sergeant Ralph: ("I heard grunting and animalistic noises;" "just grunting;" "it was grunting and animalistic noises"); V-230 ("he was growling, screaming"); VIII-25 (Deputy Silva: "he was also grunting").) Several deputies testified that they never checked Mr. Phounsy's breathing by any method other than visually observing him. (See Tr. V-230 (Deputy Allen); Tr. V-308 (Deputy Carbajal); Tr. VI-130, 142 (Deputy Pugh); Tr. VIII-37 (Deputy Silva).) Several deputies also testified that they were never trained by the County on "agonal breathing." (See Tr. V-203 (Deputy Allen); [*50] Tr. V-308 (Deputy Carbajal); Tr. VI-142, 144 (Deputy Pugh); Tr. VIII-302 (Deputy Krull).) At trial, Deputy Allen testified:

> Q: In terms of your training on positional asphyxiation, was it your testimony that you were unfamiliar with the term "positional asphyxiation" in 2015?
>
> A: Yes, sir.
>
> Q: Never heard the term before?
>
> A: I don't believe so, no.
>
> Q: And what about the signs of positional asphyxiation? Were you familiar with the signs of positional asphyxiation prior to this incident through the training that you received from the San Diego County Sheriff's Department?
>
> A: I was not.

(Tr. V-229-30.) Evidence was also presented at trial that the deputies did not immediately place Mr. Phounsy in the recovery position in both the hallway and driveway. (Tr. I-245, 252.)

Defendants' own use of force expert, Mr. Meyer, expressed concern with the deputies' application of maximum restraints on Mr. Phounsy, acknowledging that if Mr. Phounsy was kept in the position depicted in Exhibit 71 for more than "one or two seconds," "that's a problem" and it would "be close" to a hogtie. (Tr. VII-265; Attachment A.) Finally, Plaintiffs' use of force expert, Mr. DeFoe, testified the following regarding the San [*51] Diego County Sheriff's Department's training on agonal breathing as it relates to maximum restraints: "It was insufficient, although I've had seven deputies, based on their testimony that stated they heard guttural noises, animalistic noises, which is agonal breathing. It means the body's in the process of dying. That is ultimately what you're hearing." (Tr. IV-194.)

Taking the evidence presented at trial in the light most favorable to Plaintiffs, a reasonable jury could conclude that the County failed to train its officers on how to prevent the use of excessive force on an individual in maximum restraints, which amounted to deliberate indifference to Mr. Phounsy's constitutional right.

### 3. Moving Force

Finally, substantial evidence was presented at trial that the deficiencies in the County's training program were "the moving force behind" the violation of Mr. Phounsy's constitutional right. *Dougherty, 654 F.3d at 900.* Defendant Fischer testified that he applied downward pressure on Mr. Phounsy's head for approximately six minutes during the ambulance ride because he perceived that Mr. Phounsy was resisting. (Tr. I-271-74, 286; II-43-44, 67.) When asked what resisting meant, Defendant Fischer testified that resisting [*52] was "moving, side to side, not staying still . . . ." (Tr. I-280.) Plaintiffs also introduced Defendant Fischer's testimony from a prior proceeding where Defendant Fischer described Mr. Phounsy's movement in the ambulance as his "head going back and forth, his body. He was trying to move his body. His body was secured, but he was still moving, and it was just constant, just tensing and going — like bouncing." (Tr. I-103.) Defendant Fischer was asked if he "ever consider[ed] the possibility that Lucky was moving around because he was struggling to breath," and Defendant Fischer responded, "[b]ased on what I saw, he did not appear[] to be struggling." (Tr. I-279.) Mr. Phounsy then coded in the ambulance while Defendant Fischer's hand were on him. (Tr. I-280.) Dr. Thrush testified that in his opinion, Defendant Fischer's actions in the ambulance contributed to Mr. Phounsy's death because "[t]he

2022 U.S. Dist. LEXIS 221068, *52

evidence shows that Deputy Fischer pushed down on the - - the head over the temple and the ear with a 9 out of 10 force" and "[t]his may and I believe likely did on an anatomic basis constrict the airway." (Tr. II-87.) Dr. Sperry also testified that Mr. Phounsy's "basic cause of death was **[*53]** interference with his breathing or pressure on his body that caused him to be able to—well, not be able to breathe adequately." (Tr. III-5.)

Based on this evidence, a reasonable jury could conclude that Defendant Fischer lacked training on how to avoid using excessive force on a restrained individual and this deficient training was the "moving force" behind Defendant Fischer's use of excessive force on Mr. Phounsy in the ambulance. As a result, viewing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, substantial evidence was presented at trial to support the jury's finding of liability against the County on the Monell claim.

### E. Plaintiffs' Negligence Claim

Defendants challenge the jury's finding of negligence by San Diego County Sheriff's deputies Fischer, Allen, Collins, and Ralph. (Doc. No. 552-1 at 22-25.) Defendants also challenge the jury's finding of liability by the County. (Id.)

### 1. Defendant Fischer and the County

First, Defendants argue that insufficient evidence was presented at trial to support the jury's finding that Defendant Fischer's actions were negligent and that "a claim of 'direct negligence' is not cognizable **[*54]** against a municipal defendant." (Id. at 22-23, 25.) "In order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate legal cause of the resulting injury." _Hayes v. Cnty. of San Diego, 57 Cal. 4th 622, 629 (2013)_ (citation omitted). Under California law, public employees "are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons." _Id. at 628-29_ (citing _Cal. Gov. Code § 820_). "'Under California law, police officers have a duty not to use excessive force.'" _Lawrence v. City & Cnty. of San Francisco, 258 F. Supp. 3d 977, 999 (N.D. Cal. 2017)_ (quoting _Warren v. Marcus, 78 F. Supp. 3d 1228, 1251 (N.D. Cal. 2015)_); see also Mann v.

City of Chula Vista, No. 18-CV-2525-WQH-MDD, 2020 WL 5759749, at *9 (S.D. Cal. Sept. 28, 2020) (Under California law, "[p]olice officers owe 'a duty to use reasonable care' in deciding whether to use and in fact using force"); see also _Hayes, 57 Cal. 4th at 629_ ("This court has long recognized that peace officers have a duty to act reasonably when using deadly force."). "The reasonableness of an officer's conduct is determined in light of the totality of circumstances." _Hayes, 57 Cal. 4th at 629._ Further, "public entities are generally liable for injuries caused by the negligence of their employees acting within the scope of their employment." Id. (citing _Cal. Gov. Code § 815.2_). As such, governmental entities "can be **[*55]** held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct." _Mary M. v. City of Los Angeles, 54 Cal. 3d 202, 215 (1991)._

Taking the evidence presented in the light most favorable to Plaintiffs, a reasonable jury could find that Defendant Fischer did not act objectively reasonably when Defendant Fischer did not immediately place Mr. Phounsy on his side in the recovery position after placing him in maximum restraints in the hallway and after moving him to the driveway. (Tr. I-252-54.) A reasonable jury could further conclude that Defendant Fischer's failure to place Mr. Phounsy in the recovery position was in violation of the San Diego County Sheriff's Department, Addendum Section F, Use of Force Guidelines.[8] (Doc. No. 509 at 13; see also Tr. I-212, 220, 229); see _Peterson v. City of Long Beach, 594 F.2d 477, 480 (1979)_ (holding that a police department manual constitutes a "regulation" and indicates a minimal standard of care); _Clemente v. State of California, 707 P.2d 818, 824 (Cal. 1985)_ (holding that the trial court did not err in providing a jury instruction that if the jury found a highway patrol officer violated the California Highway Patrol Accident Manual and such violation was the legal cause of injury, the jury could find such violation was negligence). Further, **[*56]** taking the evidence in the light most favorable to Plaintiffs, a reasonable jury could also find that Defendant Fischer did not act objectively reasonably when he used force

---

[8] Even though Defendant Fischer is entitled to qualified immunity for his actions in the hallway and the driveway, Defendant Fischer can still be found negligent for these actions. See _Shen v. Albany Unified Sch. Dist., 436 F. Supp. 3d 1305, 1309 (N.D. Cal. 2020)_ ("Because qualified immunity is a federal doctrine, it does not bar potential state law liability.").

2022 U.S. Dist. LEXIS 221068, *56

against Mr. Phounsy in the ambulance and that such force was the cause of Mr. Phounsy's death. *Hayes, 57 Cal. 4th at 629*. The parties stipulated that Defendant Fischer was acting in the scope of his employment during the incident. (See Doc. No. 531, Jury Instruction No. 6.) As a result, substantial evidence supported the jury's finding of negligence by Defendant Fischer and vicariously the County for Defendant Fischer's actions.

### 2. Dismissed Defendants

Next, Defendants argue that the jury's finding of negligence by deputies Collins and Allen and sergeant Ralph was procedurally barred because Plaintiffs voluntarily dismissed deputies Collins and Allen and the Court dismissed sergeant Ralph at summary judgment. (Doc. No. 552-1 at 23-24.) "[A] stipulated dismissal of an action with prejudice in a federal district court generally constitutes a final judgment on the merits and precludes a party from reasserting the same claim in a subsequent action in the same court." *Headwaters, 399 F.3d at 1052*. *Federal Rule of Civil Procedure 54(b)* "permits orders to be 'revised at any time before entry of a final order'" [*57] and so "[t]he trial court may revise non-final orders 'at any time' before entry of final judgment." *In re Linton, 631 B.R. 882, 896 (B.A.P. 9th Cir. 2021)* (citing *Hyan v. Hummer, 825 F.3d 1043, 1046-47 (9th Cir. 2016)*); see also *Midmountain Contractors, Inc. v. Am. Safety Indem. Co., No. C10-1239 JLR, 2013 WL 5492952, at *4 (W.D. Wash. Oct. 1, 2013)*. However, "[o]nce a district judge issues a partial summary judgment order removing certain claims from a case, the parties have a right to rely on the ruling by forbearing from introducing any evidence or cross-examining witnesses in regard to those claims. If, as allowed by Rule 54(b), the judge subsequently changes the initial ruling and broadens the scope of the trial, the judge must inform the parties and give them an opportunity to present evidence relating to the newly revived issue. Failure to do so might in some circumstances cause substantial prejudice." *Leddy v. Standard Drywall, Inc., 875 F.2d 383, 386 (2nd Cir. 1989)*; see also *Alberty-Velez v. Corp. de Puerto Rico Para La Difusion Public, 242 F.3d 418,422 (1st Cir. 2001)*; see also *Fed. R. Civ. P. 56(g)*.

The Court agrees with Defendants that the County cannot be vicariously liable for the actions of dismissed defendants. On August 9, 2021, the Court granted the parties joint motion to dismiss deputy Collins with prejudice, (Doc. Nos. 315, 316), and on September 15, 2021, the Court granted the parties' joint motion to

dismiss all claims against deputy Allen with prejudice. (Doc. Nos. 391, 394.) The parties jointly agreed to the dismissal for a waiver of costs. (Id.) Further, on April 12, 2019, [*58] the Court granted summary judgment on all claims against sergeant Ralph and did not subsequently change its ruling. (Doc. No. 171 at 19, 22, 28-29, 36-38); see *Fed. R. Civ. P. 54(b)*; *Leddy, 875 F.2d at 386*. As a result, the County cannot be held vicariously liable for their actions. See *Freeman v. Churchill, 30 Cal. 2d 452, 461 (1947)* ("It is the firmly-established rule that a judgment on the merits favorable to the employee in an action by a third person for a tort of the employee is a bar to an action by the third person against the employer where the latter's asserted liability for the tort rests upon respondeat superior and not his independent tort.").

Plaintiffs, citing *Perez v. City of Huntington Park, 7 Cal. App. 4th 817 (1992)*, argue "that judgment could be entered in favor of all the deputies without precluding judgment against the County." (Doc. No. 563 at 20). The Court does not find *Perez's* narrow holding applicable to the present case. In *Perez*, the California Court of Appeals held that the City of Huntington Park could still be held vicariously liable for its officers' unreasonable use of force even though the trial court could not determine which of the four officers present was the officer that used the unreasonable force. *7 Cal. App. 4th at 819*. The court reasoned that since "the judgment did not determine that no employee committed a wrong," [*59] the City of Huntington Park "should not be relieved of liability." *Id. at 822*. This is distinct from the facts in the present case where the defendants were dismissed or received summary judgment. As a result, the general rule that a "verdict which exonerates the employee necessarily exonerates the employer also" applies. *Id. at 820* (citing *Freeman, 30 Cal. 2d at 461*).

Nonetheless, under California law, the Court was still required to ask the jury to apportion fault to nonparties because the fault of nonparties is relevant for comparative fault damages considerations. See *Vollaro v. Lispi, 168 Cal. Rptr. 323, 329 n.5 (Ct. App. 2014)* ("The proposition that a jury may apportion liability to a nonparty has been adopted by the Judicial Council of California Civil Jury Instructions (CACI) . . . 'Nonparties' include the universe of tortfeasors who are not present at trial, including defendants who settled before trial and nonjoined alleged tortfeasors."); *Romine v. Johnson Controls, Inc., 224 Cal. App. 4th 990, 1011 (2014)* ("[I]t is error for a trial court not to allow the jury to assess the comparative fault of defendants who settled before trial."); see also *Cal. Civ. Code § 1431.2*; Judicial

Council of California Civil Jury Instructions (CACI) No. 406. Apportionment of Responsibility (2022). As a result, it was proper for the jury to apportion a percentage of fault to deputy Collins, deputy Allen, sergeant Ralph, and the firefighter paramedics, and **[\*60]** such apportionment may still be relevant for reducing any damages award for negligence.

## F. Plaintiffs' Wrongful Death Claim

Finally, Defendants argue that because there was not substantial evidence to support Plaintiffs' excessive force or negligence causes of action, Plaintiffs' wrongful death cause of action also fails. (Doc. No. 552-1 at 25.) Under *California Code of Civil Procedure § 377.60*, "[a] cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by," among others, "[t]he decedent's surviving spouse" and "children." Cal. Civ. Code § 337.60(a). "The elements of a cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Cntr., 45 Cal. Rptr. 3d 222, 226 (Ct. App. 2006)* (internal citation omitted). Because substantial evidence supports the jury's finding of negligence by Defendant Fischer and the County, substantial evidence also supported the jury's finding in Plaintiffs' favor on the wrongful death claim.

## II. Defendants' Motion for a New Trial

In their second post-trial motion, Defendants move for a new trial pursuant to *Federal Rule of Civil Procedure 59*. (Doc. No. 551-1.) Defendants argue a new trial is warranted because (1) the jury's verdict was against **[\*61]** the clear weight of the evidence; (2) the jury instructions and special verdict form prejudiced Defendants; (3) evidentiary rulings prejudiced Defendants; (4) Plaintiffs' counsel's conduct prejudiced Defendants; and (5) the damages awarded by the jury were excessive. Id.

## A. Clear Weight of the Evidence

Defendants argue that the jury's verdict was against the clear weight of the evidence "for all the reasons explained in defendants Rule 50(b) motion" and request the Court grant a new trial if the Court declines to grant Defendants' Rule 50(b) motion. (Doc. No. 555-1 at 2.) A

court may grant a motion for a new trial based on insufficiency of the evidence "only if the verdict is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *EEOC v. Pape Lift, Inc., 115 F.3d 676, 680 (9th Cir. 1997)* (internal quotation marks omitted).

At trial, the jury heard Defendant Fischer testify that as soon as he got into the ambulance with Mr. Phounsy, he put both of his hands on Mr. Phounsy's head and pushed down as hard as he could with "9 out of 10 pressure" for six minutes. (Tr. I-271.) The jury also heard from the paramedic firefighters present in the ambulance that Defendant Fischer pressed down on Mr. Phounsy for **[\*62]** "the majority of the ride" and continued to hold down after the firefighter paramedics could see Mr. Phounsy had "stopped moving." (Tr. VI-86-87; VIII-186.) Both of Plaintiffs' medical experts, Dr. Thrush and Dr. Sperry, provided the opinion that Mr. Phounsy died because he was unable to breathe and that Defendant Fischer's actions in the ambulance contributed to Mr. Phounsy's death. (Tr. II-154, 187; III-5.) Defendant Fischer also testified that he could not remember whether the County trained him on the danger of applying pressure to an individual in maximum restraints. (Tr. I-227-28.) The jury also heard from Plaintiffs' use of force expert, Mr. DeFoe, who provided the opinion that the County's training for its deputies on detecting agonal breathing from an individual in maximum restraints "was insufficient." (Tr. IV-194.) Ultimately, the jury concluded that Defendant Fischer used excessive and unreasonable force against Mr. Phounsy, that Defendant Fischer had the specific intent under the Bane Act to use excessive force, and that the violation of Mr. Phounsy's constitutional right was the result of the County's failure to train its deputies to avoid using excessive force on individuals **[\*63]** in maximum restraints. (Doc. No. 532.) This conclusion was neither against the clear weight of the evidence nor erroneous. See *Pape Lift, 115 F.3d at 680*. As a result, the Court denies Defendants' motion for a new trial on this ground.

## B. Jury Instructions and Special Verdict Form

Defendants also argue that a new trial is warranted based on instructional errors. (Doc. No. 551-1 at 7-15.) But Defendants did not timely raise these objections or demonstrate that a new trial is warranted.

## 1. <u>Monell</u> Standard and Jury Instruction

2022 U.S. Dist. LEXIS 221068, *63

Defendants argue the Court provided the incorrect standard for <u>Monell</u> liability in Section II(B) of the special verdict form. (Doc. No. 551 at 10.) Defendants did not object to the language of Section II(B) at trial on this ground despite the Court providing Defendants numerous opportunities to do so.[9] "By waiting until post-trial motions to raise its specific contentions, [Defendants] prevented the Court from correcting any problems ex ante." *Yeti by Molly, Ltd. v. Decker Outdoor Corp., 259 F.3d 1101, 1110 (9th Cir. 2001).* Defendants cannot now assert the special verdict form was improper. See *id. at 1109* (holding a party waived its objects to the verdict form by not objecting to an alleged error "until after the jury rendered its verdict and was discharged").[10]

Even if the objection **[*64]** had been timely, the <u>Monell</u> standard in the special verdict form, taken together with the jury instructions, was correct. For a <u>Monell</u> claim based on failure to train, "a plaintiff must show, in addition to a constitutional violation, that this policy amounts to deliberate indifference to the plaintiff's constitutional right and that the policy caused the violation, in the sense that the municipality could have prevented the violation with an appropriate policy."

———————————————

[9] On Thursday, March 3, 2022, the second day of trial, the Court gave the parties a draft of the special verdict form to review and provide edits. (Tr. II-319.) On Wednesday, March 9, 2022, the Court stated to the parties "I've requested the comments for the verdict form and I'll ask them by 9:00 a.m. on Friday." (Tr. VI-328.) On Thursday, March 10, 2022, the Court provided the parties with an updated version of the special verdict form and requested that the parties "designate somebody to be able to address that tomorrow at noon." (Tr. VII-220, 310.) The morning of Friday, March 11, 2022, the Court provide the parties with an updated version of the special verdict form. (Tr. VIII-86.) After the jury was dismissed on Friday, March 11, 2022, the Court and parties went through the special verdict form together line by line. (Tr. VIII-311.) At this time, the Court asked the parties to provide edits or objections to the special verdict form. (<u>Id.</u>) The parties did not object or suggest edits to Section II(B). (Tr. VIII-318-33.) On Monday, March 14, 2022, the Court provided the parties with an opportunity to discuss and object to the special verdict form before bringing the jury in. (Tr. IX-1-11.) The parties again did not object or suggest edits to Section II(B). (Tr. IX-11.)

[10] Defendants argue that they did not waive their objection because they objected during the first trial. (Doc. No. 568 at 8.) However, objecting to a completely different version of the special verdict form during a different trial is insufficient to give the Court notice of the objection.

*Tsao, 698 F.3d at 1143* (internal quotation marks and citations omitted); see also *City of Canton, 489 U.S. at 390-92.* Section II(A) of the special verdict form asked the jury:

> Do you find by a preponderance of the evidence that one or more San Diego County Sheriff's deputies violated Lucky Phounsy's constitutional rights to be free from excessive force?

(Doc. No 532 at 3.) This question addresses the first requirement for <u>Monell</u> failure to train liability: did a "constitutional violation" occur? See *Tsao, 698 F.3d at 1143*.

Section II(B) of the special verdict form asked the jury:

> Do you find by a preponderance of the evidence that the violation of Lucky Phounsy's constitutional rights was a foreseeable result of a failure to train by the County of San Diego to avoid violating a constitutional right to be **[*65]** free from excessive force?

(Doc. No 532 at 3.) This question addresses the second requirement for <u>Monell</u> liability: was the County "deliberately indifferent" to Mr. Phounsy's constitutional rights? See *Tsao, 698 F.3d at 1143*. To show "deliberate indifference," a plaintiff must prove that "in light of the duties assigned to specific officers or employees the need for different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, 489 U.S. at 390*. In other words, was the constitutional violation a "highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations" or a foreseeable result of the County's deficient training program? See *Long, 442 F.3d at 1186* (citing *Brown, 520 U.S. at 409*).

Finally, Section II(C) of the special verdict form asked the jury:

> Do you find by a preponderance of the evidence that the County's failure to train caused injury to Lucky Phounsy?

(Doc. No 532 at 3.) To meet the "moving force" requirement, "the plaintiff must show both causation-in-fact and proximate causation." *Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1096 (9th Cir. 2013).* Section II(C) thus addresses the third and final **[*66]** requirement for <u>Monell</u> liability: was the County's failure

2022 U.S. Dist. LEXIS 221068, *66

to train the "moving force" behind Mr. Phounsy's constitutional violation? See *Tsao, 698 F.3d at 1143*.

The jury instructions provided both orally and in paper form also instructed the jury on the "moving force" standard twice. Jury Instruction No. 33 stated the following as one of the required elements of a <u>Monell</u> failure to train claim:

> The failure of the County to prevent violations of law by its deputies or to provide adequate training caused the deprivation of Mr. Phounsy's rights by the deputies; that is, the County's failure to prevent violations of law by its deputies or to train is so closely related to the deprivation of Mr. Phounsy's rights **as to be the moving force that caused his ultimate injuries**.

(Doc. No. 531 at 36, Jury Instruction No. 33; <u>see also</u> Doc. No. 542, Tr. IX-32) (emphasis added). Jury Instruction No. 34 also provided:

> In order to establish that either or both defendants deprived the plaintiff of particular rights under the United States Constitution, the plaintiff must prove by a preponderance of the evidence that the acts were so closely related to the deprivation of the particular constitutional right **as to be the moving [*67] force that caused the ultimate injury**.

(Doc. No. 531 at 38, Jury Instruction No. 34; <u>see also</u> Tr. IX-33) (emphasis added). Finally, the "moving force" standard provided in Section II(B) of the special verdict form was substantially similar to the language used in the Ninth Circuit Model Jury Instructions:

> 5. the failure of the defendant [name of local governing body] [to prevent violations of law by its employees] [to provide adequate training] **caused the deprivation of the plaintiff's rights** by the [name of defendant's [police officer[s]] [employee[s]]]; that is, the defendant's failure [to prevent violations of law by its employees] [to train] **played a substantial part in bringing about or actually causing the injury or damage to the plaintiff**.

Ninth Circuit Model Civil Jury Instruction 9.8 (2017) (emphasis added). Accordingly, the <u>Monell</u> special verdict form, taken as a whole with the jury instructions, was proper.

Defendants also argue the Court misstated the <u>Monell</u>

jury instruction during oral instructions. (Doc. No. 551-1 at 7-9.) Plaintiffs' <u>Monell</u> claim based on failure to train on serious medical needs was disposed of before jury deliberations and so the only <u>Monell</u> claim before the jury was on the theory of failure to train [*68] on use of force. (Doc. No. VIII-174-77.) When delivering its oral instructions on the <u>Monell</u> claim, the Court stated:

> [I]f you find that the plaintiffs have proved all elements they are required to prove under the instructions on excessive force and/or deliberate indifference to medical needs, your verdict should be for the Plaintiff.

(Tr. IX-33.) This instruction was from an earlier version of the proposed jury instructions and was a mistake. However, each counsel and juror was provided with a copy of the written instructions that included the correct <u>Monell</u> standard to follow along with as the Court orally instructed the jury. (Tr. IX-10-11.) Despite this, Defendants did not contemporaneously object to the oral instruction and instead raised this objection for the first time in its Rule 59 motion. (Tr. IX-33); *Fed. R. Civ. Proc. 51(c)(2)(B)*. Had Defendants objected during trial, the Court could have reinstructed the jury to cure the misstatement.

Because Defendants did not timely object to the Court's oral instructions, Defendants' objection is reviewed on appeal for plain error. *United States v. Walter-Eze, 869 F.3d 891, 911 (9th Cir. 2017)*. Plain error requires a showing that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) **[*69]** the error affected [defendant's] substantial rights, which in the ordinary case means it affected the outcome of the district-court proceedings; and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." <u>Id.</u> "In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." <u>Id.</u> Thus, "the adequacy of jury instructions is not determined by the giving of any one instruction, but by examining the instructions as a whole." *United States v. Ancheta, 38 F.3d 1114, 1116 (9th Cir. 1994)* (quoting *United States v. Boekelman, 594 F.2d 1238, 1240 (9th Cir. 1979)*).

The oral <u>Monell</u> jury instruction did not amount to plain error because the remainder of the oral instructions, the written instructions, and special verdict form repeatedly emphasized that the <u>Monell</u> claim was exclusively for failure to train on excessive force. The Court orally instructed the jury:

> Plaintiff claims a violation for failure to train the

Sheriff's deputies on the use of force. Plaintiff claims that Defendant Richard Fischer used excessive force and the County failed to properly train Sheriff's deputies on the use of force.

(Tr. IX-32.) The printed version of Jury Instruction No. 32 provided to the jurors **[*70]** to use during deliberations correctly stated:

> Plaintiff claims a violation for failure to train the sheriff's deputies on the use of force. Plaintiff claims that Defendant Richard Fischer used excessive force and that the County failed to properly train sheriff's deputies on the use of force.

(Doc. No. 531 at 35, Jury Instruction No. 32.) Similarly, the printed version of Jury Instruction No. 33 given to the jury detailed the elements of a <u>Monell</u> failure to train on excessive force claim and provided:

> If you find that plaintiff has proved each of these elements, and if you find that the plaintiffs have proved all the elements they are required to prove under the instructions on excessive force, your verdict should be for the plaintiffs.

(<u>Id.</u> at 531-32, Jury Instruction No. 33.) Finally, the <u>Monell</u> section of the special verdict form only asked the jury about the County's liability for "failure to train . . . to avoid violating a constitutional right to be free from excessive force." (Doc. No. 532 at 3.) The instructions, taken as a whole, were clear that the <u>Monell</u> claim was only for failure to train on excessive force, and so the "[C]ourt's slip of the tongue was unlikely to have misled **[*71]** the jury or affected the outcome of proceedings." *Walter-Eze, 869 F.3d at 912*.

The Ninth Circuit has held under similar facts that the no plain error occurred. See *e.g.*, *id. at 911* (holding the district court's misstatement of the burden of proof was not plain error "[w]hen considered as whole with the remainder of the district court's instructions and the fact that the jury was provided a copy of the correct written instructions"); *Ancheta, 38 F.3d at 1117* (holding the district court's oral misinstruction of a criminal jury did not amount to plain error were the "remaining instructions repeatedly and exhaustively reminded the jury of the proper legal standard" and the jury was provided "with proper written instructions"); *United States v. Brown, 552 F.2d 10, 11-12 (9th Cir. 1975)* (per curiam) (holding that although the district court erred in omitted the reasonable doubt standard in one instruction, no plain error occurred since other instructions repeatedly reminded the jury of the reasonable doubt standard). Accordingly, Defendants

have failed to show that the <u>Monell</u> instruction warrants a new trial.

## 2. Adverse Jury Instructions on the County's Discovery Violations

Defendants also challenge the adverse jury instructions given by the Court. (Doc. No. 551-1 at 12-15.) The adverse jury instructions **[*72]** were properly given as measured sanctions for the County's serious discovery violations.[11]

*Federal Rule of Civil Procedure 26(e)* imposes a duty on a party to supplement or correct prior discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." *Fed. R. Civ. P. 26(e)(1)(A)*. This affirmative duty continues "even after the discovery cut-off date." *Hernandez v. Polanco Enters., Inc., 19 F. Supp. 3d 918, 933 (N.D. Cal. 2013)*; see also *Sanders v. Univ. of Idaho, Coll. of Law, No. 3:19-cv-00225-BLW, 2022 WL 280875, at *3 (D. Idaho Jan. 31, 2022)* (collecting cases). *Federal Rule of Civil Procedure 37(c)(1)* "authorizes a court to sanction a party for failing to produce information required by Rule 26(a) or (e)" by prohibiting that party from using "the withheld information at trial unless the failure was substantially justified or harmless." *Fast v. GoDaddy.com LLC, 340 F.R.D. 326, 335-36 (D. Ariz. 2022)* (citation omitted). However, "blocking the use of information at trial is, of course, no penalty when the withheld information is unfavorable to the party that failed to disclose it." Id. As a result, Rule 37(c)(1) also permits courts to impose other sanctions, including "inform[ing] the jury of the party's failure," "designating facts be taken as established for purposes of the action," or "other appropriate sanctions." Fed. R. Evid. 37(c)(1)(A)—(B); Fed. R. Evid. 37(b)(2)(A)(i)—(vi).

Under *Federal Rule of Civil Procedure 37(e)*, potential litigants also "have a duty to preserve relevant

---

[11] At trial, the Court gave three adverse jury instructions: first, for the County's failure to supplement discovery with the Maximum Restraint Training Video; second, for the County's failure to supplement discovery and preserve Defendant Fischer's maximum restraints training test results; and third, for the County's failure to supplement discovery with the October 21, 2021 toxicology report of Mr. Phounsy's blood sample. In their Rule 59 motion, Defendants do not challenge the toxicology report adverse jury instruction. (Doc. No. 551-1 at 12-15.)

2022 U.S. Dist. LEXIS 221068, *72

information when litigation is reasonably foreseeable." *Fed. R. Civ. P. 37(e)* Committee Notes on Rules to the 2015 **[\*73]** Amendment; see also *Compass Bank v. Morris Cerullo World Evangelism, 104 F. Supp. 3d 1040, 1051 (S.D. Cal. 2015)*. "Once the duty to preserve attaches, a party must 'suspend any existing policies related to deleting or destroying files and preserve all relevant documents related to the litigation.' *Id. at 1052* (citing *Lopez v. Santoyo*, No. 09-cv-00108-W-RBB, 2021 WL 5427957, at \*7 (S.D. Cal. Nov. 7, 2012)). "[T]he failure to preserve electronic or other records, once the duty to do so has been triggered, raises the issue of spoliation of evidence and its consequences." *U.S. Legal Support, Inc. v. Hofioni, No. 2:13-cv-1770-LKK-AC, 2014 WL 172336, at \*3 (E.D. Cal. Jan. 15, 2014)* (citation omitted). "Sanctions that a federal court may impose for spoliation include assessing attorney's fees and costs, giving the jury an adverse inference instruction, precluding evidence, or imposing the harsh, case-dispositive sanctions of dismissal or judgment.' *Compass Bank, 104 F. Supp. 3d at 1052* (quoting *U.S. v. Town of Colorado City, Ariz., No. 3:12-cv-8123-HRH, 2014 WL 3724232, at \*7 (D. Ariz. July 28, 2014)*). "Ultimately, the choice of appropriate spoliation sanctions must be determined on a case-by-case basis, and should be commensurate to the spoliation party's motive or degree of fault in destroying the evidence." *Apple Inc. v. Samsung Elecs. Co., 888 F. Supp. 2d 976, 992-93 (N.D. Cal. 2012)*. When a "sanction amount[s] to dismissal of a claim, the district court [is] required to consider whether the claimed noncompliance involved willfulness, fault, or bad faith, . . . and also to consider the availability of lesser sanctions." *R & R Sails, Inc. v. Ins. Co. of Pa., 673 F.3d 1240, 1247 (9th Cir. 2012)*. Discovery sanctions are reviewed for "abuse of discretion." *Yeti by Molly, 259 F.3d at 1105*.

During discovery, **[\*74]** Plaintiffs explicitly requested information from the County about the San Diego County Sheriff's Department's training on maximum restraints and excited delirium. On September 7, 2016, Plaintiffs sent the following request for production to the County:

> CATEGORY 8: Documents containing any training, protocol, policy, or procedure (in effect at the time of the incident through the present) that applies to or governs the use of restraints by SDSD personnel, including the use of "maximum restraints" and the "recovery position."
> CATEGORY 9: Documents showing whatever training each of the SDSD personnel who helped restrain Lucky Phounsy (at any point during the incident) had, at the time of the incident, in the use

of restraints, including the use of "maximum restraints" and the "recovery position."
> CATEGORY NO. 17: Documents containing any SDSD policy or procedure (in effect at the time of the incident through the present) on how SDSD personnel should interact with mentally disturbed individuals (including those who may be suffering from "excited delirium.")

(Doc. No. 448, Scott Decl. Ex. A at 5, 7.)[12] On September 17, 2016, the County provided the following responses:

> RESPONSE TO CATEGORY 8: **[\*75]** San Diego County Sheriff's Department Use of Force Addendum F will be produced.
> RESPONSE TO CATEGORY 9: Such documents as exist will be produced.
> RESPONSE TO CATEGORY 17: Such documents as exist will be produced.

(Id.)

On February 9, 2022, after the conclusion of the first trial in this case, Plaintiffs filed a supplemental brief alleging the County did not provide Plaintiffs with a maximum restraint training video used by the San Diego County Sheriff's Department to train its deputies. (Doc. No. 448 at 3-4.) Plaintiffs represent they made multiple requests for production for maximum restraint training materials used by the County during discovery, including the September 7, 2016 request, but never received the video. (Id. at 3; Scott Decl. Ex. A at 5.) Plaintiffs represent they were instead informed of the training video after the first trial by chance from counsel in another case against the County. (Doc. No. 448 at 4; Bourassa Decl. ¶¶ 3-7.)

In response to Plaintiffs' allegations, the Court ordered briefing, targeted depositions, and a hearing on this matter. On February 14, 2022, Defendants filed a

---

[12] In response to other requests for production of "documents," the County produced video and audio discovery. For example, in response to Plaintiffs' request for "[a]ny documents related to the incident," the County produced "[a]udio recording of fire department witness statements," "[a]udio recording of civilian witnesses," "[r]adio communications recording (EMS)," and "[r]adio communications recording (sheriff). (Doc. No. 448, Scott Decl. Ex. A at 2-3.) As a result, Plaintiffs' request for production of "documents" related to maximum restraints and excited delirium covered video and audio, including the maximum restraint and excited delirium training videos. See *Fed. R. Civ. P. 34(a)(1)*.

2022 U.S. Dist. LEXIS 221068, *75

response to Plaintiffs' supplemental briefing. (Doc. Nos. 454, 455.) On February 14, **[\*76]** 2022, the Court also held a pretrial status conference where the Court addressed the discovery violations and ordered a deposition to be taken of the person most knowledgeable from the County and Plaintiffs as to whether the maximum restraint training video was provided during discovery. (Doc. Nos. 460 at 2; 465.) The Court also ordered depositions to be taken of Defendants' medical expert, Dr. Vilke, as to whether he saw, reviewed, or relied on the maximum restraint training video as part of his testimony and of Defendant Fischer related to the maximum restraint training video. (Doc. Nos. 456, 460.) On February 22, 2022, the Court order the County to produce its discovery production logs to show how the County supplemented Plaintiffs' request for production with the training video. (Doc. No. 456.) On February 23, 2022, Defendants filed an additional supplemental brief on the discovery violation. (Doc. No. 466.) On February 27, 2022, Plaintiffs also filed an additional supplemental brief. (Doc. No. 474, 478.)

The County conceded that after approximately seven years of litigation and Plaintiffs' voluntary dismissal of all of the individual deputy defendants other than Defendant Fischer, **[\*77]** the County had no record that it produced the maximum restraint training video to Plaintiffs. (Doc. No. 466 at 2-3.) Specifically, the County stated that "[a]s to the current issue of whether the County produced the video during the discovery period, the County's investigation thus far has not determined whether the video was produced while the discovery period was open." (Id. at 2.) The County further provided that "[t]he County's records do not show whether the video was provided to County Counsel by the Sheriff's Department in response to Plaintiffs' Request for Production of Documents in 2016. The video was not specifically identified in the County's initial response, but subsequent discovery was provided, unfortunately without bates numbering or logging." (Id. at 3.) The County also stated that "[w]hile the Court has ordered the County to produce a discovery production log showing disclosure of this video, the County has no such documentation in its logs. Likewise, supplemental production was made informally on an ongoing basis, and records are incomplete." (Id. at 3 n.2.) The Court notes that the training video was not listed on the parties' pretrial order or exhibit lists for **[\*78]** any prior scheduled trial in this case, (Doc. Nos. 263-2, 291, 335, 365-66), nor was it shown during depositions or used during the first trial.

After the County's maximum restraint training video discovery violation came to light, the Court learned of three additional serious discovery violations by the County. First, the County failed to provide Plaintiffs with the San Diego County Sheriff's Department's training video on excited delirium. (Doc. Nos. 448 at 4, Bourassa Decl. 6-7; 505 at 2.) The excited delirium training video was created in 2007 and narrated by Dr. Vilke, the County's medical expert who testified at the first trial in this case. (Id.) The County did not provide Plaintiffs with the excited delirium training video during discovery despite Dr. Vilke's role in this litigation and Plaintiffs' specific request for production of "[d]ocuments containing any SDSD policy or procedure . . . on how SDSD personnel should interact with mentally disturbed individuals (including those who may be suffering from 'excited delirium')." (Doc. No. 448-1 at 7.) Instead, after the first trial, Plaintiffs received the excited delirium training video from the same third party who provided **[\*79]** Plaintiffs with the maximum restraint training video. (Doc. No. 448 at 4.)

Second, the County failed to timely provide and preserve the individual Sheriff's deputies' test results from the San Diego County Sheriff's Department's "Maximum Restraint/Excited Delirium Comprehension Test." (Doc. No. 505, Bourassa Decl. ¶¶ 3-9.) At the February 14, 2022 pretrial conference, the Court asked the County whether it had produced the test results to Plaintiffs, and the County responded "I don't know if they can still be identified and generated. I would think that those should have been produced." (Doc. No. 459 at 40:9-12.) On February 24, 2022, less than a week before the retrial, the County provided Plaintiffs with some of the dismissed deputies' test results. (Doc. No. 505, Bourassa Decl. ¶¶ 4-7.) None of the results predated the incident with Mr. Phounsy. (Id. ¶ 7.) The County also did not provide Plaintiffs with any of Defendant Fischer's test results. (Id. ¶ 8; Tr. IV-132-34.)

This litigation has been ongoing since 2015. From 2015 through 2017, Defendant Fischer was accused by sixteen women of assaulting them while he was on-duty as a San Diego County Sheriff's deputy. (Doc. No. 510.) In 2018, **[\*80]** criminal charges were filed against Defendant Fischer for his on-duty conduct. (Doc. No. 279 at 3.) In September 2019, Defendant Fischer plead guilty to four felonies and three misdemeanors arising from these allegations. (Doc. Nos. 265, 279, 511.) In December 2019, the San Diego County Sheriff's Department terminated Defendant Fischer. (Tr. IV-134.) The County also settled several related civil lawsuits arising out of Defendant Fischer's conduct. (Doc. No.

265.) The criminal convictions, civil settlements, and Defendant Fischer's termination from the San Diego County Sheriff's Department occurred during the pendency of this case. County Counsel continued to represent Defendant Fischer in this litigation until November 23, 2020, when conflict counsel was hired to represent Defendant Fischer. (Doc. No. 242.) Considering the criminal and civil cases brought against Defendant Fischer arising from his on-duty conduct, the County should have had procedures in place to ensure evidence related to Defendant Fischer's training was preserved. See *Hofioni, 2014 WL 172336, at \*3*.

Finally, on the third day of trial after Plaintiffs' experts testified and left, the County disclosed that it had not provided Plaintiffs with a new **[\*81]** toxicology report the County conducted on Mr. Phounsy's blood sample. (Tr. III-122-31.) The County ordered a new toxicology report following the first trial and received the report on October 21, 2021, approximately five months before disclosing it to Plaintiffs. (Id.) The toxicology report was favorable to Plaintiffs because it indicated that there were not additional substances in Mr. Phounsy's blood besides those identified in earlier toxicology reports. (Doc. No. 505, Bourassa Decl. ¶¶ 13-14, Ex. A.) The County's retention of a sample of Mr. Phounsy's blood and ability to retest the sample was a significant issue at the first trial. (See Doc. Nos. 375, Tr. VI-293; 377, VII-25; 401 at 3.) During Plaintiffs' opening statement during the retrial, Plaintiffs referenced this issue: ". . . [T]he reality is that the blood work shows he was sober, period, and if they wanted to retest it to find out if there's something else, they could do that, too, and they haven't." (Tr. 1-109.) After the County provided Plaintiffs with the new toxicology report on the third day of the retrial, the County acknowledged that the new toxicology report should have been provided to Plaintiffs. (Tr. III-124.) **[\*82]**

The record, including the County's other discovery violations, supports the conclusion that the County inexcusably failed to supplement its discovery responses. At the first trial, Plaintiffs brought a § 1983 deliberate indifference to medical care claim against several of the sheriff's deputies, including Defendant Fischer, alleging the deputies failed to safely apply and monitor the maximum restraints placed on Mr. Phounsy. (Doc. No. 329 at 3, 9-12.) Plaintiffs also brought a related Monell claim against the County. (Id.) Accordingly, the County's training on maximum restraints was one of the central issues in the first trial. Viewing the training video in the light most favorable to Plaintiffs, a reasonable jury could conclude that the

training video undermined Defendants' case, providing an incentive for the County to not produce it to Plaintiffs. For example, the method the deputies used to apply maximum restraints on Mr. Phounsy was inconsistent with the method taught in the training video. (See Doc. No. 448 at 8-9.) The training video instructs deputies to attach the ankle restraint to the waist restraint near the suspect's stomach, but the deputies attached Mr. Phounsy's ankle restraints **[\*83]** to his waist restraints with a cord running over Mr. Phounsy's handcuffs to connect near his back. (See, e.g., Attachment A, Exs. 69, 71.) Further, viewing the training video in the light most favorable to Plaintiffs, a reasonable jury could also conclude that the initial part of the training video indicates that minimal resistance from a suspect warrants maximum restraints, which raises issues regarding the San Diego County Sheriff's Department's training on excessive force.[13]

The County attempts to minimize the severity of the discovery violation by arguing that Plaintiffs had knowledge of a training video since February 2017 and, regardless, Plaintiffs "never specifically asked for it." (Doc. Nos. 551-1 at 12; 554 at 2-3.) The County argues Plaintiffs should have known about the training video from depositions conducted of its Sheriff's deputies in 2017, during which several deputies referenced an online video on maximum restraints they watched through the Sheriff's Department's Learning Management System. (Doc. No. 454-1, Lenert Decl., Ex. A.) The Court recognizes that the duty to supplement is not triggered if the "additional or corrective information has . . . otherwise been **[\*84]** made known to the other parties during the discovery process or in writing." *Fed. R. Civ. P. 26(e)(1)(A).*

---

[13] Had the County believed the training video was favorable to their case, the County presumably would have used the maximum restraint training video at the first trial. But the County did not even include the training video in the exhibit list for the first trial. (Doc. Nos. 291, 335.) Rather than provide the jury with the actual training video used by the San Diego County Sheriffs Department to train its deputies, the County instead attempted to perform a live demonstration using one of its deputies to illustrate the County's training on maximum restraints. (Doc. No. 372, Tr. W-70-72; Tr. VIII-60.) The Court sustained Plaintiffs' objection under Federal Rule of Evidence 403 to the live demonstration. (Id., Tr. IV-71; VIII-60.) At a later hearing, the Court further explained that it did not permit the live demonstration because it would be difficult to make an adequate record given the Court's electronic recording equipment. (Doc. No. 557 at 35.)

However, the Court disagrees with Defendants that the deputies' reference to "a video" was sufficient to shift the burden to Plaintiffs to affirmatively request discoverable information the County should have provided in the first place. See *Ollier v. Sweetwater Union High Sch. Dist., 768 F.3d 843, 861-64 (9th Cir. 2014)* (affirming the district court's exclusion of thirty of the defendant's witnesses who were not formally disclosed during discovery but mentioned during depositions because "the mere mention of a name in a deposition is insufficient" to notify the plaintiff that the defendant "intends to present that person at trial"). Plaintiffs could have reasonably believed that an online training video no longer existed otherwise the County would have produced it. This is further supported by the fact that conflict counsel for Defendant Fischer did not obtain the training video until after the first trial when an investigator for the County emailed her a link to the training video.[14] (Doc. No. 454-1, Lenert Decl., Ex. B; Doc. No. 496 at 15:4-7.)

The County's argument that Plaintiffs "never specifically asked for it" is also contrary to the concept of proportionality encompassed in *Federal Rule of Civil Procedure 26*. Rule 26(b)(1) **[*85]** explicitly directs courts and parties to "consider the parties' relative access to relevant information" in determining the scope of discovery. Id. The County had exclusive access to the San Diego County Sheriff's Department's training materials. In this case, the maximum restraint training video used by the San Diego County Sheriff's Department was highly relevant to Plaintiffs' *Monell* claim. Plaintiffs' request for production on September 7, 2016 of all training on the use of maximum restraints

---

[14] Defendants also argue that Plaintiffs' supplemental briefing notifying the Court of the discovery violation violated the magistrate judge's general chambers rules requiring any motion related to discovery disputes to be brought "no later than thirty (30) days after the date upon which the event giving rise to the dispute occurred." (Doc. No. 551-1 at 12 n.3.) Nothing in the magistrate judge's chamber rules eliminated the duty to supplement under *Federal Rule of Civil Procedure 26*. The magistrate judge's scheduling orders stated that dates and times for discovery could be modified for good cause. (Doc. Nos. 37 ¶ 15; 81 ¶ 14.) Plaintiffs were informed of the training video by a third-party in October 2021 and notified the Court of the discovery violation on February 7, 2022. From late September 2021 through January 2022, one of Defendants' counsel was not available to participate in the proceedings. (Doc. Nos. 389, 396, 418.) As a result, the retrial in this case was rescheduled twice. (Doc. Nos. 399, 419.) Under these circumstances, Plaintiffs had good cause to seek an adverse inference instruction when they did. (Doc. No. 448.)

was more than sufficient. (Doc. No. 448, Decl. of Scott, Ex. A at 5.) The "burden of responding to discovery lies heavier on the party who has more information," here the County, "and properly so." *Fed. R. Civ. P. 26* Committee Rules Notes on the 2015 Amendment.

This litigation proceeded for seven years, multiple interlocutory appeals, and one trial before Plaintiffs were provided with the training video—not by the County—but by counsel in a different excessive force case against the County. In addition to not producing the training video, the County also engaged in three other serious discovery violations. The Court recognizes that the current deputy County Counsel are not the same deputy County Counsel who managed discovery in this case and the files turned over to them from prior counsel for the County were incomplete. Nevertheless, the County's inability to provide any record that the training video was produced during discovery, such as an inventory list or bate stamps, failure to put a litigation hold on highly relevant information, and other actions supports the Court's conclusion that the County's discovery violations were unjustified, harmful, and the County's fault. See *R & R Sails, 673 F.3d at 1247*.

Balancing the severity of the discovery violations with the County's **[*86]** need to put on its defense, the Court took a measured approached in sanctioning the County. Instead of prohibiting Defendants from using the maximum restraint training video at trial as requested by Plaintiffs, (Doc. No. 448 at 11-12), the Court permitted both parties to rely on the training video at the trial, informed the jury of the County's failure to supplement as permitted under Rule 37(c)(1)(B), and instructed the jury that they could, but were not required, to distrust the County's evidence about what training San Diego County Sheriff's Department personnel received or did not receive on the use of maximum restraints. (Doc. No. 505-4 at 1.) The Court provided a similarly restrained adverse jury instruction related to the County's failure to retain Defendant Fischer's maximum restraints training test results. Id. at 3; see *Compass Bank, 105 F. Supp. 3d at 1054* ("[T]he least harsh instruction permits (but does not require) a jury to presume that the lost evidence is both relevant and favorable to the innocent party.").

In the context of the entire trial, Defendants were not unfairly prejudiced by the adverse jury instructions. The Court only gave the training video adverse jury instruction during the trial when relevant, including **[*87]** when the video was raised for the first time during Plaintiffs' and Defendants' case in chief, (Tr. 1-214-15;

VI-113,119-22), and after the County played several clips of the video during the examination of one of its deputies. (Tr. VIII-7-16, 30-31.) Besides the instruction given prior to voir dire and after the close of evidence, the Court also only gave the instruction at Plaintiffs' request when appropriate. (Tr. 1-214-15; VI-120-22, VIII-30-31.) The Court also agreed at the County's request to postpone providing the instruction until after the County had finished its questioning on direct examination. (Tr. VI-113.) This is similar to how the Court instructed the jury on other issues, such as limiting instructions on evidence. (See, e.g., Tr. 1-177; IX-64.)

Further, the mid-trial alteration of the language of the training video adverse jury instruction was in direct response to objections and suggestions by the parties. The original language of the jury instruction stated that the discovery request and subsequent violation of the duty to supplement were by "Defendants." (Doc. No. 492.) Counsel for Defendant Fischer objected to the instruction on the grounds that the discovery request **[*88]** was directed at the County, not Defendant Fischer. (Tr. I-258-59.) After hearing arguments from both sides and reviewing the discovery request, the Court concluded the original version of the instruction had been in error and explicitly notified the jury of the error:

> On July 20,2016, Plaintiffs requested from Defendant, the County of San Diego, only as to the Defendant Fischer, County of San Diego -- this does not include Defendant Fischer. Earlier I had mentioned both together, and that was erroneous. It's only as to the county . . .

(Tr. VI-120-21.) Plaintiffs' counsel provided the Court with new versions of the jury instructions that incorporated this edit. (Doc. No. 505-4; IV-71-73.) Defendants did not provide the Court with their own version of the jury instructions with different language or one instruction that applied to all discovery violations despite ample opportunity to do so. (Tr. III-130-31.) Accordingly, Defendants have failed to show that the adverse jury instructions were erroneous, abused the Courts' discretion, or were substantially prejudicial in the context of the entire record as to warrant a new trial.

## C. Evidentiary and Other Rulings

Defendants argue the Court **[*89]** made several evidentiary errors. (Doc. No. 551-1 at 3, 19.) To obtain a new trial based on erroneous evidentiary rulings, the moving party must show that the ruling were both

"erroneous" and "substantially prejudicial." _Ruvalcaba v. City of Los Angeles, 64 F.3d 1323,1328 (9th Cir. 1995)._ Defendants have not met this burden.

### 1. Hospital Audio Tape

Defendants argue the Court inconsistently ruled against Defendants and for Plaintiffs when each party attempted to introduce the same audio recording. (Doc. No. 551-1 at 15-16.) The audio recording was of an interview of non-party Kellie Phounsy, Mr. Phounsy's sister, conducted by a detective at the hospital shortly after Mr. Phounsy was brought there. (Tr. VI-199.) In the interview, Kellie Phounsy made a statement to the detective regarding drug use by Mr. Phounsy. (Id.) Defendants attempted to introduce the audio clip during direct examination of Kellie Phounsy. (Tr. VI-200.) Plaintiffs objected, "I'm not sure. Is this refreshing or impeachment?" (Tr. VI-200:18-19.) The Court then stated "I don't think — we don't have the capability to play it just to the witness. So --," and Defendants interjected, "Okay. That's fine" and continued to refresh Kellie Phounsy's recollection by using a written transcript of **[*90]** the interview. (Tr. VI-200:22; 201:8-21.) During cross-examination of the same witness, Plaintiffs attempted to introduce the same audio recording. (Tr. VI-231.) Plaintiffs argued that the audio recording should be introduced "for context of that statement as a non-hearsay statement," and the Court allowed its introduction on that basis. (Tr. VI-231:20.) The Court did not favor Plaintiffs over Defendants in admitting the audio recording because Plaintiffs, unlike Defendants, provided the Court with a legal basis on which to admit the audio recording.

### 2. Questioning During Voir Dire

Next, Defendants argue the Court's questioning during voir dire regarding the jury panel's experience with maximum restraints prejudiced Defendants' case. (Doc. No. 551-1 at 15.) "The content and conduct of the questioning [during voir dire] are generally committed to the sound discretion of the district court in both civil and criminal cases." _Darbin v. Nourse, 664 F.2d 1109, 1113 (9th Cir. 1981)._ "[V]oir dire examination must be conducted in a manner that allows the parties to effectively and intelligently exercise their right to peremptory challenges and challenges for cause." Id.; see also _Paine v. City of Lompoc, 160 F.3d 562, 564 (9th Cir. 1998)._ In order to accomplish this goal, the district court should inquire **[*91]** about "important

aspect[s] of the litigation about which members of the public may be expected to have strong feelings or prejudices." *Darbin, 664 F.2d at 1113.* The actions of the district court in conducting voir dire are subject to "the abuse of discretion standard." *Id. at 1114.* "Objections to voir dire not raised at trial are subject to plain error review." *Vargas v. City of Los Angeles, N. 2:16-cv-08684-SVW-AFM, 2020 WL 10789578, at *11 (C.D. Cal. Feb. 18, 2020)* (citing *United States v. Mitchell, 502 F.3d 931, 952 (9th Cir. 2007)*).

This case involves use of force by law enforcement on an individual, including the use of a baton, taser, and maximum restraints. Based on its understanding of the case, the Court asked prospective jurors during voir dire if they had ever been "put in maximum restraints, which is sometimes called 'hobble,' sometimes called, in the vernacular, 'hog-tie.'" (Tr. I-17.) Defendants argue this question was a prejudicial error because it equated maximum restraints with hog-tie restraint.[15] (Doc. No. 551-1 at 15.) Defendants did not object to the Court's questioning of the jury and so plain error review applies. (Tr. I-17.) First, it is reasonable to expect that a potential juror who has had an experience with any restraint system, such as a four-or five-point restraint used by medical professionals or a hog-tie or hobble restraint used by law enforcement, may **[*92]** have "strong feelings or prejudices" about the use of maximum restraints. *Darbin, 664 F.2d at 1113.* In fact, one of the members of the jury panel who was ultimately selected as a juror responded to the Court's question that she had experience applying four-point restraints as a medic in the military. (Tr. I-19-20.) Accordingly, it was within the Court's discretion to inquire about the potential jurors' experiences with different restraint systems to "allow the parties to effectively and intelligently exercise their right to peremptory challenges and challenges for cause." *Darbin, 664 F.2d at 1113.* Second, it was Plaintiffs' position at trial through expert testimony that the maximum restraints used by the deputies on Mr. Phounsy were equivalent to a hogtie. (See, e.g., 1-96, 108, 101; Tr. VII-265.) Defendants' use of force expert, Mr. Meyer, also testified that if Mr. Phounsy was kept in the position depicted in Exhibit 71 for more than "one or two seconds," "that's a problem" and it would "be close" to a hogtie. (Tr. VII-265; Attachment A.) As a result, the Court's question during voir dire was not prejudicial considering the facts of this case and expert testimony

---

[15] Defendants define "maximum restraints" as "attaching ankles to a cord around the waist" and "hog-tie" as "attaching ankles to wrist." (Doc. No. 551-1 at 15.)

characterizing the facts of this case.

### 3. Hostile Witness Rulings [*93]

Defendants argue the Court erred by "refusing to allow defendants to take family members as hostile witnesses and sustained leading objections" while allowing Plaintiffs to lead their own witnesses. (Doc. No. 551-1 at 16.) This is not an accurate reflection of the record. Defendants called Kellie Phounsy and her husband, Alex Sayavong, as witnesses, and used leading objections with both witnesses with no objection from Plaintiffs. (Tr. VI-160-186, 197:25-198:1-2, 198-218.) The only citations Defendants provide in their Rule 59 motion of where the Court allegedly did not permit family members to be taken as hostile witnesses was during Plaintiffs' cross-examination of Kellie Phounsy. (Doc. No. 551-1 at 16.) After permitting Defendants to lead Kellie Phounsy during direct, Defendants then objected to Plaintiffs' use of leading questions during cross-examination of Kellie Phounsy. (Tr. VI-187:18-23; 218:13-14; 220:6-22). The Court overruled Defendants' objections because, "[t]his is cross." (Tr. VI-220:6-22.) Leading questions are ordinarily permitted on cross-examination. Fed. R. Civ. P. 611(c)(1). Regardless, it is within the Court's discretion to allow leading questions on either direct or cross to "develop the witness's **[*94]** testimony." Id. Kellie Phounsy and Alex Savayong both had difficulty testifying, in part due to nervousness and a language barrier, and so leading questions were necessary for Defendants as well as Plaintiffs to develop the testimony of these witnesses. See, e.g., *United States v. Callahan, 801 F.3d 606, 623 (6th Cir. 2015)* (permitting the government to use leading questions during direct examination of victim in order "to facilitate the progression of trial and avoid wasting time"); *United States v. Farlee, 757 F.3d 810, 822 (8th Cir. 2014)* (permitting the government to use leading questions in examining eyewitness who "was hesitant in responding and lengthy delays preceded the answers"); *United States v. Carey, 589 F.3d 187, 192 (5th Cir. 2009)* (recognizing "a victim-witness's youth and nervousness" may justify leading questions).

### 4. Videos and Photographs of Family

Defendants also argue the Court erred in admitting certain videos and photographs depicting Mr. Phounsy with his family. (Doc. No. 551-1 at 16.) Plaintiffs sought non-economic loss of services damages through their wrongful death claims and waived any claim to

2022 U.S. Dist. LEXIS 221068, *94

economic damages. (Doc. No. 503.) Factors relevant in determining non-economic damages include "closeness of the family unit, the depth of their love and affection, the character of the decedent as kind, attentive, and loving." *Soto v. BorgWarner Morse TEC Inc., 191 Cal. Rptr. 3d 263, 291 (App. Ct. 2015).* As a **[*95]** result, the videos and photographs of Mr. Phounsy with his family were highly relevant to Plaintiffs' claim for non-economic damages. *Fed. R. Evid. 401*. Based on the record, any danger of unfair prejudice or presenting cumulative evidence did not substantially outweigh the highly probative value of the photographs and videos. *Fed. R. Evid. 403.*

Further, the Court sufficiently addressed Defendants' objections at trial. (Tr. VI-8-9.) First, Defendants objected that Loan Nguyen's scrapbook was not properly admitted, and the Court heard arguments from both sides. (Id.) The Court indicated that the exhibit was received according to its record. (Id. at 8:1, 18-21.) However, the Court also directed the parties to review the daily transcripts to "see what's actually reflected" and informed the parties that witnesses could be called back to the stand if needed to ensure the exhibit was properly admitted. (Id.) The County did not raise this objection again. Defendants also objected to admitting the entire scrapbook. (Id. at 6.) The Court held it was proper to admit the scrapbook. Plaintiff Loan Nguyen testified that she made the scrapbook, and it was both relevant to her wrongful death claim and not overly prejudicial. (Tr. VI-9.) **[*96]** Accordingly, the Court properly admitted such evidence, and Defendants have failed to show they were prejudiced by the exhibits.

## 5. Video and Audio Clips

Defendants argue the Court erred in admitting certain video and audio clips of interview and deposition testimony prepared by Plaintiffs.[16] (Doc. No. 551-1 at 16.) "An expert may base an opinion on facts or data that the expert has been made aware of' even "if the facts or data would otherwise be inadmissible." *Fed. R. Evid. 703*. Rule 703 permits "hearsay, or other inadmissible evidence, upon which an expert properly

relies, to be admitted to explain the basis of the expert's opinion." *Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1261-62 (9th Cir. 1984).* "Upon admission of such evidence, it . . . becomes necessary for the court to instruct the jury that the hearsay evidence is to be considered solely as a basis for the expert opinion and not as substantive evidence." *Id. at 1262*. Further, under Federal Rule of Evidence 611(a), district courts have broad discretion in regulating the presentation of evidence. See *United States v. Gardner, 611 F.2d 770, 776 (9th Cir. 1980)* (permitting the use of charts summarizing evidence to help with the "clarity of the presentation to the jury" and to avoid the "needless consumption of time").

The video and audio clips were "evidence upon which [Plaintiffs'] expert[s] relied." *Paddack, 745 F.2d at 1261-62*; (See, e.g. **[*97]** , Tr. 11-183; 11-195-96). Several experts testified at trial that their opinions were based on the information presented in the clips. (See, e.g., Tr. 11-183; III-114-17.) The Court instructed the jury that the clips were only to be considered as a basis for expert opinion and not as substantive evidence. (See Tr. IV-196) ("The clips are not themselves evidence but is to assist your understanding of his opinion in this case."). The Court also prohibited Plaintiffs from using the clips for improper purposes. (See Tr. IV-198: 5-17.) Further, it was within the Court's sound discretion to allow Plaintiffs to use of audio and video clips rather than quoting from the written transcripts in order to make the testimony more comprehensible for the jury and avoid wasting time. *Fed. R. Evid. 611(a)*. Accordingly, the Court did not error in allowing Plaintiffs to use the clips.

## 6. Video of Deposition Testimony During Closing Argument

Defendants argue the Court erred in allowing Plaintiffs to play video of deposition testimony during Plaintiffs' closing argument. (Doc. No. 551-1 at 16.) "[T]he trial judge has broad discretion in controlling closing argument." *United States v. Guess, 745 F.2d 1286, 1288 (9th Cir. 1984).* As a result, it is within the district court's discretion **[*98]** to permit counsel to read from the transcripts of a witness's recorded testimony or play recordings during closing argument. See *Guess, 745 F.2d at 1288*; see also *K.C. ex rel. Calaway v. Schucker, No. 02-2715-STA-cgc, 2013 WL 5972192, at *7 (W.D. Tenn. Nov. 8, 2013)* (holding plaintiffs use of deposition testimony video during closing arguments was not grounds for granting a new trial). At the time of

---

[16] Prior to trial, Defendants sought to exclude Plaintiffs' use of the video and audio clips at trial. (Doc. No. 435.) The Court denied Defendants' motion. (Doc. No. 459 at 6-12.) The Court directed the parties to meet and confer regarding any of the video and audio clips that were missing a question to a response and provided that Defendants could object at trial under Federal Rule of Evidence 106. (Id.)

closing arguments, Defendants only objected once to the video deposition testimony. (Tr. IX-48, 50-51, 60, 64.) When Defendants objected, the Court gave a limiting instruction regarding the deposition testimony at Defendants' request. (Tr. IX-64.) Accordingly, Defendants have not shown that the use of the video deposition testimony was erroneous or substantially prejudicial.

### 7. Defendant Fischer's Reporting of Uses of Force

Defendants argue the Court erred by allowing Plaintiffs to question Defendant Fischer about incidents where he failed to report his on-duty use of force. (Doc. No. 551-1 at 3-4.) This evidence was properly admitted under Federal Rule of Evidence 607 to impeach Defendant Fischer by contradiction.[17] As a result, Defendants have failed to show the Court's ruling was erroneous or substantially prejudicial.

Rule 607 provides that "[a]ny party, including the party that called the witness, may attack the witness's credibility." *Fed. R. Evid. 607*. Rule 607 permits **[*99]** impeachment by contradiction, or "the admission of extrinsic evidence to impeach specific errors or falsehoods in a witness's testimony." *United States v. Antonakeas, 255 F.3d 714, 724 (9th Cir. 2001)* (citing *United States v. Castillo, 181 F.3d 1129, 1133 (9th Cir. 1999)*); see also *United States v. Gilmore, 553 F.3d 266, 271 (3rd Cir. 2009)* ("Rule 607 of the Federal Rules of Evidence authorizes impeachment by contradiction."). A party can "introduce otherwise inadmissible evidence when the defendant 'opens that door' by introducing potentially misleading testimony." United States v. Osazuwa, F.3d 1169, 1175 (9th Cir. 2009) (citing *United States v. Beltran-Rios, 878 F.2d 1208, 1212 (9th Cir. 1989)*). Therefore, if a party "believe[s] it ha[s] elicited an untruthful remark, its remedy . . [is] to impeach the witness through cross-examination." *United States v. Green, 648 F.2d 587, 596 n.12 (9th Cir. 1981)*. If a party believes a witness has provided misleading testimony

on cross-examination, the party can "attempt on further cross-examination to elicit a response from defendant contradicting his prior testimony." *United States v. Bosley, 615 F.2d 1274, 1276-77 (9th Cir. 1980)*. The admissibility of impeachment by contradiction evidence is subject to Federal Rule of Evidence 403.[18] *United States v. Chu, 5 F.3d 1244, 1249 (9th Cir. 1993)*.

The Court permitted Plaintiffs to examine Defendant Fischer about incidents when he did not report his on-duty use of force in compliance with San Diego County Sheriff's Department policy only after Defendant Fischer opened the door by portraying himself as a deputy who followed such policy.[19] Prior to permitting this line of questioning, the Court **[*100]** had repeatedly advised Defendants about opening the door on this issue. On February 8, 2021, the Court held a pretrial conference with the parties where the Court denied Defendants' motion in limine to exclude all evidence and reference to Defendant Fischer's four felony convictions. (Doc. No. 265, 279, 308 at 4-5, 22-26, 29.) During the pretrial

---

[17] At trial, the Court also cited Federal Rule of Evidence 404(b)(2) as a basis for admitting Defendant Fischer's incidents of unreported uses of force. (Tr. W-139:21-23.) Plaintiffs separately argued that the incidents were also admissible under Federal Rule of Evidence 608(b) because Plaintiffs' redirect of Defendant Fischer regarding the incidents was the functional equivalent of cross-examination. (Doc. No. 514 at 4 n.17.) The Court need not address Rule 404(b)(2) or Rule 608(b) because the incidents were properly admitted under Rule 607.

---

[18] "By limiting the application of [Rule 608] to proof of a witness' character for truthfulness, the amendment leaves the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction . . .) to Rules 402 and 403." *Fed. R. Evid. 608* Advisory Committee's Note to the 203 Amendment.

[19] The Reporting Use of Force section of the San Diego County Sheriffs' Department Addendum F Use of Force Guidelines requires:

> Deputies (or other employees) who use force to overcome resistance or to control or apprehend a subject must verbally inform their supervisor as soon as practical, but in no event later than the end of the shift . . . All deputies (or other employees) using force must clearly articulate the force used in writing.

(Doc. No. 509 at 1.) Addendum F also directed that "all sworn employees familiarize themselves with policy and law that related to the use of force" including "physical force" and "assaults by officers under color of authority." (Id. at 3-4.) In 2019, Defendant Fischer admitted to assaulting sixteen women while on the job as a Sheriff's deputy. (Doc. Nos. 511.) These incidents occurred since July 2015, three months after the present incident, and September 2017. (Id.; Doc. No. 510.) Defendants argue that Defendant Fischer's assaults of the sixteen women were not covered by Addendum F. (Tr. 551-1 at 3; Tr. V-62-64.) Addendum F requires deputies to report to their supervisor any "use force to overcome resistance or to control or apprehend a subject." (Doc. No. 509 at 1.) The Court disagrees with Defendants under the plain language of Addendum F.

conference, the Court ordered Plaintiffs to tailor admitting such evidence to minimize prejudice to Defendant Fischer. (Doc. No. 308 at 26.) The Court also explicitly warned Defendants that if Defendant Fischer were to take the stand at trial and testify in a way that implied he never used excessive force, "then he can open the door." (Doc. No. 308 at 26:2-4.)

On the first day of trial, Defendants' counsel made several remarks during opening statements that portrayed Defendant Fischer as a deputy with a minimal use-of-force history. [*101] (Tr. 1-135, 145-47.) Specifically, Defendants stated that "a year and a half after the events with Mr. Phounsy, [Defendant Fischer] was fired from the Sheriff's Department under very difference circumstances." (Tr. 1-135.) Defendants then stated that Plaintiffs would use the Mr. Williams and Mr. Weaver use-of-force incidents "as a distraction to make you believe that Richard Fischer frequently used excessive force in a manner consistent with the allegations against him in the Phounsy incident." (Tr. 1-146.) Plaintiffs objected. (Id.) Defendants also stated in reference to Defendant Fischer's four felony convictions that "[w]e're not permitted to even explain to you how those four felonies significantly differ from the Phounsy incident, we're not going to go into that at all." (Tr. 1-147.) Plaintiffs again objected. (Id.) During the break following opening statements, Plaintiffs renewed their objections to Defendants' remarks. (Tr. I-163.) The Court then warned Defendants, "I did wake up during both counsel's presentations because I thought they were going awfully close, awfully, awfully, awfully close." (Id.)

On the second day of trial during examination by the County, Defendant Fischer [*102] testified the following regarding his use-of-force reporting in a different incident:

> Q: Did you request a supervisor?
> A: Yes.
> Q: And what happened when the supervisor showed up?
>
> A: So, **any use of force**, you want to notify your supervisor. I just basically gave him a rundown of what happened, and just for his own knowledge, just part of the practice.

(Tr. 11-36) (emphasis added). During the break following the County's examination of Defendant Fischer, Plaintiffs objected to Defendant Fischer's testimony:

> PLAINTIFFS' COUNSEL: Yes, your Honor. I just wanted to flag a portion of the possible redirect, and

if we get to it before the lunch break, I want to make sure I'm on safe ground. My notes indicate that what Mr. Fischer testified to was that when he receives -- when he has use of force, he then notifies his supervisor. I want to be able to ask him, "You didn't follow that policy in your own practice?" --

> THE COURT: I think that's fair.
> PLAINTIFFS' COUNSEL: -- but I won't give numbers until the Court makes a ruling.
> THE COURT: I think that's fair.

Tr. II-82.) Plaintiffs then asked Defendant Fischer the following:

> Q: Mr. Fischer, I think you were asked some questions earlier about a particular [*103] rule that applies to deputies with the San Diego Sheriff's Department. I'd like to follow up on that. There's a rule that when you use force while out on patrol, you are to notify a supervisor when that use of force occurs. Is that what you testified to?
> A: Yes.
> Q: And is that a hard-and-fast rule?
> A: It's just policy.
> Q: Policy. Okay. You yourself, on numerous occasions, failed to follow that policy. Isn't that true?
> COUNSEL FOR DEFENDANT FISCHER: Objection.
> THE COURT: Overruled.
> A: See, I know what you're going (sic) here. I just think I disagree.
> Q: I think you've got to just answer the question.
> A: Well—
> Q: Yes or no?
> A: I guess it depends on what your definition of "use of force" is.
> PLAINTIFFS' COUNSEL: You Honor, I - -
> THE COURT: You may inquire, limited to the period from up to October 16, 2017.

(Tr. II-107-08.)

Through his own testimony, Defendant Fischer opened the door to be impeached by contradiction with his history of following the San Diego County Sheriff's Department's use-of-force reporting policy. Because Plaintiffs believed Defendant Fischer made "an untruthful remark" about his history of following the use-of-force reporting policy, Plaintiffs' remedy was "to impeach [Defendant [*104] Fischer] through cross-examination." *Green, 648 F.2d at 596 n.12*. When Defendant Fischer disagreed with Plaintiffs' question about whether he had "failed to follow" the use-of-force

2022 U.S. Dist. LEXIS 221068, *104

reporting policy on other occasions, Plaintiffs properly "attempt[ed] on further cross-examination to elicit a response from [Defendant Fischer] contradicting his prior testimony." *Bosley, 615 F.2d at 1276-77.* Defendants were then given an opportunity to re-examine Defendant Fischer. (Tr. II-150-51.) The Court limited Plaintiffs' inquiry to the date of each use of force, whether Defendant Fischer was on duty as a sheriff's deputy during each incident, and whether Defendant Fischer failed to report each use of force to his supervisor. (Tr. II-110-24.) The Court did not permit Plaintiffs to inquire about the underlying nature of the uses of force or whether Defendant Fischer was disciplined or convicted for his conduct. (Id.) The Court also denied Plaintiffs' requests to impeach Defendants' expert witnesses with Defendant Fischer's incidents of unreported uses of force, cross-examine Defendant Fischer about whether he admitted to using excessive force during the incidents of unreported uses of force, and provide a curative instruction regarding Defendants' counsels **[*105]** remarks during opening statements. (Doc. Nos. 504, 512, 514; Tr. V-1.) As a result of these limitations, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *Fed. R. Evid. 403.*

Accordingly, Defendant Fischer's incidents of not reporting his uses of force while on-duty were properly admitted to impeach Defendant Fischer by contradiction under Rule 607. As a result, Defendants have failed to show the Court's ruling was "both erroneous and substantially prejudicial." *Ruvalcaba, 64 F.3d at 1328.* Even if the ruling was prejudicial, the admission of Defendant Fischer's incidents of unreported uses of force would have been harmless error since the jury already heard testimony from Defendant Fischer that he had plead guilty to four felonies for assaulting four individuals while in uniform. (Tr. I-174-76.)

Defendants also argue that the Court unfairly barred Defendants from admitting evidence of prior bad acts by Mr. Phounsy, which Defendants allege gave the jury "a misleading, incomplete view of Phounsy." (Doc. No. 551-1 at 5.) Defendants' argument mischaracterizes the record. First, Defendants allege the Court erred in prohibiting Defendants from asking Loan Nguyen about Mr. Phounsy's prior **[*106]** DUI conviction from 2006 and related six months of incarceration. The Court held that the DUI was "so remote in time as to be 403." (Tr. V-55; Doc. No. 370, II-279.) The Court applied the same evidentiary standard to Defendants by prohibiting under Rule 403 the introduction of two misdemeanor counts of assault and battery under color of authority in violation

of *California Penal Code § 149* by Defendant Fischer and one misdemeanor count of false imprisonment in violation of *California Penal Code § 236* by Defendant Fischer. (Doc. No. 265 at 1.)

Next, Defendants argue the Court erred in excluding evidence that Mr. Phounsy was on probation at the time of the incident. (Tr. V-59-61.) At trial, Defendants argued Mr. Phounsy's probation was relevant to whether he was "fighting with the deputies and trying to escape." (Tr. V-58-59.) Defendants' argument ignored the fact that Mr. Phounsy called 9-1-1 call for assistance. It was also highly speculative to infer that Mr. Phounsy would be found in violation of probation due to trace amounts of drugs found in his system. Therefore, the Court properly excluded the evidence under Rule 403.

Finally, Defendants argue body-worn camera footage of Mr. Phounsy fighting with police officers on a different occasion should have **[*107]** been admitted. (Doc. No. 551-1 at 5.) However, when Defendants requested permission to use this evidence at trial, Defendants were unable to locate the video to show it to the Court and or provide the Court with an evidentiary basis for introducing it. (Tr. VI-129-30.) The Court directed Defendants to look for the body-worn camera footage and provided it to the Court to review, but "absent further order from the Court, it doesn't come in." (Tr. VI-130.) Defendants never followed up to provide the body-worn camera footage to the Court. Notably, the County also failed to identify the body-worn camera footage in the pretrial order exhibit list. (Doc. No. 493.) In sum, the Court also properly excluded this evidence.

The Court, however, permitted Defendants to ask Loan Nguyen about a different prior incident where Mr. Phounsy had allegedly been drunk around his wife and kids. (Tr. V-124, 130.) The Court also permitted Defendants to ask witnesses about Mr. Phounsy's plans to go into drug rehabilitation the day after the incident, (Tr. 111-95-96; V-55-57); Mr. Phounsy's alcohol use leading up to the time of his death, (Tr. V-55); Mr. Phounsy's attendance at a music festival, (Tr. V-99); and **[*108]** drug use by Mr. Phounsy. (Tr. V-169-70.) As a result, Defendants have failed to show that any of the Court's evidentiary rulings or the cumulative effect of such rulings were both "erroneous" and "substantially prejudicial" as to warrant a new trial. *Ruvalcaba, 64 F.3d at 1328.*

### D. Plaintiffs' Counsel Conduct

2022 U.S. Dist. LEXIS 221068, *108

Defendants also argue a new trial is warranted because of improper statements made during closing arguments by Plaintiffs' counsel. (Doc. No. 551-1 at 16-20.) Specifically, Defendants argue Plaintiffs violated the "Golden Rule" by appealing to community values, requesting the jury place themselves in Plaintiffs' position, and asking the jury to value non-economic wrongful death damages based on the rate the County paid its expert witnesses. (Id.)

Defendants did not object at trial to any of Plaintiffs' counsel's statements regarding community values that Defendants are now challenging. Had Defendants timely objected at trial, the Court would have ruled the "Golden Rule" statements are prohibited. Instead, Defendants waited until post-trial motions to raise their objection, denying the Court the opportunity to correct any alleged problem. "The trial court has broad discretion in the control of closing arguments." **[*109]** _People of the Territory of Guam v. Ignacio, 852 F.2d 459, 462 (9th Cir. 1988)._ For misconduct in closing arguments to warrant reversal, it must "so permeate[] the trial as to lead to the conclusion that the jury was necessarily influenced by passion and prejudice in reaching its verdict." _Cooper v. Firestone Tire and Rubber Co., 945 F.2d 1103, 1107 (9th Cir. 1991)_ (citation omitted). Plaintiffs' counsels' statements during closing reflected Plaintiffs' position that they are entitled to wrongful death damages for their loss. See _Settlegoode v. Portland Pub. Schools, 371 F.3d 503, 518 (9th Cir. 2004)_ ("Using some degree of emotionally charged language during trial is . . . well accepted courtroom tactic."). In the context of the entire trial and considering Defendants' lack of contemporaneous objections, Plaintiffs' statements did not amount to reversable error. _See, e.g., Cooper, 945 F.2d at 1107_ (declining to find reversible error where the alleged misconduct occurred only in the argument phase of trial, the remarks were isolated rather than persistent, most of counsel's comments were not objected to at trial, and the opposing party did not move for a mistrial at the end of argument"); _Mueller v. Hawaii, No. 17-00571 HG-WRP, 2022 WL 980696, at *10 (D. Haw. Mar. 31, 2022)._

Next, as part of Plaintiffs' counsel's argument for the appropriate amount of non-economic wrongful death damages to compensate Plaintiffs for their loss of Mr. Phounsy, Plaintiffs' counsel referenced the daily compensation of expert witnesses **[*110]** as an analogy. (Tr. IX-71-72, 74-75.) Defendants contemporaneously objected. (Tr. IX-72.) However, Defendants' counsel made a similar economic comparison argument during closing arguments by asking the jury to tie Mr. Phounsy's children's loss of love, companionship, comfort, care, protection, affection, society, moral support, training, and guidance to the cost of a college scholarship. (Tr. IX-128); see _Valenzuela v. City of Anaheim, No. SACV 17-00278-CJC (DFMx), 2020 WL 10574794, at *11 (C.D. Cal. Mar. 11, 2020),_ aff'd on other grounds, _6 F.4th 1098 (9th Cir. 2021)._

Comparisons to items of value have been permitted in other cases discussing non-economic damages. For example, in Nunez v. Santos, the district court held the defendants in a § 1983 excessive force case had failed to establish prejudice by the plaintiffs' reference to the cost of aircrafts or the salary of a secretary present during Google's IPO when discussing the decedent's pain and suffering damages during closing arguments. _427 F. Supp. 1165, 1193-95 (N.D. Cal. 2019)._ Similarly, in Valenzuela, the district court held the defendants had failed to establish prejudice by the plaintiffs' reference to the value of a B-1 bomber, Picasso painting, and LeBron James's basketball contract when discussing non-economic loss of services damages. _2020 WL 10574794, at *11._ In sum, Defendants have failed to establish prejudice by Plaintiffs' **[*111]** statements during closing arguments. Even if Plaintiffs' counsel's arguments were an error and the jury was "influenced by passion and prejudice in reaching its verdict," this issue is moot by the Court's grant of a new trial on wrongful death damages. _Cooper, 945 F.2d at 1107._

### E. Excessive Damages Award

Finally, Defendants argue that the jury's damages award was excessive and warrants a new trial on damages or, in the alternative, a remittitur. (Doc. No. 551-1 at 20-25.) "[A] jury's award of damages is entitled to great deference, and should be upheld unless the amount is clearly not supported by the evidence or only based on speculation or guesswork." _In re First Alliance Mortg. Co., 471 F.3d 977, 1001 (9th Cir. 2006)_ (internal quotation marks omitted); see also _Chalmers v. City of Los Angeles, 762 F.2d 753, 760 (9th Cir. 1985)._ Awards must be upheld "whenever possible, and all presumptions are in favor of the judgment." _DSPT Int'l, Inc. v. Nahum, 624 F.3d 1213, 1224 (9th Cir. 2010)_ (internal quotation marks omitted). If the damages award is supported by the evidence, it "must be affirmed unless it is 'grossly excessive' or 'monstrous' or 'shocking to the conscience.'" _Brady v. Gebbie, 859 F.2d 1543, 1557 (9th Cir. 1988)._ "[A] new trial is not required even where there is an excessive damages award

2022 U.S. Dist. LEXIS 221068, *111

resulting from passion or prejudice, unless there is also evidence that passion and prejudice affected the liability finding." _Watec Co v. Liu, 403 F.3d 645, 655 (9th Cir. 2005)_ (internal quotation marks **[*112]** omitted). "Where there is no evidence that passion and prejudice affected the liability finding, remittitur is an appropriate method of reducing an excessive verdict, although the district court still retains the option of vacating the judgment and ordering a new trial." Id. (internal quotation mark omitted).

## 1. Pain and Suffering Damages

Defendants argue that the jury's award of $5 million in pain and suffering damages to Mr. Phounsy was excessive because it was not supported by the evidence. (Doc. No. 551-1 at 24.) Defendants also argue that the jury's award of pain and suffering damages cannot be supported by Plaintiffs' state law claims because such damages are barred under state law. (Doc. No. 552-1 at 22, 25.)

"A plaintiff who establishes liability for deprivation of constitutional rights actionable under _42 U.S.C. § 1983_ is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations." _Borunda v. Richmond, 885 F.2d 1384, 1389 (9th Cir. 1988)_. A Fourth Amendment excessive force claim belongs to the decedent, though it may be asserted on his behalf by his successors in interest. See _Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 369 (9th Cir. 1988)_, as amended (Nov. 24, 1998). Compensatory damages in § 1983 cases "where the decedent's death was caused by a violation of federal law" include "pre-death **[*113]** pain and suffering damages" as well as "loss of life damages." _Chaudhry v. City of Los Angeles_, 751 F.3d 1096, 1105 (9th Cir. 2014); _Valenzuela v. City of Anaheim, 6 F.4th 1098, 1101-02 (9th Cir. 2021)_. The Court agrees with Defendants that pain and suffering damages are not available for Plaintiffs' state law claims under California Code of Civil Procedure § 337.30. However, the jury can award pain and suffering damages under § 1983. (Doc. No. 563 at 16); see _Chaudhry_, 751 F.3d at 1105.

As to Mr. Phounsy's pre-ambulance pain and suffering, the Court agrees with the Defendants that Defendant Fischer is entitled to qualified immunity for his actions in the hallway and driveway because it was a "tense, uncertain, and rapidly evolving" situation that required Defendant Fischer to "make split-second judgments." _Hyde, 23 F.4th at 870_. As a result, qualified immunity

precludes pre-ambulance pain and suffering damages. See, e.g., Willis v. City of Fresno, No. 1:09-CV-01766-BAM, 2017 WL5713374, at *5 (E.D. Cal. Nov. 28, 2017) (holding that the jury could not award pain and suffering damages for gun shots the jury found were not excessive force).

The jury's award of $3 million in damages for Mr. Phounsy's pain and suffering from the ambulance until the time of his death is supported by the evidence and is not excessive. Defendant Fischer, who was over six feet tall and 225 pounds at the time, pushed as hard as he could with "9 out of 10 pressure" on Mr. Phounsy's head and torso for approximately six minutes until **[*114]** Mr. Phounsy coded. (Tr. 1-271, 11-67.) Mr. Phounsy then remained in the hospital in a coma for nearly seven days until he finally passed away. (Tr. 111-229.) Plaintiffs' medical expert, Dr. Thrush, testified that Mr. Phounsy did not suffer a quick and painless death, but instead essentially suffocated to death until he suffered cardiac arrest, "brain death," and "multi-organ failure." (Tr. 11-151.) Dr. Thrush also testified that dying by suffocation, "[i]t's horrible. It's — — it is one of the worst if not the worst thing that — — that humans can experience is air hunger, to want to breathe and not to be able to." (Tr. II-221.) In sum, Plaintiffs provided sufficient evidence that Mr. Phounsy experienced significant pain and suffering from the ambulance until the time of his death to support the jury's award. The jury's award for Mr. Phounsy's pain and suffering is also consistent with awards in other excessive force cases, including cases cited by Defendants in their Rule 59 motion. For example, in _French v. City of Los Angeles, No. EDCV 20-00416 JGB (SPx), 2022 WL 2189649, at *2 (C.D. Cal. May 10, 2022)_, the jury awarded $4 million for the decedent's pre-death pain and suffering and loss of life. In _Archibald v. Cnty. of San Bernardino, No. ED CV 16-01128-AB (SPx), 2018 WL 6017032, at *1 (C.D. Cal. Oct. 2, 2018)_, the jury awarded $7 million for the decedent's loss of enjoyment of life and pre-death pain **[*115]** and suffering. Finally, in _Valenzuela, 2020 WL 10574794, at *1_, the jury awarded $6 million for the decedent's pre-death pain and suffering and an additional $3.6 million for the decedent's loss of life.

Finally, Defendants argue that the jury's award for Mr. Phounsy's pain and suffering amounted to punitive damages to "punish Fischer" and that the "jury based its award on a desire to punish and to send a message on behalf of the community." (Doc. No. 551-1 at 24.) However, the Court specifically instructed the jury that "[p]unitive damages may not be awarded to compensate a plaintiff' for an excessive force claim and "[p]unitive

damages may not be awarded against defendant County of San Diego." (Doc. No. 531 at 50.) "[A] jury is presumed to follow the trial court's instructions." _Deck v. Jenkins, 814 F.3d 954, 979 (9th Cir. 2016)_ (citing _Weeks v. Angelone, 528 U.S. 225, 234 (2000)_). As a result, the Court declines to disturb the jury's award of $3 million in post-ambulance pain and suffering damages.

**2. Non-Economic Wrongful Death Damages**

Defendants also challenge the jury's award of $80 million to Plaintiffs in non-economic wrongful death damages. (Doc. No. 551-1 at 20-25.) Specifically, Defendants argue the award is excessive because it is far outside the mainstream of awards in comparable cases, includes allocation **[*116]** for responsibility of dismissed defendants, and amounts to punitive damages. (Id. at 20-25.) For the reasons that follow, a new trial on wrongful death damages is warranted.

A jury's award of damages "should be upheld unless the amount is clearly not supported by the evidence or only based on speculation or guesswork." _In re First Alliance Mortg. Co., 471 F.3d 977, 1001 (9th Cir. 2006)_ (internal quotation marks omitted). As such, "an otherwise supportable verdict must be affirmed unless it is grossly excessive' or 'monstrous' or 'shocking to the conscience.'" _Brady, 859 F.2d at 1557_ (quoting _Chalmers, 762 F.2d at 760_).

During trial, Plaintiffs made a strategic decision to dismiss their claims for economic wrongful death damages and seek only non-economic damages. (Doc. No. 503.) Non-economic wrongful death damages are "the pecuniary value of the decedent's society and companionship" and do not include compensation for the grief or sorrow of the death of a loved one, sad emotions, or the sentimental value of the loss. _Nelson v. Cnty. of Los Angeles, 113 Cal. App. 4th 783, 793 (2003)_. "Factors relevant when assessing a claim loss of society, comfort, and affection may include the closeness of the family unit, the depth of their love and affection, and the character of the deceased as kind, attentive, and loving." _Mendoza v. City of West Covina, 206 Cal. App. 4th 702, 721 (2012)_. The Court properly instructed the jury on how to **[*117]** calculate wrongful death damages:

> No fixed standard exists for deciding the amount of noneconomic damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense . . . In

determining plaintiffs' loss for this claim, do not consider 1. Plaintiffs' grief, sorrow, or mental anguish; 2. Mr. Phounsy's pain and suffering; or 3. The poverty or wealth of plaintiffs.

(Doc. No. 531 at 47, Jury Instruction No. 43.)

With this direction, the jury was given the task of determining the non-economic value of Plaintiffs' loss of Mr. Phounsy's comfort, society, and protection. After diligently listening to the evidence presented by both sides regarding Plaintiffs' relationship with Mr. Phounsy, the jury awarded Plaintiffs a total of $80 million in wrongful death damages: $20 million for the loss of Mr. Phounsy's love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, and guidance from April 20, 2015 through the present and $60 million for the loss of Mr. Phounsy's love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, and guidance for the future. (Doc. No. 532 **[*118]** at 7.)

The evidence presented at trial established that Mr. Phounsy was thirty-two years old when he died and was survived by his wife, Loan Nguyen, and his two young children, K.J.P. and K.P.P. At the time of Mr. Phounsy's death, Mr. Phounsy's son was two years old and his daughter was a few months old. At trial, Loan Nguyen testified that she started dating Mr. Phounsy when he was a junior and she was a senior in high school. (Tr. V-103.) Loan Nguyen testified that in 2009 she married Mr. Phounsy, in 2013 their son was born, in 2014 their daughter was born, and that they all lived together at the time of Mr. Phounsy's death. (Tr. V-107-08.) Loan Nguyen testified that Mr. Phounsy was "very protective of me and the kids" and shared stories of Mr. Phounsy taking care of their children when they were both in the neonatal intensive care unit. (Tr. V-107-10.) Loan Nguyen testified about her and Mr. Phounsy's future plans together and that she visited Mr. Phounsy's grave every day following his death. (Tr. V-114.) The jury also heard testimony from other family members, including Mr. Phounsy's stepfather Greg Kelley, Mr. Phounsy's cousin Breanna Chanthaphanh, Loan Nguyen's aunt Ngoc "Nicky" **[*119]** Truong, and Loan Nguyen's younger brother Tuan Nguyen, who each discussed Mr. Phounsy's relationship with Loan Nguyen, K.J.P., and K.P.P., and the impact Mr. Phounsy's death had on them. (Tr. V-70, 81, 100.)

There is no doubt that Plaintiffs' loss was great. However, even accounting for the great deference owed to the jury's verdict, the Court is left with the "firm conviction" that the jury's $80 million award, divorced

from any economic damages, was likely "the result of passion or prejudice" and "grossly excessive."[20] *Landes Const. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1372 (9th Cir. 1987)*; *Brady, 859 F.2d at 1557*. Considering the entire record, the size of the jury's wrongful death award is far out of proportion to the evidence and indicates that the jury may have impermissibly included in the award some measure of Plaintiffs' emotional distress, or some amount intended to punish Defendants. See *Nelson, 113 Cal. App. 4th at 793*.

"When the court, after viewing the evidence concerning damages in the light most favorable to the prevailing party, determines that the damages award is excessive, it has two alternatives. It may grant defendant's motion for a new trial or deny the motion conditional upon the prevailing party accepting a remittitur." *Fenner v. Deendable Trucking Co., Inc., 716 F.2d 598, 608 (9th Cir. 1983)*. Generally, "a new trial is not required even where there is **[*120]** an excessive damages award resulting from passion or prejudice, unless there is also evidence that passion and prejudice affected the liability finding." *Watec, 403 F.3d at 655* (internal quotation marks and citation omitted). "Where there is no evidence that passion and prejudice affected the liability finding, remittitur is an appropriate method of reducing an excessive verdict, although the district court still retains the option of vacating the judgment and ordering

---

[20] In coming to this conclusion, the Court reviewed the cases provided by both parties. Defendants provided the Court with a survey of awards in wrongful death cases with police defendants from California district courts from 2017 to the present, (Doc. No. 551-1 at 22), and a survey of awards in wrongful death cases involving claims of excessive force against a police defendant across the Ninth Circuit from April 2012 to the present. (Doc. No. 568 at 11, Compendium A.) The Court questions why the loss of services award in the present case should be compared only to loss of services awards for wrongful death cases with police defendants rather than wrongful death cases against other defendants. The loss of services experienced by the family of a person who died due to excessive force by a police officer may not be different than the loss of services experienced by the family of a person who died due to, for example, a wrongful act of an agent of a corporation. The cases cited by Plaintiffs were similarly not instructive. Three of the cases cited by Plaintiffs did not involve non-economic loss of services awards. (Doc. No. 564 at 17-18.) Further, one of those cases involved a settlement, not a jury verdict. (Id.) The one wrongful death non-economic loss of services case cited by Plaintiffs in their supplemental briefing was a state court case from New Mexico. (Doc. No. 570.)

a new trial." Id. (internal quotation marks and citation omitted). "A remittitur must reflect the maximum amount sustainable by the proof." *Oracle Corp v. SAP AG, 765 F.3d 1081, 1094 (9th Cir. 2014)* (internal quotation marks and citations omitted). Based on the entire record, the Court concludes that passion or prejudice did not affect the jury's liability finding or damages award for Mr. Phounsy's pain and suffering. See *Pumphrey v. K.W. Thompson Tool, Co., 64 F.3d 1128, 1133 (9th Cir. 1995)*; *Warf v. Burlington N. R. Co., 60 F.3d 631, 638 (9th Cir. 1995)*. However, due to the unfixed nature of non-economic wrongful death damages, the Court is unable to determine an appropriate amount for a remittitur. Accordingly, the Court grants Defendants' motion for a new trial on wrongful death damages.[21]

---

[21] In their motion for a new trial, Defendants argue that Plaintiffs' wrongful death claim can only be supported by the jury's finding of negligence, not the jury's finding of either a violation of Mr. Phounsy's Fourth Amendment rights or Bane Act claim. (Doc. No. 551-1 at 10-11.) As a result, Defendants argue that the wrongful death special verdict form invited the jury to award impermissible damages by implying that the wrongful death claim and related damages could be supported by a "violation of one or more of his constitutional or civil rights." (Id. at 10.) Plaintiffs respond that the violation of the Bane Act and negligence each provide an independent basis for the jury's wrongful death damages award. (Doc. No. 564 at 7-8.) Because the Court grants a new trial on wrongful death damages, this issue is moot for the purposes of Defendants' present motions. Nevertheless, this is a significant issue for determining Defendants' liability for wrongful death damages. Non-economic damages for negligence are limited to a defendant's percentage of fault. See *Cal. Civ. Code § 1431.2(a)*; **C.B. v. City of Sonora**, 769 F.3d 1005, 1031 (9th Cir. 2014). But non-economic damages for intentional acts are not similarly reduced. See *B.B. v. Cnty. of Los Angeles, 10 Cal. 5th 1, 29 (2020)*. Therefore, if the jury's finding of negligence is the sole basis for non-economic wrongful death damages in this case, any such damages award must be apportioned according to section 1431.2(a). However, if the jury's finding of an intentional wrongful act can serve as a basis for the non-economic wrongful death damages, then section 1431.2(a) would not apply and Defendants may be liable for the entire wrongful death damages award. Id.; see *Murchison v. Cnty. of Tehama, 69 Cal. App. 5th 867, 898 (2021)* (citing *Edson v. City of Anaheim, 63 Cal. App. 4th 1269, 1274 (1998)*) (noting that the standard for a state law claim of battery by a police officer is the same standard applied to for a *42 U.S.C. § 1983* excessive force claim). Given the limited nature of the parties' briefing on this issue, the Court will set a new briefing schedule.

2022 U.S. Dist. LEXIS 221068, *120

## Conclusion

For the reasons above, the Court denies Defendants' motion for judgment as a matter of law, denies Defendants' **[*121]** motion for a new trial as to liability and damages for Mr. Phounsy's pain and suffering, and grants Defendants' motion for a new trial on wrongful death damages.[22] Accordingly, the Court vacates the judgment dated March 16, 2022. (Doc. No. 533.) The Court also concludes based on the entire record of the case that a renewed qualified immunity appeal would be frivolous under *Chuman v. Wright, 960 F.2d 104, 105 (9th Cir. 1992)*.



Because there is not a final judgment in this case, motions for attorneys' fees and costs pursuant to Local Civil Rule 54.1 and *Federal Rule of Civil Procedure 54* are not yet due. Instead, a new period for filing motions for fees will begin when a final judgment is entered. See *Fed. R. Civ. P. 54* Advisory Committee's Note to the 1993 Amendment ("A new period for filing will automatically begin if a new judgment is entered following. . .the granting of a motion under Rule 59."). As a result, Defendants' motion for reconsideration of the Court's order on attorneys' fees is moot and the Court vacates the related briefing schedule. (Doc. Nos. 571, 573, 578, 580.)

**IT IS SO ORDERED**

DATED: August 16, 2022

/s/ Marilyn L. Huff

MARILYN L. HUFF, District Judge

UNITED STATES DISTRICT COURT



---

[22] The Court will schedule a status conference to schedule pretrial and trial dates on wrongful death damages and to address any remaining issues and briefing schedules. The Court orders the parties to meet and confer regarding available trial dates compatible with their and their witnesses' schedules.

2022 U.S. Dist. LEXIS 221068, *121



